Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---------------------------------------------------------
                                    :  MDL CASE NO. 1724
IN RE:                              :
                                    :
VIAGRA PRODUCTS LIABILITY           :
LITIGATION                          :
                                    :
                                    :
---------------------------------------------------------
This document relates to:           :
                                    :
RICHARD MARTIN,                     :
                                    :
                Plaintiff,          :
                                    :
vs.                                 :
                                    :
PFIZER INC.,                        :
                                    :
                Defendant.          :
                                    :
                                    :
CASE NO. 06-CV-1064 (PAM)           :
                                    :
---------------------------------------------------------


DEPOSITION OF
CAROLE JEANNE MARTIN


Taken Thursday, August 7, 2008
Commencing at 9:39 a.m.

REPORTED BY:  ANDREA J. TUNGLAND, RMR, CRR
PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA  55402-1331
(612) 339-0545

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 2

1  DEPOSITION OF CAROLE JEANNE MARTIN, taken on the 7th day
2  of August, 2008, commencing at 9:39 a.m., at the law firm
   of Oppenheimer Wolff & Donnelly LLP, Plaza VII Office
3  Tower, Suite 3600, 45 South Seventh Street Minneapolis,
   Minnesota, before Andrea J. Tungland, Registered Merit
4  Reporter, Certified Realtime Reporter and Notary Public
   of and for the State of Minnesota.
5          **********
6
7          APPEARANCES
8  On Behalf of the Plaintiff:
9      STACY K. HAUER, ESQ.
       ZIMMERMAN REED, PLLP
10     651 Nicollet Mall
       Suite 501
11     Minneapolis, Minnesota 55402
       (612) 341-0400
12     skh@zimmreed.com
13  On Behalf of the Defendant:
14     LORI B. LESKIN, ESQ.
       AVIGAEL FYMAN, ESQ.
15     KAYE SCHOLER, LLP
       425 Park Avenue
16     New York, New York 10022-3598
       (212) 836-8834
17     lleskin@kayescholer.com
       afyman@kayescholer.com
18
19     DAVID P. GRAHAM, ESQ.
       OPPENHEIMER WOLFF & DONNELLY LLP
20     Plaza VII Office Tower
       Suite 3300
21     45 South Seventh Street
       Minneapolis, Minnesota 55402
22     (612) 607-7000
       dgraham@oppenheimer.com
23
24
25     NOTE: The original transcript will be filed
       with Kaye Scholer LLP, pursuant to the

## Page 3

1          INDEX
2  CAROLE JEANNE MARTIN:          Page:
3  EXAMINATION BY MS. LESKIN .................... 5
4  REPORTER'S CERTIFICATE ..................... 177
5
6
7  OBJECTIONS: Ms. Hauer: 141, 163
8  REQUESTS: Ms. Leskin: 43, 70, 125, 39, 149, 154, 171
9  INSTRUCTIONS NOT TO ANSWER: None.
10
11 CERTIFIED QUESTIONS: None.
12
13
14 C. MARTIN DEPOSITION EXHIBITS:
15 Number: Description:          Marked:
   3  5-1-02 St. Paul Eye Clinic     86
16    health history
      (Bates stamped MARTIN,R NICHOLS 0010-11)
17
   4  6-3-02 Fairview-University Medical Center  105
18    Adult History and Physical
      (Bates stamped MARTIN,R POMERANZ 0005-6)
19
   5  Miscellaneous articles/notes/forms  109
20    in Martin personal file
      (Bates stamped RMAR 00001-43)
21
   6  June/October 2004 Dr. Ferrara   160
22    office notes
      (Bates stamped RMAR 00084)
23
   7  2003 Calendar              175
24
   8  2004 Calendar              175
25

## Page 4

1  C. MARTIN DEPOSITION EXHIBITS (Continued):
   Number: Description:          Marked:
2
   9  2005 Calendar              175
3
   10  2006 Calendar             175
4
   11  2007 Calendar             175
5
6
   MARTIN DEPOSITION EXHIBITS REFERENCED:
7
   Number: Description:          Page:
8
   1  Plaintiff's Fact Sheet (30 pp.)    17
9
   2  Complaint (9 pp.)             15
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1          PROCEEDINGS
2          CAROLE JEANNE MARTIN,
3  duly sworn, was examined and testified as follows:
4          EXAMINATION
5  BY MS. LESKIN:
6      Q.  Good morning, Mrs. Martin.
7      A.  Good morning.
8      Q.  As I introduced myself a few moments ago, my
9  name is Lori Leskin.  Avigael Fyman and I are from the
10 law firm of Kaye Scholer.  David Graham here is from
11 Oppenheimer.  And we represent Pfizer in this matter.
12     A.  All right.
13     Q.  Have you ever been deposed before?
14     A.  Have I ever done this?
15     Q.  Yes.
16     A.  No, ma'am.
17     Q.  Okay.  I'm sure your attorney has gone over some
18 information with you, but I'm just going to go over some
19 of the ground rules of the deposition so that you
20 understand the process a little bit here.
21         You've just been given an oath and your oath is
22 the same as if it was in court, so you're obligated to
23 tell the truth.  And I expect that you will do that
24 during the course of the deposition.
25     A.  Yes.

2  (Pages 2 to 5)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

| Page 6 |
|---|
| 1  Q. Okay. Everything that you say or I say is going |
| 2 to be taken down by a court reporter today so it's very |
| 3 important that all of your answers be verbalized. |
| 4  A. Yes. |
| 5  Q. A "yes" and "no" or a sentence, but a shrug of |
| 6 the shoulders or "uh-huh" isn't going to come down on the |
| 7 transcript very well. So if you do answer that way we |
| 8 will try to remind you. |
| 9  A. Okay. |
| 10  Q. But to the extent that you can remember, that |
| 11 would be great. |
| 12  A. Okay. |
| 13  Q. It's also important that only one of us speak at |
| 14 a time so if you let me finish my question, I'll let you |
| 15 finish your answers. Does that sound fair? |
| 16  A. Yes. |
| 17  Q. It's very easy because you think you know where |
| 18 the questions are going, you want to get an answer out |
| 19 there but it's very important you let me get the whole |
| 20 question out there. |
| 21  A. Okay. |
| 22  Q. If you need a break, please let me know. I'll |
| 23 be happy to take a break. I just ask that you answer a |
| 24 question and not leave one pending during a break. |
| 25  A. All right. |

| Page 7 |
|---|
| 1  Q. If you don't understand one of my questions, |
| 2 please let me know. I'll be happy to repeat it or |
| 3 rephrase it, whatever the case may be. But if you answer |
| 4 my question, I'm going to assume you understood it. Do |
| 5 you understand that? |
| 6  A. Yes. |
| 7  Q. And some of my questions, as you can imagine, |
| 8 will be of a personal and intimate nature given the |
| 9 nature of the litigation. My intention is not to |
| 10 embarrass you or make you feel uncomfortable, but given |
| 11 the nature of the litigation it's my obligation to ask |
| 12 those questions and I hope you understand. |
| 13  A. Okay. |
| 14  Q. How are you feeling today? |
| 15  A. Fine. |
| 16  Q. Do you take any medications on a regular basis? |
| 17  A. Some Prilosec. |
| 18  Q. Anything else? |
| 19  A. I have in the past used some stuff for anxiety. |
| 20  Q. Do you take that currently? |
| 21  A. No, I do not. |
| 22  Q. How often do you take the Prilosec? |
| 23  A. Every morning. |
| 24  Q. Did you take it this morning? |
| 25  A. Yes. |

| Page 8 |
|---|
| 1  Q. Any other medications? |
| 2  A. I take a few vitamins now and then, calcium |
| 3 tablets. |
| 4  Q. Any other supplements -- |
| 5  A. Oh, and I used some Nasonex for a cough that I |
| 6 have. |
| 7  Q. Any other medications? |
| 8  A. Not that I can think of. |
| 9  Q. Any over-the-counter medications that you take |
| 10 regularly? |
| 11  A. No. Once in a while if I get charley horses I |
| 12 take some Tylenol. |
| 13  Q. Okay. Any other supplements or herbal |
| 14 supplements? |
| 15  A. No. |
| 16  Q. Okay. So the only medication you've taken this |
| 17 morning is your Prilosec? |
| 18  A. Yes. |
| 19  Q. Does the Prilosec affect your ability to answer |
| 20 questions? |
| 21  A. No. |
| 22  Q. Does it affect your memory at all? |
| 23  A. No. |
| 24  Q. Now, you're married to Richard Martin, correct? |
| 25  A. Yes. |

| Page 9 |
|---|
| 1  Q. And when were you married? |
| 2  A. We were married on June 19 of 1996. |
| 3  Q. And your husband was deposed here on Tuesday. |
| 4 You're aware of that? |
| 5  A. Yes. I brought him here. |
| 6  Q. Okay. You did not attend that deposition? |
| 7  A. No, I did not. |
| 8  Q. And did you discuss with your husband what |
| 9 happened at the deposition? |
| 10  A. A little. |
| 11  Q. What did he tell you? |
| 12  A. What did he say? Just that some things were |
| 13 very personal. |
| 14  Q. Anything else? |
| 15  A. I'm trying to think. Oh, he did mention that |
| 16 you had asked about his granddaughter and he couldn't |
| 17 remember her name and how embarrassing that was, and he |
| 18 said how could I have forgotten Angie's name. |
| 19  And his daughter was here from Texas, and I |
| 20 wasn't there when they had the conversation because I was |
| 21 gone for the evening with some friends to the theatre, |
| 22 but they had discussed his deceased son Bob, and the fact |
| 23 that Bob's eyes were donated for transplant after his |
| 24 death, And so they chilled those and transplanted those. |
| 25  Q. Anything else about the deposition he told you? |

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

---

Page 10

1      A. No. He said he thought I seemed nervous.
2      Q. Did he tell you about any type of questions I
3  might ask you today?
4      A. Yeah.
5      Q. What type of questions did he tell you he
6  thought I'd ask you?
7      A. What did he say? Well, what he talked about was
8  when he was talking about erections and what those were
9  like, he said that was embarrassing.
10     Q. Anything else you remember about the
11 conversations about his deposition on Tuesday?
12     A. No, not really.
13     Q. Any other information he gave you for your
14 deposition today?
15     A. No.
16     Q. Did you review any documents in preparation for
17 your deposition today?
18     A. Oh, heavens, yes.
19     Q. What did you review?
20     A. Oh, I did that, what, about a week ago. I was
21 just looking through some of the medical records and
22 stuff that we had.
23     Q. Okay. What medical records did you look
24 through?
25     A. I just looked through some of the stuff from the

---

Page 11

1  eye doctor.
2      Q. Which eye doctor?
3      A. I have to stop and think what his name is. And
4  I just made an appointment with him so I should know his
5  name.
6      Q. Dr. Nichols?
7      A. Yes, Dr. Nichols.
8      Q. Any medical records?
9      A. Yeah. I just looked briefly through
10 Dr. Ferrara's records. Dick was watching television. He
11 said why are you bothering. And I said because I don't
12 have a real great memory.
13     Q. Did you review any details of those records with
14 your husband at the time?
15     A. No.
16     Q. Other than Dr. Nichols and Dr. Ferrara did you
17 review any other medical records?
18     A. No.
19     Q. Did you review any other documents?
20     A. Just kind of flipped through the stuff, you
21 know, thinking what was this all about.
22     Q. Any other documents --
23     A. Because he mentioned -- he did mention something
24 about the records and he got some of the stuff incorrect,
25 because he said to me that you were asking whether or not

---

Page 12

1  anyone had ever said that he had ischemic optic
2  neuropathy, and he said he kept answering no. And I said
3  you answered no, and I looked back in the records and it
4  seems to me on your first, you know, your first visit
5  with Dr. Nichols that he had said that you had NAION, so
6  that was the impetus for my going back to look at that
7  time.
8      Q. So that was on Tuesday you went back to look at
9  it?
10     A. Yeah. No. Because I was busy Tuesday.
11     Q. It was yesterday?
12     A. What day was he here?
13         MS. HAUER: He was here Tuesday.
14         THE WITNESS: Okay. Because it was before
15 his daughter came or after. I don't know. Somewhere in
16 there, anyway, that I looked at it.
17     Q. (By Ms. Leskin) But it was sometime between the
18 date of his deposition and this morning?
19     A. Yes.
20     Q. And so you looked at Dr. Nichols' records,
21 Dr. Ferrara's records?
22     A. Just a little of Dr. Ferrara.
23     Q. Okay. Any other medical records?
24     A. No.
25     Q. Did you look at any records from his urologist?

---

Page 13

1      A. No.
2      Q. Did you look at any records from any of the
3  other ophthalmologists that he'd seen?
4      A. Yes, I did.
5      Q. Whose records is that?
6      A. I just read some of the stuff from Dr. Harrison.
7      Q. Did you review records from his neurologist?
8      A. Hum-um.
9      Q. Review records from his cardiologist?
10     A. No.
11     Q. Did you review records from his diabetes doctor?
12     A. No.
13     Q. Any other medical records that you can remember?
14     A. No, nothing I can remember.
15     Q. Did you review any other documents other than
16 medical records?
17     A. No.
18     Q. Read any news articles?
19     A. Before the deposition, yes.
20     Q. Okay. What news articles did you review?
21     A. I ended up looking at a very brief article that
22 was in The Week, and I ended up re-reading a note that I
23 had gotten from my friend Bobbie who sent me the article.
24 And I also read an article that was in the Nashua paper
25 that she sent me. And then there was a paper -- an

---

4 (Pages 10 to 13)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

| Page 14 | Page 16 |
|---|---|
| 1 article. I think it was in the St. Paul Pioneer Press | 1 was filed in court? |
| 2 that was very much like the one that was in the Nashua | 2    A. I don't think so. |
| 3 paper. | 3    Q. Did you personally provide any information in |
| 4    Q. Any other articles you reviewed before today? | 4 order to prepare that Complaint? |
| 5    A. Hum-um. | 5    A. Yes. |
| 6    Q. No? | 6    Q. What information did you provide? |
| 7    A. Not that I can think of. As I said, I'm a | 7    A. Everything that I had, all the information that |
| 8 little nervous. | 8 I had regarding Richard's care. I also ended up giving a |
| 9    Q. Did you review any documents that had been filed | 9 note from my friend, the article from the company. I |
| 10 with the court in preparation for your deposition today? | 10 gave information that my daughter got for me on the |
| 11    A. Oh, yes. | 11 Internet, those newspaper articles. There were questions |
| 12    Q. Okay. What documents did you review from the | 12 that were asked about, you know, his medication. |
| 13 court? | 13        MS. HAUER: To the extent there's privilege |
| 14    A. The one that was filed by our attorney from | 14 here, I just want to make sure. |
| 15 Zimmerman Reed. | 15    Q. (By Ms. Leskin) She's not a plaintiff. I don't |
| 16    Q. The Complaint in this matter? | 16 think there's a privilege. Go ahead. |
| 17    A. Yeah. | 17    A. Doctors' records. |
| 18    Q. Any other documents from the court? | 18    Q. Anything else you can think of that you provided |
| 19    A. I don't recall. | 19 to the attorneys? |
| 20    Q. Did you view your husband's Fact Sheet he filled | 20    A. No. |
| 21 out for the case? | 21    Q. Again -- |
| 22    A. No. I don't know if I even kept a copy of that. | 22    A. Oh, my calendar, my calendars, because she |
| 23    Q. Have you reviewed any -- did you review any | 23 thought, you know, when I brought one, because that's |
| 24 court filings other than the Complaint, such as any | 24 kind of what I rely on, too, to remember things. |
| 25 motions or affidavits that had been filed with the court? | 25    Q. Again if there's anything else you can remember |

| Page 15 | Page 17 |
|---|---|
| 1    A. No. | 1 during the course of your deposition that you provided to |
| 2    Q. Any other documents that you can recall having | 2 the attorneys, just let me know. |
| 3 reviewed in advance of today's deposition? | 3    A. I will. |
| 4    A. No. | 4    Q. Thank you. I'm also going to show you what was |
| 5    Q. If you think of any others during the course of | 5 marked Tuesday as Martin Exhibit 1, which is Richard |
| 6 the day, just let me know. | 6 Martin's Fact Sheet provided in the litigation. Have you |
| 7    A. Okay. I will. | 7 seen that document before? |
| 8    Q. Have you seen a transcript of your husband's | 8    A. Oh, of course. |
| 9 deposition from Tuesday? | 9    Q. And did you help prepare that document? |
| 10    A. No. | 10    A. I had to. |
| 11    Q. You have the exhibits from Tuesday? | 11    Q. Did you type up the answers to those questions? |
| 12        (Discussion held off the record.) | 12    A. I wrote them. |
| 13    Q. (By Ms. Leskin) I'm going to hand you what we | 13    Q. By hand? |
| 14 marked Tuesday as Martin Exhibit 2. I'll ask you if you | 14    A. Yes. |
| 15 recognize that document. | 15    Q. Okay. And you provided that to the attorneys? |
| 16    A. I do because it said Robert Martin. | 16    A. Yes. |
| 17    Q. And is that the Complaint you reviewed in | 17    Q. And when it came time to fill out the |
| 18 advance of today's deposition? | 18 information did you sit with your husband to prepare it |
| 19    A. Yes. | 19 or did you do that on your own? |
| 20    Q. Now, if you look at the front page of that | 20    A. I sat with my husband. |
| 21 document you'll see that it was filed in court in about | 21    Q. And did he tell you what to write or did you |
| 22 March of 2006. Do you see that big stamp on the front | 22 work together to figure out what to put in the |
| 23 page? | 23 information there? |
| 24    A. Yes, I do. | 24    A. Well, he had to provide me the answers and |
| 25    Q. Okay. Did you review this Complaint before it | 25 sometimes I had to look at dates, you know, according to |

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 18

1  the records.
2      Q. And did you ensure -- help ensure that the
3  information in that Fact Sheet was accurate?
4      A. Yes.
5      Q. And the document that's there now as Exhibit 1
6  is a typed document. Did you compare your handwritten
7  version of the document with the typed version when it
8  came back to you?
9      A. I don't remember. I guess I just assumed it was
10 correct.
11     Q. Did you review the typed document with your
12 husband before he signed it? Actually, strike that.
13         Let me ask you this: Did he sign the document
14 that you had handwritten or did he sign the document when
15 it was typed up?
16     A. I don't remember.
17     Q. Okay. And you said you did not retain a copy of
18 the document as it appears in that form?
19     A. I don't think I have a copy of this. I had a
20 copy of something you wanted clarification on.
21     Q. Okay.
22     A. It had to do with Dr. Pomeranz or something. I
23 don't remember which pages they were.
24     Q. We'll come back to that if necessary.
25     A. Okay.

## Page 19

1      Q. Now, you told me that you and Mr. Martin were
2  married on June 19, 1996; is that correct?
3      A. Yes.
4      Q. Were you married before that?
5      A. Yes, I was.
6      Q. How many times before?
7      A. Once.
8      Q. And when were you first married?
9      A. December 31, I think it was, of 1960.
10     Q. And what was your husband's name?
11     A. Gerald with a G, E-R-A-L-D. F as in Frank.
12 Voller, V as in Victor, O-L-L-E-R.
13     Q. And when did that marriage end?
14     A. On April 6 of 1995.
15     Q. And your first husband passed away?
16     A. Yes.
17     Q. And at the time of his death you were married?
18     A. Yes.
19     Q. How many children did you and Mr. Voller have?
20     A. Four.
21     Q. And are they still living?
22     A. Yes.
23     Q. And where do they live?
24     A. I have three sons. One lives in Ramsey, one
25 lives in Sartell, one lives in Glenwood Springs,

## Page 20

1  Colorado. And I have a daughter and she lives in
2  Carbondale, Colorado.
3      Q. I'm sorry. Which town?
4      A. Carbondale.
5      Q. The first two towns you gave me, Ramsey and
6  Sartell, those are both here?
7      A. Yes. They're both in Minnesota.
8      Q. And you and Mr. Martin don't have any children
9  together, correct?
10     A. No.
11     Q. Where did you grow up?
12     A. Sauk Centre, Minnesota.
13     Q. And have you ever lived outside of Minnesota?
14     A. No.
15     Q. All right.
16     A. We winter sometimes in different places since
17 Dick and I have been married.
18     Q. Where have you wintered?
19     A. Florida. Well, we've gone just about every
20 winter except the year in 2002 when he lost his vision.
21 And last winter.
22     Q. And why didn't you travel last winter?
23     A. Because we thought winters had been mild so we
24 thought we would stay home and we were fooled.
25     Q. So other than Florida where else have you spent

## Page 21

1  your winters?
2      A. California. That was just one winter.
3      Q. And do you own property in those locations or do
4  you rent?
5      A. No, we rent.
6      Q. And when you winter, how long are you there for?
7      A. Usually two months for sure. The winter we were
8  in California we were -- I think we were a month in
9  California and then we did some traveling after that
10 before coming home.
11     Q. When were you in California?
12     A. Not the winter of 2007-2008, but the winter of
13 2006-2007.
14     Q. And you said you did some traveling. Where did
15 you get to go to?
16     A. Oh, goodness. We went through the desert and we
17 were in Arizona and Colorado. Just traveling for just a
18 couple of weeks.
19     Q. When you were in California for a month did you
20 have any doctor care while you were in California?
21     A. No.
22     Q. When you were in Florida for two months at a
23 time or so did you have any doctor care while in Florida?
24     A. No, I do not.
25     Q. Did your husband?

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

| Page 22 |
|---|
| 1     A. He had a dental problem.
2     Q. Other than the dentist any other medical care?
3     A. No.
4     Q. And you said you've wintered in Florida or
5  California every year since you were married?
6     A. Yes, except for those two.
7     Q. Except for the two. Tell me about your
8  educational background.
9     A. I went to school in Sauk Centre from elementary
10 through high school, and I was on the National Honor
11 Society and was a good student. Did not go to college
12 because our family was too poor. My father had been ill
13 for six years.
14    Q. I'm sorry?
15    A. My father had been ill for six years and all the
16 family finances were used up and there wasn't the help
17 available as there is now. So when I was 40 I went to
18 Willmar Community College and took about 36 credits, and
19 that was after my kids were grown.
20    Q. When you went to community college what kind of
21 classes did you take?
22    A. I took a lot of psychology classes and I think
23 there was an English class or two. Some had to do with
24 counseling families of alcoholics.
25    Q. Did you receive any degrees? |

| Page 23 |
|---|
| 1     A. No, I did not.
2     Q. Other than those classes at the community
3  college have you taken any other classes or training?
4     A. I went to Hennepin Community College and took
5  some training and I graduated from a program in floral
6  design.
7     Q. When was that?
8     A. I just finished that program right before Dick
9  and I were married.
10    Q. Any other classes or training?
11    A. I did some nursing assistant kind of things that
12 I wanted to do.
13    Q. When was that?
14    A. I have to stop and think. That was when my
15 daughter-in-law had her accident. Let's see. I have
16 to stop and think. My granddaughter is now 16 and she
17 was about two years old when I did that.
18    Q. So about 14 years ago?
19    A. About 14 years ago.
20    Q. Have you taken any other classes or training,
21 courses?
22    A. Not that I remember right now. Nothing that's
23 significant.
24    Q. Have you taken any classes -- you said you did
25 some nursing assistant type of training. |

| Page 24 |
|---|
| 1     A. Um-hum.
2     Q. Yes?
3     A. Yes.
4     Q. What type of courses did you take as a nursing
5  assistant?
6     A. I don't remember. It just seemed kind of
7  important at the time because my -- I was caring for my
8  daughter-in-law -- I had been caring for my
9  daughter-in-law who was seriously injured, and it just
10 seemed to go hand in hand. And it was something to do as
11 she was recovering to keep me from totally hovering over
12 her and gave me an outside activity, something productive
13 to do.
14    Q. But there was some type of medical training?
15    A. Um-hum.
16    Q. Yes?
17    A. Yes.
18    Q. Did you learn about pharmaceutical products?
19    A. No.
20    Q. Did you learn about any particular type of
21 diseases?
22    A. No.
23    Q. Did you learn how to take things like blood
24 pressure?
25    A. Yes. |

| Page 25 |
|---|
| 1     Q. Did you learn the importance of blood pressure?
2     A. Yes.
3     Q. Have you ever taken any other type of medical
4  training?
5     A. No.
6     Q. Have you ever taken any type of legal training?
7     A. No.
8     Q. Any type of pharmaceutical training?
9     A. No.
10    Q. When you graduated from high school you told me
11 that you weren't able to go to college. Did you start to
12 work?
13    A. Um-hum.
14    Q. Yes?
15    A. I did.
16    Q. And where did you work?
17    A. I worked at Campbell Mithun advertising agency
18 in downtown Minneapolis.
19    Q. And what did you do for them?
20    A. I worked in their personnel department as a
21 secretary.
22    Q. And how long were you there?
23    A. About two years.
24    Q. Then what did you do?
25    A. My father died and I had made a -- my father had |

7 (Pages 22 to 25)

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

## Page 26

1  made a death-bed request that I come home and take care
2  of my mother. So I took a civil service test and went
3  back to a small town that had the only good employment,
4  and I worked at a correctional facility for delinquent
5  girls.
6      Q. For what?
7      A. For delinquent girls.
8      Q. And how long did you work there?
9      A. Until I was pregnant with my first son.
10     Q. Which was how long?
11     A. Probably about two years. This is ancient
12  history.
13     Q. And after you gave birth to your son did you
14  continue to work?
15     A. I did not.
16     Q. At some point in time did you go back to work?
17  I should say work outside the home?
18     A. Probably about -- I would say maybe around 1980
19  I was a church secretary.
20     Q. And where was that?
21     A. At St. Paul's Church in Sauk Centre.
22     Q. And how long were you at the church for a
23  secretary?
24     A. Maybe two years again. I haven't thought about
25  that, a two-year wonder.

## Page 27

1      Q. And then what was your next job after that?
2      A. I did some personal care for the elderly. And I
3  don't know if you'd call it employment, but I did hospice
4  volunteering.
5      Q. You said you did some personal care for the
6  elderly.
7      A. Um-hum.
8      Q. When was that?
9      A. I don't remember the years.
10     Q. Was it before or after you had done your nurse's
11  assistant training?
12     A. I believe it was after.
13     Q. And the hospice volunteer work that you did?
14     A. That was after I did the personal care kind of
15  stuff.
16     Q. You told me earlier you had gotten a certificate
17  in floral design?
18     A. Yes.
19     Q. Have you ever worked as a floral designer?
20     A. No. Dick said why do you want to work, I want
21  to travel. You don't need to work, Carole.
22     Q. So you said you finished that program right
23  before you were married?
24     A. Yes, in June.
25     Q. And then you got married?

## Page 28

1      A. Yes.
2      Q. And you never worked?
3      A. No, because he wanted to travel.
4      Q. Where did you travel?
5      A. Pardon?
6      Q. Where did you and your husband travel?
7      A. Let me see. We've been out to -- we've been out
8  as far as you can go on the East Coast, and up into Nova
9  Scotia, and a lot of it is car travel and driving. New
10  York, Boston, Maine and Vermont. As far south as Key
11  West, and as far west as California and Oregon, and up
12  into Canada.
13     Q. Have you traveled outside of the North America
14  area?
15     A. Not since I've been married, no.
16        (Discussion held off the record.)
17        (Mr. Graham exited the conference room.)
18     Q. (By Ms. Leskin) And do you continue to travel
19  with your husband?
20     A. Not as much as he would like.
21     Q. When's the last time you took a trip together?
22     A. It was a trip that we went with Don and Bobbie
23  Skillins, and we put on thousands of miles together.
24     Q. And when was that?
25     A. Was it a year ago? I think it was last spring.

## Page 29

1      Q. And where did you travel together? Where did
2  you go?
3      A. We went up to -- oh, goodness, Nevada,
4  California, all up along the coast.
5      Q. Sounds like a great trip. How long were you
6  gone?
7      A. It was wonderful. Oh, we were gone -- I think
8  it was about a month, um-hum.
9      Q. How often would you say you'd go on trips right
10  now on vacation?
11     A. Other than our trip to California, not very much
12  because I don't like doing all the driving alone.
13     Q. Have you traveled with other friends or family,
14  other than this one trip you just told me about with the
15  Skillins?
16     A. We would travel together just the two of us.
17  And our trip to California we had flown out and I had
18  rented a car, and when we got to where our friends were,
19  Marv and Liz, they said you don't need a car, we have
20  one. We'll be together all the time anyway. So I took
21  the car back and we traveled with them. We were with
22  them.
23     Q. When you go to Florida how do you get there?
24     A. We drive. I drive, I should say. Since Dick
25  lost his sight I have to do all the driving.

8 (Pages 26 to 29)

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 30

1    Q. Is there a reason you don't fly?
2    A. Well, when you get on the other end you still
3  need a vehicle if you're going to be gone for a month or
4  two or three.
5    Q. Okay. How is your health?
6    A. Good.
7    Q. Do you have any medical conditions? You told me
8  you take the Prilosec, but do you have any other medical
9  conditions?
10    A. Sometimes my feet trouble me.
11    Q. In what way?
12    A. Plantar fascitis and falling arches.
13    Q. Any other significant health problems?
14    A. No.
15    Q. Have you had any surgeries?
16    A. Yes.
17    Q. What surgeries have you had?
18    A. Two rectocele repairs, a cystocele repair, a
19  hernia repair, hysterectomy. That's all I recall.
20    Q. When were those surgeries?
21    A. One rectocele repair was done -- and I think
22  they did the bladder at St. Joseph's Hospital here in
23  St. Paul.
24    Q. When was that?
25    A. After my marriage to Dick. And one rectocele

Page 31

1  repair was done before my marriage to him. The hernia
2  repair was done when I was about -- I don't know, 16,
3  something like that. And the hysterectomy when I was
4  about -- I'm guessing now, but I would say my mid 30s.
5    Q. You told me earlier that sometimes you take some
6  anxiety medications?
7    A. Um-hum.
8    Q. Yes?
9    A. Yes.
10    Q. How long have you been taking anxiety
11  medications?
12    A. Oh, gosh. That happened right after I got my
13  computer. And then I was afraid to go off it because I
14  had gotten so anxious and I was so angry with myself and
15  so angry with the machine, and I didn't know if I wanted
16  to throw it out the window or what. And I had gotten it
17  at Dick's behest because he said I shouldn't stay behind
18  and I needed to get current trends, and I was frustrated
19  because I didn't know how to do it. And, you know, and I
20  felt inadequate and it was just one more pressure.
21    Q. When was that?
22    A. Maybe two and a half years ago maybe, something
23  like that.
24    Q. Have you gotten more comfortable with the
25  computer since then?

Page 32

1    A. Oh, I still have a friend who rescues me.
2      MS. HAUER: Thank goodness for good
3  friends.
4    Q. (By Ms. Leskin) And how often do you find
5  yourself taking the anti-anxiety medications?
6    A. Oh, I don't take it anymore. After I found my
7  friend to help me I thought to heck with that.
8    Q. And I want to talk about you and Mr. Martin's
9  routine a little bit before he had had his vision
10  problems.
11    A. All right.
12    Q. What was your daily routine like?
13    A. Before?
14    Q. Um-hum, yes.
15    A. We'd get up in the morning, and you shower and
16  brush your teeth and comb your hair, have breakfast
17  together, have a home to maintain. We did -- you mean
18  after our marriage?
19    Q. Yes.
20    A. Right after? His house hadn't been decorated
21  for years because of his wife's illness, and they had
22  traveled because he thought that was more important than
23  how the house looked, so we did a lot of stuff to the
24  house. What he considered a lot of stuff. Most of it
25  was cosmetic.

Page 33

1      And we did a lot of getting rid of stuff because
2  we had to combine two households, many years of
3  possessions, and disposing of a lot of things that were
4  superfluous, and a lot of painting.
5      We retiled a bathroom and tore down some ugly
6  stuff over the countertops and retiled that. We painted,
7  and he replaced a few windows, and -- what else did we
8  do? We had a big yard. We have -- we looked for homes,
9  something different to move into.
10    Q. And did you move?
11    A. No, we did not. We could not find anything that
12  I wanted to pay the money for or that he wanted to pay
13  the money for that we could find that had some of the
14  things that I truly wanted in a home, like a foyer and a
15  bathroom and a laundry room and a master bedroom on the
16  main floor, for what we wanted to pay for it. Everything
17  was multi-leveled and I said I don't want that.
18      And we maintained -- we have an acre. Our home
19  sits on about an acre of land so there's a lot of yard
20  maintenance, and there were multiple flower gardens that
21  were large to take care of.
22      Dick also has a cabin in Sauk Centre on the lake
23  that he built, and that too had -- was in need of much
24  work, And so we did that together.
25    Q. Go ahead. Finish up.

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 34

1    A. What else did we do? Well, then we traveled.
2  We traveled in the wintertime. Go to church. I don't
3  know. Pretty ordinary life.
4    Q. Now, Mr. Martin retired -- had been retired from
5  Northwest Airlines by the time you married, correct?
6    A. Yes.
7    Q. Did he work at all during the time you married?
8    A. Sporadically.
9    Q. When you say sporadically, how often?
10   A. Oh, goodness. I had him so busy doing things
11 that he didn't go in too often. He worked for a guy by
12 the name of Bob Whiplinger. He has two sons that still
13 work for the same man.
14   Q. Mr. Martin has two sons that work for him as
15 well?
16   A. Yes.
17   Q. And so how often would he go to work for
18 Mr. Whiplinger?
19   A. I don't remember. It was just here or there.
20 Sometimes it was one day, sometimes it was, you know,
21 maybe he would go in, a week he wouldn't go in, sometimes
22 he'd maybe go in two days a week or sometimes it was for
23 half a day, sometimes it was for a few hours. I was
24 busy. I didn't pay that much attention.
25   Q. When did he stop doing that type of work?

## Page 35

1    A. Oh, obviously when he couldn't see anymore. It
2  seemed like -- you know, if we went away for the winter
3  it didn't matter to Bob. He was just grateful for Dick's
4  help when he could get it. And when he couldn't see
5  anymore, why, it seems to me -- at least that's the way I
6  recall it.
7    Q. But up until the time he lost his vision he was
8  working at least sporadically?
9    A. Um-hum.
10   Q. Yes?
11   A. Yes.
12   Q. And by that you mean sometimes one day a week,
13 sometimes more, sometimes he would go a week or two
14 without going in?
15   A. Yes. That's my recollection.
16   Q. Since he lost his sight has he done any type of
17 work of any kind?
18   A. You mean for employment?
19   Q. Yes.
20   A. No.
21   Q. Does he still do things around the house with
22 you?
23   A. Yes.
24   Q. What type of things?
25   A. He'll help -- he tried to get out of doing the

## Page 36

1  dishes since he lost his eyesight because we don't have a
2  dishwasher, and he said I can't do that anymore, and I
3  said in your dreams, honey. I said you can still wash.
4  Either that or we can switch. I said if you don't get
5  them clean when I dry, you'll get them back.
6        So he helps with the dishes and he helps with
7  some of the yard work. He putters in his garage. He
8  does some mowing. That's funny. My friends kind of can
9  always tell when he mows the lawn.
10   Q. What's that?
11   A. My friends can always tell when Dick mows the
12 lawn.
13   Q. Why is that?
14   A. Why? Sometimes he has to mow it twice, you
15 know, and he still misses spots. So I usually have to go
16 over what he's done or where he's missed. But he still
17 tries. He's good about that.
18   Q. Have you ever had the occasion before -- strike
19 that. Did you ever have the occasion to discuss
20 Mr. Martin's medical condition with him from before the
21 two of you were married?
22   A. No.
23   Q. Have you ever had the occasion to view his
24 medical records from before the time you were married?
25   A. No.

## Page 37

1    Q. So is it fair to say you don't have a knowledge
2  of his medical condition from before the two of you were
3  married?
4    A. No. I mean, that I don't now?
5    Q. Yes.
6    A. Well, it just seems to me that when I found out
7  he was taking blood pressure medication, you know, he
8  said he had taken some blood pressure medication because
9  of making sure that his flight physicals were okay.
10   Q. When did you learn he was taking blood pressure
11 medication?
12   A. After we were married.
13   Q. And how long did he -- had he -- how long did he
14 tell you he had been taking the blood pressure
15 medication?
16   A. He didn't. I didn't ask.
17   Q. Okay. So sitting here today do you know when he
18 started taking blood pressure medication?
19   A. No, I do not.
20   Q. Do you know what his blood pressure levels were
21 at the time he started taking blood pressure medication?
22   A. No, I do not.
23   Q. So other than the fact that he had been taking
24 blood pressure medication, sitting here today do you have
25 any knowledge of his medical history before the time you

10 (Pages 34 to 37)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 38

1  were married?
2      A. No, I do not.
3      Q. Okay. After the two of you were married did you
4  go with him to his medical doctor visits?
5      A. Occasionally.
6      Q. Okay.
7      A. I want to clarify that. When you say did I go
8  with him --
9      Q. Okay.
10      A. -- prior to the thing with the eyes?
11      Q. Yes.
12      A. Sometimes I did, sometimes I didn't.
13      Q. Okay. So let's talk about the time period now
14  between the time that you were married and before he had
15  a problem with his vision.
16      A. Okay.
17      Q. And then we'll deal with that next time period.
18      A. Okay.
19      Q. When would you go to the doctor with him between
20  when you were married and his loss of vision?
21      A. Well, we were pretty much joined at the hip. We
22  went everywhere together. I didn't always go with him to
23  his appointments because I didn't have to drive him. He
24  wanted me to meet his doctor. It was the same one that
25  cared for his lay wife. And it's close to home so I

Page 39

1  didn't often do that.
2      Q. Now, you said you went everywhere together but
3  you didn't often go to the doctor with him. Did I
4  understand that right?
5      A. Yeah, yeah.
6      Q. When you would go to the doctor to meet his
7  doctors would you go into the examining room with him or
8  would you just meet the doctor and wait in the waiting
9  room?
10      A. I remember going in to meet Tony; otherwise, I
11  would sit in the waiting room.
12      Q. "Tony" being?
13      A. Ferrara.
14      Q. I thought that's who you meant. I just wanted
15  to make sure.
16      A. Okay.
17      Q. So between the time you were married and the
18  time that Mr. Martin began having problems with his eyes,
19  I just want to make sure I understand right: You would
20  meet his doctors but wouldn't necessarily go into the
21  appointments with him?
22      A. When you say doctors, he had a doctor.
23      Q. Dr. Ferrara?
24      A. Dr. Ferrara, yes.
25      Q. So you had met Dr. Ferrara but you didn't go

Page 40

1  into the appointments with him?
2      A. When I went with him, I didn't -- you know,
3  between the time that -- this is getting convoluted
4  because I didn't -- I didn't always go with him to the
5  doctor. The clinic is probably a half a mile from our
6  house so I didn't always go with him, but when we first
7  were married I would wait in the lobby. I mean, he's
8  entitled to his privacy.
9      Q. Okay. Do you recall going into any doctor's
10  visit with Mr. Martin prior to the time of his vision
11  loss?
12      A. Just going in to meet Dr. Ferrara, you know.
13      Q. But not to participate at all in the --
14      A. No.
15      Q. -- consultation or discussion?
16      A. No.
17      Q. Between that period of time, between the time
18  you were married and before he lost his vision, would you
19  talk to Mr. Martin about his meetings and his
20  appointments with his doctors?
21      A. Well, he would say what he was going in for. I
22  remember specifically on an occasion Dr. Ferrara
23  commenting about Dick's good health, and saying how
24  healthy he was.
25      Q. And that's -- I'm sorry.

Page 41

1      A. Beyond that, I don't know.
2      Q. That's something that Mr. Martin reported to you
3  or something that Dr. Ferrara reported to you?
4      A. No. I heard Dr. Ferrara say that, that Dick was
5  a very healthy man.
6      Q. When was that?
7      A. Oh, goodness. I couldn't say exactly. I really
8  couldn't.
9      Q. But that was before his vision loss?
10      A. Yes.
11      Q. Who was responsible for making doctor's
12  appointments for Mr. Martin prior to his loss of vision?
13      A. He did.
14      Q. And who was responsible for keeping track of
15  those appointments?
16      A. He did.
17      Q. You --
18      A. Prior to his vision loss?
19      Q. Yes.
20      A. He took care of his own things.
21      Q. Did you keep track of his medications?
22      A. No.
23      Q. Did you keep any type of journal or notes about
24  his health prior to his vision loss?
25      A. No.

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 42

1    Q. Did you keep any files in the house with
2 documentation regarding his health or his medical
3 appointments and conditions?
4    A. I kept insurance papers.
5    Q. Okay. Besides the insurance papers?
6    A. Gosh. When he had his back surgery I kept some
7 of that stuff.
8    Q. What type of stuff did you keep?
9    A. Just when he had the surgery. I'm just trying
10 to think of what's in that file right now as we're
11 talking.
12    Q. So you have in your house a file with medical
13 information regarding your husband; is that right?
14    A. It's not very big, but just a few things, yeah.
15    Q. And what kind of things do you keep in that
16 file?
17    A. Something about his back surgery is in there,
18 and I think there's something about when he went to have
19 a colonoscopy and my own colonoscopy because we both had
20 polyps. I usually keep a file, has whatever the
21 insurance has paid, like for prescriptions or whatever
22 the insurance company had paid. Another file on when
23 HealthPartners had paid for certain bills, or bills that
24 were not, you know, I had a file that I kept for -- if
25 the insurance companies didn't pay a bill so I could stay

Page 43

1 on top of it.
2    Q. Did you -- do you keep any files regarding
3 prescriptions that your husband has taken?
4    A. Now I do.
5    Q. When did you start doing that?
6    A. For both of us. I don't know.
7    Q. Were you keeping that file before he lost his
8 vision?
9    A. I don't remember.
10    MS. LESKIN: We'd ask for a review of any
11 of those files and any medical records pertaining to
12 Mr. Martin.
13    MS. HAUER: And I will ask that it all goes
14 in the same letter.
15    MS. LESKIN: We will follow that up. Just
16 want to put it on the record.
17    MS. HAUER: Okay.
18    Q. (By Ms. Leskin) Now, we talked a little bit
19 about your husband's hypertension, and you told me you
20 knew he was taking blood pressure medications?
21    A. Um-hum.
22    Q. Yes?
23    A. Yes.
24    Q. What medications do you recall Mr. Martin taking
25 as of the time you were married for his blood pressure?

Page 44

1    A. Now I'm aware that it was Tenex.
2    Q. How did you learn that it was Tenex?
3    A. I've heard it so often, seen it so often
4 probably, Dick's talked about it so often, taking Tenex
5 and what he was on.
6    Q. In what context has he talked about taking
7 Tenex?
8    A. I don't know.
9    Q. When you say now you're aware he was taking
10 Tenex, is that because you recall having conversations
11 about his blood pressure since he lost his vision, or do
12 you mean now over the years?
13    A. I've become more aware of medications, period.
14    Q. Are you aware of any other medications that he
15 was taking for his blood pressure?
16    A. Catapres.
17    Q. And when did he start the Catapres?
18    A. I don't know.
19    Q. How are you aware of Catapres?
20    A. The same, as I mentioned before.
21    Q. Any other medications for his blood pressure
22 that you were aware of?
23    A. No, not that I can recall.
24    Q. Do you recall at some point he was taking
25 Zestril for his blood pressure?

Page 45

1    A. No, I don't remember that.
2    Q. If he would go to his doctor and his doctor
3 would recommend a change in his medication, would he
4 discuss that with you?
5    A. No, not necessarily.
6    MS. HAUER: And just so the record is
7 clear, are you still talking about between the marriage
8 and when he lost -- didn't have vision problems or are we
9 talking generally?
10    Q. (By Ms. Leskin) Generally between the time of
11 the marriage and before he lost his vision, problems.
12    A. No, we didn't talk about that.
13    Q. And who was responsible for filling his
14 prescriptions?
15    A. He was.
16    Q. And he would go to the pharmacy and pick them up
17 himself?
18    A. Yes.
19    Q. Did you ever pick up his medication for him at
20 the pharmacy?
21    A. Probably.
22    Q. Did you ever have any conversation with the
23 pharmacist about the medications that you were picking up
24 for your husband?
25    A. No.

12 (Pages 42 to 45)

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 46

1    Q. Are you aware of Mr. Martin taking Zestoretic?
2  I'm sorry. Zestoretic, Z-E-S-T-O-R-E-T-I-C --
3    A. Yes, I've heard that.
4    Q. You have heard that?
5    A. I've heard that name.
6    Q. When did you hear that name?
7    A. Oh, I don't know.
8    Q. Are you aware of Mr. Martin taking Diovan for
9  his blood pressure?
10   A. No. I don't remember that.
11   Q. And you said you were aware of the Catapres?
12   A. Yes.
13   Q. And you're aware that's a patch, right?
14   A. Yes.
15   Q. And do you recall him actually wearing the
16 patch?
17   A. Oh yes.
18   Q. You say "oh yes." Why does that stand out in
19 your mind?
20   A. I don't know. It's unusual. I mean, I can
21 remember one time I wore a patch for hormones and it just
22 seemed that, you know, okay, well, here was a guy wearing
23 a patch too.
24   Q. And where would he wear his patch?
25   A. I don't remember that either.

Page 47

1    Q. Do you recall whether he had any side effects
2  from the Catapres?
3    A. No.
4    Q. Do you recall whether it made him dizzy?
5    A. No.
6    Q. No, you don't recall?
7    A. I don't recall.
8    Q. If I told you that your husband's records
9  indicate he got Catapres for the first time on April 24,
10 2002, does that sound about right in your mind or do you
11 not have a recollection one way or the other?
12   A. I don't recall.
13   Q. Okay. Are you aware of -- you told me earlier
14 during your nurse assistant training you did learn about
15 blood pressure.
16   A. Just a little. I'd forgotten. I don't know how
17 to do it anymore.
18   Q. Okay. But you're aware there are health risks
19 associated with high blood pressure?
20   A. Yes.
21   Q. Did you and your husband ever talk about the
22 risks associated with high blood pressure?
23   A. No.
24   Q. Were you ever concerned that he had high blood
25 pressure?

Page 48

1    A. No.
2    Q. What risks are you aware of that are associated
3  with high blood pressure?
4    A. Heart attack.
5    Q. Anything else?
6    A. I don't know. Probably stroke.
7    Q. Anything else?
8    A. No.
9    Q. Were you aware one of the risks of high blood
10 pressure is ischemic optic neuropathy?
11   A. No.
12   Q. Did anyone ever tell you that?
13   A. No.
14   Q. Were you aware that your husband had high blood
15 sugars?
16   A. Now we're talking about after the eye thing?
17   Q. No.
18   A. No, he did not have high blood sugars.
19   Q. You think he did not or you are not aware?
20   A. I was not aware he had any high blood
21 pressure -- high blood sugars.
22   Q. Never told you that his doctors had a concern on
23 glucose intolerance?
24   A. No.
25   Q. And he didn't take any medication for diabetes

Page 49

1  or elevated blood sugars?
2    A. No, not that I'm aware of.
3    Q. Are you aware of any recommendation he change
4  his diet or exercise more prior to the time he lost his
5  vision?
6    A. No, I do not.
7    Q. He never talked about that with you?
8    A. No, he did not.
9    Q. Did the two of you ever try to change your diet,
10 to eat more healthy before he lost his vision?
11   A. Well, sure, we were packing on the pounds
12 because we were eating good.
13   Q. Did you have a conversation about switching to a
14 healthier diet?
15   A. Yes.
16   Q. Okay. What type of diet would you try?
17   A. Probably not necessarily so much healthier but
18 not so much.
19   Q. Okay. Was that successful?
20   A. Pardon?
21   Q. Was that successful? Were you able to switch to
22 a healthier diet?
23   A. Well, no. I wouldn't call it healthier because
24 we eat very healthy. Just not eating as much of the good
25 food that we ingested.

13 (Pages 46 to 49)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 50

1     Q. Okay. Did you ever have any conversation about
2  switching to a low salt diet?
3     A. Once in a while I'd say to him should you be
4  using that much salt when he would reach for the shaker.
5  That's all.
6     Q. Did he listen?
7     A. You've got to be kidding. Men don't listen.
8  And besides, he's my husband, not my son.
9     Q. Are you aware that your husband had had a TIA in
10 1993?
11    A. No. We've talked about that, and he said he
12 never had a TIA.
13    Q. When did you talk about that?
14    A. Since this thing came up.
15    Q. The deposition or since the litigation started?
16    A. Since the litigation started.
17    Q. Okay. There wasn't -- was it within the last
18 two days you've had that conversation?
19    A. I think -- I think he said something about that,
20 that that was on the record and that was mentioned, and
21 it made him angry.
22    Q. Why did that make him angry?
23    A. Because he said he didn't think that was true.
24    Q. Have you ever looked at his medical records to
25 see if a doctor diagnosed him with a TIA?

Page 51

1     A. I never looked for anything like that.
2     Q. Do you know what a TIA is?
3     A. You mean can I say what it is? No.
4     Q. Okay.
5     A. Is it like a stroke or something?
6     Q. Are you aware that it stands for transient
7  ischemic attack?
8     A. No, I was not.
9     Q. Were you aware that he started taking aspirin in
10 1993 following his TIA?
11    A. No.
12    Q. Are you aware he takes aspirin every day?
13    A. Oh, yeah.
14    Q. Are you aware that they found some
15 atherosclerosis in his right carotid artery following
16 that TIA?
17    A. Where did they find it?
18    Q. In his right carotid artery.
19    A. No, I was not aware.
20    Q. Are you aware that they have told your husband
21 he has occasional premature atrial contractions?
22    A. No.
23       MS. HAUER: You're switching topics? Can
24 we take five minutes?
25       MS. LESKIN: Yes, we can take five minutes.

Page 52

1        (Recess taken between 10:40 a.m. and 10:45 a.m.)
2     Q. (By Ms. Leskin) Now, when you and Mr. Martin
3  were first married, were you able to engage in sexual
4  activity?
5     A. Um-hum.
6     Q. Yes?
7     A. Yes.
8     Q. Did there come a point in time where you noticed
9  there was difficulty engaging in sexual activity?
10    A. Yes.
11    Q. When was that?
12    A. I don't recall specifically, but I know he had
13 problems.
14    Q. Was it before or after you were married that you
15 first noticed that he was having problems?
16    A. After.
17    Q. Okay. You told me that you were married on June
18 19, 1996, correct?
19    A. Yes.
20    Q. Now, you've had the opportunity to look through
21 Dr. Ferrara's records, right?
22    A. Yes.
23    Q. And you're aware that Dr. Ferrara's records
24 indicate that Mr. Martin had a conversation with him
25 about problems with impotence on May 20, 1996?

Page 53

1     A. About impotence?
2     Q. Yes.
3     A. No, I didn't.
4     Q. You didn't notice that in Dr. Ferrara's records?
5     A. No.
6     Q. When you first started -- when you first noticed
7  difficulties in sexual activity, tell me what you noticed
8  the difficulty was.
9     A. Well, I noticed that he had difficulty with
10 keeping an erection.
11    Q. And how soon after your -- well, let me ask you,
12 was there a time that he was okay in keeping an erection,
13 that he was not having difficulty?
14    A. On our honeymoon.
15    Q. So he was okay on your honeymoon?
16    A. As I recall it.
17    Q. Okay. And when you returned home following your
18 honeymoon is that when you first started to notice some
19 difficulty?
20    A. I couldn't say specifically.
21    Q. Okay.
22    A. I just attribute it to the fact that he was
23 seven years older than I am, and I thought he was just
24 anxious.
25    Q. Okay. And you said he was having trouble

14 (Pages 50 to 53)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 54

1  maintaining an erection. Was he able to get an erection?
2  A. Yes.
3  Q. And when he was having trouble maintaining it
4  was he able to maintain it sufficient for penetration?
5  A. Say that again.
6  Q. Was he able to maintain his erection sufficient
7  for penetration?
8  A. Yes, sometimes.
9  Q. Was he able to maintain his erection through
10  ejaculation?
11  A. Sometimes.
12  Q. What percentage of the time would you say he was
13  able to maintain his erection for penetration?
14  A. I feel like a Catholic girl going through
15  confession. Oh, gosh. Oh, this is embarrassing. Ask me
16  that question again.
17  Q. What percentage of the time was he able to
18  maintain his erection through penetration?
19  A. I'd have to cartoon if I were to give you an
20  answer to that. I'd have to really think about that, and
21  then I don't know if I could say for sure.
22  Q. Just thinking about it, would you say it's
23  approximately half the time that he was able to maintain
24  an erection for penetration, was it more than half, less
25  than half? I'm looking for just approximations, the

## Page 55

1  extent of the difficulty.
2  A. An approximation only is what I'm giving you.
3  Q. Okay.
4  A. I'd say maybe half the time.
5  Q. Okay. And of the time that he was able to
6  penetrate, about what portion of the time was he able to
7  maintain the erection through ejaculation?
8  A. This is really hard.
9  Q. I understand.
10  A. I don't remember. I don't remember. And this
11  makes me really embarrassed. I wish he had talked to me
12  about this.
13  MS. HAUER: Well, she's -- just the best
14  you remember.
15  THE WITNESS: You want to know how many
16  times, the percentage of times he was able to maintain an
17  erection through ejaculation, is that what you're saying?
18  Q. (By Ms. Leskin) Yes, yes.
19  A. I would guess maybe half the time.
20  Q. Did you notice whether the problem got worse?
21  A. Oh, you know -- I don't know.
22  Q. I'm sorry? No. Go ahead.
23  A. I just -- my memory just isn't that good.
24  Q. That's fine. I'm asking for your best
25  recollection. I'm not asking for precision. I'm just

## Page 56

1  asking for your best recollection.
2  A. All right.
3  Q. Were you satisfied with your sexual relationship
4  at that point in time?
5  A. No.
6  Q. Did you find that his problem was getting worse
7  over time?
8  A. I just remember telling him a lot it was okay.
9  Q. Was it frustrating for the two of you?
10  A. Um-hum.
11  Q. Yes?
12  A. Yes.
13  Q. Did it have an impact on your relationship?
14  A. No.
15  Q. Did you ever talk about the difficulties he was
16  having?
17  A. Yes.
18  Q. And what did you talk about?
19  A. I thought he was shy and I thought he was
20  nervous. And I would tell him it was important for him
21  to relax or nothing would happen. And I would tell him
22  that I loved him, even though he was not able to perform
23  the way he wanted to. And after a while, and don't ask
24  me what length of time, we talked about maybe getting
25  some help for him.

## Page 57

1  Q. From where?
2  A. Well, the -- as I recall, I think it was -- the
3  most logical thing would be to see a urologist.
4  Q. Did you recommend he see a urologist?
5  A. I don't remember who or which of us said that.
6  Q. Did you do any research into --
7  A. Pardon?
8  Q. Did you do any research into the causes of his
9  impotence?
10  A. I did not.
11  Q. Do you know if he did any research into
12  impotence?
13  A. I would not know.
14  Q. Were you able to talk to anyone about the sexual
15  problems that the two of you were having?
16  A. No.
17  Q. How did his difficulty in performing, as you put
18  it, affect him, affect Mr. Martin?
19  A. I would have guessed that it would have been a
20  typical male kind of thing, you know.
21  Q. What do you mean by that?
22  A. Well, just if you read articles in women's
23  magazines about men who were impotent or had sexual
24  problems. He seemed saddened.
25  Q. Anything else that you recall him saying?

15 (Pages 54 to 57)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 58

1    A. Just that he loved me.
2    Q. It was difficult for the two of you?
3    A. It's harder to talk about than it was to talk to
4  him about it, you know, with someone else.
5    Q. Do you recall talking to him about whether his
6  hypertension medications were having an impact on his
7  impotence?
8    A. Yes, I do remember him talking about that.
9    Q. And what do you recall about that conversation?
10    A. Just that, you know, that it would probably --
11  there would probably be a corollary between, you know,
12  the blood pressure medication keeping it lower and it
13  perhaps affecting his ability to get an erection and
14  maintain it.
15    Q. Do you recall him stopping his blood pressure
16  medication for a couple weeks to see if that helped the
17  problem?
18    A. I don't recall that.
19    Q. At some point in time Mr. Martin did talk to his
20  doctors. You're aware of that, correct?
21    A. Yeah.
22    Q. Did you go with him to the doctor?
23    A. I don't remember, you know, any of those visits.
24  I know that on occasion I went with him, but I couldn't
25  tell you how often or with whom. I really could not.

Page 59

1    Q. Who's the first doctor that you recall your
2  husband talking to about his impotence problems?
3    A. Who was?
4    Q. Which doctor?
5    A. I don't remember.
6    Q. Do you recall him talking to Dr. Ferrara about
7  his impotence problems?
8    A. Not specifically. No, I don't.
9    Q. Do you recall him talking to Dr. Mcellistrem
10  about his impotence problem?
11    A. I remember that he was going to talk to both of
12  those doctors about it, but I don't remember him
13  specifically talking to them or listening to the
14  conversation myself.
15    Q. Did Mr. Martin ever talk to you about what his
16  doctors had told him about some of the potential causes
17  of his erectile dysfunction?
18    A. Just that we talked about the blood pressure
19  medication, you know. I don't know if that was what the
20  doctors had said.
21    Q. Anything else that you recall?
22    A. Not that I recall. Not right now, anyway.
23    Q. Okay.
24    A. Maybe when I go home I might recall something.
25    Q. Do you recall his doctor telling -- or did

Page 60

1  Mr. Martin ever tell you that his doctor told him his
2  impotence was due to vascular in-flow deficiency?
3    A. No, but I would -- but I would have known that
4  was the cause.
5    Q. That there was a decrease in the blood flow to
6  the penis?
7    A. Yes.
8    Q. Did he ever talk to you about the potential
9  causes of what that decrease in flow was?
10    A. No.
11    Q. And you don't -- if I understood your testimony
12  correctly, you don't have a recollection of how long it
13  was between the first time Mr. Martin started having
14  problems until the first time he spoke to a doctor?
15    A. No, I do not.
16    Q. What's the first treatment you recall your
17  husband using to treat his impotence?
18    A. Probably the most dramatic thing I can remember
19  him doing was getting a prescription for -- I think it
20  was called Caverject. It was a needle that he was
21  supposed to insert into his penis, and I thought that was
22  pretty painful.
23    Q. Before he used the Caverject do you recall him
24  using any kind of medication or supplement?
25    A. I do not.

Page 61

1    Q. Are you familiar with something called
2  yohimbine?
3    A. I've heard that.
4    Q. Do you recall your husband trying the yohimbine?
5    A. I just remember the name of the medication as
6  being something that was in his stock of things.
7    Q. Do you know -- do you recall whether the
8  yohimbine helped his erections?
9    A. I don't recall.
10    Q. You mentioned the Caverject, which was an
11  injection into the penis?
12    A. Yes.
13    Q. Did you go to Dr. Mcellistrem's office with your
14  husband when he got that prescription?
15    A. Yes, I remember going down to, you know, that
16  office because he was in downtown St. Paul.
17    Q. And did you go into the office with your
18  husband?
19    A. Rarely did that happen. I remember one specific
20  occasion when I did.
21    Q. Okay. Which occasion is that?
22    A. When Dr. Mcellistrem had seen -- he had removed
23  a growth in the bladder, and it may have been both before
24  and after, on a subsequent visit when they were checking
25  to find out whether or not it had grown back. And I

16 (Pages 58 to 61)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 62

1  think he -- I think he called me in to see it before they
2  removed it.  And then when he went back for a subsequent
3  visit that I was asked to come in while he did the exam.
4  So there was a screen that I could see whether or not if
5  it had grown back.
6      Q. But do you recall being in the office talking to
7  Dr. Mcellistrem about Caverject?
8      A. I don't remember being in his office for that.
9  I mean, I know I went with him for those appointments in
10 St. Paul.
11     Q. But you weren't in the office for that one?
12     A. Not that I can recall.
13     Q. Prior to your husband getting Caverject for the
14 first time had you heard of that medication?
15     A. I had not.
16     Q. Had your husband provided you any information
17 about Caverject before he got the first prescription?
18     A. I remember -- I vaguely remember him talking
19 about it.
20     Q. What do you remember him talking about?
21     A. Just that was kind of a scary thing to do, and I
22 said are you sure you really want to do this.
23     Q. Did you talk about any other options that were
24 available to Mr. Martin at that point in time?
25     A. No.

Page 63

1      Q. And your husband did actually try the Caverject,
2  correct?
3      A. Yes.
4      Q. How many occasions do you recall him using the
5  Caverject?
6      A. I don't remember how long he used it.  It
7  couldn't have been real long.
8      Q. How often would he use the Caverject?
9      A. I don't know.
10     Q. Was it a successful treatment?
11     A. Quite.
12     Q. He was able to get an erection?
13     A. Yes.
14     Q. And he was able to maintain that erection?
15     A. As I recall.
16     Q. Were sexual relations more satisfactory with the
17 Caverject?
18     A. Than without?
19     Q. Yes.
20     A. Oh, yes.
21     Q. Did he have any side effect from the Caverject
22 that you recall?
23     A. Not that I recall.
24     Q. Now, as you've said, the Caverject involves a
25 needle injection into the penis.  Did you ever administer

Page 64

1  the injection?
2      A. No.
3      Q. Your husband did it each time?
4      A. Yes.
5      Q. Did he have any difficulty with the injection?
6      A. Sometimes I would say what's taking you so long.
7  And he said sometimes it was difficult because instead of
8  being able to maintain any arousal that he had, his
9  anatomy would not cooperate.
10     Q. I'm not sure I understand.  What do you mean by
11 that?
12     A. Well, instead of the penis staying as large as
13 it had gotten, which was not always very large, it would
14 shrink when he would attempt to do the injection.
15     Q. At some point in time did you notice that his
16 penis developed an angulation after using the Caverject?
17     A. Yes.  Yes.
18     Q. It had gone from straight to slightly curved?
19     A. Yeah.
20     Q. How --
21     A. That's a good description.
22     Q. And how much of a curve did you notice?
23     A. Slight.
24     Q. And after how many times of using Caverject did
25 that occur?

Page 65

1      A. I couldn't say.
2      Q. Did anyone ever use the term Peyronie's disease
3  with you?
4      A. No.
5      Q. Do you know what that is?
6      A. No.
7      Q. Did your husband complain about using the
8  injections?
9      A. I don't think so.  He's not much of complainer.
10 I probably complained more than he did.
11     Q. And why did you complain?
12     A. Oh, honestly, think about it.  If it were your
13 husband wouldn't you say there's got to be a better way
14 than this?
15     Q. What were some of the difficulties you
16 experienced with the Caverject system?
17     A. Just the idea of him putting a needle into that
18 part of his anatomy.  Something that should have been
19 pleasurable, turning it into something that I view as
20 painful.
21     Q. Also decreased some of the spontaneity?
22     A. Oh, absolutely.
23     Q. At some point in time did you and your husband
24 discuss using alternatives to Caverject?
25     A. I don't recall any.

17 (Pages 62 to 65)

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 66

1    Q. At some point in time your husband did try
2  Viagra, correct?
3    A. Yes.
4    Q. How long after he started using the Caverject do
5  you recall him trying the Viagra for the first time?
6    A. How long after that?
7    Q. Yes. In other words, how long had he been using
8  the Caverject?
9    A. Well, he can't have used it for a terribly long
10  period of time. I wish I could recall dates better.
11    Q. According to Dr. Mcellistrem's records he gave
12  your husband Caverject for the first time in October of
13  1996. Does that sound about right?
14    A. That sounds about right.
15    Q. And did you and your husband start to use the
16  Caverject soon after he got it from Dr. Mcellistrem?
17    A. Yes.
18    Q. And according to Dr. Ferrara's records, he first
19  gave your husband Viagra on April -- in April of 1998.
20  Does that sound about right to you?
21    A. It sounds maybe like that would be about right.
22    Q. So about 18 months that he was using the
23  Caverject?
24    A. You know, there's some things you just don't
25  want to remember. You try and forget.

Page 67

1    Q. Over the course of use of the Caverject did your
2  husband start to use it less often or did you maintain a
3  pretty steady rate?
4    A. Oh, I didn't want him to use it very often so I
5  would rather have had an unsatisfactory sex life than
6  have him go through that.
7    Q. And did you tell him that?
8    A. I doubt that.
9    Q. Did you try to avoid sexual activity because of
10  that?
11    A. No.
12    Q. How did you first hear about Viagra?
13    A. I don't know if it was on television or from
14  Dr. Ferrara. Probably the TV ads.
15    Q. You said you saw an ad for Viagra?
16    A. Everybody's seen ads for Viagra. When you have
17  small children saying what is Viagra, you know, what's
18  ED.
19    Q. What's the first ad you recall seeing about
20  Viagra?
21    A. I don't remember exactly.
22    Q. And the reason I'm asking is I want to know if
23  we're talking about an ad or a news report or a newspaper
24  article or published advertisements. What's the first
25  thing you particularly remember seeing about Viagra?

Page 68

1    A. Just that it was a medication for erectile
2  dysfunction.
3    Q. Do you recall whether it was an ad or a news
4  report?
5    A. It would probably have been a news report or an
6  ad. I don't know which.
7    Q. When you first heard of Viagra did you have a
8  conversation with your husband about it?
9    A. See, when you ask me these questions I don't
10  know for sure if it was because we became aware of Viagra
11  because Dr. Ferrara gave him a sample or if -- or if
12  we -- because -- or if -- I don't know if Dick ever -- I
13  don't think that Dick would have asked him for anything.
14    Q. And that's really what I'm getting at, yes.
15    A. Yeah, so I really don't know. I couldn't say
16  for sure. You know, this is a long time ago.
17    Q. So you don't specifically recall suggesting that
18  your husband ask for Viagra; is that fair to say?
19    A. That's -- I would say that's accurate. I don't
20  think I would have asked him that.
21    Q. Do you recall a conversation where Mr. Martin
22  told you he was going to ask for Viagra?
23    A. Specifically, no.
24    Q. Okay. At some point in time, though, he did
25  come home with Viagra?

Page 69

1    A. Yes.
2    Q. And did you go to that visit with Dr. Ferrara
3  with him?
4    A. I don't know.
5    Q. Do you recall talking about Viagra with
6  Dr. Ferrara?
7    A. Ever, yes.
8    Q. Okay. At the time that you first --
9    A. When, I don't know. Pardon?
10    Q. So you don't recall the first time that your
11  husband got Viagra whether you were involved in that
12  conversation?
13    A. I don't recall if I was involved in that.
14    Q. Do you keep any notes or things of that nature
15  that would indicate whether you were present at that
16  time?
17    A. No, I don't have any notes to that effect.
18    Q. I noticed you brought some calendars today. The
19  earliest calendar in the pile here is dated 2003. Do you
20  have any calendars from before then at home?
21    A. Prior to that?
22    Q. Yes.
23    A. No. I mean, the desk drawer is only so deep.
24    Q. So the calendars that you brought from 2003 to
25  2007, those are the only ones you currently have?

18 (Pages 66 to 69)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

### Page 70

1    A. Well, I had a 2002.
2        MS. HAUER: It's -- did you give me a 2002?
3 It's maybe still at my office and I just didn't grab it.
4        MS. LESKIN: We'd request a copy of the
5 2002 then.
6        MS. HAUER: Sure.
7        THE WITNESS: Yeah, because what I was told
8 is that perhaps since I had a 2002 you might want
9 subsequent calendars. I said okay.
10    Q. (By Ms. Leskin) Do you have anything from
11 earlier than 2002?
12    A. I don't. It wouldn't -- and if I did, it
13 wouldn't have been of any interest.
14    Q. What do you mean?
15    A. What do I mean? Well, if you take -- if you
16 look at the subsequent ones, I don't know why those would
17 be of any interest to you either.
18    Q. You note doctor's appointments on there,
19 correct?
20    A. Most times, yes.
21    Q. But you don't note what was done at those
22 doctor's visits?
23    A. No.
24    Q. And you don't know whether you would have
25 attended the visits with your husband?

### Page 71

1    A. No.
2    Q. So when your husband came home with Viagra for
3 the first time, did you and he have a conversation about
4 Viagra?
5    A. Probably.
6    Q. Do you recall anything of that conversation?
7    A. No.
8    Q. Okay.
9    A. Just like whoopee, you know, like maybe this can
10 be at least far more spontaneous, you know, would
11 probably have been the way that conversation might have
12 gone. But I can't say specific things that I recall.
13    Q. But generally you recall being pleased that he
14 had Viagra?
15    A. Yes.
16    Q. And you had heard of Viagra before he had
17 brought it home?
18    A. I don't remember.
19    Q. Did your husband tell you anything about his
20 conversation with Dr. Ferrara about Viagra before that
21 first -- that first time?
22    A. Not that I recall.
23    Q. Did you review any written materials about
24 Viagra before he used it for the first time?
25    A. I don't recall.

### Page 72

1    Q. Did you do any research about Viagra before he
2 used it for the first time?
3    A. I did not.
4    Q. Did you call anyone from Pfizer about Viagra
5 before he used it for the first time?
6    A. I did not.
7    Q. Do you know how long it was after your husband
8 came home with Viagra for the first time that he tried
9 it?
10    A. I do not remember that.
11    Q. Do you remember the first time that he used
12 Viagra?
13    A. I do not.
14    Q. Would your husband tell you when he was taking a
15 Viagra pill?
16    A. Well, sure.
17    Q. Okay. What would he say?
18    A. Are you in the mood? Do you want to make love?
19    Q. And if you were affirmative he would take a
20 Viagra?
21    A. Um-hum.
22    Q. Yes?
23    A. Yes.
24    Q. Was the Viagra successful in your opinion?
25    A. Yes.

### Page 73

1    Q. Did it allow you to be more spontaneous?
2    A. Somewhat.
3    Q. Did it allow your husband to get an erection?
4    A. Yes.
5    Q. And maintain his erection?
6    A. Yes.
7    Q. Did it allow him to maintain that erection
8 through ejaculation?
9    A. Yes.
10    Q. And were you able to have a more satisfactory
11 sexual experience?
12    A. Yes.
13    Q. After your husband started using Viagra were
14 there times that you attempted sexual activity without
15 using Viagra?
16    A. Um-hum.
17    Q. Yes?
18    A. As I recall, yes.
19    Q. Okay. And how often would that be?
20    A. Well, you mean how often did we have intimate
21 relations?
22    Q. Without using Viagra.
23    A. I couldn't say precisely.
24    Q. How often were you engaging in sexual activity
25 at that point?

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

---

Page 74

1    A. Maybe once, maybe twice. You know how life is,
2  you might make love twice a week and then sometimes it
3  would be a week or week and a half.
4    Q. And can you say what percentage of time he was
5  using Viagra versus not using Viagra?
6    A. No, I did not.
7    Q. Could you tell the difference between the times
8  he was using Viagra and the times he was not using
9  Viagra?
10   A. Yes.
11   Q. And why is that?
12   A. The obvious reasons, the erection was better.
13   Q. Was he able to get an erection without Viagra?
14   A. Um-hum, sometimes. Quite often.
15   Q. Was he able to maintain that erection without
16  Viagra?
17   A. Not very well.
18   Q. Were you satisfied with Viagra?
19   A. Let's face it, nobody wants to use any kind of
20  drugs at all, so it would have been much better if it
21  hadn't been. But it seemed like one of those things that
22  if we were to have a sex life that was satisfactory for
23  him and for me, that it seemed to be the thing -- the
24  most logical thing to do.
25   Q. At any time prior to 2002 did you have any

---

Page 75

1  conversation with any of Mr. Martin's doctors about
2  Viagra?
3    A. Not that I recall.
4    Q. Did you have any conversations in that time
5  period with any of your doctors about Viagra?
6    A. Dr. Ferrara is my doctor.
7    Q. So does that mean no, you did not have a
8  conversation with your husband's doctor?
9    A. No, I don't go to my doctor to talk about my
10  husband, but since he lost his eyesight Dr. Ferrara
11  brings it up a lot.
12   Q. Prior to 2002 did you talk to any pharmacist
13  about Viagra?
14   A. I did not.
15   Q. Prior to 2002 did you do any research on Viagra?
16   A. I did not.
17   Q. Prior to 2002 did you call anyone at Pfizer
18  about Viagra?
19   A. I did not.
20   Q. Did you write to anyone at Pfizer about Viagra?
21   A. I did not.
22   Q. Did you see any written materials at all about
23  Viagra prior to 2002?
24   A. Well, I mean, everybody was talking about
25  Viagra. I mean, everybody was making jokes about Viagra

---

Page 76

1  I mean, it was the miracle drug, as much as you would
2  hear it touted on TV or see ads, you know.
3    Q. Did you recommend to your husband that he
4  continue to take Viagra?
5    A. Did I recommend to him that he continue?
6    Q. Yeah.
7       MS. HAUER: At any point in time?
8    Q. (By Ms. Leskin) Prior to 2002.
9    A. That he what?  That he take --
10   Q. Prior to 2002 did you ever recommend to your
11  husband that he continue to take Viagra?
12   A. Well, it just was -- it was just the thing that
13  he would do.
14   Q. Was that a decision he made or was that a
15  decision you made for him?
16   A. It was a decision he made.
17   Q. Okay. Did he ever tell you that he did not want
18  to take Viagra?
19   A. No, not that I recall.
20   Q. Now, did your husband get a prescription for
21  Viagra at any time?
22   A. I'm sure he did.
23   Q. And what pharmacy would that have been filled
24  at?
25   A. We were using Snyder Drug in Inver Grove

---

Page 77

1  Heights.
2    Q. Did you ever go to Snyder Drugs to pick up a
3  prescription for Viagra for your husband?
4    A. Probably. I don't know.
5    Q. Did you ever talk to the pharmacist about it
6  when you picked it up?
7    A. No. I would have been too embarrassed.
8    Q. You're aware that your husband also got samples
9  of Viagra, correct?
10   A. Oh, yes.
11   Q. And got those from Dr. Ferrara?
12   A. Oh, yes.
13   Q. You say oh, yes.
14   A. What?
15   Q. Was that something unique for him?
16   A. To give him samples?
17   Q. Yes.
18   A. Well, I thought it was really very nice of him.
19   Q. And how often would your husband give him
20  samples?
21   A. I'd have to cartoon if I were to give you a
22  sample of that. If Dick would run low, Dr. Ferrara would
23  give him samples.
24   Q. And did you ever pick up the samples for your
25  husband?

20 (Pages 74 to 77)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 78

1  A. Not that I recall.
2  Q. Did you ever call the doctor's office and
3  request the samples of Viagra?
4  A. You know, I have to say that I don't recall
5  that, but I remember reading it in the records.
6  Q. Okay. But you don't have a specific
7  recollection of calling the doctor's office and asking
8  for a sample?
9  A. No. That wouldn't have been something I would
10 have done. That might have been something that Dick
11 might have done, but not me.
12 Q. But you do recognize that it is -- it does
13 appear in Dr. Ferrara's records?
14 A. Yes, I'm aware of that.
15 Q. Prior to 2002 did your husband ever complain of
16 any side effects that he was getting from Viagra?
17 A. He used to say something about headaches now and
18 then.
19 Q. Any other side effects?
20 A. Not that I can recall.
21 Q. Did he ever comment of a blue-green tinge to
22 vision from Viagra?
23 A. No.
24 Q. You're aware that that's a potential side
25 effect?

Page 79

1  A. I'm aware of that. But I think the effects of
2  that would have probably worn off, because he -- Dick
3  would just use the Viagra in the evening and then go to
4  bed, and we'd go to sleep.
5  Q. Did you always use Viagra in the evening or did
6  he always take Viagra in the evening?
7  A. Yeah.
8  Q. That was pretty much your routine?
9  A. Yes.
10 Q. And when you say in the evening, what time would
11 that be?
12 A. It would vary on how tired we were and how
13 anxious we were to make love.
14 Q. Prior to 2002 were you aware of any type of
15 vision concerns your husband had reported?
16 A. No, but I do remember one specific incident
17 going to the doctor with him. We also use the same eye
18 clinic.
19 Q. Okay.
20 A. And I remember he had multiple pairs of really
21 bad-looking glasses. And he had one that was -- I think
22 two pairs, one that was chipped in the corner and another
23 pair that was chipped. And I didn't think he looked very
24 with-it, so I said why don't you make an appointment at
25 the eye doctor. And it was my ruse to get him to get

Page 80

1  some new glasses to wear when we went out.
2  And I remember the doctor -- I remember hearing
3  them laughing when I was in the waiting room, and the
4  joke was that -- that the doctor had said to him was that
5  well, you can go ahead and buy new glasses if you want
6  them, but he said I wouldn't if it were me. So he
7  obviously didn't know the condition of Dick's other
8  glasses that he was wearing. His eyes were good.
9  Q. Did Mr. Martin ever tell you that in the past he
10 had seen northern lights and blurring in his vision?
11 A. No.
12 Q. You never heard that?
13 A. No.
14 Q. I want to talk about the onset of your husband's
15 vision problems. When do you recall him first having
16 problems with either of his eyes?
17 A. It would have been the 1st of May. And it's
18 just because -- the specific dates, you know, I just
19 remember that it was -- well, waking up in the morning
20 and saying Carole, I need to go see the doctor. And I
21 said to him why, what's wrong. And he said to me that he
22 couldn't see well. And I said what's wrong. And he
23 then -- and I said when did that happen.
24 And I can't remember specifically, you know, how
25 the conversation went, but he had just said that the

Page 81

1  night before he had had difficulty, and I said why didn't
2  you tell me then. And he said because there's nobody in
3  the doctor's office. And I was alarmed so we just went
4  immediately in to see Dr. Ferrara.
5  Q. Do you remember what day of the week that was?
6  A. No, I don't.
7  Q. I can tell you that May 1 was a Friday. I'm
8  sorry. Was a Wednesday.
9  A. No, I can't remember that part of it. I just
10 remember, you know, the day.
11 Q. So you first heard about his vision problem
12 first thing in the morning?
13 A. Yes.
14 Q. And you said he told you that it had occurred
15 the night before?
16 A. Um-hum.
17 Q. Is that right?
18 A. Yeah.
19 Q. What did he tell you had happened the night
20 before?
21 A. He had been -- as I said, we have a big
22 backyard, and we have a garden patch way out in back, and
23 he said that he had been out there and he had bent over,
24 and when he got up it was like the vision, he could
25 only -- he described it to me like holding his hand up,

21 (Pages 78 to 81)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

| Page 82 |
|---|

1  and he said everything that I see below this is black,
2  Carole.  He had no vision, you know, like the lower half
3  of the right eye was missing.
4      Q.  And that was only in the right eye at that point
5  in time?
6      A.  Yes.
7      Q.  What had he been doing during the day, the day
8  before that he reported to you?  So it would have been
9  the 30th of April?
10     A.  He was probably weeding or something down in the
11 garden.
12     Q.  Had he gone to work that day?
13     A.  Not that I recall.
14     Q.  Had he had any other complaints at any point
15 during the day?
16     A.  No.
17     Q.  Had he complained of not feeling well, being
18 dizzy?
19     A.  No.
20     Q.  Do you recall prior to that morning when your
21 husband told you that he was having problems with his
22 vision when the last time you had had sexual relations?
23     A.  Well, we didn't talk about it right then, but I
24 know that we did.
25     Q.  When did you?

| Page 83 |
|---|

1      A.  What?
2      Q.  When did you have sex last before that?
3      A.  Prior to that?
4      Q.  Yes.
5      A.  Well, not the night of but the night prior to
6  that.
7      Q.  That would have been the 29th of April?
8      A.  Um-hum.
9      Q.  Yes?
10     A.  Yes.
11     Q.  And why are you sure of that?
12     A.  Well, when something -- when something really
13 important happens you just -- you think okay, well, what
14 could have happened here, what could have happened.  And
15 you know, don't -- you have to know that some things like
16 that have happened in your life too, that makes something
17 really stick in your mind.
18     Q.  Did your husband use Viagra on the night of the
19 29th?
20     A.  I would have said yes.
21     Q.  Are you sure he did or you're not sure?  You
22 said you "would have said."
23     A.  Um-hum.  The 29th, that would have been the
24 29th, if you go back in the dates, so it was not the
25 night of after he'd lost it but the night before, yes.

| Page 84 |
|---|

1      Q.  And what makes you believe that he had taken
2  Viagra that night?
3      A.  Because we had made love.
4      Q.  What time of night had he taken the Viagra?
5      A.  I don't remember specifically, you know.
6      Q.  Okay.  When you went to Dr. -- well, when you
7  took your husband to the doctor which doctor did you go
8  to?
9      A.  You mean --
10     Q.  On the 1st of May?
11     A.  On the 1st of May we went to see Dr. Ferrara.
12     Q.  What did Dr. Ferrara tell you?
13     A.  Dr. Ferrara said that he needed to go see the
14 ophthalmologist, and he thought he had a detached retina,
15 as I recall.
16     Q.  Anything else that you recall?
17     A.  Well, then I took him to see -- then after we
18 left Dr. Ferrara's office we went to the St. Paul Eye
19 Clinic.
20     Q.  I want to focus a little more on the appointment
21 with Dr. Ferrara.  Did you go into the office with your
22 husband that day?
23     A.  Oh, I'm sure I must have.
24     Q.  Did you tell Dr. Ferrara that you and your
25 husband had -- that your husband had taken Viagra that

| Page 85 |
|---|

1  night?
2      A.  No.  We weren't thinking about our sex life at
3  that point.  We were thinking about Richard's eyes.
4      Q.  When Dr. Ferrara told you to go see Dr. Nichols,
5  is that the doctor he told you to see?
6      A.  I don't remember if he gave him a specific name.
7      Q.  But he told you to go to the eye clinic?
8      A.  To go to the St. Paul Eye Clinic.
9      Q.  When you went to the eye clinic did he give you
10 a diagnosis at that point in time?
11     A.  Well, Dr. Nichols told us to go back to
12 Dr. Ferrara's.  I remember just yo-yoing back and forth.
13     Q.  You said Dr. Ferrara said he thought he had a
14 detached retina?
15     A.  Well, I think he just said he needed to go see
16 an eye specialist, and when he saw the eye specialist the
17 eye specialist said he needed a sed rate.
18     Q.  Okay.
19     A.  So we went from Inver Grove Family Clinic to the
20 St. Paul Eye Clinic back to the Inver Grove Clinic.
21     Q.  And he had the sed rate done?
22     A.  Yes.
23     Q.  Did Dr. Nichols give you -- well, when you went
24 to the St. Paul Eye Clinic your husband saw Dr. Nichols,
25 correct?

22 (Pages 82 to 85)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 86

1    A. Um-hum, yes.
2    Q. And did you go into the room with Dr. Nichols?
3    A. Probably.
4    Q. And did you assist your husband in giving
5  Dr. Nichols your husband's medical history?
6    A. At that point?
7    Q. Yes.
8    A. No.
9    Q. Who was responsible for telling Dr. Nichols --
10    A. Let me -- okay. What did you ask? You asked me
11  if I had given Dr. Nichols Richard's medical history at
12  that point?
13    Q. Yes, the first time you saw him.
14    A. No. I don't know if I'm understanding what
15  you're asking me, though.
16    Q. Okay. The first visit with Dr. Nichols?
17    A. Yes.
18    Q. That first day you went to the doctor?
19    A. Yes.
20    Q. Someone gave Dr. Nichols a medical history,
21  correct? Let's do it this way: We're going to mark
22  this. I only have one copy.
23       (C. Martin Deposition Exhibit 3 marked for
24       identification by the Court Reporter.)
25    Q. (By Ms. Leskin) We've marked as C. Martin

## Page 87

1  Deposition Exhibit 3 a document which I'll hand to you
2  and your attorney entitled -- it's a questionnaire from
3  the St. Paul Eye Clinic. And the Bates number on the
4  bottom you will see is Nichols 0010 -- I'm sorry.
5  R. Nichols -- I'm sorry, Martin,R Nichols 0011.
6    A. Okay.
7    Q. Mrs. Martin, I'll ask you to look at that
8  document and ask you if you've ever seen that document
9  before?
10    A. Yes.
11    Q. Is that in fact a document you and your husband
12  completed on May 1, 2002, at the St. Paul Eye Clinic?
13    A. Did we fill this out there?
14    Q. That's my question to you. Did you complete
15  this form?
16    A. Yes.
17    Q. And does your handwriting appear on that form?
18    A. Yes.
19    Q. Okay. Now, there looks to be two different
20  types of handwriting on the questionnaire.
21    A. Um-hum.
22    Q. You agree with me?
23    A. Yes.
24    Q. Are both of those your handwriting?
25    A. No. 8 is not.

## Page 88

1    Q. Do you recognize the handwriting in No. 8?
2    A. I do not. I do not recognize the handwriting on
3  No. 10 where it says "Who" where it says "son."
4    Q. Okay. And is this the form that you filled out
5  when you first arrived at the St. Paul Eye Clinic?
6    A. It must be.
7    Q. And No. 8 where you said you did not recognize
8  the handwriting, that's the question that asks for
9  current medications, correct?
10    A. Um-hum, it is.
11    Q. And the only drug that's filled in there is
12  Catapres, correct?
13    A. Yes.
14    Q. And you don't know who wrote that in there?
15    A. I do not.
16    Q. You did not write any medications --
17    A. I did not write that.
18    Q. And your husband did not write any medication in
19  there?
20    A. No, that is not in his handwriting.
21    Q. What do you recall Dr. Nichols telling you on
22  that first visit on May 1, 2002, other than sending you
23  back to Dr. Ferrara's office for a sed rate test?
24    A. What do I recall about what he said?
25    Q. Yes.

## Page 89

1    A. Thought it was a stroke of the optic nerve, as I
2  recall.
3    Q. Did he tell you what caused that stroke of the
4  optic nerve?
5    A. He did not.
6    Q. Did you ask him what caused the stroke of the
7  optic nerve?
8    A. Probably.
9    Q. And what else did he tell you about it?
10    A. That it was bad.
11    Q. Do you recall anything else from the
12  conversation?
13    A. Not specifically I do not.
14    Q. Did you tell Dr. Nichols that your husband had
15  taken Viagra, on that visit?
16    A. Not on that visit, no. I remember we were
17  asking what could have caused it.
18    Q. And what did Dr. Nichols tell you?
19    A. He did not know.
20    Q. Did he give you a diagnosis of ischemic optic
21  neuropathy on that day?
22    A. Yes.
23    Q. Yes?
24    A. Yes.
25    Q. Did you ask him what ischemic optic neuropathy

23 (Pages 86 to 89)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

| Page 90 | Page 92 |
|---|---|
| 1  was?<br>2   A. I'm sure he probably tried to describe it but I<br>3  can't remember specifically.<br>4   Q. So did you get any written information about<br>5  ischemic optic neuropathy?<br>6   A. Not at that point, no.<br>7   Q. When you went home did you do any research on<br>8  ischemic optic neuropathy?<br>9   A. I made a phone call to my daughter.<br>10   Q. And that was that first day?<br>11   A. And I don't remember if it was that first day,<br>12  but it was, you know, I thought what are we dealing with.<br>13   Q. Does your daughter have medical training?<br>14   A. She does not. She has a computer.<br>15   Q. And what did she tell you about ischemic optic<br>16  neuropathy when you asked her about it?<br>17   A. She didn't know. She was going to have to look<br>18  at the Internet.<br>19   Q. When you went back to Dr. Ferrara's office to<br>20  get the sed rate done did you see Dr. Ferrara?<br>21   A. I don't remember.<br>22   Q. Do you recall having any other conversations<br>23  that day with Dr. Ferrara?<br>24   A. I do not remember the conversation.<br>25   Q. After you had the sed rate test -- after your | 1   Q. Did he give you any additional information about<br>2  ischemic optic neuropathy?<br>3   A. If I would have had it, you know, you would have<br>4  it.<br>5   Q. Did he give you any -- any recommended<br>6  treatments for your husband?<br>7   A. No.<br>8   Q. Did he talk at all about blood pressure control?<br>9   A. I don't believe so.<br>10   Q. At some point in time did Dr. Ferrara raise<br>11  questions about your husband's cholesterol levels?<br>12   A. It just seemed to me that he wanted to check<br>13  everything over and over and over.<br>14   Q. Did he put your husband on Zocor?<br>15   A. Yes.<br>16   Q. Do you know why he started him on Zocor?<br>17   A. Well, I would imagine it had something to do<br>18  with his cholesterol level.<br>19   Q. Did you ever have a conversation with<br>20  Dr. Ferrara about why he put your husband on Zocor?<br>21   A. No.<br>22   Q. Did anyone ever suggest to you that his<br>23  cholesterol might have had something to do with his eye<br>24  condition?<br>25   A. No. |

| Page 91 | Page 93 |
|---|---|
| 1  husband had the sed rate test done did you talk to any<br>2  other doctors that day?<br>3   A. I don't believe so. I know there were many<br>4  appointments that were set up for him, but I don't<br>5  remember who we saw. I'd have to -- I'd have to look at<br>6  the records myself.<br>7   Q. Okay.<br>8   A. To see. Because I remember that there were lots<br>9  of appointments and lots of tests that they wanted done.<br>10   Q. And your husband met with Dr. Nichols about a<br>11  week later, correct?<br>12   A. I don't remember specifically.<br>13   Q. Do you remember going to the -- to Dr. Nichols<br>14  with your husband for the second visit?<br>15   A. Yes, I was the only one that took him to all of<br>16  his visits.<br>17   Q. Once he had his first eye problem?<br>18   A. Yes.<br>19   Q. And did you go into the office with him on that<br>20  visit?<br>21   A. Probably.<br>22   Q. What do you recall Dr. Nichols saying about his<br>23  vision on that day?<br>24   A. I don't remember. Just -- I just remember him<br>25  saying that, you know, that it didn't look good. | 1   Q. Did you ever ask anyone whether his<br>2  cholesterol -- whether your husband's cholesterol level<br>3  had anything to do with his eye condition?<br>4   A. No. The question always went more along the<br>5  lines of can you tell us what could have caused this.<br>6   Q. And what were you told?<br>7   A. We don't know.<br>8   Q. Was there ever an improvement in your husband's<br>9  right eye, to the vision in your husband's right eye that<br>10  you're aware of?<br>11   A. Yes, there was. As he described it to me at one<br>12  point, it was totally black. I mean, it went from losing<br>13  this to getting worse and worse, until he lost all vision<br>14  and it was just dark and he could see nothing.<br>15     And Dr. Nichols, as I recall, said at one point<br>16  that it could get better, it could get worse. And<br>17  eventually it got to the point where he could just see<br>18  if -- he could maybe see an outline, a vague outline of<br>19  something in his right eye.<br>20   Q. And --<br>21   A. You know, like if you were to stand against --<br>22  like if you were to stand against, say, a window like<br>23  this and you were to stand there he could perhaps see the<br>24  silhouette that there was something standing there. And<br>25  prior to that it was totally gone. |

24 (Pages 90 to 93)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 94

1    Q. And at that point in time before the end of the
2  month he had not had any problems with his left eye,
3  correct?
4    A. No. No problem.
5    Q. When your husband had the problems with his
6  right eye to begin with, did anyone recommend to him that
7  he take steroids?
8    A. No. I recommended that he see another doctor,
9  and he said I've already seen Dr. Ferrara and I've seen
10  Dr. Nichols, so he thought that was adequate. Because
11  they're well-known. Dr. Nichols is well-known, I mean
12  that clinic is, and they're good.
13    Q. What other doctor did you want him to see?
14    A. I said should we find -- should we find someone
15  else, and he just said no, he said the St. Paul Eye
16  Clinic is a good clinic, so...
17    Q. At some point in time he began having problems
18  with vision in his left eye, correct?
19    A. Yes.
20    Q. When do you recall that started?
21    A. We were coming back from the cabin. Dick has a
22  cabin in Sauk Centre, Minnesota. And as usual, I was
23  driving. I can fill in part of the conversation. I
24  don't know if I should volunteer this part of it or not
25  or how much you want to know.

## Page 95

1    Q. As much as you recall.
2    A. After the first episode with his losing the
3  vision in the right eye, he didn't drive anywhere. He
4  made one trip, and I don't remember the exact day or the
5  date, and he wanted to go to Menard's to pick up
6  something because he was saying to me, you know, he said
7  I think I'll be okay, Carole. I can live with this.
8          And he said I'm going to drive to Menard's. And
9  I said you're kidding me. And he said no, I'm going to
10  take the car. And I said are you sure. And so he took
11  the car and drove to Menard's, which was, you know, a few
12  miles away. And I was anxious because I didn't know if
13  he should be driving. And when he came home he said I
14  can do this, I can do this. He was all excited. And he
15  said I guess -- I can live with this.
16          And -- but when I went up to the cabin with him
17  there was too much traffic and so I was back to driving
18  again, and we had a really nice time at the cabin, made
19  love. This is so painful just -- to remember all of
20  this.
21    Q. Do you want to take a break?
22          MS. HAUER: Do you want to take a break for
23  a few minutes?
24          THE WITNESS: It's okay. Anyway, it's
25  about a two-hour drive, and I was going along and he was

## Page 96

1  quiet and I kept seeing him going like this (indicating),
2  you know, in my peripheral vision, going like this. And
3  I said what are you doing. And he asked me, he said
4  Carole, are there a lot of cars with one headlight. And
5  I said no.
6          And then I asked him, I said what's going on.
7  And he said -- he said the same thing that happened to my
8  right eye. And then he talked about only being able to
9  see half of the billboards. You know, just how difficult
10  it was. Anyway, so I was scared for him and for me too.
11    Q. (By Ms. Leskin) Okay. I just want to make sure
12  I have all the details. And I understand this is painful
13  and if you need a break, please let me know.
14    A. Okay.
15    Q. What day was it that you were driving back from
16  the cabin, do you recall that?
17    A. Yeah. It was just a month after the other
18  episode.
19    Q. Do you remember what day of the week it was?
20    A. No, because being retired we don't always go
21  like most people up to the lake on the weekends.
22    Q. How long had you been up at the lake?
23    A. A few days, I'm sure.
24    Q. I want to try to work backwards and see if we
25  can put a finer point on some of the dates that we're

## Page 97

1  talking about. How long after the event of driving home
2  did you first go to the doctor about your husband's
3  second eye?
4    A. Well, there was -- it was late. We didn't go in
5  until, you know, until the morning.
6    Q. So it was the next morning?
7    A. Yeah, as I recall.
8    Q. And which doctor did you go to see?
9    A. You mean in which sequence?
10    Q. Which doctor did you go to see after this drive
11  back from cabin?
12    A. I don't know if it was Dr. Ferrara first. It
13  may have been Nichols. I don't know for sure.
14    Q. The first note that we --
15    A. But that would show -- that would show in the
16  records, because I'm sure you have that on your medical
17  records.
18    Q. The first note that we have with Dr. Nichols is
19  May 31, 2002, where he's complaining about the vision
20  loss in his left eye.
21    A. Yes. That would jibe.
22    Q. Okay. So Dr. Nichols, did you see him to the
23  best of your recollection the next day after that drive
24  back from cabin?
25    A. Yeah, I'm sure that that's what it was, because

25 (Pages 94 to 97)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

### Page 98

1 it would have been too late to go into the clinic.
2 Q. So the drive back from the cabin would have been
3 the 30th?
4 A. Um-hum.
5 Q. Yes?
6 A. Yes.
7 Q. And I can represent to you that May 30 that year
8 was a Thursday.
9 A. That would make sense because we tried to avoid
10 traffic, you know, weekend traffic.
11 Q. So if you were driving home on Thursday when do
12 you recall going up to the cabin?
13 A. Probably on a Tuesday or something like that.
14 All I can do is guess at this point.
15 Q. Do you have any records? You said that you have
16 your 2002 calendar. Would that indicate when you were at
17 the cabin?
18 A. It may or may not. We've gone up there many
19 times when it's not on our calendar. It just is
20 spontaneous things, like okay, our work is done here at
21 home, do you want to go up to the cabin.
22 Q. And if you had gone up on Tuesday, as possible,
23 you said you had made love during the week, the time at
24 the cabin. Do you remember which day it was at the
25 cabin?

### Page 99

1 A. Yeah, it was before, before all this happened,
2 the night before.
3 Q. So the night before you were driving home?
4 A. Yeah.
5 Q. So if you were driving home on Thursday, the
6 30th, is it safe to say that you had made love on
7 Wednesday, the 29th?
8 A. Yeah.
9 Q. And would it have been at night?
10 A. Um-hum.
11 Q. Yes?
12 A. Yes.
13 Q. And to your knowledge your husband took a Viagra
14 as part of that?
15 A. Yes, yes.
16 Q. And how do you know he took a Viagra?
17 A. Because he always asked me if I wanted to make
18 love and, you know, he wouldn't take the pills unless he
19 would ask.
20 Q. So he had asked that night?
21 A. Um-hum.
22 Q. Yes?
23 A. Yes.
24 Q. And you had successful sexual relations?
25 A. Yes.

### Page 100

1 MS. HAUER: Can we go off the record for a
2 second?
3 (Discussion held off the record.)
4 (Recess taken between 11:53 a.m. and 12:21 p.m.)
5 (Mr. Graham present in conference room.)
6 Q. (By Ms. Leskin) Back on the record. Before the
7 break, Mrs. Martin, we were just trying to put a time
8 line on some of the things that were going on. And you
9 told me the day after the drive back to the cabin you
10 went to see Dr. Nichols about your husband's left eye?
11 A. Um-hum.
12 Q. Yes?
13 A. Yes.
14 Q. Now, have you had an opportunity to review
15 Dr. Nichols's records?
16 A. Oh, yes.
17 Q. You said you looked at them this week in advance
18 of the deposition?
19 A. Yes.
20 Q. And are you aware that Dr. Nichols -- that
21 Dr. Nichols's records from the 31st of May report that
22 your husband said that he couldn't see the street signs
23 for three or four days at the time of that appointment?
24 A. No.
25 Q. Did your husband at any time during the time

### Page 101

1 that you were at the cabin complain to you that he was
2 having difficulty seeing out of his left eye?
3 A. No. He only mentioned that on the drive back
4 from the cabin.
5 Q. And did he tell you on the drive back from the
6 cabin when that difficulty in seeing had begun?
7 A. No, because all of a sudden all he was doing was
8 taking his hand and putting it over his eye, and I said
9 what are you doing, you know.
10 Q. But is that the first -- did he tell you it had
11 just begun, the problems with his left eye, at that point
12 in time during that drive?
13 A. Did he say it had just begun?
14 Q. Yes.
15 A. No. Like I said, he was doing this with his eye
16 and he was commenting on the headlights, the oncoming
17 traffic, and he was commenting about the billboard.
18 Q. Did you ask him about the drive back when it
19 had started, the problems with his left eye?
20 A. No, no. And he said he had been having trouble
21 with that before?
22 Q. Well, that was my question to you. Had he told
23 you he had been having trouble before?
24 A. No. No.
25 Q. I think you told me you believe you were at that

26 (Pages 98 to 101)

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 102

1  visit on the 31st of May with Dr. Nichols. Did I
2  understand you correctly?
3      A. Um-hum.
4      Q. Yes?
5      A. Yes, you did.
6      Q. What do you recall of that conversation with
7  Dr. Nichols on that date?
8      A. I couldn't specifically say to you. It just --
9  you know, they don't really say very much when they're
10 examining eyes.
11     Q. Did you have any additional conversation with
12 Dr. Nichols as to the cause of your husband's vision loss
13 at that time?
14     A. I don't remember if that was the time when I
15 ended up bringing articles with, but I do remember after
16 getting the information that I received from my daughter,
17 that she had gotten -- that she mailed to me, that she
18 had taken off the Internet, that we had given copies of
19 the suspect cause for the blindness because we thought it
20 was important that, you know, the doctors know, you know
21 the eye doctor and our general practitioner of a
22 possibility of other people losing their sight.
23     Q. Prior to receiving the articles from your
24 daughter do you recall any conversations with any of the
25 doctors treating your husband as to the cause of his

Page 103

1  vision loss?
2      A. As I said, we were always asking what is the
3  cause of this.
4      Q. Okay.
5      A. What could possibly be causing this.
6      Q. And what did they tell you?
7      A. They didn't know, so when we thought we might
8  have a clue, we gave them the clue.
9      Q. When you got those articles, prior to getting
10 those articles from your daughter, had you told any of
11 your husband's treating physicians that he had taken
12 Viagra prior to his vision loss?
13     A. No.
14     Q. Now, your husband after he lost vision in that
15 second eye also saw Dr. Harrison, right?
16     A. Can I back up just a little bit?
17     Q. Sure.
18     A. There's something that I thought of too. When
19 women my age or men my husband's age, we don't talk about
20 sex. It isn't something you ask about. You don't talk
21 about it. So when you ask a doctor, you know, are there
22 any reasons you can think of, we're not going to bring
23 the other up. Why would we? It's just not the way -- we
24 might have our suspicions but we don't say anything. We
25 ask those who are supposed to know, do you know any

Page 104

1  possible reason.
2      Q. Well, did you ever tell any of your doctors
3  prior to the time that you gave them the articles that
4  your husband had taken Viagra?
5      A. No. They knew he was using Viagra. You know,
6  Dr. Ferrara knew he was using Viagra.
7      Q. Okay. Did any of the eye doctors that you saw,
8  did you tell any of them that your husband had taken
9  Viagra?
10     A. They probably asked -- I don't know. When you
11 go to a doctor you say what medications are you on.
12     Q. Right. And when you were asked that question
13 did you tell them --
14     A. They didn't ask that question that I can recall.
15     Q. They didn't ask the question of what medications
16 are you on?
17     A. They probably asked that question but they
18 didn't make the connection.
19     Q. Well, did you tell any of the doctors that your
20 husband was taking Viagra?
21     A. When we went in then?
22     Q. Yes.
23     A. No, not that I recall.
24     Q. Your husband, after the problems with vision in
25 his second eye, ultimately went to see Dr. Harrison,

Page 105

1  correct?
2      A. Yes.
3      Q. Did you go to Dr. Harrison with him?
4      A. Yes.
5      Q. Did you sit in on that visit with Dr. Harrison?
6      A. Yes, I did.
7      Q. Just let me finish the question. What do you
8  recall with that visit with Dr. Harrison?
9      A. I remember -- I don't remember the name of the
10 test, but they let me sit in on the examination when they
11 were going to determine the extent of the vision loss in
12 the left eye. And the -- one of the examining tools that
13 they used was a sphere. It was almost like a big beach
14 ball that had been cut in half, and it had lights in it.
15 And I was sitting behind him as they were flashing the
16 lights and then I really became aware of what he could
17 not see in his left eye.
18     Q. And that's the first time you saw the extent of
19 that?
20     A. So specifically, yes.
21        (C. Martin Deposition Exhibit 4 marked for
22        identification by the Court Reporter.)
23     Q. (By Ms. Leskin)  We marked as C. Martin Exhibit
24 No. 4 a document entitled Adult History and Physical from
25 the Fairview-University Medical Center, Bates numbers

27 (Pages 102 to 105)

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 106

1  Martin,R Pomeranz 0005 and 0006. I'll show this to your
2  attorney and ask you to take a look at it, Mrs. Martin.
3      A. Yes.
4      Q. Do you recognize this document marked as Exhibit
5  4?
6      A. Yes. It's my handwriting.
7      Q. Is the entire document your handwriting?
8      A. Um-hum, yes.
9      Q. And did you fill this form out at your first
10  visit with Dr. Harrison?
11      A. Yes.
12      Q. And how did you get the information that you
13  provided in this form?
14      A. Well, Richard was with me.
15      Q. And looking at the second page which says
16  "Medical Medications" listed?
17      A. Yes.
18      Q. First above that where it says "Other medical
19  problems," you wrote in there that your husband suffered
20  from elevated blood pressure, correct?
21      A. Yes.
22      Q. And under "Medical Medications" you listed
23  Accupril, Catapres, prednisone and Zocor, correct?
24      A. Yes.
25      Q. And you didn't list that he was taking Viagra,

## Page 107

1  correct?
2      A. No.
3      Q. I'm not correct?
4      A. You're correct.
5      Q. What do you recall Dr. Harrison telling you
6  about your husband's condition on that day?
7      A. Do I recall what he said?
8      Q. Yes.
9      A. I'm sure it was a stroke of the optic nerve or
10  anterior ischemic optic nerve.
11      Q. It was or it wasn't that?
12      A. Well, yes, it was.
13      Q. Did you ask Dr. Harrison what the cause of his
14  ischemic optic neuropathy was?
15      A. I didn't do much of the talking at that visit.
16  It would have been my husband who would have said most.
17      Q. Well, did your husband ask Dr. Harrison what the
18  cause of the ischemic optic neuropathy was?
19      A. Oh, yes.
20      Q. And what do you recall Dr. Harrison saying?
21      A. I remember even writing it, because Dick and I
22  talked about that, and he said that there was someone in
23  his -- the practice at the University that had had the
24  same thing, and they did not know the cause. I also
25  remember -- oh, never mind.

## Page 108

1      Q. What else do you remember?
2      A. I don't remember if it was him or if it was
3  Dr. Pomeranz, but I think it was Dr. Harrison, and I
4  remember writing it specifically when we talked about it
5  that he said it was something that happened to much
6  younger men but not to someone Richard's age.
7      Q. What was something --
8      A. It was a lot more common in someone older to
9  have had the neuropathy.
10      Q. It was more common to have neuropathy -- the
11  optic neuropathy in younger men?
12      A. No, in older men.
13      Q. Did he tell you anything else about the
14  potential cause of your husband's vision loss at that
15  time?
16      A. No.
17      Q. Now, you told me earlier you got some articles
18  from your daughter about ischemic optic neuropathy?
19      A. Yes.
20      Q. When did you receive those articles?
21      A. I can't say specifically.
22      Q. How long after you received those articles did
23  you provide copies to the doctors?
24      A. I don't remember exactly.
25      Q. Was it a year, a month? Can you estimate?

## Page 109

1      A. Well, when we had the information we passed it
2  on probably at a subsequent visit.
3      Q. Okay. So about how long of a period of time
4  would that have been?
5      A. I could guess, maybe six months, sometime within
6  a six-month time frame, I would guess.
7          (C. Martin Deposition Exhibit 5 marked for
8          identification by the Court Reporter.)
9      Q. (By Ms. Leskin) Mrs. Martin, we've marked as
10  Deposition Exhibit No. 5 a packet of documents with the
11  Bates numbers RMAR 1 through RMAR 43. These are
12  documents that were provided to us together with the Fact
13  Sheet from your husband in this case. And your husband
14  represented to us on Tuesday that this is a collection of
15  documents that you put together, and you'd be able to
16  explain them to us. Do you recognize these documents?
17      A. I probably would recognize them more if they
18  were original copies.
19      Q. It's the best I have.
20      A. But you know what I mean, in color and
21  dog-eared, going through the mail.
22      Q. And this is obviously a collection of different
23  documents so I'd kind of like to walk through them a
24  little bit and find out where you received some of these
25  documents and when. So if we can start with the first

28 (Pages 106 to 109)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 110

1  two pages, the ones with the Bates numbers RMAR 1 and 2,
2  do you recognize this document?
3     A. Um-hum.
4     Q. Yes?
5     A. Yes, I do. They're not colored.
6     Q. Okay. Where did you receive this document from?
7     A. This probably came from my daughter.
8     Q. And this is entitled Department of
9  Ophthalmology, Ischemic Optic Neuropathy, General
10  Information, correct?
11     A. Yes.
12     Q. Prior to receiving this from your daughter had
13  you received any written information about what ischemic
14  optic neuropathy is?
15     A. This kind of thing, you mean a written document?
16     Q. Yes.
17     A. No.
18     Q. Had you received any other information about
19  what ischemic optic neuropathy is?
20     A. From anyone prior to my daughter?
21     Q. Yes.
22     A. No.
23     Q. And I take it you read this document that you
24  received?
25     A. Um-hum.

Page 111

1     Q. The two-page document?
2     A. Um-hum.
3     Q. Yes?
4     A. Yes.
5     Q. And sitting here today do you recall when you
6  received this first document from your daughter?
7     A. Not precisely, no. It would have been sometime
8  after -- when Dick had received a diagnosis.
9     Q. Did you receive all the documents -- well, let
10  me rephrase it. How many documents, different documents
11  did you receive from your daughter?
12     A. Well, I know you can't transcribe this, but it
13  was a little packet that came in an 8-by-11 envelope, and
14  I would say about so thick (indicating), so that's about
15  a quarter of an inch.
16     Q. A quarter of an inch thick?
17     A. Probably.
18     Q. And did you receive only one packet from your
19  daughter?
20     A. Yes.
21     Q. Looking at the second document in the file,
22  which is Bates numbered RMAR 3 and 4 entitled University
23  of Maryland Medical News, where did you receive this
24  document from?
25     A. Well, I know that there were some things -- I

Page 112

1  see Dr. Pomeranz's name mentioned, and I received just a
2  partial document with -- mentioning him, University of
3  Maryland and Dr. Pomeranz from my daughter, but I did not
4  have the total document that Dr. Pomeranz's office ended
5  up sending to me.
6     Q. So this article from the University of Maryland
7  Medical News you believe you received from your daughter?
8     A. A partial document in regard to it, but what
9  doesn't look familiar on this is the fact that there were
10  some -- oh, yes, it is too. This could have been from my
11  daughter because it has the contact names of Ellen Levitt
12  and Gwen Newman on it.
13     Q. And if you look at the bottom of the page, it's
14  difficult on the first page of the article but on the
15  second page on the bottom above the Bates number there
16  appears to be a date that's something like 5-7-02. Do
17  you see that?
18     A. On the first page or the second?
19     Q. On the second page.
20     A. Yes, I do. I see that.
21     Q. You know that when you print something off the
22  Internet, the date you print it usually shows up on that
23  bottom line.
24     A. Hmm. Okay.
25     Q. So did you receive this from your daughter

Page 113

1  sometime in May of 2002?
2     A. As I said to you before, I don't know exactly
3  when I received it.
4     Q. Okay. But would it have -- "exactly" and
5  "generally" is two different things. So while I
6  recognize you don't recall the exact date, would it have
7  been in or about May of 2002 or would it have been
8  significantly later?
9     A. Boy, that -- I don't know. You know, it's been
10  eight years, or six years or whatever. Six years.
11     Q. Would you have received this article before the
12  left eye of your husband started to have difficulty?
13     A. Pardon?
14     Q. Did you receive this article from your daughter
15  before or after the left eye of your husband started to
16  have problems?
17     A. I don't know that either. I don't remember.
18     Q. You note at the top of this article has contact
19  information for an Ellen Beth Levitt and a Gwen Fariss
20  Newman. Did you attempt to contact Ms. Levitt or
21  Ms. Newman?
22     A. I did.
23     Q. And when did you come to contact Ms. Levitt or
24  Ms. Newman?
25     A. After I received this information.

29 (Pages 110 to 113)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 114

1    Q. And how did you attempt to contact them?
2    A. By phone.
3    Q. And that was the numbers provided there?
4    A. Yes. They would have been the numbers on the
5  paper. Those would have been the only numbers I would
6  have had.
7    Q. And did you ever reach Ms. Levitt or Ms. Newman?
8    A. No, I did not.
9    Q. What happened when you tried calling them?
10   A. Probably -- I just know that -- I didn't get
11 through to anyone.
12   Q. Did you send them an e-mail to the e-mail
13 addresses provided?
14   A. I did not.
15   Q. Did you ask anyone to send an e-mail to them on
16 your behalf?
17   A. I did not.
18   Q. Did you have any efforts to contact either
19 Ms. Levitt or Ms. Newman or Dr. Pomeranz?
20   A. Well, it said there was a contact there, so I
21 did not. I did not get through to those people at that
22 time.
23   Q. Okay. The next article is Bates stamped RMAR 5
24 and it's an article entitled Sildenafil (Viagra) Use
25 Associated With Ischemic Optic Neuropathy (stroke of the

Page 115

1  optic nerve).
2    A. Am I on the right page?
3         MS. HAUER: I think she's on this page.
4    Q. (By Ms. Leskin) Has 5 on the bottom.
5    A. Okay. Yes.
6    Q. And where did you receive this article from?
7    A. Hmm. I'm not sure, but I would think it would
8  have been from my daughter. But the fact of -- if you
9  say that would have been March of '05, that's strange.
10   Q. No, not March of '05. The numbers on the
11 bottom, this RMAR 5, that's a Bates number that we put on
12 the document.
13   A. Oh, that's what I'm looking at and thinking
14 that's strange. All right. I was going to say, that
15 doesn't gibe.
16   Q. Is the dates -- I'm sorry. Go ahead.
17   A. The date is right here.
18   Q. The May 6, 2002.
19   A. Yes. That would have been from my daughter.
20   Q. And did you receive this article in about May of
21 2002?
22   A. Um-hum.
23   Q. Yes?
24   A. I would say so, yes.
25   Q. Okay. Did your daughter know that your husband

Page 116

1  had taken Viagra at that point in time?
2    A. No. No.
3    Q. The next article Bates stamped number RMAR 6 is
4  an article from Boston Life Sciences, which is a news
5  release that says Boston Life Sciences Central Nervous
6  System Program Identifies Optic Nerve Regeneration
7  Pathway.
8    A. Um-hum.
9    Q. Where did you receive this article from?
10   A. That I think that perhaps -- well, all of the
11 articles either would have come from my daughter or
12 Dr. Pomeranz's office. Those were the only two sources.
13   Q. So do you know where this article came from?
14   A. Not -- no, not for sure.
15   Q. The next article starts on RMAR 8 and goes
16 through RMAR 10, and that's the North American
17 Neuro-Ophthalmology Society, Anterior Ischemic Optic
18 Neuropathy. Are you with me on the right article?
19   A. Number 8 on the bottom?
20   Q. Yes.
21   A. Yes.
22   Q. And have you seen this article before?
23   A. It looks familiar, yes.
24   Q. Where did you receive this article from?
25   A. As I said before, it would have either been from

Page 117

1  my doctor or from Dr. Pomeranz.
2    Q. If you look at the first part of the article
3  that sentence says, "Anterior Ischemic Optic Neuropathy,"
4  "This is the most common cause of sudden decreased vision
5  in patients older than 50 years." It's on page 8, Bates
6  stamped 8. Do you see that line, the first paragraph of
7  the article?
8    A. Yes, I do recall seeing that.
9    Q. Do you recall reading that sentence when you
10 received this article?
11   A. Yes, I do. I remember seeing it. Don't ask me
12 when I saw it.
13   Q. And if you look towards the bottom of the page
14 in the section marked "Physiology"?
15   A. Yes.
16   Q. It is a large paragraph there under the
17 pictures. And the last sentence of that paragraph says,
18 "Patients who smoke, or who have diabetes or high blood
19 pressure, may be at higher risk for AION."
20   A. Yes.
21   Q. Do you recall reading that sentence at the time
22 of the article?
23   A. I'm sure that I read it.
24   Q. And on the second page of the article, the one
25 with the Bates stamp 9 on the bottom, do you see there's

30 (Pages 114 to 117)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

## Page 118

1  a section entitled "Prognosis"?
2      A. Yes.
3      Q. Do you see the second paragraph in that section
4  says, "In patients who have had AION there is a
5  possibility of this happening in the other eye"?
6      A. Yes.
7      Q. Do you recall reading that at the time you
8  received this article?
9      A. No.
10     Q. If you look at the third page of the article
11 with the Bates stamp 10, you see that top question that
12 says, "What did I do to make this happen?"
13     A. Yes.
14     Q. Do you see where the answer says, "In most
15 cases, there is nothing you or anyone else did to create
16 this problem. The anatomy of your optic disc is
17 something you were born with. It is possible that high
18 blood pressure or smoking may have increased your risk
19 and, in rare cases, blood loss or sudden drop in blood
20 pressure can also contribute. Ultimately, we still do
21 not understand the trigger that will produce the ischemic
22 event."
23         Do you recall reading that paragraph at the time
24 you received this article?
25     A. I remember reading it. I don't remember when I

## Page 119

1  read it.
2      Q. The next article, which is on pages RMAR 11 and
3  12, looks to be a similar article to the ones that were
4  the first two pages from the Department of Ophthalmology
5  and Visual Sciences.
6      A. Um-hum.
7      Q. Ischemic Optic Neuropathy. Do you see that
8  article?
9      A. Yes.
10     Q. Do you know where you got that article from?
11     A. I would either have gotten it from my daughter
12 or from Dr. Pomeranz's office.
13     Q. Do you recall when you received that article?
14     A. I do not.
15     Q. The print date at the bottom is 5-6-2002. Do
16 you see that?
17     A. Yes, I do.
18     Q. The next page is a one-page article Bates
19 stamped RMAR 13 entitled -- from the Department of
20 Ophthalmology and Visual Sciences, Posterior Ischemic
21 Optic Neuropathy?
22     A. Yes.
23     Q. Do you recall seeing this article before?
24     A. No, I don't remember reading this.
25     Q. Do you know where you got this article from?

## Page 120

1      A. It would either have been from Dr. Pomeranz or
2  from my daughter.
3      Q. And you don't know particularly which one it is?
4      A. No.
5      Q. Okay. RMAR 14 looks to be a document that was
6  copied on top of another document from the office of
7  Dr. Harrison. Do you see that to the left?
8      A. Yes.
9      Q. And is that your handwriting on that note on the
10 left?
11     A. No.
12     Q. Do you know whose handwriting that is?
13     A. On the left?
14     Q. Where it has Dr. Halbe and Dr. Hoy?
15     A. No, I do not know whose handwriting that is.
16 It's probably Dr. Ferrara's. Well, I don't know. I
17 don't know whose it is.
18     Q. Do you know who Dr. Halbe is?
19     A. It's written right underneath it. He's a
20 cardiologist.
21     Q. Did your husband see Dr. Halbe?
22     A. Yes, he did.
23     Q. Had he seen Dr. Halbe prior to the problems with
24 his eyes?
25     A. Not to my knowledge.

## Page 121

1      Q. Do you know what Dr. Halbe said about your
2  husband's eyes?
3      A. No, I do not.
4      Q. Did you attend that visit with your husband?
5      A. I delivered him.
6      Q. Did you sit in the office with him?
7      A. I did not.
8      Q. Did you have any conversations with Dr. Halbe as
9  to the cause of your husband's vision loss?
10     A. Not that I can recall.
11     Q. Do you know Dr. Hoy?
12     A. I do not. But I recognize the name and I know I
13 took him to it.
14     Q. He's the neurologist?
15     A. Yes.
16     Q. Had he seen Dr. Hoy prior to the problems with
17 his eyes?
18     A. Not to my knowledge ever.
19     Q. And when you took your husband to see Dr. Hoy
20 did you sit in on the visits?
21     A. Not to my recollection.
22     Q. Did you have any conversation with Dr. Hoy as
23 the cause of your husband's eye problems?
24     A. I would not have had that conversation.
25     Q. Did your husband report to you that he had a

31 (Pages 118 to 121)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

## Page 122

1  conversation with Dr. Hoy as to the cause of his ischemic
2  optic neuropathy?
3      A. I know he kept asking every doctor what could
4  have caused this.
5      Q. And did your husband report to you what Dr. Hoy
6  told him?
7      A. I don't recall that conversation.
8      Q. Did your husband report to you what Dr. Halbe
9  had told him?
10     A. Well, I remember him saying like with the
11  cardiologist that I think he did a stress test or
12  something with him, and that there was nothing wrong with
13  his heart.
14     Q. Do you recall any further conversation that your
15  husband reported with Dr. Halbe as to the cause of his
16  vision loss?
17     A. No.
18     Q. The next page in this packet is RMAR 15 from the
19  St. Paul Eye Clinic.
20     A. Yes.
21     Q. And has a date of an appointment with
22  Dr. Weingarden, correct?
23     A. Yes.
24     Q. Next page, RMAR 16 through 19, there's an
25  article entitled Anterior Ischemic Optic Neuropathy

## Page 123

1  (AION). And this article seems similar to the other
2  article we discussed, does it not, the one at page 8?
3      A. Um-hum.
4      Q. Yes?
5      A. Yes.
6      Q. And do you know where you got this copy of the
7  article, the one that goes from page 16 to 19?
8      A. Any articles I had were either gotten from
9  doctor -- from the University of Minnesota and
10  Dr. Pomeranz's office or from my daughter.
11     Q. And you don't know which one you got this one
12  from?
13     A. Well, since it's the same, obviously the more
14  complete one would have been from Dr. Pomeranz's office,
15  and the incomplete one would have been from my daughter.
16     Q. When did you ultimately reach Dr. Pomeranz's
17  office?
18     A. Well, if you end up going through and looking
19  further on R -- let me see. On 21 of RMAR I had received
20  a copy of this article --
21     Q. This is an article from The Week?
22     A. Yes.
23     Q. Dated May 15, 2005?
24     A. Um-hum.
25     Q. Yes?

## Page 124

1      A. Yes. I had received a copy of this from my
2  friend Bobbie. She and her husband have been close
3  friends of my husband and I. They're from New Hampshire.
4      And Bobbie was the only friend that I ever
5  talked to about Dick's eyes because her husband had
6  profound hearing loss and she experienced difficulties in
7  her relationship because of her husband's hearing, and
8  she talked to me about the problems, the marital
9  problems, you know, or day-to-day problems because of his
10  hearing loss. And we -- and I shared with her the
11  day-to-day problems of living with someone with vision
12  loss. And I think that she was the only person that I
13  talked to that Dick had ever used Viagra. And she sent
14  me this article. And that was how I found out about
15  Dr. Pomeranz.
16     Q. I'm sorry. That's how you found out what?
17     A. Where Dr. Pomeranz was located.
18     Q. That he was located at the University of
19  Minnesota?
20     A. Yes.
21     Q. And so what did you do then?
22     A. I proceeded to call University of Minnesota for
23  my husband.
24     Q. Okay. So that was sometime after May 13 of
25  2005?

## Page 125

1      A. Yes.
2      Q. Okay.
3      A. I believe so, it would have been.
4      Q. The articles that had the print-out dates in
5  2002, those would have come later from Dr. Pomeranz's
6  office or would those be the ones that came from your
7  daughter?
8      A. Which page?
9      Q. Well, 1 through 7 are all articles dated May 6,
10  2002. And 11 and 12 are dated May 6. 13, the articles
11  for -- basically from 1 to 13 on the bottom are all dated
12  as printed on or about May 6, 2002. So did Dr. Pomeranz
13  send you articles after you spoke to his office in 2005
14  or would those be the articles you got from your
15  daughter?
16     A. Oh. These must have been the ones I got from my
17  daughter that are dated.
18     Q. If you look at RMAR 20, this is a copy of a
19  newspaper article. And unfortunately, there's some
20  writing on the margin that is cut off my copy. Do you
21  know the date or newspaper this came from?
22     A. Yes, I see that. No, but I could get you that
23  information if you need it.
24         MS. LESKIN: We would ask for a copy with
25  the legible handwriting on the side.

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

## Page 126

1    MS. HAUER: I look forward to receiving the
2 request in your letter.
3    Q. (By Ms. Leskin) Okay. Where did you get a copy
4 of this article from, if you can remember?
5    A. There were two similar articles, as I recall, to
6 the best of my recollection. There was one article that
7 came from a paper in Nashua and that would have come from
8 my friend Bobbie, and there was also one in the Pioneer
9 Press, which is a paper from St. Paul, Minnesota.
10    Q. And if you look at the article that starts at
11 Bates numbers RMAR 22 and continues on to RMAR 23, you
12 you'll see that article has a reference, view more
13 reports at www.twincities.com/news.
14    A. Yes.
15    Q. Do you see that?
16    A. Yes, I do.
17    Q. Is it more likely that article came from the
18 Minnesota paper?
19    A. I wouldn't know.
20    Q. That article is dated May 28, 2005, right, if
21 you look at the second page at the top?
22    A. Yes.
23    Q. Do you know whether the article located at RMAR
24 20 was simply published around that same date?
25    A. Yes. I had noted that myself.

## Page 127

1    Q. And in fact, the articles are pretty much
2 identical, right?
3    A. Yes.
4    Q. And did you read these articles at the time you
5 received them?
6    A. Sure.
7    Q. If you look at the second article of the
8 paragraph, and I'm looking at the version that's at RMAR
9 20, the second paragraph of the article says, "There's no
10 evidence yet that the drugs increase risk. Indeed, the
11 same types of illnesses that lead to impotence are linked
12 to this type of vision loss." Do you recall reading that
13 paragraph at the time of this article?
14    A. Yes, I do.
15    Q. How long -- are you okay?
16    A. Yeah, I just get a tickle once in a while.
17    Q. You told me after receiving a copy of the
18 article from The Week from your friend Bobbie, which we
19 said was dated May 13, 2005, you said that was the first
20 time you saw that Dr. Pomeranz was located at the
21 University of Minnesota, correct?
22    A. Yes.
23    Q. How long after receiving that copy of the
24 article did you attempt to call Dr. Pomeranz?
25    A. I don't recall.

## Page 128

1    Q. And how long did take you to reach Dr. Pomeranz?
2    A. I don't remember.
3    Q. The next few pages here, RM 24 through RM 27,
4 appear to be the package insert for Viagra dated August
5 of 2003.
6    A. Yes.
7    Q. Where did you receive this copy from?
8    A. The only way we ever would have had access to
9 this would have been through Dick's prescriptions.
10    Q. So you got this from one of the prescriptions or
11 one of the samples you got for Viagra?
12    A. One or the other. That's the only place.
13    Q. Had you seen documents like this prior -- this
14 one is dated August 2003, if you look at the last page,
15 RMAR 27. Had you seen any documents that look similar to
16 this prior to August of 2003?
17    A. Not to my recollection.
18    Q. Did any of the samples that you received, that
19 your husband received, include label information similar
20 to this?
21    A. I don't know. If they ever did, as I said, when
22 he ended up getting his prescriptions or medications, he
23 took charge of his stuff, not me.
24    Q. Okay. So you never read the label for Viagra
25 prior to August of 2003?

## Page 129

1    A. I couldn't say that for sure. I couldn't say
2 yes or no. I'm not sure.
3    Q. Okay. And do you know one way or the other
4 whether your husband ever read the labeling information
5 for Viagra prior to August of 2003?
6    A. Well, I know whenever he would get a
7 prescription he would sit down and he would look at some
8 of the stuff and he'd roll his eyes because it was
9 complicated and he doesn't have any pharm -- you know,
10 pharmacy knowledge, nor do I. And so we read what --
11 whenever any of us would get something we read what we
12 understood, and the rest of it was superfluous and in our
13 doctor's hands.
14    Q. Did he read the information for Viagra?
15    A. I'm sure, knowing him as I do, I'm sure that he
16 must have.
17    Q. And do you know how much of it he understood?
18    A. No, I don't know how much of it he understood.
19    Q. Do you know what he talked to his doctor about
20 Viagra?
21    A. No.
22    Q. Do you know what information his doctor gave him
23 about Viagra?
24    A. Just that it would help him.
25    Q. Do you know whether or not his doctor gave him

33 (Pages 126 to 129)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 130

1  any additional information?
2  A. Not to my knowledge.
3  Q. RMAR 28, why -- let me go back. When you say
4  not to your knowledge, does that mean that to your
5  knowledge the doctor did not give him any additional
6  information or you just don't know one way or the other
7  what information he got?
8  A. I don't know what information he received from
9  the doctor.
10  Q. The next article is at RMAR 28 and 29. It's an
11  article, looks like from China Daily, "Blindness reported
12  in some taking Viagra." And the print date on that is
13  May 31, 2005?
14  A. Um-hum.
15  Q. Yes, you see that?
16  A. I see it, barely.
17  Q. It's a little clearer on the second page of the
18  article. Do you know where you got this article from?
19  A. The only -- the only people I ever got
20  information from, as I said, was Dr. Pomeranz or my
21  daughter. And this doesn't look like anything that would
22  have come from Dr. Pomeranz's office so perhaps my
23  daughter may have sent more information that I didn't
24  recall.
25  Q. But your daughter never knew that your husband

Page 131

1  had taken Viagra, is that what you told me?
2  A. No, not prior to -- not when I first talked to
3  her. When I first asked her for information on NAION.
4  Q. At some point in time did she learn that your
5  husband had taken Viagra?
6  A. Yes.
7  Q. When was that?
8  A. I don't recall when I told her.
9  Q. Was it prior to May of 2005?
10  A. No. 2005? Oops. I'm thinking 2002. Probably.
11  Q. The next article at RMAR 30 is from the Medical
12  News Today. It says, "Viagra can cause permanent vision
13  loss in some men, University of Minnesota researchers
14  say."
15  A. Um-hum.
16  Q. And again this is a print date of May 31, 2005.
17  Do you remember seeing this article?
18  A. Vaguely.
19  Q. Do you know where you got this article from?
20  A. I'll just reiterate what I said before.
21  Q. The next article on RMAR 31 is a printout that
22  just says "Sildenafil" at the top. Do you know where you
23  got this article from?
24  A. No, I don't remember, you know, since I
25  didn't -- it had to have come in a packet of information

Page 132

1  from somebody.
2  Q. But you don't know where this came from?
3  A. It would have either been from my daughter or
4  from Dr. Pomeranz's office. I just don't recall ever
5  getting anything from anyone else.
6  Q. RMAR 32 is a letter from the Department of the
7  Veterans Affairs dated December 21, 2004.
8  A. You know what? I wonder if I might have gone to
9  the library at some point in time.
10  Q. Do you remember going to the library to do
11  research?
12  A. I go to the library a lot.
13  Q. Do you recall going to the library to do
14  research on Viagra?
15  A. I might have, but I would have had to have had
16  help to do that, and it would have been the librarian
17  that would have helped me.
18  Q. And where would you have done the research in
19  the library?
20  A. It's called Inver Glen in Inver Grove Heights,
21  Minnesota.
22  Q. And they have computer access there?
23  A. They do.
24  Q. And when is your best recollection of when you
25  did that research at the library?

Page 133

1  A. I just remembered it now.
2  Q. Okay. At what point in time do you recall doing
3  that research?
4  A. I'm sure that it was -- if I -- oh, gosh. It
5  would have been in the spring of 2002 after he had, you
6  know, problems with his eyes.
7  Q. And what were you researching at the time you
8  would have gone to the library in the spring of 2002 time
9  frame?
10  A. Find out what it was.
11  Q. So you would have done research on ischemic
12  optic neuropathy?
13  A. Um-hum.
14  Q. Yes?
15  A. Yes.
16  Q. And do you recall if any of these articles were
17  ones that you found while researching at the library?
18  A. No, I don't.
19  Q. Would you have printed out articles from the
20  library?
21  A. I'll have to stop and think. I'm sorry if my
22  recollection isn't the greatest.
23  Q. That's fine. I'm just trying to understand your
24  best recollection. Would you have any documents at home
25  that would help you determine which articles you received

34 (Pages 130 to 133)

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 134

1  from what source?
2    A. No. I'm sorry.
3    Q. Do you have any journals that indicate if you
4  went to the library on a particular day?
5    A. I -- no.
6    Q. Would any of these calendars indicate if you
7  went to a library on a particular day?
8    A. No.
9    Q. When you go to the library to do research are
10  there any type of documentation that you have to fill out
11  if you do research?
12    A. There might -- if there would be any, the only
13  thing I could think of would be if the library kept
14  records or something on the number of copies that they
15  would have printed out or something.
16    Q. Do you have a copy of any paperwork to that
17  effect?
18    A. Any stuff that I ever did was in a file that was
19  given to -- and I don't remember. I honestly don't
20  remember.
21    Q. That's fine. Just looking for your best
22  recollection.
23    A. Yeah.
24    Q. Or ways that would help you recall. The next
25  page here is RMAR 32 and it's a letter from the

## Page 135

1  Department of Veterans Affairs to Mr. Martin.
2    A. Yes.
3    Q. From David Griffin?
4    A. Yes.
5    Q. Do you recall receiving this letter on or about
6  December 21, 2004?
7    A. Yes, I recognize this.
8    Q. The letter at the bottom says, "You should
9  probably not take Viagra. Rarely Viagra can cause a
10  similar eye condition."
11    A. Yes.
12    Q. Do you see that?
13    A. Yes.
14    Q. As of December 21, 2004, was your husband still
15  using Viagra?
16    A. No.
17    Q. When did he stop using Viagra?
18    A. I don't know exactly. Probably after we thought
19  that it was connected -- that there was a connection.
20    Q. And when was it that you first thought there was
21  a connection?
22    A. Probably after seeing an article.
23    Q. Which article?
24    A. Probably the one from Bobbie, from The Week.
25    Q. That one was dated May 13, 2005?

## Page 136

1    A. Well -- yeah, probably.
2    Q. So is your husband continuing to --
3    A. You know, I wish I could remember. I really do.
4    Q. So you don't recall one way or the other if your
5  husband was still using Viagra as of December 21, 2004?
6    A. I just told you I don't remember when he quit
7  using it.
8    Q. Okay.
9    A. If I had thought it was -- I wish I had written
10  everything down. I wished I had kept a journal. I
11  really do. Then I could answer you everything and give
12  you a whole journal, but I did not.
13    Q. I'm just trying to understand what you do recall
14  and what you don't and the best time line we can to
15  establish it, ma'am.
16    A. Yeah.
17    Q. And if you don't know the answer to it, just
18  tell me you don't know the answer to it.
19    A. Okay.
20    Q. The next document is RMAR 33, which appears to
21  be an envelope addressed to Richard Martin from the
22  University of Minnesota.
23    A. Yes.
24    Q. And then on the bottom left there's some notes
25  written there.

## Page 137

1    A. Yes.
2    Q. Is that your handwriting?
3    A. Yes, it is.
4    Q. And what does that top note say?
5    A. The top note says, "Ruth Alliband called on
6  5-17-05 (secretary to Dr. Pomeranz)." And then her phone
7  number. The phone number is listed.
8    Q. And what did Ruth Alliband call to talk to you
9  about on May 17, 2005?
10    A. I can't tell you specifically on what date, but
11  I do have written down, you know, when I spoke to her.
12  And just had told her that I was trying to get ahold of
13  Dr. Pomeranz and why, and that my husband had taken
14  Viagra and that we had seen an article in the paper and
15  would like to speak to him.
16    Q. RM 34 through 38 is a medical journal article
17  entitled Nonarteritic Ischemic Optic Neuropathy
18  Developing Soon After Use of Sildenafil (Viagra): A
19  Report of Seven New Cases, by Dr. Howard D. Pomeranz and
20  Abdhish R. Bhavsar. Have you seen that article before?
21    A. Yes.
22    Q. Where did you receive this article?
23    A. That came from the University.
24    Q. Is that what came in the envelope that you
25  copied as page 33?

35 (Pages 134 to 137)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 138

1    A. Yes.
2    Q. Is there anything else that came in that
3  envelope as far as you know?
4    A. No. There was nothing else.
5    Q. Did you receive that article before or after you
6  spoke to Dr. Pomeranz for the first time?
7    A. Well, what's it post-dated? I know I had
8  written down when Dick and I had spoken to him. I don't
9  recall, you know, what point it came.
10    Q. I'd like you to turn to RMAR 40. RMAR 40 is the
11  first of two pages of handwritten notes. Is this your
12  handwriting?
13    A. Yes, it is.
14    Q. Now, you'll notice the dates on those notes are
15  cut off on the left so that the months are not visible.
16    A. Yeah, I see that.
17    Q. Okay. Now, if you look back to the envelope,
18  which is RM 33, you have that Ruth Alliband called on
19  5-17-05. Does that correspond to the entry that is the
20  second dated entry on your notes here?
21    A. Let me see. Yes.
22    Q. Okay. Looking at the date, the first date on
23  that entry then?
24    A. Um-hum.
25    Q. Do you know what month that was? Would that

## Page 139

1  also have been May?
2    A. Where it says 18-05?
3    Q. The top one, 16-05.
4    A. 16-05, no, but it would show on, you know, the
5  original.
6    MS. LESKIN: Okay. We'd ask for a copy of
7  the original, And we'll put that in our letter.
8    MS. HAUER: Okay.
9    Q. (By Ms. Leskin) So at some point you did call
10  Ruth Alliband at the University of Minnesota, correct?
11    A. Yes.
12    Q. And you can use your notes to help refresh your
13  recollection, but what do you recall about that
14  conversation on the 16th of some month in 2005 that you
15  had with Ruth Alliband? And I guess I should preface
16  that question, did you speak to Ms. Alliband or did your
17  husband?
18    A. Yes, I did.
19    Q. What do you recall about that conversation with
20  Ruth Alliband?
21    A. You know, this is why I started writing things
22  down because my memory is not always the greatest.
23    Q. That's fine. You can use your note there to
24  help refresh your recollection.
25    A. Well, just what it says, you know, that would

## Page 140

1  have explained why we couldn't get ahold of anyone, just
2  that I -- you know, all I can remember is that we -- or
3  that I tried to get ahold of Dr. Pomeranz and spoke to
4  his secretary, and I told her about the article, and --
5    Q. Which article?
6    A. The article that was in The Week. I don't
7  remember the extent of the conversation with her. And I
8  don't know if she told me that's why we couldn't get
9  ahold of him, but I think that those are my comments
10  about, you know, why we couldn't get ahold of him.
11    Q. And that's because you were calling the offices
12  in Maryland and Dr. Pomeranz had moved to Minnesota?
13    A. Yes, yes.
14    Q. Had you been trying to get ahold of Dr. Pomeranz
15  consistently for the three years in between the 5-7-02
16  report and this date?
17    A. No. No.
18    Q. How long --
19    A. I had no idea how to reach him, nor did Dick.
20    Q. How long before you spoke to Ruth Alliband at
21  the University of Minnesota had you tried calling
22  Dr. Pomeranz at the University of Maryland?
23    A. Say that again.
24    Q. Okay. We have here that some point, the 16th of
25  some point in 2005 you reached Ruth Alliband at the

## Page 141

1  University of Minnesota, right?
2    A. Yeah.
3    Q. And she told you that Dr. Pomeranz had moved
4  from Maryland, and you surmised that's why you were not
5  able to reach Ms. Newman or Ms. Levitt, which were
6  mentioned on a report dated 5-7-02?
7    A. Yes.
8    Q. How long had it been since you tried to reach
9  Ms. Newman or Ms. Levitt until you finally did reach
10  Ms. Alliband?
11    A. Well, it would have been -- I have to stop and
12  think about what you're asking me. Well, when I first
13  got the report from my daughter that she sent from what
14  she had gotten off the Internet, and I had tried on a
15  couple of occasions to get ahold of him, Dr. Pomeranz,
16  through either Ellen Levitt or Gwen Newman, and when I
17  couldn't get ahold of Dr. Pomeranz that way, it wasn't
18  until I received the article from Bobbie Skillins that I
19  knew where to go try and get ahold of him.
20    Q. And my question then is what period of time
21  elapsed in that interim?
22    A. Okay. Well, that would have been three years.
23    Q. Okay. So you got that report from your daughter
24  sometime in May 2002?
25    MS. HAUER: Objection, form.

36 (Pages 138 to 141)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 142

1     Q. (By Ms. Leskin)  Is that what I understood you
2  to say?
3         MS. HAUER:  You can answer.
4     Q. (By Ms. Leskin)  If you understand my question,
5  you can answer it.
6     A. Okay.  If that's what the dates were on those
7  things, yeah, that would have been accurate, May of 2002.
8     Q. So that's about when you received the report
9  from your daughter?
10    A. Um-hum.
11    Q. Yes?
12    A. Yes.
13    Q. And as soon as you received that report, you
14 tried reaching out to Ms. Levitt and Ms. Newman?
15    A. As I recall.  As closely as I can recall, yes.
16    Q. And having not been able to reach them, it was
17 three years until you were able to reach Ms. Alliband?
18    A. Yes.
19    Q. And during that three-year period did you make
20 any efforts to locate Dr. Pomeranz?
21    A. No.
22    Q. The second entry which you told me corresponds
23 to the May 17 note you wrote on the envelope says that
24 again you spoke to Ruth Alliband about the article
25 written in The Week?

Page 143

1     A. Um-hum.
2     Q. Yes?
3     A. Yes.
4     Q. What else do you recall about that conversation
5  with Ms. Alliband?
6     A. I don't.
7     Q. She did indicate she was going to send you the
8  study that Dr. Pomeranz did?
9     A. Yes.
10    Q. Yes?
11    A. Yes.
12    Q. And that's the article we identified?
13    A. Yes.
14    Q. And to give your husband's name to Dr. Pomeranz?
15    A. Yes.
16    Q. Do you recall anything else about the
17 conversation?
18    A. I do not.
19    Q. Did you give any information to Ms. Alliband
20 about your husband's medical background?
21    A. I don't recall.
22    Q. And you personally spoke to her?
23    A. Yes.
24    Q. Was your husband involved in that conversation?
25    A. No.

Page 144

1     Q. And then on May 18, and again corresponding to
2  the date on the envelope that is RM 33, RMAR 33, on May
3  18 Dr. Howard Pomeranz called you?
4     A. Yes.
5     Q. And you said that he spoke to Dick.
6     A. Yes.
7     Q. And that would have been your husband, correct?
8     A. Yes.
9     Q. Were you on the phone during that conversation?
10    A. Yes.
11    Q. Listening in on an extension?
12    A. Yes.
13    Q. What do you recall about that conversation with
14 Dr. Pomeranz?
15    A. Just that he was very understanding and he asked
16 Dick a lot of questions about what had happened, and he
17 said that he wanted to see a copy of, you know, Dick's
18 appointment, appointment with the St. Paul Eye Clinic.
19 And I think he wanted his medical records.
20    Q. Did you have any conversation about him seeing
21 your husband in person?
22    A. Well, he was leaving.  We thought gee, this is
23 great.  We lost him for three years.  Now that we found
24 him he's going to be gone again.
25    Q. So you didn't make any effort to try to see him?

Page 145

1     A. Well, he wasn't seeing anybody anymore.
2     Q. Did you ask him to see your husband?
3     A. What good would that have done?  The damage was
4  already there.  And he had access to the records that
5  were done at the University.
6     Q. But did you ask him to see your husband?
7     A. No.
8     Q. Did your husband ask him to examine him?
9     A. Not that I recall.
10    Q. What information did your husband and you
11 provide to Dr. Pomeranz during that phone call?
12    A. Well, we gave permission for St. Paul Eye Clinic
13 to send his records over, and I think he got -- I think
14 he got Dick's records probably from the Inver Grove
15 Clinic.
16    Q. That's Dr. Ferrara?
17    A. Yeah.  I think he got those.
18    Q. Did you give any other information to
19 Dr. Pomeranz about the time line of events that had
20 happened?
21    A. Yes.  Yes.  We did mention that it was almost,
22 you know, like it was a month between both events.
23    Q. And what else did you tell him?
24    A. As I said, I mostly sat and listened.
25    Q. What else do you recall your husband telling

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

## Page 146

1  him?
2      A. I don't remember.
3      Q. Other than this note that we're looking at here
4  at RMAR 40, did you keep any other notes of the
5  conversation with Dr. Pomeranz?
6      A. I did not.
7      Q. Did you put anything in writing to Dr. Pomeranz
8  about your husband's medical background?
9      A. Not that I can recall.
10     Q. Did you put anything else in writing to
11  Dr. Pomeranz about the time line of events that led to
12  his vision loss?
13     A. In writing?  No.
14     Q. Did you send the medical records to
15  Dr. Pomeranz?
16     A. I don't recall that either.  I'm sorry.
17     Q. Do you know how the medical records got to
18  Pomeranz?
19     A. Via the mail.
20     Q. Okay.  Did they come from you or from the
21  doctor's office?
22     A. I know you asked me that before you --
23     Q. You just don't know?
24     A. No.
25     Q. Do you recall going to any of the doctors to

## Page 147

1  pick up a copy of the medical records?
2      A. Oh, this is taxing.  No, I don't remember.
3      Q. Did you keep a copy of what was sent to
4  Dr. Pomeranz?
5      A. Did I keep a copy of what?
6      Q. Of what was sent to Dr. Pomeranz.
7      A. Well, there wasn't anything that you don't have,
8  you know.
9      Q. That's not my question.  My question is did you
10  keep a copy of what you sent to Dr. Pomeranz?
11     A. No.
12     Q. Okay.
13     A. I don't think so.
14     Q. Okay.
15     A. Like I said, whatever is in the packet is what
16  you have.
17     Q. But you didn't say here's an envelope and keep a
18  copy with a clip and said this is what we sent to
19  Dr. Pomeranz?
20     A. No.
21     Q. The next page of notes which is at RMAR 41 again
22  has the month cut off.  But the 27th of a month at 5:30
23  p.m., ABC-TV.  Do you know what month that was, that
24  first entry?
25     A. No.  It's in the records.  They have it.

## Page 148

1      Q. And we'll get a clean copy of that.  What is
2  that an entry about, that first entry on the second page
3  of your notes?
4      A. It just says, "Lisa Stark, broadcaster, said FDA
5  knows of 38 cases.  Viagra will change its label to
6  doctors.  Loss of vision in 24 to 36 hours after
7  ingestion."
8      Q. Is that based on a conversation you had with
9  Ms. Stark?
10     A. No.  That was something that we saw on
11  television.
12     Q. So there was a news report on television and you
13  just wrote down a note?
14     A. Yes.
15     Q. Okay.  Did you have any follow-up communications
16  with Ms. Stark?
17     A. I did not.
18     Q. Did you have any follow-up communications with
19  the FDA?
20     A. At one point we -- I sent a copy, I think it was
21  Dr. Pomeranz, that suggested that we end up filing
22  something with the FDA.
23     Q. Okay.
24     A. And so we did.
25     Q. And if you look at the last page, page 43,

## Page 149

1  there's a page from MedWatch called Advice About
2  Voluntary Reporting?
3      A. Yes.
4      Q. Now, there was a form that you filled out?
5      A. Yes, it was.
6      Q. And did you keep a copy of that form?
7      A. Yes, I did.
8          MS. LESKIN:  We'd request a copy of that
9  form.
10         THE WITNESS:  This was a copy of that form.
11     Q. (By Ms. Leskin) Did you keep a copy of what you
12  filled out on that form?
13     A. I don't remember.
14     Q. Where would you have a copy of that form if you
15  didn't keep a copy?
16     A. Where would I?  I'll look and see if I have it.
17     Q. Okay.
18         MS. LESKIN:  And if you have a copy we'd
19  request a copy.
20         MS. HAUER:  Noted.
21     Q. (By Ms. Leskin) The second entry looks like
22  it's the same date at 12:13, Channel 4.  And what does
23  that say?
24     A. It says, "12:13, Channel 4 television mentioned
25  Viagra and possible link to blindness."

38 (Pages 146 to 149)

Paradigm Reporting & Captioning, Inc.
612-339-0545

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

Page 150

1    Q. Again, that's a TV report?
2    A. Yes, it was.
3    Q. Did you follow up with anyone from Channel 4?
4    A. I did not.
5    Q. The last entry again, the month is cut off, do
6  you know the month that that is?
7    A. I do not.
8    Q. This is the 11th of some month at 3 p.m., and
9  the name is Fred Soucie?
10   A. Yes.
11   Q. All right. Who is Fred Soucie?
12   A. Fred Soucie is an attorney.
13   Q. Do you know what office he's at?
14   A. I think it's Soucie and Bolt.
15   Q. Is that the name at the bottom there?
16   A. Yes.
17   Q. And what was the purpose of contacting
18  Mr. Soucie's office?
19   A. To start litigation.
20   Q. And who is Christopher Hoffer?
21   A. Is that A-T-T-Y, which would be an attorney.
22   Q. And that's at Fred Soucie's office?
23   A. Must have been.
24   Q. And who's Bob Johnson?
25   A. Bob Johnson is my oldest son's father-in-law.

Page 151

1    Q. And you asked him for a referral for an
2  attorney?
3    A. Yes.
4    Q. Did you eventually talk to Mr. Soucie?
5    A. Yes.
6    Q. And is Mr. Soucie an attorney of record for your
7  husband in this case?
8    A. No.
9    Q. Do you know how you got to Zimmerman Reed or how
10  your husband got to Zimmerman Reed as an attorney?
11   A. It was recommended to us that it was probably
12  something that would require more finances or deeper
13  pockets, is the phrase that I remember, that it would
14  have to be a law firm with deeper pockets because -- to
15  do the investigation.
16   Q. Okay. And who recommended Zimmerman Reed?
17   A. I don't recall. It was passed off. Soucie Bolt
18  passed it to someone else who passed it on to someone
19  else.
20   Q. When did you and your husband first talk about
21  bringing litigation in this case?
22   A. I don't remember the date.
23   Q. The next page, which is RMAR 42, which is
24  dated -- looks like July 11, 2005?
25   A. Yes.

Page 152

1    Q. My copy is very bad so perhaps you could read
2  that for us.
3    A. Mine is too. Dr. Pomeranz, regarding Richard
4  Martin, Viagra and blindness. It's dated July 11 of
5  2005. I can't even -- it's not a very clear copy and I
6  can't read that either, but the second word it says, "I
7  am" -- something -- "enclosing a copy of my medical
8  records as promised earlier this spring after our
9  telephone conversation about the sudden onset of
10  blindness experienced by me in the spring of 2002. I
11  appreciate your study and reviewal of my records from
12  East Metro Family Practice in Inver Grove Heights.
13      "My right eye was affected the end of April and
14  total vision loss in 24 hours. The left eye was affected
15  the end of May with major visual acuity gone in 24 hours.
16  Both losses occurred within 24 hours of using Viagra, but
17  the damage is sadly irreversible.
18      "My wife and I know" -- let me see.
19      "My wife and I knew how to reach you after
20  reading the article sent to us by friends that appeared
21  in The Week, May 15, 2005 (Volume 5, Issue 207).
22      "Could you please let us know your opinion of
23  the possible Viagra causation of my blindness? Any
24  comments you have to offer may be used by an attorney.
25      "We appreciate your willingness to be of

Page 153

1  assistance."
2      "Sincerely, Richard L. Martin (by Carole
3  Martin), 6804 Blaine Avenue East, Inver Grove Heights,
4  Minnesota 55076. Phone (651) 455-8738."
5    Q. Did you ever have a conversation with
6  Dr. Pomeranz following this letter?
7    A. That would have been written someplace. I think
8  there was. I believe that the date listed on RMAR 40
9  would have been 7-18.
10   Q. Okay. This note says he said he'd like to see
11  Dick's medical records.
12   A. Um-hum, right, yes.
13   Q. And on your letter of July 11 is sending him
14  medical records.
15   A. Well, then that would have been -- okay. Then
16  maybe it was 6-18. When you get a clearer copy and we
17  look at that time we'll be able to tell.
18   Q. Okay. But there was a conversation following
19  this letter with Dr. Pomeranz?
20   A. I just know there were a couple of conversations
21  with him.
22   Q. Okay. Do you have any notes that have second --
23  of the second conversation with Dr. Pomeranz?
24   A. No, I don't know. I don't know.
25   Q. Do you recall making notes during the

39 (Pages 150 to 153)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin   8/7/2008
In Re: Viagra Products Liability Litigation

## Page 154

1  conversation with Dr. Pomeranz?
2      A. Making notes while we talked?
3      Q. Yes.
4      A. No.
5      Q. Do you recall writing notes after the
6  conversation with Dr. Pomeranz?
7      A. I don't remember.
8      Q. If you did have notes where would they be?
9      A. In the file.
10     Q. Okay. And do you know where that file is kept?
11     A. I do.
12         MS. LESKIN: We'd ask that review of the
13 file be made, and if there's any additional notes of
14 conversations with Dr. Pomeranz that may be produced.
15         MS. HAUER: So noted.
16     Q. (By Ms. Leskin) Thank you. What do you recall
17 about the conversation with Dr. Pomeranz, the second
18 conversation?
19     A. Just that -- just that he thought there was a
20 possibility that it could be related.
21     Q. And what did he base that on?
22     A. You have the -- just conversation that Dick had
23 and apparently with the stuff that he examined.
24     Q. Did he tell you any specifics about why he
25 thought Viagra could have caused your husband's vision

## Page 155

1  loss?
2      A. No.
3      Q. Did he tell you of any additional studies he had
4  done regarding vision loss and Viagra?
5      A. Any additional ones?
6      Q. Yes.
7      A. No, not any additional ones.
8      Q. Do you remember anything else about that
9  conversation?
10     A. No, I do not.
11     Q. Did you talk to him about the possibility of
12 litigation?
13     A. Yes.
14     Q. What do you recall talking to Dr. Pomeranz about
15 the possibility of litigation?
16     A. That he would be helpful.
17     Q. Have you had any conversations since you filed
18 lawsuits in this case with Dr. Pomeranz?
19     A. No.
20     Q. Have you sent him any additional information
21 about the lawsuit?
22     A. No.
23     Q. Are you aware of the fact that Dr. Pomeranz has
24 testified in this lawsuit?
25     A. Dick mentioned that yesterday.

## Page 156

1      Q. Okay. What did he mention to you about that?
2      A. He just mentioned you asked him whether or not
3  did he know that you guys had talked to Dr. Pomeranz.
4      Q. Okay. Did he mention anything else?
5      A. Nope, not that I can remember.
6      Q. And prior to the conversation with your husband
7  following his deposition were you aware that Dr. Pomeranz
8  had testified in this litigation?
9      A. I did not.
10     Q. Were you aware that the plaintiffs in the
11 litigation generally had designated Dr. Pomeranz as an
12 expert on the plaintiff's behalf?
13     A. Say that again.
14     Q. Do you know what a plaintiff is in a lawsuit?
15     A. Yes.
16     Q. And are you aware that the plaintiffs in the
17 Viagra litigation have designated -- had designated
18 Dr. Pomeranz as an expert on their behalf?
19     A. No, I did not.
20     Q. And were you aware that Dr. Pomeranz gave a
21 deposition as part of that proceeding?
22     A. Only yesterday after you had mentioned that to
23 Dick.
24     Q. And did your husband tell you what Dr. Pomeranz
25 testified to?

## Page 157

1      A. No.
2      Q. Were you aware that Dr. Pomeranz testified that
3  it was not his hypothesis that Viagra could cause an
4  AION?
5      A. No. That's surprising.
6      Q. You'd never heard that before?
7      A. No.
8      Q. Were you aware that the court has excluded
9  Dr. Pomeranz's expert opinion in this case?
10     A. I did not know that.
11     Q. You weren't given a copy of any order from the
12 court to that effect?
13     A. No.
14     Q. Other than the conversation with Dr. Pomeranz,
15 did you have conversation with any other doctors about
16 whether Viagra caused your husband's vision loss?
17     A. No.
18     Q. Did you ever have a conversation with
19 Dr. Ferrara as to whether Viagra caused your husband's
20 vision loss?
21     A. Did I personally?
22     Q. Yes.
23     A. I know that he's told me that he thought that he
24 did.
25     Q. Who told you that?

40 (Pages 154 to 157)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 158

1    A. Dr. Ferrara.
2    Q. When did Dr. Ferrara tell you that he thought it
3  did?
4    A. Oh. I knew you were going to say that. What
5  day and what date, and I don't know what day and what
6  date. But he is my physician and invariably when I see
7  him for my personal needs, he brings up Dick's blindness.
8  So I couldn't tell you, you know, what date or at what
9  time or what year, what month that happened.
10   Q. Do you know if it was within the last year?
11   A. I do not.
12   Q. Was it before you filed this lawsuit or before
13 your husband filed this lawsuit?
14   A. I do not know. I don't recall.
15   Q. Following your husband's onset of his visual
16 problems, of his visual loss, you took him to his
17 doctor's visits, correct?
18   A. Um-hum, yes, I did.
19   Q. And did you attend the actual visit with him
20 after that point in time?
21   A. On occasion I have been in with my husband for
22 some of his visits to different doctors. I don't
23 remember all of them. I really do not.
24   Q. Do you recall going to any visits with
25 Dr. Ferrara with him after he lost his vision?

Page 159

1    A. Yes.
2    Q. Okay. Which visits in particular do you recall?
3    A. I wish I had a better memory.
4    Q. At some point in time did you provide
5  Dr. Ferrara with copies of some of the articles that we
6  reviewed today?
7    A. The initial one that came from my daughter was
8  given to Dr. Ferrara when it was suspect, and also to
9  Dr. Nichols.
10   Q. And when was that that you gave that article to
11 Dr. Ferrara?
12   A. I don't remember the month or the year.
13   Q. The first --
14   A. This one we had we felt it was important that
15 both those doctors had.
16   Q. The first note in Dr. Ferrara's records
17 regarding a possible link between Viagra and his eye
18 condition was on June 30, 2004. Do you recall seeing
19 that in Dr. Ferrara's records?
20   A. Okay. Repeat the question.
21   Q. The first notation that we saw in Dr. Ferrara's
22 records regarding a discussion as to whether Viagra
23 caused his vision loss was on June 30, 2004. Now, you
24 told me earlier you had the opportunity to review
25 Dr. Ferrara's records.

Page 160

1    A. Um-hum.
2    Q. Do you recall seeing that in his records?
3    A. Yes, I do. He also made a statement that my
4  husband, when we got the records, just was very upset
5  about, a comment in there that Dr. Ferrara claimed that
6  he had had a conversation with my husband in which he
7  claimed that Dick said that he didn't think there was any
8  connection between the Viagra and his loss of vision, and
9  that my husband said is not true. He said he never had
10 that conversation with Dr. Ferrara.
11       (C. Martin Deposition Exhibit 6 marked for
12       identification by the Court Reporter.)
13   Q. (By Ms. Leskin) If you take a look at Exhibit
14 6, it's a document Bates numbered RMAR 84. And the RMAR
15 84 indicates these are copies of documents that were
16 produced to us together with your husband's Fact Sheet in
17 the litigation, and are not documents that we received
18 from Dr. Ferrara. Have you seen this page of your
19 husband's medical records before?
20   A. Yes.
21   Q. And you'll see there's two entries, two main
22 entries, typewritten entries to this page, one dated June
23 30, 2004, and one dated October 6, 2004, correct?
24   A. Yes.
25   Q. If you look at the one dated June 30, 2004,

Page 161

1  underneath the typewriting there's a handwritten comment
2  that says, "We gave Dr. Ferrara info from Internet dated
3  5-7-02 that daughter researched. Ask about this." And
4  "We gave" and "Ask about this" is underlined.
5    A. Yes.
6    Q. Is that your handwriting?
7    A. Yes.
8    Q. And you annotated those medical records?
9    A. Yes, I did, just that part of it.
10   Q. Okay. And did you have any conversation with
11 Dr. Ferrara as to the information you gave him dated
12 5-7-02?
13   A. Did we have a conversation with him about that?
14   Q. Yes. You wrote on here "Ask about this," so did
15 you ever ask Dr. Ferrara about the information from the
16 Internet dated 5-7-02?
17   A. That may have been something that I may have
18 annotated to ask our attorney about.
19   Q. So you don't recall having a conversation with
20 Dr. Ferrara about that information after you saw -- wrote
21 this note?
22   A. No, I do not recall.
23   Q. This note that you wrote is part of an entry
24 dated June 30, 2004. Did you attend the session with
25 Dr. Ferrara with your husband on June 30, 2004?

41 (Pages 158 to 161)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 162

1  A. I don't remember.
2  Q. Do you recall Dr. Ferrara referring your husband
3 to see a Dr. Cantrill? If you look at the entry under P,
4 the patient is referred to Dr. Cantrill?
5  A. I don't remember a Dr. Cantrill.
6  Q. Do you know what kind of doctor Dr. Cantrill is?
7  A. I do not.
8  Q. You see here as of June 30, 2004, Dr. Ferrara
9 lists your husband's current medications as Viagra,
10 including Viagra, correct?
11  A. Yes.
12  Q. And it says, "He understands the risks of
13 Viagra, as we detailed today." Do you see that line?
14  A. Yes.
15  Q. Do you recall -- well, looking at that entry,
16 does that refresh your recollection whether or not you
17 attended this session with Dr. Ferrara with your husband
18 on June 30, 2004?
19  A. No, it does not refresh my memory.
20  Q. Okay. The bottom typed entry dated October 6,
21 2004, has a written comment on the side that says, "Dick
22 says he never said any such thing??!!" Is that your
23 handwriting?
24  A. Yes, it is.
25  Q. Did you write that note?

Page 163

1  A. I did.
2  Q. Do you know when you wrote that note?
3  A. I do not. It would have been after he received
4 the records from Dr. Ferrara's office.
5  Q. Which sentence in that entry did you intend that
6 note to annotate?
7  A. When Dr. Ferrara says: "He still has erectile
8 dysfunction but relates to me that he does not feel that
9 the Viagra was given at the time that he went blind."
10  Q. Your husband now claims he never told
11 Dr. Ferrara that?
12  A. That is correct.
13  MS. HAUER: Objection to form.
14  Q. (By Ms. Leskin) Did you attend the session with
15 your husband on October 6, 2004, with Dr. Ferrara?
16  A. I could not say that for sure.
17  Q. So you don't have personal knowledge one way or
18 the other whether or not your husband said that to
19 Dr. Ferrara?
20  A. No, I do not.
21  Q. Okay.
22  A. I definitely never heard him say any such thing.
23  Q. The second line of that entry says, "He did not
24 see Dr. Cantrill because he feels that it would be a
25 waste of his time." Were you aware that your husband

Page 164

1 said that it would be a waste of his time to see
2 Dr. Cantrill?
3  A. Okay. Where do you -- oh. Well, I've read that
4 but I don't know.
5  Q. Have you ever discussed with your husband
6 whether or not it was a good idea to see Dr. Cantrill?
7  A. No.
8  Q. Did you ever discuss with Dr. Nichols whether
9 Viagra could have caused his vision loss?
10  A. No, we never asked that question that way. The
11 only thing we ever asked of him, or Dick would ever ask
12 him is, you know, do you know what could have caused
13 this.
14  Q. But you don't recall ever specifically asking
15 Dr. Nichols whether Viagra caused his vision loss?
16  A. I remember making copies of the article that
17 suggested there could be a link, and I remember, you
18 know, making sure that he got a copy of that so that it
19 would be something that they would know how to proceed,
20 because the first time Dick went to see him there was
21 nothing that was given, you know, no medication given to
22 stop the swelling, and it may have made a big difference
23 in what he has for current vision.
24  Q. But you didn't have any conversation with
25 Dr. Nichols as to whether or not Viagra had caused his

Page 165

1 vision loss; is that fair to say?
2  A. Well, after we had the article, you know, to say
3 watch for this sort of thing with your patients.
4  Q. So after you gave Dr. Nichols that article did
5 you have a conversation with Dr. Nichols as to whether
6 Viagra had caused Mr. Martin's vision loss?
7  A. I don't recall that.
8  Q. Did you ever ask Dr. Hoy whether or not Viagra
9 caused or contributed to your husband's vision loss?
10  A. I would not have but my husband would have.
11  Q. Do you know if your husband had asked Dr. Hoy
12 whether Viagra caused or contributed to his vision loss?
13  A. He didn't ask whether Viagra had. He asked if
14 they knew of anything that could have caused the sudden
15 loss of vision.
16  Q. And you were not present for any conversation
17 with Dr. Hoy; is that right?
18  A. I don't believe so, no.
19  Q. Now, you saw the letter earlier from Dr. Griffin
20 at the VA?
21  A. Yes.
22  Q. Did you have any conversation with Dr. Griffin
23 as to whether Viagra caused your husband's vision loss?
24  A. No.
25  Q. Did you ever discuss with any of your husband's

42 (Pages 162 to 165)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 166

1 doctors whether any of his other medications could have
2 caused or contributed to his vision loss?
3     A. No.
4     Q. Did you ever discuss with any other doctors
5 whether any other medication that your husband was taking
6 could have caused or contributed to your husband's vision
7 loss?
8     A. I did not.
9     Q. Did you ever do any research on the Internet as
10 to whether or not any of the other medications your
11 husband was taking could cause or contribute to his
12 vision loss?
13     A. No.
14     Q. We talked earlier about Catapres, the
15 anti-hypertensive that your husband started taking, the
16 patch. Do you recall that?
17     A. Yeah.
18     Q. Do you recall that your husband started the
19 Catapres a week before he lost his vision in his first
20 eye?
21     A. Am I aware of that?
22     Q. Yes.
23     A. I think Dick mentioned that.
24     Q. When did he mention that?
25     A. Oh, most people can remember what was said but

Page 167

1 they don't remember exactly when.
2     Q. Did he mention that in the last two days or did
3 he mention that a while ago?
4     A. A while ago.
5     Q. Did you ever ask any doctor whether Catapres
6 could have caused or contributed to your husband's vision
7 loss?
8     A. No.
9     Q. Did you ever ask any of Mr. Martin's doctors
10 whether his hypertension could have caused or contributed
11 to his vision loss?
12     A. I did not, no.
13     Q. Did you ever ask any of your husband's
14 doctors --
15     A. You know, most -- do most people ask their
16 doctor lots of questions like that?
17     Q. I'm asking if you asked your husband's doctors
18 these questions, ma'am. Did you ever ask your husband's
19 doctors whether any other part of his underlying medical
20 conditions could have caused his vision loss?
21     A. No.
22     Q. You're aware your husband has currently been
23 diagnosed as diabetic, correct?
24     A. Yes. That's very current.
25     Q. Did anyone tell you how long that diabetes had

Page 168

1 been there before he was diagnosed?
2     A. No.
3     Q. Are you aware that diabetes is a risk factor for
4 ischemic optic neuropathy?
5     A. Now I am, yes.
6     Q. And now you're aware that hypertension is also a
7 risk factor for ischemic optic neuropathy?
8     A. Yes.
9         MS. LESKIN: Can we take a quick break?
10        MS. HAUER: Okay. She's almost done.
11     (Recess taken between 1:59 p.m. and 2:10 p.m.)
12     Q. (By Ms. Leskin) Mrs. Martin, have you had to
13 make any modifications to your house as a result of any
14 of your husband's vision problems?
15     A. No.
16     Q. Have you had to buy any special equipment?
17     A. Yes.
18     Q. What equipment have you bought?
19     A. One of these big screen things, you know, you
20 slide a piece of paper underneath that you can adjust the
21 size of the print.
22     Q. Does that help him read the papers that are put
23 in there?
24     A. He doesn't use it a great deal simply because he
25 has never been a rapid reader, and he reads more slowly

Page 169

1 than most people, or than I do. And sometimes because of
2 the field of his vision, sometimes by the time he gets to
3 the end of a line he's forgotten, because he can only --
4 if the words are a little bit longer he can only see
5 portions of them and it's very easy for him to lose his
6 train of thought.
7         He primarily uses it like if I want to go over
8 financial records, if I want him to see something, I have
9 a question about something and I'll ask him about
10 finances, or he will use it on occasion when he is
11 attempting to repair a piece of old equipment, and if he
12 can look at a diagram of what a part looks like or
13 something, you know, for repairs.
14        And he has really thick glasses that he got from
15 the Phillips Eye Institute for magnification, and he has
16 a hand-held little piece of equipment that is about --
17 oh, gosh, how big around is that?  About four inches
18 around that has an LED light in it that he holds directly
19 up to his eye. We'll say that this is the piece of
20 equipment and he puts it next to his face, and then he
21 puts the piece of paper next to it.  And then sometimes
22 he can, you know, make out things.
23     Q. So like a lighted magnifier?
24     A. Yes. And then he also has another piece of
25 equipment that he purchased that he doesn't use very

43 (Pages 166 to 169)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole  Jeanne  Martin   8/7/2008
In  Re:  Viagra  Products  Liability  Litigation

---

Page 170

1  much. He thought he could use it in the car but it
2  doesn't help very much, and that is like a little
3  magnifier he can hold up. He'll hold it up to his left
4  eye so he can look through that but he doesn't use that
5  real often either.
6       He'll usually say Carole, can you read this for
7  me or what do you see, or tell me.
8       Q. How much did that large reader screen cost you?
9       A. I don't remember. I think it was around $700 or
10  something.
11      Q. Do you have any receipts for the equipment?
12      A. I could probably find that through -- if I
13  haven't thrown out the records, in a check register.
14      Q. How about his glasses, how much did you pay for
15  the glasses?
16      A. I don't remember.
17      Q. Do you have receipts for those?
18      A. Oh, gosh. They may or may not be in with
19  records for tax purposes.
20      Q. And how about the LED light that you said he
21  holds up to his eye that you said he tries to read?
22      A. Those might be on the same record for the place
23  we go for low vision.
24      Q. And the magnifier he bought to use in the car,
25  do you know how much he paid for that?

---

Page 171

1       A. No. I'm sorry.
2       Q. Do you have receipts for any of these at the
3  house?
4       A. That's a good question. I can look.
5       MS. LESKIN: If you're going to be claiming
6  these for damages we would ask for receipts for all these
7  items.
8       MS. HAUER: Noted.
9       Q. (By Ms. Leskin) Any other expenses that you've
10  had to lay out as a result of your husband's visual
11  problems?
12      A. Oh, let's just say there are a lot of things
13  that he used to do that he can't do anymore. He used to
14  be able to do everything. He built his cabin, he built
15  the -- I mean, he did everything. There wasn't anything
16  he couldn't do, and now I do it. And what he can't do
17  doesn't get done.
18      MS. HAUER: Do you need a break?
19      THE WITNESS: Oh, shoot. This is hard.
20  It's just...
21      He could use a chauffeur. He could use someone
22  to cut his hair, someone to shave his nose hairs. He
23  could use someone to clip his fingernails and his toe
24  nails. He could -- if we wanted yard work done really
25  good he would have to hire someone else to do it instead

---

Page 172

1  of me. He would have to hire someone to do the roofing
2  we've had to do, you know, have things we reroofed that
3  he could do.
4       Have someone to come over and read him the
5  newspaper, he could have someone come over and explain
6  all the financial stuff to him, he could have someone
7  come over and pay all the bills instead of all the record
8  keeping that I try to do, someone to clean up behind him.
9  I'm sorry. I just...
10      Q. (By Ms. Leskin) That's okay. Take your time.
11      A. It's expenses, you know. What kind of -- what
12  kind of expense, you know, can you put to someone's eyes?
13  Oh, shoot.
14      MS. HAUER: Why don't we just take a couple
15  minutes.
16      THE WITNESS: I'm sorry. I'm usually not
17  an emotional woman. I try to put on a brave front for
18  most people, but it's exhausting. It's truly exhausting.
19      Q. (By Ms. Leskin) And have and your husband
20  discussed what you hope to get out of this lawsuit?
21      A. No. When this happened to him, his eyes are
22  gone, and if there's any culpability on Pfizer's part
23  they need to make damn sure it doesn't happen to anybody
24  again or that people know what's going to happen or what
25  could happen to them, if they use that product.

---

Page 173

1       Apparently since the scare came out, from what I
2  saw in the Nashua paper, the St. Paul Pioneer Press, once
3  there was a scare that was known, what, did the sales
4  drop, but it's all conjecture. Nobody knows for
5  positive. It shouldn't happen to anybody, not because of
6  a drug. It's a horrible thing. And not too many things
7  in life are horrible.
8       Q. Ma'am, we went over a bunch of articles that you
9  provided us that you got from various newspapers and your
10  doctor sent to you from the Internet or from
11  Dr. Pomeranz. Other than the articles that we went over,
12  do you have any other evidence that Viagra can in fact
13  cause ischemic optic neuropathy?
14      A. I do not. If I knew how to search for it, I
15  would. I would dig. If I thought there was any link or
16  possibility I would do what I could so nobody else would
17  have to go through this.
18      Q. Do you know whether or not Pfizer has made that
19  inquiry?
20      A. No, I do not.
21      Q. Are you aware --
22      A. To me it seems like -- to me it seems like the
23  tobacco thing, denial, denial, denial.
24      Q. Have you had the opportunity to look at the
25  clinical study results done by Pfizer?

44 (Pages 170 to 173)

b50aa160-0859-411e-853f-53f45d9f4f3e

Carole Jeanne Martin  8/7/2008
In Re: Viagra Products Liability Litigation

Page 174

1    A. No.
2    Q. Have you had a chance to look at the clinical
3  analysis conducted by Pfizer?
4    A. You mean recently or what?  Like what?
5    Q. Yes.
6    A. No.
7    Q. Did Dr. Pomeranz send you any articles published
8  by anyone from Pfizer showing the results of their
9  analysis of the data?
10   A. No.  The only thing that I have are those pages
11 that were sent to me initially.
12   Q. And no one has sent you any other information?
13   A. No.
14   Q. Other than the conversations you've had that we
15 talked about with your doctors, have you -- or your
16 husband's doctors, have you discussed with anyone else
17 whether Viagra can cause ischemic optic neuropathy?
18   A. Have we discussed with anyone else that it
19 could?
20   Q. Other than the doctors that we talked about?
21   A. Probably not, because of our age and because we
22 don't talk about sex, and taking Viagra was an
23 embarrassment to my husband, and he's very private and so
24 am I.
25   Q. So you've not discussed it with anyone?  I just

Page 175

1  want to make sure I understand.
2    A. I've mentioned it to my son Marty, and I've
3  mentioned it to Greg and to Kevin and to my daughter.
4    Q. Do any of them have any type of medical
5  training?
6    A. My oldest son is an equine veterinarian.
7    Q. Has he done any medical research for you as to
8  the medical data as to whether Viagra can cause an AION?
9    A. No, he has not.
10       MS. LESKIN: I have nothing further.
11       MS. HAUER: I have no questions.
12       MS. LESKIN: Thank you, ma'am.  I
13 understand this was difficult for you.
14       (Discussion held off the record.)
15       (C. Martin Deposition Exhibits 7 - 11 marked for
16       identification by the Court Reporter.)
17   Q. (By Ms. Leskin) Are you ready?  A few more
18 minutes.  We've marked as Exhibit 7 a calendar provided
19 to us by Mrs. Martin from 2003; Exhibit 8 is a calendar
20 2004; Exhibit 9 is a calendar from 2005; Exhibit 10 is a
21 calendar from 2006; Exhibit 11 a calendar from 2007.  I'm
22 just going to ask you to briefly take a glance at these
23 and confirm they are in fact your calendars that you've
24 brought with you to the deposition today?
25   A. They are.

Page 176

1    Q. And the dates and appointments that are
2  identified on those calendars, is that information you
3  put on the calendar contemporaneously when the
4  appointments were made?
5    A. Right.
6    Q. Or the event occurred?
7    A. Yes.
8    Q. Have you since the litigation began or since
9  your husband lost his vision gone back and annotated
10 these calendars in any way?
11   A. No.
12   Q. And they're true and correct copies of calendars
13 you maintain?
14   A. Yes.
15   Q. Yes?
16   A. Yes.
17       MS. LESKIN:  All right.  I have nothing
18 further.
19       MS. HAUER:  Nothing for me.
20       (The deposition concluded at 2:26 p.m.)

Page 177

REPORTER'S CERTIFICATE

STATE OF MINNESOTA )
                   ) ss.
COUNTY OF SHERBURNE )

I hereby certify that I reported the deposition
of CAROLE JEANNE MARTIN on the 7th day of August, 2008,
in Minneapolis, Minnesota, and that the witness was by me
first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is
a true record of the testimony of the witness;

That the cost of the original has been charged
to the party who noticed the deposition, and that all
parties who ordered copies have been charged at the same
rate for such copies;

That I am not a relative or employee or attorney
or counsel of any of the parties, or a relative or
employee of such attorney or counsel;

That I am not financially interested in the
action and have no contract with the parties, attorneys,
or persons with an interest in the action that affects or
has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition
by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 12th day of
August, 2008.

Andrea J. Tungland, RMR, CRR
Notary Public, Sherburne County, Minnesota
My commission expires January 31, 2013.

45 (Pages 174 to 177)

b50aa160-0859-411e-853f-53f45d9f4f3e