Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE:                             * | MDL Case No. 1724 |
| VIAGRA PRODUCTS LIABILITY  * | |
| LITIGATION                    * | |

This document relates to:   *

RICHARD MARTIN,                 *

        Plaintiff,       *

     vs.                        *

PFIZER INC.,                    *

       Defendant.       *

CASE NO.  06-CV-1064 (PAM) *

DEPOSITION OF
ANTHONY FERRARA, M.D.


Taken October 14, 2008
Commencing at 9:46 a.m.


REPORTED BY:  MARY P. MITCHELL, RDR, CRR, CCP
PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
612-339-0545 * 800-545-9668 * Fax 612-337-5575

18d32f61-08b9-4e3d-a5c9-43bd27b38251

## Anthony Ferrara, M.D.   10/14/2008
## In Re: Viagra Products Liability Litigation

### Page 2

1   Deposition of ANTHONY FERRARA, M.D.
taken on October 14, 2008, commencing at 9:46 a.m.,
2   at the offices of deponent, Family HealthServices
Minnesota, P.A., 2980 Buckley Way, Inver Grove
3   Heights, Minnesota, before Mary P. Mitchell,
Registered Diplomate Reporter, Certified Realtime
4   Reporter, Certified CART Provider, and Notary Public
of and for the State of Minnesota.
5
\*\*\*\*\*\*\*\*\*\*
6
APPEARANCES
7
8
On Behalf of the Plaintiff:
9       Christopher A. Gomez, Esq.
cgomez@doctoratlaw.com
10      THE MILLER FIRM
555 East City Avenue, Suite 910
11      Bala Cynwyd, Pennsylvania 19004
(610) 660-0622
12
13
On Behalf of the Defendant:
14      Lori B. Leskin, Esq.
lleskin@kayescholer.com
15      KAYE SCHOLER LLP
425 Park Avenue
16      New York, New York 10022
(212) 836-8000
17
On Behalf of the Deponent:
18      Cecilie M. Loidolt, Esq.
cloidolt@meagher.com
19      MEAGHER & GEER, P.L.L.P.
33 South Sixth Street
20      Suite 4400
Minneapolis, Minnesota 55402
21      612-338-0661
22
23
24      NOTE: The original transcript will be filed
with Kaye Scholer LLP, pursuant to the applicable
Rules of Civil Procedure.

### Page 3

1               INDEX
2   WITNESS: ANTHONY FERRARA, M.D.        PAGE
3
EXAMINATION BY MS. LESKIN........................ 5
4   EXAMINATION BY MR. GOMEZ..................... 80
FURTHER EXAMINATION BY MS. LESKIN............. 96
5
6
OBJECTIONS:
7       By Ms. Loidolt: 35, 81, 82, 89, 90, 93, 95.
8
By Mr. Gomez: 20, 30, 35, 37.
9
By Ms. Leskin: 81, 82, 89, 90, 91, 93.
10
11
INSTRUCTIONS NOT TO ANSWER: (None.)
12
13
PRODUCTION/INFORMATION REQUESTS: (None.)
14
15
EXHIBITS MARKED AND REFERRED TO:
16
EXHIBIT 1: Printout from Family
17      HealthServices Minnesota, P.A. Web site,
CV of Dr. Ferrara.................... 5, 7
18      (No Bates)
19
EXHIBIT 2: Dr. Ferrara's medical records on
20      Richard Martin... 10, 22, 37, 50, 57, 71,
80, 84
21      MARTIN,R FERRERA 0001 - 0375
22
EXHIBIT 3: Surgical report from HealthEast,
23      dated 6/9/02.................... 65, 95, 96
(No Bates)
24
25

### Page 4

1   EXHIBITS (Continued)
2
EXHIBIT 4: Handwritten note from Carole
3       Martin, w/attached University of Maryland
Medicine News Release, "UM Medical Center
4       Ophthalmologist Says Viagra May Trigger
Permanent Vision Loss in Some
5       Men"................................ 71, 96
(No Bates)
6
EXHIBIT 5: Dr. Ferrara's medical records
7       for Richard Martin not included in
Exhibit 2 for the period December 2007
8       through March 2008.............. 95, 96, 98
(No Bates)
9
10
11
12
13
14
15
16
17  (Original exhibits attached to original transcript;
copies provided to counsel.)
18
19
20
21
22
23
24
25

### Page 5

1           (Dr. Ferrara Deposition Exhibit No. 1
2           marked for identification.)
3               ANTHONY FERRARA, M.D.,
4   duly sworn, was examined and testified as follows:
5               EXAMINATION
6   BY MS. LESKIN:
7       Q.  Good morning, Doctor.
8       A.  Good morning.
9       Q.  As I introduced myself a few moments ago, my
10  name is Lori Leskin. I'm with the firm of Kaye
11  Scholer, and we represent Pfizer in this matter.
12          First, I just want to thank you for
13  rescheduling this deposition from a few weeks -- a
14  couple months ago actually.  It was my fault, my
15  plane was cancelled and/or delayed and just messed
16  up the entire deposition schedule.  So I appreciate
17  your ability to reschedule that for us.
18      A.  Okay.
19      Q.  Have you ever been deposed before?
20      A.  Yes.
21      Q.  Okay.  As a fact witness or as an expert
22  witness?
23      A.  You know, I guess I don't know -- I don't
24  know if I knew what the difference was.
25      Q.  Okay.  Were you asked in those depositions

2 (Pages 2 to 5)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

---

Page 6

1　just to give information about your patients?
2　　A. Right.
3　　Q. Okay.
4　　A. That's correct.
5　　Q. Were you asked to provide an expert opinion
6　as to the cause of their problems or injury?
7　　A. No.
8　　Q. Okay. And you understand you're not being
9　sued by Mr. Martin in this litigation?
10　　A. That's correct.
11　　Q. And we're here just, again, to get
12　information about your care and treatment of
13　Mr. Martin.
14　　A. Okay.
15　　Q. Okay. And I know you've spoken to your
16　attorney, but I just want to go over a couple of the
17　ground rules so we are all on the same page.
18　　A. Okay.
19　　Q. If your attorney objects to a question,
20　please let her get her objection on the record.
21　And, you know, follow her instructions as to whether
22　or not you can answer the question. Okay?
23　　A. Okay.
24　　Q. The court reporter is taking down everything
25　that is said, so it's very important that all of

---

Page 7

1　your answers be verbalized and not just a nod of the
2　head or a shrug of the shoulders. Okay?
3　　A. Okay.
4　　Q. Also, it's very important that only one of
5　us speak at a time. And I know sometimes it's easy
6　to guess where I'm going with my question, but if
7　you just wait for me to get my whole question on the
8　record, I'll wait for you to get your whole answer
9　on the record. Okay?
10　　A. Okay.
11　　Q. If you don't understand a question, I'm
12　happy to rephrase it, just let me know.
13　　A. Okay.
14　　Q. And if you need a break for any reason,
15　please just let me know.
16　　A. Okay.
17　　Q. You have provided us before the deposition
18　today a document we've marked as Ferrara Exhibit 1.
19　First, is it fer-RAUR-ra or fer-RARE-ra?
20　　A. Either pronunciation is fine.
21　　Q. Which do you prefer?
22　　A. Fer-RAUR-ra.
23　　Q. Okay, if I mess up, I apologize.
24　　A. That's okay.
25　　Q. Dr. Ferrara, you've provided us with a

---

Page 8

1　document we've marked as Exhibit 1, which is from
2　your Web site I understand?
3　　A. That's correct.
4　　Q. And does this CV accurately reflect your
5　education and training?
6　　A. That's correct.
7　　Q. And does it accurately reflect your medical
8　appointments?
9　　A. Yes.
10　　Q. And do you have any publications?
11　　A. No.
12　　Q. Do you have any current work experience that
13　is not reflected on Exhibit 1?
14　　A. Well, I, you know, I don't know that this
15　reflects that I work at the Inver Grove -- the
16　Family HealthServices of Minnesota, Inver Grove
17　Clinic. I've worked here for 27 years by my
18　recollection. And then prior did my residency
19　through the University of Minnesota at St. John's
20　Hospital, it does reflect that.
21　　I also did emergency room work in what we
22　would now call a moonlighting capacity at St. John's
23　and St. Joe's Hospital.
24　　Q. Okay. You said you have been here at --
25　what's the name? Is it --

---

Page 9

1　　A. Currently it's called Family HealthServices
2　of Minnesota. And we abbreviate that FHSM.
3　　Q. And before that it was the East Metro Family
4　Practice?
5　　A. Correct.
6　　Q. And it just changed names, is that right?
7　　A. Well, we merged with another group of
8　doctors.
9　　Q. Okay.
10　　A. And before East Metro it was another name,
11　so.
12　　Q. Okay. But it's been the same general
13　practice?
14　　A. Exactly.
15　　Q. For the entire 27 years?
16　　A. Yup.
17　　Q. Okay. Have you ever worked in a different
18　practice group?
19　　A. When I finished my residency, I worked at a
20　clinic for about six months waiting for this clinic
21　to be built that was a family practice clinic.
22　　Q. Now, you are certified in family practice,
23　correct?
24　　A. Correct.
25　　Q. What does family practice entail?

---

3 (Pages 6 to 9)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 10

1    A. Family -- we now call it family medicine.
2 But it entails general internal medicine, some
3 orthopedics, pediatrics, obstetrics, gynecology.
4 Pretty much a broad spectrum of health care.
5    Q. Okay. You're not an ophthalmologist, right?
6    A. That's correct.
7    Q. And when you have patients with visual
8 issues do you refer them to an ophthalmologist?
9    A. Yes.
10    Q. Is there an ophthalmologist here within the
11 practice?
12    A. No.
13    Q. And in fact you did refer Mr. Martin to an
14 ophthalmologist?
15    A. Yes.
16    Q. And is it fair to say you would defer to an
17 ophthalmologist for diagnoses of your patients'
18 visual problems?
19    A. Yes.
20    Q. Have you ever done any clinical studies?
21    A. No, not that I -- I mean I may have
22 participated in some I'm not aware of, but not that
23 I'm aware of.
24        (Dr. Ferrara Deposition Exhibit No. 2
25         marked for identification.)

Page 11

1    Q. Okay. Now, we've marked here as Exhibit 2 a
2 large pile of documents, which purport to be the
3 medical records from Richard Lee Martin that have
4 been produced to us from your office. And you'll
5 see on the bottom here they are Bates-stamped
6 Ferrera 1 -- and I apologize, the spelling is
7 incorrect, Ferrera 1 through Ferrera 375.
8     I apologize again, these records are not in
9 date order, they're a little bit out of order. I'm
10 going to ask you just to take a brief look through
11 here and just tell me if there's anything that you
12 would expect to see in those records that you do not
13 see in those records.
14    A. (Examining.) These look to be, in brief
15 review, my medical records.
16    Q. Okay. Now, I know you brought your chart
17 from your practice here with you. And I invite you
18 to use that chart as opposed to Exhibit 2, as it may
19 be easier for you to find certain records.
20    A. Okay.
21    Q. I'll refer you to the matching page in
22 Exhibit 2 so we can confirm we have an accurate copy
23 when we get there.
24    A. Okay.
25    Q. The earliest record in Exhibit 2 is dated

Page 12

1 January 11th, 1985. Is that in fact the first date
2 you saw Mr. Martin?
3    A. Yes.
4    Q. And you'll see on the front page of Exhibit
5 2 that the certification is dated June 18th, 2007 on
6 the bottom.
7    A. Yes.
8    Q. And the latest record I have in Exhibit 2 is
9 dated April 25th, 2007. Do you have any records --
10 which would be pages 2 and 3 in Exhibit 2. Do you
11 have any records for Mr. Martin that postdate April
12 25th, 2007?
13    A. Give me a moment. (Examining.) 2007 did
14 you say?
15    Q. Yes.
16    A. So you're saying do I have the records after
17 2007?
18    Q. April of 2007.
19    A. Yeah, there are records after 2007.
20    Q. Okay. And are all of those records in your
21 hand now from after April 25th, 2007?
22    A. I believe they are, that's correct.
23    Q. Okay.
24        MS. LESKIN: At some point if we can
25 get a copy, and maybe during a break I can take a

Page 13

1 brief look through them.
2        MS. LOIDOLT: I think there's quite a
3 few, so we might end up mailing them to you.
4        MS. LESKIN: That's fine.
5        MS. LOIDOLT: Yeah, we can take a look
6 during the break.
7        THE WITNESS: This is my copy that she
8 could have I would believe.
9        MS. LOIDOLT: Okay. You might want to
10 double-check that.
11        THE WITNESS: I mean we have this in
12 our computer. This is a printout of our computer.
13        MR. GOMEZ: I'll need a copy as well.
14    A. Okay. Now I'm looking at what day in April
15 did you say?
16 BY MS. LESKIN:
17    Q. April 25th, 2007.
18    A. Okay, so it looks to me from what I can
19 see -- wait a minute -- that this would be the
20 extent of the records afterwards (indicating). So I
21 can certainly have my secretary copy this for you.
22    Q. Okay. That would be great.
23    A. Okay.
24    Q. And like I said, during a break if we could
25 make a copy and I could just take a look and see if

4  (Pages 10 to 13)

Paradigm Reporting & Captioning, Inc.
612-339-0545

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

**Page 14**

1 there's any questions that arise out of that.
2    A. Yeah, no problem.
3    Q. As a physician, is it your regular practice
4 to maintain a complete and accurate record of your
5 patient's medical treatment?
6    A. That I give, yes.
7    Q. And do you depend on the accuracy and
8 completeness of your medical records in order to
9 provide proper treatment to your patients?
10    A. Yes.
11    Q. And are you careful in your note-taking to
12 be as accurate as possible to keep track of what
13 your patients tell you?
14    A. Yes.
15    Q. And you agree it's important to take
16 accurate notes of all those conversations?
17    A. Yes.
18    Q. And you take care not to write anything
19 incorrect or inaccurate in your medical records?
20    A. I do my best. That doesn't say mistakes
21 don't occur, but that's correct.
22    Q. Okay. And do you take notes at or about the
23 time that you see a patient?
24    A. I do now. Back in prior years sometimes the
25 notes would be dictated at the end of the day also.

**Page 15**

1 It varied depending on the schedule.
2    Q. But it would be the day that you saw the
3 patient?
4    A. Yes.
5    Q. Okay. Now, I noticed going through your
6 record that you have two types of notes. Some are
7 handwritten -- some appear to be handwritten, and
8 then a typed insert is placed. And then now your
9 more recent ones you have all off your computer?
10    A. That's correct.
11    Q. When in time did the practice switch from
12 using the handwritten and dictated typed notes to
13 the ones that are now maintained in your computer?
14    A. In April of 2006.
15    Q. Okay. So anything prior to April 2006 would
16 have been done the old-fashioned way?
17    A. That's correct.
18    Q. And on those notes there is both handwriting
19 and, as we said, typed notes.
20    A. That's correct.
21    Q. How did that occur?
22    A. At a point in time when we could afford a
23 dictation typist, we hired a dictation typist.
24    Q. Okay, and you would dictate into a
25 Dictaphone?

**Page 16**

1    A. Correct.
2    Q. And would that be at the end of the day or
3 when you were with a patient?
4    A. Again, it depended on the day. It could be
5 either way.
6    Q. Okay. And those would be typed up by the
7 transcriptionist?
8    A. That's correct.
9    Q. And would you review those notes for
10 accuracy?
11    A. Yes.
12    Q. And then you would place them in the
13 records?
14    A. Yup.
15    Q. Have you had any conversations with
16 Mr. Martin or his wife concerning the accuracy of
17 your medical records for him?
18    A. No.
19    Q. Have they asked you to change anything in
20 your records?
21    A. Not that I'm aware of, no.
22    Q. Now, we established that you first saw
23 Mr. Martin on January 11th, 1985. Correct?
24    A. Correct.
25    Q. And what was the reason for his visit then?

**Page 17**

1    A. He came in with head congestion and a sore
2 throat and a cough. And had what I believe to be an
3 upper respiratory infection and a bronchitis.
4    Q. Did you make any other diagnoses at that
5 time?
6    A. I also thought his blood pressure was too
7 high.
8    Q. What was his blood pressure reading?
9    A. 174 over 100 by my reading.
10    Q. Okay. Had he been diagnosed with elevated
11 blood pressure at any time prior to his seeing you?
12    A. Not that I'm aware of.
13    Q. Okay. Did you in fact diagnose him with
14 hypertension at that time?
15    A. Yes.
16    Q. And what treatment did you recommend for
17 him?
18    A. At that time I recommended that he have his
19 blood pressure checked repeatedly on a weekly basis
20 and then call me.
21    Q. Now, what is hypertension?
22    A. Well, we all have a blood pressure. And
23 it's when your blood pressure goes above what is
24 believed to be a safe level. So I guess that would
25 be my definition.

5  (Pages 14 to 17)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.  10/14/2008
In Re: Viagra Products Liability Litigation

Page 18

1    Q. And would you agree with me that that
2 safe -- the definition of the safe level has varied
3 over the years?
4    A. Yes, it has.
5    Q. And am I right that the guiding body of
6 physicians has continually lowered that level?
7    A. That's correct.
8    Q. What is the current level -- let me just
9 make it clear, have a clearer question on the
10 record.
11        What is the currently defined safe level for
12 blood pressure?
13    A. 130 over 80 is considered -- anything below
14 that is considered normal or safe. And then between
15 130 and 140 systolic, between 80 and 90 diastolic is
16 if you want to call it borderline, is elevated, but
17 depending on the situation may or may not require
18 treatment.
19        And then 140 over 90 and above is considered
20 hypertension.
21    Q. Okay. At some point in time did you put
22 Mr. Martin on medication to treat his blood
23 pressure?
24    A. Yes.
25    Q. And what medication did you start him on?

Page 19

1    A. Give me a moment. Hydrochlorothiazide.
2    Q. And when did you start Mr. Martin on
3 hydrochlorothiazide?
4    A. In April of, April 29th of 1987.
5    Q. And that's a diuretic, correct?
6    A. Correct.
7    Q. And a short time after that you also
8 prescribed Tenex?
9    A. That's correct.
10    Q. And what kind of drug is Tenex?
11    A. Tenex is an alpha-2 blocker. It's an
12 antihypertensive medicine that falls under the
13 category of an alpha-2 blocker.
14    Q. Are there any side effects known to occur
15 with Tenex?
16    A. There are side effects from Tenex. You
17 know, it's been a long time since I've used Tenex,
18 haven't used it in many years. I can't right off
19 the top of my head right now recall them, but there
20 are side effects.
21    Q. And when you would prescribe a new
22 medication to a patient, would you review the known
23 side effects with the patient?
24    A. I would review any major side effects that
25 might be expected. Not necessarily every side

Page 20

1 effect possible.
2    Q. When you say major, what do you mean by
3 that?
4    A. Well, there may be, there may be multiple
5 potential side effects. If something occurs with
6 great frequency, I'll warn a patient of that, to
7 look for that. But otherwise, I'm not going to
8 review side effects that occur in a minority of
9 people, other than to just say to the patient, "If
10 you have any side effects, please call me."
11    Q. Was Mr. Martin compliant with his medication
12 for his hypertension?
13        MR. GOMEZ: Objection to form.
14    A. You know, I would say if you want a yes/no
15 answer to that, which it isn't always an easy yes/no
16 answer, I would say yes, he was.
17    Q. Okay. Were there times that he was not
18 necessarily compliant?
19    A. Yes.
20    Q. Okay. And would you talk to him about the
21 importance of being compliant with the medication?
22    A. Yes.
23    Q. What type of risks faces a patient with
24 hypertension if they're not compliant with their
25 medication?

Page 21

1    A. Increased risk of cardiovascular disease.
2    Q. And are those risks that you would discuss
3 with the patient?
4    A. Yes.
5    Q. And did you discuss those risks with
6 Mr. Martin?
7    A. I'm certain I did. It's hard to remember
8 back to 1987, but that was my standard of care back
9 then, yes.
10    Q. And has that portion of your standard of
11 care changed?
12    A. No.
13    Q. Do the risks of cardiovascular disease
14 disappear even if a patient is compliant with
15 medication?
16    A. No.
17    Q. And over the course of the time that you
18 have treated Mr. Martin, you've tried other
19 medications for his blood pressure, correct?
20    A. Correct.
21    Q. At some point you had him on Vasotec?
22    A. Correct.
23    Q. And did he have any side effects to the
24 Vasotec?
25    A. You know, I think he had. He had complaints

6 (Pages 18 to 21)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

## Page 22

1  that -- we weren't certain if it was his blood
2  pressure medicine or not that was causing them, and
3  so there was adjustments made to try to answer that
4  question. So to say he had a side effect to a drug,
5  I'm not sure to this day if it was a side effect to
6  the drug or not.
7     Q. Okay. But he had, let's say, complained of
8  chest pain when taking the Vasotec, is that right?
9     A. I guess I'd have to look at the record.
10    Q. Sure, I'll refer you specifically to what I
11 have as page 54 in Exhibit 2, dated July 6, 1988.
12    A. Correct, that was a phone conversation in
13 which he called me and said that the Vasotec gave
14 him chest pain.
15    Q. And you switched him back to the Tenex?
16    A. That's correct.
17    Q. Now, sometime in that -- sometime
18 thereafter, Mr. Martin experienced a transient
19 ischemic attack, or what you believed was a
20 transient ischemic attack?
21    A. Correct.
22    Q. I believe that was May of 1993?
23    A. Correct.
24    Q. Now, what is a transient ischemic attack?
25    A. A transient ischemic attack is when a

## Page 23

1  patient demonstrates symptoms or signs of a stroke,
2  but that it's transient and it improves over time.
3     Q. And what symptoms or signs of a stroke did
4  Mr. Martin experience?
5     A. He had numbness in his right arm and in his
6  leg and had weakness.
7     Q. And what are the risk factors for a TIA?
8     A. Well, you can certainly get it with no risk
9  factors. But risk factors that would increase a
10 person's risk of cardiovascular disease in general
11 would be, one would be age. Another would be
12 diabetes. Another would be hypertension. Another
13 would be high cholesterol. Cigarette smoking. And
14 a family history inheritance of premature
15 atherosclerosis.
16    Q. And did Mr. Martin have any of these risk
17 factors at the time of his TIA?
18    A. Yes.
19    Q. Which ones?
20    A. He had hypertension.
21    Q. Anything else that you were able to diagnose
22 at that time?
23    A. At that time, that, by my memory, that's the
24 only other risk factor, although there may be a
25 family history. I don't have that right off the top

## Page 24

1  of my head. But he had hypertension.
2     Q. Okay. And obviously by the definition this
3  was a transient incident, correct?
4     A. Right. He also was a man over 40, which is
5  a risk factor for cardiovascular disease, too, at
6  that time.
7     Q. Did Mr. Martin have any long-term effects
8  from his TIA?
9     A. Not that I can recall, no.
10    Q. As a result of his having the TIA, did you
11 do any testing?
12    A. Yes, we did.
13    Q. What kind of testing did you do?
14    A. He had a CAT scan of the head. And he had a
15 carotid ultrasound. And then I also believe he was
16 sent to a neurologist.
17    Q. And what did you learn from those tests?
18    A. He had, according to the ultrasound, some
19 blockage in an artery. And -- in his carotid
20 artery, on the right. And I'd have to get the CAT
21 scan report. Hold on. He had a normal CAT scan of
22 the head. So he had some blockage in a carotid
23 ultrasound.
24    Q. Is the blockage of the carotid artery some
25 evidence of atherosclerosis?

## Page 25

1     A. Yes.
2     Q. Did you change Mr. Martin's treatment as a
3  result of the TIA?
4     A. (Examining.) He was started on aspirin, one
5  tablet a day. He was also placed on Vasotec in
6  addition to his Tenex.
7     Q. Did he have any, did Mr. Martin have any
8  complications from the Vasotec, reported side
9  effects at that point in time?
10    A. Not that I recall, no.
11    Q. At some point you started him on Zestril,
12 correct? I believe that was in 2000?
13    A. In 2000?
14    Q. Do you know the date? I have August 14th,
15 2000.
16    A. Yes, that's correct.
17    Q. Okay. And what is Zestril?
18    A. Zestril is a similar drug to Vasotec. It's
19 called an ACE inhibitor.
20    Q. And why did you switch him to Zestril at
21 that point in time?
22    A. Zestril was thought to be a little
23 longer-lasting drug than Vasotec. It was thought to
24 be superior.
25    Q. And did Mr. Martin have any complications

Paradigm Reporting & Captioning, Inc.
612-339-0545

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

**Page 26**

1 relating -- or side effects relating to the Zestril?
2    A. He developed a cough on Zestril.
3    Q. Is Zestril the same as Zestoretic?
4    A. No, that, Zestoretic is Zestril with
5 hydrochlorothiazide. So it's a combination of two
6 drugs.
7    Q. Okay. And by March of 2002, I have that you
8 switched him to Diovan. Is that right?
9    A. That's correct.
10    Q. And what is Diovan?
11    A. Diovan is an ARB; it is an antihypertensive
12 drug that's different than the rest.
13    Q. Okay. And what was the reason to switch him
14 to Diovan?
15    A. You say that was March of '02?
16    Q. That's what I have in my records.
17    A. Well, Diovan was reported to have the fewest
18 side effects of any hypertensive drug. And so as
19 Dick was developing abdominal pain and he -- and we
20 weren't sure what was causing it, we tried Diovan
21 just to see if it would help. Also, his cough. And
22 Zestoretic has been -- Zestril is associated with a
23 cough in people, so it was supposed to have less
24 side effects even.
25    Q. And for Mr. Martin, did the Diovan have less

**Page 27**

1 side effects?
2    A. I believe it was a transient prescription,
3 so I do not believe that he felt it made a big
4 difference for him.
5    Q. When you say transient, what does that mean?
6    A. Meaning that my next note said that he was
7 back on the Zestril and Dyazide -- wait a minute,
8 let me just look. (Examining.)
9       Could you rephrase your question to me.
10    Q. Sure. We were talking about the Diovan,
11 correct?
12    A. Correct.
13    Q. And you said that Diovan was believed to
14 have the fewest side effects?
15    A. Correct.
16    Q. Did it in fact have less side effects for
17 Mr. Martin?
18    A. No.
19    Q. Did he continue to have complaints with his
20 medication?
21    A. Yes.
22    Q. And what complaints did he have on the
23 Diovan?
24    A. Well, he complained of abdominal pain.
25    Q. And in April of 2002, you switched him to

**Page 28**

1 Catapres?
2    A. That's correct.
3    Q. And that was April 24th, 2002?
4    A. Patch. Catapres-TTS. It's a patch.
5    Q. How does that differ from the other
6 medications you were giving him?
7    A. It's a patch that you put on once a week, it
8 doesn't go through your mouth so you don't absorb it
9 in your GI tract. It has a gradual release of the
10 antihypertensive medicine through your skin for a
11 week.
12    Q. And then you switch the patch?
13    A. We switched him to a patch.
14    Q. Then you change -- put on a new patch?
15    A. You move the patch once a week, that's
16 correct.
17    Q. Okay. And it's a whole new patch when you
18 move it?
19    A. Yes.
20    Q. And he started that on April 24, 2002?
21    A. That's correct.
22    Q. And was that a better medication for
23 Mr. Martin?
24    A. In what --
25    Q. Well, let me rephrase, that's a bad

**Page 29**

1 question.
2       Did he -- did it help his abdominal pain or
3 did it not -- rephrase that.
4       Did Mr. Martin continue to experience
5 abdominal pain after switching to the Catapres?
6    A. I don't know the answer to that question.
7    Q. Okay.
8    A. Because at that point in time, that was
9 around the time that his eye went bad and I, you
10 know, I don't think he really complained much of
11 abdominal pain when his eye was going bad.
12    Q. Okay.
13    A. So I don't know if it made it better or not.
14    Q. Okay. And you took him off the Catapres on
15 June 5th, correct?
16    A. That's correct.
17    Q. And what was the reason for changing him off
18 the Catapres patch?
19    A. I guess I felt that given his situation,
20 that -- that we may have more luck with a different
21 medicine. I didn't think the Catapres -- I didn't
22 think the pills were contributing to his abdominal
23 pain. And I'd rather have had him on a pill than a
24 patch. It isn't that there was any one particular
25 reason. It was just that I thought that the ACE

8 (Pages 26 to 29)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 30

1  drug might be a better antihypertensive drug in
2  general.
3     Q. A more effective drug for him?
4     A. I don't know if I can say more effective,
5  I'll just say a better drug in general.
6     Q. Okay. And that's taking everything into
7  account, correct; his medical situation, potential
8  side effects, as well as the efficacy of the drug?
9        MR. GOMEZ: Objection to form.
10       MS. LOIDOLT: Go ahead.
11    A. What was your question again?
12 BY MS. LESKIN:
13    Q. I just want to understand, when you say it
14 was a better drug for him, I'm just trying to
15 understand what you meant by that?
16    A. It might have been my belief that in general
17 an ACE inhibitor was a better drug than Catapres as
18 a general antihypertensive drug. So it may have
19 been my belief at the time that that would be a
20 better blood pressure medicine for him than
21 Catapres.
22       It wasn't necessarily that the Catapres
23 wasn't working or that he was having more side
24 effects. I may have thought theoretically it was a
25 better drug.

Page 31

1     Q. Okay. And again, that's taking the entire
2  situation into account, including the efficacy and
3  the side effects and Mr. Martin personally?
4     A. Yes.
5     Q. Now, your record notes that you put him on
6  Accupril during that time as well, correct?
7     A. Right.
8     Q. And what is Accupril?
9     A. Accupril is an ACE inhibitor. It's a
10 similar drug to Zestril.
11    Q. Okay. My records are out of date order, so
12 I just want to make sure I'm following them
13 correctly.
14       What blood pressure medications is
15 Mr. Martin currently taking?
16    A. He's on lisinopril, 10 milligrams. And then
17 he also takes Cardura, 4 milligrams. And then he
18 takes Atenolol, 50 milligrams.
19    Q. Let's start with lisinopril. What kind of
20 medication is lisinopril?
21    A. That's a generic for Zestril. It's an ACE
22 inhibitor.
23    Q. And Cardura?
24    A. That's an alpha-1 blocker. And it is
25 usually used for prostate symptoms, but it is

Page 32

1  classified as an antihypertensive drug.
2     Q. And you're giving it to him for his blood
3  pressure?
4     A. I believe it's being given to him for his
5  prostate, by the best of my memory. I don't recall
6  that I prescribed that for him. I think he may have
7  gotten that from a urologist.
8     Q. That would be Dr. McEllistrem?
9     A. May be the case. I don't know that with
10 certainty.
11    Q. Okay. Are you providing him with ongoing
12 prescriptions for that?
13    A. Probably.
14    Q. Okay.
15    A. I'd have to look up that, I don't have that
16 available right at this moment. But it certainly
17 could be.
18    Q. Okay. What other records would you have
19 that would indicate?
20    A. I'd have to get my computer and look up when
21 he last got a prescription if I prescribed it.
22    Q. And the Atenolol is what kind of medication?
23    A. That's a beta-blocker.
24    Q. So the combination of those three
25 medications is providing Mr. Martin treatment for

Page 33

1  his hypertension at the current time?
2     A. That's correct.
3     Q. When was Mr. Martin last in the office?
4     A. According to the record I have in front of
5  me, it was March 28th of '08.
6     Q. And what was his blood pressure on that
7  date?
8     A. On that day his blood pressure was 120 over
9  54.
10    Q. And that's adequate control, correct?
11    A. Yes.
12    Q. Now, Mr. Martin also hàs, you've diagnosed
13 him with high cholesterol, correct?
14    A. Yes.
15    Q. When did you diagnose him with high
16 cholesterol?
17    A. Give me a moment.
18    Q. Take your time.
19    A. (Examining.) I believe that was diagnosed
20 on May 10th of 2002.
21    Q. And what was his cholesterol level at the
22 time?
23    A. His most recent cholesterol had been done in
24 March, March 27th of 2002, and his cholesterol level
25 was 186 on that date.

9 (Pages 30 to 33)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.  10/14/2008
In Re: Viagra Products Liability Litigation

Page 34

1    Q. And is that considered elevated?
2    A. Total cholesterol, it is not. But his LDL
3  cholesterol, which is, you know, a subfraction of
4  his cholesterol, it was mildly elevated at 138.
5    Q. And LDL, is that the good cholesterol or the
6  bad cholesterol?
7    A. That's the bad cholesterol.
8    Q. Okay. And in May of 2002, Mr. Martin was
9  started on Zocor, correct?
10   A. Correct.
11   Q. And did you prescribe that for him?
12   A. Yes.
13   Q. And why did you prescribe him Zocor in May
14 as opposed to March when the --
15   A. Cholesterol was high? Because after it was
16 identified that he had an ischemic event, upon
17 conversation with his eye doctor, I asked what
18 things he thought I could do to try to help him.
19 And one of the suggestions he made was that we get
20 his cholesterol lower.
21   Q. And has his cholesterol been lower since
22 then?
23   A. I don't have all of them available, but it
24 certainly lowered it immediately thereafter. I
25 could look through other cholesterols since, but.

Page 35

1    Q. Well, what's Mr. Martin's most recent
2  cholesterol level?
3    A. The last one I see here is dated December
4  23rd of '07. And his cholesterol was 115.
5    Q. And his LDL?
6    A. 63.
7    Q. And that's a better number for him?
8    A. That's better for him, correct.
9    Q. And is he still taking the Zocor?
10   A. To my knowledge, he is.
11   Q. You're continuing to prescribe it for him?
12   A. You know, as I have not seen him since
13 March, I in general will require people to come in
14 every six months. I would have to get my current
15 computer prescriptions to see if we're still giving
16 it to him. But as of that December time, I was.
17   Q. Now, you've also diagnosed Mr. Martin with
18 diabetes?
19      MS. LOIDOLT: Well, that's a
20 misstatement of the record.
21      MR. GOMEZ: Object.
22      MS. LOIDOLT: But you can go ahead and
23 answer.
24 BY MS. LESKIN:
25   Q. Okay, have you diagnosed Mr. Martin?

Page 36

1    A. At one time I felt he had diabetes.
2  Subsequent to that, I felt that it was confusing and
3  referred him to a diabetic specialist, Dr. Abid, who
4  does not feel that he has diabetes.
5    Q. Okay. And why were you concerned that he
6  had diabetes?
7    A. He had had an occasional fasting blood sugar
8  that was elevated.
9    Q. And Dr. Abid is what kind of doctor?
10   A. An endocrinologist.
11   Q. And did Dr. Abid make any diagnosis to your
12 knowledge?
13   A. My understanding was that he said that he
14 had abnormal -- an abnormal glucose tolerance test.
15   Q. And how is that different from diabetes?
16   A. I guess you would have to ask Dr. Abid, to
17 be honest with you.
18   Q. Okay.
19   A. But my understanding is that it has to be a
20 certain degree of abnormal before it makes the
21 diagnosis of diabetes.
22   Q. Is Mr. Martin taking any medication to
23 control his blood sugars?
24   A. No, not that I'm aware of.
25   Q. Is he doing anything to help control his

Page 37

1  blood sugars?
2    A. He's supposed to be watching his diet.
3    Q. And have you provided him any written
4  information about what kind of diet he should be
5  following?
6    A. No, I referred him to Dr. Abid for care of
7  his diabetes -- or of his abnormal blood sugar.
8    Q. Okay. And you referred him to Dr. Abid
9  because you were concerned that if he had diabetes
10 it would -- could contribute to further damage to
11 his eyes, is that fair to say?
12      MR. GOMEZ: Objection to form.
13      (Reporter asked for repeat.)
14      MR. GOMEZ: I objected too early. I
15 didn't mean to interrupt her question, I apologize.
16 Just form. Sorry.
17   A. I was concerned that if he had diabetes, I
18 wanted to make sure that it was adequately taken
19 care of. I was not certain if he truly had diabetes
20 at that point in time, so I wanted to clarify the
21 diagnosis also.
22   Q. I just want to -- if you take a look at your
23 record dated January 30th, 2006, which is in Exhibit 2
24 I believe is page 86. January 30th, 2006.
25   A. Okay.

10 (Pages 34 to 37)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

---

Page 38

1    Q. And you wrote here, "Unfortunately, he has
2  gone blind because of an ischemic event in his eyes.
3  He clearly has high risk atherosclerosis with
4  diabetes that has been confirmed on repeated fasting
5  blood sugars in spite of the normal glycosylated
6  hemoglobin."
7    A. Correct.
8    Q. "He has seen Dr. Abid who recently did a
9  glucose tolerance test and indeed was abnormal. In
10  any event, he's controlled with diet. He can still
11  see some but is certainly at an increased risk for,"
12  and then there's a handwritten note that I can't
13  read.
14    A. "For further ischemia."
15    Q. "To his eyes"?
16    A. Right.
17    Q. Now, when you said that he was at increased
18  risk for further ischemia to his eyes, was that in
19  relation to his blood sugars or to anything else?
20    A. It had to do with his general health. The
21  more risk factors people develop, the more risk they
22  are for atherosclerosis. And at that time I was
23  convinced he had diabetes, and so I really wanted to
24  make certain that we were taking care of it and that
25  that didn't become an increased factor in damaging

---

Page 39

1  his eyes.
2    Q. Now, when did Mr. Martin first complain to
3  you of erectile dysfunction?
4    A. One second. (Examining.)
5       MS. LOIDOLT: I think it's 1996.
6       THE WITNESS: I think it's 1996 also,
7  but I just wanted to get her the exact date.
8    A. I believe it was May 20th of 1996.
9    Q. Okay. Now, before we go to that, you
10  referred briefly to some handwritten notes.
11    A. These are just notes I wrote in reviewing
12  the chart so that I could try to answer your
13  questions more effectively. These are my own notes
14  summarizing my chart.
15       MS. LOIDOLT: They're not part of the
16  medical record.
17       THE WITNESS: No.
18  BY MS. LESKIN:
19    Q. Okay. Those are notes that you prepared?
20    A. Right.
21    Q. I didn't prepare those.
22    A. That's correct.
23    Q. And your attorney didn't prepare those.
24    A. That's correct.
25    Q. Okay. And when did you prepare those notes?

---

Page 40

1    A. When you were first coming, whatever date
2  that was.
3    Q. Okay, so a couple months ago?
4    A. Right.
5    Q. Okay. And that was based on your review of
6  the medical records?
7    A. I just wanted to review his records to
8  remember when I did what.
9    Q. Okay.
10    A. That's correct.
11    Q. What do you recall about the conversation
12  you had with Mr. Martin on May 20th, 1996, regarding
13  erectile dysfunction?
14    A. Well, I asked him to stop his Tenex and
15  monitor his blood pressure to see if that was
16  contributing to his problems with erectile
17  dysfunction.
18    Q. Did he provide you any explanation as to the
19  scope or extent of his dysfunction?
20    A. He stated that he got erections at night.
21  That his libido was good. I do not know based on
22  this note what the degree of erectile dysfunction he
23  had.
24    Q. And you don't have any independent
25  recollection?

---

Page 41

1    A. No, I don't.
2    Q. What was your impression of the erectile --
3  his erectile dysfunction after your examining him?
4    A. Well, you know, I believed it to be a
5  problem for him that he wanted help with.
6    Q. And did you diagnose a cause for his
7  erectile dysfunction at that point in time?
8    A. No.
9    Q. You did recommend he stop the Tenex,
10  correct?
11    A. That's correct.
12    Q. Is that because one of the side effects of
13  blood pressure medications is erectile dysfunction?
14    A. Correct.
15    Q. Did stopping the Tenex have any help in his
16  erectile dysfunction?
17    A. No.
18    Q. So what was the next thing you did to assess
19  the cause of erectile dysfunction?
20    A. To assess the cause, I recommended that he
21  see Dr. McEllistrem, a urologist.
22    Q. Okay. Prior to referring him to
23  Dr. McEllistrem, did you recommend any treatments
24  for him?
25    A. Yes, I tried him on a medicine called Yocon.

---

11 (Pages 38 to 41)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

**Page 42**

1    Q. And that's the brand name of yohimbine?
2    A. Yes.
3    Q. And what is yohimbine?
4    A. Well, again, that's been many years since
5  we've used that. My recollection is it's -- it's a
6  drug that affects -- helps people with erection some
7  of the time. It's nowhere near as good as our newer
8  medicines, but it's a medicine to help with erectile
9  dysfunction. I don't off the top of my head recall
10  the mechanism by which it works.
11    Q. And was the yohimbine, the Yocon, effective
12  for Mr. Martin?
13    A. No, because there's a phone call a month
14  later that says "Meds not working." And that's when
15  I referred him to Dr. McEllistrem.
16    Q. At the time that you prescribed the
17  yohimbine to Mr. Martin, did you discuss any other
18  treatment options with him?
19    A. Not that I recall.
20    Q. As a family practitioner at this point in
21  time, in 1996, did you regularly treat patients with
22  erectile dysfunction?
23    A. You know, it's hard to recall 1996. Let me
24  say that I had a few patients that I tried this
25  medicine on, but in general if it didn't work well

**Page 43**

1  for them, I referred them to a urologist.
2    Q. Did you have any conversations with
3  Dr. McEllistrem about Mr. Martin's erectile
4  dysfunction after you referred him there?
5    A. We had communication. I don't specifically
6  recall a conversation with him regarding his
7  erectile dysfunction. You're saying with
8  Dr. McEllistrem?
9    Q. Yes.
10    A. A conversation. I don't recall one.
11    Q. Okay. You did do some lab work at the
12  request of Dr. McEllistrem, correct?
13    A. Correct, right.
14    Q. And do you know the results of that lab
15  work?
16    A. (Examining.) Give me a second.
17    Q. Sure.
18    A. (Examining.) Well, I see some of it. I
19  don't know if I see all of it.
20    Q. Okay.
21    A. I see -- now sometimes Dr. McEllistrem would
22  have labs sent directly to him and they wouldn't
23  necessarily come to me.
24    Q. Okay.
25    A. I know that we did a PSA. We did a thyroid

**Page 44**

1  profile on him. There was an LD done, that's a
2  test. I don't see -- it looks as if Dr. McEllistrem
3  had a testosterone -- oh, here it is, yeah, it was
4  done, I'm sorry it took me -- I'm looking in '96.
5  Did you say '98?
6    Q. No, '96.
7    A. Okay, I'm sorry. Yeah, there is a
8  testosterone level here and a prolactin level.
9    Q. And were those normal or abnormal?
10    A. Those look normal.
11    Q. And your understanding is that was a way to
12  rule out potential causes of Mr. Martin's erectile
13  dysfunction?
14    A. I guess I can't come to a conclusion.
15  Dr. McEllistrem wanted those tests.
16    Q. Okay.
17    A. But I would presume that's what he wanted
18  them for.
19    Q. But you didn't discuss it with
20  Dr. McEllistrem as to why he ordered particular
21  tests?
22    A. In general we would not. I would leave that
23  up to him. And I don't recall talking to him about
24  it.
25    Q. Do you know whether Dr. McEllistrem ever

**Page 45**

1  reached a diagnosis as to the cause of Mr. Martin's
2  erectile dysfunction?
3    A. I think he did. There's a letter from him
4  dated September 5th, 1996, in which he said there
5  was a slow filling of the corpora post-compression.
6  So he believed it was vascular in-flow deficiency,
7  per his letter.
8    Q. And are you familiar with the treatment
9  options that Dr. McEllistrem gave Mr. Martin at the
10  time?
11    A. Well, I'm familiar with what his letter
12  says, yes.
13    Q. Okay, and what does his letter tell you?
14    A. Said that he gave him Yocon and Trazodone.
15  And he said that he feels somewhat improved,
16  although he still has a problem.
17    Q. And at some point in time are you aware of
18  any different medications or treatments that were
19  tried prior to 1998?
20    A. Prior to 1998.
21    Q. Help you out here.
22    A. In 1996, he has a letter stating the initial
23  treatment. And then he talks about things that
24  might be necessary. But I don't know that he did
25  that. But I think at one point in time he -- well,

12 (Pages 42 to 45)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.  10/14/2008
In Re: Viagra Products Liability Litigation

**Page 46**

1 prior to 1996 you're asking me?
2     Q. 1998.
3     A. I think he gave him Caverjects. There's a
4 letter here dated September of 1997 in which he
5 instructed him on the use of Caverjects.
6     Q. Okay. Are you familiar with Caverject?
7     A. Not very familiar. In general, I refer
8 people to specialists for that. But I know that's
9 an injectable drug that can give people erections.
10     Q. Did you have any conversations with
11 Mr. Martin about his use of Caverject?
12     A. Not that I can recall.
13     Q. You're aware that in March 1998 the FDA
14 approved Viagra for use for the treatment of
15 impotence?
16     A. I know it was in 1998. I wasn't aware it
17 was March, but that makes sense.
18     Q. Okay. Have you prescribed Viagra to your
19 patients?
20     A. Yes.
21     Q. And prior to -- let me ask you this. When's
22 the first time you recall prescribing Viagra to one
23 of your patients?
24     A. Gee, I believe it was in 1998.
25     Q. Was it soon after the drug came on the

**Page 47**

1 market?
2     A. Yes.
3     Q. Now, prior to prescribing Viagra to any of
4 your patients, did you review the published
5 literature?
6     A. I reviewed the insert that came with Viagra
7 from the company.
8     Q. Okay.
9     A. I did not review all the published
10 literature in the world, but whatever the company
11 gave I reviewed.
12     Q. The printed label, correct?
13     A. Right.
14     Q. Did you review any medical articles that had
15 been published in any of the journals?
16     A. No.
17     Q. Did you discuss Viagra with any of your
18 colleagues?
19     A. I'm certain that I discussed it with various
20 colleagues over time. I don't recall specific
21 conversations.
22     Q. Do you remember discussing it with anyone
23 else?
24     A. What do you mean about anyone?
25     Q. Any other professional people. Well, let me

**Page 48**

1 ask you this. Did you talk to anyone at Pfizer
2 about Viagra?
3     A. I've talked to pharmaceutical reps. They've
4 sent pharmaceutical reps here.
5     Q. And did they provide you with information?
6     A. Yes.
7     Q. What type of information did they provide
8 you regarding Viagra?
9     A. They often had a pack of, a sample pack that
10 included literature right with it.
11     Q. And did you find the information that the
12 sales rep provided you to be helpful?
13     A. Yes.
14     Q. Did you find it to be accurate information?
15     A. Yes.
16     Q. Was there any questions you would ask of
17 your sales reps that they were unable to answer for
18 you?
19     A. No.
20     Q. Did you prepare any written information for
21 your patients regarding Viagra?
22     A. Other than what came with the sample pack,
23 no.
24     Q. Did you have a standard talk that you would
25 give to your patients about Viagra?

**Page 49**

1     A. Yes.
2     Q. And what would you tell your patients when
3 the drug first came on the market?
4     A. I would describe the time frame in which
5 they needed to use it. I would describe that they
6 could not take nitroglycerin anywhere around using
7 it, within days of using it.
8         And that if they got an erection that didn't
9 come down after ejaculation, I would always say
10 within an hour they were to call me, whether it was
11 the middle of the night or around the clock.
12         That they shouldn't take more than the dose
13 that was prescribed.
14         And that sometimes they would have to use it
15 more than once to see if it worked. Was the main.
16 And if they had any other side effects, they could
17 call me.
18     Q. Were there any other side effects that you
19 specified at that point in time?
20     A. You know, I guess I would ask the patient if
21 they had questions about side effects. And if they
22 did, I would go into more details. But in general,
23 the literature that came with it was pretty complete
24 and I didn't go into usually more detail than that.
25     Q. Generally, have you found Viagra to be an

13 (Pages 46 to 49)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 50

1 effective treatment for your patients?
2    A. Yes.
3    Q. And have you found it to be a safe treatment
4 for your patients?
5    A. Yes.
6    Q. When did you first discuss Viagra with
7 Mr. Martin?
8    A. (Examining.) I believe it was on April 17th
9 of 1998.
10    Q. Okay. And just so we're all on the same
11 page, that's, in Exhibit 2 it's on page 96. I just
12 want to confirm that I'm looking at the right
13 record. Is the entry dated April 17, '98?
14    A. Yes, that's correct.
15    Q. Okay. What do you recall about that
16 conversation with Mr. Martin?
17    A. Well, he had complained of problems with
18 impotency and had expressed that he would like to
19 try a new medication that he had heard about. And
20 at that time I prescribed Viagra. Told him to call
21 me with, you know, how he did with it. And gave him
22 a prescription for six pills with three refills.
23    Q. Did he tell you how he had heard about
24 Viagra?
25    A. You know, I do not recall that.

Page 51

1    Q. Based on your note and your recollection,
2 did he raise Viagra with you or did you raise Viagra
3 with him?
4    A. You know, I really can't answer that. I
5 mean based on my note, it looks as if he brought it
6 up to me. But, you know, I can't recall that.
7    Q. And at the time that you prescribed him the
8 Viagra in April of 1998, did you give him the
9 standard discussion talk about Viagra that you just
10 went through with me?
11    A. Yes.
12    Q. Do you recall if he had any questions about
13 the drug?
14    A. I do not recall him having any questions
15 about it.
16    Q. Now, you gave him a prescription when you
17 saw him in April of '98, correct?
18    A. Yeah.
19    Q. At some point in time you started giving him
20 samples, correct?
21    A. That's correct.
22    Q. And was there a reason -- well, let me ask
23 you this. Did you give him a prescription at the
24 same time you gave him samples? Or did you solely
25 provide him with samples?

Page 52

1    A. I'm sure he had an ongoing prescription at
2 the pharmacy that he could fill if he wished. Or
3 certainly if he'd ask for it I would give him a
4 prescription. But it is not uncommon for men to ask
5 me for samples because they're free, and if we have
6 some I will give people some.
7    Q. Okay. And over the course of the years that
8 Mr. Martin was taking Viagra, did you ever have any
9 additional conversations with him about the drug?
10    A. Anytime I hand a patient the sample of
11 Viagra, I always review with them every time that
12 they need -- the risks that I talked about earlier.
13    Q. Now, over the years that Viagra has been on
14 the market, the label has been updated from time to
15 time?
16    A. Right.
17    Q. When the label is updated, do you review an
18 updated label?
19    A. Yes.
20    Q. And how do you become aware of the updates?
21    A. Various issues. Sometimes a pharmaceutical
22 rep will provide me with that information.
23 Sometimes the company, pharmaceutical company will
24 send out new information via mail. Sometimes
25 there's a new package insert that comes with it.

Page 53

1    Q. And when the -- as the label has been
2 updated over the years, have you changed the
3 information you provide to your patients?
4    A. Yes.
5    Q. In November of 1998, you may recall the
6 label was changed to include information about
7 reports of heart attack that had been reported. Do
8 you recall that change?
9    A. That's correct, yeah, I do.
10    Q. Did you change the information you gave to
11 patients based on that change in label?
12    A. Yes, I did.
13    Q. And what -- how did you change your
14 information?
15    A. Well, I explained to people that there
16 were -- that there was a risk to every drug,
17 including Viagra, and that people who now were
18 sexually active that weren't sexually active before
19 did increase their physical activity. And any
20 physical activity could precipitate heart disease.
21 And that they should be aware that if they had any
22 prior existing heart disease, they needed to go to
23 their cardiologist and get it cleared before they
24 use Viagra. That if they didn't have any
25 preexisting heart disease, that if they developed

14 (Pages 50 to 53)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 54

1 any sort of symptoms such as chest pain or shortness
2 of breath, they should stop using the medicine and
3 let me know that.
4     Q. At some point in time the label added
5 information about alpha blockers?
6     A. That's correct.
7     Q. You're aware of that as well?
8     A. Yeah.
9     Q. What information -- or let me ask you this.
10 Did you change the information you provided to
11 patients when that label was changed?
12     A. Well, actually if my memory serves me right,
13 it changed to where initially they said that you
14 couldn't use a drug like Viagra with an alpha
15 blocker, and then later they adjusted it to say that
16 you could but they had some caution with it.
17        So when the warning came out with an alpha
18 blocker, any patient that I saw that was on an alpha
19 blocker with Viagra, I asked them how they were
20 doing with it, informed them of the risks of what
21 the warning was, and then told them that the
22 recommendation was that they stop it. And they then
23 decided what they wanted to do.
24     Q. And most recently you're aware the label has
25 been -- added some information about reports of

Page 55

1 ischemic optic neuropathy?
2     A. That's correct.
3     Q. That was in July of 2005, right?
4     A. I don't know when it was, but I know it was
5 more recently.
6     Q. Okay. And have you changed the information
7 you provided to patients when that label came out?
8     A. Yes.
9     Q. And what information do you provide to your
10 patients about that?
11     A. I tell people that there has been some
12 reports of vision loss. That if they have any
13 symptoms of vision loss or if they are concerned
14 about it, they should be evaluated by their eye
15 doctor prior to starting Viagra. If they have any
16 vision loss symptoms, they are to stop the drug and
17 call me promptly.
18     Q. You told me earlier that you receive
19 information from sales reps?
20     A. That's correct.
21     Q. And also from the printed label about
22 Viagra?
23     A. Correct.
24     Q. Correct? Do you keep up with the literature
25 that's published regarding Viagra?

Page 56

1     A. You're talking general literature?
2     Q. General literature.
3     A. No.
4     Q. Have you read any written articles about
5 Viagra?
6     A. Other than the article that his wife
7 provided for me, I cannot recall any off the top of
8 my head.
9     Q. What did Mr. Martin report to you at the
10 time he was using Viagra about the efficacy of the
11 drug?
12     A. He stated it worked well for him.
13     Q. Did you ever change the dosage that you were
14 giving him?
15     A. Not that I recall.
16     Q. Did he have any complaints about the Viagra?
17     A. Not that I recall.
18     Q. Did you ever give Mr. Martin an erectile
19 dysfunction drug after 1998 other than Viagra?
20     A. I think at one time I think there was a note
21 that I gave him some Levitra at one time.
22     Q. And did he try that?
23     A. You know, I don't know that.
24     Q. Did you give him Levitra anytime other than
25 that one time?

Page 57

1     A. Not that I recall.
2     Q. Do you recall ever writing him a
3 prescription or giving him a sample of Cialis?
4     A. You know, I don't recall that. You know, I
5 really don't recall giving him a sample of Cialis.
6 Not that I recall.
7     Q. Did you ever tell Mr. Martin to stop taking
8 Viagra?
9     A. Not that I recall.
10        MS. LESKIN: This is probably a good
11 time to take a quick break.
12        THE WITNESS: I'm with you.
13        (Break from 10:53 a.m. to 11:05 a.m.)
14 BY MS. LESKIN:
15     Q. Back on the record.
16        I want to talk about Mr. Martin's vision
17 loss.
18     A. Okay.
19     Q. When did he first complain to you about any
20 loss of vision?
21     A. On May 1st of 2002.
22     Q. Okay. And in Exhibit 2, I just want to
23 confirm that that's page 114. Correct?
24     A. Yup, that's correct.
25     Q. Okay. And well, let me ask you this. Was

15 (Pages 54 to 57)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

---

Page 58

1  that a normal scheduled appointment for Mr. Martin?
2  Can you tell that?
3     A.  No, I believe that would have been, if you
4  want to term it an emergency appointment, it was an
5  appointment related to a problem in his vision.
6     Q.  Okay.  And what did Mr. Martin report to you
7  on that date?
8     A.  That he had developed decreased vision in
9  the upper half of the right eye.  That it was
10 blurred.
11    Q.  Do you recall or did he tell you about the
12 time of onset?
13    A.  It had started the day before.
14    Q.  Did he tell you what time of day?
15    A.  No.
16    Q.  Did he tell you what he was doing at the
17 time of the onset?
18    A.  No.
19    Q.  Did he tell you of any medications he had
20 been taking around at or about the time of the
21 onset?
22    A.  No.
23    Q.  And what did you do when he came to the
24 office?
25    A.  I examined him.  And then referred him to an

---

Page 59

1  eye doctor, Dr. Dan Nichols, that very day.
2     Q.  And Dr. Nichols is an ophthalmologist,
3  correct?
4     A.  That's correct.
5     Q.  Did you make any diagnosis of Mr. Martin's
6  condition on May 1st?
7     A.  Well, I diagnosed that he had vision loss,
8  called a right hemianopsia.  I did not diagnose the
9  cause of it, just that he had vision loss.
10    Q.  And to your knowledge did Mr. Martin go see
11 Dr. Nichols?
12    A.  Yes.
13    Q.  Are you aware of any diagnosis that
14 Dr. Nichols made as to the cause of Mr. Martin's
15 vision loss?
16    A.  Yes.
17    Q.  What did he diagnose him with?
18    A.  Ischemic eye disease.
19    Q.  Okay.  Did you ever talk to Dr. Nichols
20 about that diagnosis?
21    A.  Yes.
22    Q.  And what do you recall of that conversation?
23    A.  Well, Dr. Nichols called me after seeing him
24 and asked me to do a blood test called a sed rate.
25 And then told me that he wanted to recheck the

---

Page 60

1  patient in a week.
2     Q.  Did you have an understanding as to why
3  Dr. Nichols wanted you to do a sed rate?
4     A.  In general, a sed rate is done to see
5  whether or not a person has inflammation of their
6  arteries going to their eyes.
7     Q.  And you noted that the sed rate was normal
8  for Mr. Martin?
9     A.  Yes.
10    Q.  When was the -- I'm sorry, when was the next
11 time you saw Mr. Martin?
12    A.  The next time I saw him was on May 10th.
13    Q.  And what was his status then?
14    A.  He had worsening vision to the point where
15 he could hardly see out of his right eye at all.
16    Q.  And this was on the right eye only, correct?
17    A.  Correct.
18    Q.  And did you make any further diagnosis at
19 that point in time?
20    A.  I diagnosed that he had had hypertension,
21 hyperlipidemia/high cholesterol, and that his right
22 eye had suffered what I called an infarct.
23    Q.  And that was the ischemic event that
24 Dr. Nichols had identified?
25    A.  That's correct.

---

Page 61

1     Q.  Did Mr. Martin provide you any additional
2  information on that date regarding what he was doing
3  at the time of his initial vision loss?
4     A.  No.
5     Q.  Did he provide you any additional
6  information as to any of the events surrounding his
7  vision loss?
8     A.  At that time?
9     Q.  Yes.
10    A.  No.
11    Q.  On that date did he provide you any
12 additional information regarding any medications he
13 had been taking at or about the time of his vision
14 loss?
15    A.  No.
16    Q.  Now, you also note here that you spoke with
17 Dr. Nichols again on that date?
18    A.  That's correct.
19    Q.  And what did Dr. Nichols tell you?
20    A.  Dr. Nichols explained to me that he had
21 ischemic eye disease, and that the best I could do
22 for him was keep his blood pressure and cholesterol
23 controlled.  And put him on an aspirin a day, which
24 we did.  And I asked Dr. Nichols if he would object
25 to me sending him to the University of Minnesota,

---

16 (Pages 58 to 61)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

## Page 62

1  and he said no.
2      Q. And what's at the University of Minnesota?
3      A. They have a prestigious eye department at
4  the University of Minnesota.
5      Q. And you have -- there's a handwritten note
6  here, Dr. Andrew Harrison?
7      A. Apparently that would be who Dr. Nichols --
8  either, I don't know who gave me that name, but I
9  would suspect Dr. Nichols would have told me that.
10     But it also could be that I called the
11  University and said, you know, who can I get him in
12  to see. And they may have said this is the doctor
13  that deals with that problem and given me his name
14  and phone number. But that would be the eye doctor
15  I suspect from the University of Minnesota.
16     Q. Do you know Dr. Harrison?
17     A. No.
18     Q. Do you know his area of specialty?
19     A. I do not.
20     Q. Did Mr. Martin in fact go see Dr. Harrison
21  at that point in time?
22     A. My understanding is that he saw him in June.
23     Q. And that he did not go see him in May after
24  his first vision -- his first eye was affected?
25     A. That's my understanding, yes.

## Page 63

1      Q. Okay. When was the next time you saw
2  Mr. Martin?
3      A. May 24th of 2002.
4      Q. And what was the reason for that visit?
5      A. It was a follow-up of his vision loss and
6  his blood pressure and so forth.
7      Q. And what did you diagnose on that date?
8      A. That he had hypertension, hyperlipidemia,
9  and a recent ischemic event to his right eye.
10     Q. Did you make any other diagnosis as to the
11  cause of the ischemic event?
12     A. No.
13     Q. Did Mr. Martin provide you any additional
14  information on May 24th regarding the circumstances
15  surrounding his vision loss?
16     A. No.
17     Q. Did he provide you any additional
18  information on May 24th, 2002 as to any medications
19  he had been taking at or about the time of his
20  vision loss?
21     A. No.
22     Q. After the conversation with Dr. Nichols on
23  May 10th, did you have any additional telephone
24  conversations with Dr. Nichols?
25     A. Between then and the 24th? Or are you

## Page 64

1  saying ever again?
2      Q. Well, start with between then and the 24th.
3      A. Not that I recall.
4      Q. When was the next time you saw Mr. Martin?
5      A. On June 5th.
6      Q. Okay, before you get to the June 5th entry,
7  there's an entry dated May 31st?
8      A. Oh, excuse me, yes, I did see him on May
9  31st.
10     Q. Okay. And what was the reason for the
11  visit?
12     A. He had a pre-operative exam for a temporal
13  artery biopsy.
14     Q. And what was your understanding as to the
15  reason for the temporal artery biopsy?
16     A. I believe that the eye doctor wanted a
17  temporal artery biopsy done to rule out inflammation
18  of the arteries.
19     Q. Did you in fact examine him on May 31st,
20  2002?
21     A. Yes, I did.
22     Q. Is there a separate form that has the result
23  of that examination?
24     A. Yes. That would be this form right here
25  (indicating).

## Page 65

1      Q. Okay, see if I can find the matching form.
2         (Discussion held off the record.)
3         MS. LESKIN: Perhaps we could make a
4  copy and separately attach it.
5         MS. LOIDOLT: Let's do that.
6         MS. LESKIN: So we'll separately copy
7  it and an attach it afterwards as Exhibit 3.
8      A. Okay --
9         MS. LOIDOLT: Wait for a question.
10  BY MS. LESKIN:
11     Q. So we'll mark this as Exhibit 3, Doctor.
12     A. Okay, all right. This is Exhibit 3?
13     Q. Yes. We'll make a copy afterwards.
14     A. Okay.
15     Q. What information did Mr. Martin provide to
16  you when you saw him on May 31st?
17     A. That he had a history of right eye blindness
18  and that his left eye had decreased vision also.
19     Q. And May 31st when you saw him, was that the
20  first time you learned that he had decreased vision
21  in the left eye?
22     A. That's correct.
23     Q. And what did Mr. Martin report to you
24  regarding his loss of vision in the left eye?
25     A. He just noted that it had gone -- that his

17 (Pages 62 to 65)

Anthony Ferrara, M.D. 10/14/2008
In Re: Viagra Products Liability Litigation

Page 66

1 eye, vision wasn't as good. And he said that it was
2 noted to be decreased on May 29th. So that would
3 have been two days before I saw him.
4 Q. And did he provide you with any information
5 at that visit regarding the circumstances
6 surrounding his loss of vision?
7 A. No.
8 Q. What else did he tell you on May 31st?
9 A. I guess the only additional thing that I
10 noted there that comes out at me is that he was on
11 prednisone that was started that day.
12 Q. Now, what was the reason for the prednisone,
13 do you know?
14 A. Prednisone would be a drug given for
15 possible temporal arteritis. That would be what we
16 were doing the biopsy for. And sometimes doctors
17 will start the drug pending the biopsy result and
18 stop it if the biopsy is negative or if they don't
19 feel the person has that disease.
20 Q. Who was the doctor who ordered the temporal
21 artery biopsy?
22 A. My guess would be that it was the eye
23 doctor. To be honest with you, I don't know.
24 Q. Okay. It wasn't you?
25 A. It was not me.

Page 67

1 Q. Okay. And do you know the results of the
2 temporal artery biopsy?
3 A. Yes.
4 Q. What were they?
5 A. There was moderate arteriosclerosis with
6 intimal hyperplasia, moderate luminal stenosis, and
7 no evidence of giant cell arteritis.
8 Q. Now, subsequent to May 31st, 2002, is it
9 your understanding that Mr. Martin in fact went to
10 see the neuro-ophthalmologist at the University of
11 Minnesota?
12 A. Subsequent to May 31st, yeah, I believe he
13 saw him in June. So that's correct.
14 Q. Okay. And that was Dr. Harrison, right?
15 A. I'd have to get his letter out in front of
16 me, hold on one second. Yes, it was.
17 Q. And what was the diagnosis that Dr. Harrison
18 made?
19 A. That he had bilateral ischemic optic
20 neuropathy. He said, "The differential diagnosis as
21 you know includes arteritic versus nonarteritic. He
22 has no arteritic symptoms. His sed rate was 2 and
23 [sic] most likely represents bilateral nonarteritic
24 events." And that he had mild cataract.
25 Q. And then you saw Mr. Martin on June 5th, is

Page 68

1 that correct, June 5th, 2002?
2 A. That's correct.
3 Q. And you wrote in your note, "He has had
4 problems with his circulation and actually went
5 blind in his right eye. He has decreased
6 circulation in the left"?
7 A. That's correct.
8 Q. What was the basis for your conclusion that
9 he had decreased circulation?
10 A. Discussion with Dr. Nichols as to what had
11 occurred to him.
12 Q. And did you reach an opinion to a reasonable
13 degree of medical certainty as to the cause of
14 Mr. Martin's vision loss?
15 A. Did I reach --
16 Q. Yes.
17 A. -- an opinion? I referred the patient to
18 specialists and just read their opinions. So my
19 opinion would be whatever their opinion was.
20 Q. You did not independently reach an opinion?
21 A. That's correct.
22 Q. When you saw Mr. Martin on June 5, 2002, did
23 he provide you any additional information regarding
24 the circumstances surrounding his vision loss in
25 either eye?

Page 69

1 A. No.
2 Q. And what diagnoses did you make on June 5th,
3 2002?
4 A. That there was no evidence of temporal
5 arteritis. That he had atherosclerosis with
6 subsequent blindness in both eyes. And that he had
7 hypertension and hyperlipidemia.
8 Q. At some point after June of 2002, did you
9 have a discussion with Mr. Martin regarding Viagra
10 and vision loss?
11 A. After 2002?
12 Q. After June of 2002.
13 A. (Examining.) Could you give me that
14 question. Did we have any discussion regarding
15 Viagra and vision loss?
16 Q. Correct.
17 A. In June 30th of 2004, I had referred him to
18 a doctor by the name of Dr. Cantrill. And I had
19 sent a letter to Dr. Cantrill outlining that his
20 wife in May of 2004 had brought some
21 Internet-derived research that questioned whether
22 Viagra could contribute to blindness. And I had
23 asked Dr. Cantrill if he was aware of that or if it
24 played a role.
25 So I'm certain in June of 2004 that was

18 (Pages 66 to 69)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D. 10/14/2008
In Re: Viagra Products Liability Litigation

Page 70

1 included somewhat in our conversation, you know, as
2 to why I wanted him to see Dr. Cantrill.
3 But in October of 2004, there was a
4 discussion regarding erectile dysfunction and
5 blindness.
6 Q. Okay.
7 A. From the use of Viagra.
8 Q. Now, let's just, I want to back up for one
9 moment. You told me that Mrs. Martin had provided
10 you with some articles in May of 2004?
11 A. That's correct.
12 Q. Which articles did she provide for you?
13 A. One second. (Examining.) She gave me a
14 release (indicating), 2001 release, University of
15 Maryland Medical News. And this was an article by
16 Dr. Pomeranz, a review of the Internet of work that
17 Dr. Pomeranz had done (indicating).
18 (Discussion held off the record.)
19 Q. You also gave me a handwritten note that she
20 provided to you?
21 A. That's correct.
22 Q. And what did the note say?
23 A. It says, "Just some information found on the
24 Internet by" -- by doing, I can't read her writing,
25 "regarding the possible effects of Viagra on vision.

Page 71

1 Dick wanted you to know this for a heads up.
2 Perhaps you're already aware."
3 MS. LESKIN: Perhaps we can just make a
4 copy again at a break and call that 4.
5 BY MS. LESKIN:
6 Q. Now, at the time that Mrs. Martin provided
7 you with these articles, were you aware of their
8 existence before that?
9 A. No.
10 Q. Had you heard any reports about Viagra being
11 reported -- ischemic optic neuropathy being reported
12 in patients taking Viagra?
13 A. No.
14 Q. Based on your review of these two articles
15 that Mrs. Martin provided you, did you reach an
16 opinion to a reasonable degree of medical certainty
17 as to whether Viagra can cause ischemic optic
18 neuropathy?
19 A. No.
20 Q. Now, you mentioned to me that you wrote a
21 letter to Dr. Cantrill?
22 A. That's correct.
23 Q. And that looks like page 335 in Exhibit 2,
24 just to confirm.
25 A. That's correct.

Page 72

1 Q. Okay. And that's dated June 30th, 2004?
2 A. That's correct.
3 Q. Okay. Now, who is Dr. Cantrill?
4 A. He's a retinal specialist.
5 Q. Did Dr. Cantrill ever write you back?
6 A. No.
7 Q. Did you ever have any conversations with
8 Dr. Cantrill?
9 A. No.
10 Q. And Mr. Martin never went to see
11 Dr. Cantrill?
12 A. That's my understanding.
13 Q. Now, you wrote in your letter here, "I have
14 asked Pfizer representatives to investigate this
15 also"?
16 A. That's correct.
17 Q. What conversations did you have with Pfizer
18 representatives about this?
19 A. I cannot recall the specific representative,
20 but I'm certain I asked the Pfizer representative
21 that provides us with Viagra samples if they were
22 aware of any research that had shown problems with
23 vision related to Viagra.
24 Q. And did you get any information from them?
25 A. Not to my knowledge. Now, that doesn't say

Page 73

1 they never sent me any. I do not recall them
2 sending any.
3 Q. Okay. At any time subsequent to this date?
4 A. I don't recall ever receiving any. However,
5 that doesn't say they didn't send me any.
6 Q. Okay. Now, you said that Mrs. Martin gave
7 this to you in May of 2004, correct?
8 A. Right.
9 Q. Prior to her providing you with these
10 articles, were you aware that Mr. Martin had
11 allegedly taken Viagra at or about the time of the
12 onset of his visual problems?
13 A. No, I'm not aware of that.
14 Q. You told me the next time you saw Mr. Martin
15 was June 30th, 2004, after receiving this
16 information, correct?
17 A. Correct.
18 Q. Did you have any discussions with Mr. Martin
19 on that day regarding the articles his wife had
20 provided you?
21 A. I'm certain -- the letter I sent to
22 Dr. Cantrill is dated the same day. I'm certain
23 that I brought it up with Mr. Martin that his wife
24 had left me a letter, that I had reviewed it, that I
25 didn't know what this meant, and that I would

19 (Pages 70 to 73)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

---

Page 74

1  recommend that he see Dr. Cantrill and try to
2  discuss it with him.
3      Q. Okay. Do you recall anything that
4  Mr. Martin said to you about Viagra and his vision?
5      A. On that date, no, I do not recall him saying
6  anything about it.
7      Q. Okay. And at the end of that entry on June
8  30th, 2004, you note that he continued to take
9  Viagra 50 milligrams p.r.n.?
10     A. That's correct.
11     Q. And you wrote, "He understands the risks of
12 Viagra as we detailed today"?
13     A. Right.
14     Q. What conversation did you have with him
15 about those risks?
16     A. I'm certain that I reviewed with him the
17 risks that I had told you about up at that point in
18 time of not using nitroglycerin with it, and if an
19 erection was prolonged to call, and if there was any
20 chest pain symptoms. That was my standard risks at
21 that time.
22         And I'm certain I would have mentioned to
23 him that I was not aware of Viagra causing any
24 visual problems, but that his wife had brought up
25 the article and that's why I was sending him to

---

Page 75

1  Dr. Cantrill.
2      Q. And then you saw him again on October 6,
3  correct?
4      A. That's correct.
5      Q. Of 2004?
6      A. That's correct.
7      Q. You know he told you that he did not see
8  Dr. Cantrill?
9      A. That's correct.
10     Q. And why did he explain to you that he did
11 not go see Dr. Cantrill?
12     A. Well, he said that he thought it would be a
13 waste of his time, that he didn't think there was
14 anything more that could be done for him. And I
15 told him that I couldn't promise him Dr. Cantrill
16 could help him either.
17     Q. Now, did you have a conversation with
18 Mr. Martin on that day regarding his use of Viagra
19 and his vision loss?
20     A. I did.
21     Q. And what did you note about that
22 conversation?
23     A. Well, I noted that, "He still has erectile
24 dysfunction and relates to me that he did not feel
25 that the Viagra was given at the time that he went

---

Page 76

1  blind."
2      Q. Do you recall anything else about that
3  conversation?
4      A. That's the only thing that I recall. And I
5  only recall that because I wrote it.
6      Q. Okay. Subsequent to October 6 of 2004, did
7  you ever have any additional conversations with
8  Mr. Martin regarding -- well, strike that.
9          Let me go back to October 6, 2004. As of
10 October 6, 2004, did you reach any opinion to a
11 reasonable degree of medical certainty as to whether
12 Viagra can cause ischemic optic neuropathy?
13     A. No.
14     Q. And as of October 6, 2004, did you reach any
15 opinion to a reasonable degree of medical certainty
16 as to whether Viagra caused or contributed to
17 Mr. Martin's ischemic optic neuropathy?
18     A. No.
19     Q. Subsequent to the conversation on October 6,
20 2004, did you have any additional conversations
21 regarding Viagra and its possible contribution to
22 his vision loss?
23     A. On June 30th of 2005, I put that: "His
24 blindness was caused by ischemic eye disease and has
25 questioned prior whether or not Viagra could play a

---

Page 77

1  role in this. Newer information recently has
2  questioned this in the past. He and I discussed
3  this today. He is convinced that this contributed."
4  That was the extent of that discussion.
5      Q. What new information were you referring to
6  in that note?
7      A. You know, I guess I would have to say there
8  must have been some publication that was either in
9  the lay press or that -- I don't know at what point
10 in time the pharmaceutical company put out a warning
11 regarding this, but there had to be information
12 besides what his wife had given me that had
13 questioned that.
14     Q. But sitting here today you don't recall what
15 that was?
16     A. I do not recall what that was.
17     Q. Now, you also wrote that he is convinced
18 that this contributed. And you're referring to
19 Mr. Martin?
20     A. That's correct.
21     Q. Did Mr. Martin tell you why he was convinced
22 that the Viagra contributed to his vision loss?
23     A. No.
24     Q. Did he tell you whether any of his
25 physicians had told him that it contributed to his

---

20  (Pages 74 to 77)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 78

1  vision loss?
2      A.  No.
3      Q.  As of June 30th, 2005, did you reach any
4  opinion to a reasonable degree of medical certainty
5  as to whether Viagra contributed to Mr. Martin's
6  vision loss?
7      A.  No.
8      Q.  Subsequent to June 30th, 2005, did you have
9  any additional conversations with Mr. Martin
10 regarding whether Viagra contributed to his vision
11 loss?
12     A.  None that I can recall.
13     Q.  And sitting here today, do you have an
14 opinion to a reasonable degree of medical certainty
15 as to whether Viagra can cause ischemic optic
16 neuropathy?
17     A.  No, I do not.
18     Q.  And sitting here today, do you have an
19 opinion to a reasonable degree of medical certainty
20 as to whether Viagra caused or contributed to
21 Mr. Martin's ischemic optic neuropathy?
22     A.  No, I do not.
23     Q.  Did you ever discuss this lawsuit with
24 Mr. Martin?
25     A.  I have a vague recollection that he told me

Page 79

1  that he had hired an attorney.  I think that was the
2  extent of our conversation.
3      Q.  And did you ever have a conversation with
4  Mrs. Martin about this lawsuit?
5      A.  I may have mentioned to her that I felt bad
6  that Dick was blind -- that Richard was blind, and
7  that I understood that he was pursuing his legal
8  options.  I did not otherwise say anything else that
9  I could recall.
10     Q.  Okay.
11         MS. LESKIN:  I have no further
12 questions at this time.  I would like to just take a
13 look through those additional records while
14 Mr. Gomez is asking you some questions.
15         MR. GOMEZ:  Do we want to stop now for
16 five minutes and copy them?  Because I'm not going
17 to be long.
18         (Discussion held off the record.)
19         (Break from 11:40 a.m. to 11:42 a.m.)
20 BY MS. LESKIN:
21     Q.  And I lied, I actually have one additional
22 one.
23     A.  Okay.
24     Q.  Doctor, before I conclude my questioning, I
25 just want to go back to your note of October 6,

Page 80

1  2004, if I may.
2      A.  Okay.
3      Q.  It's page 92 of Exhibit 2.
4      A.  Okay.
5      Q.  We discussed the sentence that you wrote in
6  here, "He still has erectile dysfunction but relates
7  to me that he does not feel that the Viagra was
8  given at the time that he went blind."
9      A.  That's correct.
10     Q.  That statement is based on information
11 Mr. Martin provided to you as of October 6, 2004,
12 correct?
13     A.  That's correct.
14     Q.  Did Mr. Martin ever provide you any
15 information different from that?
16     A.  No.
17         MS. LESKIN:  Now I have no further
18 questions.
19         THE WITNESS:  Thank you.
20             EXAMINATION
21 BY MR. GOMEZ:
22     Q.  Hi, Doctor.  My name is Chris Gomez, I'm
23 here on behalf of Mr. Martin.  Let me just ask a
24 quick follow-up on that last question, referring to
25 October 6, 2004, and the statement about -- let me

Page 81

1  get to it real quick, bear with me.
2          You were just asked about on October 6,
3  2004, that -- and you write in your chart that "He,"
4  Mr. Martin, "relates to me that he does not feel
5  that the Viagra was given at the time he went
6  blind."
7      A.  Correct.
8      Q.  Looking at that right now, there's no
9  indication there that Mr. Martin was absolutely sure
10 it was given or was not given at the time, correct?
11         MS. LOIDOLT:  I'll object to that as
12 calling for speculation and lacking in foundation.
13         MS. LESKIN:  I'll join the objection.
14         MS. LOIDOLT:  You can answer to the
15 best of your knowledge.
16     A.  Could you phrase that one more time to me.
17 BY MR. GOMEZ:
18     Q.  Sure.  Looking at -- going back, as you look
19 at your records here for October 6, 2004, Mr. Martin
20 stated that -- to you that he does not feel that
21 Viagra was given at the time he went blind.  As you
22 look at that statement, there's nothing there to
23 indicate that he was absolutely certain it was not
24 given or was given when he talked with you about it
25 in October 6, 2004, correct?

21 (Pages 78 to 81)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 82

1     MS. LOIDOLT: I have the same
2 objection. I don't know that Dr. Ferrara can speak
3 to Mr. Martin's level of certainty. And the record
4 speaks for itself.
5     MS. LESKIN: I'll join the objection.
6     MS. LOIDOLT: But you can go ahead.
7     A. To be honest with you, I don't recall more
8 than what I wrote there. I mean I interpret that as
9 him telling me that he did not recall that he had
10 used Viagra at the time he went blind.
11 BY MR. GOMEZ:
12     Q. Okay. Were you aware that he told
13 Dr. McEllistrem that he did take it at that time?
14     MS. LESKIN: Objection.
15     MS. LOIDOLT: Yeah, lacking in
16 foundation. He doesn't have Dr. McEllistrem's
17 records.
18     MR. GOMEZ: I'm just asking if he was
19 aware of that.
20     A. No, I'm not aware of that.
21 BY MR. GOMEZ:
22     Q. Now, Doctor, you talked a lot about risk
23 factors. Just so we can be clear for the record,
24 Mr. Martin does not suffer from diabetes, correct?
25     A. That's correct.

Page 83

1     Q. There was some indication in your records
2 that he was being checked out for that, fair?
3     A. That's correct.
4     Q. Prior to 2002, specifically prior to May of
5 2002, there's nothing in your records to indicate
6 that he had any signs or symptoms of diabetes,
7 correct?
8     A. Hold on a second.
9     Q. Sure.
10     A. (Examining.) Prior to 2002, he had had some
11 abnormal fasting blood sugars. He had had abnormal
12 fasting blood sugars prior to May of 2002. He has
13 never been diagnosed correctly that he has diabetes.
14     Q. Okay. Any indication that he has ever been
15 diagnosed with a myocardial infarction or a heart
16 attack?
17     A. None that I'm aware of.
18     Q. Prior to the middle of 2002, any indication
19 that he was ever diagnosed with coronary artery
20 disease?
21     MS. LOIDOLT: Other than the
22 atherosclerosis? Well, go ahead.
23     A. Not coronary artery disease, no, he was not
24 diagnosed with coronary artery disease.
25     Q. Okay. You testified when you first

Page 84

1 prescribed Viagra to Mr. Martin you wrote him a
2 prescription the first time, correct?
3     A. That's correct.
4     Q. And then after that you might have given him
5 a prescription but you mostly gave him samples,
6 correct?
7     A. That's correct.
8     Q. How many pills were in a sample package?
9     A. Six.
10     Q. Six. Do you remember generally how many
11 times you would give him, I mean how many sample
12 packets you would give him at a given time?
13     A. It could be as many as two to three packs,
14 maximum. Usually I give people one or two.
15     Q. And your instructions were to take them as
16 needed?
17     A. Take them as needed p.r.n. sexual activity.
18     Q. Fair enough. In your medical records
19 specifically around -- well, strike that, I'll come
20 back to that. Bear with me jumping around here.
21     A. That's all right.
22     Q. Let me ask you a follow-up question about
23 page 135 of Exhibit 2. Ms. Leskin asked you
24 about --
25     MS. LESKIN: Let him get there.

Page 85

1     MR. GOMEZ: Yeah, I'm sorry, go ahead.
2     (Interruption at door.)
3     (Break from 11:50 a.m. to 11:51 a.m.)
4     MR. GOMEZ: Back on.
5 BY MR. GOMEZ:
6     Q. In the letter you write to Dr. Cantrill, "I
7 have asked Pfizer representatives to investigate
8 this also." Do you see that?
9     A. That's correct.
10     Q. You testified essentially you don't remember
11 whether they got back to you or not, correct?
12     A. Correct.
13     Q. If they had gotten back to you, would you
14 have kept -- is there someplace in your records that
15 you would have kept that?
16     A. No. You can request from a pharmaceutical
17 rep that they ask their research department to
18 report to you if there's evidence of a problem. And
19 they are very cooperative with that and will often
20 have someone send you a letter saying yes or no or
21 this is the research there is. I don't recall ever
22 getting that. I certainly do not recall having read
23 it or being aware of it.
24     Q. Do you ever receive from pharmaceutical
25 companies Dear Doctor letters? Do you know what

22 (Pages 82 to 85)

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

**Page 86**

1  those are?
2      A. I get a lot of Dear Doctor letters. I guess
3  I don't specifically recall from a pharmaceutical
4  company that.
5      Q. When -- for example, generally when a
6  pharmaceutical company makes a change to their
7  label, do they ever send you something in advance
8  telling you that there's going to be a label change
9  with their medication? You ever receive letters
10  like that?
11      A. Yes, I do.
12      Q. Do you keep them?
13      A. No.
14      Q. What do you do with them?
15      A. I read 'em and throw 'em away.
16      Q. Have you ever had any conversations with any
17  Pfizer sales representatives about Viagra and NAION,
18  or nonarteritic ischemic optic neuropathy?
19      A. Not that I recall.
20      Q. Around this time of the letter to
21  Dr. Cantrill on June 30th, 2004 -- well, strike
22  that.
23      Did you write Pfizer a letter requesting
24  them to investigate this?
25      A. Not that I recall.

**Page 87**

1      Q. Okay. Do you recall whether you spoke to a
2  Pfizer sales representative about it?
3      A. I spoke with a Pfizer sales representative
4  asking if he had any information regarding ischemic
5  eye disease and Viagra use.
6      Q. And this would have been on or about June
7  30th, 2004, correct?
8      A. That's correct.
9      Q. Do you remember what the Pfizer sales
10  representative said in response to your question?
11      A. I remember that other than the letter that
12  his wife had provided to me -- or that Internet,
13  that I had no knowledge of that at all in that time
14  frame. And that included any representative or any
15  other physician telling me that.
16      Q. And you relayed those sentiments on or about
17  June 30th, 2004 to Mr. Martin, correct, that even
18  with the letter provided to you, you had no other
19  information to go by?
20      A. I don't recall relating that to him either
21  way. I mean I -- I just addressed that his wife had
22  dropped me off a letter and that I thought he should
23  see Dr. Cantrill and see if he knew anything related
24  to it. I didn't relay to Mr. Martin either way.
25      Q. I don't know if I asked this, if I have I

**Page 88**

1  apologize. But after June 30th, 2004, have you ever
2  had any discussions with any Pfizer representatives
3  regarding Viagra and blindness?
4      A. Not that I can recall.
5      Q. Just so I'm clear, the Pfizer representative
6  you talked to on or about June 30th, 2004 never got
7  back to you?
8      A. I don't recall ever receiving any
9  information from Pfizer regarding this. I didn't
10  say they didn't, I just don't recall it.
11      Q. Do you remember the name of the Pfizer
12  representative you talked to on June 30th, 2004?
13      A. No, I don't, I really don't.
14      Q. Generally how many -- do you have one
15  specific Pfizer rep come see you? Or are there more
16  than one?
17      A. There are many more than one.
18      Q. Do you remember any of their names?
19      A. I remember a Matt, but I don't think he
20  handled Viagra, he handled other products. I really
21  don't recall the name of the Pfizer rep that handled
22  Viagra.
23      Q. You testified that in 1998 you had a
24  standard, I think I'll use your term, speech, that
25  you would give to your patients regarding Viagra?

**Page 89**

1      A. Correct.
2      Q. And that there came a time when that
3  changed?
4      A. That's correct.
5      Q. When you heard about the possible
6  association between Viagra and blindness. Is that a
7  fair statement?
8      A. Yes.
9      Q. If you had had that information available to
10  you in 2001, 2002, would you have changed your
11  speech to include that at that time?
12          MS. LOIDOLT: I'll object to the form
13  of the question as a vague hypothetical.
14          MS. LESKIN: Join the objection.
15          MS. LOIDOLT: And lacking in foundation
16  and calling for speculation. If you know, you can
17  answer. If you don't, tell him that.
18      A. Could you rephrase the question.
19  BY MR. GOMEZ:
20      Q. Sure. There came a time when you received
21  new information that there was an association
22  between Viagra and blindness, correct?
23      A. Correct.
24      Q. And that would have been sometime in 2005 I
25  believe you testified?

23 (Pages 86 to 89)

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 90

1   A. That's correct.
2   Q. If that information was available prior to
3   that and had been given to you in 2001 or 2002, you
4   would -- you would have changed your speech just
5   like you did in 2005, correct?
6        MS. LOIDOLT: I'll object to the form
7   of the question. Same objections.
8        MS. LESKIN: Join objection.
9   Q. Correct?
10  A. Correct.
11  Q. And Doctor, you would agree with me that
12  when you prescribe a medication to a patient you
13  want to weigh the risks versus the benefits,
14  correct?
15  A. Correct.
16  Q. And that it's ultimately -- when you do have
17  a discussion with a patient, it's ultimately --
18  you're there to advise the patient as to the risks
19  and the benefits, and ultimately the decision
20  of the patient whether or not to take the drug,
21  correct?
22       MS. LESKIN: Objection.
23  A. Well, it's obviously a combination of my
24  beliefs and the patient's beliefs. If I think it's
25  too risky, I'm not going to offer it. But once I've

Page 91

1   decided to prescribe a drug, yes, then it is
2   ultimately the patient's decision.
3   Q. Doctor, you would agree with me that in 2001
4   -- or from 1990 -- well, strike that.
5        You would agree with me that in the 2000 to
6   2001 time frame, there was not anything in the label
7   about blindness in regards to Viagra, correct?
8        MS. LESKIN: Objection.
9   A. Well, there's nothing I was aware of.
10  Q. Doctor, if you could go in your chart to the
11  medical records for the time frame I think it was in
12  May of 2002 to June 2002, when Mr. Martin came in to
13  see you about the vision loss, if you can go there
14  real quick.
15  A. Sure.
16  Q. If you go to 4/24/02 in your note entry.
17  A. Okay.
18  Q. Is there anything in that record to indicate
19  that he was taking Viagra?
20  A. On that note? Hold on, May of 2004. We
21  kept track of patients' medications in different
22  ways back then (indicating). And so this says in
23  March of 2004 that I wrote these were --
24       MS. LOIDOLT: 2004 or 2002?
25  A. 2002, oh, I apologize. There's nothing in

Page 92

1   that specific note that said that he was taking
2   Viagra.
3   Q. That doesn't mean he wasn't -- strike that.
4        The reason I ask is because there seems to
5   be -- it's not mentioned each and every visit that
6   he came in that he was on Viagra?
7   A. Correct.
8   Q. And because it's not mentioned it doesn't
9   mean he wasn't taking it at that time, correct?
10  A. That's correct.
11  Q. Doctor, there's a lot of talk about
12  hypertension. At the time, around the time that
13  Mr. Martin was diagnosed with his vision problems in
14  2002, his hypertension had been under control for
15  some time?
16  A. Correct.
17  Q. And that he was recently diagnosed with
18  hyperlipidemia just before he had his vision
19  problems, correct?
20  A. Correct.
21  Q. Doctor, in the time frame 2000 to 2002, if
22  you had been told that patients who were
23  hypertensive were at a 6.9 times increased risk for
24  developing NAION as a result of taking Viagra, is
25  that something you would have liked to know?

Page 93

1        MS. LESKIN: Objection.
2        MS. LOIDOLT: I'll object to the form
3   of the question as a vague hypothetical question
4   without any reference to any medical literature. I
5   don't know that he has to answer it, unless you have
6   something you can point to, at which time we'll take
7   a break and he can read it I guess. Although I'm
8   not likely to even allow that.
9        So he's referencing some medical literature
10  I've never even heard of. I don't know if you've
11  heard of it either. So you don't have to answer a
12  question that is a vague hypothetical question like
13  that with no factual or scientific basis in it that
14  we know of in this room, so.
15       MS. LESKIN: And I would just add my
16  objection for a lack of foundation; misrepresenting
17  the facts.
18  A. I have the choice not to answer that, I'd
19  prefer not to answer it.
20  Q. Okay, fair enough.
21       MS. LOIDOLT: Are you almost done?
22       MR. GOMEZ: No.
23       MS. LOIDOLT: No? How much more time
24  do you need?
25       MR. GOMEZ: I don't know.

24  (Pages 90 to 93)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 94

1     MS. LOIDOLT: Well, I don't know how
2 much time my client has, so.
3     MR. GOMEZ: Well, I'm entitled to equal
4 time, but --
5     MS. LOIDOLT: There's been a lot of
6 long breaks in between.
7     MR. GOMEZ: I didn't see you ask her if
8 she was almost done, so.
9     MS. LOIDOLT: Well, because she moved
10 it along.
11     MR. GOMEZ: I'd appreciate just a
12 little courtesy. Let me finish up. I am almost
13 done.
14     MS. LOIDOLT: Okay, I'm just asking you
15 how much more you have left.
16     MR. GOMEZ: I don't have much.
17 BY MR. GOMEZ:
18     Q. Doctor, you were asked some questions about
19 a transient ischemic attack in May of 1993. Do you
20 remember talking about that?
21     A. Yes, I do.
22     Q. Since that time, he has had no subsequent
23 TIAs, correct?
24     A. I'll have to look that up. Hold on a
25 second.

Page 95

1     Q. Sure.
2     A. (Examining.) That's correct.
3     Q. Doctor, did you ever read the PDR about
4 Viagra before prescribing it to your patients?
5     A. Yes.
6     Q. I think you testified to this. Did you --
7 did you learn about Viagra from the sales reps
8 before you prescribed it in relation to --
9     MS. LOIDOLT: Well, I think we already
10 covered this, it's asked and answered. But go ahead
11 and answer it again.
12     A. I don't recall that. But certainly the
13 sales reps would be about -- would be a very likely
14 way that I first heard about it. But I don't recall
15 how I first heard about it.
16     Q. Would you generally rely on what the sales
17 representatives told you?
18     A. I found sales representatives to be very
19 reliable for all pharmaceutical companies, so yeah,
20 I would.
21     MR. GOMEZ: A few more seconds, Doctor.
22 You can start counting.
23     Thank you, that's all I have, Doctor.
24 Appreciate your time.
25     (Dr. Ferrara Deposition Exhibits 3-5

Page 96

1     marked for identification.)
2     FURTHER EXAMINATION
3 BY MS. LESKIN:
4     Q. Just very briefly. We've marked as
5 indicated Exhibit 3, the two prep-op reports that you
6 had in your files. Just confirm that that is in
7 fact the two prep-op reports?
8     A. That's correct, yup.
9     Q. We've marked as Exhibit 4 the note from
10 Mrs. Martin and the two articles she provided to
11 you. And just confirm for me that that is in fact
12 what Mrs. Martin provided?
13     A. That's correct.
14     Q. We've also marked as Exhibit 5 the
15 additional medical records that you've provided
16 today, from December 2007 through March of 2008.
17     A. That's correct.
18     Q. Just a couple follow-up questions. You were
19 asked a question as to whether Mr. Martin was
20 diagnosed with coronary artery disease. And you
21 were very specific that he was not diagnosed with
22 coronary artery disease?
23     A. That's correct.
24     Q. Is there a difference between coronary
25 artery disease and atherosclerosis?

Page 97

1     A. Absolutely.
2     Q. And has Mr. Martin been diagnosed with
3 atherosclerosis?
4     A. Yes.
5     Q. Okay. You also were asked a question about
6 the control of his blood pressure?
7     A. Correct.
8     Q. And if you can look at your notes that are
9 dated April 24th, 2002.
10     A. Okay.
11     Q. And you note that his blood pressure that
12 day, I guess the nurse took his blood pressure at
13 152 over 80, and on a recheck it was 142 over 80, is
14 that correct?
15     A. That's correct.
16     Q. Now, under the standards in effect in 2002,
17 that was considered controlled, correct?
18     A. I believe that was adequately controlled.
19     Q. Okay. As under today's standards, as we
20 discussed, those numbers are elevated, correct?
21     A. That's correct. Please, can I qualify it.
22 When you check blood pressure, it depends on the
23 setting, too.
24     Q. Absolutely.
25     A. If a person's in for tummy pain or some

Paradigm Reporting & Captioning, Inc.
612-339-0545

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

## Page 98

1 other reason, that is not always considered the same
2 as a person who comes in for a blood pressure check
3 and who is at rest, et cetera.
4    Q. Looking at the notes that you provided us
5 from the more recent visits, there is a diagnosis
6 that's included about atrial fibrillation?
7    A. That's correct.
8    Q. When was Mr. Martin diagnosed with atrial
9 fibrillation?
10    A. Hold on. (Examining.) I believe it was
11 January of '08. So one second.
12    Did she take my more recent records?
13    Q. Yeah, yes, gave those back. But you can
14 look at what we've marked as Exhibit 5.
15    A. Okay. (Examining.) Can you give me one
16 moment to clarify that.
17    Q. Absolutely.
18    A. (Examining.) By my recollection, I thought
19 that he was seen by my partner in around January of
20 2008 when that occurred. I have a note in here that
21 I saw him in follow-up at that time. So it had to
22 occur around December to January -- December of
23 2007, January of 2008.
24    Q. What causes atrial fibrillation?
25    A. There are many potential causes. A number

## Page 99

1 of people who have atrial fibrillation have no known
2 cause. Other causes include atherosclerotic heart
3 disease, thyroid disease, diseases like pulmonary
4 emboli. There are other causes. Dilatation of
5 certain chambers of the heart, heart valve disease.
6    Q. Mr. Martin was referred to the St. Paul
7 Heart Clinic?
8    A. That's correct.
9    Q. And do you know if they made a diagnosis as
10 to the cause of Mr. Martin's -- whether they made a
11 diagnosis as to the cause of Mr. Martin's atrial
12 fibrillation?
13    A. I'd have to find their records, if you'll
14 hold a minute.
15    Q. I don't know that they were in what you
16 sent -- or what we've marked.
17    A. I know that we have some communication with
18 the St. Paul Heart Clinic. Can you wait a minute
19 and let me look and see if I can find that?
20    Q. Sure.
21    A. Okay.
22    (Break from 12:13 p.m. to 12:14 p.m.)
23    MS. LESKIN: Just let the record
24 reflect that the doctor is checking his notes on his
25 computer.

## Page 100

1 BY MS. LESKIN:
2    Q. 12/6/33 is his birth date.
3    A. Yup. (Examining.) Okay, so he was
4 hospitalized on December 22nd of 2007 because of his
5 chest fluttering, that's what was diagnosed. The
6 last letter that I have on February 28th of 2008
7 from Dr. Vatterott states that he had a stress test
8 that showed no ischemia or heart attack. One more
9 second. I have to check one more thing.
10 (Examining.)
11    (Discussion held off the record.)
12    A. Okay, he had an echocardiogram that showed a
13 mild left atrial enlargement. And sometimes that
14 can contribute. He really doesn't give us a cause
15 of his atrial fibrillation, so.
16    Q. Have you separately made any -- reached any
17 conclusion as to the cause of Mr. Martin's atrial
18 fibrillation?
19    A. No, I -- my opinion has been it was
20 idiopathic, meaning of unknown cause.
21    MS. LESKIN: I have no further
22 questions.
23    MR. GOMEZ: That's it.
24    MS. LESKIN: Thank you very much,
25 Doctor.

## Page 101

1    THE WITNESS: Thank you both for coming
2 here. You're both very nice to deal with.
3 Appreciate it.
4    THE REPORTER: Will the doctor be
5 reading and signing?
6    MS. LOIDOLT: Yeah, you do have the
7 right to do that, Dr. Ferrara, read and review your
8 deposition for accuracy and sign off on it.
9    THE WITNESS: Do you think I should?
10    MS. LOIDOLT: Yeah. We'll do it. You
11 can send it to me.
12    (Deposition concluded at 12:17 p.m.)
13    ***************
14
15
16
17
18
19
20
21
22
23
24
25

26 (Pages 98 to 101)

18d32f61-08b9-4e3d-a5c9-43bd27b38251

Anthony Ferrara, M.D.   10/14/2008
In Re: Viagra Products Liability Litigation

Page 102

1       REPORTER'S CERTIFICATE
2
STATE OF MINNESOTA  )
3                    ) ss.
COUNTY OF DAKOTA     )
4
        I hereby certify that I reported the
5   deposition of ANTHONY FERRARA, M.D. on October 14,
    2008 in Inver Grove Heights, Minnesota, and that the
6   witness was by me first duly sworn to tell the whole
    truth;
7
8       That the testimony was transcribed by me and
    is a true record of the testimony of the witness;
9
10      That the cost of the original has been
    charged to the party who noticed the deposition, and
11  that all parties who ordered copies have been
    charged at the same rate for such copies;
12
13      That I am not a relative or employee or
    attorney or counsel of any of the parties, or a
14  relative or employee of such attorney or counsel;
15      That I am not financially interested in the
    action and have no contract with the parties,
16  attorneys, or persons with an interest in the action
    that affects or has a substantial tendency to affect
17  my impartiality;
18      That the right to read and sign the
    deposition by the witness was reserved.
19
20
        WITNESS MY HAND AND SEAL THIS 20th day of
21  October, 2008.
22
23
    _____
24      Mary P. Mitchell, RDR, CRR, CCP
        Notary Public, Dakota County, Minnesota
25      My commission expires January 31, 2010.

Paradigm Reporting & Captioning, Inc.
612-339-0545

18d32f61-08b9-4e3d-a5c9-43bd27b38251