Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

IN RE:                        *     MDL Case No. 1724
                              *
VIAGRA PRODUCTS LIABILITY     *
LITIGATION                    *
                              *

This document relates to:     *
                              *
RICHARD W. STANLEY,           *
                              *
            Plaintiff,        *
                              *
      vs.                     *
                              *
PFIZER INC.,                  *
                              *
            Defendant.        *
                              *
CASE NO.  06-CV-1065 (PAM)    *
                              *

DEPOSITION OF
ABDHISH R. BHAVSAR, M.D.

Taken August 11, 2008
Commencing at 5:20 p.m.

REPORTED BY:  MARY P. MITCHELL, RDR, CRR, CCP
PARADIGM REPORTING & CAPTIONING INC.
1400 RAND TOWER
527 MARQUETTE AVENUE SOUTH
MINNEAPOLIS, MINNESOTA 55402-1331
612-339-0545 * 800-545-9668 * Fax 612-337-5575

Paradigm Reporting & Captioning, Inc.
612-339-0545

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

## Page 2

1    Deposition of ABDHISH R. BHAVSAR, M.D.
2    taken on August 11, 2008, commencing at 5:20 p.m.,
3    at the offices of deponent, Retina Center, 710 East
4    24th Street, Suite 304, Minneapolis, Minnesota,
5    before Mary P. Mitchell, Registered Diplomate
6    Reporter, Certified Realtime Reporter, Certified
7    CART Provider, and Notary Public of and for the
8    State of Minnesota.
9
            **********
10
11
            APPEARANCES
12
On Behalf of the Plaintiff:
13    Peter A. Miller, Esq.
      pmiller@doctoratlaw.com
14    THE MILLER FIRM LLC
      The Sherman Building
15    108 Railroad Avenue
      Orange, Virginia 22960
16    (540) 672-4224
17
On Behalf of the Defendant:
18    Lori B. Leskin, Esq.
      lleskin@kayescholer.com
19    Avigael Fyman, Esq.
      afyman@kayescholer.com
20    KAYE SCHOLER LLP
      425 Park Avenue
21    New York, New York 10022
      (212) 836-8000
22
23
24    NOTE: The original transcript will be filed
      with Kaye Scholer LLP, pursuant to the applicable
      Rules of Civil Procedure.
25

## Page 3

1            INDEX
2
WITNESS: ABDHISH R. BHAVSAR, M.D.        PAGE
3
EXAMINATION BY MS. LESKIN......................... 5
4
EXAMINATION BY MR. MILLER.......................... 73
5
FURTHER EXAMINATION BY MS. LESKIN............... 80
6
7
OBJECTIONS:
8    By Mr. Miller:  17, 18, 35, 48, 53, 69, 72.
9
     By Ms. Leskin:  73, 74, 75, 76, 77, 78, 79.
10
11
INSTRUCTIONS NOT TO ANSWER: (None.)
12
13
PRODUCTION REQUESTS:  12, 23, 80.
14
15
DR. BHAVSAR EXHIBITS MARKED AND REFERRED TO:
16
EXHIBIT 1: Subpoena and attached
17    Schedule A............................ 5, 7
      (No Bates)
18
EXHIBIT 2: Curriculum vitae for Abdhish R.
19    Bhavsar, M.D. ....................... 5, 12
      (No Bates)
20
EXHIBIT 3: Contents of Dr. Bhavsar's file on
21    Richard Stanley........................ 21
      STANLEY,R BHAVSAR 0001 - 014
22
EXHIBIT 4: 1/9/02 letter from Richard W.
23    Stanley to Abdhish Bhavsar, M.D. ........ 55
      RSTAN-00106
24
25

## Page 4

1    EXHIBITS (Continued)
2
     EXHIBIT 5:  Article, "Nonarteritic Ischemic
3        Optic Neuropathy Developing Soon After
         Use of Sildenafil (Viagra): A Report of
4        Seven New cases by Drs. Pomeranz and
         Bhavsar................................. 62
5        (No Bates)
6
     EXHIBIT 6:  Supplement to Dr. Bhavsar's file on
7        Richard Stanley....................... 81
8
     (Exhibit 6 to be furnished to reporter for
9    attachment to Original transcript.)
10
11
12
13
14
     (Original exhibits attached to original transcript;
15    copies provided to counsel.)
16
17
18
19
20
21
22
23
24
25

## Page 5

1            (Bhavsar Deposition Exhibit Nos. 1-2
2            marked for identification.)
3            ABDHISH R. BHAVSAR, M.D.,
4    duly sworn, was examined and testified as follows:
5            EXAMINATION
6    BY MS. LESKIN:
7        Q.  Good afternoon, Doctor.  How are you?
8        A.  Good afternoon.
9        Q.  I introduced myself a few moments ago.  My
10   name is Lori Leskin.  Avigael Fyman and I are with
11   the firm of Kaye Scholer, and we represent Pfizer in
12   this matter.
13            And Mr. Miller is here on behalf of the
14   plaintiff in this litigation, Richard Stanley.
15            Have you ever met Mr. Miller before?
16       A.  I have not.
17       Q.  Have you ever spoken to him on the phone?
18       A.  I have not.
19       Q.  Have you ever spoken with anyone from the
20   law firm of Zimmerman Reed?
21       A.  Not that I know of.
22       Q.  Okay.  You do not have counsel here today,
23   correct?
24       A.  I do not.
25       Q.  Okay, and Mr. Miller does not represent you,

Paradigm Reporting & Captioning, Inc.
612-339-0545

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

## Page 6

1  correct?
2    A. He does not.
3    Q. Okay. Have you ever been deposed before?
4    A. I have.
5    Q. Okay, and how many occasions?
6    A. Several.
7    Q. Okay. As a fact witness or as an expert
8  witness?
9    A. As an expert witness.
10   Q. Okay. And you understand you're not here as
11 an expert witness in this litigation?
12   A. Okay.
13   Q. Have you been asked by the plaintiff to
14 serve as an expert witness in this litigation?
15   A. I don't know.
16   Q. Okay. Have you had any contact with
17 Mr. Stanley about the litigation?
18   A. No, I have not.
19   Q. Have you had any contact with any of
20 Mr. Stanley's lawyers about the litigation?
21   A. I have not personally had any contact with
22 anyone about the litigation.
23   Q. Okay. Are you aware of any request for you
24 to give testimony as an expert in this litigation?
25   A. No, I'm not.

## Page 7

1    Q. Have you been asked to prepare a report from
2  the point of view of an expert in this litigation?
3    A. No.
4    Q. You understand that my role -- my objective
5  here is simply to ask you questions, factual
6  questions about your care and treatment of
7  Mr. Stanley, correct? Yes?
8    A. Okay.
9    Q. Okay. And you understand you're not being
10 sued by Mr. Stanley.
11   A. Okay.
12   Q. And you're not a defendant in this action.
13   A. Okay.
14   Q. Has anyone contacted you about potential
15 litigation by Mr. Stanley against you?
16   A. No.
17   Q. I'm going to show you what we've marked as
18 Bhavsar -- am I pronouncing your name correctly?
19   A. Yes.
20   Q. Okay, as Bhavsar Exhibit 1. This is a copy
21 of a subpoena sent to you in this case. Have you
22 seen this before?
23   A. I do not know for certain.
24   Q. Okay. If you take a look at the third page
25 of this document, you see there's a page entitled

## Page 8

1  "Schedule A"?
2    A. Yes.
3    Q. Have you seen that list before?
4    A. I don't know.
5    Q. Were you aware that we had asked that
6  certain documents be brought with you to this
7  deposition?
8    A. No.
9    Q. Okay. Well, have you brought with you your
10 file on Richard Stanley?
11   A. Yes.
12   Q. Other than the file that you brought with
13 you, do you have any other files that would contain
14 correspondence with Mr. Stanley?
15   A. No.
16   Q. Other than the file you brought with you, do
17 you have any files that would contain documentation
18 about Mr. Stanley?
19   A. No.
20   Q. Other than the file you brought with you, do
21 you have any correspondence with Mr. Stanley or with
22 anyone about Mr. Stanley?
23   A. No.
24   Q. Have you engaged in any e-mail
25 correspondence with Mr. Stanley?

## Page 9

1    A. I don't know.
2    Q. If you had engaged in e-mail correspondence
3  with Mr. Stanley, would you keep a hard copy of
4  that?
5    A. Usually, yes.
6    Q. Okay.
7    A. If it was of substantive value to his care
8  that I was providing.
9    Q. In your file that you have before you, do
10 you have correspondence with Mr. Stanley, e-mail
11 correspondence with Mr. Stanley?
12   A. I have an e-mail from Richard Stanley to
13 Dr. Pomeranz, and I have a copy of that e-mail. But
14 that e-mail does not seem to have been written to
15 me.
16   Q. Okay, that was not provided to us as part of
17 the records that we received earlier. But we'll
18 come back to that as we review the files that we
19 received. And we may ask for a copy of that during
20 the course of the deposition.
21      Have you had any correspondence with
22 Mrs. Stanley regarding Mr. Stanley's medical care?
23   A. Not that I remember.
24   Q. You referenced a copy of an e-mail from
25 Mr. Stanley to Dr. Pomeranz. Have you had any

3 (Pages 6 to 9)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 10

1  correspondence with Dr. Pomeranz regarding
2  Mr. Stanley's case?
3     A. I think yes, probably, that is correct.
4     Q. And would that have been written
5  correspondence or telephonic communications?
6     A. Written correspondence.
7     Q. And do you have copies of the correspondence
8  you had with Dr. Pomeranz?
9     A. No.
10    Q. Were those e-mail correspondence or letters?
11    A. It could be e-mail.
12    Q. Would you still have those on your computer
13 in your e-mail account?
14    A. I do not know.
15    Q. Would that be from your work e-mail address
16 or your personal e-mail address that you had the
17 correspondence with Dr. Pomeranz?
18    A. My -- probably my personal e-mail address.
19    Q. You published an article with Dr. Pomeranz,
20 correct?
21    A. That's correct.
22    Q. The e-mail correspondence that you had with
23 Dr. Pomeranz, was that relating to the article you
24 published with him?
25    A. Yes.

Page 11

1     Q. Did you have any other e-mail correspondence
2  with Dr. Pomeranz?
3     A. Not aside from relating to the publication
4  of the article.
5     Q. Okay. Do you have any written
6  correspondence or written files or files of
7  documentation relating to the article you published
8  with Dr. Pomeranz?
9     A. I may have a file with the paper in it or
10 with the publication in it.
11    Q. Okay. With just the final publication in
12 it?
13    A. Yes.
14    Q. Do you have drafts of that publication?
15    A. I do not know.
16    Q. If you did have drafts, would it be in that
17 file?
18    A. Yes.
19    Q. And any correspondence you had with
20 Dr. Pomeranz, would that be in that file?
21    A. Yes.
22    Q. Is that file maintained here at the office?
23    A. It is not.
24    Q. Where is that file maintained?
25    A. In my house.

Page 12

1     Q. If you look at No. 3 on Schedule A, you'll
2  see it calls for "Drafts, notes, data and final
3  versions of studies or case reports related to the
4  medical condition and treatment of Richard Stanley."
5     Did anyone communicate to you that you
6  were -- that we had asked that that material be
7  brought to the deposition?
8     A. No.
9     Q. Can we ask that following the conclusion of
10 the deposition perhaps we can coordinate receiving
11 copies of that file from you?
12    A. Yes. Although I should let you know I don't
13 know where the file is.
14    Q. Okay.
15    A. I have moved, and I don't actually know
16 where it is right now.  And I don't know if I can
17 find it.  But I would look for it.
18    Q. Okay.  That's what we would ask then.
19    Let me show you what we marked as Exhibit 2.
20 This is a copy of -- purports to be a copy of the
21 curriculum vitae you provided us at the beginning of
22 the deposition.  Can you please take a look at that
23 and confirm that is your current CV?
24    A. Yes.
25    Q. And does the CV accurately reflect your

Page 13

1  education and training?
2     A. Yes.
3     Q. Does it accurately reflect your employment
4  history?
5     A. Yes.
6     Q. Does the CV accurately reflect your medical
7  appointments?
8     A. Yes.
9     Q. And does it accurately reflect your
10 publications?
11    A. Yes.
12    Q. Are there any articles that you have written
13 that do not appear on this CV?
14    A. It is possible.
15    Q. Can you tell from looking at the CV what
16 articles you've written that do not appear in the
17 CV?
18    A. No.
19    Q. What is the most recent article you've
20 published?
21    A. "A Report on the Rates of Endophthalmitis
22 and the Diabetic Retinopathy Research Clinical Trial
23 Network."
24    Q. Does that article appear on your CV?
25    A. It does not.

Paradigm Reporting & Captioning, Inc.
612-339-0545

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R. Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

| Page 14 |
|---|
| 1    Q. And when was that article published? |
| 2    A. This past year. |
| 3    Q. Which journal was that published in? |
| 4    A. American Journal of Ophthalmology. |
| 5    Q. And who is the lead author on that article? |
| 6    A. I was. |
| 7    Q. Looking at your CV, can you determine when |
| 8  the last time it was updated -- when was the last |
| 9  time it was updated? |
| 10   A. I cannot tell. But earlier this year. |
| 11   Q. Are there any other articles that you recall |
| 12 publishing that you do not see listed in that CV? |
| 13   A. No. |
| 14   Q. Are there any articles on nonarteritic |
| 15 ischemic optic neuropathy that you've published |
| 16 other than the paper with Dr. Pomeranz? |
| 17   A. No. |
| 18   Q. Have you published any papers regarding |
| 19 Viagra other than the paper with Dr. Pomeranz? |
| 20   A. No. |
| 21   Q. Are you currently board certified? |
| 22   A. Yes. |
| 23   Q. In what area? |
| 24   A. Ophthalmology. |
| 25   Q. Are you a neuro-ophthalmologist? |

| Page 15 |
|---|
| 1    A. I am not. |
| 2    Q. You are a retina specialist? |
| 3    A. Yes. |
| 4    Q. And what does that mean? |
| 5    A. That means I diagnose and treat diseases of |
| 6  the retina and of the eyes, because I'm board |
| 7  certified in ophthalmology as well. |
| 8    Q. Do you treat patients with nonarteritic |
| 9  ischemic optic neuropathy as part of your practice? |
| 10   A. Yes. |
| 11   Q. How many patients in the course of a year |
| 12 would you estimate you treat with nonarteritic |
| 13 ischemic optic neuropathy? |
| 14   A. Probably about ten. |
| 15   Q. What is nonarteritic ischemic optic |
| 16 neuropathy? |
| 17   A. It's a disease of the optic nerve that |
| 18 primarily results from nonarteritic etiologies. |
| 19   Q. Nonarteritic meaning -- well, what would |
| 20 arteritic etiology mean? |
| 21   A. Inflammatory related to giant cell |
| 22 arteritis, or some other condition that was |
| 23 primarily inflammatory in disorder rather than |
| 24 vascular. |
| 25   Q. And the inflammatory condition, that would |

| Page 16 |
|---|
| 1  be known as arteritic anterior ischemic optic |
| 2  neuropathy, correct? |
| 3    A. Yes. |
| 4    Q. And by optic neuropathy, that means that |
| 5  there's a damage to the optic nerve, correct? |
| 6    A. Yes. |
| 7    Q. And anterior, that's the front part of the |
| 8  optic nerve? |
| 9    A. That's correct. |
| 10   Q. And that's the part meaning that comes into |
| 11 the eye, correct, at the back of the eye? |
| 12   A. That's correct. |
| 13   Q. Is that also known as the optic nerve head? |
| 14   A. Yes. |
| 15   Q. And ischemic would tend to mean that there's |
| 16 a decrease in blood flow, correct? |
| 17   A. Yes. |
| 18   Q. Are you comfortable with the abbreviation |
| 19 NAION for nonarteritic anterior ischemic optic |
| 20 neuropathy? |
| 21   A. N-A-I-O-N? |
| 22   Q. Correct. |
| 23   A. Yes. |
| 24   Q. Okay. It makes it much easier for me. And |
| 25 the court reporter. |

| Page 17 |
|---|
| 1      Now, what causes NAION? |
| 2    A. Well, the etiology is thought to believe to |
| 3  be small vessel disease of the optic nerve and |
| 4  posteriorly or posterior ciliary circulation of the |
| 5  eye. |
| 6    Q. Is it a thrombotic event? |
| 7      MR. MILLER: I'm going to object, it |
| 8  calls for expert testimony. |
| 9    Q. You can answer if you're able, Doctor. |
| 10   A. It could be. |
| 11   Q. In your treatment of Mr. Stanley, were you |
| 12 able to determine whether his NAION was thrombotic? |
| 13   A. No. |
| 14   Q. No you were not able to determine? Or it |
| 15 was not thrombotic? |
| 16   A. I am not able to determine that. |
| 17   Q. Is NAION a hemorrhagic event? |
| 18   A. It is not. |
| 19   Q. In looking at a patient such as Mr. Stanley, |
| 20 in examining his eye, can you determine what caused |
| 21 his NAION? |
| 22   A. No. |
| 23   Q. How common is NAION? |
| 24   A. It is relatively common. |
| 25   Q. Would you agree that it's one of the most |

5 (Pages 14 to 17)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

Page 18

1 common optic nerve disorders?
2     A. Yes.
3     Q. What's your understanding of the risk
4 factors for NAION?
5         MR. MILLER: Object, calls for expert
6 testimony.
7     A. In general, cardiovascular risk factors.
8     Q. So would hypertension be a risk factor?
9     A. Yes.
10    Q. And cardiovascular disease would be a risk
11 factor?
12    A. Yes.
13    Q. Diabetes would be a risk factor?
14    A. Yes.
15    Q. Would a cardiac rhythm disorder be a risk
16 factor for NAION?
17    A. It's possible.
18    Q. Would atrial flutter be a risk factor for
19 NAION?
20    A. It's possible.
21    Q. What is your understanding of the mechanism
22 of NAION?
23        MR. MILLER: Objection again, calls for
24 expert testimony.
25    A. My understanding is that small vessel

Page 19

1 disease affects the blood flow to the optic nerve,
2 and that results in damage to the optic nerve
3 anteriorly, and that results in vision loss.
4     Q. As I understand, you're an assistant
5 professor at the University of Minnesota?
6     A. I'm an adjunct assistant professor at the
7 University of Minnesota.
8     Q. Okay, and what courses do you teach?
9     A. I teach the residents in ophthalmology for
10 retinal diseases.
11    Q. Is that the name of the course that you
12 teach?
13    A. It is not a course. It is teaching the
14 residents in surgery and in clinic seeing patients.
15    Q. And how many days a week do you spend with
16 students, with residents?
17    A. Approximately one day a week. Excuse me,
18 one half day a week.
19    Q. Okay.
20    A. There is also a course that I teach. It's
21 called a Fluorescein Conference course, and that's
22 once a month.
23    Q. And what does that teach?
24    A. We teach imaging of the retina with
25 different tests called fluorescein angiograms and

Page 20

1 OCTs.
2     Q. Do fluorescein angiograms, are they used to
3 diagnose NAION?
4     A. They can be used in the diagnosis, yes.
5     Q. And you also mentioned OCTs?
6     A. Yes.
7     Q. That's a different test?
8     A. That's a different type of test.
9     Q. And is that test used to diagnose NAION?
10    A. I'm not aware of that.
11    Q. Now, you are a former chair of the Phillips
12 Eye Institute, correct?
13    A. That's correct.
14    Q. And are you still affiliated with the
15 Phillips Eye Institute?
16    A. Yes.
17    Q. And your practice here is called the Retina
18 Center?
19    A. Yes.
20    Q. And is this where you saw Mr. Stanley as a
21 patient?
22    A. Yes.
23    Q. Do you do research for any pharmaceutical
24 companies?
25    A. I do research in clinical trials that have

Page 21

1 pharmaceutical companies as sponsors, but I don't do
2 the research for them.
3     Q. You maintain your independence?
4     A. That's correct.
5     Q. What pharmaceutical companies have sponsored
6 your clinical -- clinical trials that you have
7 conducted?
8     A. Genentech. Novartis. Allergen. QLT.
9 ISTA.
10    Q. Any others?
11    A. I don't recall any others.
12    Q. Have you ever conducted any clinical trials
13 sponsored by Novartis?
14    A. Yes.
15    Q. Have you ever conducted any clinical trials
16 sponsored by Pfizer?
17    A. No.
18    Q. Have you ever conducted any clinical trials
19 involving NAION patients?
20    A. I have not.
21        (Bhavsar Deposition Exhibit No. 3
22        marked for identification.)
23    Q. Doctor, I want to show you what we're
24 marking as Bhavsar Exhibit 3. During the course of
25 this litigation, Pfizer, through its attorneys,

6 (Pages 18 to 21)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

## Page 22

1  asked for copies of your file on Mr. Stanley. What
2  we've marked as Exhibit 3 is the complete file we
3  received from your office. And you'll see on the
4  bottom right-hand corner there's a number called a
5  Bates number, it says STANLEY,R BHAVSAR and then
6  it's numbered 1 through 14. Do you see those
7  numbers?
8      A. Yes.
9      Q. Those are the numbers that we put on there
10 to better identify the various pages.
11     Now, the file you have before you that you
12 brought with you to the deposition today seems to be
13 larger than the file we've marked as Exhibit 3. Is
14 that correct?
15     A. I do not know.
16     Q. I'd like to ask you to take a couple minutes
17 and compare the two.
18     A. (Examining.) Can you please repeat the
19 question.
20     Q. Sure. Are there documents -- I'll rephrase.
21 Are there documents in the file you brought with you
22 to the deposition today that do not appear as part
23 of Exhibit 3 that we've marked today?
24     A. Yes.
25     Q. Okay. What I'd like to do, if with your

## Page 23

1  permission, is to take a brief look through your
2  file. And perhaps we can mark with a Post-It note
3  those documents that were not previously provided to
4  us and have copies made and attached to the
5  deposition as a supplemental exhibit.
6      A. (Hands file to Ms. Leskin.)
7      Q. Thank you.
8      A. You're welcome.
9          (Discussion held off the record.)
10 BY MS. LESKIN:
11     Q. Doctor, during the break we've marked a few
12 pages from the file. And if at some point we can
13 get a copy made, we'll attach that as a supplement
14 to the deposition as well.
15     A. Okay.
16     Q. Thank you. I'm going to go through some of
17 the pages that we do have in Exhibit 3. You can
18 feel free to use your original if it's easier to
19 read if -- which I'm sure it will be. And then at
20 some point we'll ask you some questions about some
21 of the other documents as well.
22     I just want to start, though, with a couple
23 questions about your filing and your recordkeeping
24 here at the office.
25     Is it your regular practice to maintain a

## Page 24

1  complete and accurate record of your patient's
2  medical treatment?
3      A. Yes.
4      Q. And do you depend on the accuracy and
5  completeness of your medical records in order to
6  provide proper treatment to your patients?
7      A. Pardon me?
8      Q. Do you depend on the accuracy and
9  completeness of your records in order to provide
10 proper treatment to your patients?
11     A. That is a part of providing medical care,
12 but it is not the most important part.
13     Q. Okay.
14     A. Providing good medical care for the patient.
15     Q. Let me ask you this then. Do you strive to
16 maintain accurate records?
17     A. Yes.
18     Q. And if a patient provides you with
19 information, do you write that down in their records
20 as accurately as possible?
21     A. Yes.
22     Q. And completely as possible?
23     A. Yes.
24     Q. There are notes in your files that we have
25 from your examination and visits with Mr. Stanley.

## Page 25

1  What is your practice as to how those notes are
2  created?
3      A. Which notes do you refer to?
4      Q. Okay. I'll use as an example, if you look
5  at Exhibit 3, page 1, appears to be a note dated
6  3/12/01. This first page here. You see which note
7  I'm talking about?
8      A. Yes.
9      Q. What is the practice as to how a note like
10 that is created in the course of your practice?
11 What is your regular business practice here?
12     A. Our technical staff checks the visual acuity
13 of the patient and intraocular pressure of the
14 patient and asks the patient the history of what
15 brings them into the office, including the chief
16 complaint and the history of present illness,
17 including medication changes or eye drop changes.
18     Then I perform the ocular examination and
19 note my findings on the sheet, including anterior
20 segment examination and retinal examination.
21     Q. Is it your practice -- is it your office's
22 routine practice that the technician completes the
23 information on the form regarding visual acuity,
24 intraocular pressure, history of the chief
25 complaint, history of the illness, and medication

7 (Pages 22 to 25)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 26

1  changes at or about the time that that information
2  is taken from the plaintiff -- from the patient?
3    A. Yes.
4    Q. And is it your practice, your routine
5  practice to write the notes regarding your findings
6  as part of the exam at or about the time that you're
7  seeing the patient?
8    A. Yes.
9    Q. So are your notes created contemporaneously
10 with the visit with the patient?
11   A. Yes.
12   Q. There are also letters that you send to
13 primary care physicians or referring physicians in
14 your records?
15   A. Yes.
16   Q. And do you dictate those letters -- well,
17 let me ask you this. When do you generally dictate
18 those letters?
19   A. At the time that I'm seeing the patient.
20   Q. And is that in the room with the patient
21 there?
22   A. Most of the time, yes.
23   Q. And if it's not in the room with the patient
24 there, is it contemporaneous, though, with that
25 patient's visit?

Page 27

1    .A. Yes.
2    .Q. If a patient provides you with information,
3  is it your routine practice to keep track of that
4  information in your files?
5    A. Yes.
6    Q. And would you agree with me it's important
7  to take accurate notes of your findings?
8    A. Yes.
9    Q. And it's important to take accurate notes of
10 your conversations with your patients?
11   A. Yes.
12   Q. When was the first time you met Mr. Stanley?
13   A. June 5th, 2000.
14   Q. And how did Mr. Stanley come to be a patient
15 of yours?
16   A. He was sent to me by Dr. Sheridan.
17   Q. And what was the reason that you understood
18 that Dr. Sheridan sent Mr. Stanley to you?
19   A. For a retinal detachment.
20   Q. And what's a retinal detachment?
21   A. A retinal detachment is when the retina
22 becomes detached from the posterior wall of the eye.
23   Q. And what causes a retinal detachment?
24   A. Retinal tears are the most common cause of
25 retinal detachment.

Page 28

1    Q. And what causes a retinal tear?
2    A. Posterior vitreous detachment, which is an
3  aging change in the eye.
4    Q. And in Mr. Stanley's case, were you able to
5  determine what caused his retinal detachment?
6    A. It was caused by -- yes.
7    Q. And what caused Mr. Stanley's retinal
8  detachment?
9    A. A tear in the retina.
10   Q. And what caused the tear in the retina in
11 Mr. Stanley's case?
12   A. Most likely aging changes in the eye.
13   Q. And that's the vitreous detachment that you
14 referred to?
15   A. That's correct.
16   Q. Do you have an independent recollection of
17 your care and treatment of Mr. Stanley?
18   A. How do you mean?
19   Q. Do you, sitting here today, do you recall
20 meeting Mr. Stanley on June 5th, 2000?
21   A. No.
22   Q. And do you have an independent recollection
23 of the examination on June 5th, 2000?
24   A. Not without my notes.
25   Q. Okay, and so you're using your notes to

Page 29

1  refresh your recollection?
2    A. That's correct.
3    Q. Okay. I'm going to ask you to look at your
4  letter to Dr. Sheridan, dated June 5th, 2000. In
5  Exhibit 3 it has the Bates stamp page 13. And feel
6  free to look at the original once you confirm for me
7  that that page 13 is in fact your letter.
8    A. Yes. Although it is not -- yes, it is,
9  that's correct.
10   Q. Okay. And if you look at the second page,
11 the one marked 14, it has your signature line but no
12 signature. Would the original that you sent to
13 Dr. Sheridan have had your signature?
14   A. No.
15   Q. Is it your regular practice not to send
16 these with your signature?
17   A. It was at that time.
18   Q. Has that changed since then?
19   A. Yes.
20   Q. Does this appear to be a true and correct
21 copy of the letter you sent to Dr. Sheridan on or
22 about June 5th, 2000?
23   A. Yes.
24   Q. Now, if you take a look at that first
25 paragraph in the letter, the last line says, "He

8 (Pages 26 to 29)

Paradigm Reporting & Captioning, Inc.
612-339-0545

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 30

1  also has a history of hypertension and atrial
2  flutter and is on Coumadin, chlorthalidone, Lanoxin
3  and digoxin." Did I read that correctly?
4      A. Which letter are you referring to?
5      Q. The June 5th, 2000 letter, the first
6  paragraph.
7      A. Yes.
8      Q. The last sentence. What was that
9  information based on?
10     A. The history that the patient gave me and my
11 staff.
12     Q. Did Mr. Stanley tell you any other
13 medications that he was taking as of June 5th, 2000?
14     A. He did not.
15     Q. A little bit further down that first page
16 you note that his cup-to-disc is 0.2. Do you see
17 that reference?
18     A. Yes.
19     Q. What does that mean, cup-to-disc is 0.2?
20     A. The cup-to-disc ratio is the ratio of the
21 central cupping of the optic nerve to the rest of
22 the optic nerve.
23     Q. And is 0.2 considered small?
24     A. No.
25     Q. Is there a tool that you use to measure a

Page 31

1  cup-to-disc ratio?
2      A. We use our assessment visually of the
3  relationship of the optic nerve to the remainder of
4  the optic nerve.
5      Q. But there's no tool or a ruler or anything
6  that you would use to measure that?
7      A. No.
8      Q. It's based on your experience in treating
9  patients, correct?
10     A. That's correct.
11     Q. Now, under "Impression" you've listed six
12 items here from this June 5th letter. No. 1 is the
13 chronic retinal detachment. And that was in his
14 left eye, correct?
15     A. Yes.
16     Q. Okay, No. 2 says, "Mild PVR, left eye."
17 What does that mean?
18     A. That means proliferative vitreoretinopathy,
19 which is scar tissue on the surface of the retina.
20     Q. And what causes that?
21     A. Chronicity of the retinal detachment.
22     Q. Were you able to tell based on your
23 examination how long Mr. Stanley had suffered from
24 his retinal detachment by the time you'd seen him?
25     A. Not exactly. However, we can get an idea of

Page 32

1  weeks versus years versus one day.
2      Q. And what were you able to conclude for
3  Mr. Stanley?
4      A. His retinal detachment appeared chronic,
5  given the partial demarcation line in the retina and
6  the scar tissue that was present on the surface of
7  the retina.
8      Q. And when you say chronic, what does that
9  mean?
10     A. At least several weeks old.
11     Q. The first paragraph of your letter says that
12 he had noticed flashes and floaters in the left eye
13 six months ago, as well as a nasal shimmer of light
14 in the left eye. Do you see that?
15     A. Yes.
16     Q. Is that -- are those symptoms of a retinal
17 detachment?
18     A. Yes.
19     Q. No. 3 on your impression list says,
20 "Age-Related macular degeneration without CNVM, both
21 eyes." What is CNVM?
22     A. Choroidal neovascular membrane.
23     Q. And what is macular degeneration without
24 CNVM?
25     A. It's age-related disease of the center part

Page 33

1  of the retina without choroidal neovascular --
2  choroidal neovascular membrane growing in the retina
3  or onto the retina.
4      Q. And is there significance to not having the
5  -- a choroidal neovascularization?
6      A. Yes, that's good.
7      Q. Okay. No. 4 is, "Reticular pigmentary
8  degeneration." What is that?
9      A. Those are aging changes in the peripheral
10 retinal pigmentation pattern of the retina. They
11 are associated with macular degeneration.
12     Q. No. 5 is, "Paving-Stone degeneration." What
13 does that mean?
14     A. That is a form of atrophic degeneration that
15 typically occurs in a circular pattern at the
16 periphery of the retina.
17     Q. And what is the significance of that?
18     A. It is not significant.
19     Q. No. 6 is, "PVD, left eye." What is that?
20     A. Posterior vitreous detachment.
21     Q. And is that what we were talking about
22 before?
23     A. Yes.
24     Q. And you said that's related to aging?
25     A. That's correct.

9 (Pages 30 to 33)

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

**Page 34**

1    Q. At the time you saw Mr. Stanley on June 5th,
2  did you make any findings as to his right eye?
3    A. Yes.
4    Q. What did you find as to his right eye?
5    A. Age-related macular degeneration, peripheral
6  reticular pigmentary degeneration, and paving-stone
7  degeneration.
8    Q. Did you make any notations as to the
9  appearance of his optic nerve head?
10    A. Cup-to-disc ratio 0.2.
11    Q. And that's the only observation you made?
12    A. Yes.
13    Q. Now, you recommended that Mr. Stanley have
14  surgery to correct his -- his detached retina,
15  correct?
16    A. Yes.
17    Q. And you said that you recommended scleral
18  buckle surgery?
19    A. Yes.
20    Q. What is scleral buckle surgery?
21    A. It's a way to fix retinas with a silicone
22  band that is sewn to the outside of the eye wall.
23    Q. And that kind of supports it like a belt,
24  right?
25    A. That's correct.

**Page 35**

1    Q. And that helps keep the retina in position?
2    A. That's right.
3    Q. Now, you also said that it may require pars
4  plana vitrectomy, V-I-T-R-E-C-T-O-M-Y. What is pars
5  plana vitrectomy?
6    A. That's when we operate inside the eye with
7  microsurgical instruments to remove the vitreous gel
8  in the eye.
9    Q. And why would you need to do that in a case
10  such as Mr. Stanley's?
11    A. Sometimes it is necessary to perform
12  vitrectomy surgery if the retina cannot be
13  reattached with scleral buckle surgery.
14    Q. And in fact you did the surgery on
15  Mr. Stanley on June 6th, correct?
16    A. Yes.
17    Q. What would have been the risks to
18  Mr. Stanley had he not proceeded with the surgery?
19      MR. MILLER: Object, calls for
20  hypothetical. Sorry, Doctor, you can answer.
21    A. Sorry, I should not answer?
22    Q. You should.
23      MR. MILLER: You should, I'm sorry,
24  Doctor, yes.
25    A. It can lead to loss of vision and blindness.

**Page 36**

1    Q. And you explained that to Mr. Stanley?
2    A. Yes.
3    Q. And what were the risks associated with the
4  surgery that you did do?
5    A. The risk associated with performing surgery,
6  the major risks are pain, bleeding, infection, loss
7  of vision.
8    Q. And you explained those to Mr. Stanley?
9    A. And retinal detachment happening again, yes.
10    Q. Are cataracts associated with this type of
11  surgery?
12    A. Not typically.
13    Q. Are there any other risks associated with
14  this surgery?
15    A. There can be.
16    Q. What are the risks?
17    A. Almost anything that you could possibly
18  think of could happen during surgery.
19    Q. Is ischemic optic neuropathy a risk
20  associated with this surgery?
21    A. Not that I know of.
22    Q. Is it a risk associated with retinal
23  detachment?
24    A. No.
25    Q. When you did the surgery on Mr. Stanley, you

**Page 37**

1  did a cryoretinopexy?
2    A. Yes.
3    Q. And that involves using cold to create like
4  a scar on the retina, correct?
5    A. That's correct.
6    Q. And that helps keep the retina attached?
7    A. Yes.
8    Q. And you implanted the buckle, right?
9    A. Yes.
10    Q. Did you do a vitrectomy?
11    A. I did not.
12    Q. Now, you put an air bubble behind his
13  retina, correct, or in his eye?
14    A. Yes.
15    Q. And what's the purpose of putting an air
16  bubble in his eye?
17    A. To re-form the eye after draining the fluid
18  out from underneath the retina.
19    Q. And what type of air do you use?
20    A. Sterile air.
21    Q. How would you describe Mr. Stanley's
22  surgery, the outcome of Mr. Stanley's surgery?
23    A. Very good. Successful.
24    Q. And did the retina stay attached to your
25  knowledge?

10 (Pages 34 to 37)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 38

1  A. Yes.
2  Q. Prior to September of 2000, did Mr. Stanley
3 have any complications associated with the surgery?
4  A. No.
5  Q. How many times following his surgery did you
6 see Mr. Stanley prior to September 5th, 2000?
7  A. Four.
8  Q. And during those visits you noticed that
9 there was some retinal fluid remaining in his eye?
10  A. There was some subretinal fluid.
11  Q. Subretinal fluid. Is that normal following
12 this type of surgery?
13  A. It can happen.
14  Q. Are there risks associated with the
15 subretinal fluid?
16  A. No.
17  Q. And as you saw him, that pocket of fluid was
18 decreasing, right?
19  A. Yes.
20  Q. And that's an improvement?
21  A. Yes.
22  Q. I'd like you to turn to the page of your
23 notes that in Exhibit 3 is labeled page 2, dated
24 September 5th, 2000. Do you see that?
25  A. (Nodded affirmatively.)

Page 39

1  Q. Yes?
2  A. Yes.
3  Q. Okay. Now at the top of the page -- there's
4 two different types of handwriting on this page,
5 right?
6  A. Yes.
7  Q. Okay. Now, some of this is yours?
8  A. Yes.
9  Q. And whose other handwriting is this?
10  A. My technician's.
11  Q. Okay, and that would be, for example, where
12 it says, "New gray spot and VA loss"?
13  A. Yes.
14  Q. "OS," that would be left eye, right?
15  A. Yes.
16  Q. Okay, and that's your technician's
17 handwriting?
18  A. Yes.
19  Q. And then underneath where it says, it starts
20 off, "times 1 week"?
21  A. Yes.
22  Q. Is that sentence generally in your
23 technician's handwriting?
24  A. Yes.
25  Q. Now, that first word where it says "times 1

Page 40

1 week" there's also a line above it says "dash two
2 weeks"?
3  A. Yes.
4  Q. Did I read that correctly?
5  A. (Nodded affirmatively.)
6  Q. Yes?
7  A. Yes.
8  Q. Is that your handwriting?
9  A. Yes.
10  Q. Okay. Now, tell me what happened on this
11 visit that you added that in there.
12  A. I asked the patient for the history again.
13 And I add information that I learn from the patient
14 after they tell me.
15  Q. And what was the history that Mr. Stanley
16 provided you on September 5th about his vision?
17  A. That he saw new gray spots in the central
18 portion of his vision in the left eye for one to two
19 weeks. It was off to the side and it was leading to
20 vision loss. Did not have any trouble with the
21 right eye. And that the vision was slightly worse
22 over the past two weeks in the left eye. He noticed
23 decreased brightness.
24  Q. And what does that say underneath that?
25  A. That's a test that we do for red

Page 41

1 desaturation.
2  Q. And what's the significance of that test?
3  A. It can indicate damage to the optic nerve.
4  Q. And what did the results of that test show?
5  A. It's normal in the right eye. And he was
6 unable to perform the test in the left eye.
7  Q. Under "Medication changes" is the word
8 "Same," you see that?
9  A. Yes.
10  Q. And that's your technician's handwriting
11 that wrote "Same"?
12  A. Yes.
13  Q. And then next to "Same" there's additional
14 handwriting. Is that your handwriting?
15  A. Yes.
16  Q. And what did you write there?
17  A. I wrote that he does have atrial flutter,
18 hypertension. Cardizem was added and changed to
19 sotalol.
20  Q. And did you note when his Cardizem had been
21 changed to sotalol?
22  A. No.
23  Q. Did you change his medication to sotalol?
24  A. I did not.
25  Q. And do you know when he had been changed to

11 (Pages 38 to 41)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R. Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

Page 42

1  sotalol?
2      A. No.
3      Q. What is sotalol?
4      A. I do not know.
5      Q. And all that information on top, is that,
6  it's based on the history that was provided to you
7  by Mr. Stanley?
8      A. That's correct.
9      Q. On September 5th, 2000, correct?
10     A. Yes.
11     Q. Prior to seeing Mr. Stanley on September
12  5th, 2000, did you have any conversation with him?
13     A. Yes.
14     Q. What date did you have a conversation with
15  him?
16     A. August 28th.
17     Q. And what did he tell you on August 28th?
18     A. He called regarding decreased vision and a
19  gray central area in the left eye. And I
20  recommended that he make an appointment as soon as
21  possible. And did not have any flashes or floaters
22  and no decreased peripheral vision. I still
23  recommended an appointment as soon as possible. He
24  preferred to finish vacation and come in next week.
25     Q. Did he tell you when you spoke to him on

Page 43

1  August 28th as to how long those symptoms had been
2  going on?
3      A. I don't know.
4      Q. Do you know where he was on vacation at the
5  time he called you?
6      A. I do not remember.
7      Q. During that telephone conversation on August
8  28th -- strike that.
9         During your meeting with him on September
10  5th, did he tell you what time of day he first noted
11  his decreased vision?
12     A. No.
13     Q. Did he tell you what he was doing at the
14  time he noticed his decreased vision?
15     A. No.
16     Q. Did you have any conversation with him
17  between August 28th and September 5th?
18     A. No.
19     Q. When you saw him on September 5th, you
20  conducted a full examination?
21     A. Yes.
22     Q. What were your findings?
23     A. His visual acuity was 2 foot 200 in the left
24  eye. Intraocular pressure 14 millimeters mercury.
25  Anterior segment examination showed mild cataract.

Page 44

1  Occasional anterior vitreous cell. The fundus
2  examination showed disc edema with dilated -- mildly
3  dilated retinal veins. Drusen in the macula. Good
4  scleral buckle. The same small area of subretinal
5  fluid. Posterior vitreous detachment.
6      Q. And what was your impression based on your
7  examination?
8      A. Optic neuropathy, left eye. And status post
9  retinal detached repair stable in the left eye.
10     Q. And what was your plan?
11     A. Consult Dr. Steven Grosser for evaluation
12  and workup.
13     Q. And can you read the rest of that line?
14     A. "He will see the patient tomorrow and I
15  talked to Dr. Grosser."
16     Q. And who is Dr. Grosser?
17     A. He is an ophthalmologist and neuro --
18  practices neuro-ophthalmology.
19     Q. And where is he located?
20     A. On the west side of the cities.
21     Q. And to your knowledge, did Mr. Stanley ever
22  see Dr. Grosser?
23     A. I do not know. (Examining.)
24     Q. Do you have any communications from
25  Dr. Grosser?

Page 45

1      A. I do not.
2      Q. I believe in your file one of the documents
3  that we tagged was a letter from Dr. Weingarden. Do
4  you have that in your file? It may be on the front
5  half there.
6      A. (Examining.) Yes.
7      Q. And in fact if you look at your letter dated
8  September 5th, 2000, which in the pile of materials
9  that we marked as Exhibit 3 is page 10, and that's a
10  letter you wrote to Dr. Sheridan?
11     A. Yes.
12     Q. And under the recommendation it says, "I
13  have recommended that Mr. Stanley see a
14  neuro-ophthalmologist or you. Since I believe that
15  you would prefer a neuro-ophthalmologist to work up
16  Mr. Stanley, I recommend following up with Dr. Alan
17  Weingarden. He will see Mr. Stanley and work him up
18  tomorrow." Do you see that?
19     A. Yes.
20     Q. Do you know why you switched from
21  Dr. Grosser to Dr. Weingarden?
22     A. Only if the patient did not want to go to
23  see Dr. Grosser due to the location of his office.
24     Q. Do you recall Mr. Stanley having any
25  objection to seeing Dr. Grosser?

12  (Pages 42 to 45)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 46

1    A. I don't specifically recall that, but it is
2  very possible. In fact, it is very likely. That is
3  the only reason why I would not have sent -- why he
4  would have wanted to see Dr. Weingarden instead of
5  Dr. Grosser.
6    Q. And in fact as the letter from
7  Dr. Weingarden in your file indicates, he did see
8  Dr. Weingarden, correct?
9    A. Yes.
10    Q. And you received a letter from
11  Dr. Weingarden?
12    A. Yes.
13    Q. And what did Dr. Weingarden report to you?
14    A. He appears to have ischemic optic
15  neuropathy.
16    Q. Anything else?
17    A. He thought that a short trial of Medrol Dose
18  Pack would help to decrease some of the swelling.
19  He warned him of the risks and would see him back in
20  a few weeks.
21    Q. And Medrol, that's prednisone, correct?
22    A. It is a steroid.
23    Q. And what would the purpose of giving
24  Mr. Stanley a steroid be at that point in time?
25    A. To try to decrease the inflammation in the

Page 47

1  optic nerve or swelling in the optic nerve.
2    Q. As of September 5th, 2000, had you reached
3  an opinion to a reasonable degree of medical
4  certainty as to the cause of Mr. Stanley's ischemic
5  optic neuropathy?
6    A. No.
7    Q. Did you have any further follow-up with
8  Mr. Stanley following September 5th, 2000 as a
9  patient? Did he see you again?
10    A. Yes.
11    Q. When did he see you again?
12    A. March 12th, 2001.
13    Q. And what was his status at that point in
14  time?
15    A. His visual acuity in the right eye was 20/20
16  and 20/125 in the left eye. The intraocular
17  pressure was 13 in the left eye. He had mild
18  cataracts in both eyes. And the retina was attached
19  with drusen and pigmentary change in the macula.
20  And with posterior vitreous detachment and pallor to
21  the optic nerve.
22    Q. Did you recommend any further treatment for
23  his ischemic optic neuropathy?
24    A. Pardon me?
25    Q. Did you recommend any further treatment for

Page 48

1  his ischemic optic neuropathy?
2    A. No.
3    Q. And in fact if you refer to your letter to
4  Dr. Sheridan and Dr. Weingarden dated March 12,
5  2001, which is page 9 of Exhibit 3, you in fact
6  released him to the care of Dr. Sheridan and
7  Dr. Weingarden, correct?
8    A. Yes.
9    Q. Is March 12, 2001 the last time you saw
10  Mr. Stanley as a patient?
11    A. Yes.
12    Q. As of March 12th, 2001, had you reached an
13  opinion to a reasonable degree of medical certainty
14  as to the cause of Mr. Stanley's ischemic optic
15  neuropathy?
16    MR. MILLER: Object, calls for expert
17  testimony.
18    A. No.
19    Q. Did you have any discussions -- as of March
20  12th, 2001, had you had any discussions with
21  Mr. Stanley as to the causes of ischemic optic
22  neuropathy?
23    A. Prior to March 12th?
24    Q. Yes.
25    A. No, not in terms of other causations aside

Page 49

1  from the workup that we asked him to perform with
2  the neuro-ophthalmologist.
3    Q. To your knowledge, as of March 12, 2001, had
4  Dr. Weingarden reached an opinion as to the cause of
5  Mr. Stanley's ischemic optic neuropathy?
6    A. I do not know.
7    Q. Did you have any conversations with
8  Dr. Weingarden regarding Mr. Stanley?
9    A. Repeat that, please.
10    Q. Sure. Did you ever have any telephone
11  conversations with Dr. Weingarden regarding
12  Mr. Stanley?
13    A. I do not know.
14    Q. As of March 12th, 2001, had Mr. Stanley ever
15  told you that he had taken Viagra?
16    A. No.
17    Q. Now, you have in your files I believe we
18  identified some correspondence that Mr. Stanley sent
19  to Dr. Pomeranz, correct, that he then forwarded to
20  you?
21    A. (Examining.) Yes.
22    Q. When did you receive that?
23    A. March 14th, 2001.
24    Q. And how did you receive it?
25    A. I do not know.

13 (Pages 46 to 49)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 50

1    Q. And can I see the letter, since we don't
2  have a copy of it yet.
3    A. (Hands to Ms. Leskin.)
4    Q. And this was an e-mail that Mr. Stanley
5  wrote to Dr. Pomeranz, correct?
6    A. Yes.
7    Q. And this is dated March 13th, 2001?
8    A. Yes.
9    Q. And the e-mail attached an article from
10 Yahoo News, dated March 12th, correct (indicating)?
11   A. Yes.
12   Q. And that article is entitled, "Doctor Links
13 Viagra to Five Cases of Blindness," right?
14   A. Yes.
15   Q. Had you seen this article prior to
16 Mr. Stanley providing a copy of this to you?
17   A. Not that I recall.
18   Q. Prior to March 12th of 2001, did you know
19 Dr. Pomeranz?
20   A. Yes.
21   Q. He was at the University of Minnesota at the
22 time, correct?
23   A. Yes.
24   Q. Had you done any work with Dr. Pomeranz as
25 of that date?

Page 51

1    A. What kind of work?
2    Q. Any kind of work.
3    A. It's possible.
4    Q. Do you recall any type of work with
5  Dr. Pomeranz prior to March 12th of 2001?
6    A. It's possible that we shared patients.
7    Q. Had you done any research with Dr. Pomeranz?
8    A. No.
9    Q. Had you published any articles with
10 Dr. Pomeranz?
11   A. No, not prior to that date.
12   Q. Prior to March 12th of 2001, were you
13 familiar with any of Dr. Pomeranz's publications
14 regarding Viagra and ischemic optic neuropathy?
15   A. No, not that I remember.
16   Q. Paragraph 4, paragraph numbered 4 of
17 Mr. Stanley's e-mail to Dr. Pomeranz says, "Since
18 being treated for prostate cancer (implanted seeds
19 two years ago), the cause could have been age or the
20 treatment, I have had occasional erectile failures,
21 and my urologist suggested I try Viagra, which I
22 have done. Every week or two, a half or whole pill
23 is my usage pattern."
24   Prior to receiving this e-mail, did you know
25 that Mr. Stanley had taken Viagra?

Page 52

1    A. No.
2    Q. Page 8 of Exhibit 3 that we've provided
3  today is a letter from you to Dr. Stanley, dated
4  March 14th, 2001; correct?
5    A. Yes.
6    Q. Now again, this copy is not signed.  Would
7  it have been signed at the time you sent it to
8  Mr. Stanley?
9    A. I do not know.
10   Q. Is this in fact a true and correct copy of
11 the letter you sent to Mr. Stanley?
12   A. Yes.
13   Q. On or about March 14, 2001?
14   A. Yes.
15   Q. The last sentence of your letter says,
16 "Perhaps you may wish to consider discontinuing
17 Viagra, given these findings that you discovered."
18 Did I read that correctly?
19   A. Yes.
20   Q. And was it your understanding that as of
21 March 14th, 2001, Mr. Stanley was in fact continuing
22 to take Viagra?
23   A. Yes.
24   Q. And what was that based on?
25   A. The e-mail that he had sent me prior to my

Page 53

1  writing the letter, which states that he has been
2  using Viagra for some time.
3    Q. When you received a copy of Mr. Stanley's
4  e-mail to Dr. Pomeranz, did you call Mr. Stanley?
5    A. I do not know if I called him.
6    Q. Sitting here today, do you recall calling
7  him?
8    A. No.
9    Q. After you received that e-mail from
10 Mr. Stanley to Dr. Pomeranz, did you call
11 Dr. Pomeranz?
12   A. I do not think so.
13   Q. Other than sending this letter dated March
14 14th, 2001, did you take any other action with
15 regard to Mr. Stanley?
16   A. I do not think so.
17   Q. After receiving a copy of Mr. Stanley's
18 e-mail to Dr. Pomeranz, did you contact anyone at
19 Pfizer?
20   A. No, I did not.
21   Q. After receiving a copy of Mr. Stanley's
22 e-mail to Dr. Pomeranz, did you reach an opinion to
23 a reasonable degree of medical certainty as to the
24 cause of Mr. Stanley's ischemic optic neuropathy?
25   MR. MILLER: Object, calls for expert

14 (Pages 50 to 53)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 54

1 testimony.
2    A. No.
3    Q. Did you do any research following receipt of
4 a copy of the e-mail that Mr. Stanley sent to
5 Dr. Pomeranz?
6    A. I do not know.
7    Q. Were you familiar with Viagra as of the date
8 that you received the e-mail correspondence from
9 Mr. Stanley?
10    A. I think so.
11    Q. And in what way were you familiar with the
12 drug?
13    A. I suspect that I had heard about the drug
14 and its use.
15    Q. Had you ever prescribed Viagra to any
16 patients?
17    A. I have not.
18    Q. Had you done any research on Viagra as of
19 that time?
20    A. No.
21    Q. Had you reviewed any of the label for Viagra
22 as of that date?
23    A. No.
24    Q. Had you had any patients who had taken
25 Viagra, other than Mr. Stanley, that you were aware

Page 55

1 of as of that date?
2    A. I do not know.
3    Q. Are you a member of the North American
4 Neuro-Ophthalmology Society?
5    A. I am not.
6    Q. Now, at some point in time after receiving
7 that e-mail that Mr. Stanley sent to Dr. Pomeranz,
8 did you contact Dr. Pomeranz?
9    A. I don't believe I contacted Dr. Pomeranz, I
10 believe he probably contacted me.
11    Q. Okay, and when did that occur?
12    A. Probably sometime in two thousand -- end of
13 2001 or beginning of 2002.
14    Q. And how did Dr. Pomeranz contact you?
15    A. I think that Mr. Stanley had let me know
16 that he had some questions about the dosing that he
17 was taking and so on.
18       (Bhavsar Deposition Exhibit No. 4
19       marked for identification.)
20    Q. We've marked as Exhibit 4 a letter from
21 Mr. Stanley to you, dated January 9, 2002. Is that
22 a copy of a letter you received from Mr. Stanley on
23 or about January 9th, 2002?
24    A. Yes.
25    Q. And you in fact have a copy of that letter

Page 56

1 in your files?
2    A. Yes.
3    Q. Now, the first line of Mr. Stanley's letter
4 to you says, "Here are what I believe to be the
5 answers to your questions on Viagra and my bad left
6 eye." Do you see that?
7    A. Yes.
8    Q. How did you contact Mr. Stanley with
9 questions? How did that -- I should say did you
10 contact Mr. Stanley with questions?
11    A. I do not remember, but it would seem to be
12 the case.
13    Q. But sitting here today, you don't recall
14 reaching out to Mr. Stanley for any information?
15    A. I do not remember that, no.
16    Q. Can I just see your file real quick.
17    A. (Hands to Ms. Leskin.)
18    Q. Among the pages in your file looks to be
19 e-mail correspondence between you and Dr. Pomeranz.
20 I'll ask you to take a look at that one
21 specifically. And is this an e-mail that you
22 printed out?
23    A. I think so.
24    Q. And the date on that looks to be January
25 5th, 2002?

Page 57

1    A. Yes.
2    Q. Now, on the way your e-mail prints, is the
3 earliest e-mail the one at the bottom and then you
4 read up? Or is the earliest e-mail the one at the
5 top and then you read down?
6    A. The earliest e-mail is probably on the
7 bottom.
8    Q. And that first e-mail is from whom to whom?
9    A. From Dr. Pomeranz to me.
10    Q. And what did Dr. Pomeranz ask you?
11    A. "Do you have the patient case ready for me?"
12    Q. Had you spoken to Dr. Pomeranz prior to the
13 date of his e-mail to you?
14    A. It is possible.
15    Q. And do you recall how that came to be?
16    A. No. But I would guess that he wanted to
17 accumulate cases of association -- possible
18 associations of Viagra use with optic neuropathy.
19 And already knew of Mr. Stanley's case because of
20 Mr. Stanley's communication with Dr. Pomeranz, and
21 he probably would have asked me to include that case
22 in his series that he was already accumulating.
23    Q. Did you provide Dr. Pomeranz with copies of
24 Mr. Stanley's medical records?
25    A. I do not think so, no.

15 (Pages 54 to 57)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

Page 58

1    Q. Did you provide the written -- the write-up
2  of Mr. Stanley's case for inclusion in the article?
3    A. Yes.
4    Q. Now, the top e-mail is the one that -- last
5  one that Dr. Pomeranz had sent to you, correct?
6    A. I believe so.
7    Q. Okay. And in it Dr. Pomeranz asks you some
8  questions, correct?
9    A. Yes.
10   Q. And what questions did he ask you?
11   A. "Do you know what dose of Viagra he was
12 using? 50 milligrams or 100 milligrams? How long
13 and how frequently had he been using the medication
14 when the nonarteritic anterior ischemic neuropathy
15 occurred? When was his last use of Viagra prior to
16 developing NAION?"
17   Q. Okay. After you received that e-mail from
18 Dr. Pomeranz, what did you do?
19   A. I do not remember.
20   Q. Did you write a letter to Mr. Stanley?
21   A. I don't think so.
22   Q. Did you call Mr. Stanley?
23   A. It is possible.
24   Q. There's handwritten notes on that e-mail.
25 Is that your handwriting?

Page 59

1    A. Yes.
2    Q. And what do those notes say?
3    A. "Dosage question. Frequently [sic] one time
4  per week. Call patient in a few days. Patient will
5  call me."
6    Q. Okay, and in terms -- you have an arrow from
7  the last question, which is, "When was the last use
8  of Viagra prior to developing NAION," you have an
9  arrow and you wrote "few days," correct?
10   A. Yes.
11   Q. Do you know what that note was based on?
12   A. What the patient would have told me.
13   Q. Would that have been during your telephone
14 conversation?
15   A. Yes.
16   Q. And then you received this letter that we've
17 marked as Exhibit 4 after or before your
18 conversation with him on the phone?
19   A. This would have been after.
20   Q. And after you received the letter dated
21 January 9th, 2002 that we've marked as Exhibit 4,
22 did you have any further conversation with
23 Mr. Stanley prior to writing up the article for
24 Dr. Pomeranz?
25   A. Can you repeat the question.

Page 60

1    Q. Sure. After you received the letter that
2  we've marked as Exhibit 4, dated January 9th, 2002,
3  did you have any further correspondence with
4  Mr. Stanley prior to the publication of the article
5  with Dr. Pomeranz?
6    A. I do not know.
7    Q. If you had would you have noted it in your
8  file?
9    A. It's possible.
10   Q. I'd ask you to take a look then.
11       MR. MILLER: Doctor, can I see that
12 e-mail. Thank you, sir.
13   A. (Examining.) Yes.
14   Q. When was that communication?
15   A. April 11th, 2005.
16   Q. And what was the question -- what was the
17 form of the communication?
18   A. Telephone call from Mr. Stanley. "He called
19 and would like me to call him regarding the recent
20 article in the journal my co-authored."
21   Q. And did you call him?
22   A. Yes.
23   Q. And what was the nature of the conversation?
24   A. He wanted a copy of the article.
25   Q. And did you send that to him?

Page 61

1    A. I think so.
2    Q. Did you have any conversation with him after
3  that?
4    A. Not that I recall.
5    Q. I ask you to turn to that last page in your
6  files. I think there was some other notes you may
7  have had there.
8    A. (Witness complies.)
9    Q. What's the date on the pink slip that
10 appears on that last page?
11   A. May 31st, 2005.
12   Q. And what did the note say?
13   A. He would -- "patient does not want to be
14 interviewed."
15   Q. Do you know what that was referring to?
16   A. No.
17   Q. Did you call him back after that he called
18 you on May 31st, 2005?
19   A. Not that I know of.
20   Q. There's one other note, looks like it's
21 dated May 14th, 2001. What does that say?
22   A. "Patient asked if the scleral buckle could
23 be related to decreased blood flow to the optic
24 nerve. I said no, as far as we know."
25   Q. Are you aware of any case reports

16 (Pages 58 to 61)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

Page 62

1  associating ischemic optic neuropathy with retinal
2  detachment?
3       A. No.
4            (Bhavsar Deposition Exhibit No. 5
5            marked for identification.)
6       Q. Looking back at Mr. Stanley's letter dated
7  January 9th, 2002 to you, at the bottom of the
8  letter Mr. Stanley says, "I checked on the history
9  of the problem I had in my right eye in early 1987.
10 At the time, I complained of fuzziness, and my eye
11 doctor's notes show that I got an angiogram.  They
12 also mention 'RPE atrophy,' that he couldn't say it
13 wasn't papillitis, and that it was no longer visible
14 a month after my first complaint."
15      Do you see that?
16      A. Yes.
17      Q. Did you review any of the medical records
18 from Mr. Stanley's right eye from 1987?
19      A. No.
20      Q. We've marked as Exhibit 5 copy of an article
21 published in the Journal of Neuro-Ophthalmology
22 entitled, "Nonarteritic Ischemic Optic Neuropathy
23 Developing Soon After Use of Sildenafil (Viagra): A
24 Report of Seven New Cases," by Howard D. Pomeranz
25 and Abdhish R. Bhavsar.

Page 63

1       Is this the article you co-wrote with
2  Dr. Pomeranz?
3       A. Yes.
4       Q. Now, this article summarizes seven patients,
5  right?
6       A. That's correct.
7       Q. And case No. 5 is Mr. Stanley's case,
8  correct, on page 11 of the article?
9       A. I believe that's correct.
10      Q. Are any of the other six patients summarized
11 in this article your patients?
12      A. No.
13      Q. Did you review any medical records for any
14 of these other six patients?
15      A. No.
16      Q. Do you know who did?
17      A. Dr. Pomeranz would have, since he wrote that
18 portion of the paper.
19      Q. So you didn't comment on the other six
20 patients?
21      A. I did not.
22      Q. Did you tell Mr. Stanley that you were
23 writing his case up for publication?
24      A. I believe, yes.
25      Q. Did you ask him permission as to whether you

Page 64

1  could use the case?
2       A. I do not recall.
3       Q. Did you review any of Mr. Stanley's medical
4  records other than your own medical records in
5  writing up the summary of his case?
6       A. I should go back one sentence.
7       Q. Okay.
8       A. By the fact that Mr. Stanley sent me
9  information that Dr. Pomeranz requested for his
10 gathering of cases, this would imply consent of the
11 patient to be including his information in that
12 article.  Because he supplied us with detailed
13 information after that request was made.
14      Q. Okay.  Thank you.
15      Did you review any of Mr. Stanley's medical
16 records, other than your own records, prior to
17 writing up the summary of his case for this article?
18      A. No, I did not.
19      Q. And you didn't provide copies of any of the
20 records to Dr. Pomeranz, right?
21      A. No, I did not.
22      Q. If you turn to Mr. Stanley's letter to you
23 dated January 9th, 2002, he said, "I was using
24 Viagra about once a week at the time and thought
25 that I had used it a day or two before the problem

Page 65

1  arose."  Do you see that sentence?
2       A. Yes.
3       Q. If you turn to the article under Case 5,
4  sentence 1 says, "A 69-year-old man used a single
5  50-milligram sildenafil tablet and reported acute
6  visual loss in the left eye the next day."
7       Do you see that sentence?
8       A. Yes.
9       Q. Did you have any additional information from
10 Mr. Stanley between the time that you received his
11 letter dated January 9th, 2002 and the publication
12 of this article?
13      A. No.
14      Q. The next sentence of Mr. Stanley's letter
15 says: "Whether I used 50 milligrams or 100
16 milligrams on that particular occasion I can't
17 recall."  Do you see that sentence?
18      A. Yes.
19      Q. Did you receive any information other than
20 that from Mr. Stanley regarding the dose he took
21 prior to the publication of the article?
22      A. No.
23      Q. If you go back to your letter dated
24 September 5th, 2000.
25            MR. MILLER:  What page number is that?

17 (Pages 62 to 65)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

Page 66

1    MS. LESKIN: 10 from Exhibit 3.
2  BY MS. LESKIN:
3    Q. In the first paragraph you wrote that, "He
4  had successful retinal detachment repair surgery in
5  the left eye on June 6, 2000, however, noticed
6  sudden decreased vision in the left eye over the
7  past one to two weeks." Right?
8    A. Yes.
9    Q. And September 5th was the first time you saw
10  him, correct, after he noticed the decrease in
11  vision in the left eye?
12    A. Yes.
13    Q. Are you aware as to whether he had seen any
14  other eye doctor --
15    A. No.
16    Q. Prior to you seeing him on September 5th?
17    A. No.
18    Q. And if you look at the article that we
19  marked as Exhibit 5, that second paragraph says,
20  "Visual acuities one day after the acute visual loss
21  in the left eye were 20/32 in the right eye and
22  2/200 in the left eye." Right?
23    A. Yes.
24    Q. And if you go back to your notes of that
25  visit on September 5th, 2000?

Page 67

1    MS. FYMAN: Page 2.
2    Q. You wrote that the Cardizem had been changed
3  to sotalol, correct?
4    A. Yes.
5    Q. Did you identify sotalol as one of the
6  medications in the write-up of the case?
7    A. No.
8    Q. Did you provide any information regarding
9  the problems he had had in his right eye in your
10  write-up of the case?
11    A. What problems in his right eye?
12    Q. The possible papillitis he had had back in
13  1987?
14    A. No.
15    Q. You mentioned his macular degeneration in
16  the write-up of the case?
17    A. No.
18    Q. If you turn to the chart that's on page 10
19  of the article we've marked as Exhibit 5. If you
20  look under case No. 5 under cup/disc ratio, it says
21  NK, not known, right?
22    A. Yes.
23    Q. You had measured his cup/disc ratio though,
24  right?
25    A. No, I did not measure it.

Page 68

1    Q. You had assessed what the value was?
2    A. Yes.
3    Q. If you turn to page 12 of your article,
4  Exhibit 5, if you look at the right-hand column
5  towards the bottom it says, you see where it starts
6  "Because of the lack of a model"?
7    A. Yes.
8    Q. "In which to test for a relationship between
9  sildenafil and NAION, a definite causal relationship
10  cannot be established at this time"?
11    A. Yes.
12    Q. That's what you wrote, correct?
13    A. That's what is written in the article.
14    Q. That you're an author of, correct?
15    A. That's correct.
16    Q. Can you go back to the chart that's on page
17  10. The right-hand column is labeled "Risk
18  Factors." Right? See that column?
19    A. Yes.
20    Q. Case No. 5, which is Mr. Stanley, it's
21  listed HTN, which is hypertension, correct?
22    A. Yes.
23    Q. And RD left eye; retinal detachment of the
24  left eye, correct?
25    A. Yes.

Page 69

1    Q. Sitting here today, do you have an opinion
2  to a reasonable degree of medical certainty whether
3  Viagra can cause ischemic optic neuropathy?
4    MR. MILLER: Objection, calls for
5  expert testimony. But you can go ahead and answer.
6    A. Yes, I have an opinion.
7    Q. And what is your opinion?
8    A. I believe that there is an association in a
9  small number of patients who have used Viagra with
10  the development of nonarteritic anterior ischemic
11  optic neuropathy. But we do not have any evidence
12  of causality, as was written in the article.
13    Q. Sitting here today, do you have an opinion
14  to a reasonable degree of medical certainty whether
15  Viagra caused Mr. Stanley's ischemic optic
16  neuropathy?
17    MR. MILLER: Objection, calls for
18  expert testimony.
19    A. No.
20    Q. When did you first learn that Mr. Stanley
21  had filed a lawsuit against Pfizer?
22    A. (Examining.) Within the past week.
23    Q. And how did you learn that?
24    A. When my office manager said that we had
25  received a subpoena regarding Mr. Stanley.

18 (Pages 66 to 69)

Paradigm Reporting & Captioning, Inc.
612-339-0545

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

**Page 70**

1  Q. Have you spoken to Mr. Stanley regarding the
2  litigation?
3  A. I have not.
4  Q. Have you spoken to anyone on Mr. Stanley's
5  behalf regarding the litigation?
6  A. No.
7  Q. Have you spoken to Dr. Pomeranz since the
8  article that's Exhibit 5 was published?
9  A. Yes.
10  Q. When was that?
11  A. A few years ago.
12  Q. And what was the nature of the conversation?
13  A. About an interview for Good Morning America.
14  Q. Were you interviewed on Good Morning
15  America?
16  A. I was not.
17  Q. Was he interviewed on Good Morning America?
18  A. Yes, he was.
19  Q. And what was the nature of the conversation
20  regarding that interview?
21  A. I believe it was that -- that I would not
22  tell them that this was a study that was done on
23  Viagra and anterior ischemic optic neuropathy. And
24  that -- that I would not be giving them an
25  interview. And that they had called me to give them

**Page 71**

1  an interview. And that he was going to do the
2  interview -- or he had done the interview. I don't
3  remember if I spoke to him before or after the
4  interview.
5  Q. Was it your decision not to give the
6  interview? Or was it Dr. Pomeranz's decision that
7  you shouldn't give the interview?
8  A. It would have been my decision.
9  Q. And why did you decide not to give an
10  interview to Good Morning America?
11  A. They had asked me a number of questions and
12  I made it so that they would not want to interview
13  me.
14  Q. What type of questions did they ask you?
15  A. They repeatedly tried to put words in my
16  mouth and link our paper to a study, essentially
17  trying to make our paper into a clinical trial,
18  which is not scientifically accurate or appropriate.
19  Q. Why not?
20  A. It is not a clinical trial. It is a case
21  report series. It's a retrospective case report
22  series, and that is all it is. It is not a study
23  and it's not a clinical trial. And if it is
24  attempted to be depicted that way by the press or by
25  anyone else, it is not scientifically accurate. And

**Page 72**

1  I clearly stated that.
2  Q. Did you and Dr. Pomeranz disagree as to the
3  nature of the study -- or the nature of the paper?
4  A. That is very possible, but I don't recall
5  that we had any dispute about that.
6  Q. Did Dr. Pomeranz term this a study?
7  MR. MILLER: Objection, not relevant.
8  A. I don't know.
9  Q. Have you spoken to Dr. Pomeranz since that
10  discussion?
11  A. I may have spoken to him in passing.
12  Q. Have you spoken to him about Viagra?
13  A. Not that I recall.
14  Q. Are you aware that Dr. Pomeranz is now at
15  Long Island Jewish in New York?
16  A. Yes, now that you've told me that.
17  Q. Did you know that he had left the University
18  of Minnesota?
19  A. Yes, I did.
20  Q. When did you find out he had left the
21  University of Minnesota?
22  MR. MILLER: Object, object to form.
23  A. Probably before he left I had known that he
24  was going to leave.
25  Q. Did you know there was litigation generally

**Page 73**

1  involving Viagra and ischemic optic neuropathy?
2  A. No.
3  MS. LESKIN: I have no further
4  questions at this time. Thank you, Doctor.
5  EXAMINATION
6  BY MR. MILLER:
7  Q. Doctor, I introduced myself earlier. Pete
8  Miller, represent the plaintiff Richard Stanley.
9  I just have a few questions just to go over
10  a couple things that I probably had some confusion
11  on.
12  Sir, you were asked about the risk factors
13  of NAION. And I guess to go down the list here.
14  Hypertension. Sir, you're not an expert on
15  hypertension, is that a fair statement?
16  A. Yes.
17  Q. And you would -- you would refer [sic] to
18  someone who is an expert on hypertension as far as
19  the causation or hypertension being a risk factor in
20  the diagnosis of NAION?
21  MS. LESKIN: Objection to form.
22  A. I suppose that would be correct.
23  Q. And the same holds true for a cardiac --
24  cardiac disease; you're not an expert in cardiac
25  disease?

Paradigm Reporting & Captioning, Inc.
612-339-0545

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

## Page 74

1    A. I am not.
2    Q. And same holds true for diabetes?
3        MS. LESKIN: Objection to form.
4    Q. You're not an expert in diabetes?
5    A. I am not an expert on diabetes, no.
6    Q. As someone who's involved in the care and
7  treatment of Richard Stanley's NAION, it's important
8  that you know his medical history, is that a fair
9  statement?
10   A. Yes.
11   Q. Knowing what you know now about the
12 potential association between Viagra and NAION,
13 would you have wanted to know of his Viagra use
14 during your care and treatment?
15       MS. LESKIN: Objection to form.
16   A. That would have been interesting to note.
17   Q. Would it be important for you to know as a
18 treater for Mr. Stanley that he was taking Viagra at
19 the time that he was diagnosed with NAION?
20   A. That would be helpful.
21   Q. Is that something that you ask your male
22 patients today that are diagnosed with NAION?
23   A. Yes.
24   Q. And you were asked earlier if you could look
25 at the eye and determine what caused the NAION. Is

## Page 75

1  it ever possible to look at an eye and determine
2  what the cause of the NAION is?
3    A. I do not think so.
4    Q. Are there any techniques where you can
5  determine the cause of NAION?
6    A. Not that I'm aware of.
7    Q. Did the surgery that you performed on
8  Mr. Stanley's retina, the retinal detachment
9  surgery, that did not cause his NAION, is that an
10 accurate statement?
11       MS. LESKIN: Objection to form.
12   A. I think that's very likely.
13   Q. Very likely that it did not cause it?
14   A. Yes.
15   Q. And the same holds true for the scleral
16 buckle that you placed on his eye, that wouldn't
17 have caused the NAION?
18       MS. LESKIN: Objection to form.
19   Q. Is that an accurate statement?
20   A. I think that it would be very unlikely to
21 cause that.
22   Q. The same holds true for the air bubble where
23 you used the sterile air to re-form the eye, that
24 wouldn't cause NAION, is that an accurate statement?
25       MS. LESKIN: Objection to form.

## Page 76

1    A. I think that also would be unlikely to cause
2  NAION.
3    Q. Looking back at his medical history, did you
4  determine anything that was more likely to cause his
5  NAION than his use of Viagra?
6        MS. LESKIN: Objection to form.
7    A. It is possible.
8    Q. It's possible that you did see something
9  when you looked back in his history or?
10   A. Yes.
11   Q. Does anything stand out in your mind now
12 that you look back at his records?
13       MS. LESKIN: Objection to form.
14   A. Hypertension and heart disease.
15   Q. Is someone who has hypertension and a heart
16 disease more susceptible to NAION? Is that
17 statement accurate?
18   A. It is a risk factor for development of
19 NAION.
20   Q. Taking a look at the article which was
21 Exhibit 5, and you were asked about a portion that
22 was written outside of the case study, specifically
23 case 5. My understanding what you testified to
24 earlier, that the only portion that you wrote of
25 this was the case study for case 5?

## Page 77

1        MS. LESKIN: Objection to form.
2    A. I do not know that I actually wrote that
3  section, but I submitted information to Dr. Pomeranz
4  for that history of that section.
5    Q. When you read the study and you read case 5,
6  did you have any issue with the way Dr. Pomeranz
7  wrote that section?
8    A. I do not recall at that time. But I believe
9  that the case is markedly abbreviated in order to,
10 in order to streamline the paper.
11   Q. Do you agree that it's a fair and accurate
12 summary of the case study?
13       MS. LESKIN: Objection to form.
14   A. It is not -- does not appear to be 100
15 percent accurate, but it conveys the general
16 principles of his case history.
17   Q. Is there anything about the accuracy of case
18 study 5 as it's written in this paper that concerns
19 you as far as the accuracy of the entire paper goes?
20       MS. LESKIN: Objection to form.
21   A. Yes.
22   Q. And what would that be?
23   A. Dose of medication used and the time course
24 prior to development of NAION, as well as the
25 history of visual acuity loss.

20 (Pages 74 to 77)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.  Bhavsar, M.D.  8/11/2008
In Re: Viagra Products Liability Litigation

## Page 78

1    Q. Going back to the time of use, you were
2  asked about an e-mail. I don't believe it was
3  marked as an exhibit, but it's part of your record.
4  And that one right in front of you, Doctor, the 5
5  January 2002 e-mail from Dr. Pomeranz in which you
6  answered a question in there. And I'll paraphrase,
7  it was the time from when the drug was used until he
8  had the issue with the eye, and in there it's your
9  handwritten note that it was a few days.
10      You were asked, Doctor, if that was from a
11  writing or a phone call. And originally is it
12  accurate to say that you didn't recall or you don't
13  recall as you sit here whether it was a phone call
14  or a writing?
15    A. It could only have been a phone call,
16  because on the note I've written to call patient and
17  patient will call me and then I've written the
18  responses next to the sentence.
19    Q. When in Exhibit 4, which is the letter from
20  Richard Stanley, January 9, 2002, we went over where
21  Mr. Stanley answers your questions, and one of the
22  bulleted items he says that he thought he had used
23  it a day or two before the problem arose.
24      Did you have any reason to doubt what he had
25  written there?

## Page 79

1      MS. LESKIN: Objection to form.
2    A. No.
3    Q. No?
4      As a doctor who is involved in the care and
5  treatment of Mr. Stanley's eyesight, can you tell me
6  when you believe that he developed NAION (NAY-on,
7  phonetic) -- or NAION (NIE-on, phonetic), excuse me?
8    A. Sounds like a few weeks, one to two weeks
9  prior to September 5th, 2000.
10    Q. One second.
11      Sir, you say that -- and correct me if I'm
12  wrong, but the use of Viagra is associated with a
13  small number of your patients with regard to the
14  diagnosis of NAION. Is that?
15      MS. LESKIN: Objection to form.
16    Q. Well, I'll tell you, I'll rephrase it.
17      Is there an association with Viagra and
18  NAION?
19    A. Yes.
20    Q. Is there an association of Richard Stanley's
21  NAION and his use of Viagra?
22    A. Yes.
23      MR. MILLER: I have no further
24  questions.
25

## Page 80

1      FURTHER EXAMINATION
2  BY MS. LESKIN:
3    Q. Regarding the association between Viagra use
4  by Mr. Stanley and the onset of his ischemic optic
5  neuropathy, sitting here today, can you say to a
6  reasonable degree of medical certainty that that is
7  anything more than a temporal association?
8    A. No.
9      MS. LESKIN: Nothing further.
10      MR. MILLER: We're done.
11      MS. LESKIN: Okay. Thank you. If we
12  can get copies of those pages, that would be great,
13  Doctor. We're off the record --
14      You have the right to read and review
15  the transcript and make corrections. Or you could
16  waive that. Do you have a preference?
17      THE WITNESS: Okay, I'll review them.
18      MS. LESKIN: Okay.
19      (Deposition concluded at 7:22 p.m.)
20      (Discussion held off the record.)
21      MS. LESKIN: Dr. Bhavsar has been kind
22  enough to ask his -- agree to ask his office to copy
23  the additional pages from his file that were not
24  previously provided following the conclusion of the
25  deposition today.

## Page 81

1      Copies of those records will be supplemented
2  and attached to the deposition as Exhibit 6. Is
3  that acceptable?
4      MR. MILLER: That's acceptable.
5      (REPORTER'S NOTE: Exhibit 6 will be
6  marked for identification upon receipt of the
7  documents.)
8      MS. LESKIN: Thank you. We're off.
9      (Deposition concluded at 7:23 p.m.)
10      ***************
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 to 81)

816346a6-95c1-4b87-8fad-b999dcfdf479

Abdhish R.   Bhavsar, M.D.   8/11/2008
In Re: Viagra Products Liability Litigation

Page 82

```
 1        REPORTER'S CERTIFICATE
 2
   STATE OF MINNESOTA  )
 3                     ) ss.
   COUNTY OF DAKOTA    )
 4
          I hereby certify that I reported the
 5   deposition of ABDHISH R. BHAVSAR, M.D. on August 11,
     2008 in Minneapolis, Minnesota, and that the witness
 6   was by me first duly sworn to tell the whole truth;
 7
          That the testimony was transcribed by me and
 8   is a true record of the testimony of the witness;
 9
          That the cost of the original has been
10   charged to the party who noticed the deposition, and
     that all parties who ordered copies have been
11   charged at the same rate for such copies;
12
          That I am not a relative or employee or
13   attorney or counsel of any of the parties, or a
     relative or employee of such attorney or counsel;
14
          That I am not financially interested in the
15   action and have no contract with the parties,
     attorneys, or persons with an interest in the action
16   that affects or has a substantial tendency to affect
     my impartiality;
17
          That the right to read and sign the
18   deposition by the witness was reserved.
19
          WITNESS MY HAND AND SEAL THIS 21st day of
20   August, 2008.
21
22
23   _____
     Mary P. Mitchell, RDR, CRR, CCP
     Notary Public, Dakota County, Minnesota
24   My commission expires January 31, 2010.
25
```

22 (Page 82)

816346a6-95c1-4b87-8fad-b999dcfdf479