1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**CONFIDENTIAL**

- - - - - - - - - - - - -

In re:

Viagra Products Liability

Litigation

MDL Docket No. 1724

Judge Paul A. Magnuson

- - - - - - - - - - - - -

This Document Relates to:

    Martin v. Pfizer

    Stanley v. Pfizer

- - - - - - - - - - - - -

**** CONFIDENTIAL ****

VIDEOTAPED DEPOSITION OF CHERYL BLUME, Ph.D.

Taken on Behalf of the Defendant Pfizer Inc.

| | |
|---|---|
| DATE TAKEN: | February 12, 2009 |
| TIME: | 9:17 a.m. - 7:21 p.m. |
| PLACE: | Pharmaceutical Development |
| | Group, Inc. |
| | 13902 North Dale Mabry |
| | Highway, Suite 122 |
| | Tampa, Florida |

Stenographically Reported by:

Donna L. Peterson

Registered Diplomate Reporter

Certified Realtime Reporter

## 2

```
 1  APPEARANCES:
 2
 3  Counsel for Plaintiffs and Steering Committee:
 4      DANIEL E. BECNEL, JR., ESQUIRE
        Becnel Law Firm, LLC
 5      106 W. Seventh Street
        Reserve, Louisiana 70084
 6
 7  Counsel for Plaintiffs and Steering Committee:
 8      NEIL D. OVERHOLTZ, ESQUIRE
        Aylstock, Witkin, Kreis & Overholt, PLLC
 9      803 North Palafox Street
        Pensacola, Florida 32501
10
11  Counsel for Plaintiffs and Steering Committee:
12      KEITH L. ALTMAN, ESQUIRE
        Finkelstein & Partners, The Injury Attorneys
13      39 Broadway, Suite 1850
        New York, New York 10006
14
15  Counsel for Defendant Pfizer Inc.:
16      LORI B. LESKIN, ESQUIRE
        MARK D. SPATZ, ESQUIRE
17      Kaye Scholer, LLP
        425 Park Avenue
18      New York, New York 10022
19
20  Special Master:
21      JOHN W. BORG, ESQUIRE
        District Court Judge, Retired
22      6612 Limerick Drive
        Edina, Minnesota 55439
23
24  Also Present:
25      Jamie Hollingsworth, videographer
```

## 3

```
 1              INDEX
 2
 3  WITNESS                              PAGE
 4  Called by the Defendant Pfizer Inc.:
 5  CHERYL BLUME, Ph.D.
 6      DIRECT EXAMINATION BY MS.. LESKIN      9
 7      CROSS EXAMINATION BY MR. ALTMAN      328
 8      CROSS EXAMINATION BY MR. OVERHOLTZ   344
 9      CROSS EXAMINATION BY MR. BECNEL      370
10      REDIRECT EXAMINATION BY MS. LESKIN   373
11      RECROSS EXAMINATION BY MR. ALTMAN    385
12      RECROSS EXAMINATION BY MR. OVERHOLTZ 387
13  ERRATA SHEET                           392
14  CERTIFICATE OF REPORTER OATH           393
15  REPORTER'S DEPOSITION CERTIFICATE      394
16
17
18              EXHIBITS
19
20  NO.   DESCRIPTION                      PAGE
21  Exhibit 1  Expert report of Cheryl Blume,   43
             Ph.D.
22  Exhibit 2  Guidance for Industry, Good      85
             Pharmacovigilance Practices and
23           Pharmacoepidemiologic Assessment,
             from the FDA, dated March 2005
24
25
```

## 4

```
 1      E X H I B I T S - continued
 2  NO.   DESCRIPTION                      PAGE
 3  Exhibit 3  Excerpt from the new drug        96
             application, Bates stamped
 4           002000947 through 950
 5  Exhibit 4  Index to the sildenafil NDA that  97
             was filed with the Food and Drug
 6           Administration, Bates stamped
             002000001 through 46
 7
 8  Exhibit 5  Appendix XII to the NDA, entitled 103
             "Sildenafil Visual Summary"
 9  Exhibit 6  August 2008 version of the label  118
             for Viagra
10
11  Exhibit 7  Copy of the joint clinical review 120
             put out by the Food and Drug
12           Administration; review date is
             January 22nd, 1998
13  Exhibit 8  October 10, 2000, "Sildenafil:   172
             Glaucoma, Increased Intraocular
14           Pressure, Retinal Detachment,
             Retinal Hemorrhage, and Blindness,"
15           a report prepared by Pfizer
16  Exhibit 9  Letter from Dr. Richard Siegel to 178
             the editor of the Ocular Surgery
17           News
18  Exhibit 10  Chart based on the numbers that  194
              Mr. Altman provided the witness
19
20  Exhibit 11  May 23rd, 2000 memo from Shira   204
              Rohde to distribution, subject
21            Viagra PNP team meeting of
              27 April 2000
22  Exhibit 12  Document entitled "Response to   210
              Press Release and News Story
23            Regarding Viagra and Nonarteritic
              Anterior Ischemic Optic Neuropathy"
24
25
```

## 5

```
 1      E X H I B I T S - continued
 2  NO.   DESCRIPTION                      PAGE
 3  Exhibit 13  Document entitled "Dear Field    217
              Force Managers and Representatives,"
 4            Bates stamped 002184799 through 800
 5  Exhibit 14  Donahue case support entitled    245
              "Pupil-Sparing Third Nerve Palsy
 6            Associated With Sildenafil Citrate
              (Viagra)"
 7
 8  Exhibit 15  Article by Vobig, "Retinal Side   248
              Effects of Sildenafil"
 9  Exhibit 16  Article that is by Dr. Burton, a  249
              letter to the journal, letter is
10            entitled "Sildenafil (Viagra), A
              Cause of Proliferative Diabetic
11            Retinopathy"
12  Exhibit 17  Article by Murata, written in     250
              Japanese, with English abstract at
13            end of document
14  Exhibit 18  Article by Dr. Hotta              261
15  Exhibit 19  Article by Behn and Potter entitled 263
              "Sildenafil-Mediated Reduction in
16            Retinal Function in Heterozygous
              Mice Lacking the Gamma Subunit of
17            Phosphodiesterase"
18  Exhibit 20  Article by Dr. Vatansever and     270
              others
19
20  Exhibit 21  Article by LaVail and others      273
              regarding retinal degeneration in
21            the mouse
22  Exhibit 22  Article by Drs. Farber and Lolley 276
23  Exhibit 23  Document dated February 28th, 2000; 307
              FDA's response to public citizen
24  Exhibit 24  Dr. Osterloh's report prepared and 324
              submitted to the EMEA in 2002
25
```

2  (Pages 2 to 5)

**VERITEXT REPORTING COMPANY**
(212) 279-9424        www.veritext.com        (212) 490-3430

**6**

E X H I B I T S - continued

NO.   DESCRIPTION                              PAGE

Exhibit 25  Document dated December 6th, 2002,  324
by Jeanette Barrett of Pfizer

Exhibit 26  Report by Dr. Barrett dated June   326
28th, 2002

Exhibit 27  Paper entitled "The Potential     332
Utility of Data-Mining Algorithms
for Early Detection of Potentially
Fatal/Disabling Adverse Drug
Reactions:  A Retrospective
Evaluation" authored by Manfred
Hauben and Lester Reich

Exhibit 28  September 25th, 2002, telefax from  375
the EMEA

Exhibit 29  Gorkin article                     378

**7**

PROCEEDINGS

THE VIDEOGRAPHER:  Today's date is February
the 12th, 2009.  The time is approximately 9:17 a.m.
My name is Jamie Hollingsworth.  I'm the
videographer.  The court reporter is Donna Peterson.

We are present at the offices of Pharmaceutical
Development Group in Tampa, Florida.  We're here for
the purpose of taking the deposition of
Cheryl Blume, Ph.D.  The case is instituted in the
United States District Court, District of Minnesota.
The short style is In re:  Viagra Products Liability
Litigation.

I will now ask the attorneys to introduce
themselves, beginning with the plaintiffs' attorney.

MR. OVERHOLTZ:  Yes.  Neil Overholtz on behalf
of the Plaintiffs Steering Committee.

MR. ALTMAN:  Keith Altman on behalf of the
Plaintiffs Steering Committee.

MR. BECNEL:  Daniel Becnel on behalf of
Plaintiffs Steering Committee.

MR. SPATZ:  Mark Spatz for Pfizer.

MS. LESKIN:  Lori Leskin for Pfizer.

THE VIDEOGRAPHER:  Would the court reporter
kindly swear in the witness.

CHERYL BLUME, Ph.D., called as a witness by the

**8**

Defendant Pfizer Inc., having been first duly sworn,
testified as follows:

THE WITNESS:  I do.

JUDGE BORG:  Dr. Blume, I'm the referee here.

THE WITNESS:  Oh.

JUDGE BORG:  If -- if anybody says "objection"
when a question is asked of you, please hold up
until I tell you whether or not you can do that.

If you don't understand the question, or if it
isn't clear or if it's multiple or anything like
that, and you want the question reasked, feel free
to do that.  Okay?

THE WITNESS:  I will.  And, I'm sorry, I didn't
hear your name.

JUDGE BORG:  It's John Borg.

THE WITNESS:  Okay.  Nice to meet you.

JUDGE BORG:  Nice to meet you, too.

And any time that you need a break, just so
say.

THE WITNESS:  I will.

JUDGE BORG:  And we'll take one.  Okay?

THE WITNESS:  Thank you.

JUDGE BORG:  And we'll be breaking at about the
one-hour mark every -- each -- each hour anyway.

THE WITNESS:  Okay.

**9**

JUDGE BORG:  Thank you.

DIRECT EXAMINATION

BY MS. LESKIN:

Q.  Good morning, Dr. Blume.

A.  Good morning.

Q.  You're not an ophthalmologist, correct?

A.  Correct..

Q.  Is anyone on staff here at PDG an
ophthalmologist?

A.  No.

Q.  Did you consult with any ophthalmologist in the
preparation of your report in this case?

A..  No.

Q.  You've never diagnosed ischemic optic
neuropathy, correct?

A.  No.

Q.  Have you ever studied ischemic optic neuropathy
prior to this litigation?

A..  Yes.

Q.  In what concept -- in what context?

A.  In association with a new development project
that we are working on for a pharmaceutical client.

Q.  Is that a current client?

A.  It is.

Q.  Is the new development project you're working

10

1 on related to the treatment of erectile dysfunction?
2     A.  No.
3     Q.  Is the new development project you're working
4 on a phosphodiesterase type 5 inhibitor?
5     A.  No.  It is an inhibitor of GABA-transaminase.
6     Q.  As part of your work, have you determined the
7 cause of anyone's ischemic optic neuropathy?
8     A.  No.  I was not asked to do that.
9     Q.  You're not an expert in ocular blood flow, are
10 you?
11     A.  I mean, I've worked with ocular blood flow in
12 my work, but ocular blood flow is not the focus of my
13 career.
14     Q.  When you say you've worked with ocular blood
15 flow in your work, in what context?
16     A.  The development program that we are working on
17 impacts retinal blood flow.
18     Q.  When did you start working on that project?
19     A.  Approximately two and a half years ago.
20     Q.  Have you ever published any articles on ocular
21 blood flow?
22     A.  No.
23     Q.  Has anyone employed by PDG ever published any
24 articles on ocular blood flow?
25     A.  Well, I would have to check their publication

11

1 lists, but I am not familiar with any.
2     Q.  Okay.  Is anyone on staff here, to your
3 knowledge, an expert on ocular blood flow?
4     A.  We do not have any ophthalmologists on staff.
5     Q.  Do you have anyone who works with ocular blood
6 flow on staff?
7     A.  I would have to check their previous work, but
8 their only experience at PDG is with the development
9 program I discussed.
10     Q.  You're not a medical doctor, right?
11     A.  No.  I'm a pharmacologist.
12     Q.  And your Ph.D. is in pharmacology?
13     A.  Correct.
14     Q.  You don't diagnose patients' diseases, correct?
15     A.  That is correct.
16     Q.  Do you have any medical doctors on staff here
17 at PDG?
18     A.  We have had a medical doctor.  He recently
19 retired.  And we are looking for another one.
20     Q.  And when did he retire?
21     A.  Oh, I'd have to check the records.  It was in
22 2008, I believe.
23     Q.  And what was his name?
24     A.  Dr. Santalucio.
25     Q.  And did Dr. Santalucio help you prepare the

12

1 report in this case?
2     A.  I'd have to check the billing records on that,
3 but I do not believe so.
4     Q.  You don't prescribe medications to patients,
5 correct?
6     A.  No.  I'm a pharmacologist.
7     Q.  And that, in fact, would be against the law in
8 the state of Florida for you to write a prescription for
9 a patient, correct?
10     A.  Well, I've never checked that, but that would
11 be my understanding.
12     Q.  Okay.  You've never worked for the FDA?
13     A.  No.
14     Q.  You've never served on an advisory committee
15 for the FDA?
16     A.  Well, I've always, over the last 30 years,
17 represented industry, so I would not be eligible to be
18 serving as an active member of the advisory committee.
19 I have worked on two para-advisory committees with FDA,
20 one on antihypertensives and one on the elaboration of
21 electronic data submissions.
22     Q.  Okay.  You've identified that as a
23 para-advisory committee.  What do you mean by that?
24     A.  Because it was directed — not directed toward
25 the -- a particular drug product.  It was more a process

13

1 and a category of drugs, and not the approval of a
2 pending NDA.
3     Q.  You've never served on an advisory committee
4 for the FDA, correct?
5     A.  Correct.
6     Q.  And you're not an epidemiologist, correct?
7     A.  Of course we use epidemiology in our work, but
8 my Ph.D. is in pharmacology.
9     Q.  And so you personally are not an
10 epidemiologist?
11     A.  I personally am not an epidemiologist.
12     Q.  Do you have epidemiologists on staff here at
13 PDG?
14     A.  Yes.
15     Q.  And did that person help with the preparation
16 of the report in this case?
17     A.  In the review of literature, yes.
18     Q.  And what's the epidemiologist on staff's name?
19     A.  Darren Shearer.
20     Q.  When were you first contacted about the Viagra
21 litigation?
22     A.  I believe it was the late summer, early fall of
23 last year.
24     Q.  2008?
25     A.  2008.

4  (Pages 10 to 13)

CONFIDENTIAL

**14**

1    Q.   And who contacted you?

2    A.   I believe it was Mr. Overholtz.

3    Q.   And what did Mr. Overholtz tell you at the time

4 he first contacted you?

5    A.   That they were working with, I believe it was

6 with Viagra, and looking at different issues associated

7 with Viagra, and they were interested in talking with me

8 regarding a regulatory overview of those issues.

9    Q.   Had you worked with Mr. Overholtz before?

10   A.   Yes.

11   Q.   In which litigations had you worked with

12 Mr. Overholtz?

13   A.   Baycol.

14   Q.   Anything else?

15   A.   I'm not recalling any as I sit here, but I

16 would probably have to check my list, because oftentimes

17 there are groups of attorneys who work with cases.

18   Q.   Mr. Altman is here.  You've worked with

19 Mr. Altman before, correct?

20   A.   Yes.

21   Q.   On several litigations, right?

22   A.   And in my product development work, yes.

23   Q.   Okay.  What litigations have you worked with

24 Mr. Altman in?

25   A.   Let's see..  Baycol.  Neurontin.  Mirapex.  The

**15**

1 fenfluramine litigation, fentanyl litigation, and

2 isotretinoin.  And there may be others, but those are

3 the ones that immediately come to mind.

4    Q.   Did you work with Mr. Altman on the hormone

5 replacement therapy litigation?

6    A.   I don't recall on that litigation, since it was

7 largely a cancer end point, if we did an evaluation of

8 the adverse event databases.  But I may have, perhaps.

9    Q.   And -- but you worked on the hormone

10 replacement therapy litigation?

11   A.   Yes.

12   Q.   Did he work with you on Seroquel litigation?

13   A.   No.

14   Q.   Did you work on Seroquel litigation?

15   A.   I recall consulting on it.  I don't believe

16 I've been designated as an expert in it.

17   Q.   What question were you presented with in

18 connection with the Viagra litigation?

19   A.   As I recall, they -- the attorneys were

20 interested in a review of the regulatory events relating

21 to primarily the NDA for erectile dysfunction, looking

22 at the events subsequent to the initial approval of the

23 NDA, and examining, in a manner similar to what I do for

24 product development when I'm helping a client with

25 post-marketing work, a review of the literature

**16**

1 following approval.  A review of clinical studies or

2 Phase IV-type studies that may have been done after

3 approval, tracking of pharmacovigilance efforts

4 following approval, looking at various adverse event

5 databases, events outside the United States, if they

6 were applicable to events inside the United States.  An

7 overview of the handling of adverse events and labeling

8 information relative to what was going on at that

9 particular time point as it relates to FDA, comparing

10 that with other drug labeling.

11   Q.   Okay.  Walk me through the methodology that you

12 went through to answer those questions.

13   A.   Uh-huh.  Multiple tasks are conducted when

14 evaluating the postapproval events of a drug product.

15 Of course the first that is done is an overview of the

16 scientific literature.  We conduct our own literature

17 searches, our own literature surveys and evaluations.

18 We don't rely on literature that is provided to us.  I

19 think in this case we accessed 3300 literature articles

20 and had a working library, somewhat, of the retinal

21 issues because of our work with the earlier development

22 program.  So the literature was reviewed.

23       We also did an overview of the regulatory

24 events, relying on -- not only on the documents that

25 were provided to us by counsel, but we independently

**17**

1 accessed regulatory records in the United States.  And

2 if relevant, we will access them, also, from other

3 countries.

4       We also examined the regulatory events relating

5 to pharmacovigilance, so our -- we'll look at Phase IV

6 work, Phase IV studies that were done or were not done.

7 We asked Mr. Altman to evaluate the AERS database.

8       We then looked -- also looked at an overview of

9 the labeling chronology.  Our interest in this case was

10 of course the ophthalmic event, so we reviewed the

11 evolution of the labeling as it relates to ophthalmic

12 events, both those events that were precipitated by your

13 client, as well as those events that were triggered by

14 the Food and Drug Administration.

15       We looked at other labeling during the relevant

16 time period for these events to see how other companies

17 may have handled these events, in their discussion

18 points in the labeling, as well as if there was any

19 patient labeling.

20       And we reviewed the documents that were

21 provided to us, the company's documents that were

22 provided to us, primarily from the perspective of safety

23 updates to their regulatory submissions and the handling

24 of the ophthalmic events.

25   Q.   Anything else?

**18**

1  A.  I think that's it.
2  Q.  Okay.  If you think of anything else you did,
3  please let me know.
4  A.  I will.
5  Q..  Now, you said "we," so I want to kind of go
6  through and find out what you personally did and what
7  other people have done, and who those people are.  Okay?
8  A.  Uh-huh.
9  Q.  So the first thing you told me was that, "We
10  did a scientific literature review accessing about 3300
11  articles."
12  A.  Correct.
13  Q.  Did you personally do the literature review?
14  A.  No.
15  Q.  Did you review any of the articles?
16  A.  Yes.
17  Q.  Okay.  So who did the initial review?
18  A.  Well, it's done in a series of steps, and I
19  would have to check the assignment records.  But one of
20  the research associates would conduct the initial
21  literature search.  We have -- we are members of the
22  PubMed system, so we conduct our own PubMed searches at
23  the facility.  And the terms that were employed have
24  have been given to him by Dr. Sirois, S-i-r-o-i-s, who
25  is a neuropharmacologist on staff here.

**19**

1  The initial articles are examined for
2  relevance.  We obviously are not interested in articles
3  that are not in English.  We may also pare out articles
4  that are abstracts for articles for which we have the
5  full publications.  We would delete any articles that
6  didn't seem to be on target as it relates to Viagra or
7  some of the other drugs that were approved later.  So
8  the initial cut of the data -- initial cut of the
9  literature would be done by Dr. Sirois.
10  Following that, the literature is grouped
11  according to the topics of interest.  And while there
12  may be some overlap in literature into different topics,
13  we try to break them into the areas of the animal
14  pharmacology, animal toxicology, and then we follow the
15  same review sequence that we use for FDA.  We looked at
16  Phase I, if you will, type studies, healthy
17  volunteer-type studies, and then move into the clinical
18  programs.  We also look at reports of -- case reports of
19  adverse events, any -- any case series or post-marketing
20  events we can find.  If there is not adequate
21  information with the drug of interest, we may look at
22  pharmacologically or mechanistically similar drug
23  products.
24  I think -- I think that will be about it.
25  Q.  Okay.  My question was:  Who did the initial

**20**

1  review?
2  A.  The initial review, again, is done by
3  Dr. Sirois, according -- and is grouped according to
4  those topics that I mentioned.  And then as I begin the
5  development and writing of the report, I then go to
6  those literature articles and begin reading those
7  articles that are believed to be relevant.  And then as
8  I review those relevant articles, I will request which
9  additional articles that I want.  Oftentimes there will
10  be articles cited in a bibliography that we may not have
11  picked up, and I will ask for those articles as well.
12  Q.  Okay.
13  A.  So it is a process that goes on over several
14  months.
15  Q.  Okay.  But the initial review, which is my
16  question, the initial review was done by Dr. Sirois?
17  A.  Well --
18  MR. OVERHOLTZ:  I'm going to object to form.
19  Asked and answered.  What "initial review" means is
20  poorly defined by the questioner.  And she has --
21  the witness has answered the question now twice, in
22  detail, as to what was done.
23  JUDGE BORG:  Dr. Blume, do you understand the
24  question?
25  THE WITNESS:  Yes.  I thought I had answered

**21**

1  them.
2  JUDGE BORG:  Well, do you understand the
3  question?
4  THE WITNESS:  Yes.
5  JUDGE BORG:  Okay.  You're able to answer it?
6  THE WITNESS:  Yes.  The initial review was done
7  by Dr. Sirois.
8  MS. LESKIN:  Thank you, Doctor..
9  MR. BECNEL:  Let me add an objection.  I do not
10  intend to have repetitious questions over and over
11  asked in this deposition.  It's a cost.  It's not
12  cost effective, and it's costing my clients a lot of
13  money.
14  JUDGE BORG:  Okay.  The objection is overruled.
15  It's her time.  She gets seven hours.
16  You can proceed, Ms. Leskin.
17  MR. BECNEL:  It cannot be -- Judge, it cannot
18  be under the federal rules repetitious.
19  MS. LESKIN:  May I proceed?
20  JUDGE BORG:  Yes.
21  MS. LESKIN:  Thank you.
22  BY MS. LESKIN:
23  Q.  You told me that before Dr. Sirois actually did
24  the review, that there was a research associate who did
25  the PubMed search?

**22**

1    A.  Correct.
2    Q.  Okay.  Who was the research associate?
3    A.  I don't know.  I would have to check the
4  assignment logs.  I don't know.
5    Q.  Okay.  How many research associates do you have
6  on staff here?
7    A.  Four.
8    Q.  And what are their backgrounds?
9    A.  Let's see.  One of them is -- their
10  undergraduate degree is in, I believe, chemistry;
11  master's degree and their Ph.D. work is in epidemiology.
12       Another's undergraduate degree had biology and
13  chemistry.
14       Let's see.  A third one's undergraduate degree
15  was in public health, ongoing master's work also in
16  public health.
17       And the fourth one's undergraduate degree is in
18  business; and graduate program was in information
19  dissemination tools, communication tools.
20    Q.  Now, Dr. Sirois does the initial cut from the
21  articles pulled by one of the research associates.  Did
22  I understand that correctly?
23    A.  Well, the way it is conducted is:  The PubMed
24  search will provide thousands and thousands of articles
25  that fulfill the terms that were provided by Dr. Sirois,

**23**

1  and then some of them are automatically struck because
2  of language issues.  And Dr. Sirois will then look at
3  the list and make the selection on which of those
4  thousands and thousands of articles will actually be
5  ordered in full format for review.
6    Q.  Okay.  What term did Dr. Sirois provide to the
7  research associates?
8    A.  Multiple terms were provided.  Of course the
9  name, generic name and brand name, would have been used.
10  The listing of terms relevant to regulatory would be
11  used, such as preclinical, nonclinical evaluations,
12  Phase I, Phase II, Phase III, post-marketing.  And those
13  terms are used in conjunction with either Viagra, its
14  generic name.  A litany of adverse event terms would be
15  used, adverse medical events.  Post-marketing events in
16  general terms are used.  And then focusing in on
17  fatalities, we generally start the search with fatality
18  events, and then move to the events of interest.
19    Q.  Do you have a document that lists the research
20  terms that were actually used for the search in this
21  case?
22    A.  I don't, but it would probably be available
23  within the -- Dr. Sirois's records.
24       MS. LESKIN:  We'd request a copy of whatever
25  search terms were used to do the initial review.

**24**

1       MR. OVERHOLTZ:  I would object to that.
2       MS. LESKIN:  We'll follow up.
3       JUDGE BORG:  Overruled.
4  BY MS. LESKIN:
5    Q.  Do you have --
6       MR. OVERHOLTZ:  As soon as I can get a list of
7    search terms that Pfizer used to look for their
8    adverse events, then we'll start providing a list of
9    search terms.
10       JUDGE BORG:  Is that an objection?  Let's stick
11    to the objections, folks.
12       Go ahead.
13  BY MS. LESKIN:
14    Q.  Do you have a list of the articles that
15  Dr. Sirois culled from the original search group?
16    A.  Yes.  They're on your disk.
17    Q.  They're on the disk that was --
18    A.  Yes.
19    Q.  -- provided to us?
20       Thank you.
21       Are they organized by relevance as you've told
22  me that Dr. Sirois did?
23    A.  I doubt it.
24    Q.  Okay.  Are the full text of the articles or
25  just the titles provided?

**25**

1    A.  I believe that all the titles are on there, and
2  the text will be in there for those articles which
3  actually were employed in the report.
4    Q.  Did Dr. Sirois provide you with any written
5  summaries of any of these articles or just simply
6  provided you with the articles to review?
7    A.  We may have talked about the articles.  There
8  was no written summaries.  They were really rather
9  grouped into the categories that I was going to use for
10  evaluation for the report.
11    Q.  Okay.  The next thing you identified is that
12  you did an overview of the regulatory events.  Who did
13  that overview?
14    A.  Well, the report has a -- the brief overview of
15  the regulatory chronology of the NDA.  And I believe --
16  and again I would have to check the assignment records.
17  I believe the regulatory chronology was prepared by
18  Derek Gutowski.
19    Q.  I'm sorry.  Derek?
20    A.  Gutowski, yes.
21    Q.  And what are his qualifications?
22    A.  He is presently in the University of Florida
23  PharmD program.  And his undergraduate degree, I think,
24  is chemistry.  Might be biology.
25    Q.  Do you know how Derek went about preparing the

**CONFIDENTIAL**

**26**

1 regulatory overview?
2     A.   Yes.  The first issue is that we have -- track
3 the FDA database for the NDA number.  We also look for
4 regulatory events happening that may be relevant in
5 Europe.  We also receive documents -- had received
6 documents from the attorney and had an overview of what
7 regulatory documents we had received.  So we included
8 those in a regulatory chronology as well.  Then we moved
9 to the various labeling iterations and attempted to
10 track the labeling from its approval until the present..
11     Q.   And is Derek the one who wrote the regulatory
12 overview part of the report for this case?
13     A.   No.  I crafted it, but he assembled all of the
14 regulatory documents.  And then as I reviewed them, if I
15 needed more, we accessed the additional ones needed.
16     Q.   Now, the next thing you told me is that you did
17 a -- you looked at the regulatory events relating to
18 pharmacovigilance, including any Phase IV work.  Who
19 here did that work?
20     A.   Well, we would be tracking Phase IV studies in
21 the literature review that I just discussed, and we
22 would also be looking for any Phase IV studies that may
23 have been reported in the literature, either conducted
24 by Pfizer or conducted by others.
25           Following that, we would look at the Phase IV

**27**

1 documents that were provided in the document production,
2 various NDA annual reports, periodic safety update
3 reports, any Phase IV related overviews provided to the
4 regulatory authorities.  And then finally we would be
5 examining the FDA database.
6           MS. LESKIN:  Move to --
7           THE WITNESS:  For adverse medical events.
8           MS. LESKIN:  Move to strike; nonresponsive.
9 BY MS. LESKIN:
10     Q.   My question, Doctor, was:  Who here did that
11 work?
12           MR. OVERHOLTZ:  Your question is illogical,
13 because she explained to you, some of it was part of
14 the literature review, some of it was part of
15 another process that she previously described to
16 you.  So your question doesn't make sense.
17           JUDGE BORG:  Well, Doctor, are you able to
18 answer the question?
19           THE WITNESS:  Well, I thought I had.
20           Dr. Sirois assembled what he considered the
21 relevant literature.  Mr. Gutowski had reviewed the
22 regulatory -- assembled the regulatory chronology. .
23 I believe that Mr. Shearer looked at the studies and
24 assembled the -- attempted to assemble the various
25 labeling iterations employed.

**28**

1           MR. BECNEL:  May it please the Court.  The MDL
2 rules call for efficiency, not redundancy.  In fact
3 there's admonitions of lawyers for wasting time on
4 repetitious information.  I'd like to pull and ask
5 the special master to review the MDL manual that
6 calls for that.  Now, this is the second time that
7 we've heard her answer the same question over and
8 over, and that's a violation of the MDL manual for
9 complex litigation.
10           JUDGE BORG:  Then you should go see
11 Judge Magnuson.  I've read --
12           MR. BECNEL:  Well --
13           JUDGE BORG:  -- the Court's order -- I've read
14 the Court's order governing the depositions in this
15 case.
16           All objections are preserved, except as to form
17 and to privilege.  Now, that is not a form
18 objection.  The deposition is going to proceed.  The
19 objection is overruled.  Go see Judge Magnuson if
20 you want to, or we can call him.
21           And, Ms. Leskin, you can proceed.
22           MR. BECNEL:  Well, I would ask the Court, if it
23 has its computer, to pull the manual and read those
24 sections.
25           JUDGE BORG:  I'm reading the Court's order.

**29**

1           Let's go -- let's go forward, Ms. Leskin.
2 BY MS. LESKIN:
3     Q.   The next thing you told me was that you -- you
4 asked Mr. Altman to evaluate the AER database, correct?
5     A.   The FDA's adverse event database, yes.
6     Q.   Okay.  Did Mr. Altman provide you any written
7 work product from that?
8     A.   I was provided with adverse event counts and a
9 adverse event graphic summary, tabular summary.
10     Q.   Do you have that with you?
11     A.   I believe so.
12     Q.   Okay.  Is that on the disk that was provided to
13 us?
14     A.   I don't know.  I'd have to check that.  But I
15 can get a copy of it.
16           MS. LESKIN:  We would ask for the adverse event
17 counts and tabular summary provided to the witness
18 by Mr. Altman.
19           MR. OVERHOLTZ:  Okay.
20 BY MS. LESKIN:
21     Q.   Do you know which adverse events were counted
22 for you?
23     A.   Yes.
24     Q.   Which adverse events?
25     A.   I asked Mr. Altman to evaluate the adverse

8  (Pages 26 to 29)

**30**

1  event database from the launch of the product, I believe
2  through 2004 or '5 -- I'd have to check that -- and
3  using the same terms that were outlined -- outlined and
4  employed in the public citizen review of the AERS
5  database.
6      Q.  And what terms are those?
7      A.  Just one second. I'll get the adverse event
8  database so I -- there's a complete listing.
9          Ischemic optic neuropathy. Visual field
10  defects. Blindness. Blindness temporary. Blindness
11  unilateral. Scotoma. Optic nerve infarction. And I
12  think that's it.
13     Q.  Okay. And what document is that that you're
14  reviewing to get the answers to my questions?
15     A.  I'm on page 12 of my report. And this will be
16  on your disk as well. I cite October 20th, 2005
17  petition that was submitted to the FDA. And included
18  within that petition was an analyses of the FDA's AERS
19  database.. And those terms are listed on page 3 of 8 of
20  the petition.
21     Q.  The information that Mr. Altman provided you,
22  was that any different from the information that
23  summarized in the citizen petition report?
24     A.  Well, it was an amplification of the
25  information in this report.

**31**

1      Q.  In that it went up until the time of his review
2  of that?
3      A.  No. In that I asked him to do it on a yearly
4  basis instead of the cumulative information provided in
5  this petition.
6      Q.  Okay. And he provided that to you in tabular
7  form, you said?
8      A.  Yes, and in a graph.
9      Q.  Okay.
10         (Telephone interruption.)
11         THE WITNESS: I'm sorry.
12         THE VIDEOGRAPHER: We're off the video record.
13         (There was a discussion off the record.)
14         THE VIDEOGRAPHER: We are back on the video
15  record.
16  BY MS. LESKIN:
17     Q.  Other than the adverse events count and tabular
18  graph and summary that Mr. Altman provided to you, did
19  he provide any other information for you?
20     A.  I also asked him to evaluate the AERS database
21  for another drug product.
22     Q.  And what drug product was that?
23     A.  Protonix.
24     Q.  I'm sorry. Which product?
25     A.  Protonix.

**32**

1      Q.  And what is Protonix?
2      A.  Protonix is a drug -- a gastrointestinal drug
3  that inhibits the synthesis of various -- inhibits the
4  synthesis in the stomach of the various acids. And it's
5  used for GERD, reflux, ulcer-type conditions. It's a
6  proton pump blocker..
7      Q.  And what was the purpose of asking Mr. Altman
8  to review the Protonix database for you?
9      A.  Well, I was interested in Protonix because it
10  had ION in its labeling, I believe, as early as 2001.
11  So I was interested in magnitude of reports that
12  Proton -- that had been received for Protonix, since it
13  had added the term quite early in its labeling.
14     Q.  And the labeling you're referring to is the
15  Protonix section on post-marketing reports, correct?
16     A.  I believe I gave you copies of all the labeling
17  in that notebook. And I think it was in their overview
18  of the post-marketing adverse events.
19     Q.  And what did you learn from the review that
20  Mr. Altman gave you for Protonix?
21     A.  Well, I learned it was in their labeling -- I
22  think it was the 2001 labeling -- and that to date, to
23  the present time, I believe they have a total of eight
24  events in the FDA's AERS database. And as I recall,
25  most of those are categorized as nonsuspect.

**33**

1      Q.  Did you look at the adverse events that the --
2  the ION -- strike that.
3          Did you look at the ischemic optic neuropathy
4  events for Protonix other than the fact that they had
5  been reported? In other words, did you look at the
6  details of those adverse event reports?
7      A.  Well, his adverse event search was for ionic --
8  ION. And, no. All I looked at was the number of events
9  that had been received and serious and suspect status.
10     Q.  Do you know whether there is any proposed
11  mechanism for Protonix as to how it could possibly cause
12  ischemic optic neuropathy?
13     A.  I don't know.
14     Q.  Did you do any review to determine whether
15  there was any proposed mechanism for Protonix?
16     A.  I did a brief review, and I did not see a
17  specific mechanism for it. But they had it in their
18  labeling.
19     Q.  Did you review any -- well, do you know when
20  those adverse events have been reported?
21     A.  Yes. There have been, I believe, eight over
22  the entire -- entire approval period for Protonix. I do
23  not recall, sitting here, at what -- how many were in
24  each year. And I know that the term had been added in,
25  at least by the 2001 --

CONFIDENTIAL

34

1    Q.  And how many --
2    A.  -- iteration.
3    Q.  And how many of the adverse event reports had
4  been reported by the time that label update had been
5  made?
6    A.  I -- that's what I said.  I don't recall how
7  many were in each year.  I was interested in how many --
8  when I realized that they only had eight total, I'm not
9  as interested in how many each year because they only
10  have a total of eight.
11    Q.  Do you know how many people have taken
12  Protonix?
13    A.  I -- I am not familiar with its annual sales.
14  I know it is among the largest of the proton pump
15  blockers at this time, but I do not know its annual
16  sales, and nor was that really a focus of my interest.
17    Q.  Did you look at any clinical databases for
18  Protonix?
19    A.  I have not at this point, no.
20    Q.  Did you ask Mr. Altman to do any other work for
21  you?
22    A.  No..  I think that -- I think those were the
23  two -- my two interests.
24    Q.  You also mentioned that you did a labeling
25  chronology focusing on the ophthalmic events.  Who

35

1  prepared that labeling chronology for you?
2    A.  Well, again I'd have to check the assignment
3  logs.  I do not recall who specifically did it.  The
4  research associates are all trained in each of these
5  tasks, but --
6    Q.  Would you have records that indicate who did
7  the labeling chronology?
8    A.  Yes.
9    Q.  Do you have records as to how many hours each
10  person on your staff devoted to this case?
11    A.  I'd have to ask our -- our CPA.  I don't -- I
12  don't know how their -- how their hours are tallied and
13  then recorded.  I don't know.
14    Q.  Well, people who work here are asked to keep
15  track of their time, correct?
16    A.  Yes, of course.
17    Q.  Okay.  And you -- and you keep records for that
18  in order to bill --
19    A.  Yes.
20    Q.  -- the plaintiffs' lawyers, correct?
21    A.  Yes.
22    MS. LESKIN:  We would ask for a rundown of all
23  the people who have worked and billed time to this
24  matter from PDG.
25  BY MS. LESKIN:

36

1    Q.  You also said that you -- one other -- the next
2  step you said is, you looked at other labeling for these
3  events from other companies.  You've already told me
4  about Protonix.  What other companies did you look at or
5  products did you look at?
6    A.  As I recall, we looked at -- we were interested
7  in early inclusions of this term in professional
8  labeling.  And I recall we also reviewed Zyvox, the
9  antibiotic Zyvox, and the migraine agent sumatriptan, or
10  Imitrex.
11    Q.  Okay.  Zyvox.  Why did you look at Zyvox?
12    A.  They have an interesting approach with their
13  post-marketing, as I recall, information.  I believe
14  they had ophthalmic events in the -- in the
15  post-marketing section fairly early, I think around
16  2002.  But they handled their post-marketing information
17  by including events based on seriousness -- I believe
18  it's seriousness or number of events or information
19  relating to association and causation.  So they -- they
20  describe how they -- how they choose events for their
21  post-marketing.  But as I do recall, that antibiotic did
22  have an indication of a retinal event fairly early.  I
23  think it was 2002.
24    Q.  What type of ophthalmic events do they have on
25  their labeling?

37

1    A.  I'll have to check my labeling notebook for the
2  specific term that they use.  I think you have that.
3    Q.  I do.
4    A.  Optic neuropathies, they use..
5    Q.  Do you know how many reports of optic
6  neuropathies have been -- have been reported with Zyvox?
7    A.  If I have the information.  I know it isn't in
8  the top group in -- within the FDA's AERS database.  If
9  I had the specific number, I don't recall.
10    Q.  Do you know if there's any proposed mechanisms
11  to how Zyvox would cause optic neuropathies?
12    A.  I'd -- well, let me think.
13    Yeah.  I recall an article where they linked --
14  they -- they don't know, of course, how -- how it causes
15  it, and nor is causation a requirement for their
16  including it in the post-marketing events.
17    But I recall an article where they looked at
18  the same -- they -- they were look -- trying to see if
19  it was the same apoptotic mechanism that was related to
20  the myelosuppression events.  But that's -- that's as
21  much as I remember about it.
22    My interest was only how firms handled related
23  events during the time frame I was interested in, which
24  was 2000 and forward.  And Zyvox handled it by including
25  it because it had a set of criteria they use, which I

10 (Pages 34 to 37)

**38**

1 think is a good set of criteria, for when they include
2 events in their post-marketing section.  And one of them
3 is not the number of the events but potential
4 seriousness of the event.
5     Q.  And do you know if -- are you aware of any of
6 the regulatory discussions that went on prior to that
7 being added to their labeling?
8     A.  Oh, no, not yet.  I haven't been asked to
9 pursue this further, but I may..
10    Q.  Okay.  But for this litigation you have not,
11 correct?
12    A.  No.  Again, repeating what my interest was, is
13 how did companies handle these related terms and events
14 if they saw them after the product was launched.  Did
15 they include it in their labeling?  What was the
16 reasoning for including it in their labeling?  Were they
17 large contributors to their adverse event database or
18 were they isolated events?
19    Q.  Did you do an analysis of the -- of the Zyvox
20 database, adverse event database?
21    A.  No.  I was only interested in the ophthalmic
22 issue and if they put it in their labeling.
23    Q.  Okay.  So you didn't look at the overall Zyvox
24 database?
25    A.  No.  I haven't been asked to do that yet.  No..

**39**

1     Q.  Okay.  You also mentioned Imitrex..  What was
2 the reason for looking at Imitrex?
3     A.  I think it was one of the earliest ones that I
4 saw.  I think it was '98 or 1999.  That Glaxo included
5 it in their labeling.
6     Q.  Do you know how many adverse events they had
7 received before they put it in their labeling?
8     A.  No.
9     Q.  Did you do any type of analysis of the Imitrex
10 adverse event database?
11    A.  Well, I know the grouping of the products that
12 contribute to the ION events in the FDA database.  I
13 mean, sumatriptan is not in that group.  But other than
14 that, I did not do any more specific work other to --
15 than to know in 1999 they were adding ophthalmic -- at
16 least by 1999 they had added ophthalmic events.
17    Q.  Okay.  So you did not do any analysis of the
18 Imitrex adverse event database?
19    A.  No.  I haven't been asked to do that yet.
20    Q.  Okay.
21    A.  And the term that they added, at least by '99,
22 was ischemic optic neuropathy.
23    Q.  Can I just see that again, please?
24    A.  Uh-huh.
25    Q.  Thank you.

**40**

1     Now, you also said that we, PDG, reviewed
2 company documents that had been provided to you.
3     Who was responsible for reviewing the Pfizer
4 company documents?
5     A.  Well, it -- there is no one responsibility.  It
6 depends on the work that was being done for the various
7 topics that I outlined earlier.
8     So if a particular person was looking at the
9 labeling chronology, they would also access the Pfizer
10 documents that were provided to us for anything relating
11 to labeling.
12    The person who was looking at post-marketing
13 events would access the database and look for protocols,
14 final study reports of all of the post-marketing studies
15 that were conducted by the company or in the company's
16 database or documents relating to post-marketing
17 studies.
18    Whoever was interested in putting together the
19 regulatory chronology outside of labeling would access
20 the database for any documents that might be informative
21 or relating to meetings with FDA, phone calls with FDA,
22 telephone logs, those types of issues.
23    Q.  Your list of reviewed materials that was
24 provided to us with your expert report indicates that
25 you looked at the Pfizer production documents provided

**41**

1 in hard drive and CD.
2     A.  Yes.
3     Q.  Who provided you those documents?
4     A.  Well, the attorneys provided it to us, but I
5 don't know which office.  I can't recall.  I'd have to
6 track the records.
7     Q.  Do you know how many documents you were
8 provided?
9     A.  I think it's about -- as I recall, there was
10 around a half a million or 600,000 pages.  I think
11 around 34,000, 35,000 documents were on those disks.
12    Q.  Do you know -- well, let me ask you:  Was that
13 represented to you to be the entire production that
14 Pfizer made in this case?
15    A.  I don't know.
16    Q.  So you don't know if there's documents that
17 were provided to plaintiffs that were not provided to
18 you?
19    A.  I don't know.
20    Q.  Do you have an index of the documents that were
21 provided to you?
22    A.  I -- I'd have to check.  I believe so, but I
23 can't recall.
24    Q.  The materials that were provided to you, were
25 that -- are those on the disk that you gave us this

11  (Pages 38 to 41)

## 42

1  morning?
2      A.  Yes.
3      Q.  So that disk contains everything that you
4  reviewed or that the office here reviewed?
5      A..  Well, the disk includes the documents provided
6  to us, the documents we accessed independently, the
7  literature, labeling iterations.  And that doesn't
8  include materials that we have in-house.  Obviously I
9  didn't include CFRs and FDA guidances and those types of
10  issues, which would have been -- may have been
11  referenced during the --
12     Q.  Okay.
13     A.  -- review of records.
14     Q.  When you say that you --
15         MR. OVERHOLTZ:  Just to be clear on the record,
16     the disk cannot include the 200 gig hard drive or so
17     of the production, I mean.
18         MS. LESKIN:  Well, that's what I'm trying to
19     find out, is there's two -- there's what we provided
20     to you and there's what was provided to Dr. Blume.
21     And I'm trying to find out how close those two
22     things are.
23  BY MS. LESKIN:
24     Q.  So were there materials provided to you by the
25  plaintiff that were not included on the disk you

## 43

1  provided us today?
2      A.  No.
3      Q.  Okay.
4          MR. ALTMAN:  There's some confusion.
5  BY MS. LESKIN:
6      Q.  Now, you also indicate that on your list of
7  reviewed materials that you reviewed some depositions?
8      A.  Yes.
9      Q.  Now, do you have the page of the reviewed
10  material there in front of you?  If not, I can give you
11  a copy.
12     A.  I think that's in that notebook, the small
13  notebook.
14     Q.  Okay.  I have another list.  I'll give you a
15  copy of that.
16         What we'll do is, we'll go ahead and mark a
17     copy of your report.
18         (Exhibit No. 1 was marked for identification.)
19  BY MS. LESKIN:
20     Q.  Marked as Exhibit 1.  And I'll give you a
21  formal copy of your expert report that we received in
22  this case.  The last page of that report is entitled
23  "List of Reviewed Materials."  Do you see that?
24     A.  Yes.
25     Q.  And on that list, the fifth category -- the --

## 44

1  I'm sorry, the fourth category are depositions.  Do you
2  see that?
3      A.  Yes.
4      Q.  Okay.  And it says, "Depositions of
5  Stephen Watt, Stephen Kimmell, Sohan Hayreh,
6  Rachel Sobel, Peter Netland, Peter Ellis, John Gamel,
7  Ian Osterloh, Howard Pomerantz, Gregory Gribko,
8  Gerald McGwin, and Augustine Aruna."
9      A.  Yes.
10     Q.  Do you see that list?
11     A.  Yes.
12     Q.  Do you know who these individual people are?
13     A.  I think so.
14     Q.  Okay.  Well, first let me ask you.  Above that
15  it says, "Deposition of multiple Pfizer employees,
16  staff, and consultants."
17         Other than the people listed on the second
18  bullet, what other depositions did you look at?
19     A.  I reviewed depositions that I had from
20  Dr. Hauben, Manfred Hauben.
21     Q.  Anyone else?
22     A.  That's the only one I can remember now but --
23     Q.  Who in Manfred Hauben?
24     A.  He is Pfizer's international pharmacovigilance
25  and safety surveillance.

## 45

1      Q.  And what litigation was that deposition taken
2  in?
3      A.  I think -- I believe it was in the Neurontin
4  litigation.
5      Q.  Was there any protective order issued in the
6  Neurontin litigation?
7      A.  Oh, I'd have to check.  I don't recall.
8      Q.  Do you know if there's limitations on the use
9  of that deposition outside of the Neurontin litigation?
10     A.  I don't know.  I had read it for the Neurontin
11  litigation, and because his opinion on post-marketing
12  surveillance is important, I thought I ought to put a
13  line item in here for him.  I did not re-review it for
14  this litigation, but I had reviewed it for the Neurontin
15  litigation.
16     Q.  And does any of the testimony of Manfred Hauben
17  impact your opinion in this case?
18     A.  It could.
19     Q.  Well, I'm not asking if it could.  Does it?
20     A.  Well, depending on the question that is asked.
21  Yes.  I mean, I agree with what he says about the
22  importance of pharmacovigilance evaluation.  So, yes, it
23  would impact what I think.
24     Q.  Okay.  Are you relying on his testimony in the
25  Neurontin litigation for your opinion in the Viagra

**46**

1  litigation?
2  A. Oh, no. Oh, no.
3  Q. Are there any other depositions of multiple
4  Pfizer employees, staff, and consultants that you
5  reviewed other than the people listed in the second
6  bullet?
7  A. Yeah, that's the only one that comes to mind
8  right now. I don't know which ones I had -- was
9  thinking about when I first wrote the report, but I have
10 a list of the other -- I have a list of all of our
11 depositions. So I will look at it. If I'm asked to do
12 that, I will look at it and see if there's any other
13 ones.
14 Q. Well, did you review anyone -- any other
15 deposition other than the people listed on the second
16 bullet? Did you review any deposition in forming your
17 opinion in this litigation?
18 A. I don't recall the other ones that I read,
19 sitting here. But I can check the list and let you
20 know.
21 Q. We'd ask that at a break you check the list and
22 let us know today, please.
23     What's your understanding of who Stephen Watt
24 is?
25 A. I don't remember.

**47**

1  Q. How about Stephen Kimmell?
2  A. He is a consultant, ophthalmology consultant.
3  Q. What's your understanding of Dr. Hayreh,
4  Sohan Hayreh?
5  A. The same. For the -- yes, I believe that
6  Dr. Kimmell provided an opinion to Pfizer, and
7  Dr. Hayreh provided an opinion to the plaintiffs.
8  Q. Did you review their reports?
9  A. Oh, yes.
10 Q. Who is Rachel Sobel?
11 A. She's an employee of Pfizer. And I recall that
12 she's in the notebooks that I provided to you on
13 periodic safety update-related reports and
14 correspondence.
15 Q. Who is Peter Netland?
16 A. I believe he is an outside consultant. And I
17 have his report and his dep -- I have his report and
18 deposition.
19 Q. And who is your understand -- who -- for whom
20 is he consulting?
21 A. I think he gave a report indicating no
22 causation, so I think it was for Pfizer.
23 Q. How about Peter Ellis?
24 A. I believe he is an employee, as is Gamel and
25 Dr. Osterloh.

**48**

1  Q. And Howard Pomeranz?
2  A. Dr. Pomeranz provided the additional -- initial
3  literature relating to the ophthalmic findings. I
4  believe his first publication or presentation was in
5  1999, and then in 2000, 2005, perhaps 2002.
6  Q. I'm sorry.. So when you say that he provided
7  the additional literature --
8  A. Provided the --
9  Q. -- did he provide it --
10    MR. BECNEL: The initial.
11 BY MS. LESKIN:
12 Q.. -- to you?
13 A. The initial literature.
14    MR. BECNEL: The initial. Look.
15 BY MS. LESKIN:
16 Q. Okay. Well -- okay.
17    When he provided the initial literature, he
18 provided that to you?
19 A. No, to the literature.
20 Q. Okay. Gregory Gribko?
21 A. An employee.
22 Q. Gerald McGwin?
23 A. Dr. McGwin did the Phase -- one of the studies
24 that are referenced in my report.
25 Q. And Augustine Aruna?

**49**

1  A. I also have that opinion. I believe -- I
2  believe Dr. Aruna worked -- provided an opinion for the
3  plaintiffs.
4  Q. Have you been provided the report or deposition
5  transcript of Dr. Lee, Andrew Lee?
6  A. Yes, after -- yes. After I wrote the report, I
7  did.
8  Q. And what's your understanding who Dr. Lee is?
9  A. I understand -- let me think about Dr.. Lee.
10    I believe that Dr. Lee's deposition was just
11 recently taken, and he is a practicing -- practicing
12 physician and has consulted with the plaintiffs.
13 Q. Did you review the report or deposition
14 transcript of Dr. Williams?
15 A. Which Williams?
16 Q. John? John Williams.
17 A. No.
18 Q. Did you review the report or deposition
19 transcript of Dr. Witt?
20 A. If I did, I'm not recalling it at this time.
21 Q. Do you recall the report of Dr. Daniel Shamus?
22 A. Let's see. I know I cited documents of his in
23 my report with FDA issues, but I don't recall reading a
24 deposition of his.
25 Q. How about a report provided by him?

**50**

1    A.   Report.  I don't recall that.
2    Q.   The plaintiffs haven't provided you a copy of
3  that report?
4    A.   If they did, I'm just not recalling it now.
5  And I don't recall citing it in my report, although I
6  did cite his documents.
7    Q.   Do you know Dr. Simmons Lessell?
8    A.   No.
9    Q.   You haven't seen his report?
10   A.   If I did, I'm not recalling it.
11   Q.   Dr. John Mulcahy?
12   A.   No.
13   Q.   Haven't seen his report?
14   A.   All of these are going to be the same.  If I --
15 if I did have them, I'm not recalling it now.
16   Q.   Okay.  Were you provided any briefs or court
17 submissions from this case?
18   A.   I think just the original -- yeah, I think I
19 cited that I had the original, a brief complaint, I
20 guess it was called.  I'm not sure what it's called.
21 But I do recall -- I have listed here "plaintiffs
22 complaint," so yes.
23   Q.   Whose complaint?
24   A.   Two names are on it.  Let me think.  Stanley
25 and Martin.  Stanley and Martin.

**51**

1    Q.   Okay.  But you weren't provided any briefs that
2  were submitted to the Court?
3    A.   I seem to recollect seeing something that was
4  submitted.  I -- it must have been after I wrote the
5  report.  I just don't -- I vaguely remember seeing
6  something else; I just don't recall what it is.
7    Q.   Would that be in any of the materials you have
8  here in this room?
9    A.   No.
10   Q.   Do you have any other materials or files for
11 Viagra litigation?
12   A.   I believe that I have a copy of the citizens --
13 the Stanley and Martin complaint and the other complaint
14 that I saw -- not a complaint.  I think it was some
15 filing to the Court.  I don't think I spent a lot of
16 time on it, because I can't remember what it is.
17   Q.   At a break, perhaps you can locate that and
18 tell us what it is after the break.
19       Have you seen any court orders issued by the
20 Court?
21   A.   I received a subpoena for the deposition.
22 That's all I recall.
23   Q.   But nothing -- no order written by the Court or
24 issued by the Court, that you can recall?
25   A.   Relating to what?

**52**

1    Q.   The Viagra litigation.
2    A.   Just -- just the subpoena.
3    Q.   Are you -- you told me that you saw some
4  reports from other experts in the litigation, from this
5  list that we just went through.
6    A.   Yes.
7    Q.   Are you relying on those reports at all in
8  reaching your opinion in this case?
9    A.   Well, I reviewed them, but not -- no.
10   Q.   You're not offering an opinion in this case
11 that Viagra causes NAION; is that right?
12   A.   I haven't been asked to do that, no.
13   Q.   So you're not giving an opinion as to whether
14 or not Viagra can cause NAION?
15   A.   Well, yes, I am not giving that opinion.
16   Q.   Okay.  And you are not offering an opinion that
17 Viagra caused Mr. Martin's NAION?
18   A.   Yes, I am not offering that opinion either.
19 Either way, I don't know.
20   Q.   Okay.  And you're not offering an opinion that
21 Viagra caused Mr. Stanley's NAION?
22   A.   Again, I haven't been given that information, I
23 haven't been asked to do that, and I am not going to do
24 that.
25   Q.   Okay.  When I say "NAION," you understand that

**53**

1  I'm referring to nonarteritic anterior ischemic optic
2  neuropathy, correct?
3    A.   I do.
4    Q.   Okay.  Just easier to say "NAION."
5        What is NAION?  What's your understanding of
6  NAION?
7    A.   My understanding of NAION is that it is the
8  nonarteritic form.  And to make it easy, the arteritic
9  form is that form that is generally associated with
10 autoimmune diseases, inflammatory of the giant cells,
11 generally treated with steroid-type therapy.
12       Nonarteritic ION is an ischemic condition that
13 is not related to the giant cells and leads to a process
14 by which the ciliary bodies supplying the optic nerve
15 are believed to be deprived of the necessary oxygen
16 needed to convert the visual -- the visual signals that
17 we see to the electrical signals that are transferred to
18 the brain for vision.
19   Q.   And what's the basis of that opinion?
20   A.   You want me to -- I've listed the citations, in
21 this report, that I have relied upon.  But additionally
22 I've worked with GABA-transaminase inhibitors who are
23 also believed to cause a direct retinal toxicity and
24 lead to similar optic ischemia and a perturbation in a
25 ferrin optic nerve transfer as a result of that oxygen

14  (Pages 50 to 53)

**54**

1  loss.
2      Q..  I'm looking at page 12 of your report, which is
3  where you first talk about NAION, or at least a
4  condition of NAION.  Is that where you're referring to?
5      A.  Well, I certainly introduce it there.  And then
6  I think if you continue through the report, you will see
7  a listing of references that look at -- that attempted
8  to look at various characteristics of and perhaps
9  mechanisms of, although that was really not a focus of
10 my report.
11     Q.  Right.  So my --
12     A.  Page 18.
13     Q.  What on page 18 shows the -- your understanding
14 of what NAION is?  I'll make this simpler.  My -- I'm
15 just going back to my original question, was:  What is
16 the basis of the opinion?  And you said that you had
17 citations in the report that you relied on, as well as
18 your other work.  So I'm just trying to figure out which
19 citations you're relying on for your understanding of
20 what NAION is.
21     A.  Well, these citations relate to various
22 potential mechanisms that lead to the oxygen
23 deprivation.  And that was the question that I was
24 answering.
25     Q.  Okay.  Which citation?

**55**

1      A.  Okay.  Beginning in 18, we can start, I think
2  the first one that I add is Mahmud's article relating to
3  biphasic hypotensive effect associated with the PDE5
4  inhibitors.
5      Q.  Okay.  Let me just stop you there real quick.
6      I see your reference in the first -- top
7  paragraph to Mahmud for the hypotensive effect of
8  Viagra.
9      A.  Okay.
10     Q.  Is that -- am I -- is that the article you're
11 referring to?
12     A.  Yes.
13     Q.  Okay.  And is it your testimony that Mahmud
14 refers to NAION?
15     A.  No.  He refers to the hypotensive effect.
16     Q.  Okay.  I'm -- just now, I really just want to
17 know which articles you're relying on for your
18 understanding of what the condition known as NAION is.
19     A.  You're asking for general textbooks that I may
20 have used for NAION?
21     Q.  I'm asking what the basis of your opinion is.
22 You told me that you had citations in the report.  I
23 want to know which citations in the report you're
24 referring to.
25     A.  Well, beginning on page 12, I reference several

**56**

1  clinical articles that have examined patients with
2  NAION.  And I would also offer, as I said earlier, that
3  I did not include textbooks in this report.  But I'm
4  quite certain that I also looked at Harrison's Textbook
5  of Medicine.  I probably looked at the Martindale
6  review, as well as reviewing these articles, and
7  previous work that I have done with oxygen deprivation
8  of the ciliary bodies relating to the optic nerve.
9      Q.  Okay.  So even though you didn't cite
10 Harrison's or the Martindale review, those are materials
11 you relied upon in creating your report, right?
12     A.  Well, they're reference materials that I use in
13 all my work, both work for product development as well
14 as for work with individual drug products.
15     Q.  Okay.  Did you use them to create this report?
16     A.  I can't tell you if I went back and relooked at
17 their chapter on ischemic optic neuropathies.  I don't
18 know.
19     Q.  Well --
20     A.  I've worked with it in the past, so it probably
21 wasn't necessary for me to go back.  But I may have.
22 But I cite, probably, in here 30 or 40 clinical articles
23 that have examined patients with ION or NAION, so I'm
24 sure my knowledge is an accumulation of all of this
25 work.

**57**

1      Q.  What's the background rate of NAION in the
2  general population?
3      A..  Well, I'm only aware of the, I believe, the two
4  studies that I quote in here.  And one is, I believe, 2
5  in 100,000.  And the other one is 10 in 100,000.
6      Q.  And what's the background rate of NAION in men
7  over 60?
8      A.  Oh, I guess it's between 2 and 10.  I don't --
9  I don't know specifically for them.  My opinion isn't --
10 isn't based on the background rate.
11     Q.  Okay.  And you don't know what that background
12 rate is for older men, correct?
13     A.  I don't specifically know where in that
14 category they fall, no.
15     Q.  Do you know what the background rate for NAION
16 is in men with cardiovascular disease?
17     A.  I would imagine it's on the higher end of it,
18 but I don't have a specific number.
19     Q.  Okay.  And do you know what the background rate
20 is for NAION in men with erectile dysfunction?
21     A.  No.  Remember, regulatory opinions, we are
22 directed by FDA that background incidences do not impact
23 the way we handle labeling or information relating to
24 diseases.  In fact, we are specifically directed not to
25 consider background incidences.  We are looking at an

58

1   adverse event and deciding what to do with it from a
2   regulatory perspective.
3       MS. LESKIN:  Move to strike as nonresponsive.
4       MR. BECNEL:  Objection.  How is it
5   nonresponsive?
6       MS.. LESKIN:  There was no question pending.
7       JUDGE BORG:  There was no question to the
8   witness, I believe.  Sustained.
9       MR. BECNEL:  Object to the special master's
10  ruling.
11      MR. OVERHOLTZ:  I object as well.
12      JUDGE BORG:  Overruled.
13      MR. BECNEL:  I can put the objection on the
14  record.
15      JUDGE BORG:  Well, I've got to rule on it,
16  don't I?
17      MS. LESKIN:  All objections are preserved.
18  BY MS. LESKIN:
19  Q.   Now, you have some discussion in your report
20  about the effect of sildenafil on PDE6, right?
21  A.   Yes.
22  Q.   And you understand that PDE6 is a different
23  phosphodiesterase enzyme than PDE5, correct?
24  A.   It's a different iso form of it, yes, I do
25  understand that.

59

1   Q.   And the affinity for Viagra on
2   phosphodiesterase type 5 is different than the affinity
3   for Viagra on phosphodiesterase type 6?
4   A.   There is a tenfold difference, one magnitude
5   difference, which in the -- in terms of affinity is --
6   is a relatively minor difference, a tenfold difference.
7   Q.   Do you know how sildenafil's effect on PDE6
8   compares to other ED treatments?
9   A.   No..
10  Q.   Now, PDE6 is found in the rods and the cones of
11  the retina, correct?
12  A.   Yes.
13  Q.   And what role does PDE6 play with respect to
14  vision?
15  A.   It is believed in the transfer of the visual to
16  electronic stimuli that it increases — let me think --
17  it increases membrane permeability on the outer membrane
18  of the rods and cones.
19  Q.   And what role does PDE6 play with regard to
20  blood flow?
21  A.   PDE6 is a vasodilator which leads to increased
22  blood flow in which increase -- responsible for the
23  increased membrane permeability.
24  Q.   And what's the basis for that?
25  A.   That vasodilators are usually associated with

60

1   increased blood flow.
2   Q.   That PDE6 is a vasodilator?
3   A.   Are you -- are you asking me what in here?
4   Q.   What is your basis for your statement that PDE6
5   is a vasodilator?
6   A.   PDE6 and PDE5 have similar actions, although a
7   magnitude difference in the binding capacity.  My
8   understanding is that both of them lead to vaso -- both
9   of them will trigger a vasodilatation.
10  Q.   Okay.  And what is that understanding based on?
11  A.   Okay.
12      Okay.  I cite the work of --
13  Q.   What page?
14  A.   Beginning on page 12.  I cite the work of Roth,
15  Hayreh.. I have several studies on page 13 relating to
16  Pfizer-sponsored studies.
17      Let's see.  Who else is sponsoring here?
18      The work of Mahmud mentions it.  Biphasic flow
19  was presented by Hotta in '98.  A 2003 review article by
20  Vatansever.
21      Let's see.  I think that's it.
22  Q.   Okay.  You said that you -- let's go back to
23  page 12.  You said you cite to the work of Dr. Roth.  Is
24  it your testimony here today that the work of Dr. Roth
25  establishes that PDE6 is a vasodilator?

61

1   A.   No.  I recall in one of the reports that he had
2   written, regarding the patients that he had seen early
3   in Germany, that he had noted in one of the patient
4   reports in there, question, "blood flow changes."  So
5   that was the first time that I can recall seeing it by
6   someone.
7   Q.   Okay.  Which document is that?
8       JUDGE BORG:  Four minutes, Counsel --
9       MS. LESKIN:  Thank you.
10      JUDGE BORG:  -- on the tape.
11      THE WITNESS:  Oh, I don't know which of the
12  specific ones.  I have -- I have a whole series of
13  Roth patient reports in the database.
14  BY MS. LESKIN:
15  Q.   Okay.  And is it -- now, you said that it says
16  "blood flow changes"?
17  A.   Question mark, I believe.  That's the first
18  time I've seen -- I think that was Roth's work.
19  Q.   Okay.
20  A.   Now, he publish -- did not publish that aside
21  in a separate article.  He just notes it in a patient
22  report.
23  Q.   As a possible reason for why that patient had
24  glaucoma, correct?
25  A.   Oh, I don't know if it was one of his glaucoma

16 (Pages 58 to 61)

**62**

1  patients or one of the glaucoma patients that also
2  suffered from loss of sight.
3      Q.  Okay.
4      A.  He reports a series.  And some have glaucoma
5  alone.  And some have sight loss.  And some have
6  glaucoma and sight loss recorded.
7      Q.  Okay.  And -- and we'll come back to talk about
8  Dr. Roth's patient series.
9          But is it your testimony that Dr. Roth
10  concluded that the inhibition of PDE6 affected blood
11  flow?
12      A.  No.  I was just trying to give you an overview
13  of everything that I put in the report -- everything I
14  recall where blood flow was --
15      Q.  I'm not asking --
16      A.  -- mentioned relating to Viagra.
17      Q.  Okay.  I'm not asking about blood flow.  You
18  had made the statement that PDE6 is a vasodilator.  I
19  want your citation for your support for that statement.
20      A.  Well, I -- PDE6 leads to -- can lead to
21  vasodilatation, yeah.
22      Q.  Okay.  I want the support for that statement.
23      A.  I gave it to you.
24      Q.  You're telling me that Dr. Roth's question mark
25  about blood flow is support for your conclusion that

**63**

1  PDE6 is a vasodilator?
2      A.  No.  I was just trying to be complete and
3  answer everywhere in the port -- report where that was
4  addressed.  And I recall in his patient series that he
5  had made that notation.
6      MS. LESKIN:  Okay.  We need to change the tape,
7  so let's go off the record.
8      THE VIDEOGRAPHER:  We're off the video record.
9      JUDGE BORG:  Let's take five minutes.
10      (Recess from 10:35 a.m. until 10:54 a.m.)
11      THE VIDEOGRAPHER:  We are back on the video
12  record.
13  BY MS. LESKIN:
14      Q.  I just want to go back, Doctor.
15          Right before the break, I had asked you the
16  question:  "What role does PDE6 play with regard to
17  blood flow?"
18          And you answered:  "PDE6 is a vasodilator which
19  leads to increased blood flow."
20      A.  Right.  I thought about that when I left, and I
21  think I was talking too quickly.  Let me clarify.
22      Q.  Okay.  Well, let me ask you a question again.
23          What role does PDE6 play with regard to blood
24  flow?
25      A.  It's the inhibition of -- let me -- let me

**64**

1  answer that by going backwards a little bit.
2          PDE5 first.  PDE5 inhibition of the
3  phosphodiesterase activity leads to an accumulation of
4  what we'll just abbreviate as GMP.  And GMP leads to
5  vasodilatation.  We have no idea all of the places where
6  phosphodiesterase-5 or its inhibition may be impacted in
7  the body, but we certainly know it leads to an overall
8  systemic lowering of the blood pressure.
9          We know that PDE6 is in other areas of the
10  body.  We know that it is in the rods and cones of the
11  retinal cells, and that inhibition of PDE6 just in the
12  rods and cones area are believed to affect, as I noted
13  earlier, increased membrane permeability, maybe some
14  perturbation in the apoptotic cycle, and may be
15  responsible for the blue-green tinge that we hear about
16  with -- with various agents, including the erectile
17  dysfunction drugs.
18          As it relates to phospho -- inhibition of
19  phosphodiesterase, phosphodiesterase is responsible for
20  degrading and removing GMP levels.  So inhibition of
21  phosphodiesterase inhibits, if you will, the inhibition,
22  so you have an increase in the -- the activity of GMP.
23          Now, as it relates to the blood flow, your
24  question, the blood flow in the eye, I don't know if
25  anyone is exactly sure how the blood flow is influenced.

**65**

1  Is it a result of a direct action in the eye or is it a
2  result of the fact that there is a systemic lowering of
3  blood pressure; that lowering of blood pressure is
4  bodywide, systemwide, leads to lowering of blood
5  pressure, leads to vasodilatation?  We see it
6  systemically.  We see it, also, within the eye.
7          So I hope that clarifies what I was saying
8  before the break.
9      Q.  So is it your testimony that the inhibition of
10  PDE6 has an ultimate effect on blood flow?
11      A.  I don't know if that's the case or if it is the
12  systemic effect.  I think -- I know that it has an
13  effect on PDE5, and that leads to an increase in the
14  blood flow in many areas, I mean in -- well, certainly
15  in the lung, with the erectile dysfunction actions.  And
16  it translates, also, to increased blood flow in the eye.
17      Q.  Okay.
18      A.  But the inhibition of the PDE6 in the rods and
19  cones is a separate action, and that may well be --
20  underlie the effects on the perceived observations of
21  blues and greens.
22      Q.  Do you have any support for a conclusion that
23  the inhibition of PDE6 has an effect on blood flow?
24      MR. OVERHOLTZ:  Object to form; asked and
25  answered.

17  (Pages 62 to 65)

66

1    JUDGE BORG: Tell me where in the form.
2    MR. OVERHOLTZ: I believe that she just said
3  that -- she said she didn't know whether PDE6 --
4  inhibition of PDE6 had an effect on blood flow or
5  that it was the PDE5. And then she --
6    JUDGE BORG: And the question?
7    MS. LESKIN: Do you have any support for a
8  conclusion that the inhibition of PDE6 has an effect
9  on blood flow?
10    MR. OVERHOLTZ: So my -- my -- my objection is,
11  there's a lack of foundation that there is such a
12  conclusion that's an effect of PDE6.
13    JUDGE BORG: Dr. Blume, do you understand it?
14  Are you able to answer that question?
15    THE WITNESS: I'm not exactly sure that I
16  understand --
17    JUDGE BORG: Okay.
18    THE WITNESS: -- what this question is and how
19  it differs from what I just answered.
20    JUDGE BORG: Well, I appreciate that. But do
21  you understand the question?
22    THE WITNESS: Yes, I think so.
23    JUDGE BORG: Okay. Okay. And you're able to
24  answer it?
25    THE WITNESS: Well, yes, with -- but my answer

67

1  is: I -- I don't know if inhibition of PDE6 also
2  causes that. I don't know if anyone knows that.
3  But my interpretation of its effects -- of the
4  effects of the erectile dysfunction drugs in the eye
5  are independent of that.
6  BY MS. LESKIN:
7    Q.  Are you aware of any evidence that Viagra's
8  effect on PDE6 is related to NAION?
9    A.  Viagra inhibits PDE6, and PDE6 is --
10    Q.  Are you aware --
11    A.  -- my understanding is, its actions in the rods
12  and cones are more associated with the perceived color
13  changes.
14    Q.  Are you -- is it your opinion that an
15  inhibition of PDE6 can cause NAION?
16    A.  I don't know. I don't know if anybody knows
17  that. I don't know.
18    Q.  And you're not offering that opinion today,
19  correct?
20    A.  I don't know. I believe that Viagra's effects
21  on NAION are independent of that action, but I don't
22  know if PDE6 also has some function on blood flow within
23  the eye.
24    Q.  Are you aware of anyone who has put forth the
25  theory that Viagra's effect on PDE6 causes NAION?

68

1    A.  I don't know of that. I don't think we know
2  enough about the distribution of PDE6 outside the rods
3  and cones to answer that.
4    Q.  I -- that's -- I just want to answer my -- my
5  question is very different than that, I think.
6      Are you aware of anyone who has put forth the
7  theory that the effect of -- on PDE6 is what causes
8  NAION?
9    A.  I am not aware of that.
10    Q.  Would studying the effect of Viagra on PDE6 --
11  well, strike that.
12      Do you know what glaucoma is?
13    A.  Increase in intraocular pressure.
14    Q.  And what's the basis for that?
15    A.  That I know that answer?
16    Q.  Yes.
17    A.  I just -- I don't know. I mean, I've known it
18  for years. I've worked with beta blockers.
19    Q.  Is it your opinion that glaucoma is related to
20  NAION?
21    A.  In the etiology of NAION?
22    Q.  Yes.
23    A.  No, I don't believe that I've said that. I
24  know that intraocular pressure can impact distribution
25  of blood flow; so I guess indirectly it could be

69

1  involved in the flow -- blood -- in blood flow within
2  the eye. But I haven't specifically connected.
3    Q.  And are you aware of anyone who has put forth
4  the theory that glaucoma is causally related to NAION?
5    A.  That glaucoma causes NAION?
6    Q.  Correct.
7    A.  I recall a discussion in one of the expert's
8  report about the impact of intraocular pressure in blood
9  flow. But other than that, I don't remember anything
10  else.
11    Q.  Would a study of the incidence of glaucoma
12  provide any insight on the incidence of NAION?
13    A.  I don't know. I don't know.
14    Q.  Do you know what third nerve palsy is?
15    A.  No.
16    Q.  Is it -- do you have an opinion as to whether
17  third nerve palsy is related to NAION?
18    A.  No.
19    Q.  Are you aware of any study demonstrating that
20  third nerve palsy is related to NAION?
21    A.  No.
22    Q.  Do you know what retinitis pigmentosa is?
23    A.  I recall that it's in the labeling. I think --
24  it's in the labeling of several drug products. But --
25  but I'm not -- I'm not familiar with them.

18  (Pages 66 to 69)

**70**

1    Q.  Do you know whether retinitis pigmentosa is
2  related to NAION?
3    A.  No.
4    Q.  Are you aware of anyone who says that retinitis
5  pigmentosa causes NAION?
6    A.  No.  I just recall seeing it as an exclusion
7  criteria in some of the ophthalmic studies.
8        MR. OVERHOLTZ:  Lori, this is such a waste of
9  the Court's time, our time, everybody's time.  We
10  have never ever come into this court, none of our
11  expert report, none of our testimony, none of our
12  depositions have ever attempted to link any of the
13  issues that you're going over now, out of your
14  little outline that somebody's prepared for you,
15  that any of these conditions are related to NAION.
16  Can't we keep this deposition limited to the topics
17  in her report so we can get through this?  This is a
18  complete waste of time.
19        JUDGE BORG:  The objection I think I understand
20  is overruled.  Let's proceed.
21  BY MS. LESKIN:
22    Q.  Do you know what diabetic retinopathy is?
23        MR. OVERHOLTZ:  Judge, I have to restate this
24  objection.  This expert has not offered any opinions
25  related to these issues she's questioned about;

**71**

1  neither have any of our other experts.  This is just
2  a waste of her time..  I don't -- setting up some --
3  I don't know even know what it's about, if it's
4  setting up some kind of defense in some other case
5  they have pending, but this expert is not here for
6  these issues.
7        If someone else -- if somebody else has sued
8  Pfizer and claims that because it can cause
9  retina -- is contraindicated in the people with
10  retinitis pigmentosa, that that's how it causes
11  NAION, then go take the depositions of their experts
12  about those issues.  But wasting our expert's time,
13  our time, your time, all on the clock while they
14  bill and ching, ching, ching, while our clients
15  suffer with blindness, is just an unbelievable
16  affront, and it's -- it's unbearable.  It's
17  unbearable what we've said.
18        They've now spent more time deposing our
19  witnesses in this litigation than we have spent
20  deposing Pfizer.  It's ridiculous.  This massive
21  corporation has hundreds of employees working on
22  this drug.  They've now deposed more people, more
23  times, more hours than we've deposed them.
24        MR. BECNEL:  I need to put for the record that
25  this MDL is out of control financially in terms of

**72**

1  the method of Pfizer doing discovery and the
2  irrelevant nature of their questioning concerning
3  every issue dealing with every other piece of
4  litigation Pfizer is involved with, and that that's
5  improper.  It violates the rules of the MDL manual
6  on complex litigation.  And it's continued
7  throughout the course of this supposedly,
8  quote/unquote, discovery, and that is not
9  appropriate; and, therefore, you leave me no
10  alternative but to file a complaint dealing with
11  these issues.  And I will so file.
12        MS. LESKIN:  Go for it.
13        MR. BECNEL:  I always do.
14        JUDGE BORG:  Your objections are noted for the
15  record.  They are overruled.  I'm following the
16  Court's order regarding depositions.  If you wish a
17  protective order or some other guidelines from the
18  Court, then I think you need to get them from the
19  Court.
20        MR. OVERHOLTZ:  Okay.  Just let me say that
21  that's fine.  I understand your ruling.  If
22  questions continue today outside of the scope of her
23  report, outside the scope of the opinions that she
24  has given, I'm going to file a motion for protective
25  order and end the deposition.  I just want to put

**73**

1  counsel on notice of that.
2        MS. LESKIN:  Can -- you know what?  Can we go
3  outside of the presence of the witness?  And I will
4  make a proffer so that we can stop this interruption
5  and I can proceed with my deposition in an efficient
6  manner.
7        JUDGE BORG:  Well, let -- do you want to do
8  that right now --
9        MS. LESKIN:  Yes.
10        JUDGE BORG:  -- or do you want to proceed with
11  the deposition?
12        MS. LESKIN:  No.  I want to do that right now,
13  because I want to stop being interrupted after every
14  other question.
15        JUDGE BORG:  All right.
16        Dr. Blume, would you mind excusing us here,
17  please?
18        THE WITNESS:  No, of course not.
19        (Dr. Blume exited the proceedings.)
20        MR. BECNEL:  It is the most amazing thing I've
21  ever heard of for Ms. Leskin to say she wants to
22  stop objections.  In the deposition of Dr. Hayreh,
23  every other question was objected to.  Every other
24  question.
25        JUDGE BORG:  Okay.  It's Ms. Leskin's turn to

19  (Pages 70 to 73)

### 74

1  respond to your -- both of your objections.
2      MS. LESKIN: I will start on page 12 of her
3  report. "Soon after product launch, Pfizer quickly
4  became aware of additional ophthalmic adverse events
5  associated with Viagra from a variety of sources."
6      She then goes on to cite Dr. Watt's "Adverse
7  Event Reports on Glaucoma."
8      She continues later on, on page 18 -- 16,
9  "Pfizer was also aware of reports of a number of
10  other ophthalmic adverse events, including NAION."
11     And she cites, at the bottom of the page,
12  "Additional adverse ophthalmologic events in
13  association with sildenafil have been published in
14  the medical literature," including Donahue, which is
15  a third nerve palsy case; Vobig, which refers to ERG
16  changes; Burton, which is diabetic retinopathy;
17  Murata, which is a Japanese case involving central
18  serous chorioretinopathy, which is a retinal
19  detachment; Tripathi and O'Donnell, which is branch
20  retinal artery occlusion; Gabrieli, which is visual
21  halos; Luu, which is ERG effects; Balacco, which is
22  ERG effects.
23     (Reporter clarification.)
24     MS. LESKIN: Luu, ERG effects. Balacco,
25  B-a-l-a-c-c-o, ERG changes. Bertolucci, which is a

### 75

1  hemi-retinal artery occlusion due to sex. Allibhai,
2  A-l-l-i-b-h-a-i, another central serous
3  chorioretinopathy. Jagle, again looking at the ERG
4  differences. Marsh, retinopathy of prematurity.
5  Quiram, serous macular detachment.
6      And she goes on. She refers to other adverse
7  event reports throughout. She talks about exposure
8  of --
9      MR. OVERHOLTZ: Talking about things --
10     MS. LESKIN: Hold on.
11     MR. OVERHOLTZ: It's a pretty long proffer.
12  Okay?
13     MS. LESKIN: Okay. Well, let me finish my
14  proffer. You had hours and --
15     JUDGE BORG: Okay. Finish.
16     MR. BECNEL: What hours have we had?
17     JUDGE BORG: Wait, wait, wait. Whoa. Stop it.
18     MR. BECNEL: Wait. I want to know what hours
19  have we had. It's an out-and-out lie.
20     JUDGE BORG: You don't get to ask the question
21  at the moment.
22     Ms. Leskin, finish with your proffer.
23     MS. LESKIN: She continues to say, on page 19,
24  "The continued accumulation of serious adverse
25  ophthalmologic events associated with Viagra use and

### 76

1  found in the medical literature should have prompted
2  Pfizer to undertake a more thorough analysis of
3  NAION-related events associated with the drug."
4      So if she's going to rewrite her report to
5  remove any reference to an event other than NAION, I
6  won't ask about events other than NAION. But she is
7  relying on all of these adverse events in the
8  database and in the literature on things other than
9  NAION, and I should be entitled to set up my motion
10  to exclude any reference to those adverse events by
11  getting her to acknowledge that they are not
12  related.
13     JUDGE BORG: Mr. Overholtz.
14     MR. OVERHOLTZ: Your argument is 100 percent
15  completely illogical, and your questions were not in
16  any way directed towards whether or not Ms. --
17  Dr. Blume had any opinions as to whether or not --
18  not one of your proffers says that Dr. Blume has an
19  opinion as to whether retinosa or any of those
20  things are related to NAION.
21     You obviously don't understand her report, or
22  either you're feigning here just so you can create a
23  record of some -- so you can make up issues to take
24  to the Court's attention. But the providing
25  background information about adverse events that

### 77

1  Pfizer has had from an ophthalmic nature is not her
2  opinions in this case.
3      And she has not given an opinion that Viagra --
4  that retinosa -- retinosa pigmentosa causes NAION,
5  and neither does any of the statements you said make
6  such conclusions. It says Pfizer's received those
7  adverse event reports. And those are all true,
8  factual statements, background. Okay?
9      If you want to start out by asking her at a
10  deposition of expert like other lawyers do it, which
11  is, "Dr. Blume, do you have an opinion in this case,
12  okay, tell me what it is, now let me ask you what
13  the basis of that opinion is," that would be the way
14  to do this deposition. But to sit there and ask
15  about things that she hasn't given opinions about is
16  a complete waste of time.
17     MS. LESKIN: And just to conclude, on page 41,
18  under her conclusions, "An association between use
19  of Viagra and a number of serious and even
20  irreversible ophthalmologic-related events was
21  apparent even prior to its regulatory approval."
22     And I think everyone will agree that there is
23  no report of NAION prior to approval.
24     "Evidence can be found in the growing
25  collection of both internal and public documents

20  (Pages 74 to 77)

**78**

1   discussing the occurrence of adverse events such as
2   blindness, ischemic optic neuropathy, nonarteritic
3   ischemic optic neuropathy, retinopathy, glaucoma,
4   and many others. Despite an accumulating knowledge
5   of potentially serious ophthalmologic adverse
6   events, Pfizer avoided timely updates to the Viagra
7   product line label, thereby exposing users to
8   unnecessary and unknown events. This is especially
9   concerning because a significant percentage of the
10  patient population receiving Viagra possesses one or
11  more risk factors which may predispose them to NAION
12  and related events. Although Pfizer did update the
13  Viagra product label in July 2005, this change does
14  not adequately reflect the number and severity of
15  the serious ophthalmologic events associated with
16  the drug over three years later."
17          MR. OVERHOLTZ: The problem is --
18          MS. LESKIN: So that part is not limited to
19  NAION.
20          MR. OVERHOLTZ: The problem is, your questions
21  are geared towards causation.
22          MR. ALTMAN: That's --
23          MR. OVERHOLTZ: And they're not geared towards
24  liability. The fact that Pfizer had all of these
25  reports did put them on a duty to look into the

**79**

1   ophthalmic issues more. If you want to ask about
2   that opinion that Dr. Blume has given, I think
3   that's fine. But asking her causation questions,
4   which she has not been presented as a causation
5   witness here, is waste of this Court's time.
6          MS. LESKIN: Well, I think I'm absolutely
7   entitled to ask her her knowledge of the -- of the
8   events and whether she's saying that it's at all
9   related to NAION.
10          JUDGE BORG: Well, she's --
11          MR. OVERHOLTZ: She never said it's related to
12  NAION.
13          JUDGE BORG: She has also testified that she
14  hasn't been asked to be given -- to give certain
15  opinions, and she's disqualified herself on those by
16  virtue of the answer.
17          Listen, folks, here is the deal. We've got a
18  witness here, and the reason that we're here is to
19  get it done. I understand your objections,
20  Mr. Overholtz, and I'm not going to -- and I'm not
21  going to say whether or not they ought to be granted
22  or not. You can take that up with the Court.
23          But the fact of the matter is, nobody wants to
24  come back here and do this again --
25          MR. OVERHOLTZ: No.

**80**

1   JUDGE BORG: -- if the Court concludes that --
2   that Ms. Leskin go -- can go where she wants to go.
3   So we're going to get it done. We're going to get
4   it on the record.
5          All of your objections are preserved, whether
6   or not you state them, but for, of course, the form,
7   privilege, and responsiveness.
8          So you're on the record with this. You know,
9   have at it with the Court when the time comes. But
10  we've got to get this done.
11          MR. BECNEL: But, Judge Borg, the problem is:
12  The purpose of the plaintiffs and the defendants
13  paying you to come down here is not to tell us we
14  got to go to the Court. You've got to make calls.
15          You know, I've never been in an MDL other than
16  in Minnesota twice, in the whole country. And I've
17  been doing these for almost 40 years.
18          Well, we have a special master of discovery
19  that's -- that rides herd on us here.
20          And the problem is, in almost every other MDL,
21  we stop, we call the Court or the magistrate judge,
22  and they make a ruling right there based upon the
23  evidence we've given them, every one I've been
24  involved in over the years.
25          But we have you here now. And you tell us,

**81**

1   well, we've got to go back to the judge. That makes
2   no economic sense whatsoever; because that doesn't
3   deal with efficiency, that doesn't deal with whether
4   we got to come back here or not come back here.
5   We've got stay here no matter what.
6          And the purpose of your being here should be to
7   make these calls. The purpose of you being here
8   shouldn't be for me to say, "The Manual for Complex
9   Litigation requires us to follow these rules, and if
10  you do things that are repetitious, you get
11  penalized for that."
12          It's not just because you got seven hours, you
13  waste seven hours or you use seven hours. If it's
14  relevant, certainly. And many times, seven hours
15  might not be enough in a case. And we could say,
16  "Judge Borg, we haven't covered all of the issues.
17  Can we go on over that?" That's your role, as I
18  understand, as special master.
19          We don't have any choice in the picking of a
20  special master. And as I said, I've never had a
21  special master ever that does what you're doing.
22  But when we got you, we ought to be able to have
23  some resolution in some of these issues. We ought
24  to not be able to be told, "Well, go back to the
25  judge." That makes no sense.

82

1      And -- and the manual says that. It's not me
2   saying it. It's people who created the manual, not
3   me.
4      JUDGE BORG:  Well, I'm reading the Court's
5   order, which governs this case. So the objections
6   are noted. They're overruled, and we're going to
7   proceed with the deposition.
8      (There was a discussion off the record.)
9      (Dr. Blume re-enters the proceedings.)
10     MS. LESKIN:  You didn't go off.
11     THE VIDEOGRAPHER:  Correct. We were not off
12   the video record.
13  BY MS. LESKIN:
14     Q.  Dr. Blume, do you have an understanding what
15  diabetic retinopathy is?
16     A.  Other than prolonged diabetes associated with
17  decreased retinal function.
18     Q.  Do you -- do you believe -- well, strike that.
19     Is it your opinion that diabetic retinopathy is
20  related to NAION?
21     A.  I don't know.
22     Q.  Are you aware of anyone who has put forth the
23  opinion that diabetic retinopathy is related to NAION?
24     A.  I'm not aware either way.
25     Q.  Would a study of diabetic retinopathy provide

83

1   any insight as to the incident rate of NAION?
2      A.  Well, I mean, all studies yield information
3   that might be useful. But, I mean, I guess if there was
4   a, you know, a large study done that looked at age
5   controls across time, and enough data were collected
6   that one could look at -- look at these, yeah, I guess
7   it could be helpful, if someone did a big enough study..
8      Q.  Would -- if you wanted to determine the
9   incidence of NAION, would you study -- would you focus
10  your study on diabetic retinopathy?
11     A.  Oh, I don't know. I don't know how to answer
12  that.
13     Q.  Okay. Do you know what retinal detachment is?
14     A.  Yes.
15     Q.  What is retinal detachment?
16     A.  My understanding is that the retina literally
17  physically detaches from the anchoring membranes and is
18  then no longer able to funnel the visual stimuli to the
19  optic nerve for transfer to the brain.
20     Q.  Is that the same thing as chorioretinopathy?
21     A.  I don't know.
22     Q.  Is it your opinion that retinal detachment is
23  related to NAION?
24     A.  Oh, I've never heard that, but I've also not
25  studied it.

84

1      Q.  And you're not aware of anyone who's put forth
2   the opinion that retinal detachment is related to NAION?
3      A.  I haven't researched it. I don't know the
4   answer either way.
5      Q.  Do you know what retinal artery occlusion is?
6      A.  No.
7      Q.  Do you know whether retinal artery occlusion is
8   related to NAION?
9      A.  No. I don't know what it is.
10     Q.  Do you know what retinopathy of prematurity is?
11     A.  Retinopathy of prematurity?
12     Q.  Yes.
13     A.  No.
14     Q.  And do you have any opinion as to whether
15  retinopathy of prematurity is related to NAION?
16     A.  No. I don't know what it is.
17     Q.  Do you know what macular detachment is?
18     A.  Macular detachment?
19     Q.  Yes.
20     A.  No.
21     Q.  Do you have any opinion as to whether macular
22  detachment is related to NAION?
23     A.  I -- I don't know either way.
24     Q.  Are you familiar with the term "safety signal"?
25     A.  The safety signal?

85

1      Q.  Yes.
2      A.  Uh-huh.
3      Q.  Would you agree to me that the safety -- would
4   you agree with me that a safety signal is a concern
5   about an excess of adverse events compared to what would
6   be expected with a product's use?
7      A.  Could you repeat that?
8      Q.  Sure. Would you agree with me that a safety
9   signal is a concern about an excess of adverse events
10  compared to what would be expected to be associated with
11  a product's use?
12     A.  Well, my understanding of a safety signal is
13  any issue that you observe with your data that makes you
14  think differently. And it can include a new event or
15  some change in the frequency or magnitude of a previous
16  event. I generally do not qualify whether something is
17  a signal or not based on what I would anticipate to see
18  in a given population, simply because we are instructed
19  to not do that.
20     Q.  Okay. Well, let me give you what we've marked
21  as Exhibit 2.
22     (Exhibit No. 2 was marked for identification.)
23     MS. LESKIN:  I have a copy for counsel.
24  BY MS. LESKIN:
25     Q.  This is the March 2005, Guidance for Industry,

22  (Pages 82 to 85)

**86**

1  Good Pharmacovigilance Practices and
2  Pharmacoepidemiologic Assessment, from the FDA, right?
3      A. Yes.
4      Q. And you cite this in your report, correct?
5      A. Yes.
6      Q. Turn with me to page 4. And in the second
7  paragraph it says, "In this guidance document, 'safety
8  signal' refers to a concern about an excess of adverse
9  events compared to what would be expected to be
10 associated with a product's use."
11     A. Yes.
12     Q. Do you see where I read that?
13     A. Yes.
14     Q. And that's how the FDA is defining that,
15 correct?
16     A. Well, yes, but that's only part of the study.
17 You have to continue with the guidance and FDA notes in
18 this guidance that one cannot limit the importance of a
19 safety signal based on post-marketing information
20 because of the absence of complete post-marketing
21 information. So one cannot rule out a signal based
22 simply on comparison to what would -- what is a baseline
23 incidence or what one would anticipate in that
24 population; because we know that only 1 to 10 percent of
25 all adverse events are ever reported.

**87**

1      Q. Okay. And we'll come back to that.
2          But as the FDA writes in this document, they're
3  referring to a safety signal as an excess of adverse
4  events compared to what would be expected to be
5  associated with a product's use, right?
6      A. Yes, you read that correctly.
7      Q. Okay. Now, a safety signal is not the same as
8  causation, right?
9      A. Of course.
10     Q. Okay. And a single case report isn't
11 necessarily a safety signal, right?
12     A. Can be, but it might not be.
13     Q. Okay.
14     A. Depends on the situation and the data.
15     Q. And depends on the type of event?
16     A. Yes. One cannot rule out that it's a signal
17 simply because it's -- you have one or two events. But
18 because you have one or two events may not be a signal.
19 Depends on the data.
20     Q. And when you get a safety signal, the
21 obligation of a pharmaceutical company is to investigate
22 that safety signal, correct?
23     A. Yes.
24     Q.. And sometimes that safety signal may turn out
25 to signal a cause and effect relationship, but sometimes

**88**

1  it might not, correct?
2      A. I'm sorry. Sometimes a safety signal may lead
3  to a cause and effect assessment?
4      Q. Sometimes it may turn out that the safety
5  signal signaled a cause and effect relationship, but
6  sometimes it may not be a cause and effect relationship,
7  right?
8      A. Well, there's very few ways in which you can
9  address causation. The only way I can imagine that a
10 safety signal would address causation is if it were
11 evidence of a rechallenge event.
12     Q. Okay. My question, I think, may have been
13 unclear.
14         You told -- we agreed that when you get a
15 safety signal and identify something as a safety signal,
16 there's an obligation to investigate it, right?
17     A. Of course.
18     Q. And that investigation may lead someone to
19 determine that there is in fact a cause and effect
20 relationship, right?
21     A. I don't -- I guess it could. I mean, it's not
22 really -- I mean I -- yes, I guess if one saw a safety
23 signal, your client or companies could design studies
24 designed to address causation.. I mean, it's sort of two
25 different issues.

**89**

1      Q. Okay. They also could do some investigation to
2  find out that it's simply coincidence, right, that there
3  is no cause and effect relationship?
4      A. Well, cause -- causality can only be
5  established in really three ways. And if they did an
6  evaluation, and one of the -- and they ruled it out, I
7  guess it's possible. But that generally isn't what we
8  do in industry with a -- with a safety signal.
9      Q. Okay. Well, let me direct you back to that
10 same paragraph on page 4 of Exhibit 2 that we were just
11 looking. At if you look at the next to last sentence,
12 the FDA writes, "Signals generally indicate the need for
13 further investigation, which may or may not lead to the
14 conclusion that the product caused the event," right?
15     A. You may find out that caused or didn't cause
16 the event. That -- okay. But that doesn't impact what
17 we do with the signal.
18     Q. Okay. Now, you're not saying in this case that
19 immediately upon receiving a safety signal, there's an
20 obligation to change your label, are you?
21     A. Well, it depends on the circumstances. For
22 every -- I mean, there are labelings that have been
23 changed when there have been two events noted in the
24 AERS database, and labeling has been changed
25 immediately. And it's noted that they don't have proof

**90**

1  of causation, but it's been observed, hasn't been in the
2  labeling, so we're putting it in the labeling.  So I
3  think that companies have changed labeling with very
4  small-number events and no evidence of causation.  And
5  we are encouraged to do that and permitted to do that.
6         If you're talking about this particular case --
7  Q.  No.  I'm --
8  A.  -- Viagra --
9  Q.  I'm talking in general.
10  A.  Okay.  In general I think companies look at
11  their data, and even with few events, depending on the
12  seriousness of the event or other factors, may or may
13  not change labeling for -- for various reasons.  But you
14  certainly don't rule out changing labeling when there's
15  been one or two events.
16  Q.  Okay.  But is it the obligation of a company to
17  change its label based solely on one or two events?
18  A.  I think it's the obligation of the company to
19  make sure that important information is in their
20  labeling.  It is the -- that responsibility rests with
21  the company.  And I can't answer it for all times.  I
22  mean, in this report I noted a Dear Doctor letter, a
23  labeling change that I made based on two adverse events
24  noted in the AERS database.  So it is done with one and
25  two.  Product development programs are stopped with one

**91**

1  or two events.
2         So, yes, I think depending on the frequency of
3  the event, the seriousness of the event, what
4  information you have with the event, it is incumbent
5  upon a company to consider a label change even with very
6  few numbers of events.
7  Q.  You -- you just raised something that you have
8  in your document here.  You have on page 9 of your
9  report where you state, "There are examples of labeling
10  changes and Dear Doctor -- Dear Healthcare Professional
11  letters based upon manufacturer's receipt of only two or
12  three events."
13         Is that what you were just referring to when
14  you testified about that?  You said you said in your
15  report that you --
16  A.  I think so.
17  Q.  Okay.
18  A.  Yeah.
19  Q.  What are the examples that you're referring to
20  in this report?
21  A.  Well, the one that I have given is my own Dear
22  Doctor letter where I sent out a Dear Doctor letter and
23  made a labeling change when we received two reports of
24  dose-related hypertension change with elder -- for
25  elderly and Parkinson patients.  And that's -- that's

**92**

1  the one that I'm using.
2  Q.  Okay.  That's -- nothing cited in this report
3  for that, though, right?
4  A.  Oh, I've used it so many times.  Yes.  But
5  that's one that I'm using.
6  Q.  Okay.
7  A.  And it's currently on the FDA website, so it's
8  readily available.
9  Q.  Now, one thing a company can do to investigate
10  a safety signal is to go back and look at their clinical
11  database, right?
12  A.  Well, they -- that's one of the things they
13  should do.
14  Q.  Yeah.  And that's a reasonable response, to go
15  back and examine the clinical database?
16  A.  It is.  The -- the worlds are so different
17  between the patients that are in a clinical trial and
18  what happens once the product gets in the real world.
19  Of course it's always interesting to go back and look,
20  but it is certainly different populations that you're
21  looking at.  And that's why post-marketing information
22  is so critical to the company, is because that is the
23  picture of the real-world use of the product, not the
24  rather artificial populations that we use in our
25  clinical trials.

**93**

1  Q.  Okay.  So one response to a safety signal would
2  be to go back and look at the clinical database?
3  A..  Yeah, you could.
4  Q.  And another response would be to go back and
5  look at any animal testing that had been done, right?
6  A.  Yeah, you could.
7  Q.  And to -- another response would be to review
8  the literature, correct?
9  A.  Well, companies always ongoing reviewing
10  literature.  But of course.
11  Q.  And another response could be to evaluate
12  whether there is any plausible biological mechanism for
13  the event that's being identified?
14  A.  Right.  You could look at that.
15  Q.  And one thing that would be reasonable to do
16  would be to evaluate the background rate of the event in
17  the population being treated?
18  A.  Well, not so much.  I don't -- I don't agree
19  with that.  It's interesting, but if you're looking at a
20  post-marketing adverse event and you know that you're
21  only going to receive 1 percent of all of the people who
22  report that event, it's interesting to look at the
23  background incidence, but it's impossible to compare the
24  two.  So one cannot rule out the importance of event
25  based on a perceived background incidence in the

24  (Pages 90 to 93)

CONFIDENTIAL

94

1  population because you simply can't compare the two
2  numbers.
3      Q..  But it is important to put the event into
4  context, isn't it?
5          MR. OVERHOLTZ:  Object to form; lack of
6  foundation.
7          JUDGE BORG:  How -- where?  How so?
8          MR. OVERHOLTZ:  It's important to put the event
9  into context?  I don't even know what that means:
10  context.  What is she referring to, what type of
11  context?
12         JUDGE BORG:  Ms. Leskin, you want to expand on
13  that? .
14         Sustained.  I don't know what that means
15  either.
16  BY MS. LESKIN:
17     Q.  Did -- one thing a company could do when it has
18  a safety signal is to consult with experts in the area?
19     A.  Yes.
20     Q.  And get their view as to whether this
21  represents a true signal?
22     A.  Well, a signal is defined as if it makes you --
23  if it's a new event or makes you look differently on
24  something you saw in the past.  I'm not sure what the
25  definition of a true signal is.

95

1      Q.  Okay.
2      A.  Signal is simply anything that makes you look
3  differently, something new or some change in something,
4  a magnitude of frequency you've seen before.  I think
5  it's important to consult outside experts, of course,
6  but I don't know if they really can address whether
7  something is a true signal.
8      Q.  Okay.  They could help you put the -- help you
9  better understand the event being reported?
10     A.  I guess if it's a particularly difficult event
11  to understand, I guess they could be helpful.
12     Q.  I want to talk a little bit more specifically
13  about Viagra.
14         Now, you're aware that the company, that
15  Pfizer, submitted a new drug application to the Food &
16  Drug Administration for Viagra, correct?
17     A.  Yes.  I have that cited in my report.
18     Q.  Okay.  And did you have the opportunity to
19  review the NDA for Viagra?
20     A.  I did review parts of it, yes.
21     Q.  Okay.  Which parts of it?
22     A.  I looked at the, primarily, at the medical.  I
23  did scan over the animal review.
24     Q.  Okay.
25     A.  And I did look at the pharmacokinetic data.

96

1      Q.  Before submitting -- before submitting the NDA,
2  are you aware that Pfizer submitted an IND?
3      A.  I believe they did.  I don't know if I quoted
4  the IND, though.  I believe they did.
5      Q.  That's an investigation of a new drug, correct,
6  a new drug application, correct?
7      A.  Yeah, a request for exemption, yes.
8      Q.  Do you know when that -- an IND was filed?
9      A.  No..
10     Q.  Do you know what data was included in the IND?
11     A.  No.
12         MR. BECNEL:  Excuse me, Ms. Leskin.  Are you
13  going to make this a part of the deposition or not?
14         MS. LESKIN:  Yeah.  We marked that as
15  Exhibit 2.
16         MR. BECNEL:  2.  Okay.
17  BY MS. LESKIN:
18     Q.  Did you have the opportunity to review the IND
19  in this case?
20     A.  No.
21         MS. LESKIN:  I'm going to mark as Exhibit 3,
22  this is an excerpt from the new drug application.
23  It's Bates stamped 002000947 through 950.
24         (Exhibit No. 3 was marked for identification.)
25  BY MS. LESKIN:

97

1      Q.  Have you seen these pages before?
2      A.  I may have.  But can you put these in the
3  context for me?  I don't -- page 6 of what?
4      Q.  This is a section of the NDA, I believe part of
5  the initial summary, I believe.  And the section that
6  I've given you, just for the record, is Section H.2.B,
7  entitled "Interactions With FDA."
8          MR. OVERHOLTZ:  I'm going to object to the
9  document.  I'm trying to look for anywhere on here
10  that indicates what it is and where it comes from.
11  I don't know if this is Pfizer's summary of what has
12  happened or what this is.
13         JUDGE BORG:  Ms. Leskin.
14         MS. LESKIN:  I'm trying to get the context
15  here.
16  BY MS. LESKIN:
17     Q.  Okay.  To help you out, I'm going to mark as
18  Exhibit 4, a document that's entitled Index to
19  Sildenafil NDA.
20         (Exhibit No. 4 was marked for identification.)
21  BY MS. LESKIN:
22     Q.  I'll represent to you, this is the index to the
23  NDA that was filed with the Food and Drug
24  Administration, Bates stamped 002000001 through 46.
25         Have you seen this index before?

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

**CONFIDENTIAL**

98

1    A.  I may have.  I don't recall it, though.
2    Q.  Okay.  And --
3        MR. BECNEL:  It says "redacted" on it.  What is
4    redacted?
5        MS. LESKIN:  Pursuant to the protective order
6    and the objections that were made at the time of
7    production, it's the CMC section.  The chemistry
8    manufacturing section has been redacted.
9        MR. ALTMAN:  I'm completely confused.  You were
10   asking her about the IND, and then this is out of
11   the NDA.  Are you totally off the IND topic?
12       MS. LESKIN:  No, we're not.  I'll -- don't
13   worry.  We'll get there.
14   BY MS. LESKIN:
15   Q.  If you look at page little 7.
16       JUDGE BORG:  Well, let's get this document
17   identified again.  I don't know that that's that
18   clear.
19       MS. LESKIN:  Okay.  This will be --
20       MR. OVERHOLTZ:  I don't even which document
21   we're trying to do.
22       MS. LESKIN:  -- Exhibit 4, which I've marked,
23   is the index to the NDA.
24   BY MS. LESKIN:
25   Q.  Have you seen the index before, Doctor?

99

1    A.  As I -- I just answered that.  I may have; I
2    just don't recall it.
3    Q.  Okay.  If you look at page little 7, Roman
4    numeral VII on the bottom.  It's Bates stamped 002, and
5    then lots of zeros and a seven.
6        MR. OVERHOLTZ:  I don't know if this is a final
7    or a draft.
8        MS. LESKIN:  This is the final as produced in
9    this litigation.
10       THE WITNESS:  All right.
11   BY MS. LESKIN:
12   Q.  Okay.  And you'll see there's a -- it says "2,
13   Overview of Clinical Studies"?
14   A.  Yes.
15   Q.  Okay.  And you go down to B., where it says
16   "Interactions With FDA"?
17   A.  Yes.
18   Q.  Okay.  And you'll see that says page 949, all
19   the way on the right where it says under "page number"?
20   A.  Yes.
21   Q.  Okay.  And if you go back to what we marked as
22   Exhibit 3, you'll see this has a "949" on the bottom?
23   A.  Yes.
24   Q.  Okay.  So that's the section of the NDA that
25   this comes from.  Okay?

100

1        So have you reviewed this section of the NDA
2    entitled "Interactions With FDA" before?
3    A.  I -- I don't recall if I did or not, when I
4    reviewed it.
5    Q.  Were you aware that representatives of Pfizer
6    had met with the FDA before they filed the NDA?
7    A.  Of course.  That's required.
8    Q.  Okay.  And you'll see the first line under
9    H.2.B, "Interactions With FDA," says, "The original IND
10   for sildenafil was submitted on December 7, 1994"?
11   A.  Yes.
12   Q.  And that "On January 9, 1995, Pfizer was
13   informed by the medical reviewer, that clinical trials
14   under IND No. 46,863 could begin"?
15   A.  Yes, I see it.
16   Q.  Okay.  Had you read that before?
17   A.  Oh.  If I did, I just don't recall it.
18   Q.  Okay.  So does this refresh your recollection
19   that Pfizer did in fact file an IND in this case?
20   A.  Oh, I would imagine -- I wasn't arguing they
21   filed one.  I just didn't remember when.  I -- they --
22   they studied humans, so I'm quite sure they would have
23   filed an IND.
24   Q.  Okay..  And do you know whether any humans have
25   been studied before this IND was filed in the

101

1    United States?
2    A.  No, I don't know.
3        Oh, in the United States?
4    Q.  Yes.
5    A.  Oh, I certainly hope not.
6    Q.  Okay.  Do you know whether --
7    A.  I hope they didn't study it before they had an
8    IND.
9    Q.  Okay.  And do you know how many -- whether they
10   had filed -- strike that.
11       Do you know whether they had studied sildenafil
12   in any humans outside of the United States before filing
13   their IND on September 7th, 1994?
14   A.  I don't believe so, but I -- I'm not certain.
15   Q.  So you weren't aware that they had started
16   studies of sildenafil in humans in Europe prior to that
17   date?
18   A.  I do not know if it was before 1994, but I -- I
19   don't think it would have been in the United States
20   before 1994.
21   Q.  Okay.  Do you know -- well, strike that.
22       If you look at the second paragraph under
23   "Interactions With the FDA," it says that "The Division
24   of Cardio-Renal Drug Products."
25       That's DCRDP, right?

26  (Pages 98 to 101)

102

1   A. Yes.
2   Q. Okay. So "DCRDP expressed the basic
3   requirements of the long-term safety database for an NCE
4   and PRN drug," right?
5   A. Yes.
6   Q. What is NCE?
7   A. New chemical entity.
8   Q. And PRN drug?
9   A. One that will be taken as needed.
10  Q. Okay. It says, "Based on the outcome of the
11  muscle aches and color vision disturbances, DCRDP
12  recommended that 1,000 to 2,000 patients should be
13  exposed to the drug, of which 500 to 1,000 should have
14  taken it for one year."
15       Do you see that?
16  A. Yes, you read it correctly.
17  Q. Okay. The reference to color vision
18  disturbances, do you know what that refers to?
19  A. The blue reports in the IND patients.
20  Q. And that was known to Pfizer and FDA
21  before the application was ever submitted to FDA,
22  correct?
23  A. Now you're referring to the new drug
24  application.
25  Q. Yeah, correct.

103

1   A. Yes, because it says "1995."
2   Q. Okay.
3   A. Yes.
4   Q. And do you know what type of testing was done
5   to investigate the color vision disturbances that had
6   been seen before the drug was filed, the drug
7   application was filed?
8   A. What kind of -- what kind --
9   Q. Testing was done to investigate?
10  A. Well, the initial reports were simply patient
11  reports of this. And then I believe they had entry --
12  they changed the entry criteria to include one of the
13  battery -- one of the color battery testings as a
14  condition for the continued studies. But I believe the
15  initial reports were patient reports, spontaneous
16  patient reports.
17  Q. Okay. Let me -- let me repeat my question.
18       Do you know what testing Pfizer did before
19  submitting the NDA to investigate the color vision
20  disturbances?
21  A. No.
22       (Exhibit No. 5 was marked for identification.)
23  BY MS. LESKIN:
24  Q. I give you what we've marked as Exhibit 5,
25  which is Appendix XII to the NDA, entitled "Sildenafil,

104

1   Visual Summary."
2        Have you seen this document before?
3   A. No. I'm confused by the documents, though,
4   because these have an approved date in '97 on them. So
5   I'm confused.
6   Q. I'm sorry. You're referring to what?
7   A. They have approval date stamped of August '97
8   on them, so I'm still a little confused how these
9   interact -- how these relate to the '98 FDA approval.
10       MR. ALTMAN: Objection; foundation, too. I --
11  what is this out of it? This says "Appendix XII."
12  Is this part of the NDA here?
13  BY MS. LESKIN:
14  Q. I'll refer you back to Exhibit 4, Doctor. And
15  if you look at the last page of Exhibit 4, which is the
16  index.
17  A. Exhibit 4, last page.
18  Q. You'll see under the listing for appendices,
19  Appendix XII says "Visual Summary"?
20  A. Appendix XII.
21       I see that. I'm just confused by the approval
22  stamp date of a year before the NDA was approved.
23  Q. Okay.
24       MR. BECNEL: Let me enter an objection now.
25       This document has the 28th of August 1997 where

105

1   it says "approved." And the index that you've given
2   us, Counsel, is for what year? What year is this
3   index from?
4        MS. LESKIN: Is that your objection?
5        MR. BECNEL: No. I'm asking you to explain
6   what --
7        JUDGE BORG: Well, is -- is there -- is there a
8   date on the exhibit?
9        MR. BECNEL: No.
10       MS. LESKIN: It's the index to the NDA,
11  Your Honor.
12       MR. BECNEL: Yeah. It doesn't make any
13  difference. I want to know what year are you
14  alleging that you've given this witness an index for
15  that makes reference to something in the 28th of
16  August 1997. That's all I'm asking.
17  BY MS. LESKIN:
18  Q. Doctor, do you know when the NDA --
19       MR. BECNEL: No, no, Counsel. I --
20       MS. LESKIN: Let me set my --
21       MR. BECNEL: Then I'll object to the --
22       MS. LESKIN: Let me set my foundation.
23       MR. BECNEL: I'll object to the use of the
24  document.
25       JUDGE BORG: Okay.

27 (Pages 102 to 105)

CONFIDENTIAL

## 106

1    MS. LESKIN: Can I ask a foundation question?
2    JUDGE BORG: You can.
3  BY MS. LESKIN:
4    Q.  Doctor, do you know when the NDA was filed in
5  this case?
6    A.  I know it was approved in March of '98, and it
7  was -- yeah, it was filed at the end of '97 -- in six
8  months -- I think it was the fall of '97. I'll find the
9  date. I think I saw -- just saw it in here. But I
10 think it was in the fall of '97. Let me see. That's my
11 recollection.
12   Q.  Okay. You want to find the date?
13   JUDGE BORG: Ms. Leskin, do you know the date?
14   MS. LESKIN: I believe it was sometime
15 around --
16   JUDGE BORG: Okay.
17   MS. LESKIN: -- August, the end of August or
18 September.
19   JUDGE BORG: No, no, I just wondered if you
20 knew the date. I --
21   MS. LESKIN: Yes. And I'm happy to represent
22 that it was late August, early September, 1997.
23   MR. BECNEL: Your Honor, my only thing is, is
24 trying to connect whether one is out of order or not
25 out of order.

## 107

1    MS. LESKIN: It is not out of order. I will
2  represent to you that Exhibit 4 is the index to the
3  NDA as filed with the Food and Drug Administration;
4  that Exhibit 3 is an excerpt from the NDA as filed
5  with the Food and Drug Administration; and that
6  Exhibit 5 is an excerpt from the NDA as filed with
7  the Food and Drug Administration. I'm not trying to
8  play games.
9    THE WITNESS: Well, okay.
10   MS. LESKIN: Trying to find out if the witness
11 reviewed these documents.
12   THE WITNESS: Okay. Well, you -- actually the
13 approval date was September -- I mean the submission
14 date was September 29th, 1997.
15   MS. LESKIN: Okay.
16   THE VIDEOGRAPHER: Doctor, your mic.
17   THE WITNESS: Okay. I'll repeat it. Just one
18 second.
19   The submission was, as I thought, in the -- in
20 the fall of the previous year. And the specific
21 date is September 29th, 1997.
22 BY MS. LESKIN:
23   Q.  Okay. And prior to filing an application with
24 the Food and Drug Administration, you know that
25 companies go through an internal approval process for

## 108

1  the documents that they file with the government,
2  correct?
3    A.  Yes. I've just never seen a different approval
4  date stamped on a document that actually went to the
5  FDA.
6    Q.  Okay.
7    A.  That I've never saw. I've never seen that
8  before.
9    Q.  Okay.
10   A.  So I just --
11   Q.  I will represent to you that these are excerpts
12 of documents that were -- of the NDA that was filed with
13 the Food and Drug Administration.
14   MS. LESKIN: I think we have answered all the
15 objections. Okay.
16   MR. ALTMAN: I just need to make one other
17 statement, that part of the problem is, too, Lori,
18 is that if you look at Exhibits 3 and 4, they're
19 stamped "Grant/Pfizer" and a Bates number.
20   MS. LESKIN: That is correct.
21   MR. ALTMAN: And Exhibit 5 does not have that
22 legend, which --
23   MS. LESKIN: That's correct.
24   MR. ALTMAN: -- also makes it confusing as to
25 whether this is all part of one continuous stream.

## 109

1    That's part -- just part of the confusion here,
2  that they have different Bates numbers and different
3  legends.
4    MS. LESKIN: I'll represent to you that the way
5  that these documents were produced in this
6  litigation is that there were cases that were on --
7  that were filed prior to the MDL being created. The
8  NDA was made available to plaintiffs' counsel in
9  that litigation. They selected documents to be
10 copied. Those documents were copied and Bates
11 stamped. Those have there the legend "Grant/Pfizer
12 docs."
13   Subsequent to that, additional document
14 requests were made, additional review was made, and
15 additional documents were requested to be copied.
16 Those documents contain different Bates numbers.
17   So the fact that they -- I'm not representing
18 that they were produced, though they were copied and
19 therefore Bates stamped in order. These are all
20 excerpts from the same Food and Drug Administration
21 NDA.
22   ·JUDGE BORG: That's sufficiently confusing.
23 Okay.
24   MS. LESKIN: It's because we Bates stamp
25 numbers based on --

28  (Pages 106 to 109)

## 110

1    JUDGE BORG: No, no. I understand.
2    MS. LESKIN: -- what they copied, not based on
3    how they were made available.
4    MR. ALTMAN: I'm not -- I just -- I guess -- I
5    think we just need to put on an objection just to
6    the extent that I'm concerned that these productions
7    were done at separate points in time, but the Bates
8    numbers have been woven together. And whether this
9    truly represents a complete continuous, I don't have
10   any way of knowing that.
11   MS. LESKIN: We have made available -- from the
12   beginning of this litigation, we have offered to
13   make the NDA available. Plaintiffs have chose -- in
14   this MDL, have chosen not to avail themselves of
15   that. That's not our problem.
16   MR. BECNEL: It is your problem to make it
17   understandable because of the production. That's
18   your requirement.
19   MS.. LESKIN: You produced -- we made the
20   documents available. You copied them. We Bates
21   stamped them based on what copies counsel wanted.
22   Zoe Littlepage is a member of your steering
23   committee. She was responsible for identifying the
24   documents as they were made available. She didn't
25   copy the entire NDA. You can talk to

## 111

1    Ms. Littlepage.
2    MR. ALTMAN: I guess there's one question that
3    can probably --
4    Can we take it that even though the NDA as it
5    was produced may not be complete because it wasn't
6    all selected, that at least it is in the exact
7    correct order it would have been in the NDA? I
8    mean, you've basically pulled out pieces of the NDA
9    that have -- let me ask it a different way.
10   We've got, I don't know, 20,000 -- at least
11   20,000 pages of an NDA here.. But we didn't get --
12   you're saying we didn't get the entire NDA. And I
13   say that because the Bates number of Exhibit 5 is
14   19569. So one would assume --
15   Is it a true statement that while we may not
16   have every page of the NDA up to that point, that
17   whatever, the 20,000 pages up to this point, are in
18   the exact order they were in the NDA?
19   MS. LESKIN: No, that's not a reasonable
20   assumption because that's not how they were copied.
21   That's not how they were requested. There were
22   several times Ms. Littlepage came, selected
23   documents, came back, selected more documents, in
24   different litigations at different points in time.
25   All of those documents were made -- then made

## 112

1    available to the steering committee in the MDL when
2    the MDL was created.
3    MR. ALTMAN: Okay. So if we go in Bates number
4    order, we're not going to see whatever was selected
5    necessarily in the order in the NDA.
6    MS. LESKIN: I can't make that representation
7    without going back and seeing what the first 20,000
8    pages look like.
9    MR. ALTMAN: Okay.
10   MS. LESKIN: I can find out. We can talk about
11   that offline.
12   MR. ALTMAN: That's fine.
13   MS. LESKIN: That was -- that was the --
14   MR. ALTMAN: I just wanted to understand the
15   context.
16   MS. LESKIN: That was the request.
17   JUDGE BORG: Let's get going.
18   MR. OVERHOLTZ: All right. We'll just have an
19   objection to this document, obviously, at trial.
20   They'll have to lay a foundation.
21   JUDGE BORG: Yeah.
22   BY MS. LESKIN:
23   Q. Dr. Blume, let's go back to Exhibit 5. Have
24   you seen this document before?
25   A. I believe so. I believe so.

## 113

1    Q. And did you review this in developing your
2    opinion?
3    A. I believe I looked through it. I mean, I did
4    look over the -- what was known at the time of NDA
5    approval, yes.
6    Q. Now, the provision of the federal statute that
7    governs the filing and review and approval of an NDA is
8    21 USC 355, correct? Yes?
9    A. Yes.
10   Q. Okay. And you're not -- well, let me ask you
11   this.
12   Are you offering an opinion in this case as to
13   whether or not Pfizer complied with Section 355 in
14   submitting its NDA?
15   A. The NDA was approved by the FDA.
16   Q. Okay.
17   A. So I would -- I am not going to argue that they
18   filed the NDA appropriately..
19   Q. Inappropriately, you mean?
20   A. I'm not going to argue that it wasn't filed
21   appropriately. FDA approved it.
22   Q. And you're not offering an opinion in this case
23   that FDA was wrong when they approved this NDA, are you?
24   A. No.
25   Q. And you're not offering an opinion that FDA

CONFIDENTIAL

**114**

1  should withdraw this NDA, are you?
2     A.  Well, I haven't offered that opinion, no.
3     Q.  Okay.  And you're not going to in this case,
4  are you?
5     A.  I have -- based on what the information I have
6  so far, no.
7     Q.  And you're aware that subsequent to the
8  approval of the Viagra NDA that the FDA evaluated a
9  separate NDA for sildenafil for use with -- in pulmonary
10  arterial hypertension patients, correct?
11     A.  Yes.  I have that referenced in my report.
12     Q.  Okay.  And that's marketed today as Revatio --
13     A.  Revatio.
14     Q.  -- correct?
15     A.  Yes, that is correct.
16     Q.  And the FDA approved that NDA?
17     A.  June of 2005.
18     Q.  And you're not offering an opinion in this
19  litigation that the FDA was wrong when they approved the
20  NDA for Revatio, are you?
21     A.  I am not.
22     Q.  And you're not offering an opinion in this case
23  that Pfizer violated any federal statute in submitting
24  its application for Revatio, are you?
25     A.  No.  I've never said that at all in my report.

**115**

1     Q.  I just --
2     A.  I don't know where you're getting this..  No.
3     Q.  I want to make sure that I understand your
4  report and your opinions.
5        MR. BECNEL:  Counsel, I'm trying to figure out:
6  Why you are asking questions that's not in her
7  report, that's not the subject of this MDL in any
8  way, shape, and form?  Why are we doing this?
9  BY MS. LESKIN:
10     Q.  Now, under Section 355 there's several grounds
11  that Congress has prescribed for refusing the approval
12  of an NDA, right?
13     A.  Yes..
14     Q.  And the FDA is required to deny the application
15  if it does not include adequate tests to show that the
16  drug is safe, correct?
17     A.  Yes.
18     Q.  And the FDA is required to deny an NDA if the
19  testing that's submitted shows that the drug is unsafe,
20  correct?
21     A.  What did you say the first one was?  Not safe
22  and then unsafe?
23     Q.  No.  The first one I asked was whether -- well,
24  let me rephrase, then.
25        The first question I asked you was:  The FDA is

**116**

1  required to deny the application if it does not include
2  adequate tests to show that the drug is safe, right?
3     A.  Right.
4     Q.  Next part that I'm asking you is:  The FDA is
5  required to deny the application if the testing shows
6  that the drug is unsafe?
7     A.  Yes.  Product has to be safe and effective to
8  be approved.
9     Q.  Okay.  And if there's insufficient information
10  to determine whether the drug is safe, the FDA is
11  required to deny the application, correct?
12     A.  Yes.
13     Q.  At the time that the FDA approved the Viagra
14  NDA, it also approved the label for Viagra, correct?
15     A.  Of course.  NDA approval must include the
16  FDA-approved launch label, yes.
17     Q.  Okay.  Is it your opinion or are you offering
18  an opinion in this case that the label at the time of
19  approval was in any way inadequate?
20     A.  I haven't offered that opinion at all.
21     Q.  Okay.  In your report, and I think even earlier
22  today, we talked about the population of patients in a
23  clinical trial database as compared to the real world.
24  Right?
25     A.  Yes.

**117**

1     Q.  And do you know how the population in the
2  Viagra clinical trial database compares with the
3  population in the real world?
4     A.  Somewhat.  I mean, the NDA is a -- is a
5  relatively modest population.  I think it only had about
6  4,000 patients in it, and some of those patients would
7  have been on placebo therapy.  So it is not a very big
8  NDA.  And my understanding from the correspondence
9  between the company and the FDA and between some of the
10  citizen's petitions is that several of the populations
11  of concern were omitted from the clinical trials.
12  Cardiovascular risk factors, some of the advanced
13  diabetic populations were omitted from the Phase III
14  patients.
15     Q.  When you say that CV risk factors were omitted,
16  what do you mean by that?
17     A.  That patients who had marked hepatic
18  dysfunction, marked renal dysfunction, and a listing of
19  cardiovascular coincidental events were omitted from
20  the -- from the control clinical trials.
21     Q.  What's the basis for that statement?
22     A.  The -- well, I think we have the inclusion
23  criteria in one of the documents for the Phase III
24  trials, and FDA denied one of the citizen's petitions
25  that requested those omitted patient criteria be

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

---

**118**

1  included in the -- be included in the warnings and black
2  box, and FDA denied that even though those populations
3  had not been fully studied in the NDA students.
4      Q.  Do you know whether that information is
5  currently included in the label for Viagra?
6      A.  I have it.  I'll look right now.  What -- if
7  what information?  The exclusion criteria?
8      Q.  Yes.  You said that the FDA denied a public
9  citizen's petition, so I'm asking --
10     A.  Yes, it is -- it is in the label.  They asked
11 that it be put in a more prominent part of the label.
12 And I believe that FDA denied it because they said it
13 was already in another section of the label.  So, yes,
14 it -- it was included.  They were asking for a more
15 prominent spot.  But I'm answering your question
16 regarding exclusion -- exclusionary criteria in the
17 critical trials.
18     Q.  Okay.  I'm going to give you what we're marking
19 as Exhibit 6, which is the August 2008 version of the
20 label for Viagra.
21         MS. LESKIN:  Do you want a copy?
22         (Exhibit No. 6 was marked for identification.)
23 BY MS. LESKIN:
24     Q.  I take it you've seen this before.  Correct?
25     A.  I have this cited in my report.

---

**119**

1      Q.  Okay.  So you've seen this before, correct?
2      A.  Yes.
3      Q.  Okay.  And I'd like to direct your attention,
4  if I may, to page 12.  And you'll note this is under the
5  warning section, correct?
6      A.  Yes.
7      Q.  Now, there's four bullets there at the top of
8  page 12.  Are those the exclusion criteria you're
9  referring to?
10     A.  Those are the cardiovascular ones.
11     Q.  Okay.  And that's patients with a myocardial
12 infarction?
13     A.  I'm sorry.  And also the retinis -- retinitis
14 pigmentosa.
15     Q.  Okay.  And the cardiovascular ones that you
16 referred to are myocardial infarction, stroke, or
17 life-threatening arrhythmia within the last six months,
18 right?
19     A.  Uh-huh, yes.
20     Q.  And resting hypotension or hypertension?
21     A.  Yes.
22     Q.  Meaning below 90 over 50 or over 170 over 110?
23     A.  Yes.
24     Q.  And patients with cardiac failure or coronary
25 artery disease causing unstable angina, correct?

---

**120**

1      A.  Yes.
2      Q.  Okay.  Are there any other exclusion criteria
3  regarding to cardiovascular factors that you're
4  referring to?
5      A.  Well, there were certain concomitant
6  medications that were excluded.
7      Q.  Like nitrates?
8      A.  Of course.
9      Q.  And that's a contraindication, correct?
10     A.  Of course.
11     Q.  And that's been a contraindication in the label
12 since it was -- approval, correct?
13     A.  Oh, yeah.  That's -- I hope so.  Yeah.
14         MS. LESKIN:  I'm going to mark here as
15 Exhibit 7 a copy of the joint clinical review put
16 out by the Food and Drug Administration dated -- the
17 review date is January 22nd, 1998.
18         (Exhibit No. 7 was marked for identification.)
19 BY MS. LESKIN:
20     Q.  Have you seen this document before?
21     A.  We -- we have a medical review.  I -- I don't
22 recall if I had the joint medical review, though.
23     Q.  And when it approves a application, the FDA
24 creates a review of all the information, correct?
25 They're required to create a written document justifying

---

**121**

1  the approval?
2      A.  Summary basis of approval, yes.
3      Q.  Okay.  And are you aware that this document,
4  the joint clinical review, was published on the FDA
5  website following the approval of Viagra?
6      A.  I don't remember the joint review.  I remember
7  a medical review, but I don't remember a joint clinical
8  review.. I -- I just don't recall it.
9      Q.  Okay.  Are these in the documents that
10 plaintiffs provided to you?
11     A.  I believe I have the medical review that I
12 obtained from the website.  And I also believe they
13 provided me NDA documents relating to a medical review..
14 I just don't recall one that was titled "Joint Review.."
15     Q.  Okay.
16         MR. ALTMAN:  I'm going to -- I think we need to
17 object to foundation.  Are you saying you got these
18 off the FDA website?
19         MS. LESKIN:  This is the FDA joint clinical
20 review.  It's available on the website.  But this is
21 the FDA joint clinical review.
22         MR. ALTMAN:  Okay.  Can you tell me where on
23 the FDA website?
24         MS. LESKIN:  FDA.gov, search for Viagra, look
25 for history of approval, you'll find it.  It's still

## 122

1    up there.
2  BY MS. LESKIN:
3    Q.  If you look at page 13.
4    MR. ALTMAN:  I don't see it.
5    THE WITNESS:  I'm sorry?
6  BY MS. LESKIN:
7    Q.  If you look at page 13.
8    A.  Okay.
9    Q.  Okay.  You look at the top, and it says it's
10 referring to Table 8?
11   A.  Yes.
12   Q.  And that's a summary of the numbers of subjects
13 exposed in the sponsor's development program, correct?
14   A.  Yes.
15   Q.  And you said that there was about 4,000
16 patients, but some of those had taken placebo?
17   A.  Yeah.  That was my recollection.
18   Q.  Okay.  What's the number actually?
19   A.  4,526.
20   Q.  And those patients had all taken sildenafil,
21 correct?
22   A.  Taken sildenafil.  Let's see.  The column --
23 3,003 and 3 -- and 769 is 3,772.
24   Okay.  3,772.
25   Q.  Plus 178 from the Japanese studies?

## 123

1    A.  Plus the foreign data.  Yeah.  It was a
2  relatively modest NDA.
3    Q.  It's about the size of an NDA for an
4  antihypertensive product, correct?
5    A.  Well, they're bigger now.  I mean, 4,000 active
6  patients is a relatively small NDA.
7    Q.  Okay.  As of 1998, was that about the size of a
8  hypertension study?
9    A.  Yeah.  Generally they were between five and
10 seven thousand during that time frame.
11   Q.  If you look at page 15.
12   A.  I mean, for a -- for a new chemical entity, it
13 is not a big NDA.
14   Q.  Okay.  If you look at page 15.
15   In section 5.3, the FDA notes that this is
16 comparable to the size of a typical database for a new
17 antihypertensive agent.
18   Do you see that reference?
19   A.  Yeah.  It's just --
20   Q.  Take a look at page 14 on that -- in that
21 document for me.  Do you see Table 11?
22   A.  To go back to your earlier question, I think
23 FDA is referring in this to the adequacy of the patients
24 on subject years.  I think that you need -- this is a
25 narrow interpretation of what they're saying.  And

## 124

1    they're looking at how many patients were in it for
2  various points of time.  And I think that the FDA
3  comment also says, while this level of safety assessment
4  is adequate, it's a matter of judgment.  So I don't
5  think they're referring in this paragraph to the number
6  4,000.
7    Q.  Okay.
8    A.  They're referring to how many of those patients
9  were used in longer study designs.
10   Q.  Okay.  But you're not offering an opinion that
11 the size of the database was inadequate for approval,
12 are you?
13   A.  I'm not arguing -- okay.  I -- again, I'm not
14 arguing that this product was approved.  I'm just
15 saying, 4,000 patients on a new chemical entity for a
16 new indication is a rather modest NDA.  But the NDA was
17 approved.
18   Q.  Okay.  And you're not offering an opinion that
19 the size of the database was inadequate for approval,
20 are you?
21   A.  I am -- I agree with you that the NDA was
22 approved and FDA found the database adequate for
23 approval.
24   JUDGE BORG:  You've got about four minutes.
25   MS. LESKIN:  Okay.

## 125

1  BY MS. LESKIN:
2    Q.  Turn to page 14, please.
3    MS. LESKIN:  Thank you.
4  BY MS. LESKIN:
5    Q.  See Table 11 up there on top?
6    A.  I see, yes.
7    Q.  And according to -- that next table
8  representing the disease status of patients within the
9  study, correct?
10   A.  In the placebo-controlled and open-label
11 studies, yes.
12   Q.  Okay.  And according to this table, 25 percent
13 in the placebo-controlled and 27 percent of the patients
14 in the open-label studies had hypertension, correct?
15   A.  I can't read the black.
16   Q.  It -- I'll represent it says "PC" and "OL," and
17 then it has the "N."
18   A.  And that's percentage?
19   Q.  That's percentage --
20   A.  Percentage of the --
21   Q.  -- if you look at the top.
22   A.  Yes, 25 had hypertension in one, and 27 in the
23 other.
24   Q.  Okay.  Do you know what the percentage of men
25 with hypertension is in the general population?

32  (Pages 122 to 125)

126

1    A.  I know it's 40 percent in 50-year-olds.  And I
2  believe it goes higher with each decade, although that
3  is complicated by those that are on antihypertensives.
4    Q.  You see that diabetes in the clinical study was
5  18 and 19 percent?
6    A.  Yes.
7    Q.  Do you know what the underlying medical
8  percentage in the population is for men?
9    A.  No.
10   Q.  And you see it says 14 and 15 percent of the
11  men in the studies had hyperlipidemia?  Do you see that?
12   A.  Well, go back and comment on your question, the
13  hypertension.
14       They specifically excluded types of -- I mean
15  the more severe forms of hypertension.  So that probably
16  explains why these are only at 25 and 27 percent,
17  because they took out the really -- the high-level
18  hypertensives before the studies.  And that agree --
19  that also goes for the rest of these
20  cardiovascular-related.  So these end-point percentages
21  may well be under the average across all populations.
22   Q.  Well, do you know what the background rate for
23  diabetes is among men?
24   A.  No.
25   Q.  Are you aware that the -- Massachusetts Male

127

1  Aging Study found 7 percent of that population had
2  diabetes?
3       MR. BECNEL:  I'm going to enter an objection.
4  She just told you she didn't know.  And then you
5  asked the question:  Do you know of what this study
6  says?
7       JUDGE BORG:  That -- that's not repetitious,
8  and it's overruled.
9       Do you understand, and are you able to answer
10  the question?
11       THE WITNESS:  I know that it -- okay.  I
12  didn't -- I didn't know they said 7 percent.
13       I have used the term 6 percent across the
14  United States population.
15  BY MS. LESKIN:
16   Q.  And the Massachusetts Male Aging Study
17  specifically looked at the pop -- the incident rate in
18  older men, correct?
19   A.  I don't know.  I don't know.
20   Q.  Are you familiar with the study?
21   A.  Not particularly.  I just use the number
22  6 percent.
23   Q.  Okay.  And across the entire population?
24   A.  Yes.
25   Q.  Okay.  Going back to hyperlipidemia.

128

1       JUDGE BORG:  Two minutes.  Is this a good time?
2       MS. LESKIN:  Let me finish these last two --
3       JUDGE BORG:  Okay.
4       MS. LESKIN:  -- and I'll be done.
5       JUDGE BORG:  All right.
6  BY MS. LESKIN:
7    Q.  Hyperlipidemia, that's high cholesterol,
8  correct?
9    A.  Or high triglycerides.
10   Q.  Okay.  And 14 or 15 percent of the men in the
11  clinical database had hyperlipidemia, correct?
12   A.  Yes.
13   Q.  And cardiovascular disease, 14, 15 percent of
14  the men in the clinical database had cardiovascular
15  disease, correct?
16   A.  Correct.
17   Q.  Do you know what the population of the men --
18  of the background rate in older men is of either
19  hyperlipidemia or cardiovascular disease?
20   A.  No.  But I have a question.
21       The open-label study, did this conclude their
22  volunteers, the healthy volunteer studies?  Because if
23  the healthy volunteers are included in this number, then
24  all the ages are diluted because they will be younger
25  than the intended population for this drug.  So we can't

129

1  merge them.
2       MS. LESKIN:  Okay.  We'll come back to that as
3  soon as we change the tape.
4       THE VIDEOGRAPHER:  We're off the video record.
5       (There was a discussion off the record.
6  Luncheon recess from 12:14 p.m. to 12:46 p.m.)
7       THE VIDEOGRAPHER:  We are back on the video
8  record.
9       MR. ALTMAN:  Lori, before you get started, just
10  two brief issues.
11       I just want to note for the record that we were
12  able to locate that FDA document, and that it is not
13  in the regular place where those documents would be
14  kept on the FDA website.  It was just in some other
15  place.  I just want to clear up that it is not in
16  the regular place.
17       The second issue is:  You asked for a copy of
18  the data and charts provided to Dr. Blume.  I'm
19  presenting you with a CD that has all of those
20  materials on it.
21       MS. LESKIN:  Thank you.
22       JUDGE BORG:  Is that all?  Bless you.
23       MR. ALTMAN:  Do you want more?
24       JUDGE BORG:  No.  But I think I want you to do
25  all the talking..

33  (Pages 126 to 129)

**CONFIDENTIAL**

---

**130**

1    MS. LESKIN:  For them, you mean?
2    JUDGE BORG:  That's why I said it.
3    Well, no, I'd let him do it for everybody.
4    All right.  Ms. Leskin, you may proceed.  We're
5    back on.
6    MS. LESKIN:  Just to clarify, though, the FDA
7    document we're talking about is a joint clinical
8    review, right?
9    MR. ALTMAN:  Yes.  It's just that there was a
10   regular place where one would expect to find those
11   documents, and we've agreed you had to show me where
12   to find the documents --
13   MS. LESKIN:  Right.  On the website, though?
14   MR. ALTMAN:  On the website.  But it is not
15   where such documents are normally kept.
16   MS. LESKIN:  Okay.
17   THE WITNESS:  And I also need to clarify, I did
18   not make another copy of my hard drive for you.  If
19   it's requested, I can make another copy of the hard
20   drive.  The disk that I gave you obviously does not
21   include the hard-drive documents.
22   MS. LESKIN:  Okay.
23   THE WITNESS:  The hard-drive documents, I can
24   make another -- I can make a hard drive for you
25   if -- if you request it.  But it is the Pfizer

---

**131**

1    production documents.
2    BY MS. LESKIN:
3    Q.  Okay.  And do you have any kind of index as to
4    what documents are on that drive?
5    A.  Yes, I think so.
6    Q.  Okay.
7    A.  I think so.
8    Q.  If we can get a copy, at least, of the index of
9    the documents on the drive, that would -- instead of
10   getting a whole new hard drive from you.
11   MR. OVERHOLTZ:  That's fine.
12   MR. ALTMAN:  It's going to be the production
13   through -- it's -- the only thing that's not going
14   to be in it is, like, the last Pfizer production.
15   MS. LESKIN:  Okay.  That's fine.
16   THE WITNESS:  So you still want it?
17   MS. LESKIN:  Yeah, I'd still like the index.
18   MR. OVERHOLTZ:  We'll get it done.
19   MS. LESKIN:  At a break.
20   THE WITNESS:  We'll get it at a break.  I will.
21   MS. LESKIN:  Yeah.
22   BY MS. LESKIN:
23   Q.  Dr. Blume, when in your -- is it your opinion
24   that a signal -- well, strike that.
25   Is it your opinion that there has been a

---

**132**

1    signal, a safety signal, for NAION and sildenafil?
2    A.  Yes.
3    Q.  And in your opinion, when did that signal
4    occur?
5    A.  I think a signal for visual disturbances,
6    including vision loss, was apparent by 2002.
7    Q.  Now, when you say "vision loss," does that
8    include things other than NAION?
9    A.  Well, I -- it includes permanent vision loss, I
10   think.  Yeah.
11   Q.  Does that include permanent vision loss due to
12   things other than NAION?
13   A.  It includes also the terms reported as ION.
14   Q.  So NAION, ION.  Anything else?
15   A.  I think that's it.
16   Q.  Okay.  So it's your opinion that as of 2002
17   there was a safety signal for NAION and ION.  Is that
18   fair to say?
19   A.  Right, yes.
20   Q.  When you say by -- when it was apparent by
21   2002, is there a particular time in 2002 that it became
22   apparent?
23   A.  No.  I don't think I looked at it by month.
24   Q.  Okay.
25   A.  No.  Well, let me clarify that in reality in

---

**133**

1    2000 there was an AERS database signal for the ION term.
2    So by 2000 there was a post-marketing -- based on that
3    alone, there was a -- there was a signal.
4    Q.  Okay.  When you say by 2000 there was an AERS
5    database signal, for NAION and ION?
6    A.  Well, it's the ION term.
7    Q.  The ION term?
8    A.  Right.
9    Q.  What was that -- what's that based on?
10   A.  When I asked Mr. Altman to evaluate the AERS
11   databases we discussed earlier this morning, beginning
12   in 2001 Viagra -- the signal that I -- I would have
13   detected is that Viagra had the most number of events
14   beginning in 2000, and it maintained that total number
15   of cumulative events throughout the period to 2005.
16   Q.  Now, when you say it has the most number of
17   events, what do you mean by that?
18   A.  Had the greatest -- of all the products in the
19   AERS database, Viagra had the greatest number of ION
20   events, beginning in 2000, cumulative number events
21   beginning in 2000.  And that continued through my period
22   of interest, through 2005.
23   Q.  How many ION events did Viagra have in 2000?
24   MR. ALTMAN:  Objection; vague.
25   THE WITNESS:  I did not -- I started the

---

34  (Pages 130 to 133)

**134**

1  database evaluation in '98 because it was approved
2  in '98. And AERS has two terms in '98, total of
3  five terms in '99, and 12 terms in 2000.
4  MR. ALTMAN: I had an objection. I don't think
5  it was heard. But I had objected as vague. And my
6  only point is: Are you talking about -- when you
7  said how many NAION events, are you talking about
8  just in the AERS database?
9  MS.. LESKIN: The witness was able to understand
10 the question.
11 JUDGE BORG: Yeah. She answered it.
12 MR. ALTMAN: Well, I don't think she heard me
13 object to know whether -- I just want to make sure
14 that she was answering in term of context of AERS.
15 That's all. I'm sorry.
16 JUDGE BORG: Okay.
17 THE WITNESS: Well, I'm intending that to be
18 the context of AERS, yes. And in 2000, those 12
19 represented about 15 percent of the total ION events
20 in the overall AERS database.
21 BY MS. LESKIN:
22 Q. Now, when you say there is two terms in '98 and
23 five terms in '99, what's a term?
24 A. Reports.
25 Q. Okay. So according to the data that you have,

**135**

1  there were two NAION reports in nineteen ninety -- or
2  ION reports in '98, and five reports in 1999, correct?
3  A. Correct.
4  Q. Have you looked at those reports?
5  A. No. I mean other than -- no. I did an
6  evaluation of the total number of reports only.
7  Q. Well, let me ask you this.
8  Do you know if anyone at Pfizer -- excuse me --
9  looked at those reports?
10 A. I don't -- I think I recall seeing that
11 Pfizer -- Pfizer correspondence about AERS. I don't
12 recall if I remember it in '98 and '99.
13 But a signal, when one product is a contributor
14 and is the largest contributor to a database, that alone
15 is a signal.
16 Q. Okay.
17 A. And that position did not change for the next
18 five years.
19 Q. Okay.
20 A. So in my interpretation, that is a signal.
21 Q. Okay. What do you base that on?
22 A. Well, again, FDA's definition, and the one that
23 we are taught to use in industry, is anything that makes
24 you look differently and anything that makes --
25 distinguishes your product from others, be it

**136**

1  mechanistically or be it in a chemical category.
2  And Viagra comes into the market in mid '98, I
3  believe, and within 18 months it has the largest number
4  of ION-related events in the database. And in fact it
5  is 15 percent of that database and is up to around
6  20 percent of it in 2001.
7  So ION events in the U.S. database are not
8  distributed equally across all products, obviously, and
9  the distribution is skewed to a couple products. And
10 the largest of those products is Viagra.
11 Q. What percentage of the AERS database were
12 Viagra adverse events of any type in 1998 -- well,
13 strike that.
14 In 2000, what percentage of events in the AERS
15 database were related to Viagra?
16 A. What -- I'm sorry. What percentage of AERS
17 related to Viagra?
18 Q. Yes.
19 A. As what?
20 Q. In 2000, what related --
21 A. I don't understand what you're asking. But is
22 it as a primary drug? A secondary drug? Is it a report
23 that has it as a primary? A suspect? A serious
24 suspect? I mean, how are -- how are you breaking that
25 down?

**137**

1  Q. Okay. Well, let's talk about the ION reports
2  in 2000. You said there were 12 events reported,
3  correct?
4  A. Yes.
5  Q.. What is Viagra for those events?
6  A. Suspect agent.
7  Q. Okay. So what percentage of adverse events in
8  the AERS database in 2000 listed Viagra as a suspect
9  agent?
10 A. Oh, I have no idea. I'm only -- I'm -- I'm
11 focusing on a -- the ION events. It's of no relevance
12 to me what percentage of all the Viagra events are in
13 the database. What relevance is that to me? My
14 interest is: Is there a signal for a very particular
15 event? It doesn't matter to me if Viagra is causing
16 cardiovascular events, different cardiovascular or
17 different hepatic events. I'm focusing on ophthalmic
18 events. If I focused on everything, I would never be
19 able to drill into the data.
20 Q. What percentage of Viagra adverse events in
21 2000 were ION events?
22 A. Again, I have no idea, nor does that influence
23 my opinion. My opinion is, when I look at an event --
24 when you work in a company and realize that you are
25 receiving some events, and you want to know the -- put

35 (Pages 134 to 137)

**CONFIDENTIAL**

## 138

1  some context, as you say, into this event, one way of
2  doing it is looking at your contribution to these events
3  and all other drugs' contribution to this event. And
4  what I would see is, there was a very definite
5  difference with Viagra and the rest of the drugs. And
6  that difference continued. So it wasn't one year that
7  there was a difference, and then it disappeared. It was
8  maintained.
9      MS. LESKIN: Move to strike as nonresponsive.
10 BY MS. LESKIN:
11     Q.  My question --
12     MS. LESKIN: I'm sorry.
13     JUDGE BORG: Sustained. Go ahead.
14 BY MR. OVERHOLTZ:
15     Q.  What percentage of Viagra adverse events in
16 2000 were ION events?
17     A.  I thought I answered it. I don't know. And it
18 isn't relevant to my opinion.
19     Q.  What authority are you relying on to establish
20 that the 12 events in 2000 identified a signal?
21     A.  Okay. Again, a signal is anything that makes
22 you look differently, an event.
23     Q.  What authority are you relying on for that?
24     A.  That's the FDA's definition of a signal.
25     Q.  Where does it say that?

## 139

1      A.  Oh, I don't -- I don't know if it's in this
2  current one or not. You know, I have been doing this
3  for 30 years. And for 30 years I have done signal
4  detection, looking at different databases to see if I
5  see anything different or any change in something I've
6  seen before.. And I believe that the definition they use
7  here is, if you're seeing anything in excess of what you
8  expected to see. In fact, I think you read that to me.
9      Well, if I look at this database using the
10 government's AERS database, and I see that of the 80
11 events, 12 of them are Viagra, that is more events than
12 I expected to see with one single drug. If I look at
13 the database in 2001, and I see there's only 100 events
14 in the database, and 21 of them are Viagra, again that
15 is more than I anticipated to see based on all of the
16 data I'm looking at. So even with this 2005 definition,
17 I think we've defined a safety signal with the AERS
18 database.
19     Q.  Well, let's go back to that 2005 definition.
20 That definition says, "Safety signal refers to a concern
21 about an excess of adverse events compared to what would
22 be expected to be associated with a product's use."
23     A.  Exactly. The product was launched in mid '98,
24 and there were two events. You didn't see any, as
25 you've told me three times, in the -- as was told three

## 140

1  times in the overview, on the clinical trial database.
2  None were seen. So now it's on the market for a couple
3  months, and there's two events. The following year,
4  it's up to six events, and then up to 12 events. And
5  that's the leading contributor. That's more than what I
6  would have anticipated to see with a Viagra use.
7      MS. LESKIN: Move to strike. There was no
8  question pending.
9      JUDGE BORG: Sustained.
10     MR. OVERHOLTZ: There was a question pending.
11     JUDGE BORG: No, no. There -- there --
12     MR. BECNEL: Yeah.
13     JUDGE BORG: The question was -- was asked, and
14 the question was answered, and then it continued.
15     MR. OVERHOLTZ: She said, "Let's go back to
16 that 2005 definition. It says, 'Safety signal
17 refers to a concern about excess of adverse events
18 compared to what would be expected to be associated
19 with a product's use.'"
20     MS. LESKIN: Where's the question?
21     MR. OVERHOLTZ: And then looked at her.
22     MS. LESKIN: I actually didn't look at her.
23     MR. OVERHOLTZ: Were you making a statement?
24     MS. LESKIN: Well, she started speaking
25 before --

## 141

1      MR. OVERHOLTZ: You were just testifying on the
2  record.
3      MS. LESKIN: Well, no, but I -- I read a
4  statement. I did not yet ask a question. And the
5  doctor started speaking.
6      Move to strike; no question pending. And I
7  believe that was sustained.
8      MR. BECNEL: Objection.
9      MS. LESKIN: To?
10     MR. OVERHOLTZ: First of all, I don't --
11 I've never -- first of all, there's no authority in
12 the rules to a move to strike during the deposition
13 of a testimony. There is no authority for it. If
14 you want to --
15     JUDGE BORG: For -- for what? The motion to
16 strike?
17     MR. OVERHOLTZ: Motion to strike. If she wants
18 to file objection, nonresponsive, that's one thing.
19 A motion to strike is not an appropriate legal
20 objection during a deposition. There is no legal
21 authority of it in any case you will ever find
22 reported during a deposition.
23     JUDGE BORG: The objection is limited to
24 nonresponsive.
25     MR. OVERHOLTZ: That's correct.

36  (Pages 138 to 141)

142

1    JUDGE BORG: By the way, that makes all other
2 objections limited to privilege, nonresponsive, and
3 form of the question. And I hear lots of objections
4 that don't fit any of those three.
5    MR. OVERHOLTZ: You're right.
6    JUDGE BORG: Okay. Ms. Leskin, you can
7 proceed.
8    MS. LESKIN: Thank you.
9 BY MS. LESKIN:
10    Q.  Do you know how many men took Viagra in the
11 first year it was on the market?
12    A.  No.
13    Q.  Do you know how many men in a population --
14 well, strike that.
15    Do you know how many men have taken Viagra
16 since it has been on the market?
17    A.  Oh, I recall seeing that in one of your
18 records. I think it's 30 million. I think it's around
19 there..
20    Q.  So using that number of 30 million, do you know
21 how many cases of NAION you would expect to see in a
22 population of 30 million men over a 10-year period, just
23 as background rate?
24    A.  Well, I only have the two background studies.
25 So if it's 10 in 100,000 or 2 in 100,000, 2 in

143

1 100,000 -- 2 in 100,000 would be 20 in a million. 20 in
2 a -- 60.
3    Q.  And if you use the higher number?
4    A.  Higher number was five times more than that, so
5 that would be 300 million.
6    Q.  300?
7    A.  300. Sorry. And if these -- oh, sorry. I'll
8 continue when you ask a question.
9    Q.  Now, we talked about signals, and we said that
10 once you have a signal, there's an obligation to
11 investigate, correct?
12    A.  I was just going to complete my answer to the
13 last one. Can I do that?
14    Q.  I think you answered the question.
15    The question was, what would be -- what you
16 would expect. And you said 60 or 300. That was the
17 only question that was asked, Doctor.
18    So my question now is: Once you have a signal,
19 there's an obligation to investigate, correct?
20    A.  Well, there's multiple obligations. One of the
21 obligations is to investigate.
22    Q.  Okay. Are you -- are you aware of what
23 investigation Pfizer conducted in 2000?
24    A.  No. I'm not aware of any.
25    Q.  Is it your testimony that Pfizer did not

144

1 conduct an investigation in 2000 or you're not aware of
2 any?
3    A.  I'm not aware of any investigation in 2000 or
4 any studies done in 2000.
5    Q.  Well, was the only study that -- the only way
6 to investigate to do a study?
7    A.  No.  There's other ways.
8    Q.  Is it your opinion that Pfizer should have done
9 a study in 2000?
10    A.  I think, yes, my -- my opinion is that
11 certainly by 2001 or '2, when this pattern was
12 confirmed, a study should have been conducted.
13    Q.  What type of study should have been conducted?
14    A.  Well, a study that would allow them to
15 quantify -- I think Pfizer should have done two things
16 beginning in 2000.
17    One is, of course, that the information should
18 have been shared with prescribers and patients.
19 Absolutely that should have been done. And then if they
20 wanted to define further the risk of NAION, they could
21 have begun a study that would have allowed them to
22 compare NAION events in Viagra-treated patients with
23 some sort of a control -- hopefully age and disease and
24 other demographic-controlled control groups. But that
25 study is certainly not necessary before they share the

145

1 information with their prescribers and patients.
2    And by the time 2000 or two thousand -- the
3 additional events in 2001 and 2002 were known, NAION
4 should have been in the labeling or ION in the labeling.
5    MS. LESKIN: Objection; nonresponsive.
6 BY MS. LESKIN:
7    Q.  My question was: What type of study should
8 have been conducted?
9    MR.. OVERHOLTZ: She answered your question.
10    THE WITNESS: I thought I answered that.
11    MS. LESKIN: Okay. Well, I'll move to strike
12    anything -- part of that answer that was not. And
13    I'm going to ask my question and ask you to restrict
14    your answer to my question.
15 BY MS. LESKIN:
16    Q.  What type of study should have been conducted
17 in 2000?
18    A.  Well, in 2000 they should have reviewed the
19 various options for this type of an event. They
20 could -- they should have reviewed the ability in 2000
21 to do either a case-controlled study or a
22 cohort-controlled study. And then making a decision of
23 what was available to them in 2000, based on available
24 databases, that study should have been initiated.
25    Q.  Have you ever designed a case-control study?

37  (Pages 142 to 145)

## 146

1    A. Oh, yeah. Yes.
2    Q. Okay. How long would a case -- well, let me
3 ask you this..
4       How many patients would be required in a
5 case-control study to determine whether there was an
6 increased risk of NAION in patients taking Viagra?
7    A. Oh, it's depending on how you calculate it. I
8 mean, it could be anywhere from -- could look for 300
9 patients all the way up to 150,000 patients.
10    Q. How long would a study like that take?
11    A. All depends on how much effort they put into
12 the study, how many ophthalmologic sites they were
13 willing to open.
14    Q. What's a range?
15    A. A couple years. A couple years. Maybe longer.
16 We don't know because they didn't do it. But I would
17 imagine a couple years.
18    Q. You're aware that currently Pfizer has started
19 doing a case-crossover study --
20    A. Oh, yes.
21    Q. -- to investigate NAION, correct?
22    A. Yes, I'm aware they did start that last year.
23    Q. Okay. Do you know how long that study is
24 estimated to take?
25    A. No.

## 147

1    Q. And have you ever designed a cohort study?
2    A. We helped with the cohort study, designing it,
3 with a client.. But there was also -- their people were
4 also involved in it.
5    Q. How many --
6    A. And I think in this case it would -- a
7 case-control study would probably be the study one would
8 have to do. A cohort study would take forever. But a
9 case-controlled study, I mean certainly people were
10 doing those types of study in 2000. It should have been
11 started then.
12    Q. What authority are you relying on for your
13 opinion that the Pfizer should have started a
14 case-control study in 2000?
15    A. That when safety signals are higher than what
16 one anticipates, one needs to investigate it --
17 investigate. And that investigation can take a variety
18 of venues, and one of those venues is, is to do a study.
19    Q. And what authority are you relying on that 12
20 reports is sufficient justification to start doing a
21 case-control study?
22    A. Well, there was more than those 12 reports.
23 We've been focused on the AERS database. But 12 reports
24 is a safety signal, and it's a safety signal for an
25 event that can lead to blindness. So it's a serious

## 148

1 event, as it is -- as it is not a transient clinical --
2 clinically minor adverse event.
3       So when a signal was obtained in a population
4 for which the use of the drug is recreational, and
5 certainly not intended to either extend life or cure a
6 disease, and the adverse event is -- can be permanent
7 blindness, then certainly the benefit/risk would tilt
8 toward doing a study to learn more about this event, not
9 only to quantify the event, but also to do a study that
10 would attempt to identify any particularly vulnerable
11 subgroups. And that's why post-marketing studies are
12 done.
13    Q. Now, you said to me that there's more than
14 12 events. We were only looking at AERS. Well, how
15 many other events were there?
16    A. Well, if FDA tells you that AERS has only
17 1 percent to 10 percent of total events, so either -- at
18 that point there was either 120 or 1,200 ION events.
19    Q. How many events were there as of 2000, Doctor?
20       MR. BECNEL: Objection; vague.
21       THE WITNESS: I thought I answered. There were
22 12 points to AERS, and FDA has -- has always
23 cautioned, that's only 1 to 10 percent that have
24 actually occurred.
25 BY MS. LESKIN:

## 149

1    Q. That's estimated 1 to 10 percent, correct?
2    A. Well, that's the FDA's numbers.
3    Q. So you don't know, sitting here today, how many
4 reports -- how many events there actually were in 2000,
5 correct?
6    A. I can only quote to you what FDA uses in -- as
7 their number, and it's 1 to 10 percent.
8    Q. Okay. So sitting here today, you don't know
9 how many events there were in 2000?
10       MR. OVERHOLTZ: Object to the form; asked and
11 answered, misstates the witness's testimony. She
12 answered the question.
13       JUDGE BORG: She -- she -- it's overruled.
14 She's not misstating anything. She's asking a
15 question.
16       MR. OVERHOLTZ: Well, she asked the same
17 question --
18       JUDGE BORG: It's not the same question.
19 She --
20       MR. OVERHOLTZ: It's the exact same words.
21       JUDGE BORG: It is overruled. The question is
22 asked. This witness --
23       Dr. Blume, are you able to answer it?
24       THE WITNESS: I -- I don't know where the
25 number fell between 120 and 1,200.

38  (Pages 146 to 149)

**CONFIDENTIAL**

---

150

1  BY MS. LESKIN:
2      Q.  Do you know it's at least 120?
3      A.  Just based on what FDA says. You're -- I don't
4  know what I don't know.  No one knows.  But because we
5  try to be conservative in our safety handling with our
6  drugs and with our potential patients, we use the
7  estimate that FDA gives us:  1 to 10 percent are
8  reported.
9      Q.  But you don't know what the actual number is,
10 right?
11     A.  Okay.. I thought I've answered this.  No, I
12 don't know the actual number.  But with 12 alone, I
13 would have recommended it going into labeling.
14     Q.  Did you look at the adverse events that were
15 reported in 2000?
16     A.  No.  I know that they are serious suspect
17 events.
18     Q.  Did you look at the --
19     A.  No.
20     Q.  -- MedWatch forms?
21     A.  I did not look at the MedWatch forms.
22     Q.  Do you know if any of those 12 are duplicative?
23     A.  The way in which we do these analyses,
24 duplicates are ruled out.
25     Q.  How do you know?

---

151

1      A.  Because Mr. Altman has done this repeatedly for
2  me for years, and it's been the basis of NDA
3  submissions.  FDA has asked this same question.  And the
4  NDAs have been approved upon -- and using the materials
5  he has given me with his evaluation of the AERS database
6  has -- has been specifically questioned if there can be
7  duplicates.
8      Q.  Is it possible that the company was unaware if
9  there were duplicate reports?
10     A.  I have no idea what the company knew in 2000
11 about their 12 events.  I have no idea.
12     Q.  And that's because you never looked at the
13 MedWatch reports that were submitted to FDA, correct?
14     A.  No, because I'm looking for signal detection.
15 And you can demean and denigrate, dilute AERS data all
16 you want, but the basis is, it serves as the basis for
17 product withdrawals and product labelings.  And based on
18 this, they had a signal in 2000 using the same criteria
19 that we use for making decisions on drug -- for drug
20 product labeling.
21     Q.  What case -- what product has been withdrawn
22 from the market based on 12 adverse event reports where
23 no one looked at the MedWatch reports?
24     A.  I didn't say they were withdrawn based on 12.
25 I said the AERS database is the basis for making

---

152

1  decisions relating to drug labeling changes and drug
2  withdrawals.
3      Q.  And that -- that's -- the AERS database serves
4  as a starting point, correct?
5      A.  Oh, I don't know if it's just a starting point.
6  I don't know where you're -- what authority you're
7  basing that we make decisions using only the AERS as
8  a -- as a starting point.
9      Q.  Are you telling me that people have made
10 decisions on the AERS database without ever looking at
11 the underlying reports?
12     A.  No, I didn't say that either.  But I'm looking
13 at signal detection now for labeling purposes.  And the
14 product had more than anyone else in the database, and
15 they were coded as serious and suspect agents.
16         In addition to that, by 2000 and later there
17 had been independent literature reports, and there had
18 been other reports.  So we're not talking just about the
19 AERS data.
20     Q.  Okay.  Tell me what literature reports there
21 were in 2000.
22     A.  Okay.  I think the original -- well, I'll --
23 I'll just do this in order.
24         Okay.  I begin the literature review on
25 page 16, dealing with ophthalmologic events.  And I

---

153

1  believe the first event that everyone talks about is the
2  Egan and Pomeranz.
3      Q.  Where is that on page 16, Doctor?
4      A.  Oh, I don't know if it's there.  I was just --
5  mentioned that -- I think it comes a little bit later.
6  But Egan and Pomeranz was in 2000.
7      Q.  I'll direct your attention to page 13 of your
8  report.
9      A.  I'm sorry?
10     Q.  Top of page 13, is that where you refer to
11 Egan and Pomeranz?
12     A.  Yes.
13     Q.  Okay.
14     A.  Okay.
15     Q.  Is that the first case --
16     A.  Well, I refer to them -- I refer to them
17 separate -- several times.
18     Q.  Okay.
19     A.  I think.  I think that was the first case that
20 was reported.
21     Q.  Okay.  Is that report in the AERS database?
22     A.  I think so.  I think so.
23     Q.  So that's one of the 12 that you --
24     A.  I believe so.  I believe --
25     Q.  Okay.

39  (Pages 150 to 153)

CONFIDENTIAL

154

1    A.  I believe I recall that, reading that.
2    Q.  Okay.  So what other literature reports were in
3  there in 2000?
4    A.  Well, I think I gave between 2000, 2001, and
5  2002 when I gave my review.
6    Q.  Okay.  What other literature?
7    A.  Okay.  Cunningham and Smith is 2001.
8    Q.  Is that in the FDA AERS database?
9    A.  I don't -- I don't -- no.  It's in the Egan and
10  Pomeranz.  Boshier in 2002.  Dheer in 2002.
11    Q.  Are those reports in the FDA database?
12    A.  I don't think so, no.
13    Q.  Did you look?
14    A.  I did not look at the underlying events,
15  underlying MedWatch forms, in the FDA's database.
16    Q.  So when you say you don't think that they're in
17  the FD AERS database, what's the basis for that opinion?
18    A.  I recall reading it in the Pfizer documents,
19  that Dheer and Boshier had not been included.
20    THE REPORTER:  Dheer and?
21    THE WITNESS:  Boshier, B-o -- B-o-s-h-i-e-r.
22  BY MS. LESKIN:
23    Q.  Find me that document, please.
24    A.  Pfizer documents?  Oh, I don't have it cited
25  here.

155

1    Q.  You just made a statement, Doctor, that these
2  reports are not in the AERS database.  I want to see the
3  document you're relying on --
4    A.  And I will -- and I will attempt to find it --
5    (Reporter clarification.)
6  BY MS. LESKIN:
7    Q.  Doctor, you just testified that the Dheer and
8  Boshier case reports were not included in the AERS
9  database.  What is the basis for that opinion?
10    A.  Because I thought I recalled in the Pfizer
11  documents that they had noted that the original -- those
12  two reports, the Indian report and the Boshier report,
13  had not been included in the early AERS data.
14    Q.  Okay.  When you define early AERS data, when is
15  that?
16    A.  Well, I think they were talking about prior to
17  2005.
18    Q.  Okay.
19    A.  But I don't recall the specific year.  But my
20  point is --
21    Q.  No, no.  My question is:  What document says
22  that?
23    A.  I'll have to look.  I don't --
24    Q.  I'd like you to find -- at the break --
25    A.  I'm sure you would.  And I will attempt to look

156

1  at it.
2    But my point was, in bringing this up is, you
3  asked me --
4    Q.  Doctor, there's no question pending.
5    A..  Well, you asked me what a signal was.  I'm
6  answering your question.
7    JUDGE BORG:  No, no.  I'm sorry.  I didn't get
8  that question.  Is that back in there, where she
9  asked for a signal?
10    MS. LESKIN:  I -- I haven't asked that question
11  in at least 20 minutes.
12    JUDGE BORG:  Well, I'm asking the court
13  reporter.  The last question that I heard was, "Can
14  you find the document?"  You've indicated you will
15  attempt to do that.
16    THE WITNESS:  I will.  I will.
17    JUDGE BORG:  Okay.  That's the last question
18  I've got.
19    THE WITNESS:  But I was responding.  She
20  interrupted me when I was responding to an earlier
21  question.
22    JUDGE BORG:  Okay.  Well, there isn't a
23  question to you.  Yeah.  Well, that wasn't -- yeah.
24  We do them one at a time here.  And -- and you're --
25    By the way, the attorneys on the other side are

157

1  going to get to ask you questions today.
2    THE WITNESS:  I understand.
3    JUDGE BORG:  Okay.
4  BY MS. LESKIN:
5    Q.  When did you receive this chart from
6  Mr. Altman?
7    A.  Oh, gee.  I don't know.  I don't know.  I'll
8  have to check.  I don't know when I got it.
9    Q.  Was it before or after you signed your report
10  in this case?
11    A.  I think it was after.
12    Q.  So that information that you have in your hand
13  did not form the basis for the opinions as expressed in
14  your expert report dated December 1st, 2008; is that
15  fair to say?
16    A.  No, probably not.  It corroborates it, but no.
17  I had the opinion long before I saw any of the -- yeah,
18  I had the opinion earlier.
19    Q.  Okay.  So putting aside the report that
20  Mr. Altman provided to you, what other basis do you have
21  for your testimony that a signal existed in 2000?
22    A.  Well, I've always said 2000 to 2002.  Okay?
23    Q.  Well, which is it?
24    A.  It's that time frame, because of the -- what
25  I'm going to talk to you about.  Okay?

40  (Pages 154 to 157)

**158**

1    I looked over a variety of issues.  One of the
2  things that I looked at were the safety update reports
3  who included blindness, either temporary blindness or
4  permanent blindness.  Beginning with safety update No. 2
5  and continuing with all safety updates after that, there
6  were reports of blindness.  Also beginning with safety
7  update 2, which is a 1998, and 1999 in safety update 3,
8  there were reports of rechallenge information.  So that
9  alone is another signal.  You had the reports, reported
10  them in the safety update.  And included with that
11  information were reports of rechallenges.  One
12  rechallenge alone can be evidence for the need to change
13  a label.
14    Q.  Okay.  Show me the report of rechallenge.
15    A.  Well, it's a safety -- well, okay.  I think I
16  have a -- it's a couple different places.
17    If you look at page 28, I talk about a man in
18  2000 who had positive rechallenge on three separate
19  occasions using Viagra, in blindness.  Then --
20    Q.  I'm sorry.  You said a positive rechallenge on
21  three separate occasions..  What is the date of that
22  report?
23    A.  October 10th, 2000.
24    Q.  And what's the event that's being reported
25  there?

**159**

1    A.  Blindness.
2    Q.  Is that NAION?
3    A.  I don't recall.  But I recall saying to you
4  that I looked at temporary or permanent blindness.  And
5  since you don't have permanent blindness in your
6  labeling either, that should have gone in there as well.
7    And then I do a review of the periodic safety
8  updates, and there were rechallenge events relating to
9  blindness in, as I said, safety update 2 and safety
10  update 4.
11    Q.  Before we get there, I just want to ask you a
12  question, Doctor.
13    Is it your testimony -- see, I'm -- I'm having
14  a problem here, given some of the objections that
15  plaintiffs have.
16    Is your report focusing on blindness or is your
17  report focusing on NAION?
18    MR. ALTMAN:  I have an objection, Your Honor.
19  Just -- she asked Dr. Blume what was the basis of
20  her, you know, opinion in 2000.  I don't know that
21  Dr. Blume has completed her answer.  And several
22  times Ms. Leskin has asked her additional questions
23  and interrupted.  I think she should have a chance
24  to finish her answer to that question, because it
25  was a pretty broad question, and then when she's

**160**

1  done with that, I think she can follow up with
2  whatever she wants.
3    JUDGE BORG:  Well, I -- I understand what
4  you're saying.  And that's a fair comment.  I guess
5  my assumption has been, when it's followed up with
6  another question, that it essentially withdraws the
7  earlier one.  But perhaps I'm incorrect -- incorrect
8  in making that assumption.
9    MS. LESKIN:  Well --
10    JUDGE BORG:  Is that -- Ms. Leskin, you did ask
11  a question, and then you stopped it and started
12  another one.
13    MS. LESKIN:  Right.  And --
14    JUDGE BORG:  Do you want an answer to the first
15  one?
16    MS. LESKIN:  Well, I want to under -- I'd like
17  an answer to the second question.  And that will
18  help me understand her answer to the first question.
19    JUDGE BORG:  All right.
20    MS. LESKIN:  Because apparent -- what -- what
21  it's telling me is that my question was vague.  And
22  I want to make sure we're talking on the same page.
23    JUDGE BORG:  Okay.
24    MS. LESKIN:  So I'm trying to understand her
25  opinion before I go back and let her explain the

**161**

1  basis for that.
2    MR. ALTMAN:  My only point, then maybe she
3  should withdraw the other question, because I don't
4  think it's --
5    MS. LESKIN:  Withdraw the other question.
6    MR. ALTMAN:  I don't think it's fair that --
7    JUDGE BORG:  It's withdrawn.
8    MS. LESKIN:  I'll withdraw the other question.
9  BY MS. LESKIN:
10    Q.  So let me just go back to my question.
11    Is your -- is your opinion here focused on
12  NAION or is your opinion focused on blindness?
13    A.  It's really -- it's focused on both.  And the
14  reason is, NAION isn't a term..  So we can't just
15  restrict it to NAION because that's -- that's hiding the
16  ball.  Even today the term is ION in the adverse event
17  database.  So if we restrict our -- restrict our study
18  just to NAION, we're doing nothing but diluting the
19  numbers even further.  And in the periodic safety update
20  reports, it all funnels into optic neuritis.
21    So what I tried to do in here was to use the
22  terms that your client used at various points in time,
23  recognizing that within optic neuritis we will have
24  NAION reports.  And I tried to then look at ones that
25  looked at blindness, since the concern with NAION is the

**CONFIDENTIAL**

---

**162**

1  blind -- permanent blindness. But it's hiding the ball,
2  Ms. Leskin, to say -- to look only at the term NAION.
3     Q.  Well, I'll give you the term ION. I'm trying
4  to figure out --
5     A.  But, Ms. Leskin --
6     Q.  I'm sorry. There's no question pending.
7     A.  But I have to correct that, because it all
8  codes to optic neuritis --
9     MS. LESKIN: Move to strike.
10    THE WITNESS: -- in your client's safety update
11 reports.
12    MS. LESKIN: Move to strike.
13    JUDGE BORG: Well, that's not available to you.
14 If you have a --
15    MS. LESKIN: Okay. Objection; nonresponsive.
16    JUDGE BORG: Okay. That's sustained.
17 BY MS. LESKIN:
18    Q.  Is it your opinion that all cases of blindness
19 that are reported are the same as all cases of ischemic
20 optic neuropathy?
21    A.  Well, blindness can come from a variety of
22 reasons. I did not look at blindness that came as a
23 result of a car accident, if that's what you're asking.
24 I was not looking at accidental blindnesses.
25    Q.  Well, can you tell from these -- if something

---

**163**

1  is coded to blindness, can you tell if it comes from an
2  accident unless you look at the underlying MedWatch
3  report?
4     A.  Well, luckily with your client's periodic
5  safety update reports, they outline those types of
6  issues. So that's what I looked at with your periodic
7  safety updates, and learned that there were nonaccident
8  events of permanent blindness were coded as early as
9  safety update No. 2. But one has to look at that
10 because you code everything to optic neuritis.
11    Q.  Is there a code for nonarteritic ischemic optic
12 neuropathy?
13    A.  Well, according to what are in your periodic
14 safety update reports, it quotes nonarteritic anterior
15 optic -- nonarteritic anterior ischemic optic neuropathy
16 codes to optic neuritis. So the code is to optic
17 neuritis, but within the safety update reports blindness
18 is discussed separately. And by safety update No. 2,
19 reports of blindness are in the safety updates.
20    Q.  Are you familiar --
21    A.  Nonaccident safety -- nonaccident blindness.
22    Q.  Are you completed your answer?
23    A.  I think so.
24    Q.  Are you familiar with the WHO-ART terms?
25    A.  Yes.

---

**164**

1     Q.  Are you -- do you know whether there is a
2  WHO-ART term for nonarteritic anterior ischemic optic
3  neuropathy?
4     A.  In what year?
5     Q.  The date --
6     A.  I know it changed over years. So what year it
7  refers -- are you referring to?
8     Q.  The year that you're looking in the periodic
9  safety updates.
10    A.  No, not in the early years. These go back to
11 1998.
12    Q.  Are you familiar with the MedDRA data --
13 libraries?
14    A.  Yes.
15    Q.  And are you -- do you know whether there is a
16 term for nonarteritic anterior ischemic optic neuropathy
17 in the MedDRA library?
18    A.  It refers to ION. Codes to ION.
19    Q.  So Pfizer could not have coded to nonarteritic
20 anterior ischemic optic neuropathy under either of those
21 libraries, correct?
22    A.  Well, FDA instruction code to ION. So it would
23 have been coded under ION.
24    Q.  Today?
25    A..  No, I don't know -- yeah. Back then, too.

---

**165**

1     Q.  Well, at some point in time, FDA switched from
2  WHO-ART to MedDRA, correct?
3     A.  Yeah. But these all represent codes to ION.
4     Q.  Okay. So Pfizer could not have coded to
5  nonarteritic anterior ischemic optic neuropathy?
6     A.  Correct.
7     Q.  Okay.
8     A.  But that isn't what I was discussing.
9     Q.  That's my question, though.
10    So let's go back to where we started this
11 afternoon.
12    When I asked you whether there was a signal,
13 and you told me that there was a signal in 2000 --
14    A.  Uh-huh, in the AERS database.
15    Q.  -- is that a signal for blindness or is that a
16 signal for ION?
17    A.  It's a signal for ION, which was not in the
18 labeling.
19    Q.  Putting aside --
20    MS. LESKIN: Objection; nonresponsive.
21    JUDGE BORG: Are you waiting for a ruling?
22 That's sustained.
23 BY MS. LESKIN:
24    Q.  Putting aside the chart you received from
25 Mr. Altman after you completed your report, please

---

42 (Pages 162 to 165)

**166**

1 identify for me the basis of your opinion as to the
2 signal -- the existence of a signal in 2000 for ION.
3     A.  Okay.  The basis for my opinion is that there
4 were reports of permanent blindness in your database
5 beginning with safety update No. 2.  And by safety
6 update No. 4, we had -- you had positive rechallenges
7 with blindness.  There were also, in peer-reviewed
8 literature, reports appearing in 2000.  Those two issues
9 alone would have formed a signal.
10    Q.  So is it your opinion, as I understand today,
11 that the reports in the safety updates that you
12 reviewed, of permanent blindness, would have created a
13 signal for ischemic optic neuropathy?
14    A.  It would have given a signal that the labeling
15 should include that there is potential for permanent
16 blindness, and that that had been confirmed by
17 rechallenge.
18    Q.  Okay.  I asked you whether in 2000 there was a
19 signal for blindness or for ischemic optic neuropathy,
20 and you told me that there was a signal for ischemic
21 optic neuropathy.  So please explain to me how the
22 identification of events of blindness in the periodic
23 safety updates leads to your conclusion that there was a
24 signal for ION in 2000.
25    A..  I think what I said is, there was a signal for

**167**

1 blindness in 2000, and that there was a signal based on
2 the information in the -- in the safety update reports,
3 and that there was a signal for ION in the AERS
4 database.
5     Q.  Okay.  But as of the time you prepared your
6 report, you did not have the information from the AERS
7 database, correct?
8     A.  Right, which is why I use blindness into my
9 report..
10    Q.  Okay.  So you've supplemented your opinion.  Is
11 that fair to say?
12    A.  Well, my concern is that permanent blindness
13 get in there.  Now -- yeah, I guess that is additional
14 information.  But the point is, permanent blindness
15 needed --
16        The reason we're concerned with ION is the end
17 result of permanent blindness.  Permanent blindness was
18 known to you early after the market launch.  The fact
19 that we now know that there are also specific terms
20 coded to ION and now NAION, all is permanent blindness..
21    Q.  Doctor, if blindness is due to glaucoma, does
22 that help a patient know about ischemic optic
23 neuropathy?
24    A.  Well, your -- your safety updates
25 differentiated between blindness and that related to

**168**

1 glaucoma.
2     MS. LESKIN:  Move to -- objection;
3 nonresponsive.
4     JUDGE BORG:  Sustained.
5     Doctor, did -- do you understand her question?
6     THE WITNESS:  No.
7     JUDGE BORG:  Okay.  You know, if you don't,
8 would you please tell her that so she can rephrase
9 it?
10    THE WITNESS:  Yes.
11    JUDGE BORG:  Thank you.
12    MS. LESKIN:  Thank you.
13    JUDGE BORG:  Ms. Leskin, you want to try again?
14    MS. LESKIN:  I will try again.
15 BY MS. LESKIN:
16    Q.  Is blindness due to glaucoma the same as
17 blindness due to ischemic optic neuropathy?
18    A.  No.
19    Q.  Would warning a patient about blindness due to
20 glaucoma -- strike that.
21    MR. OVERHOLTZ:  Yeah, it sure would.  It'd keep
22 them from prescribing it.
23    THE WITNESS:  Yeah.
24    MR. OVERHOLTZ:  Keep them from going blind.
25    MS. LESKIN:  I'm sorry.  Are you testifying

**169**

1 here, Mr. Overholtz?
2     JUDGE BORG:  Oh, come on, let's -- let's --
3     MS. LESKIN:  Well, I'm tired of being
4 interrupted.
5     JUDGE BORG:  Yeah, I understand that.
6     MR. BECNEL:  How can we interrupt you when
7 you've got an outline of what you're doing.
8     JUDGE BORG:  You know, guys, that -- that has
9 no place in the record, and it -- and it has no
10 place between professionals.
11    Ms. Leskin, proceed, please.
12    MS. LESKIN:  Thank you.
13 BY MS. LESKIN:
14    Q.  What would you recommend -- what would --
15        In your opinion, what should the label have
16 been changed to include in 2000?
17    A.  Oh, I think in 2000 the post-marketing adverse
18 events should have included that reports of blindness,
19 permanent blindness, and ION had been received, and that
20 rechallenge -- that there was positive rechallenge
21 information in the -- in patients who had received
22 Viagra on multiple occasions and had suffered visual
23 loss.  And, I mean, at a minimum it should have gone
24 into the post-marketing adverse events information.
25    Q.  What's the basis for that opinion, the

43 (Pages 166 to 169)

## 170

1    regulatory basis for that opinion?
2        A.   Well, post-marketing adverse events are -- are
3    to be included when there is -- based on a variety of
4    categories, but certainly one of them is seriousness.
5        Q.   Is it your testimony that every time a company
6    gets adverse event, it needs to be included in its
7    label?
8        A.   No, and nor did I say that.
9        Q.   I want to make sure.
10       A.   But this one is a recreational drug and results
11   in permanent blindness, so that fits the category of
12   what should go into a post-marketing adverse event --
13       MS. LESKIN:  Objection.
14       THE WITNESS:  -- section.
15       MS. LESKIN:  Objection; nonresponsive.
16       JUDGE BORG:  Sustained.
17       I -- you know, Doctor, I know you're frustrated
18   by this and -- I mean, at least it's clear to me
19   that you are.  Sort of the rules of the road when we
20   do these depositions is that she does get to control
21   your answers to an extent.  I know you have more
22   information that you would like to offer that you
23   think will clarify it.  Mr. Overholtz, Mr. Altman,
24   Mr. Becnel have an opportunity to do that if they
25   think it's necessary for the record.

## 171

1        THE WITNESS:  But, Judge, I understand how it
2    works, but I am trying --
3        JUDGE BORG:  I know that you do.
4        THE WITNESS:  -- to answer these questions.
5        And it's this parsing of critical information
6    in an effort to dilute and demean and denigrate
7    clearly available information that should have been
8    included in a labeling.  There is no -- no
9    confusion --
10       JUDGE BORG:  I -- I understand --
11       THE WITNESS:  -- it should have been in the
12   labeling.
13       JUDGE BORG:  I understand your frustration with
14   her parsing it out.  She gets to do that.
15       THE WITNESS:  Oh, I -- No, I understand.  I've
16   done this --
17       JUDGE BORG:  Okay.
18       THE WITNESS:  -- before, but --
19       JUDGE BORG:  Well, I understand that you have.
20   So have I.  And I'm just trying to get some rules of
21   the road here because it will go faster for
22   everybody, it will go more smoothly.
23       MS. LESKIN:  I'm going to mark as Exhibit 8,
24   October 10, 2000, "Sildenafil:  Glaucoma, Increased
25   Intraocular Pressure, Retinal Detachment, Retinal

## 172

1    Hemorrhage, and Blindness," a report prepared by
2    Pfizer.
3        (Exhibit No.. 8 was marked for identification.)
4    BY MS. LESKIN:
5        Q.   You've seen this document before, haven't you?
6        A.   I think so.
7        Q.   Turn with me to page 8.  And that's the section
8    on blindness that you're referring to, right?
9        A.   Well, I was referring to the safety update
10   report.  This is not the safety update report.
11       Q.   Okay.  You're right.
12       But this is a discussion, a review of the cases
13   of blindness as of 2000, correct?
14       MR. OVERHOLTZ:  Object to form; lack of
15   foundation.
16       THE WITNESS:  Just one second.
17       JUDGE BORG:  Can you lay some more foundation,
18   Ms. Leskin?
19       MR. OVERHOLTZ:  I don't think she can.  But I
20   don't think the witness can ever know what this is.
21       JUDGE BORG:  Well --
22       THE WITNESS:  Well, I do know that it -- I'm
23   sorry.
24       JUDGE BORG:  No, no.  That's all right.
25       Are you able to identify it?

## 173

1        THE WITNESS:  Well, it's not the safety update.
2    And it also cut off in August of 2000.  So it's not
3    the end of 2000, this report.
4    BY MS. LESKIN:
5        Q.   I'm sorry.  I didn't realize I said end of
6    2000.  As of 2000.  But to be more specific, I'll
7    rephrase my question.
8        This is a discussion of the review of cases of
9    blindness as of August 2000, correct?
10       A.   Yeah, among other things, yes.
11       Q.   This section that I referred you to refers to
12   blindness, correct?
13       A.   Oh.
14       Q.   On page 8?
15       A.   I'm there.
16       Q.   Okay.  Now, four of the cases of blindness, if
17   you look at the second paragraph on that section, the
18   physician denied ever reporting them, correct?
19       A.   I'm sorry.  Where are you now?
20       Q.   The second paragraph under blindness.
21       JUDGE BORG:  Page?
22       MS. LESKIN:  Page 8.
23   BY MS. LESKIN:
24       Q.   Do you see that?
25       A.   Yes.

44  (Pages 170 to 173)

174

1  Q.  But those four reports don't go away, correct?
2  A.  No.
3  Q.  They remain in the database, correct?
4  A.  I would hope so.
5  Q.  And they would add to the numbers that you saw
6  in the AERS database, correct?
7  A.  They could.
8  Q.  Well, they do, don't they?
9  A.  Yep.
10  Q.  Then there's another case that talks about
11  temporary blindness of less than a minute, right?
12  That's the next case in the list, same paragraph.
13  A.  Yes.
14  Q.  And that physician said the patient didn't even
15  take sildenafil at the time of the event, right?
16  A.  Yes, you've read it correctly.
17  Q.  But that report stays in the database, correct?
18  A.  It's required to, yes, unless they show that
19  it's a duplicate.
20  Q.  And that shows up in the counts that you have
21  looked at, correct?
22       MR. ALTMAN:  Objection; misstates -- misstates
23  her testimony.
24       THE WITNESS:  Yeah.  And I have no idea if this
25  was one of the ones.

175

1       JUDGE BORG:  It's overruled.  Your witness has
2  answered the question.
3       MR. ALTMAN:  Got to wait for an objection.
4       THE WITNESS:  Oh, I'm sorry.
5  BY MS. LESKIN:
6  Q.  Now, you also referred to the incidents of
7  rechallenge.  You told me that we had -- one of the
8  bases for the -- one of the bases for your opinion that
9  there was a signal is because there was evidence of a
10  rechallenge of blindness in this case in this report.
11  And that's what you referred to on page 28 of your
12  report, correct?  In fact you wrote, "A positive
13  rechallenge was reported in one case of a 28-year-old
14  male experiencing temporary blindness on three separate
15  occasions."
16  A.  Yeah, I assume that's the same three
17  patients -- three --
18  Q.  Well, that's in fact the Bates number?
19  A.  Bates number, yeah, it is.
20  Q.  Now, this is the document you're citing,
21  correct, not the safety update?
22  A.  No.  I cited a separate number.  So it wasn't
23  the safety update.
24  Q.  You cited the document that we've marked here
25  as Exhibit 8?

176

1  A.  03283827 -- yes.
2  Q.  That was temporary blindness, correct?
3  A.  Yes, three times.
4  Q.  Do you know if that's at all related to
5  ischemic optic neuropathy?
6  A.  Temporary blindness?  I think it can be.
7  Q.  Do you know if the temporary blindness that
8  this 28-year-old patient reported was related to
9  ischemic optic neuropathy?
10  A.  No.  The point of it is that it was a positive
11  rechallenge, which is a safety signal.
12  Q.  For ischemic optic neuropathy?
13  A.  No, for blindness, in that it was related to
14  the drug.
15  Q.  Doctor, the concern -- the confusion I'm
16  experiencing here -- and maybe you can help me -- is I
17  keep asking about a signal for -- in 2000, and you told
18  me at some point that the signal was for ischemic optic
19  neuropathy, in 2000.
20       And so the basis for that signal that -- for
21  ischemic optic neuropathy in 2000, is that solely the
22  AERS database or is that these reports of temporary
23  blindness that may or may not be ischemic optic
24  neuropathy?
25  A.  Well, I think there's two opinions.  Ischemic

177

1  optic neuropathy is certainly confirmed by the AERS
2  database.  The fact that there was blindness, reports of
3  blindness, permanent blindness, and ischemic optic
4  neuropathy occurred in the safety updates as well; and
5  that there was permanent blindness in those reports in
6  2000, 2001, and 2002.  So in both instances there were
7  permanent blindness reports and ischemic optic
8  neuropathy, and neither of them were in the labeling.
9  Q.  And you're not distinguishing in your mind
10  between blindness and ischemic optic neuropathy when
11  you're doing this analysis?
12  A.  I am.  But because they all coded to optic
13  neuritis, I was particularly interested in the
14  blindness.
15  Q.  But --
16  A.  Everything -- everything filters to one bucket
17  with this optic neuritis.  So rather than just look at
18  the bucket, which is not the fair way of doing it, but
19  would have been even bigger numbers, I looked at those
20  events of interest, which were the blindness and ION, if
21  it was reported that way.  But that was oftentimes hard
22  to tell because it all coded to optic neuritis.
23       So my concern is that physicians and
24  prescribers know, patients know that it can cause
25  permanent blindness.  And when we had more information

45  (Pages 174 to 177)

**CONFIDENTIAL**

---

**178**

1  about ION and then NAION, that that information be added
2  to the database. So it is a continuum that needed to be
3  done.
4      (Exhibit No. 9 was marked for identification.)
5  BY MS. LESKIN:
6      Q.  Let me show you what we've marked as Exhibit
7  No. 9. This is a letter from Dr. Richard Siegel to the
8  editor of the Ocular Surgery News.
9      You've seen this document before, haven't you,
10 Doctor?
11     A.  Yes.
12     Q.  You cite that in your report, correct?
13     A.  I don't -- I don't recall the specific page.
14 Let me look.
15     I'm sorry.  Can you direct me to the page I
16 cite it?
17     Q.  Uh-huh.  If you look at page 13.
18     A.  Yes.
19     Q.  First paragraph, you have the sentence: "While
20 Pfizer was aware of these NAION cases in 2000, their
21 response seemed to focus on deflecting the negative
22 publicity which they knew would result rather than
23 initiating an update to the product labeling or
24 performance of the necessary epidemiologic study
25 required to determine the relatedness of this adverse

---

**179**

1  event to the drug's use."
2      Do you see that sentence?
3      A.  I do.
4      Q.  And you see up in the middle of that sentence,
5  you cite three different Bates numbers or Bates ranges?
6      A.  Yes.
7      Q.  Do you see that middle number --
8      A.  I do.
9      Q.  -- 003 --
10     A.  I see it.
11     Q.  -- 085962?
12     A.  I see it.
13     Q.  That's Exhibit 9, correct?  The Bates number
14 matches?
15     A.  Yes.
16     Q.  Okay.  So you've looked at this letter before,
17 correct?
18     A.  Yes.
19     Q.  Do you know of the circumstances under which
20 this letter was written?
21     A.  I recall that there had been a release, and
22 they were referring -- responding to a lease -- release.
23     Q.  By whom?
24     A.  A release -- I -- I think it's the original
25 work with Pomeranz, Dr. Pomeranz.

---

**180**

1      Q.  Looking at that, I guess the bottom paragraph
2  that starts, "With regard to the letter by
3  Dr. Pomeranz..."  Do you see that?  Do you see where I
4  am, about halfway through the letter?
5      A.  Yes.
6      Q.  It says, "...we have conducted a review of
7  Pfizer's worldwide clinical trial and post-marketing
8  spontaneous adverse event reporting database covering
9  multiple 'optic nerve' reporting terms."
10         JUDGE BORG:  Ms.. Court Reporter, are you
11     getting all that?
12         MS. LESKIN:  I'll start that again.
13 BY MS. LESKIN:
14     Q.  The sentence reads: "With regard to the letter
15 by Dr. Pomeranz, we have conducted a review of Pfizer's
16 worldwide clinical trial and post-marketing spontaneous
17 adverse event reporting database covering multiple
18 'optic nerve' reporting terms."
19     Do you see that sentence?
20     A.  Yes.
21     Q.  Okay.  Do you have any reason to believe that
22 Pfizer did not in fact do that review?
23     A.  No.
24     Q.  "To date, there are over 11,000 person year of
25 exposure to sildenafil in our controlled clinical

---

**181**

1  trials."
2      Do you see that sentence?
3      A..  Yes.
4      Q.  Do you have any reason to doubt the truth of
5  that statement?
6      A.  I -- I have never argued that they did not see
7  this in a -- in the NDA program.
8      Q.  Okay.  So -- but that's a correct number,
9  right, that as of 2000 there were over 11,000
10 person-years of exposure to sildenafil, correct?
11     A.  Well, no.  There were -- they're referring to
12 their controlled clinical trials with that number.
13     Q.  Correct.  And they had 11,000 person-years of
14 exposure in the controlled clinical trials, correct?
15     A.  That's what it says.  I mean, I have -- I have
16 no way of calculating that number, but that's what they
17 say.
18     Q.  You have no basis to disagree with that number,
19 though, right?
20     A.  Or agree with it.
21     Q.  Okay.
22     A.  I don't know.
23     Q.  "There have been no cases of anterior ischemic
24 optic neuropathy reported among these patients."
25     You have no reason to disagree with that,

---

46 (Pages 178 to 181)

182

1  correct?
2     A.  Right.  In the controlled clinical trials,
3  right.
4     Q.  Correct.
5        "With approximately 30 million prescriptions
6  for sildenafil having been written worldwide since its
7  U.S. approval in March 1998, representing approximately
8  250 million tablets dispensed, the case reported by
9  Drs. Egan and Pomeranz is the first well-documented case
10  of AION with a possible temporal relationship between
11  sildenafil intake and onset of the event."
12        Is that a true statement?
13     A.  I don't know how many other events there are.
14  They're saying that that's the first event where there
15  has been all three criteria, first documented case of
16  ION that had a documented temporal relationship and had
17  a relationship between the intake and the onset of the
18  event.  I don't know what they mean by that, if that's
19  the first ION event or if that's the first that they
20  know of that complied with all three of their
21  conditions, and that there are others.  I don't know the
22  answer to that.
23     Q.  So you don't know whether that's a true
24  statement or not?
25     A.  I don't know if there's others that don't

183

1  comply with the three criteria Pfizer laid out.
2     Q.  "We currently do not have any detailed
3  information on the other cases mentioned in the Pomeranz
4  letter."
5        Do you know what other cases he's talking
6  about?
7     A.  No.
8     Q.  "Any future discussion about AION and
9  sildenafil must take several facts into account:  the
10  age range of patients who spontaneously develop AION and
11  those taking sildenafil appear to overlap."
12        Is that a true statement?
13     A.  Well, if he is saying that ION more likely in
14  middle-aged people, middle-aged men, I guess that's
15  true.
16     Q.  It says, "Although this apparently did not
17  apply to the patient reported, sildenafil is most often
18  taken in the evening, and there's a well-described
19  temporal association of spontaneous AION, which occurs
20  most often during sleep."
21        Are you aware of that statement?
22     A.  Yeah.  I have seen Dr. Hayreh's, yes.
23     Q.  It says, "Based on the above, at present we do
24  not believe that the events reported by Drs. Egan and
25  Pomeranz represent evidence of a problem with

184

1  sildenafil."
2        Is it your opinion that as of June of 2000 that
3  that was an incorrect statement?
4     A.  "We do not believe -- represent" --
5        I believe it represents evidence that it needed
6  to be in the labeling, and that prescribers and patients
7  should decide if that was a problem with sildenafil.
8     Q.  And then he says, "We will continue to follow
9  with care the information being collected by Drs. Egan
10  and Pomeranz."
11        That is a responsible thing to do, correct?
12     A.  Well, it's -- it's reasonable.
13     Q.  And the FDA was aware of the event published by
14  Dr. Pomeranz, correct?
15     A.  Yes.
16     Q.  In 2000, did the FDA request Pfizer to change
17  its label to include ischemic optic neuropathy?
18     A.  I don't know.  It's not the FDA's job to do
19  that.  It's the -- it's the company's job.  The company
20  knows more about their product than anyone else.
21        MS. LESKIN:  Objection; nonresponsive.
22        JUDGE BORG:  Sustained.
23  BY MS. LESKIN:
24     Q.  Doctor, did the FDA request Pfizer to change
25  its label in 2000 to include ischemic optic neuropathy?

185

1        MR. OVERHOLTZ:  Objection; lack of foundation.
2  There's no foundation that the FDA is the one to
3  request Pfizer change its label.
4        JUDGE BORG:  Let's hear the question again.
5  BY MS. LESKIN:
6     Q.  In 2000, did the FDA request Pfizer to change
7  its label to include ischemic optic neuropathy?
8        JUDGE BORG:  If you know.
9        THE WITNESS:  I don't know.  And FDA did not
10  have the authority to require that until 2008.
11        JUDGE BORG:  The question -- the answer was:
12  "I don't know."
13  BY MS. LESKIN:
14     Q.  In 2000, the FDA could have requested that
15  Pfizer change its label to include ischemic optic
16  neuropathy, correct?
17     A.  Yeah, I guess it's possible..
18     Q.  And you've looked through all of the documents
19  that have been produced in this litigation.  Did you
20  find any evidence that the FDA, in 2000, requested that
21  Pfizer include ischemic optic neuropathy in its label?
22        MR. ALTMAN:  Objection.
23        MR. OVERHOLTZ:  Objection.
24        MR. ALTMAN:  Misstates the testimony.
25        MR. OVERHOLTZ:  Lack of foundation.

47 (Pages 182 to 185)

186

1    JUDGE BORG: It's -- let me hear the question
2  again.
3  BY MS. LESKIN:
4    Q. You've looked through all the documents that
5  have been produced in this litigation. Did you find any
6  evidence that the FDA, in 2000, requested that Pfizer
7  include ischemic optic neuropathy in its label?
8    JUDGE BORG: Overruled.
9    MR. OVERHOLTZ: Well, it -- it's --
10   MS. LESKIN: You've made your objection. It's
11  been overruled.
12   MR. ALTMAN: Your Honor.
13   JUDGE BORG: Are you able -- do you understand
14  the question?
15   THE WITNESS: I thought I answered it. I don't
16  know..
17   JUDGE BORG: Okay.
18  BY MS. LESKIN:
19   Q. You don't know if you found any evidence?
20   JUDGE BORG: Well, hang on a second,
21  Ms. Leskin.
22   What's the problem, Mr. Altman?
23   MR. ALTMAN: Only to the extent she said, "You
24  looked through all of the documents that have been
25  produced." She never said she looked through every

187

1  document in the litigation.
2    JUDGE BORG: Well, she answered the question "I
3  don't know" anyway, but --
4    MR. BECNEL: Judge, as you know, the authority
5  of the Congress to give the FDA authority to require
6  label change only occurred just a few days ago.
7  Prior to that, they didn't have any authority to do
8  it.
9    THE WITNESS: That's right.
10   MS. LESKIN: She's testified that they had the
11  authority to request.
12   MR. ALTMAN: I'm -- I'm just trying to address
13  the one issue. She said, "You reviewed all" --
14   JUDGE BORG: I understand. But the answer got
15  rid of it anyway.
16   MR. ALTMAN: Okay.
17   JUDGE BORG: Because she said, "I don't -- I
18  don't know."
19   MR. ALTMAN: Okay.
20   JUDGE BORG: I understand your objection,
21  though.
22   Ms. Leskin, go ahead.
23  BY MS. LESKIN:
24   Q. You don't know if you found evidence or not?
25   A. I don't know if they asked the -- I didn't -- I

188

1  didn't see any evidence. But I don't know if they asked
2  them.
3    Q. But you didn't see any evidence of that?
4    A. No. And more -- no, I didn't see any evidence.
5    Q. Did you see any evidence that Pfizer -- that --
6    Did you see any evidence that the FDA requested
7  Pfizer to change its label to include ischemic optic
8  neuropathy at any time prior to 2005?
9    A. Did you say FDA or regulatory authorities?
10   Q. FDA.
11   A. No. I -- no, I didn't see any evidence that
12  FDA asked them prior to 2005.
13   Q. One of the things we spoke about earlier that a
14  company can do to investigate a safety signal is to look
15  at animal studies, correct?
16   A. Well, I agreed that that could be done, yes.
17   Q. Are you aware of any animal studies that Pfizer
18  conducted on -- that would -- strike that.
19   Are you aware of any animal studies that Pfizer
20  conducted for Viagra?
21   A. I'm aware of the ones that were submitted in
22  the NDA.
23   Q.. Do you know how, if at all, those studies would
24  impact Viagra's effect on vision?
25   A. No. How the -- which animal model -- to what

189

1  are you referring?
2    Q. Any animal model.
3    A. No, I don't think there's an animal model
4  that's directly applicable to human ION or NAION.
5    Q. Okay. My question was a little broader than
6  that for this time.
7    My question said: Do you know how, if at all,
8  that the studies that Pfizer did do can measure Viagra's
9  effect on vision?
10   A. In animals?
11   Q. In animals.
12   A. No.
13   Q. If you can pull out Exhibit 5. Just a visual
14  summary.
15   MR. BECNEL: Which page?
16   MS. LESKIN: I haven't directed her to a page
17  yet.
18   MR. BECNEL: Oh.
19  BY MS. LESKIN:
20   Q. If you look at page 15, section 6, entitled
21  "Summary of Preclinical Visual Study -- Findings."
22   Have you reviewed this information before?
23   A. Yes, I've seen it before.
24   Q. Okay. And the first paragraph talks about the
25  effect on PDE6, correct?

48 (Pages 186 to 189)

190

1    A.  Yes.
2    Q.  Second paragraph says, "In toxicology studies,
3  administering doses in excess of those shown to be
4  pharmacologically active in the retina, daily for up to
5  24 months, does not result in any treatment-related
6  toxicity of the retina or eye."
7        Were you aware that those studies had been
8  done?
9    A.  Well, they're required to be done.
10   Q.  Were you aware they had in fact been done?
11   A.  Well, the FDA approved the NDA so, yes, they
12  had to be done, and they were done.
13   Q.  And if you look at the section above that, it's
14  part of a section called "Histology."  Do you see where
15  I'm directing you?
16   A.  Yes.
17   Q.  And if you look at the first -- top paragraph
18  on page 15, they found no statistically significant
19  difference in the number of nuclear layers of the retina
20  following high doses of Viagra, correct?
21   A.  Yes.
22   Q.  Were you aware those studies had been done?
23   A.  Yes.
24   Q.  And if you look at the paragraph below that, it
25  says that there were no evidence of an effect on the

191

1  treatment of the -- on the retina, tapetum in dogs,
2  choroid or associated blood vessels in the animals
3  tested..
4        Do you see that?
5    A.  Right.  The animal models did not show any
6  perturbation of retinal function, so they didn't serve
7  as a model for what was seen, even with the blue-green
8  tinges, seen in humans.  So as I said, there is no
9  animal model that would reflect this.  And indeed
10  Pfizer's own animal database didn't reflect what they
11  saw with the blue-green tinges and the changes in the
12  retinal blue-green perception.  So the animal models
13  were not predictive at all, even for the retinal changes
14  that were observed with the blue-green tinges.
15   Q.  Are you aware -- familiar with the Bernstein
16  model for NAION that's been developed?
17   A.  No.  Bernstein animal model?
18   Q.  Yes, of rats.
19   A.  The rat model.  I think I did see that, but I'm
20  not -- I'm not an expert in that at all.
21   Q.  Okay.  And Dr. -- are you familiar that Dr. --
22  well, you said you saw that.
23        Are you aware that Dr. Bernstein used a
24  laser-activated dye to ablate the blood supply to the
25  optic nerve in rats as part of that model?

192

1    A.  I think I looked it over, but I don't recall.
2        JUDGE BORG:  Five minutes.
3  BY MS. LESKIN:
4    Q.  Now, you'll agree with me that that's not a
5  valid model to assess the impact of a drug in causing
6  NAION, right?
7    A.  I don't know if any model will work.  I mean,
8  the rat models didn't work, didn't -- didn't predict a
9  change in humans.  And I don't know if the Bernstein
10  model's been accepted for humans.  I don't -- I don't
11  know.  But it wasn't an issue at the time the product
12  was approved.
13   Q.  Well, was it at issue at any time after the
14  product was approved?
15   A.  Well, I mean, I guess they could have done the
16  studies, but they already knew that the animal models
17  were not predicting.  And in any event, animal models
18  never trump human experience.  One does not avoid
19  addressing human safety issues because of negative
20  animal models.  Clinical data are always the most
21  important.
22   Q.  But animal models are useful to understand
23  whether there is in fact a cause and effect relationship
24  between a drug and an event, correct?
25   A.  You -- well, you can -- you can't -- I mean,

193

1  it -- no.  There's three ways of looking at causation in
2  humans.  And, again, causation is not an issue for what
3  I'm talking about because causation does not impact
4  whether one puts information in their labeling.
5    Q.  Do you believe that you should put information
6  in your labeling that doesn't have any scientific basis?
7    A.  No.
8    Q.  If there was a report of an adverse event that
9  occurred, but investigation demonstrated that it was
10  not -- definitively that it was not related to the
11  event, should that event show up on the label?
12   A.  Can you give me more information about the
13  event?  I'm not sure what you're talking about.
14   Q.  Sure.  Well, if there's an adverse event
15  reported, but evidence is clear that there is no causal
16  relationship, should that adverse event show up on
17  your -- on your label?
18   A.  How was that causality issue determined?
19   Q.  However it was determined, you were able to
20  definitively say.  You can't answer?
21   A.  I can't answer a question like that.  I mean,
22  there are times when one adverse event would be enough
23  to put it in the label.
24        JUDGE BORG:  Let's break.
25        MS. LESKIN:  Yep.

49  (Pages 190 to 193)

194

1    THE VIDEOGRAPHER: We're off the video record.
2    (Recess from 2:05 p.m. until 2:24 p.m.)
3    THE VIDEOGRAPHER: We are back on the video
4    record.
5    BY MS. LESKIN:
6    Q.   Dr. Blume, you have this chart here, that
7    you've been referring to, based on the numbers that
8    Mr. Altman provided you. Can we mark that as an exhibit
9    to this deposition? I'm going to ask you to put No. 10
10   on the bottom there.
11   (Exhibit No. 10 was marked for identification.)
12   MR. BECNEL: Have you got a duplicate of that
13   or is that the only one?
14   MS. LESKIN: That's the only copy, as far as I
15   know.
16   MR. BECNEL: We're going to have to make some
17   copies of that.
18   MS. LESKIN: We'll get them with the -- when
19   the court reporter circulates the transcript.
20   That's fine. It's okay.
21   THE WITNESS: I'll make copies at a break.
22   I'll make a copy at the next break.
23   MS. LESKIN: Do that, too.
24   BY MS. LESKIN:
25   Q.   The numbers that are on there, are those

195

1    cumulative numbers or annual numbers?
2    A.   Yes, that's what I indicated, they're
3    cumulative.
4    Q.   They are cumulative. Okay.
5    Do you know the total number of adverse events
6    reported for amiodarone, all events, over that time
7    period of 1998 to 2004?
8    A.   For -- adverse events for ION.
9    Q.   No, all adverse events for amiodarone.
10   A.   No.
11   Q.   How about interferon, do you know the total
12   number of all adverse events reported over the time
13   period 1998 to 2004?
14   A.   No.
15   Q.   And the number of ION events that are on that
16   list that you have in front of you, Exhibit 10, you
17   don't know what percentage of adverse events for
18   amiodarone that number represents, correct?
19   A.   No. I would not have been interested in that
20   for this, no.
21   Q.   And you don't know the percentage of adverse
22   events for interferon that the -- that the ION number on
23   your chart there represents, correct?
24   A.   No. It did not have relevance as to the data
25   mining that I was doing.

196

1    Q.   Okay.. What authority are you relying on for
2    that chart to show that that is an acceptable way to
3    determine whether there's a safety signal?
4    A.   The use of the AERS database?
5    Q.   In the method in which it's presented on
6    Exhibit 10.
7    A.   Well, the AERS database of course is -- is a
8    product of the FDA and acknowledged by the FDA and
9    required by FDA as part of your safety surveillance
10   techniques. And it -- this is the most conservative
11   approach of this because it does -- it narrows it to the
12   serious and suspect events rather than taking all
13   events. So this represents the most conservative way of
14   looking at the data. The numbers would have been
15   larger, not limited to serious and suspect.
16   And as far as looking across different drugs
17   and looking for a signal, it's commonly done by FDA. If
18   you look at FDA's example of the publication that FDA
19   did when they instructed Bayer to remove Baycol from the
20   marketplace, it was because they compared Baycol's
21   adverse events relating to rhabdomyolysis with those of
22   other statins.
23   Q.   Is amiodarone in the same class as Viagra?
24   A.   No.. Amiodarone is Cordarone. It's a
25   cardiovascular product.

197

1    Q.   So it's not in the same class as amiodarone,
2    correct -- I mean as Viagra, correct?
3    A.   No. It's a cardiovascular product.
4    Q.   Is it a phosphodiesterase type 5 inhibitor?
5    A.   I -- I doubt it. No, I don't think so.
6    Q.   Is interferon in the same pharmaceutical class
7    as Viagra?
8    A.   No.
9    Q.   Is Vioxx in the same pharmaceutical class as
10   Viagra?
11   A.   No. Vioxx is a COX-2 inhibitor.
12   Q.   And interferon also is not a phosphodiesterase
13   type 5 inhibitor, correct?
14   A.   Correct, right.
15   Now, when the other products were approved,
16   that are sister drugs to Viagra, it would be appropriate
17   to include those on this list as well. So if we were
18   looking at after 2002 and 2005, we would -- we could
19   include the other drugs as well.
20   Q.   And you haven't done that analysis, correct?
21   A.   I don't -- no, I did not.
22   Q.   If you could turn with me to page 13 of your
23   report.
24   A.   Can I make a clarification?
25   Q.   Okay.

50  (Pages 194 to 197)

**198**

1    A.  I think I said earlier that these reports were
2  coded as ION.  And I wanted to clarify that these
3  reports come from the company's database.  So these
4  would have been coded as ION by the company.  I don't
5  know if I made that point clear before.  I think I might
6  have complicated that unnecessarily.  This is the
7  adverse event database, so they would have been coded by
8  the company as ION.
9    Q.  I'm on page 13 of your expert report, please.
10  Are you there with me?  Are you there with me?
11    A.  Oh, yes.
12    Q.  Okay.  That first full paragraph starts with
13  the sentence, "While Pfizer was aware of these NAION
14  cases in 2000, their response seemed to focus on
15  deflecting the negative publicity which they knew would
16  result rather than initiating an update to the product
17  labeling or performance of the necessary epidemiologic
18  study required to determine the relatedness of this
19  adverse event to the drug's use."
20        Do you see that sentence?
21    A.  Yes.
22    Q.  Is this sentence part of your opinion held to a
23  reasonable degree of scientific certainty?
24    A.  Well, we know that Pfizer -- I would say yes,
25  because Pfizer, we know it was aware of ION cases.  They

**199**

1  coded them as such.  They had a signal in 2000 from this
2  publication, and their commitment to track it in 2000.
3  So they were certainly aware of this.  And I did not
4  find any effort in 2000 to update the product labeling.
5  And I believe that you indicated earlier that the
6  epidemiologic study was not started by Pfizer until
7  several years later, I think in 2007.
8        MS. LESKIN:  Objection; nonresponsive.
9        JUDGE BORG:  Sustained.
10  BY MS. LESKIN:
11    Q.  The question, Doctor, was:  Is this sentence
12  part of your opinion held to a reasonable degree of
13  scientific certainty?
14    A.  Well, I thought I answered yes and then
15  explained why.
16    Q.  Okay.  But, yes, it is held to a reasonable
17  degree of scientific certainty?
18    A.  Yes.
19    Q.  What science did you use in applying -- what
20  science did you apply in reaching this opinion?
21    A.  Well, I tracked to see if they were aware of
22  these databases.  And as I just indicated, they coded
23  them this way for FDA purposes.  They said that they
24  were aware of ION and promised to track it.  I believe
25  there is a follow-up -- there is an e-mail from

**200**

1  Dr. Siegel in the database where he is talking about
2  needing to follow up on this, and perhaps connecting
3  with Dr. Hayreh for this.  So they were certainly aware
4  of it and had promised to follow up on it.  So I tracked
5  what the company was doing internally.
6        And then I tracked the labeling chronologies to
7  see if there was any labeling submissions in 2000 to add
8  blindness, ION, or NAION, and could not find any, and
9  did not find any labeling changes relating to those.
10        And I relied upon Pfizer's statements through
11  2005 and 2006 that they could not do an epidemiology
12  study, did not believe one could be done, and then
13  relied upon their commitment to do one after FDA
14  insisted and the notice in the FDA website that it was
15  starting in 2007.
16    Q.  What science -- what branch of science is that?
17    A.  It's regulatory affairs.
18    Q.  And you're selling -- you're telling this --
19        You're telling us that you used a -- the
20  science of regulatory affairs to conduct that -- that
21  analysis?
22    A.  It's standard regulatory and pharmacovigilance
23  behavior for a pharmaceutical company.  I'm -- I'm not
24  sure what you're meaning by science.  Such as anatomy or
25  physiology?  I don't know what science would come into

**201**

1  that sentence, other than collection of the normal
2  information that a drug company collects.
3    Q.  What's the basis for the part of the opinion
4  where you said, "Their response seemed to focus on
5  defecting the negative publicity"?
6    A.  I was aware of information that they were
7  going -- that they were going to use in discussing the
8  Egan and Pomeranz information, and it was directed to
9  the field staff on how to answer the question if this
10  was an issue, if the question was raised to them by any
11  of their practitioners.  And those answers did not
12  include that a study was going to be -- an epidemiology
13  study was going to be done, but rather it talked about
14  issues such as this is the normal age of patients where
15  this occurs.
16        We didn't see any in our clinical trial data.
17  Pfizer didn't see any in their clinical trial data.  The
18  incidence rate isn't even as high as what normally
19  occurs as back -- as background incidence of this..
20        So it appears that their concern was diluting
21  the consequences of the Egan finding rather than
22  discussing the potential for vision loss as it agreed --
23  as it -- as it was at that point in time with
24  prescribers.
25    Q.  I want you to take a look at the document that

**CONFIDENTIAL**

---

**202**

1  we identified before, the letter by Dr. Siegel, which
2  would be to Ocular News Surgery. Do you have that in
3  front of you?
4      A.  Are you referring to Exhibit 9?
5      Q.  Yes. Yes.
6      A.  Then I have it.
7      Q.  Okay. Where in that letter does it say
8  anything about deflecting negative publicity?
9      A.  It doesn't.
10      Q.  That's just your --
11      A.  I doubt if it --
12      Q.  -- interpretation?
13      A.  I doubt if it would say that in a -- in a
14  response letter as an outlet.
15      Q.  So is that just your interpretation of the
16  letter?
17      A.  Of that letter? No. It's my interpretation of
18  all the documents that I just mentioned. And in fact --
19      Q.  Okay. Well, let me -- I'm just talking about
20  this letter right now. If you look at that sentence on
21  page 13 that we just read, you cite three documents,
22  correct? You cite --
23      A.  Yes.
24      Q.  Okay. And that's -- Exhibit No. 9 is the
25  second document, right?

---

**203**

1      A.  Yes.
2      Q.  Okay. So are you relying on that letter as
3  support for your statement that Pfizer's response seemed
4  to focus on deflecting the negative publicity which they
5  would -- which they knew would result?
6      A.  Well, I think -- well, yeah, let's look at
7  this. This is June of 2000. And they're saying this is
8  the first event that they have, but yet ION -- target --
9  ION coded events had already been submitted to the AERS
10  database. So I'm not sure where that statement comes
11  from, unless it is because they have applied these three
12  criteria along with that statement.
13          And they also are saying that they had patient
14  populations, none in their clinical trials, but we know
15  their clinical trials was a selected group to exclude
16  some of the other risk factors. They also say that it's
17  the only one meeting those criteria. They conclude that
18  they don't believe they have a problem, and that they
19  promise that they will follow up.
20          So, yeah, I think it -- I think it is an
21  example of diluting the importance of the findings.
22      MS. LESKIN:  Objection to everything except the
23  last sentence of that answer --
24      JUDGE BORG:  It's overruled.
25      MS. LESKIN:  -- as nonresponsive.

---

**204**

1      JUDGE BORG:  It's overruled. The answer
2  stands.
3  BY MS. LESKIN:
4      Q.  Where in that letter does it say "deflecting
5  negative publicity," Doctor?
6      A.  Oh, it doesn't.
7      Q.  That's your interpretation of the letter,
8  correct?
9      A.  And my paper says, "Their response seemed to
10  focus." I don't have quote marks in that response, nor
11  do I say their response was -- did deflect. I said, "It
12  seemed to focus."
13      Q.  Okay. That's your interpretation of the
14  document, correct?
15      A.  Yes. That's -- well, it's my interpretation of
16  multiple documents, but yes.
17      Q.  Okay. The first document you have listed on
18  that list is 211665, correct?
19      A.  Yes.
20      Q.  I'm going to mark that Exhibit 11.
21          (Exhibit No. 11 was marked for identification.)
22  BY MS. LESKIN:
23      Q.  This is a May 23rd, 2000 memo from Shira Rohde
24  to distribution, subject Viagra PNP team meeting of
25  27 April 2000, right?

---

**205**

1      A.  Yes.
2      Q.  And is that in fact a document that you refer
3  to on page 13 in that sentence we read -- we just read?
4      A.  I think so.
5      Q.  I'm going to ask you to turn to page 8 of the
6  document..
7          Well, first, before you get there, can you show
8  me where in that document it refers to deflecting
9  negative publicity?
10      A.  Of course the article, of course it doesn't say
11  they're going to deflect negative publicity, nor did I
12  say they said that. I said it seemed to.
13      Q.  Okay. That's your --
14      A.  And the reason --
15      Q.  That's your interpretation of the document,
16  correct?
17      A.  Well, because of the following: that they say
18  that they think that Dr. Egan is going to begin
19  discussing, that he was going to present his findings
20  to -- at the American Academy meeting. So they -- their
21  response was, they were -- it would be useful to
22  proactively write a manuscript reviewing sildenafil's
23  effects on ocular blood flow.
24      Q.  Doctor, can I ask you to read that sentence in
25  its entirety, please?

---

52 (Pages 202 to 205)

**CONFIDENTIAL**

---

**206**

1    A.   Yes.  "After the -- after the article was
2  published, Dr. Egan received calls from other
3  ophthalmologists reporting five additional" -- oh,
4  here's another five additional cases of ION.. Oh, in
5  2000. So that should be added to the tally.  I didn't
6  even see that until right now.
7    Q.   Do you know if that's included in the ION -- in
8  the ION database that you have in your chart?
9    A.   I wouldn't be able to tell.  This is in May
10  of 2000.  I don't -- I don't know by month.  I wouldn't
11  be able to tell.
12    Q.   So you --
13    A.   But I have --
14    Q.   So you have no idea whether those numbers need
15  to be added to the tally or not; isn't that true?
16    A.   Well, let's see.  Egan and Pomeranz had seven.
17  This is five.  And in the safety update reports, there's
18  two others reported.  So we're over 12 already, and it's
19  only May of --
20    Q.   I'm sorry.
21    A.   -- two thousand --
22    Q.   Go through that math again for me, Doctor.
23    A.   Well, we had seven with Pomeranz, five more
24  here.
25    Q.   When did you have seven with Pomeranz?

---

**207**

1    A.   Oh, two thousand -- I don't know if it was
2  two -- maybe 2002. So I don't know.  I don't know if
3  they're included.  But it's another signal that I did
4  not include in my discussion with you regarding what
5  signals they have.
6       So now we have AERS is a signal in 2000, Egan
7  in June of 2000.  And in fact we learn in May of 2000,
8  there is other cases that were unbeknownst to Dr. Egan.
9  So now we have three different signals by mid 2000.
10      So anyways, continuing with reading, picking up
11  with the second sentence, "He" -- and I believe that's
12  referring to Dr. Egan -- "is planning to write these up
13  for presentation to the American Academy of
14  Ophthalmologists meeting in the fall.  R. Siegel,
15  A. Laties, and I. Osterloh have been discussing whether
16  it would be useful to proactively write a manuscript
17  regarding sildenafil's effects on ocular blood flow."
18    Q.   Reviewing, correct?  Isn't that word
19  "reviewing"?
20    A.   Right, reviewing.
21    Q.   What's the action item that came out of that
22  meeting?
23    A.   "McLaughlin is going to contact Egan to get
24  follow-up information on the five new cases of ION."
25    Q.   And that's exactly what the company should be

---

**208**

1  doing, correct?
2    A..  Well, they're required to do that.
3    Q.   So that's what they should be doing, correct?
4    A.   Because they have to do it.  They should do it
5  because they're required to do it.
6    Q.   Do you know what information came out of
7  Dr. McLaughlin contacting Dr. Egan?
8    A.   No.
9    Q.   Do you know if Dr. Egan confirmed that he
10  actually had five additional cases?
11    A.   Not Dr. Egan.  Dr. Egan is receiving calls from
12  other ophthalmologists who have cases.  This isn't
13  Dr. Eagan.
14    Q.   "Dr. McLaughlin will contact Dr. Egan to get
15  follow-up information on the five new cases of ischemic
16  optic neuropathy," correct?
17    A.   "Dr. Egan received calls from other
18  ophthalmologists reporting five additional cases."
19    Q.   Do you know whether --
20    A.   It's other ophthalmologists.
21    Q.   Do you know whether that information actually
22  ever existed?
23    A.   Well, I'm -- I have no reason to believe that
24  Dr. Egan would lie, but I don't know what happened in
25  the follow-up.  It's another signal in 2000.

---

**209**

1    Q.   That requires follow-up by the company,
2  correct?
3    A.   Of course.  All signals are required to be
4  followed up.  Of course.
5    Q.   And that's exactly what the company did,
6  correct?
7    A.   Well, the company didn't do a study, and the
8  company didn't tell prescribers, and prescribers
9  couldn't tell their patients.
10    Q.   If Dr. McLaughlin had contacted Dr. Egan, and
11  Dr. Egan said, "You know what, it's really not five
12  cases of ION, it's something else," would they still
13  have been required to change the label, if that didn't
14  pan out?
15    A.   Well, yes, if it -- if those cases were
16  blindness.  Yes.  I'm not -- yes, if it were --
17    Q.   You don't know --
18    A.   -- blindness.
19    Q.   You don't know what those cases were, do you?
20    A.   No.  And I don't know -- they may have been
21  permanent blindness.  I don't know.
22    Q.   And they may have been --
23    A.   I'm just --
24    Q.   -- nothing, correct?
25    A.   I doubt it, but perhaps.

---

53 (Pages 206 to 209)

## 210

1    And the point is, you asked me earlier what
2   signals there were in 2000, and I was saying I didn't
3   know that there was an additional signal in 2000. So
4   now we're up to at least three.
5    Q.   And all those signals require the company to
6   follow up, correct?
7    A.   The company is required to follow up on
8   signals.
9    Q.   And where in this document does it talk about
10   deflecting negative publicity?
11    A.   Well, I don't know how many ways to answer this
12   for you.
13    The term "deflecting negative publicity" is
14   mine, and nor did I say they did it. I said it seemed
15   to focus on deflecting it.
16    Q.   And that's your interpretation of this
17   document, correct?
18    A.   Versus who else's?
19    Q.   So that's your interpretation, correct?
20    A.   I don't know to whom else you might be
21   referring. Of course it's mine.
22    (Exhibit No. 12 was marked for identification.)
23   BY MS. LESKIN:
24    Q.   I show you Exhibit 12. The document's entitled
25   "Response to Press Release and News Story Regarding

## 211

1   Viagra and Nonarteritic Anterior Ischemic Optic
2   Neuropathy." And this is the third document that you
3   cite, correct, on this page 13 on that top sentence
4   we've been discussing?
5    JUDGE BORG:   Of exhibit which?
6    MR. BECNEL:   12. This one.
7    MS. LESKIN:   This is Exhibit 12. We've been
8   discussing page 13 of her report, which was
9   Exhibit 1.
10   BY MS. LESKIN:
11    Q.   Is this in fact that document?
12    A.   Yes. And I have to correct an earlier answer.
13    They had -- Pfizer had seven cases of
14   documented ION by January of 2001. I think I earlier
15   said they had five. They had seven, according to this
16   document.
17    Q.   As of January 2001, correct?
18    A.   Yes.
19    Q.   Okay. Show me where in this document it refers
20   to deflecting negative publicity.
21    A.   I'm sorry. Are you waiting for me to answer?
22    Q.   Yes. My question was: Show me where in this
23   document refers to deflecting negative publicity.
24    A.   Well, it's the same answer I gave you before.
25   These are documents relating to Pfizer's opinions. I'm

## 212

1   pretty confident they're not going to say, "We're
2   writing this to deflect negative publicity." What my
3   paper says is: Their collective responses within
4   documents seem to focus on deflecting negative
5   publicity.
6    Q.   Again, that's your interpretation of this
7   document, correct?
8    A.   Yes, because the document discusses various
9   mechanisms to dilute the findings by Dr. Pomeranz and
10   others.
11    Q.   Show me where it uses the word "dilute."
12    A.   Well, "dilute" is my word.
13    Q.   Is it reasonable for the company to attempt to
14   understand the mechanism of NAION when faced with these
15   reports?
16    A.   To understand the mechanism?
17    Q.   Yes.
18    A.   Of course.
19    Q.   And is it reasonable for the company to
20   understand the context in which the cases of ION have
21   been reported?
22    A.   They are required to do that.
23    Q.   And part of that is understanding the
24   biological mechanism of NAION, correct, of how NAION
25   occurs, or trying to understand how NAION occurs?

## 213

1    A.   Well, it's always interesting to know the
2   pharmacology, but the mechanism — we aren't required to
3   know the mechanism of how a drug produces its beneficial
4   effects, and we aren't required to know the mechanism by
5   which it -- by which it triggers its negative effects.
6   It's interesting to know it, but it isn't required for
7   us to know it. I mean, many inserts will say after the
8   indication, "We have -- we don't know how the drug
9   causes this effect."
10    Q.   So is it -- are you saying that the company was
11   wrong in trying to understand how the drug would
12   cause -- could cause NAION?
13    A.   Oh, I think that all information is important.
14   And I -- and I didn't say they were wrong to attempt to
15   do studies to try to tease out, if that's what they were
16   doing, the biochemical or pharmacologic mechanism. It's
17   not required for them to do that for them to conduct the
18   proper pharmacovigilance responses. And one doesn't --
19    Q.   If the -- if the --
20    A.   Let me finish.
21    And one doesn't delay follow-up
22   pharmacovigilance activities while doing or planning or
23   thinking about doing mechanism of action studies.
24    Q.   Well, isn't part of your pharmacovigilance
25   activity understanding the mechanism by which a drug

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

214

1 could cause an event?
2    A.  I don't think so.  It's interesting to know,
3 but one doesn't delay follow-up activities to tease out
4 a mechanism.
5    Q.  Getting back to Exhibit 2, which is the
6 Guidance for Industry for Good Pharmacovigilance
7 Practices.
8        It's right here, Doctor.
9        If you look to page 6, if you look right above
10 the numbered list, it says, "In assessing case reports,
11 FDA recommends that sponsors look for features that may
12 suggest a causal relationship between the use of a
13 product and the adverse event, including." And number 4
14 says, "Consistency of the event with the established
15 pharmacological, toxicological effects of the product.."
16 Right?  That's what the FDA recommends, correct?
17    A.  For causal relationship.  But the FDA
18 regulations and the FDA opinions also say that including
19 information in your labeling is not dependent upon
20 establishing a causal relationship.
21    Q.  But the FDA recommends that you do look to see
22 whether there is a causal relationship, correct?
23    A.  You can, but you don't delay or avoid including
24 it in your labeling while you toy with those types of
25 studies.  The regulations state that.  And FDA's stated

215

1 opinions by people such as Dr. Woodcock, Dr. Buhl, all
2 state that causality is not necessary.  It's been -- you
3 don't delay for causality.
4    Q.  Okay.  I'm not asking you about causality.  I'm
5 asking you about whether Pfizer was -- did anything
6 wrong by trying to understand whether there was a
7 plausible biological mechanism by which Viagra could
8 cause NAION.
9    A.  It's never wrong to want to do additional
10 studies.  What I'm saying is -- I didn't say Pfizer was
11 wrong to do studies.  I said Pfizer was wrong not to
12 inform patients and their prescribers.
13    Q.  Now, the end of that sentence we've been
14 talking about on page 13 of your report, you say that
15 the company didn't perform the necessary epidemiological
16 study to determine the relatedness of this adverse event
17 to the drug's use.
18        That's what you wrote, correct?
19    A.  Yes.
20    Q.  And there's other ways to determine relatedness
21 other than doing an epidemiological study, correct?
22    A.  Well, for this particular drug, one couldn't do
23 a prospective study, so one would have to do an
24 epidemiologic study.
25    Q.  Well, there's other ways to determine

216

1 relatedness besides an epidemiological study, isn't
2 there?
3    A.  Yes, but they already had evidence of
4 rechallenge.  So the three ways of doing it are
5 prospectiveness, prospective studies, retrospective
6 studies, or rechallenge information.
7    Q.  And is looking at biological mechanism one of
8 the ways to determine relatedness?
9    A.  Well, yeah, you can look at that.  But that
10 isn't what I'm referring to there.
11    Q.  Okay.  But that's something that the company
12 did, correct?
13    A.  Right..  But I'm referring to updating the
14 product labeling.
15    Q.  Looking at Exhibit 12, is there anything in
16 this document that's incorrect?
17    A.  Well, I'm -- I believe their conclusion to the
18 first three pages is that there is not sufficient
19 evidence to suggest that Viagra is causally associated
20 with NAION.  And I don't think that's incorrect.  I
21 don't think it's relevant to what I'm talking about, but
22 it's not incorrect.
23    Q.  The FDA was aware of these case -- of these
24 case reports of NAION, correct?
25    A.  Well, they were aware of the ones that were

217

1 included in the update reports, and they were aware of
2 the ones in AERS.
3    Q.  Are you aware of any report for NAION that the
4 company did not send to FDA?
5    A.  I don't know.
6    Q.  Do you agree with me that the FDA has
7 information regarding this class of drugs beyond what
8 Pfizer has?
9    A.  Well, they would have information -- if other
10 manufacturers were submitting information to them, they
11 would have that.
12    Q.  So they have the information being submitted in
13 support of Levitra, correct?
14    A.  I would imagine, yes.
15    Q.  And Pfizer didn't have access to that, correct?
16    A.  I don't know.  I don't know, but I wouldn't
17 think so.
18    Q.  And they -- and the FDA would have access to
19 information regarding Cialis, correct?
20    A.  I would think so.
21    Q.  And Pfizer wouldn't have access to that
22 information, correct?
23    A.  Not that I know of.
24        (Exhibit No. 13 was marked for identification..)
25 BY MS. LESKIN:

55  (Pages 214 to 217)

## 218

1    Q.  Exhibit 13, which is a document entitled "Dear
2  Field Force Managers and Representatives," Bates stamped
3  002184799 through 800.  And you've seen that document
4  before, correct?
5    A.  Yes.
6    Q..  And you cite that at the bottom of the
7  paragraph on page 13 that we've been talking about?
8    A.  Yes.
9    Q.  And this document is prepared after
10 Dr. Pomeranz's case series of seven patients in 2005,
11 correct?
12   A.  I believe so.
13   Q.  In fact it's referring to Dr. Pomeranz's case
14 series of seven new cases?
15   A.  Yeah.  It appears when it was published.  I --
16 I -- I don't know the date, if they knew about it
17 earlier than the date it was published.  And I don't
18 know the date that he submitted it.
19   Q.  Is there anything in this document that's
20 false?
21   A.  I don't know if there is anything false.  We
22 are not permitted to do what is in the middle there, the
23 underline bold "there is no evidence it occurred more
24 frequently."  We are not allowed to make those type of
25 statements anymore because -- or actually they were

## 219

1  never appropriate -- because we are compare -- what
2  they're comparing there is the NAION from the seven
3  events, and attempting to compare that with the normal
4  incidences rate.  And repeatedly FDA has said that's an
5  unfair comparison because those seven events do not
6  represent -- we have no way of knowing what the true
7  incidences of the events are.
8    Q.  What are you basing your view that this
9  underlined sentence that says, "There is no evidence
10 showing that NAION occurred more frequently in men
11 taking Viagra than men of similar age and health who did
12 not take Viagra," what are you basing your statement on
13 that that is based on the seven reports in Pomeranz?
14   A.  Because they're talking about the seven events
15 in Pomeranz.
16   Q.  Are you aware of any evidence showing that
17 NAION occurred more frequently in men taking Viagra than
18 men of similar age who did not take Viagra?
19   A.  We don't know either way because labeling --
20 because adverse events only report 1 to 10 percent.  We
21 have no idea what the true incidences rate is.  So
22 because of that, we cannot represent that there's no
23 difference from the background incidences rate.  I mean,
24 FDA has stated that.  There have been letters written.
25 I mean, there's a publicly available letter to Roche,

## 220

1  with Accutane, that they could not say statements such
2  as this because they don't know the true incidences rate
3  of the adverse event.
4    Q.  Are you aware of what data exists to back up
5  Pfizer's statement that it's underlined in here?
6    A.  Well, at this point they're talking about the
7  seven cases.
8    Q.  Where does it say that, that that statement is
9  referring to the seven cases?
10   A.  The lead paragraph is:  "There's a case of
11 seven."  What else -- what -- what else are they
12 referring to?
13   Q.  Well, that's what -- Where is the evidence that
14 those -- that that statement is referring solely to the
15 seven cases published by Dr. Pomeranz?
16   A.  Well, that was my impression, since it leads
17 with that.  And this is designed to help field
18 representatives to respond to the Pomeranz information.
19   Q.  So that's your assumption that that's what
20 that's referring to, correct?
21   A.  Yes.
22   Q.  Now, on bottom of page 13, you list several
23 bullets coming from a Pfizer document, which you
24 describe as "several reasons to overlook Viagra as a
25 risk factor in the onset of NAION."

## 221

1    A.  I'm sorry.  I have to amplify that.
2        They say in this third -- second paragraph,
3  "While there is no new information on this subject, from
4  what we knew in March, the media has taken up the story
5  again with great intensity.  In response, Pfizer has
6  issued the following statement to the media."
7        So they are referring to the Egan and Pomeranz
8  reports.
9    Q.  So it's your testimony that that statement you
10 just read demonstrates that the underlying sentence
11 means they're referring solely to the seven reports?
12   A.  Well, they only refer to the seven reports and
13 the clinical trial data.  And since there were no
14 reports in the clinical trial data, and the clinical
15 trial used a population that is not indicative of the
16 post-marketing adverse event information, that only
17 leaves the Pomeranz reports that they're referring to
18 here.
19   Q.  Looking at page 13 of your report again, at the
20 bottom there's a list several bullet points comes out of
21 a document, which you said are several reasons that
22 Pfizer noted to overlook Viagra as a risk factor in the
23 onset of NAION.  Do you see where I am?
24   A.  Yes.
25   Q.  Okay.  In that first bullet you wrote, "No

56  (Pages 218 to 221)

## 222

1  reason to believe that Viagra decreases blood flow to
2  the vessels supplying the optic nerve head."
3      Is that a true statement?
4    A.  Do you have the document?
5    Q.  I'm on page 13 of your report.
6    A.  No, I mean the document to which it's
7  referring.
8    Q.  Well, I'm just looking at the sentence you
9  quoted.  Do you have anything to say that that statement
10  is not true?
11    A.  I'm just trying to see the document because I
12  have it in quotes.
13    Q.  Okay.  It's Exhibit 12.  That's what you cite,
14  I should say.
15      MR. BECNEL:  Ms. Leskin, on Exhibit 13, do
16  these two documents go together?  The page 1 and
17  page 2 are 799 and 800.
18      MS. LESKIN:  They follow Bates stamp.
19      MR. BECNEL:  Yeah.  But if you look at the
20  front page where they send Dear Field Force Managers
21  and Representatives, they say "23 million men have
22  used it worldwide."  Then on the next page, which is
23  supposed to be attachment, they say "26 million men
24  have used Viagra since its introduction."  Which is
25  true?  Are they not the same document?

## 223

1      MS. LESKIN:  They follow each other in Bates
2  number.
3      MR. BECNEL:  I didn't ask that question.  I
4  asked you if you got 3 million -- you got 3 million
5  people --
6      JUDGE BORG:  I think the answer is:  "I don't
7  know."
8      MR. BECNEL:  Okay.  She --
9      MS. LESKIN:  The answer is:  I'm not obligated
10  to respond to your question --
11      MR. BECNEL:  You are if it's a false document.
12      MS. LESKIN:  It's a document she cited.
13      MR. BECNEL:  It's not -- no.  You produced
14  this.  We didn't have this.
15      MS. LESKIN:  She cited it in her report.
16      MR. BECNEL:  Yes.
17      MS. LESKIN:  That's why I'm asking about it.
18  That's it.
19      MR. BECNEL:  Because it's a confidential,
20  subject to protective order.  We didn't produce
21  that.
22      MS. LESKIN:  Mr. Becnel, if you wanted -- had a
23  question about the substance of the document, you
24  could have taken discovery of our witnesses.  You
25  chose not to ask anyone about the document.

## 224

1      JUDGE BORG:  Ms. Leskin, please continue with
2  Dr. Blume.
3      MS. LESKIN:  Thank you.
4      MR. BECNEL:  I'll just point out to the jury
5  the falsity of how Pfizer does documents.
6      JUDGE BORG:  Okay.  So let's get going with the
7  deposition.
8      THE WITNESS:  Okay.  I'm looking.  I'm trying
9  to track it.  I see --
10      JUDGE BORG:  Do you remember the question?
11      THE WITNESS:  Yes.
12  BY MS. LESKIN:
13    Q.  We're talking about the first bullet at the
14  bottom of page 13.
15    A.  Yes.  And I started -- I'm tracking the quote
16  marks to this document.
17      Let's see.  A delay of two days following is
18  Point No. 3 on page ending --
19    Q.  I want --
20    A.  -- 08.
21    Q.  I want to focus on bottom of page 13, your
22  first bullet.  You quoted the statement of "several
23  reasons to overlook Viagra as a risk factor in the onset
24  of NAION."  And you wrote, quote, "No reason to believe
25  that Viagra decreases blood flow to the vessels

## 225

1  supplying the optic nerve head."
2      My only question is:  Do you have any evidence
3  that that is a false statement?
4    A.  I put it in quotes, and it's at -- it's on your
5  page 08.  I took it right from this document.  "No
6  reason to believe that Viagra decreases."  I took it
7  directly from your document.
8    Q.  Okay.  Do you have any evidence that that is a
9  false statement?
10    A.  I'm a little confused.  I didn't say they were
11  false statements.  I said they collected these
12  statements in an effort to deflect the information
13  relating to NAION.  And then I quoted them directly from
14  your client's documents.  But nowhere in there do I --
15  have I misquoted them, that I've seen so far, and
16  nowhere did I say they were false.
17    Q.  Okay.
18    A.  I said they included these as alternative
19  reasons to the NAION.
20    Q.  Doctor, my question is:  Is that a false
21  statement?
22    A.  Not that I know of, based on the information I
23  have, nor did I say it was false.  I said they used it
24  to avoid the true issue.
25      MS. LESKIN:  Move to strike.  Objection;

**CONFIDENTIAL**

226

1  nonresponsive.
2      JUDGE BORG: It's overruled.
3  BY MS. LESKIN:
4      Q.  The next bullet point: "Several Pomeranz case
5  reports," quote, "have aspects to their descriptions
6  which must be considered suspect when suggesting a
7  causal association between the development of NAION and
8  the use of Viagra," end quote.
9      Do you have any evidence that is a false
10  statement?
11      A.  Oh, I -- I don't know if anything suspect in
12  the Pomeranz case reports. I'm not sure to what they're
13  referring.
14      Q.  Do you disagree with that statement, then?
15      A.  I don't have enough information either way.
16  But I'm using -- the quotes are because it comes from
17  your report. And moreover, it's in there to deflect, in
18  my opinion, to deflect concerns from the Pomeranz data
19  by calling upon the doesn't support a causal
20  association. It doesn't matter if it suspects a -- is a
21  causal association. The clinical data showed that it
22  occurred.
23      Q.  Are you saying that the company shouldn't have
24  tried to understand whether there was a causal
25  association, it didn't matter whether there was a causal

227

1  association to the company?
2      A.  It may have mattered to the company. The
3  problem is, it shouldn't matter to the extent they
4  didn't put it in their labeling, and it's inappropriate
5  to fall back on inadequate data to -- to support
6  causation in an effort to dilute the importance of the
7  events.
8      Q.  Is it inappropriate to try to disseminate
9  truthful information?
10      A.  What? No, it's not inappropriate to submit
11  truthful information. It's inappropriate to hide
12  truthful information.
13      Q.  Do you have any evidence that Pfizer tried to
14  hide information?
15      A.  Well, they didn't put it in their labeling.
16      Q.  The third bullet point is: "Significant risk
17  factors for vascular disease and/or NAION were described
18  for several patients, including diabetes, coronary
19  artery disease, hypercholesterolemia, smoking, and a
20  previous episode of AION in the opposite eye with recent
21  visual difficulties before starting to take Viagra," end
22  quote.
23      Is that a false statement?
24      A.  No. I think I quoted it directly from -- as
25  you had it in your report, the client had it in their

228

1  report.
2      Q.  And do you have any evidence that that's not a
3  true statement?
4      A.  I'm not quite certain where you get that
5  they're not true statements. I'm assuming that they're
6  true. I quoted them directly assuming they were true.
7  My point has nothing to do with their veracity.
8      Q.  My question has to do with the veracity. Do
9  you have any evidence that those statements are not
10  true?
11      A.  No.
12      Q.  The next bullet: "Patients' age (52, 69, 42,
13  62, 59) and male gender provide two well-known risk
14  factors for the development of vascular disease
15  regardless of whether or not they had additional
16  cardiovascular risk factors."
17      Do you have any evidence that that is a false
18  statement?
19      A.  I hope not, since I quoted it directly.
20      Q.  The next bullet: "Two of these cases, the
21  patients were on Viagra for long periods of time (15
22  months in one case, two years in another) with no prior
23  episodes of AION."
24      Do you have any evidence that that is not a
25  true statement?

229

1      A.  Yeah, I don't know either way. I assumed it
2  was true because I quoted it directly, but I don't have
3  the source documents to know that for sure..
4      Q.  The last bullet says: "A delay of two days
5  following the suspect dose of Viagra before a visual
6  field loss was reported, although eye pain occurred the
7  day following Viagra use."
8      Do you have any information that that is a
9  false statement?
10      A.  I don't know. I assumed it was true because I
11  quoted it, but I have no idea because I don't have the
12  source documents.
13      Q.  At the end of the bullets, you wrote the
14  sentence: "Unfortunately, the campaign to minimize a
15  serious adverse event was successful."
16      Did I read that sentence correctly?
17      A.  Yes.
18      Q.  Is that an opinion you hold to a reasonable
19  degree of scientific certainty?
20      A.  Yes.
21      Q.  What science are you using to reach that
22  opinion?
23      A.  Well, I quote a document where they are pleased
24  that the story is over regarding the NAION.. And there
25  is later in here a document that shows that the sales

58  (Pages 226 to 229)

230

1  were maintained during that period. So if they're
2  pleased that the bad news is over and the sales are
3  maintained in the face of a blinding -- blinding --
4  permanent blinding in patients taking a recreational
5  drug, then that is the basis for my statement.
6      Q.  What science did you use to reach that
7  conclusion?
8      A.  Well, you keep asking that question. But these
9  are personal opinions based on 30 years of experience.
10 I can't point to anatomy or physiology. This is
11 regulatory affairs.
12     Q.  And that's your personal opinion?
13     A.  Based on regulatory affairs, pharmacovigilance,
14 the documents from your client, and 30 years in the
15 business, yes.
16     Q.  What aspect of regulatory affairs science goes
17 to decide whether a campaign is necessary -- is -- a
18 campaign designed to minimize serious adverse event was
19 or was not successful?
20     A.  What component of regulatory affairs?
21     Q.  Yes.
22     A.  Because I think they got one warning letter --
23 let me make sure of this.
24         I think they received a warning letter, but
25 they did not have to withdraw the ad campaign.

231

1          Yes. During that period, there was not any
2  request by FDA to withdraw the ads, although -- yeah,
3  they received two DDMAC letters, but there was no
4  request to withdraw them.
5      Q.  And it's your opinion that those two requests
6  to -- that those two DDMAC letters constitute -- let me
7  start again.
8          Is it your opinion that those two DDMAC letters
9  were in response to a campaign to minimize a serious
10 adverse event?
11     A.  Well, the February 2001 says, "Contains written
12 and graphic representations about Viagra, fails to
13 include information relating to Viagra's major side
14 effects and contraindications." So I think that one
15 does.
16         And the next one says, "Your TV ads failed to
17 disclose the drug's indication, fails to include
18 information relating to its major side effects and
19 contraindications."
20     Q.  Does anywhere in the DDMAC letter say that
21 Pfizer was required to include reference to NAION in its
22 advertisements?
23     A.  Well, no. But that isn't the question you
24 asked me. The question is, did any of the --
25     Q.  It's a new question. Is there anywhere in the

232

1  DDMAC letters that says Pfizer was required to include
2  reference to NAION in its advertisements?
3      A.  The April 2008 letter is a warning letter, and
4  it says that "The ads to patients, direct to consumer,
5  fails to disclose risk information. The video raises
6  public health and safety concerns through its omission
7  of risk information by suggesting Viagra is safer than
8  has been demonstrated."
9          Now, I don't have the specifics here for what
10 went into that warning letter, so whether the absence of
11 NAION was on that ad or not, I don't know. But that
12 would have been after NAION was in the labeling.
13     Q.  Okay. But that's not the campaign you're
14 referring to on page 14, is it?
15     A.  14. Okay. I'm sorry. I'm lost. I was
16 referring to your question regarding warning letter in
17 2008.
18     Q.  Okay. This started as a discussion of the
19 campaign to minimize a serious adverse effect, as
20 referred to on page 13, in 2005 following the
21 publication of Dr. Pomeranz's seven-case series.
22         Now, the letter date -- from DDMAC, dated
23 April 16th, 2008, that's not part of the campaign you
24 were referring to in 2005, is it?
25     A.  No, of course not. Because I'm referring to --

233

1  I'm referring to campaign in 2005 here. The warning
2  letter in 2008 is a different issue. But I was
3  responding to your question regarding warning letters.
4      Q.  Okay. Is the February 2000 DDMAC letter part
5  of the campaign that you're referring to on page 14?
6      A.  14 is referring to the early days in 2005,
7  after the Egan and Pomeranz data. The warning letter
8  regarding failure to include safety information was in
9  2008.
10     Q.  So I'm going to go back to my question, which
11 is where we started the discussion of the ads.
12         I asked you: What aspect of regulatory affairs
13 leads you to conclude that Pfizer ran a campaign to
14 minimize a serious adverse event or that that campaign
15 was successful?
16     MR. BECNEL:  Objection; compound.
17     THE WITNESS:  Okay. Oh.
18     JUDGE BORG:  Are you able to answer that
19 question?
20     THE WITNESS:  No.
21     JUDGE BORG:  Okay.
22 BY MS. LESKIN:
23     Q.  Okay. I'll separate it.
24         I asked you earlier, what science supported
25 your sentence on page 14 that the campaign to minimize a

59  (Pages 230 to 233)

## 234

1  serious adverse event was successful. And you told me
2  that that sentence was your personal opinion based on 30
3  years of regulatory affairs experience, correct?
4      A.  No. I think I said more than that, but that
5  was included in what I said.
6      Q.  Okay. So my question is: What aspect of
7  regulatory affairs leads you to reach the opinion on
8  that first sentence under the bullets on page 14?
9      A.  Well, regulatory affairs is the science design
10 that includes providing labeling and marketing and
11 advertising information and being consistent and
12 maintaining consistency with FDA regulations.
13     My answer was, that while they received two
14 DDMAC letters and one warning letter regarding Viagra
15 and not providing all necessary safety information, they
16 were not associated with these events, with this -- with
17 this information I'm proposing -- or he's summarizing in
18 page 14.. So from that prospective they did not receive
19 a warning letter or a DDMAC letter on this.
20     My other answer to that was: They were pleased
21 with themselves, congratulating themselves that their
22 approach was able to trigger the continued sales of
23 Viagra notwithstanding this adverse information, and
24 that they maintained their sales. They say, "Our
25 business goal was to maintain the number-one position in

## 235

1  the ED market." And they were pleased because they
2  think that they resumed it because they were able to
3  capture relapsing patients.
4      So those facts underlie my feeling that their
5  campaign was successful.
6      Q.  You don't have the opinion that Viagra should
7  not be on the market today, do you?
8      A.  I know you asked me that before. And I think I
9  said no. I am not saying that it's -- should be
10 withdrawn.
11     Q.  Okay.
12     A.  What I'm saying in this report is, it didn't
13 have adequate labeling.
14     Q.  Okay. And if a drug is legitimately and
15 legally on the market, is there anything wrong with the
16 company wanting to sell the drug?
17     A.  I think that a company should want to sell
18 their product if they believe in their product. Of
19 course they should. But I think inherent in that
20 obligation, inherent with their obligation and reward of
21 selling a drug and having a billion-dollar-per-year drug
22 is that they provide prescribers and their patients with
23 all available safety information. And that is
24 especially important for a drug such as Viagra that is
25 unnecessary.

## 236

1      So with the -- with the joy of making it --
2  having multibillion-dollar-per-year drugs is the
3  obligation that you maintain adequate labeling. And
4  that is my issue with Pfizer and the Viagra labeling.
5      Q.  So the fact that the company wanted to continue
6  selling Viagra and maintain the number-one position in
7  the ED market for sales, you don't necessarily find
8  fault with that, do you?
9      A.  Of wanting to have a number-one product? No.
10 I find fault with not -- with having a number-one
11 product while not providing important safety
12 information, especially for a lifestyle drug.
13     Q.  What document says, "We want to have the
14 number-one product, but we don't want to provide the
15 right safety information"?
16     A.  I didn't say there was a document. I said that
17 they did want to provide it, and they didn't amplify
18 their labeling. So they did say they wanted their
19 number-one drug, and they didn't amplify their labeling
20 until they were forced to by the FDA.
21     Q.  Is there anything wrong with wanting physicians
22 to understand changes to your label, the company wanting
23 to -- for physicians to understand changes they make to
24 the label?
25     A.  No, of course not. That's why when changes are

## 237

1  made to labeling, Dear Doctor letters are sent, a
2  variety of things can happen. But the labeling has to
3  be changed first.
4      Q.  So on page 14, that bottom part of page 14,
5  where you say "By 2006..." Do you see that?
6      A.  I'm sorry. Just one second.
7      Q.  Sure.
8      A.  Yes.
9      Q.  Now, by 2006, the Viagra label had been
10 changed, correct?
11     A..  Yes.
12     Q.  That happened in July 2005, correct?
13     A.  Yes.
14     Q.  So where Pfizer said that their business goal
15 was to maintain the number-one position in the ED
16 market, that was after they changed their label,
17 correct?
18     A.  Yes.
19     Q.  And their plan to support physician
20 understanding of label changes, that also was after they
21 had changed their label, correct?
22     A.  Yes. That they were going to -- they were
23 going to do that by attempting to re-attract lapsing
24 Viagra patients, increasing information with regard to
25 alpha blockers and ION as they arise.

60  (Pages 234 to 237)

238

1    Q.  Is there anything wrong with that?
2    A.  Well, the labeling had been changed.  I would
3    hope they would be trying to support physician
4    understanding of NAION.
5    Q.  So there's nothing wrong with that, then, is
6    there?
7    A.  Helping physicians understand?
8    Q.  Correct.
9    A.  No.  I would hope they would help physicians
10   understand.
11   Q.  Or reducing the lapse in Viagra patients.  Do
12   you have a problem with that?
13   A.  Focus on reducing lapsing of Viagra patients.
14   I'd have to go back and check that document.  I can't
15   remember that document specifically.
16   Q.  Bottom of page 15, you refer to the McGwin
17   study?
18   A.  Yes.
19   Q.  Do you agree with me that the McGwin study did
20   not find an increased rate of NAION in patients overall,
21   taking Viagra -- strike that.  That's a bad question.
22       Do you agree with me that the McGwin study did
23   not find an increased rate of NAION take -- in patients
24   taking Viagra overall?
25   A.  Yes.

239

1    Q.  You also wrote here that, "A statistically
2    significant association was observed in those patients
3    with a history of myocardial infarction."
4        Do you see that?
5    A.  I do.
6    Q.  And that's based on the published article,
7    correct?
8    A.  Yeah, I'm referring to the publication here.
9    Q.  Okay.  Did you read Dr. McGwin's deposition in
10   this case?
11   A.  Yes.
12   Q.  Both of them?
13   A.  Oh, I don't recall if there were two.  I don't
14   know.
15   Q.  Do you recall reading a deposition that was
16   taken on December 11th?
17   A.  I think that was the one where they discuss two
18   patients in the study, errors with two patients?
19   Q.  The one where they discussed errors in the
20   study.
21   A.  Yeah, I do recall that.
22   Q.  Okay.  Do you recall Dr. McGwin's testimony
23   that he had assumed that the information he was provided
24   dealt with a personal history of myocardial infarction
25   in those patients?  Do you remember reading that in the

240

1    deposition?
2    A.  I remember discussing -- I remember reading
3    that he was discussing a couple of errors.  I do
4    remember that.  I don't remember the specifics, though.
5    Q.  I want you to assume with me, hypothetically,
6    that the authors of the McGwin study did not investigate
7    the subject's prior history of myocardial infarction.
8    Would that make the reporting findings about the
9    association in patients with a history of myocardial
10   infarction, as you cite in your report, unreliable?
11   A.  Oh, I don't know.  I'd have to know the whole
12   story.  But it doesn't impact my -- none of these
13   studies really impact my opinion because I don't believe
14   that the reporting of blindness in ION and NAION is
15   dependent on what's going on in the other studies.  And
16   the McGwin study only has, I think, 30 or 40 people in
17   it anyways.
18   Q.  Did the McGwin study study blindness?
19   A.  I thought it -- I thought they used the term,
20   the specific term NAION, but I'd have to look at the
21   study again.
22   Q.  Do you have an opinion here today whether
23   Viagra causes blindness as you've used the term?
24   A.  I didn't use the term "cause."  I used the term
25   that blindness has been reported with Viagra.  And it

241

1    was the inclusion of permanent blindness was delayed in
2    the labeling.  There is -- it's very difficult to
3    separate out blindness, optic neuritis, ION, and NAION
4    because of the way the coding of these events occur.  So
5    I have tried very hard to look at the events of
6    interest, which are the ones that might lead to
7    blinding.  I mean, the way these are coded, it might be
8    optic neuritis, it might be ION, it might be NAION, it
9    might be blinding.  So I have tried to look at the ones
10   of most concern to me, and those are the ones with
11   blinding.
12       MS. LESKIN:  Objection; nonresponsive.
13       JUDGE BORG:  I'll overrule.
14   BY MS. LESKIN:
15   Q.  Let me ask the question again.
16       Do you have an opinion here today whether
17   Viagra causes blindness as you have used the term
18   blindness?
19       MR. BECNEL:  Objection; asked and answered.
20       THE WITNESS:  I have not been answered -- asked
21   to look at causation.
22   BY MS. LESKIN:
23   Q.  And you're not going to be giving an opinion in
24   this case regarding causation of blindness; is that
25   correct?

61  (Pages 238 to 241)

**CONFIDENTIAL**

---

### 242

1  MR. BECNEL: Let me enter an objection. That's
2  repetitious. You covered that the first 15 minutes
3  of this deposition, Counsel.
4  MS. LESKIN: Well, no, I didn't.
5  MR. BECNEL: Why are we going back over it a
6  second time and third time?
7  MS. LESKIN: I specifically asked about NAION.
8  JUDGE BORG: You know what? Counsel is not
9  going to argue with each other. It's overruled.
10  Would you please restate the question.
11  BY MS. LESKIN:
12  Q.  I just want to be clear that you are not
13  offering an opinion in this case regarding causation of
14  blindness.
15  A.  It is my understanding I will not be.
16  Q.  Now, you wrote on your report here at the end
17  of page 16, top of 16, regarding the McGwin study, that:
18  "Given the results observed and the potential
19  significance of the associated adverse events, these
20  results should not be diluted or ignored."
21  Is it your opinion that Pfizer ignored the
22  McGwin study?
23  A.  I don't know. I don't know.
24  Q.  Is it your opinion that Pfizer diluted the
25  McGwin study?

### 243

1  A.  I think that most of the Pfizer reports have
2  focused on background incidences and the pulling of data
3  by the Gorkin -- in the Gorkin paper, and have
4  criticized the other studies. And my opinion, as I've
5  addressed all day, is that it's inappropriate to dilute
6  the significance of the adverse event finding by
7  incidences studies.
8  And I think that the Pfizer experts have
9  largely have criticized the Margo and French study and
10  the McGwin study, and focused on the -- on the Gorkin
11  study as an effort to address the importance of the
12  NAION events relative to population indices. And I
13  disagree with that approach completely.
14  So in that respect, I think that they have
15  ignored what is important by those efforts. But other
16  than that, I don't think I have made any other -- have
17  any other comments regarding their efforts with the --
18  with the McGwin study.
19  Q.  When you referred to the Pfizer experts, are
20  you talking about the experts in this litigation?
21  A.  Yes. I recall reading their reports, and they
22  dismiss the importance of many of -- of the NAION events
23  in an effort to compare them to background incidences.
24  And I recall in those reports, they also talk about some
25  of the frailties with the various studies. And I recall

### 244

1  the McGwin study is included in some of those. But I
2  disagree with that approach. I don't think that you can
3  estimate -- put any perspective on the relevance of an
4  important adverse event by comparing it to a background
5  incidence when we know that only 1 percent of the
6  adverse events are known to us.
7  Q.  Okay. That's -- that -- again, to be clear,
8  you're referring to statements made in the context of
9  this litigation, correct?
10  A.  Yeah. I think I'm referring to the reports
11  that were provided to me.
12  Q.  In this litigation?
13  A.  Yes. But I --
14  A..  But you're not --
15  A.  I don't believe that I ever said that -- I
16  don't believe I ever said that Pfizer in public
17  diluted -- I would have no reason to say in public
18  diluted the significance of the McGwin findings..
19  Q.  That was my question. Thank you.
20  I want to turn to the bottom of page 16 of your
21  report.
22  A.  Yes.
23  Q.  You have a series of reports -- of literature
24  here at the bottom of page 16 where it says, "Additional
25  adverse ophthalmologic events in association with

### 245

1  sildenafil have also been published in the medical
2  literature soon after the launch of the product."
3  Do you see that at the bottom?
4  A.  Yes.
5  Q.  And then you cite a whole bunch of reports?
6  A.  Yes.
7  Q.  What event was at issue in the Donahue report?
8  A.  Which ophthalmic event? I don't -- I don't
9  recall specifically. But I have everything here if you
10  want me to get it.
11  Q.  Oh, I have them.
12  A.  Okay.
13  Q.  I just was seeing if there was a way to
14  shortcut it.
15  A.  Uh-uh.
16  Q.  14 we're going to mark as the Donahue case
17  support entitled "Pupil-Sparing Third Nerve Palsy
18  Associated With Sildenafil Citrate (Viagra)."
19  (Exhibit No. 14 was marked for identification.)
20  BY MS. LESKIN:
21  Q.  And that's the Donahue article you cite at the
22  bottom of page 16 of your report?
23  A.  I believe so.
24  Q.  Okay. And you'll agree with me that this
25  refers to third nerve palsy, right?

CONFIDENTIAL

---

246

1     A.  Yeah.  I think the reason -- well, first of
2  all, this paragraph is all ophthalmologic events.  And
3  of interest in this one is that the editor -- or the
4  writer notes that it suggests that system -- systemic
5  hypotension sufficient to cause dysfunction can be
6  induced by sildenafil without other products.  And I
7  think I was interested in that because it's a -- it's
8  another hypotension, which is a similar mechanism of
9  action as to what we fear may be involved with ION and
10  NAION.
11         MS. LESKIN:  Objection; nonresponsive.
12         JUDGE BORG:  Sustained.
13  BY MS. LESKIN:
14     Q.  This article deals with --
15         JUDGE BORG:  Five minutes.
16  BY MS. LESKIN:
17     Q.  This articles deal with third nerve palsy;
18  correct?
19     A.  Yes.
20     Q.  Is it your opinion in this case that Pfizer
21  should have amended its label to include third nerve
22  palsy?
23     A.  No, nor do I say that.  This is simply an
24  overview of other ophthalmologic events.
25         For example, the reason Tripalzi and O'Donnell

---

247

1  are in there in 2000, is they have a plea in their
2  article that this information regarding the -- the
3  retinal event should be made public so that physicians
4  can describe it and share it with their patients.  And
5  I -- that's why that article is in there.  So as early
6  as 2000, independent people were saying, "We need this
7  in the labeling so we can share this with our patients."
8         MS. LESKIN:  Objection; nonresponsive.
9         JUDGE BORG:  Sustained.
10  BY MS. LESKIN:
11     Q.  Is it your opinion in this case that Pfizer
12  should have amended its label to include third nerve
13  palsy?
14     A.  Gee, I thought I answered that.  But the answer
15  was no.  This is a combination of ophthalmic literature.
16  We can go through them one by one.  The reason this one
17  is in here, it's a similar mechanism of action.  And
18  you'll note that they do use the word "cause" in this
19  one.
20         MS. LESKIN:  I'll object to everything after
21     the word "no."
22         JUDGE BORG:  As nonresponsive?
23         MS. LESKIN:  As nonresponsive.
24         JUDGE BORG:  Sustained.
25  BY MS. LESKIN:

---

248

1     Q.  Are you familiar with the Vobig article?
2     A.  Oh, I don't specifically recall it.  We can
3  look at it.
4         (Exhibit No. 15 was marked for identification.)
5     Q.  Exhibit 15 is Vobig, "Retinal Side Effects of
6  Sildenafil."
7         This article deals with retinal side effects,
8  correct?
9     A.  Yes.  And what's important in this article is
10  that the authors, as early as 1999, were agreeing that
11  the long-term effects should be clarified by further
12  studies.  So that's why I included this article.
13         MS. LESKIN:  Objection as nonresponsive
14     everything after the word "yes."
15         JUDGE BORG:  Sustained.
16  BY MS. LESKIN:
17     Q.  Dr. Vobig attributes the retinal effects on the
18  inhibitory effect on phosphodiesterase 6, correct, if
19  you look at the bottom of his -- of his article?
20     A.  That's what he thinks.
21     Q.  And he's -- and he is advocating further
22  studies on the long-term effects of sildenafil on
23  retinal function, correct?
24     A.  Correct.
25         JUDGE BORG:  Want to find a break here?

---

249

1         MS. LESKIN:  Yep.  One more question, then I
2     will.
3         JUDGE BORG:  Sure.
4  BY MS. LESKIN:
5     Q.  You'll agree with me that there was information
6  about the effects of PDE6 in the Viagra label from the
7  time of its initial approval, correct?
8     A.  Oh, I think so.
9         MS. LESKIN:  We can take a break.
10         THE VIDEOGRAPHER:  We're off the video record.
11         (Recess from 3:44 p.m. until 3:57 p.m.)
12         THE VIDEOGRAPHER:  We are back on the video
13     record.
14         (Exhibit No. 16 was marked for identification.)
15     Q.  We have marked as Exhibit 16 an article that is
16  by Dr. Burton, a letter to the Journal.  And that's the
17  Burton article you referenced, correct, on page 16 of
18  your report?
19     A.  I think so.
20     Q.  And the article is entitled -- or the letter is
21  entitled "Sildenafil (Viagra), A Cause of Proliferative
22  Diabetic Retinopathy," right?
23     A.  That is the title, yeah.
24     Q.  And we talked a little bit about diabetic

---

63  (Pages 246 to 249)

250

1  retinopathy before. I just want to make sure that the
2  publication of this case report doesn't support your
3  opinion that -- well, strike that. Let me phrase that
4  better.
5      I want to make clear that it's not your opinion
6  that this article should have caused Pfizer to amend its
7  label regarding NAION..
8  A. No. That isn't what any of those are in there
9  for.
10  Q. Okay. And is it your opinion that the label
11  should have been amended to include diabetic
12  retinopathy, based on this case report?
13  A. You know, I don't know. I wasn't asked to
14  study that, so I don't -- I don't have an opinion on
15  that.
16      (Exhibit No. 17 was marked for identification.)
17  BY MS. LESKIN:
18  Q. Exhibit 17, this, I believe, is Murata. And
19  there's some -- are you with me on 17, Doctor?
20      And even though it looks like most of this
21  article is in Japanese --
22  MR. BECNEL: Are you going to read it?
23  MS. LESKIN: I am not going to read it.
24  MR. BECNEL: Are you going to read it and
25  interpret it for us? I want --

251

1  MS. LESKIN: Would you be impressed if I did?
2  JUDGE BORG: Yes.
3  MS. LESKIN: If you look at the last page,
4  there's an abstract in English.
5  MR. BECNEL: I'm sure she went to school for
6  three months to learn it.
7  MS. LESKIN: It actually says Viagra doesn't
8  cause NAION.
9  BY MS. LESKIN:
10  Q. Do you see the abstract in English on the last
11  page?
12  A. Yes.
13  Q. Okay. And this is regarding central serous
14  chorioretinopathy, right?
15  A. Yes.
16  Q. And this article doesn't support your view that
17  Viagra's label should have been amended to include
18  NAION, correct?
19  MR. ALTMAN: Objection; foundation. She just
20  said "this article." It's in Japanese. We don't
21  know what it says.
22  MS. LESKIN: Well, let me -- I'll rephrase the
23  question. It's -- I'll rephrase.
24  JUDGE BORG: She's referred -- well, I don't
25  have --

252

1  MR. ALTMAN: She said "the article" -- she said
2  "the article," not "the abstract," is my
3  concern.
4  MS. LESKIN: I'll rephrase the question.
5  JUDGE BORG: Okay.
6  BY MS. LESKIN:
7  Q. You're not using this abstract to support your
8  view that the Viagra label should have been amended to
9  include NAION, correct?
10  A. No. This paragraph says that there were many
11  ophthalmologic -- there were many reports relating to
12  ophthalmologic events in the period following the
13  launch --
14  Q. And this is --
15  A. -- of Viagra.
16  Q. -- just one of those, correct?
17  A. And I tried to pick -- this one happens to be
18  the year 2000. I tried to pick different events,
19  different ophthalmic events. This one happens to say
20  that, you know, it was in -- the cause -- it was the --
21  the problem was induced by sildenafil. But all of these
22  relate to hypotensive events and common mechanism of
23  action, and I thought it was important because there is
24  so much -- so much overlap with the various vision
25  events -- blindness, NAION, ION -- that I thought it was

253

1  important to cover all three of those earlier in the
2  report, and then look at other ophthalmologic reports
3  that have been reported.
4  Q. Where does this say this was a hypotensive
5  event, Doctor? And I'm referring to the Murata article.
6  A. Oh, I -- if I said that it was this one, most
7  of them related to hypotensive events. I think this one
8  said that it was -- let's see. Dilatation of the
9  choroidal vein near the leakage site. So they talk
10  about a dilatation of the choroidal vein, and that that
11  led to congestion over the retinal pigment, epithelial
12  tissue.
13  Q. Does that have anything to do with the
14  mechanism by which NAION is caused?
15  A. We don't know. It could.
16  Q. Are you aware of any -- and I thought I asked
17  you this before, but we'll talk about it again.
18      Are you aware of any study that shows that
19  central serous chorioretinopathy is at all causally
20  related to NAION?
21  A. No. I was speaking in a larger mechanistic way
22  that it causes a -- can cause a hypotensive effect that
23  may lead to a vasodilatation. And one of the theories
24  is that that vasodilatation may lead to a congestive or
25  a compartmentalization effect, which in the end leads to

64  (Pages 250 to 253)

CONFIDENTIAL

254

1 an anoxia of the ciliary arteries for the optic nerve.
2    Q.   And are you relying on the Murata article or
3 abstract for that?
4    A.   No, not particularly.
5    Q.   You're relying on the Donahue article for that?
6    A.   Donahue?
7    Q.   That was Exhibit 14, on third nerve palsy.
8    A.   No.  As I said, this says "adverse
9 ophthalmologic events associated with sildenafil."  I
10 mean, there's many ophthalmologic events associated with
11 Viagra, and this is a collection of them.  And I think I
12 told you that I put Donahue in there because they said
13 it was causative.
14    Q.   Okay.  You also told me that you collected a
15 bunch of adverse events because they were hypotensive
16 and --
17    A.   And some of them --
18    Q.   -- of the same mechanism.
19    A.   Some of them relate to hypotensive properties.
20    Q.   So what I'm asking is:  Are you have -- do you
21 have any evidence or are you relying on Donahue as one
22 of those articles?
23    A.   Okay.  That was number what?
24    Q.   14, third nerve palsy.
25    A.   Well, it says that, "Although this is a single

255

1 case, systemic hypotension sufficient to cause
2 neurologic dysfunction can be induced by sildenafil
3 without other drugs."
4         So they are -- they are also talking about --
5 yeah, they're also talking about hypotension.
6    Q.   And is the mechanism by which third nerve palsy
7 occurs related to the mechanism by which NAION occurs?
8    A.   Well, this is a neurologic, but it -- in the
9 beginning there is a hypotension which is believed to
10 trigger the neurologic dysfunction associated with third
11 nerve palsy.  There is also hypotension associated --
12 believed to be associated with the events that lead to
13 the damage that can be -- that is believed to be
14 associated with NAION and ION.  So the hypotensive
15 properties are common, but what happens after that leads
16 to different events.  But there is a systemic
17 hypotension that we have to be concerned with with both
18 of those types of ophthalmic events.
19    Q.   Are you relying on the Vobig article for the
20 hypotensive events or the similar mechanism that you
21 described for me?
22    A.   Well, I've -- I've added them in here for a
23 variety of reasons.  And I think that many different
24 authors from the beginning of the launch, 1998, until
25 current talk about the concern with hypotension,

256

1 vasodilatation, and various ophthalmic events.  And
2 while we're focused on blindness and ION and NAION, I
3 think it's important to note that the drug does cause
4 significant systemic hypotension and it can lead to
5 several different types of ophthalmic events, and these
6 are just a few examples.
7         MS. LESKIN:  Objection; nonresponsive.
8         JUDGE BORG:  Sustained.
9 BY MS. LESKIN:
10    Q.   Talking about the Vobig article, Doctor, are
11 you relying on this letter to support as one of the
12 hypotensive or similar mechanism of action as NAION?
13    A.   I'm not relying on it to be a similar event as
14 NAION.  I'm relying that multiple authors have been
15 concerned with ophthalmic damage secondary to
16 hypotension.
17    Q.   Is Dr. Vobig concerned with ophthalmic injury
18 secondary to hypotension?
19    A.   Who -- which one are you on now?  Vobig?
20    Q.   The one numbered 15, Dr. Vobig.
21    A.   Well, he's linking the change in retinal
22 function simply with the pharmacokinetic data.  I don't
23 think he mentions -- I don't think he takes it to the
24 next step and wonders if the pharmacokinetic level
25 somehow influences hypotension.

257

1    Q.   Does Dr. Burton, Exhibit 16, express a concern
2 about hypotension?
3    A.   Well, he says sildenafil -- "On the other hand,
4 sildenafil is a potent vasoactive drug and diabetes
5 fundamentally a vascular disease.  Is it purely
6 coincidental that such a dramatic deterioration in the
7 retina should occur a few months following commencement
8 of sildenafil?"
9         So I think he's looking -- yeah, he also is
10 looking at the effects of it.  It is a vasoactive
11 chemical.
12    Q.   Does -- is Dr. Burton expressing a concern
13 about the hypotensive effects of Viagra?
14    A.   Well, I don't know if he's expressing a
15 concern.  He's reporting a patient that has -- a
16 long-term diabetic patient that had this event after --
17 a few months after starting the drug.  I don't think he
18 has enough information to be expressing a conclusion on
19 it yet.
20    Q.   Does he address at all the hypotensive response
21 of Viagra?
22    A.   Well, he discusses its vasoactive properties.
23 And as far as I know, its vasoactive properties are
24 largely -- largely limited to the systemic
25 vasodilatation.

65  (Pages 254 to 257)

CONFIDENTIAL

258

1    Q.  Show me where in this article he uses the term
2    "hypotensive."
3    A.  No.  He -- I told you, he uses "vasoactive."
4    Q.  And it's your -- it's your belief that he meant
5    to say hyper -- "hypotension"?
6    A.  Oh, I have no idea what he meant.  I'm just
7    telling you that vaso -- this product is a hypotensive
8    agent.
9    Q.  You're also telling me that you're relying on
10   these articles because they express a similar mechanism
11   or a hypotensive effect.  So I'm asking you:  Which of
12   these articles express a similar mechanism or
13   hypotensive effect?
14   A.  And I told you that I answered -- I added these
15   because they are other expressions of ophthalmic damage
16   associated with Viagra.  And in many of these -- well,
17   actually it does say vasodilatation.  It says it in the
18   first paragraph, "Inhibition of PDE5 results in
19   increased level of GMP, the intracellular messenger
20   which affects vasodilatation."
21   Q.  Okay.  Where does that say "hypotension"?
22   A.  Well, vasodilatation leads to hypotension.
23   You're word parsing.  All of this is the same thing.
24   They all are looking at different ophthalmic events
25   secondary to Viagra.  And my point is that in many of

259

1    these there is a concern with vasoactivity,
2    vasodilatation, and hypotension.
3    Q.  Was Pfizer's effect on blood pressure disclosed
4    in the initial label?
5    MR. ALTMAN:  Objection; vague.
6    JUDGE BORG:  What's -- I sustain.
7    MS. LESKIN:  I'm sorry.  Yeah, I'm going to
8    rephrase it.
9    BY MS. LESKIN:
10   Q..  Was Viagra's effect on blood pressure disclosed
11   in the initial label?
12   A.  I believe so.
13   Q.  Was Viagra's effect on vasodilation disclosed
14   in the initial label?
15   A.  Yes.
16   Q.  On page 18 -- on page 18 you say, "Regarding
17   the association between Viagra and NAION, and associated
18   temporary or permanent loss of vision, several lines of
19   evidence support the possibility of a drug-induced
20   effect."
21   Right?  Did I read that correctly?
22   A.  The first -- you read the first sentence and
23   the second sentence?  I'm sorry.
24   Q.  The second sentence of that paragraph on top of
25   page 18.

260

1    A.  I think you read it correctly.
2    Q.  Okay.
3    A.  Wait.
4    Q.  Now, you're referring to -- you refer first to
5    Dr. Mahmud's article, correct?
6    A.  Yes.
7    Q.  Does Dr. Mahmud's article measure blood flow in
8    the optic nerves, in the optic vessels?
9    A.  Well, I'll have to see it.  But I don't know.
10   From what I understand, it's not possible to accurately
11   measure it in the fine -- in the fine optic vessels.
12   Q.  Talk about the animal studies.  Second
13   paragraph talks about the animal studies supporting the
14   biologic plausibility of Viagra inducing NAION.  Now,
15   you reference Hotta as one of those articles that
16   demonstrate that, correct?
17   A.  Well, I used Hotta to suggest that there might
18   be biphasic effects.
19   Q.  Well, is that one of the articles that you used
20   to support your statement that results from animal
21   studies support the biologic plausibility of Viagra
22   inducing NAION?
23   A.  Yeah.  And I specifically used Hotta because I
24   believe that was the one who talked about biphasic
25   effects.

261

1    (Exhibit No. 18 was marked for identification.)
2    BY MS. LESKIN:
3    Q.  Exhibit 18, an article by Dr. Hotta.
4    A.  I'm sorry.  Did we do Mahmud?  I lost track
5    here.
6    Q.  No.  I skipped over that one for now.  I'm on
7    to the animal studies.
8    MR. BECNEL:  Can I get one, please?
9    MS. LESKIN:  I don't think I have an extra
10   copy.  The only copies I have are half and
11   gobbly-gook or miscopied.  You guys will have to
12   share.
13   BY MS. LESKIN:
14   Q.  Sorry.  Exhibit 18 is Dr. Hotta's article,
15   correct?
16   A.  18.  Yes.
17   Q.  And that's the article that you refer to here
18   on page 18, right?
19   A.  I believe so.
20   Q.  Okay.  Is Dr. Hotta studying sildenafil?
21   A.  I don't believe so.  It's a cyclic AMP
22   phosphodiesterase inhibitor.  I think at this point it
23   was experimental.
24   Q.  Does Viagra have an effect on cyclic AMP?
25   A.  I -- I don't believe so.

66 (Pages 258 to 261)

CONFIDENTIAL

262

1    Q.  So does this article demonstrate the biological
2  plausibility of sildenafil, even creating a biphasic
3  effect on ocular blood flow?
4    A.  Let me see.  I don't think directly, but it was
5  the reason that I -- the reason it's in here is, there
6  are different theories as to how it may -- how ION and
7  NAION may occur as it -- as a result of hypotensive
8  properties and how does the vasodilatation cause it.
9  And they seem to conflict because one talks about
10  increased blood flow in congestion, and the other talks
11  about deprivation of blood flow.  And this article talks
12  about by biphase -- biphase -- that a biphasic property
13  can be present in retinoid blood flow, and that's why
14  it's in here.  It's one of the few articles that talk
15  about that it can be biphasic.  So it may not need to be
16  one or the other.  It may be a biphasic effect.
17    Q.  Do you have any evidence that sildenafil
18  produces this biphasic effect?
19    A.  No.  It's simply addressing that there's --
20  that the reduced blood flow may cause a congestion or
21  may cause a deprivation.
22    Q.  Okay.  Do you, Dr. Blume, sitting here today,
23  have any evidence that sildenafil causes a biphasic
24  effect on ocular blood flow?
25    A.  No.  But that's -- no.  And that's not the

263

1  purpose of why this is in here.  The purpose of it in
2  here is showing that it's possible in the retinal
3  tissues to have both a gorging effect and a deprivation
4  effect.
5    Q.  Dr. Blume, you wrote in your report, "Results
6  from animal studies also support the biologic
7  plausibility of Viagra inducing NAION."  The very first
8  article you cite is the Hotta article for the
9  proposition that a phosphodiesterase inhibitor produced
10  biphasic effects on ocular blood flow.
11    A.  Well --
12    Q.  So I'm asking you today:  Do you have any
13  evidence that Viagra or sildenafil produces a biphasic
14  effect on ocular blood flow?
15    A.  No.  And that's not why it's in here.
16    (Exhibit No. 19 was marked for identification.)
17  BY MS. LESKIN:
18    Q.  Exhibit 19 is an article by Behn and Potter
19  entitled "Sildenafil-Mediated Reduction in Retinal
20  Function in Heterozygous Mice Lacking the Gamma Subunit
21  of Phosphodiesterase."  That's the next article you cite
22  in that paragraph, correct?
23    A.  Yes.
24    Q.  And this is an article in a study of mice with
25  retinitis pigmentosa, correct?

264

1    A.  Correct.
2    Q.  And it studies the effect on PDE6, correct?
3    A.  Correct.
4    Q.  How does the effect on PDE6 support the
5  biological plausibility of Viagra inducing NAION?
6    A.  Because one of the theories relating to NAION
7  is unrelated or perhaps additive to the vasodilatation
8  properties in that there's a direct renal -- or retinal
9  toxicity.  And this -- this article is addressing a
10  renal toxic -- direct renal toxic -- a renal -- direct
11  renal toxicity with the drug.
12    Q.  Renal or retinal?
13    A.  If I said renal, I met retinal.
14    Q.  Okay.  What article supports the theory that
15  Viagra is direct retinal toxicity causes NAION?
16    A.  Okay.  Well, no article ever says that one
17  effect causes it.  But among the article -- among the
18  different discussions is vasodilatation with congestion,
19  vasodilatation with oxygen starvation, and perhaps some
20  direct retinal effect.
21    Q.  Okay.  What article discusses a direct retinal
22  effect that causes NAION?
23    A.  Okay.  None of -- again I will correct you.
24  None of the articles will say "cause NAION."  They are
25  potential pathways associated with retinal dysfunction

265

1  that may lead to ION or NAION, but none of them will say
2  "cause."
3    Q.  Okay.  What article supports --
4    A.  Oh, I don't --
5    Q.  -- the hypothesis that Viagra causes NAION
6  through a direct retinal toxicity?
7    A.  None of them use the word -- none of them --
8  none of them that I know will use the word "cause."
9    Q.  I didn't ask you cause.  I asked you
10  hypothesize.  What --
11    MR. BECNEL:  Wait.
12  BY MS. LESKIN:
13    Q.  -- article --
14    MR. BECNEL:  Wait, wait.  Objection.
15    JUDGE BORG:  Well, let's -- let's hear the
16  question.
17    MR. BECNEL:  That's exactly what you said
18  twice.
19    MS. LESKIN:  Fine.  I will -- I'll rephrase the
20  question.
21    MR. BECNEL:  Well, let's read the transcript.
22    MS. LESKIN:  I'll rephrase the question.
23    JUDGE BORG:  She can rephrase the question.
24    MR. BECNEL:  I understand, but she -- she --
25  BY MS. LESKIN:

67  (Pages 262 to 265)

266

1    Q.  What article gives the hypothesis that Viagra
2  may lead to NAION through direct retinal toxicity?
3    A.  Gee, I don't know.  One of the articles.  And I
4  think it's -- addresses various mechanisms by the
5  experts.
6    Q.  Which article, Doctor?
7    A.  I don't -- I don't recall a specific article.
8  I just recall that there's three plausible articles, and
9  direct retinal toxicity is probably the least of the
10  three.  But this was an example of being able to cause a
11  direct retinal toxicity.
12    Q.  Does Dr. Behn and Dr. Potter say that Viagra
13  causes a direct retinal toxicity?
14    A.  I don't know.
15    Q.  Does Dr. Behn and Dr. Potter say that Viagra
16  may cause NAION because of its effect on PDE6?
17    A.  I don't -- oh, I don't know.  I doubt it.  It's
18  a mouse model.  And you know from your work -- your
19  client's work that the mouse model doesn't reflect
20  humans.  But it's -- all of these articles
21  address which you have said many times today, that it's
22  appropriate to go out and gather as much information you
23  can in various models to attempt to describe what action
24  the drug may be having.  And that's what these do.  They
25  look at different aspects of the known actions -- they

267

1  look at different aspects of the actions of sildenafil,
2  and hope to try to address what actions might be leading
3  to ION and NAION.
4    Q.  You say in your report, Doctor, that this
5  article supports the biologic plausibility of Viagra
6  inducing NAION.  Where is that support in this article?
7    A.  That is what I believe.  I believe there's
8  three different ways that it may happen, and that this
9  article was one of the few that I have seen that looks
10  at direct retinal toxicity.
11    Q.  What's the basis for that belief?
12    A.  Just my accumulated reading.  And really, none
13  of this is material to my report about labeling because
14  labeling is independent of biologic mechanisms.
15    Q..  So you are not going to give -- on the stand in
16  front of a jury, you're not going to make the statement
17  that the animal study supported the biologic
18  plausibility of Viagra inducing NAION?
19    A.  I think what I would say is that the clinical
20  data have shown that Viagra caused or is associated with
21  blindness, ION, and NAION, and it was known from 2000,
22  and that we know from various animal models that Viagra
23  influences phosphodiesterase 5 and phosphodiesterase 6,
24  and those actions may both have impact on ophthalmic
25  function.

268

1    Q.  Okay.
2    A.  And that's as -- probably as much as I will say
3  about biologic plausibility.
4    Q.  When you say "ophthalmic function," you don't
5  mean to say that PDE6 has an effect on NAION, correct?
6    A.  No.  I've said many times today that the PDE6
7  is believed to be due to the blue and green tinges, one
8  other ophthalmic dysfunction.
9    Q.  And so you're not going to offer the opinion
10  that the Behn and Potter article provides evidence that
11  supports the biologic plausibility of Viagra inducing
12  NAION; is that correct?
13    A.  I think I will say that there are collections
14  of articles in different animal models showing that
15  Viagra has various influences on retinal function.  And
16  I may show that this is a direct -- believed to show a
17  toxicity on retinal function.
18       I don't know what I'll say because it will
19  depend on what question I am asked.
20    Q.  There's a difference, Doctor, between retinal
21  function and NAION, correct?
22    A.  Yes.  But I'm talking about biologic
23  plausibility.
24    Q.  And I am, too.  But I'm asking you:  Is there a
25  difference between retinal function and NAION?

269

1    A.  Yes, of course.
2    Q.  And so when you wrote the statement in your
3  report, "Results from animal studies also support the
4  biologic plausibility of Viagra inducing NAION," I'm
5  trying to figure out which studies you're referring to.
6  And so far we've talked about Hotta, which doesn't
7  address sildenafil, and we talked about Behn and Potter,
8  which you told me originally supported a direct retinal
9  toxicity.
10    A.  Well, what the authors say is, these data --
11  these data and other model systems could be useful in
12  understanding the mechanisms of RP and other forms of
13  retinal degeneration.  And sildenafil is associated with
14  end -- end events that may well be the function of
15  retinal degeneration or retinal apoptosis.  So that's
16  why this is instructive.
17    Q.  Is NAION retinal degeneration?
18    A.  No.  But there is a inability to process the
19  signals with NAION.  And no one knows the complete
20  evolution of the events that lead between hypotension
21  and blindness, and what that cascade of events is.  And
22  if we have information that sildenafil is a direct
23  retinal -- has a direct retinal impact, and this author
24  thinks it may be important in other forms of retinal
25  degeneration, then I would say it's important to look at

68  (Pages 266 to 269)

CONFIDENTIAL

270

1   this.
2   Q. And Viagra -- Pfizer included on the Viagra
3   label, from the beginning, the effect on PDE6, correct?
4   A. Yes, the FDA label noted that it does have an
5   effect on PDE6..
6   Q. And it's well known in the --
7   A. It isn't PDE6 --
8   Q. It's well known in the medical community that
9   PDE6 is in the retina, correct?
10   A. Oh, I -- I know it. I have no idea if it's
11   well known across the medical community. I'm sure
12   ophthalmologists know it.
13   (Exhibit No. 20 was marked for identification.)
14   BY MS. LESKIN:
15   Q. I'm giving you Exhibit 20. It's an article by
16   Dr. Vatansever and others. This is the next article
17   cited in that paragraph, correct?
18   A. Yes.
19   Q. How does this article by Dr. Vatansever support
20   the biological plausibility of Viagra inducing NAION?
21   A. It's another article that looks at
22   histopathology associated with sildenafil and ophthalmic
23   events.
24   Q. And how does this article support your
25   statement about the biological plausibility of Viagra

271

1   inducing NAION?
2   A. Oh, I take it back. He does say, "Sildenafil
3   is potentially retinotoxic due to the increase in
4   retinal CGMP, suggesting clinical toxicity of the
5   retina." So I guess there is one more -- there is -- he
6   does -- he is noting several people who have looked at
7   direct retinal toxicity. So I may have to amplify my
8   earlier statement that it appears to --
9   Q. Well, I'll ask you --
10   A. -- be the least -- the least considered.
11   Q. I'll ask you again: Is retinal toxicity
12   associated with NAION?
13   A. That -- yeah, I think that's one of the
14   theories, that maybe it is.
15   Q. I'll ask you again: Who has said that? Where
16   is --
17   A. Well, we found --
18   Q. -- the support for that statement?
19   A. I don't recall -- I don't recall the exact
20   publication.
21   Q. Do you have a basis for that statement, Doctor?
22   A. Yeah. That's my understanding, is that there's
23   three statements. And I know the experts have denounced
24   retinal toxicity in their reports, saying that there is
25   little support for that, but I know it is one of the

272

1   ones that was considered. But it has no relevance at
2   all to my opinion. But if it's important, I will go
3   back and tell you which expert looked at retinal
4   toxicity. But I can tell you that this doctor is
5   looking at it as well, and has decided that perhaps it
6   is retinotoxic. Not that any of this has anything to do
7   with my opinion or my report but --
8   Q. Well, Doctor, if you're going to not -- if
9   you're going to confirm that you're not going to get on
10   the stand and read and make the statement that animal
11   studies support the biologic plausibility of Viagra
12   inducing NAION, that's one thing. But if you are going
13   to say that statement to the jury, I'm entitled to know
14   the basis for that opinion.
15   A. And I gave a series of animal articles that
16   show that Viagra has -- has -- has had impact in various
17   models in various -- in various animal models dealing
18   with the retina.
19   Q. And I wanted you to show me the study that
20   shows that direct retinal toxicity causes NAION.
21   A. Yeah, I just don't remember which article that
22   I read that.
23   Q. Well, you'll be able to find that for me if you
24   wanted to?
25   A.. Oh, I think so, yeah.

273

1   MS. LESKIN: We'd ask for any support for the
2   statement that direct retinal toxicity is associated
3   with NAION that the doctor is relying on in
4   providing her opinion in this case.
5   (Exhibit No. 21 was marked for identification.)
6   BY MS. LESKIN:
7   Q. Giving you Exhibit No. 21, which appears to be
8   an article by LaVail and others regarding retinal
9   degeneration in the mouse. This is the article you cite
10   further on in Exhibit 18, correct -- on page 18, I'm
11   sorry?
12   A. Well, this is looking at other inherited
13   retinal disturbances that are associated with GMP
14   elevations.
15   Q. Okay. Is this the article you cite on page 18
16   of your study?
17   A. I -- I think this is the one. There's several
18   1974 ones, but I think this is it.
19   Q. And again this article deals with retinal
20   toxicity, correct, or retinal degeneration? Is that
21   correct?
22   A. Secondary to photoreceptor cell degeneration,
23   yes.
24   Q. Does this article have anything to do with
25   sildenafil?

274

1    A.  I think, as I indicated, this looked at other
2    inherited forms of retinal degeneration and their
3    examination of cyclic GMP.
4    Q.  Does this have anything to do with ischemic
5    optic neuropathy?
6    A.  Well, indirectly.  One of the -- one of the
7    pivotal tenets of pharmacologic research is, you look at
8    common mechanisms of action and see if they lead to
9    similar or related disturbances in the same target
10   tissue.  And this is an instance where someone is
11   looking at elevated GMP levels, looking at other retinal
12   disturbances.
13   Q.  Ischemic optic neuropathy is not a retinal
14   disturbance.  Didn't you tell me that earlier?
15   A.  It's secondary to inadequate blood supply.
16   Q.  That's not a retinal disturbance, is it?
17   A.  Well, indirectly.
18   Q.  Is this article by Dr. LaVail looking at
19   inadequate blood supply?
20   A.  No.  It's looking at inherited -- in animal --
21   no.  The -- the role -- the importance of this article
22   is the cyclic GMP elevations.
23   Q.  Is there any evidence that increased cyclic
24   GMP -- elevated cyclic GMP causes NAION?
25   A.  No.  But a tenet of pharmacologic research is,

275

1    you don't have an animal model short of monkeys that
2    look at NAION.  And one of the ways that pharmacologic
3    research is done is, in those instances you look at
4    common mechanisms or common disturbances.  And this is a
5    collection of articles.  And one of the things that I
6    looked at was to other retinal disturbances, other
7    ophthalmic issues, are they dependent upon toxicity
8    secondary to increase of the cyclic GMP.  This is an
9    example of one.  You cannot make the direct link that
10   this animal model is the same as the issues that may or
11   may not impact humans who are blinded or suffer ION or
12   NAION.  That isn't the way pharmacologic research goes.
13   Q.  Tell me how the study by Dr. LaVail on cyclic
14   GMP in mice retina supports the biological plausibility
15   of Viagra inducing NAION.
16   A.  Because what they're looking at is, there's
17   diminution in retinal function secondary to cyclic GMP.
18   And then we know that cyclic GMP as an issue is
19   increased with Viagra.  So it's a link that cyclic GMP
20   is not conducive to maximal retinal health.
21   Q.  And what does what that have to do with the
22   health of the optic nerve?
23   A.  Well, cyclic GMP is an issue with both PDE5 and
24   PDE6.  And we don't know.  No one knows the direct cause
25   of this.  This is a distillation, a constellation of

276

1    articles that look at different mechanisms.  And you
2    can't dilute the importance of what they're looking at
3    simply because you can't make a link to -- directly to
4    NAION.  Your client hasn't been able to find a biologic
5    mechanism for NAION.  It's marketed the product since
6    1998.
7    Q.  But you, Dr. Blume, can say that this article
8    supports biological plausibility of Viagra --
9    A.  Sure, because --
10   Q.  -- inducing NAION?
11   A.  -- associated GMP.
12       Of course.  We look at GMP.  I didn't say it
13   caused it.  I didn't say it was directly.  It shows that
14   GMP is a negative player to ophthalmic events, to
15   ophthalmic health.
16   Q.  All the ophthalmic events are the same to you?
17   A.  Of course they're not.  I -- I separate them
18   completely in this report.  And I don't know why you
19   have to be so denigrating in your tone.  This is an
20   effort in pharmacologic research.  This is the way it's
21   done.
22       MR. BECNEL:  Don't feel singled out.
23       THE WITNESS:  It's -- if you're not a
24   pharmacologist, you can't understand this.
25       (Exhibit No. 22 was marked for identification.)

277

1    BY MS. LESKIN:
2    Q.  Exhibit 22 is a letter by Drs. Farber and
3    Lolley, L-o-l-l-e-y.  This is the next article cited on
4    that page 18, correct?
5    A.  Yes.  This is an article, along with the one
6    that we just had -- 1974, let's see, that was 24 years
7    before Viagra was launched.  And at that point they knew
8    that GMP may be a concern with retinal function.  And
9    this is another article a couple years later, in 1976,
10   where they're looking at retinal function with CGMP.  So
11   you see the connection was anticipated for several
12   decades before the product was launched.
13   Q.  And how does this article support the
14   biological plausibility of Viagra causing NAION?
15   A.  Well, what it does is, it is again a link
16   20 years in -- 20 years earlier that GMP is a problem
17   for retinal function.  So retinal function is a concern,
18   and it -- so it suggests that an inhibitor, such as
19   Viagra, with both PDE5 and PDE6 may be a concern with
20   events -- with retinal events.
21   Q.  Do you know if Pfizer considered this article
22   at the time it conducted its research on Viagra?
23   A.  I think I quote that.  I said Pfizer was aware
24   of these.
25   Q.  And did Pfizer consider the evidence that

70  (Pages 274 to 277)

278

1  you're talking about when it was doing its studying of
2  Viagra?
3      A.  Well, I don't know if it specifically
4  considered this as they planned their animal studies.  I
5  don't know.
6      Q.  Well, let's take a look back at Exhibit 5,
7  which was the visual summary from the NDA.
8          MR. BECNEL:  What page on that one?
9          MS. LESKIN:  Well, let her pull the exhibit out
10  first, please.
11         THE WITNESS:  I have it.
12         MS. LESKIN:  Okay.  On page 15 --
13         MR. BECNEL:  Well, Counsel, you can be
14  courteous and answer.  You're looking at it.  I
15  asked you a simple question to be able to be on
16  track with you.
17         MS. LESKIN:  Page 15, Counsel.
18         MR. BECNEL:  Okay.  Fine.
19  BY MS. LESKIN:
20      Q.  And if you look at the bottom -- are you on
21  page 15, Doctor?
22      A.  I am.
23      Q.  And if you look at that bottom paragraph, you
24  will see there's reference to the LaVail and Farber
25  articles, correct?

279

1      A.  Yes.
2      Q.  And then it goes on to the Ulshafer article,
3  which you also cite, correct?
4      A.  Yes.
5      Q.  And they specifically assess that when looking
6  at the data that they got from their studies; isn't that
7  correct?
8      A.  Yes.
9      Q.  And this document was submitted to the FDA,
10  correct?
11      A.  That's what you told me, yes.
12      Q.  Well, this is part of the NDA, correct?
13      A.  That's what I understood you to say.
14      Q.  And if it is in fact part of the NDA, then it
15  was submitted to the FDA; is that correct?
16      A.  I guess that would follow.
17      Q.  I want to turn to page --
18      A.  Well, in fact this is why they cited those,
19  because they were talking about direct -- direct retinal
20  toxicity.
21      Q.  As a cause of NAION?
22      A.  No, associated with the drug.
23      Q.  And that's why they did additional testing in
24  humans of the eyes, correct, of visual function?
25      A.  Which additional testing was that in humans?

280

1      Q.  During the clinical studies that were done
2  during the clinical development program.
3      A.  Well, I thought you were referring to -- it was
4  required that they needed to do clinical studies, yes.
5      Q.  And Pfizer in fact did do the clinical studies
6  of visual function during the clinical development
7  program, correct?
8      A.  Well, they would have to because it -- it
9  impacts PDE6.  So they would have been required to do
10  it, of course.
11      Q.  And they did that?
12      A.  Well, yes, because they had to get approved.
13  They had to do them to get approved.  I thought you were
14  referring to postapproval studies.
15      Q.  Turn to page 19 of your report, please.  Your
16  first sentence there says, "The continued accumulation
17  of serious adverse ophthalmologic events associated with
18  Viagra use and found in the medical literature, foreign
19  and United States spontaneous adverse event databases
20  and Pfizer's internal adverse event database should have
21  prompted Pfizer to undertake a more thorough analysis of
22  NAION-related events associated with the drug."
23         Did I write that -- did I read that correctly?
24      A.  I think so.
25      Q.  What type of analysis do you suggest Pfizer

281

1  should have done?
2      A.  Well, I mean, every -- every analysis that they
3  eventually did was prompted by the FDA.  FDA had to go
4  to them and ask them to reanalyze their clinical data,
5  then FDA had to go to them, tell them to reanalyze their
6  pharmacovigilance post-marketing data, and then FDA had
7  to tell them to continue to report all of their events,
8  all of their ophthalmic events, as 15-day relating to
9  NAION, and then FDA had to force them to do a
10  post-approval trial, that took them multiple years to
11  get started.
12         So my comment here is, is that there was plenty
13  of information prior to FDA putting a gun to their head
14  to do these things that should have prompted Pfizer to
15  do this on their own.  I mean, certainly they shouldn't
16  have waited till 2008 to do a epidemiology study to look
17  at blinding for a lifestyle drug.  So that's -- it is
18  those events to which I am referring.  Every major event
19  done, completed to address NAION was at the hand of the
20  FDA.
21      Q.  Is it your testimony that Pfizer did not review
22  its clinical data until the FDA made a specific request
23  to?
24      A.  I'm saying that FDA requested the clinical data
25  be reviewed, the post-marketing data be reviewed, and to

71  (Pages 278 to 281)

### 282

1  do a complete -- to do a Phase IV study.
2      Q.  Is it your testimony that Pfizer did not do a
3  review of its clinical data until the FDA asked for it?
4      A.  Well, I'm sure that they reviewed their data as
5  it was generated for their NDA and as -- as they
6  reviewed it during their periodic reports.
7      Q.  So is it your testimony that after the initial
8  reports of NAION came in, that Pfizer did not review its
9  clinical database?
10     A.  Oh, I'm sure they did.  They referred all the
11 time that they had no events in their clinical database.
12 So I would assume they were going back and looking at
13 their database.  But FDA asked them to go back and look
14 for events more than NAION, and FDA gave them a complete
15 list of what events they were to review.
16     Q.  And did they find any additional NAION events
17 when they did that review?
18     A.  I don't -- I don't believe, in their clinical
19 database, which made it all the more important that they
20 do the pharmacovigilance Phase IV study once the NAION
21 events became apparent in 2000.
22     Q.  When you say you don't believe in their
23 clinical database, you -- what do you mean by that?
24     A.  Oh, I believe in their clinical database.  I
25 mean, FDA approved it as a condition for approval..

### 283

1      Q.  I'm sorry.  Did you -- I asked you the
2  question, did they find any additional events when they
3  did that review, in the clinical database.  And you
4  said, "I don't believe in their clinical database."
5      A.  Oh, I don't believe that they found any in
6  their clinical database.
7      Q.  Okay.  And you just don't know whether they
8  went back and had reviewed the clinical database before
9  the FDA asked them to do that?
10     A.  I don't recall that they reviewed it using the
11 litany of terms that FDA forced them to use, no.
12     Q.  And you said that they only went back and
13 looked at their adverse event data when the FDA asked
14 them to do that?
15     A..  No.  I said FDA required them to do a
16 comprehensive study of their post-marketing data, and
17 then when that was conducted, they required them to
18 continue submitting 15-day reports even for the listed
19 events.
20     Q.  So is it your testimony that before FDA made
21 that request, that Pfizer did not do a comprehensive
22 review of their post-marketing data?
23     A.  They were required to review post-marketing
24 data.  You have to submit periodic safety update
25 reports.  It wasn't of the complexity and completeness

### 284

1  that FDA required.
2      Q.  And what's your basis for that statement?
3      A.  FDA sent them a list of terms to use..  Pfizer
4  went back with additional terms -- or negotiated other
5  terms.  And then Pfizer did their -- did the review and
6  submitted it to FDA.
7      Q.  And did they find any additional NAION cases?
8      A.  I don't recall.  I don't know.
9      Q.  Is it your testimony that Pfizer did not submit
10 15-day reports for NAION before the FDA asked them to?
11     A.  No, I didn't say that.  I said that FDA told
12 them they could not stop submitting them even though it
13 was now a listed event, that they had to continue
14 submitting 15-day reports.
15     Q.  And that was after the label was changed,
16 correct?
17     A.  Oh, of course, because that's when it became a
18 listed event.
19     Q.  Now, let's talk about that label change in
20 2005.
21         As it currently exists, do you believe the
22 current label is inadequate?
23     A.  As it relates to what?
24     Q.  As it relates to NAION.
25     A.  No.  I think the language for the NAION

### 285

1  inclusion was negotiated with FDA, and FDA was part of
2  that.  So I -- I'm not referring to that.
3      Q.  Okay.  So the label as it currently exists for
4  NAION is adequate, correct?
5      A.  Well, I think the verbiage that's in there is
6  certainly an improvement.  I think it would -- if -- in
7  the post-marketing section, I think it would be helpful
8  if it included information that they had rechallenge
9  data.  I think that the labeling should be more specific
10 that if you have a visual disturbance you should stop
11 the use of the drug.  I mean, I -- I think the -- it
12 should probably have a contraindication that if you've
13 been blinded in one eye by Viagra, you should not take
14 the drug again.
15     Q.  Did the FDA request that that information be
16 contraindicated?
17     A.  I don't know.  I know it's contraindicated in
18 Europe.  I know that Viagra has different labels in
19 Europe than they have in the United States, and there
20 are more significant contraindications in the UK than
21 they have in the United States.  Whether FDA required
22 that, I -- I don't know.  And I could not find any
23 information where Pfizer attempted to synchronize their
24 U.S. label with the UK, and that the FDA forbade them
25 to -- forbid them to do that.

**CONFIDENTIAL**

286

1     MS. LESKIN: Objection; nonresponsive.
2     JUDGE BORG: Sustained.
3  BY MS. LESKIN:
4     Q.  Did the FDA ever request that Pfizer
5  contraindicate, in its label, patients with prior NAION?
6     A.  I -- I don't think FDA required that, but that
7  does not --
8     Q.  Did FDA ever request that?
9     A.  I don't know.  I don't think so.  But nor does
10 that absolve them of the need to -- I mean, really,
11 United States patients and prescribers should have the
12 same information for a product that the European
13 prescribers have.
14    Q.  Are you an expert in European regulatory
15 requirements?
16    A.  No.  I've -- we've done some European work.  I
17 wouldn't consider myself an expert.  But I think that
18 it's appropriate that United States patients have the
19 same benefits that your patients in other countries
20 have.
21    Q.  Did you -- the labeling that currently exists
22 with regard to NAION, that was approved by the FDA,
23 correct?
24    A.  The last label that I have in the report, I
25 believe, is the 2005 label, as far as part of the

287

1  chronology.  And then I have the label dated August 2008
2  juxtaposed to the UK August 2008 label..  But I did not
3  continue the chronology between 2005 and 2008.
4     MS. LESKIN: Objection; nonresponsive..
5     JUDGE BORG: Sustained.
6  BY MS. LESKIN:
7     Q.  The question was:  The labeling that currently
8  exists with regard to NAION was approved by the FDA,
9  correct?
10    A.  I thought -- I thought I answered it.  I have
11 the FDA-approved label in 2005, but I did not track the
12 FDA approvals between 2005 and what is in here in 2008.
13    Q.  Doctor, I'm not asking you if you tracked it in
14 your report.  I'm asking:  The label as it currently
15 exists, with regard to NAION, that label was approved by
16 the FDA, correct?
17    A.  And I'm answering you that there's NAION in the
18 2008 label, NAION information.  I did not track it, the
19 2008 approval, if it were approved label, with what was
20 approved in 2005, so I can't answer your question.
21    Q.  Do you have any basis to believe that there is
22 information in the Viagra label that is not approved by
23 the FDA?
24    A.  Well, certainly they could have added more
25 safety information, more warnings, more

288

1  contraindications, more adverse events without getting
2  an approval from the FDA.  They always have the right to
3  do that.  I haven't seen evidence that they've done it.
4  But I don't know if there have been subsequent approvals
5  between 2005 and 2008 because I stopped at the time
6  NAION went into the labeling.
7     Q.  Let's talk about the 2005 label..
8        When the label was changed in July of 2005,
9  that label was approved by the FDA, correct?
10    A.  Yes.
11    Q.  And that label was the result of a prior
12 approval submission, correct?
13    A.  I think that's true.  I think FDA required that
14 because they were -- they were standardizing the label
15 among the products.
16    Q.  And FDA specifically required that the draft
17 labeling be submitted as a prior approval supplement,
18 correct?
19    A.  Yeah, because they were -- they were
20 standardizing labeling, yes.
21    Q.  Okay.  Now, the FDA was aware of all the
22 various adverse events, ophthalmic adverse events, that
23 we've been talking about today, correct?
24    A.  Oh, I have no way of knowing that.
25    Q.  Well, are you aware of any adverse --

289

1  ophthalmic adverse events that Pfizer did not submit to
2  FDA?
3     A.  I don't know.  I did not -- I didn't -- I have
4  no idea if they submitted everything to FDA, nor do I
5  have -- know if FDA was aware of all of these signals
6  that we've discussed.  And moreover, doesn't really
7  matter because it's not -- FDA did not at that time have
8  the authority to require that.  And it is never FDA's
9  job to maintain the currency, correctness, or adequacy
10 of a company's labeling.
11    MS. LESKIN: Objection; nonresponsive.
12    JUDGE BORG: Sustained.
13 BY MS. LESKIN:
14    Q.  Are you aware of any adverse ophthalmic events
15 that Pfizer did not submit to FDA?
16    A.  I don't -- I don't know either way.
17    Q.  In 2005, when the FDA proposed the label change
18 to include information about NAION, they didn't ask for
19 a label to include information on blindness, did they?
20    A.  I believe they discuss blindness in the NAION
21 information, that it may lead to blindness.  I think
22 they did.
23    Q.  But these other events that you've been talking
24 about that cause blindness -- well, let me back up.
25        There are other causes of blindness besides

290

1   NAION, correct?
2       A.  Yes.
3       Q.  And those other causes of blindness have
4   different mechanisms than NAION do, correct?
5       A.  Yes.
6       Q.  And FDA, when they proposed the label change in
7   2005, did not suggest lumping all of these ophthalmic
8   events that lead to blindness together to include
9   information about blindness in the label, correct?
10      A.  Well, they note that NAION is a cause of
11  decreased vision and it includes permanent loss of
12  vision.
13      Q.  But they didn't request the inclusion of any
14  other cause of blindness, did they?
15      A.  I'm sorry.. Such as -- such as what?
16      Q.  Such as any other cause of blindness that
17  you've been talking about today..
18      A.  No, they didn't -- they did not include other
19  causes of blindness.
20      Q.  The FDA has medical doctors on their staff,
21  correct?
22      A.  Yes.
23      Q.  And the FDA has ophthalmologists on their
24  staff, correct?
25      A.  Yes.

291

1       Q.  And if the FDA -- well, strike that.
2           MS. LESKIN:  Give me a few minutes.  I'm just
3   going to go through my stuff and get myself
4   organized.
5           JUDGE BORG:  Yep.  We'll take --
6           THE VIDEOGRAPHER:  We're off the video record.
7           JUDGE BORG:  Thank you.
8           We'll take five.
9           (Recess from 4:54 p.m. until 5:13 p.m.)
10          THE VIDEOGRAPHER:  We are back on the video
11  record.
12  BY MS. LESKIN:
13      Q.  Doctor, we were at page 19 of your report.
14  You have a statement here.  You make reference to the
15  October 2008 study that started, in the middle of the
16  paragraph.
17      A.  Yes.
18      Q.  Okay.  And right after that you have a sentence
19  that reads, "Had a study been initiated when it became
20  apparent (soon after product launch) that ophthalmologic
21  adverse events, many of which were serious, comprised a
22  significant portion of the overall adverse event
23  profile, it is likely the product labeling would contain
24  more stringent language regarding NAION."
25          Did I read that sentence correctly?

292

1       A.  Yes.
2       Q.  Let's go through that piece by piece.
3           What type of study should have been conducted
4   or initiated soon after product launch?
5       A.  Well, soon -- if we say that it was apparent at
6   2000, then I would say at 2000.  So two years after the
7   launch.
8       Q.  Okay.  So --
9       A.  Year and a half.  I guess a year and a half
10  after launch.
11      Q.  So that I'm clear, when you say "soon," it's
12  your opinion that a study should have been initiated in
13  2000?
14      A.  Well, they had events -- we know they had
15  events even the first year they marketed the product,
16  but I -- I mean, it would have been wonderful if they
17  started it in '98, but I picked 2000 because it's a
18  clear -- they had multiple clear signals by 2000.  So
19  2000.
20      Q.  Okay.  And what type of study should have been
21  launched -- initiated in 2000?
22      A.  Well, again it would be directed toward the
23  ophthalmic adverse events.  And I think it would
24  probably have to be a case-controlled study.  I mean,
25  I -- I can think of no way that one can do a prospective

293

1   study with Viagra where we're looking for ophthalmic
2   adverse events and be able to get it through an IRB.
3   Moreover, it's almost impossible to maintain the blind.
4   So --
5       Q.  So when you say an "ophthalmic adverse event,"
6   are you saying that Pfizer should have done a study
7   looking at every single ophthalmic adverse event that
8   was being recorded?
9       A.  Well, I certainly think they should -- by 2000
10  they had reports of temporary and permanent blindness,
11  ION, and NAION, so I think they should have certainly
12  been looking at that cascade of events.  And they would
13  have looked at the events, not only comparing the events
14  with a control group, but also an important part of it
15  would be looking to see if within that group there were
16  any particularly vulnerable subgroups..  So the goal
17  would be to quantify the risk, and within the patients,
18  look at those patients who are particular risk of one of
19  those eye events.
20      Q.  And you're saying, though, they should look at
21  any ophthalmic event?
22      A.  No.  I was saying that I -- I'm looking at the
23  events related to blindness, temporary or permanent,
24  ION, or NAION.
25      Q.  How temporary is temporary?

VERITEXT REPORTING COMPANY
(212) 279-9424          www.veritext.com          (212) 490-3430

294

1   A.  I haven't reviewed this with an
2   ophthalmologist.. We'd have to look at -- talk to an
3   ophthalmologist to know the best way to construct that
4   end point in order to study it.
5   Q.  So have you talked to an ophthalmologist as to
6   whether this type of study you're postulating is even
7   feasible?
8   A.  No.  I -- no.  I have not talked outside --
9   with any outsiders on this project.  I don't think I'm
10   able to.
11   Q.  You haven't spoken to any epidemiologist --
12   well, strike that.
13   Have you spoken to any -- any epidemiologist as
14   to whether this type of study is even feasible?
15   A.  Well, Mr. Shearer is an epidemiologist in my
16   office, and we have talked about the study.
17   Q.  Okay.  And he's concluded that this is a
18   feasible study?
19   A.  Well, we talked about different designs and the
20   need to do such a study.  Yes, he's concluded that, of
21   course.
22   Q.  And how many patients does he say you need?
23   A.  Well, again, that would be dependent on
24   which -- which of the adverse events we were attempting
25   to examine.  And we really didn't get to the point that

295

1   we were designing the size of the study.  I wasn't asked
2   to do that.  But that would be my recommendation.
3   Q.  Have you -- did you talk about how long of a
4   window you would need?
5   A.  No, because I didn't -- I wasn't able to talk
6   to an ophthalmologist.  And an epidemiologist -- you
7   need an epidemiologist and a ophthalmologist -- multiple
8   ophthalmologists for that.
9   Q.  Did you determine how long such a study would
10   take?
11   A.  No, because I don't have an appreciation of how
12   quick the patient number is, depending on the number of
13   ophthalmic centers.  All of that requires interaction
14   with the actual tertiary ophthalmic centers, and -- and
15   I wasn't able to do that.
16   Q.  Since you haven't spoken with an
17   ophthalmologist, am I correct that you have not spoken
18   with an ophthalmologist as to whether the type of study
19   you have talked about here would provide any meaningful
20   information to an ophthalmologist?
21   A.  Whether information relating to ION, NAION, or
22   blinding would be important to an ophthalmologist?
23   Q.  Well, the study that you've hypothesized here,
24   whether that study would give any meaningful
25   information.

296

1   A.  I haven't talked to an ophthalmologist, but
2   certainly the FDA suggested a very similar study,
3   case-controlled studies, examining ION- and
4   NAION-related events.  So I think that if the study were
5   properly designed, could be done, properly designed, and
6   gave information, whether good or bad, regarding these
7   adverse events, either outcome would be critically
8   important to an ophthalmologist.  I showed you a
9   literature article in 2000 where they were crying for
10   information to be shared with them.  So I think that no
11   matter what the outcome, it would have been important to
12   the ophthalmologist, either to warn their patients or to
13   relieve their patients of any concerns.  I mean, that's
14   why we do labeling.
15   Q.  You're aware that there was ongoing discussions
16   between Pfizer and the FDA as to the protocol for the
17   current study that is being -- being done about Viagra
18   and NAION, correct?
19   A.  I saw, beginning in 2005 and '6, discussions
20   with them about the protocol, yes.
21   Q.  And some of the discussions that the company
22   had with the FDA was regarding the definition of NAION,
23   right?
24   A.  Well, I think the earlier discussions were that
25   they didn't believe that they could do the study, that

297

1   such a study would not be possible.  And after FDA
2   convinced them such a study would be possible, then
3   there were some discussions regarding definition of
4   NAION.
5   Q.  And some of the complications associated with
6   defining NAION, correct?
7   A.  I recall those discussions.
8   Q.  Did the FDA ever ask Pfizer to include the more
9   general term of blindness --
10   A.  I don't know.
11   Q.  -- as part of the study?
12   A.  I don't know.
13   Q.  Did you see that in any of the correspondence
14   you looked at?
15   A.  I did not see that in the correspondence.
16   Q.  Did you see that in any of the minutes of any
17   of the meetings that the company had with FDA about the
18   study?
19   A.  I recall there was a discussion about
20   determining the etiology of any blindness that occurs,
21   but that's all I remember.  So I think that FDA was
22   attempt -- was attempting to capture all blinding
23   events.
24   Q.  Really?  What document says that?
25   A.  Oh, I just vaguely recall that in reviewing it,

75  (Pages 294 to 297)

CONFIDENTIAL

298

1  that they wanted a -- wanted a definition discussion of
2  any events of vision disturbance, vision impairment.
3     Q.  Can you show me the document that says that?
4     A.  No.  I just vaguely recall the discussion.  But
5  why wouldn't they track that?  I mean, certainly they
6  would want to track all their temporary or permanent
7  blinding events.
8     Q.  Doctor, is it your testimony here today that
9  the FDA asked Pfizer to track all blindness as part of
10 this NAION study?
11    A.  No.  What I said was, is they asked for a
12 discussion of any reports, discussion to be provided by
13 the investigator of any reports of visual impairment, be
14 it temporary or permanent.
15    Q.  But you don't know what document says that?
16    A.  No.  I just recall it when they were discussing
17 with the FDA whether the study could be done.
18    Q.  And you're aware that Pfizer consulted with
19 outside expert ophthalmologists and epidemiologists in
20 developing the protocol for this study, correct?
21    A.  Yes.
22    Q.  Are you aware of whether any of those
23 epidemiologists or ophthalmologists suggested that the
24 generic term blindness be included in the study?
25    A.  I don't know, nor do I know with what proposal

299

1  Pfizer came to them.  I don't know if Pfizer asked them
2  whether it would be important to study different types
3  of blinding or if Pfizer went to them and asked them to
4  help them with a protocol design to assess NAION.  Two
5  different issues.
6     Q.  Did you look at the documents from those?
7     A.  Yes, and saw that they were discussing a
8  protocol for NAION.
9     Q.  The question was:  Did you look at the
10 documents from the meeting?
11    A.  From what?
12    Q.  From the meeting.
13    A.  Yes.  My interpretation was, it was a protocol
14 specific to NAION.
15    Q.  That's your interpretation?
16    A.  Yes.
17    Q.  Now, you say here at the end of that sentence,
18 "It's likely the product labeling would contain more
19 stringent language regarding NAION."
20       What's the basis for that?
21    A.  Well, because Pfizer has continued to receive
22 reports of ION, NAION from -- from 1998 and going
23 forward, so there was no -- was not an isolated event;
24 they've continued to see it.  So it is likely that a
25 long-term, a big study, a critically done study, would

300

1  establish the relative risk of NAION with -- with the
2  drug, and hopefully it would show additional information
3  regarding dose-related events, vulnerable subgroup
4  events, length of time.
5     Q.  And you're assuming that the study would show a
6  positive relationship, correct?
7     A.  I'm -- yes.  But even if the study didn't show
8  that, that would be well worth to do that study because
9  again the labeling would provide more information for
10 prescribers and their patients.
11    Q.  But if the -- if the study did not have a
12 positive result, meaning show a positive relationship
13 between Viagra and NAION, that the product label would
14 still contain more stringent language regarding NAION?
15    A.  Well, if the study were negative, the labeling
16 would -- may well changed.  The labeling would probably
17 still need to include that NAION had been reported in
18 post-marketing adverse events.  I don't think there's
19 ever going -- that will ever be removed.  But the
20 company could add information that, notwithstanding
21 these post-marketing events, a controlled --
22 case-controlled study failed to show a difference
23 between the control group.  I mean, if that were the
24 case, then NAION would still be in the labeling, but
25 they could add that sentence after, of course.

301

1     Q.  So your statement, "It is likely the product
2  labeling would contain more stringent language regarding
3  NAION," that's speculation on your part, isn't it?
4     A.  Well, I think if they did the study, the
5  labeling would change no matter what.  It may restrict
6  the NAION warning, NAION precaution, to say, "We've seen
7  it in post-marketing events, but we didn't see it in a
8  case-controlled study, or it may say, "We saw even more,
9  and here are the particular groups."  So either way
10 there would be amplified information.
11    Q.  But that's not what you wrote here, is it?  You
12 didn't say "amplified information."  You said "more
13 stringent language regarding NAION."
14    A.  Yeah.  It depends on how the study comes out.
15    Q.  So the fact that the product labeling would
16 contain more stringent language regarding NAION, that's
17 speculation on your part, right?
18    A.  Well, if -- if it restricts the NAION to
19 post-marketing events only, and not shown in a
20 case-controlled study, then that would be more stringent
21 information -- more stringent labeling information,
22 "It's only seen in post-marketing.  We didn't see it in
23 a case-controlled study."
24    Q.  And -- and that's what you mean by "stringent"
25 there?

76  (Pages 298 to 301)

302

1    A.  No.  I mean it both ways.  I have no idea how
2    the study will turn out..  I anticipate it will show that
3    Viagra is associated with significant increased risk of
4    NAION.  But until your client elects to do a study, we
5    won't know.
6    Q.  Do you know when Levitra was approved?
7    A.  Yes.  It was approved 2003.
8    Q.  And when was Cialis approved?
9    A.  2003.
10   Q.  Did the FDA request that either -- did the FDA
11   request that the Levitra label include any information
12   regarding NAION?
13   A.  I believe the labeling changed in 2005.
14   Q.  So at the time of approval, did the FDA request
15   that the Levitra label include any information regarding
16   NAION?
17   A.  I don't know, nor do I know if they saw any in
18   their clinical program.  I don't know.  And I -- and I
19   don't know the rate at which they appeared
20   post-marketing..  I don't know.  But notwithstanding the
21   fact that Viagra is the market leader, both -- all of
22   the labelings changed to include that information in
23   19 -- 2005.
24   Q.  At the time of approval, did the FDA request
25   that the Cialis label include information regarding

303

1    NAION?
2    A.  Oh, it's the same answer.  I don't know.
3    Q.  By 2003, the FDA was aware of the reports of
4    NAION in -- so that -- with Viagra, correct?
5    A.  Yes.
6    Q.  Do you have any evidence that Mr. Martin saw
7    any of the Viagra ads that you refer to on page 25 of
8    your report?
9    A.  I have no information about individuals.
10   Q.  Do you have any evidence that Mr. Stanley saw
11   any of the ads referenced on page 25 of your report?
12   A.  I have no patient information at all.
13   Q.  So you just don't know one way or the other
14   whether either of the plaintiffs saw those ads, correct?
15   A.  No idea.
16   Q.  Do you know whether Mr. Martin's physicians saw
17   any of the information regarding --
18   A.  It's the same answer.  I have no information
19   regarding individual plaintiffs..
20   Q.  So you don't know what Mr. Martin's doctors or
21   what Mr. Stanley's doctors looked at or relied upon --
22       MR. BECNEL:  Let me enter an objection.
23   BY MS. LESKIN:
24   Q.  -- is that correct?
25       MR. BECNEL:  Counsel, she was as clear as a

304

1    bell that she has no information on any individual
2    or what they saw or what their doctor saw.  Now, how
3    much more repetitious do you have to be?
4        JUDGE BORG:  It's overruled.  You -- are you --
5    do you have a question to the witness?
6        MS. LESKIN:  I did.
7        JUDGE BORG:  Can we have it back?
8    BY MS. LESKIN:
9    Q.  You don't know what Mr. Martin's doctors or
10   what Mr. Stanley's doctors looked at or relied upon in
11   prescribing Viagra; is that fair to say?
12   A.  I don't know if they saw any of the
13   advertisements, but I know they would have relied upon
14   the labeling in place at that time, and the labeling did
15   not have this information.
16   Q.  How do you know that?
17   A.  Because I understand that the time frame was
18   around 2001 and 2002.
19   Q.  How do you know they read the label?
20   A.  Well, they would have -- you asked what they
21   relied upon.  That was the only label, was the one that
22   was in the Pfizer label.  And the Pfizer label didn't
23   have it.  I'm assuming that that would have been the
24   label they relied upon, since Viagra was a single-source
25   product.

305

1    Q.  Did Dr. Martin read any literature other than
2    the label?
3        MR. BECNEL:  Dr. Martin?
4        MS. LESKIN:  I'm sorry.
5        MR. BECNEL:  Dr. Martin?  Who is Dr. Martin?
6        MS. LESKIN:  I misspoke.  I misspoke.
7    BY MS. LESKIN:
8    Q.  Did any of Mr. Martin's doctors read any
9    literature other than the label?
10   A.  I don't know.
11   Q.  Did any --
12   A.  I don't know.  I have -- okay.  I have no
13   information about the plaintiffs or their doctors or
14   their pharmacists.
15   Q.  Does that -- does that also mean that you have
16   no information and you don't know whether Mr. Stanley's
17   doctors read any literature other than the label?
18   A.  Okay.  I don't have any information regarding
19   the patients, the doctors, the pharmacists, the
20   pharmacies, and I don't know if anyone read the label.
21   Q.  Well, you made a statement earlier that the
22   doctors would have relied on the label, and the label
23   didn't have information.
24   A.  Right.  They would have had to rely on the
25   label because that was the only label available because

306

1    only Viagra marketed the product.
2        Q.  But now how do you --
3        A.  I mean Pfizer marketed the product.
4        Q.  Now you just told me you have no information
5    about the doctor.  So which one is it?
6        A.  Oh, my god.  I said the same thing ten times.
7    I have no information about the individual plaintiffs or
8    any of their attendings.  The only label in effect at
9    that time would have been the Pfizer label.  So if they
10   had a -- if the doctors relied upon a label and read a
11   PDR, it would have been the Pfizer label, and the Pfizer
12   label was inadequate.
13       Q.  And you don't know what other information the
14   doctors had available to them; isn't that correct?
15       A.  I -- I don't know what they read.  I know what
16   information is available.  I summarize much of it in
17   this report.  But I don't know what they availed
18   themselves of.
19       Q.  We talked earlier about citizen petitions that
20   had been filed regarding Viagra.  Do you recall that
21   testimony, that discussion?
22       A.  Yes.
23       Q.  You know that in 1998 public citizen filed
24   petition -- citizen petition with the FDA to add
25   stronger warnings to the Viagra label, correct?

307

1        A.  Yes.  I have it on page 12 of my report.
2        Q.  And part of the warning that citizen
3    petition -- that public citizen requested in 1998 was
4    warnings relating to color aberrations, increased light
5    sensitivity, and blurred vision, correct?
6        A.  Correct.
7        Q.  And those events, as far as you know, were
8    related to the PDE6 effect, correct?
9        A.  I think the color events were.  I don't know
10   about blurred vision.
11       Q..  Is there any mention in the citizen petition
12   from 1998 about NAION?
13       A.  I don't think so.  The product had just been
14   launched.  I don't know.
15           MS. LESKIN:  I'm going to mark as Exhibit 23 a
16   document dated February 28th, 2000.
17           (Exhibit No. 23 was marked for identification.)
18   BY MS.. LESKIN:
19       Q.  This is the FDA's response to public citizen,
20   correct?
21       A.  I believe so.
22       Q.  And that's the response to the 1998 petition,
23   right?
24       A.  Yes, I believe so.
25       Q.  If you look at page 8 of the response, there's

308

1    a section entitled "Effects on Vision."  Do you see
2    that?
3        A.  Yes.
4        Q.  And the FDA responded by saying, "FDA believes
5    that the Viagra package insert adequately discusses the
6    findings of vision abnormalities and describes the dose
7    relationship associated with these effects," right?
8        A.  Yes.
9        Q.  That was the finding by FDA in response to
10   the citizen petition in 2000, right?
11       A.  Yes.  Well, they also note that the labeling
12   was changed by Pfizer to include post-marketing
13   experiences.
14       Q.  And when was that label changed to include
15   post-marketing experiences?
16       A.  Well, it's been changed a couple times, in
17   '98 -- it was twice in '98.  I don't know the dates.
18   FDA says, "Subsequent to your submission of this
19   petition, Pfizer significantly revised the product's
20   package insert."
21       Q.  And on the second page -- I'm sorry, page 9,
22   where they continue the discussion on the vision
23   effects, the FDA noted the adverse reaction section of
24   the label, correct, including the changes made to the
25   post-marketing experience section?

309

1        A.  Well, that's where the post-marketing
2    information goes, is in that section.
3        Q.  Right.  And they added that there had been
4    reports of diplopia, temporary vision loss, and
5    decreased vision, ocular redness or bloodshot
6    appearance, ocular burning, ocular swelling and
7    pressure, increased intraocular pressure, retinal
8    vascular disease or bleeding, vitreous detachment,
9    traction, and paramacular edema, correct?
10       A.  Yes, all those events were reported
11   post-marketing, correct.
12       Q.  And all of those were added to the label in
13   1998, correct?
14       A.  That's my understanding.
15       Q.  If you look at page 14 of the FDA's findings,
16   do you see there's a section entitled "Effects of
17   Phosphodiesterase Inhibition on Vision"?  Do you see
18   that?
19       A.  I'm sorry.  Page?
20       Q.  14.
21       A.  Okay.  I'm there.
22       Q.  Okay.  And at the bottom of the page, the FDA
23   writes, "As for the risk of retinal degeneration due to
24   high levels of cyclic GMP, FDA does not believe that
25   there is evidence of such a possibility."

78  (Pages 306 to 309)

CONFIDENTIAL

## 310

1    Do you see that?
2    A.  Uh-huh, yeah.
3    Q.  And that's what the FDA concluded in response
4  to the citizen petition, correct?
5    A.  Based on what was available in 1998, yes.
6    Q.  And all those articles that we talked about
7  before, that was -- those were published before 1998,
8  right?
9    A.  Some were.
10   Q.  Continues on, "The repeated use of Viagra over
11 as much as a -- one year in clinical trials did not
12 demonstrate any serious ophthalmologic adverse events,"
13 right?
14   A.  Yes.
15   Q.  And the FDA goes on, "In addition, despite
16 extensive use of Viagra since its approval, FDA has
17 received few reports of serious ophthalmologic adverse
18 reaction.. Consequently, the Agency sees no need at this
19 time to require further labeling changes related to
20 visual problems," correct?
21   A.  Yes.  They had already made all the changes you
22 mentioned earlier to post-marketing, so --
23   Q.  And no other changes were necessary as of
24 February 2000, correct?
25   A.  As of, yeah, February of 2000.

## 311

1    Q.  We've talked earlier about the phenomenon of
2  underreporting.  You're familiar with that, right?
3    A.  Yes.
4    Q.  And you've said that underreporting is usually
5  between 1 and 10 percent --
6    A.  Yes.
7    Q.  -- correct?
8    What's the basis for that statement?
9    A.  Dr. Brinker at FDA, last year, testified before
10 Congress and noted that it was 1 to 10 percent.
11 THE WITNESS:  Time?
12 MR. OVERHOLTZ:  Getting really close.  It's
13 5:30 right now.
14 BY MS. LESKIN:
15   Q.  Do you know what Dr. Brinker's basis for the
16 1 to 10 percent number is?
17   A.  I think I have the report.
18   Q.  You refer to it on page 7 of your report.
19   A.  I know.
20   It's a huge report.  It's going to take me a
21 minute to find it.
22   Q.  Actually you cite to an FDA presentation --
23   A.  Yes.
24   Q.  -- on December 14th, 2006.
25   A.  I know.  But if you're familiar with the

## 312

1  presentation that they made, it is huge.
2    Oh, they don't have the speakers in any
3  particular order, so I'm going to have to look for it.
4    Q.  Okay..  But what was the context of the
5  presentation that Dr.. Brinker made --
6    A.  It was a presentation --
7    Q.  You have to let me finish my question --
8    A.  I'm sorry.
9    Q.  -- for the court reporter.
10   Otherwise she'll get upset.
11   What was the context of the presentation that
12 Dr. Brinker made?
13   A.  It was a group of FDA employees who were
14 speaking to Congress, to the Institute of Medicine in
15 association with their request for additional funding,
16 and they were requesting additional funding specifically
17 for enhanced authority postapproval.  And they were
18 making various -- giving various examples of why they
19 needed this.  And it was -- it was needed to do --
20 was -- so that they would have the authority to require
21 Phase IV studies and the ability to require -- be able
22 to force labeling changes postapproval.  And it was
23 secondary to the Vioxx issue and the criticism leveled
24 by Congress on the FDA as a result of the handling of
25 Vioxx.

## 313

1    Q.  Now, you will agree with me that the reporting
2  rate varies from drug to drug, correct?
3    A.  It -- it may, yes.
4    Q.  And some drugs get much more publicity than
5  other drugs, correct?
6    A.  Yes.
7    Q.  And drugs that get more publicity get higher
8  rates of adverse event reports than other drugs,
9  correct?
10   A.  Well, there's a blip after the -- there's a
11 blip after -- during the period immediately after the
12 publicity.  But generally you can watch in safety
13 surveillance, and that will -- it will -- the reporting
14 rate will generally go back to a -- to a prior level
15 after the publicity subsides.
16   Q.  Newer drugs tend to get more reports than older
17 drugs, correct?
18   A.  Generally.
19   Q.  Are you familiar with the Weber effect?
20   A.  Yeah, the newness.  Yeah.  Generally that's
21 true, unless an older drug has -- new information is
22 made available about the newer drugs -- I mean, I'm
23 sorry, about the older drugs.
24   JUDGE BORG:  The older drugs.  Right.  I don't
25 mean to correct the witness but --

**79 (Pages 310 to 313)**

CONFIDENTIAL

### 314

1    THE WITNESS: I caught it.
2    JUDGE BORG: I know what you meant. You caught
3  it.
4    THE WITNESS: I caught it.
5  BY MS. LESKIN:
6    Q.  And serious events get more reports than
7  nonserious events?
8    A.  Generally that's true if they're -- if the
9  physicians can discern -- can tease away from the
10  patient's -- otherwise the patient's condition. That's
11  generally true, for a period.
12    Q.  And litigation increases adverse event
13  reporting, correct?
14    A.  Again, there's usually a phasic period, a blip
15  period; and then it goes back down to a baseline level.
16    Q.  Do you know how many of the adverse events in
17  the Viagra database for NAION are litigation reports?
18    A.  No.. I stopped at 2004.
19    Q.  Do you know how many of those reports are
20  litigation reports?
21    A.  No, no.
22    Q.  Now, you -- going back to page 7 of your
23  report, you say, "Several factors contribute to the low
24  percentage of significant adverse medical events
25  actually reported to FDA and other authorities."

### 315

1    Do you see where I am?
2    A.  Yes.
3    Q.  Okay.  Let me just take you to that sentence
4  right above it, which is the last sentence on the prior
5  paragraph.  And you said, "It is thereof imperative that
6  manufacturers closely monitor all available data,
7  conscientiously review published literature, conduct
8  necessary follow-up studies, and fully explore all
9  potential adverse events."
10    A.  Yes.
11    Q.  Do you have any evidence that Pfizer did not do
12  that?
13    A.  Well, I don't think they conducted a follow-up
14  study in a timely fashion, and I don't think they
15  amplified the labeling as a result of the
16  ophthalmic-related events we've discussed today.
17    Q.  Did Pfizer closely monitor the available data
18  to them?
19    A.  I haven't -- I haven't offered an opinion in my
20  report that they didn't.  I don't know.
21    Q.. Did Pfizer review the published literature?
22    A.  I don't know.  I don't know.  My report focuses
23  on the fact that no action was taken, not that they
24  didn't know about it.  I'm assuming they knew about it.
25    Q.  Well, specifically that they didn't change the

### 316

1  label when they did not initiate a case-controlled
2  study, correct?
3    A.  Or any study.  Or any study to examine it.  I
4  mean, I didn't see any records that they attempted to do
5  a cohort study either.
6    Q.  And those are the only two types of studies
7  that would have answered the question, to you?
8    A.  There's other studies that one can do, it's
9  just I was attempting to look at ones that might be more
10  readily doable.  I think a prospective double-blind
11  controlled study with this drug and these events would
12  be difficult to execute.  I didn't see any evidence that
13  they attempted it to look at this adverse event, but I
14  think it would be difficult to execute.
15    Q.  On page 8 you say one of the other factors
16  contributing to a low reporting rate, you write, "If a
17  manufacturer inaccurately, incompletely, or
18  inarticulately submits adverse event reports and
19  subsequent analyses, the FDA may not fully appreciate an
20  emerging or changing safety profile associated with a
21  drug product."
22    Do you see that sentence that you wrote?
23    A..  No.  Could you --
24    Q.  Sure.
25    A.  -- repeat where?

### 317

1    Q.  Page 8 --
2    A.  I got distracted.
3    Q.  Sure.  Page 8, the top full paragraph.
4    A.  Yes.
5    Q.  In the middle of the paragraph, you have a
6  sentence that reads, "If a manufacturer inaccurately,
7  incompletely, or inarticulately submits adverse event
8  reports and subsequent analyses, the FDA may not fully
9  appreciate an emerging or changing safety profile
10  associated with a drug product."
11    Did I read that correctly?
12    A.  Yes.
13    Q.  Do you have any evidence that Pfizer
14  inaccurately submitted adverse event reports?
15    A..  I don't recall seeing in their periodic reports
16  an analyses of the escalating events of ION, an
17  evaluation over time of the escalating events of ION in
18  the various databases.  I don't -- I did not see an
19  overview from adverse event databases, the literature
20  where they did a signal analysis and submitted that to
21  FDA.
22    Q.  Do you have any evidence that Pfizer
23  inaccurately submitted adverse event reports to FDA?
24    A.  Yeah, I -- I didn't see analyses of these
25  events.  I saw events reported, but I didn't see a

80  (Pages 314 to 317)

318

1   distillation or an analyses of these over time and
2   sharing with the FDA that they believe that a signal
3   had -- had been obtained in 2000 and maintained until
4   2005.
5       Q.  Is anything about the adverse event reports
6   that were submitted to FDA inaccurate?
7       A.  The individual reports?
8       Q.  Yes.
9       A.  I didn't specifically look for invalidity in
10  the individual reports.  I was more concerned with an
11  analysis overview.  But -- but I -- I have not said that
12  they lied or submitted anything inaccurately in the
13  individual reports.  I just didn't see an overview
14  analysis of the events during that -- that time period.
15      Q.  So you're not offering an opinion that FDA at
16  all -- I'm sorry.
17      You're not offering an opinion that Pfizer
18  misled the FDA; is that fair?
19      A.  I didn't see information where Pfizer brought
20  the issue to the FDA during the 2000 and 2005 time
21  period, but I'm not saying that they lied to the FDA.  I
22  didn't see that they gave a complete overview to the
23  FDA, though.
24      Q.  But your opinion in this case is not that
25  Pfizer lied to FDA, correct?

319

1       A.  No, I don't think I've said that Pfizer lied to
2   FDA.
3       Q.  And your opinion in this case is not that
4   Pfizer withheld information from FDA, correct?
5       A.  I didn't see an analyses where they did the
6   type of analyses --
7       Q.  Okay.
8       A.  -- that we've discussed.
9       I didn't see it.
10      MS. LESKIN:  Objection; nonresponsive.
11      JUDGE BORG:  Overruled.
12  BY MS. LESKIN:
13      Q.  And maybe I wasn't clear.
14      Are you offering an opinion in this case that
15  Pfizer withheld information from the FDA?
16      A.  It's the pharmaceutical company's
17  responsibility to track information and make labeling
18  changes.  I didn't see where Pfizer attempted to make a
19  labeling change to address the escalating events that
20  we've discussed today with FDA.
21      Q.  You've said that now twice, Doctor.  And I'm --
22  I'm not asking what you think the company didn't do,
23  except I'm asking:  Did the company withhold information
24  that it had from the FDA?
25      A.  I don't know how else to answer it.

320

1       I didn't see a synthesized report of these
2   events between 2000 and 2005.  I didn't see that the
3   company did anything with respect to discussing this
4   with FDA prior to FDA forcing the actions.  So I didn't
5   see those reports.
6       But I didn't say they lied on individual
7   events.  But I didn't see any effort or energy being
8   made to -- to get this information as they received it
9   into the labeling, and then modifying it as additional
10  information became available.  I saw nothing till the
11  FDA was involved in 2005.
12      Q.  What information did Pfizer have that they did
13  not give to FDA?
14      A.  It isn't enough to simply give individual
15  reports and give counts.  A company is required to
16  assess, address, evaluate the information overall.  I
17  didn't see that.  And I think that the information we've
18  discussed today from these various databases provided an
19  overview of events that were occurring, and I think it
20  required a labeling change earlier than 2005..
21      JUDGE BORG:  I think you have four or five
22  minutes left, Ms. Leskin.  Two?  Two minutes.
23      MS. LESKIN:  Thank you.
24  BY MS. LESKIN:
25      Q.  Did you see any information that Pfizer did the

321

1   analysis you think they should have?
2       A.  I didn't see an overall analyses of the data
3   between 2000, 2005.  I saw where they reviewed events as
4   they occurred, but I didn't see a pharmacovigilance
5   assessment of these events across the various data
6   sources during this time period.
7       Q.  The time period being between 2000 and 2005?
8       A.  Yes.
9       Q.  Other than this information, this analysis that
10  the company did not do, is there any other information
11  you believe that Pfizer did not give to the FDA?
12      A.  Well, I think if Pfizer had done this analysis,
13  or whether they did or didn't do it, they should have
14  provided for labeling changes during this time period.
15      Q.  But did they withhold anything else from the
16  FDA that they had?
17      A.  Well, that's all I've addressed.  My interest
18  in this was the ophthalmic reports during these time
19  periods for Viagra only.  I didn't address other issues
20  with Pfizer in this report.
21      MS. LESKIN:  You can change the tape.
22      THE VIDEOGRAPHER:  We are not out of tape.
23      MS. LESKIN:  Oh.
24      JUDGE BORG:  It's not the tape we're out of.
25      You're out of seven hours.

322

1    MS. LESKIN: Okay. Let's take a break off the
2 record.
3    THE VIDEOGRAPHER: We're off the video record.
4    (There was a discussion off the record.)
5    THE REPORTER: Am I supposed to be on the
6 record? Because I am not.
7    JUDGE BORG: Do you all want this on the
8 record?
9    MS. LESKIN: Yes.
10    THE REPORTER: I'm going back on now.
11    MS. LESKIN: I'm representing that I have five
12 minutes or less of time left. I've asked for an
13 agreement of counsel. They've refused to provide
14 agreement.
15    I am now appealing to Judge Borg and asking
16 that in light of the extended colloquy that went on
17 on the record, including on the videotape, including
18 time that the witness was out of the room, that I be
19 given an additional five minutes to be able to
20 complete my examination.
21    MR. BECNEL: Ms. Leskin, in answer to your
22 request, you have been so repetitious throughout
23 this deposition over and over, and wasted time
24 asking the same question over and over, when the
25 witness has given you answers, you could have gotten

323

1 your five minutes.
2    The problem is, if you recall, when you
3 objected to virtually every single question asked of
4 Dr. Hayreh or objecting to everything he was doing,
5 you know, we didn't get that courtesy. So I don't
6 intend to give you that same courtesy.
7    MS. LESKIN: Dr. Hayreh was your witness.
8    MR. BECNEL: Yeah. But you made --
9    MS. LESKIN: I was taking his deposition.
10    MR. BECNEL: -- most of the objections to
11 everything he said.
12    JUDGE BORG: Well, she -- well, okay.
13    You can have five more minutes because of the
14 discussion on the record without the witness
15 present. And the -- and the Court's order for
16 deposition says seven hours of examination, and that
17 was not examination. So you get five more.
18    We're back on. Can you -- are you ready to
19 proceed, Ms. Leskin?
20    MS. LESKIN: I'm sorry?
21    JUDGE BORG: Are you ready to proceed now?
22    MS. LESKIN: Yes.
23    THE VIDEOGRAPHER: One moment, please. Let me
24 get rolling.
25    We are back on the video record.

324

1    (Exhibit No. 24 was marked for identification.)
2 BY MS. LESKIN:
3    Q.  Dr. Blume, I'm going to hand you what's been --
4 we've marked now as Exhibit 24. I'll represent to you
5 that Dr. Osterloh, at his deposition, confirmed that
6 this was a report he prepared and submitted to the EMEA
7 in 2002.
8    Did you ever see this document before?
9    A.  I think so.
10    Q.  And did you review this document in reaching
11 your opinion in this litigation?
12    A.  I -- yes, I think I reviewed this.
13    (Exhibit No. 25 was marked for identification.)
14    THE WITNESS: I'm sorry. Who did you say?
15 Osterloh, right? Yes. This is -- yes. This is an
16 in-house report. Yes.
17 BY MS. LESKIN:
18    Q.  Well, are you aware that this was a report that
19 was submitted to the EMEA?
20    A.  Yes.
21    Q..  So it's not an in-house report?
22    A.  Well, it was compiled by the in-house --
23    Q.  Okay.
24    A.  -- staff.
25    Q.  I'll give you a document numbered Exhibit 25,

325

1 which is a document dated December 6th, 2002, by
2 Jeanette Barrett, also with Pfizer. I'll represent to
3 you that at Dr. Osterloh's deposition, he confirmed that
4 this report is part of the submission made to EMEA in
5 2002.
6    Have you seen this document before?
7    A.  I thought I had cited it.
8    Q.  Okay. And so you reviewed this document in
9 connection with your report, correct?
10    A.  I cited this. Yes.
11    MS. LESKIN: Okay. I have nothing further.
12 Thank you very much, Doctor.
13    JUDGE BORG: Mr. Overholtz or whoever, are you
14 going to do the exam?
15    MR. OVERHOLTZ: We're going to take a break
16 and --
17    JUDGE BORG: Well, I was going to do that, but
18 I was going to ask if you wanted a break.
19    MR. OVERHOLTZ: I think Mr. Altman is going to
20 ask some questions, then I'm going to ask some
21 questions. Okay?
22    THE VIDEOGRAPHER: We're off the video record..
23    (Recess from 6:00 p.m. until 6:13 p.m.)
24    THE VIDEOGRAPHER: We are back on the video
25 record.

82  (Pages 322 to 325)

CONFIDENTIAL

326

1  BY MS. LESKIN:
2  Q.  Dr. Blume, I just need to make a correction on
3  the record.  I -- we marked as Exhibit 25 a report
4  prepared by Dr. Barrett dated December 6th, 2002, and I
5  think I represented to you that that was submitted to
6  EMEA.
7       If you look at the first paragraph in the
8  abstract, it says that the report has been prepared in
9  response to questions posed by the Swissmedic.
10 A.  Uh-huh.
11 Q.  So I apologize.  I didn't mean to mislead you.
12     MS. LESKIN:  Let me mark as Exhibit 26 a report
13 by Ms. Barrett -- Dr. Barrett dated June 28th, 2002.
14     (Exhibit No. 26 was marked for identification.)
15 BY MS. LESKIN:
16 Q.  And you'll see in the first paragraph that this
17 report was prepared in response to a question posed by
18 the rapporteur from the Dutch Medicines Evaluation
19 Board, and that that was submitted with Dr. Osterloh's
20 report to the EMEA.
21     So have you seen this document that we marked
22 as Exhibit 26 before?
23 A.  Yes.
24 Q.  I'm sorry.  Yes?
25 A.  I said yes.

327

1  Q.  Okay.  Thank you very much.
2      MR. OVERHOLTZ:  This is the same -- are you
3  talking about the same document or a different
4  document?  Did you replace it?
5      MR. ALTMAN:  No.
6      MS. LESKIN:  No.
7      MR. ALTMAN:  New exhibit.
8      MS. LESKIN:  I gave her the one June 28th,
9  2002.  It's a different --
10     MR. ALTMAN:  This is Exhibit 26.
11     MS. LESKIN:  One is dated December and one is
12 dated June.
13     MR. OVERHOLTZ:  It was -- this was 25, and this
14 is now 26?
15     THE WITNESS:  Yes.
16     MS. LESKIN:  Correct.
17     MR. ALTMAN:  Well, they're not -- it just
18 appears they're not exactly the same document.  The
19 other one appears to have more pages.  So I don't
20 know what the difference is between the two.
21     MS. LESKIN:  They're two different reports.
22     JUDGE BORG:  They're two different reports.
23     MR. OVERHOLTZ:  Two different reports and
24 different days and everything.
25     MR. ALTMAN:  Okay.  All set?

328

1      MS. LESKIN:  I'm all set.  Go for it.
2          CROSS EXAMINATION
3  BY MR. ALTMAN:
4  Q.  Dr. Blume, I just have a few questions on --
5  for you.
6      I want to go over your background very briefly.
7      How long have you been working in the
8  pharmaceutical industry?
9  A.  Since 1977.
10 Q.  And while working in the pharmaceutical
11 industry, have you held any supervisory or management
12 positions within a pharmaceutical company?
13 A.  Yes.
14 Q.  Can you just tell us those positions very
15 quickly?
16 A.  Yes.  I have been a technical director,
17 vice president of scientific affairs, chief operations
18 officer.  I've been a member of the board of directors..
19 And that's it.
20 Q.  And which companies was that for?
21 A.  I worked for both Mylan Laboratories and for
22 Somerset Pharmaceuticals.
23 Q.  When you were at the pharmaceutical companies,
24 did you have responsibility for the assimilation, shall
25 we say, of information from lots of different sources in

329

1  rendering business decisions and safety decisions?
2  A.  Yes, of course.
3  Q.  Okay.  In your either a capacity while at the
4  pharmaceutical companies or in your consulting capacity
5  afterwards, do you develop INDs?
6  A.  Oh, yes, yes.
7  Q.  More than one?
8  A..  Yes, multiple ones.  Yes.
9  Q.  Do you develop new drug applications?
10 A.  Yes.
11 Q.  When you develop INDs in your drug
12 applications, do you have substantial authorship
13 responsibilities for those applications?
14 A.  Yes.  For -- most of those I am the U.S. --
15 U.S. contact for our clients with the FDA.
16 Q.  Do you assimilate all the -- much of the
17 information that would go into those NDAs and INDs?
18 A.  Yes.
19 Q.  And do you prepare the overall structure?
20 A.  Yes.
21 Q.  Do you develop the integrated summary of safety
22 for those NDAs?
23 A.  I develop both the ISS, integrated summary
24 safety, and the ISE, the integrated summary of
25 effectiveness.

83 (Pages 326 to 329)

330

1  Q.  As part of your experience, do you draft
2  labels?
3  A.  Yes.
4  Q.  Have you had primary responsibility for
5  drafting the label from scratch, shall we say?
6  A.  Yes.  A new label associated with a launch NDA?
7  Q.  Yes.  Have you had responsibility for
8  negotiating the language of draft labeling with the FDA?
9  A.  Yes.
10 Q.  Have you had primary responsibility for making
11 changes to a label subsequent to the initial marketing?
12 A.  Postapproval labeling?
13 Q.  Yes.
14 A.  Oh, yes, yes.
15 Q.  Have you ever, of your own volition, suggested
16 to the FDA that a labeling change needed to be made?
17 A.  Yes.  I've submitted -- independently submitted
18 both labeling changes requiring approval and affected
19 labeling changes that didn't require prior FDA approval.
20 Q.  In your consulting capacity,
21 have you developed clinical trials?
22 A.  Yes.
23 Q.  Have you selected -- help select the
24 organizations that conduct the clinical trials?
25 A.  Yes.  Contract research group, yes.

331

1  Q.  Have you had responsibility for collecting the
2  information from the clinical trials and simulating that
3  into the overall new drug application or IND?
4  A.  Yes.  The information from the trials are --
5  are provided, and it's my responsibility to develop that
6  into a new drug application format.
7  Q.  With respect to the INDs, the NDAs and the
8  labels, and the ANDAs, are you just simply signing off
9  on these applications or are you actually -- does the
10 buck stop with you in many of these applications?
11 A.  No.  When I was in industry, I was responsible
12 for the departments for securing NDA approvals.  And in
13 my capacity here, PDG works with companies in all -- in
14 all facets of their NDA preparation.  But in the NDAs
15 that we have submitted for our clients, I am the
16 contact, I am the one responsible for the preparation
17 and the approval, getting -- securing the approval of
18 the NDA.
19 Q.  And do you, as part of that capacity, negotiate
20 the approval process with the FDA?
21 A.  Well, I'm -- I'm the one who attends the
22 meetings with FDA prior to submission of the NDA to make
23 sure that we agree upon what the format will be and what
24 data will be submitted, and I am responsible for
25 coordinating the answers of approvable letters or

332

1  deficiency letters during the FDA review process and
2  securing the final FDA approval.
3  Q.  And do you -- do you correspond regularly with
4  the FDA in this capacity?
5  A.  Oh, yeah.
6  Q.  Okay.  I want to ask you just a few general
7  questions.
8  Do you know what I mean by the term "clinical
9  signal"?
10 A.  Yes.
11 Q.  As a -- and that would be something different
12 than a data mining signal, correct?
13 A.  Yes.
14 Q.  Okay.  Can you disprove a clinical signal
15 through the use of data mining?
16 A.  No.
17 Q.  Okay.  I'd like to hand you --
18 MR. ALTMAN:  What's the next exhibit?
19 THE WITNESS:  27.
20 MS. LESKIN:  27.  There's a sticker here for
21 you.
22 (Exhibit No. 27 was marked for identification.)
23 MR. BECNEL:  This one?
24 MR. ALTMAN:  Yeah.
25 BY MR. ALTMAN:

333

1  Q.  This is a paper entitled "The Potential Utility
2  of Data-Mining Algorithms For Early Detection of
3  Potentially Fatal/Disabling Adverse Drug Reactions:  A
4  Retrospective Evaluation."
5  Have you ever seen this paper before?
6  A.  Oh, yes.
7  Q.  Are the authors of this paper Manfred Hauben
8  and Lester Reich?
9  A.  That's correct.
10 Q.  If you look at the bottom, right above the page
11 number on the first page, does it say there that this
12 document comes from Pfizer?
13 A.  Yes.
14 Q.  Okay.  And Dr. Hauben works for Pfizer,
15 correct?
16 A.  Correct.
17 Q.  Okay.  Would you -- I'd like you to read
18 about -- one, two, three, four, five, six, seven --
19 eight lines down starting with the sentence that says
20 "Pharmacovigilance," do you see that, "is dependent"?
21 A.  Yes.
22 Q.  Okay.  Would you please read that?
23 A.  "Pharmacovigilance is dependent on astute
24 clinical recognition of an unusual or unexpected pattern
25 of events or a pattern of events that is consistent with

84  (Pages 330 to 333)

CONFIDENTIAL

**334**

1 a biologically plausible explanation, either within a
2 single case or across a series of cases."
3     Q.   And just read one more sentence.
4     A.   Uh-huh. "Such clinical/pharmacological
5 knowledge-based approaches have been referred to as
6 traditional methods of signal detection."
7     Q.   The -- the mechanism that was just described
8 here in this paper, is that effectively the same
9 mechanism as you use in conducting your
10 pharmacovigilance activities?
11     A.   Right.
12         MS. LESKIN:   Objection.  I don't think there's
13 a method defined in this paper.
14         JUDGE BORG:   I'm sorry.  What's your objection?
15         MS. LESKIN:   It's vague.
16         JUDGE BORG:   Overruled.
17         Do you understand the question?  Are you able
18 to answer?
19         THE WITNESS:   Yes.
20         JUDGE BORG:   Okay.  Go ahead.
21         MR. ALTMAN:   Okay.
22 BY MR. ALTMAN:
23     Q.   Dr. Blume, I'd like you to take what was marked
24 as Exhibit 9 previously.
25     A.   9?

**335**

1     Q.   Yes.  That's the June 15th, 2000 letter from
2 Pfizer to the editor of Ocular Surgery News.
3         Well, you know, for ease of finding it, I'll
4 just hand you this one.
5     A.   I found it.  There we go.  Okay.
6     Q.   Dr. Blume, would you -- is it your opinion that
7 this document represents that Pfizer had recognized a --
8 Pfizer had a signal as of June 15th, 2000?
9     A.   Yes, yes.
10     Q.   With respect to the last sentence, "We will
11 continue to follow with care the information being
12 collected by Drs. Egan and Pomeranz."
13         Did I read that sentence correctly?
14     A.   Correct.
15     Q.   Does that demonstrate to you that Pfizer
16 recognized that they needed to do some monitoring based
17 upon the signal?
18     A.   Yes.
19     Q.   We looked at the chart.  I don't remember what
20 exhibit number you marked it as.  That was the chart
21 from the AERS database.
22     A.   10.
23     Q.   Okay.  Would -- would a difference of a few
24 reports through there, which could possibly be data
25 entry by the FDA or duplicate by the company, would that

**336**

1 substantially change that chart?
2     A.   No, because the -- the same pattern was seen
3 on several sequential years.  No.
4     Q.   Okay.  Is there any rule that says internally a
5 company has to use any particular database for how it
6 describes adverse events?
7     A.   No.  Companies are encouraged to use as many
8 databases as they can.  In fact, when FDA now
9 communicates with you on what they want in INDs and
10 NDAs, they list several and then offer for you to offer
11 additional ones to them.  But AERS is always included.
12     Q.   I think I asked a slightly different question.
13         In terms of describing an adverse event, the
14 terms to use, is there any requirement that a company
15 use any particular dictionary internally in describing
16 those adverse events?
17     A.   No.
18     Q.   Okay.  Have you ever heard the term "COSTART"?
19     A.   Yes.
20     Q.   What is COSTART?
21     A.   A dictionary of terms to proceed -- was used
22 previously.
23     Q.   When you say "previously," is that previously
24 to MedRA?
25     A..  Yeah, prior to MedDRA.

**337**

1     Q.   I think the question was asked earlier about
2 the FDA using WHO-ART.  Did the FDA ever use WHO-ART?
3     A.   Yeah, I didn't quite understand that either.
4 No.
5         MR. BECNEL:   Ms. Reporter, is he going a little
6 too quickly for you here?
7         THE REPORTER:   Yes.  Could you slow down a
8 little?
9         MR. ALTMAN:   Absolutely.
10         MR. BECNEL:   Please don't be shy about that.
11         MR. ALTMAN:   You've got to throw something at
12 me.
13         MR. BECNEL:   This is New Yorkers.  This is
14 New Yorkers.  That's what they do.
15         JUDGE BORG:   Well, it's going to be a hard
16 enough transcript as it is, so.
17 BY MR. ALTMAN:
18     Q.   With respect to the 2005 citizen's petition by
19 public citizen, did you review that document before
20 drafting your expert report?
21     A.   Oh, yes.
22     Q.   The Exhibit 10, is that anything other than
23 just a breakdown by year of the same adverse event
24 reports that were part of the public citizen citizen's
25 petition?

CONFIDENTIAL

### 338

1    A. Yes, exactly. It's the same database, but
2  instead of doing the cumulative, it's a breakdown by
3  year.
4    Q. Okay. When you look for signals, whether
5  clinical or data mined, do you limit it to just one
6  specific term or do you use collections of terms
7  together that may have similar properties?
8    A. No. You really -- it's almost impossible to
9  limit it to a single term because prescribers -- many
10  people submit adverse event reports, prescribers,
11  hospitals, insurance databases, and the terminology may
12  vary. So it's important when trying to focus on a
13  particular concern, a particular adverse event that you
14  attempt to access as many descriptive terms as possible
15  when coming to a conclusion if there is a signal or if
16  that signal has changed.
17    Q. And what you've just described there, is that
18  the way you've conducted pharmacovigilance in your
19  regulatory activities while you were at industry?
20    A. Oh, yeah. That's the way we have to. Yeah.
21    Q. I'd like you to pull your expert report for one
22  second. And could you please go to page 13.
23      In the first paragraph that starts "while
24  Pfizer," there was some questions about those three
25  documents that are listed as part of that sentence.

### 339

1    A. Yes.
2    Q. Now, there are two clauses of that sentence.
3  One is that Pfizer was aware of NAION cases in 2000,
4  correct?
5    A. Right.
6    Q. And the other one is that their response seemed
7  to focus on deflecting negative publicity, correct?
8    A. Correct.
9    Q. Do those three -- can those three documents
10  that are listed apply to one or both of those clauses?
11    A. Yes.
12    Q. Okay. So you weren't necessarily saying there
13  that all three of those were specific for deflecting
14  negative publicity, correct?
15    A. No. I think the first two of those was
16  confirmation that Pfizer had to -- was aware of the
17  NAION cases as early as 2000.
18    Q. We talked, I think with Dr. McGwin's report,
19  about statistical significance. Does a lack of
20  statistical significance mean that you conclude that
21  there is no effect?
22    A. Oh, no, never.
23    Q. Okay. Do all -- do all -- strike that.
24      Does the FDA require a manufacturer in the
25  United States to submit all adverse event reports to the

### 340

1  FDA?
2    A. No.
3    Q. Do foreign-labeled adverse events have to go to
4  the FDA?
5    A. No.
6    Q. Do foreign nonserious events have to go to the
7  FDA?
8    A. No.
9    Q. So even if complying with the regulations, is
10  it your opinion that the -- that the company would have
11  more adverse event information than the FDA would have
12  in terms of events that went to the company?
13    A. Oh, for their product, the company always has
14  more information than the FDA, always.
15    Q. So if the company had --
16      JUDGE BORG: Mr.. Altman, slow it down --
17      MR. ALTMAN: Sorry.
18      JUDGE BORG: -- a little bit, please.
19  BY MR. ALTMAN:
20    Q. Sorry. If the FDA has -- strike that.
21      If the company had more information than the
22  FDA, can the FDA on its own replicate an analysis that
23  the company could do?
24    A. No.
25    Q. Is there any requirement that the company do

### 341

1  more than simply collect adverse event reports and
2  submit them to the FDA?
3    A. Yes. And I -- and I was describing that a
4  little earlier. If you look at the regulations in --
5  outlined in 314.8, it isn't -- it isn't sufficient to
6  simply list the events and send them to FDA, a tabular
7  listing. One has to assess, analyze, evaluate your
8  adverse event reporting. So FDA relies upon you to do
9  the evaluation of all these different sources of
10  information that only the manufacturer of the product
11  can access.
12    Q. Does the company have to prove a causal
13  relationship in order to make a labeling change?
14    A. No, not at all. FDA is very specific about
15  that you do not have to.
16    Q. Does the company -- does the FDA require
17  proving a statistically significant association in order
18  to make a labeling change?
19    A. No. In fact I mentioned one of my labeling
20  changes based on two adverse events.
21    Q. To your knowledge, has anybody ever written or
22  opined about the importance of a single rechallenge
23  event?
24    A. Yes.
25    Q. Can you tell us some of the sources of where

86  (Pages 338 to 341)

**342**

1  you read that or heard it or seen it?
2      A.   At -- Dr. Goldman has -- from the FDA has
3  opined on that.  And I believe Dr. Hauben has mentioned
4  it.
5      Q.   Dr. Hauben is?
6      A.   From Pfizer, has mentioned the importance of
7  even one documented rechallenge report.
8      Q.   You're not -- we discussed before, you're not a
9  clinician, correct?
10     A.   Correct.
11     Q..  But in your 30 years of experience, has it been
12 your day-to-day responsibilities to interpret clinical
13 information and how to convey ramifications of clinical
14 information to -- through labeling or to interpret or
15 make decisions based upon clinical information?
16     A.   Yes.  I design clinical trials.  I summarize
17 the data from clinical trials for FDA's purposes.  And
18 I -- and I write the labeling relating to the clinical
19 trial data.
20     Q.   And while you would not necessarily diagnose a
21 patient in terms of an adverse event, do you interpret
22 the information provided in adverse events in terms of
23 how -- whether that is adequately labeled or a labeling
24 change should be made?
25     A.   Yes, yes.

**343**

1      Q.   And as a part of your practice, do you take
2  collections of disparate information from many different
3  sources, whether it be clinical trials or post-marketing
4  safety surveillance or the literature or from wherever,
5  and assimilate that information into a cohesive picture
6  so that you can make a decision or recommendation?
7      A.   Yes, routinely.
8      Q.   Have you made labeling changes or recommended
9  labeling changes based on that kind of activity?
10     A.   From multiple sources of information?
11     Q.   Yes.
12     A.   Yes.
13     Q.   Okay.  And I just have one last question for
14 you before I pass you to -- to Neil.
15          Are there any opinions that you've rendered in
16 this case that are not of the type of opinions that you
17 render on a regular basis outside of the context of
18 litigation?
19     A.   Right.  The assignments that were conducted in
20 evaluating the data in this report are -- are very
21 similar to the assignments that we are required to do
22 while assessing a product's worthiness to submit for
23 approval and whether when we assess post-marketing data
24 with a product that's been launched and/or conducting --
25 developing our periodic safety update reports or

**344**

1  deciding on whether to make labeling changes relating to
2  new safety information.  It's the same type of
3  assignment.
4      Q.   And the methodologies that you used to write --
5  to render your opinions in the report are the same as
6  the methodologies that you use every single day?
7      A.   Yes.  The methodologies that we have used in
8  new drug development are the same as what we use in
9  litigation, and the information and the steps that I
10 take with literature and evaluation of post-marketing
11 clinical study reports are exactly the same.
12          MR. ALTMAN:  Pass the witness.
13          MR. OVERHOLTZ:  Thank you.
14                 CROSS EXAMINATION
15 BY MR. OVERHOLTZ:
16     Q.   Dr. Blume, I have a few questions for you, and
17 I want to start out by following up on questions Keith
18 was just asking you.
19          It's your opinion that a pharmaceutical company
20 has a duty to conduct pharmacovigilance for their
21 products?
22     A.   Yeah.  They're required to conduct it, yes.
23     Q..  And by conducting pharmacovigilance, can you
24 tell the jury what you mean by what duty the
25 pharmaceutical company has?

**345**

1      A.   Right.  Prior to approval, a limited -- there's
2  only a limited amount of information available to a
3  company regarding a new product.  And there's two
4  reasons for that.  One is that the clinical trials are
5  often only four to ten thousand patients, and many of
6  those patients -- and several of those patients can
7  receive placebo therapy; and moreover, as we've
8  discussed today, the patients that are used in a
9  clinical trial for NDA purposes are generally as clean a
10 population as we can have, in order to study the
11 particular drug effect.
12          So for both of those reasons, we learn the real
13 safety information about a product after the product has
14 been approved, because then it goes into hundreds of
15 thousands or millions of patients, and it's in a
16 real-world setting where patients will be given the drug
17 that weren't allowed to have the drug prior to approval
18 and who take the drug in ways outside the labeling
19 provision.  So that's when we learn safety information.
20 And that's why we have to do pharmacovigilance.  Many of
21 the events that we learn could not have -- could not
22 have been realized in our clinical trials.
23     Q.   Okay.  Within the pharmaceutical industry, are
24 there accepted methodologies for conducting
25 pharmacovigilance?

CONFIDENTIAL

346

1     A.   There are.  But pharmacovigilance is largely
2  dependent on your patient population and on the drug
3  product and of the event of interest.  So oftentimes
4  pharmacovigilance is tailored by a company for their
5  particular product and their particular concern with
6  that product.
7     Q.   And tailoring the pharmacovigilance activities
8  that a pharmaceutical company would undertake is part of
9  the regular practice of pharmaceutical companies in the
10 industry?
11    A.   Oh, absolutely, absolutely.
12    Q.   Now, in reaching your opinions that you stated
13 in your expert report, did you use the same accepted
14 methodology that you would use in your profession
15 working for pharmaceutical industry?
16    A.   Yes.
17    Q.   And in reaching the opinions that you've stated
18 at your expert -- at your deposition today, did you
19 apply this same accepted methodology regarding
20 pharmacovigilance in coming to those opinions and
21 stating those opinions?
22    A.   Yeah.
23    Q.   And does a pharmaceutical company have a duty
24 to comply with regulatory obligations?
25    A.   Yes.

347

1     Q.   And in reaching your opinions that you've
2  stated in your report in analyzing Pfizer's compliance
3  with the regulatory obligations, did you apply the same
4  standards and same methodology you would -- that you
5  would apply to a pharmaceutical company that you were
6  working for in your profession?
7     A.   Yes.
8     Q.   You remember you were asked some questions on
9  direct about the fact that -- and there were many
10 documents where Pfizer indicated that they were aware of
11 no adverse events of NAION-related adverse events in
12 their clinical trials.  Do you recall those documents
13 and questions?
14    A.   Yes.
15    Q.   Okay.  In light of that information, before
16 going to market with the drug, would Pfizer have
17 expected to see an excess of adverse events for NAION?
18    A.   Well, they did not see any in their clinical
19 trials, I believe, so they would have had that
20 background information.  However, they should have been
21 looking, I think, or should have -- should have been
22 aware of the retinal effects and the hypotensive effects
23 of the drug.  So the hypotensive properties of the
24 product were well known, well established in the
25 labeling.

348

1     Q.   I asked you about pharmacovigilance.
2          Pharmacovigilance allows a company to detect a
3  signal regarding a potential safety issue with the drug?
4     A.   That's one of the reasons one does
5  pharmacovigilance, yes.
6     Q.   And you told Mr. Altman that you believe that
7  Pfizer by 2000, with the Pomeranz reports, had received
8  a signal related to ischemic optic neuropathy in Viagra;
9  is that correct?
10    A.   Well, yeah.  That -- in fact that article was
11 said -- they said that they see it and they're going to
12 monitor it.
13    Q.   And in giving the opinion that Pfizer had
14 reached a signal based on -- should have received a
15 signal based on pharmacovigilance, you reached that
16 opinion applying the same methodology you would apply to
17 a pharmaceutical company that you've worked for in your
18 profession?
19    A.   Yeah.  Yes, of course.
20    Q.   Do you agree with the statement that a company
21 has a duty to investigate a signal?
22    A.   Oh, yes.
23    Q.   And if a company begins an investigation of a
24 signal, and through that investigation concludes that
25 they are unable to exclude their drug as a cause of a

349

1  serious adverse event, does the company have a duty to
2  warn about that event?
3     A.   That they're unable to exclude their drug as a
4  cause?
5     Q.   Yes.
6     A.   Well, yeah, of course.
7     Q.   In other words, a company that reaches that
8  conclusion that they can't exclude the product as a
9  cause after investigating a signal, should that company
10 amend its product labeling to warn physicians?
11    A.   Of course, yes.
12    Q.   And so if Pfizer concluded that they could not
13 exclude Viagra by 2002 as a cause of reports of NAION,
14 should they have amended their labeling and warned of
15 NAION?
16    A.   Yes, sir.  In my opinion, certainly.
17    Q.   I show you what was marked as Exhibit No. 24.
18 If you could pull that up.  And it's previously marked
19 as Exhibit 24.
20    A.   I have it..
21         MS. LESKIN:  Can I have it?  What was that?
22         MR. OVERHOLTZ:  I don't know where it went.
23         MS. LESKIN:  What was it?
24         MR. OVERHOLTZ:  "Sildenafil and Anterior
25 Ischemic Optic Neuropathy."

88  (Pages 346 to 349)

350

1    THE REPORTER: I'm sorry, say that again.
2    MR. OVERHOLTZ: "Sildenafil and Anterior
3    Ischemic Optic Neuropathy." It's the one that's
4    Bates 003 283877.
5    MS. LESKIN: I got it.
6    MR. OVERHOLTZ: Okay.
7    MS. LESKIN: Thank you.
8    BY MR. OVERHOLTZ:
9    Q.  AND this was the report that Ms. Leskin showed
10   you that she indicated that Osterloh had testified had
11   been provided to the EMEA regarding the reports of
12   NAION. Do you recall that?
13   A.  I do.
14   Q..  If you could turn with me over to page 6,
15   there's a paragraph. Do you see that?
16   A.  I do.
17   Q.  And it says -- it starts with "In conclusion."
18   A.  I see it.
19   Q.  Okay. And if you could read for me the last
20   sentence, that begins with "However."
21   A.  "However, due to the nature of spontaneous case
22   reports it is virtually impossible to definitively --
23   to -- yeah, definitively exclude any causal link, and so
24   it is important to continue to review new reports of
25   cases and new clinical studies and periodically reassess

351

1    this issue."
2    Q.  Okay. In light of that statement, do you
3    believe that Pfizer had a definitive signal of NAION by
4    2002?
5    A.  Yes.
6    Q.  And based on that statement, should Pfizer have
7    warned of NAION?
8    A.  Yes, I believe so.
9    Q.  Doctor, you were asked some questions by
10   Ms.. Leskin regarding whether the Martin -- Mr. Martin,
11   Mr.. Stanley saw Viagra ads. Do you recall those?
12   A.  Yes.
13   Q.  Have you seen a Viagra ad on TV?
14   A.  Yes.
15   Q.  Do you know anybody with a television that
16   hasn't see a Viagra ad on TV?
17   MS. LESKIN: Objection. Outside the area --
18   outside her expertise.
19   JUDGE BORG: I'm going to overrule it.
20   BY MR. OVERHOLTZ:
21   Q.  Go ahead, you can answer.
22   A.  I don't know how they could miss it.
23   Q.  Okay. Viva Viagra. We can sing along if you
24   wanted to, right?
25   Is it your opinion in this case that Pfizer

352

1    should have warned of permanent vision loss associated
2    with Viagra by 2002?
3    A.  Yes. Reported with Viagra, yes.
4    Q.  You were asked some questions regarding
5    changing a label?
6    A.  Yes.
7    Q.  And I want to kind of clarify something.
8    As a company learns more information regarding
9    the specific nature of an adverse event and its
10   association with the product, is it -- can the label be
11   revised to reflect this more accurate information that
12   the company has learned?
13   A.  Yes, of course.
14   Q.  So as -- if Pfizer would have initially warned
15   of -- of permanent vision loss in their labeling for
16   Viagra when they saw a signal, as they -- as they
17   received more information regarding that association,
18   they could have revised the label to add additional
19   information?
20   A.  Well, of course. We call the labeling a living
21   organism because it's always changing.
22   Q.  Do you recall some questions on direct
23   regarding the terms of coding for NAION?
24   A.  Yes.
25   Q.  And was your testimony that NAION was not a

353

1    term that was available to Pfizer --
2    A.  That's correct.
3    Q.  -- and coding to the -- as far as with -- in
4    the AERS database --
5    A.  That's not true.
6    Q.  -- of the FDA.
7    Instead, it had to be coded to terms like ION
8    or optic neuritis or blindness --
9    A.  Blindness, correct.
10   Q.  -- is that correct?
11   A.  That's correct.
12   Q.  Okay. In light of that fact, would it be
13   reasonable for a company looking to investigate NAION
14   associated with their drug to review all adverse event
15   reports in their database that could potentially be a
16   NAION case?
17   A.  Oh, yes, of course.
18   Q.  In other words, it would be important to look
19   at any adverse event reporting a sudden loss of vision.
20   Is that -- would that be a fair statement?
21   A.  Yes, yes.
22   Q.  And any reports of blindness?
23   A.  Correct.
24   Q.  And that's because blindness -- NAION can
25   result in blindness --

89 (Pages 350 to 353)

CONFIDENTIAL

354

1    A.  Right.
2    Q.  -- is that right?
3    A.  Correct.
4    Q.  Okay.  And in fact in 2005, are you aware as to
5   whether or not the FDA asked Pfizer to review their
6   adverse event database for a broad range of terms
7   associated with NAION?
8    A..  Yes.  I think it was mentioned that they gave a
9   complete list of term -- terms in an effort to trap all
10  possible ways of describing the events of interest.
11   Q..  Do you recall testimony that you gave earlier
12  regarding the 1998 label change that added entry
13  regarding temporary decreased vision or vision loss?
14   A.  Uh-huh, yes.
15   Q.  Okay.  By 1998, Pfizer had also received
16  reports of permanent vision loss?
17   A.  Correct.
18   Q.  They had received reports of ION; is that
19  correct?
20   A.  Correct.
21   Q.  By 1999, was that -- the same true?
22   A.  Right.
23   Q.  They -- by '99 they received reports of
24  permanent vision loss?
25   A.  Yes.

355

1    Q.  By 2000, had Pfizer received such reports?
2    A.  That's true.
3    Q.  The same would be true for 2001 and 2002?
4    A.  Right.
5    Q.  All the way through 2005?
6    A.  Correct.
7    Q.  Was it reasonable for Pfizer to not amend its
8   label to add permanent vision loss to the labeling for
9   Viagra between 1998 and 2005 in light of the fact they
10  had received a growing number of reports of permanent
11  vision loss?
12   A.  Yes.  I think that section should have been
13  amended to include both temporary and permanent
14  blinding.
15   Q.  And was it -- was it reasonable for Pfizer to
16  not add ION as an adverse event under the post-marketing
17  surveillance report as they had added earlier the '98
18  change regarding temporary vision loss?
19   A.  Right.  That should have been added as well.
20   Q.  Should have been added by 1999?
21   A.  For 2000, yes.
22   Q.  By 2000?
23   A.  By 2000.
24   Q.  I want to talk a little bit about what the
25  company had available to it by 2002.  Okay?

356

1    A.  Okay.
2    Q.  We've seen a lot of reports from Pfizer going
3   back and forth to EMEA in 2002.  By 2002 and even
4   earlier, the company had in its possession their own
5   clinical trial data; is that fair?
6    A.  Yes.
7    Q.  The company had available to it the IMHS study
8   data?
9    A.  Yes.
10   Q.  The company had available to it --
11   THE REPORTER:  Could you slow down?
12   MR. OVERHOLTZ:  Yes.  I'm sorry.
13   (Reporter clarification.)
14  BY MS. LESKIN:
15   Q.  And the company had available to it the PIM
16  data?
17   A.  2002.  Yes.
18   Q.  Okay.
19   A.  Yes.
20   Q.  Are you aware that Pfizer has told the FDA that
21  their marketing data shows that the average use of
22  Viagra in their patients is approximately two to three
23  times per month?
24   A.  Per month, is that -- per month, right.
25   Q.  Do you remember some questions regarding

357

1   Pfizer's publication of the Gorkin report --
2    A.  Yes.
3    Q.  -- or your testimony regarding that?
4    A.  Yes.
5    MS. LESKIN:  Objection.  I didn't ask anything
6   about Gorkin.
7    MR. OVERHOLTZ:  I said -- I changed it to her
8   testimony.
9    MS. LESKIN:  Okay.
10  BY MR.. OVERHOLTZ:
11   Q.  Do you recall you mentioned of publication --
12   A.  I did.
13   Q..  -- of a Gorkin report?
14   A.  I did mention it.
15   Q.  And you're aware of Pfizer's publication of the
16  Gorkin report in 2006?
17   A.  I am.
18   Q.  And in that report, Pfizer pooled data from the
19  clinical trial database and the PIM database to report
20  an incidence rate of NAION associated with Viagra?
21   A.  Yes.
22   Q.  And you're aware that as early as 2002, Pfizer
23  were reporting to various agencies and doctors the same
24  pooling of data information --
25   A.  Correct.

90  (Pages 354 to 357)

358

1    Q. -- that was published in the Gorkin study?
2    A.  Correct.
3    Q.  Okay.  Was it appropriate for Pfizer and
4  Pfizer's employees to pull the clinical trial and PIM
5  data to report an incidence rate for Viagra and NAION?
6         MS. LESKIN:  Objection; outside the area of
7  expertise.  She's testified she's not an
8  epidemiologist.
9         JUDGE BORG:  Overruled.
10        MS. LESKIN:  It's also outside the scope of the
11  opinion that she's providing in this case.  It's not
12  anywhere in her report, and she didn't testify to
13  that.
14        JUDGE BORG:  How about some more foundation on
15  that.
16        MR. OVERHOLTZ:  I thought I laid a foundation
17  regarding -- regarding the pharmacovigilance and the
18  information -- I mean, she asked a ton of questions
19  regarding what Pfizer had done.
20  BY MR. OVERHOLTZ:
21    Q.  Let me ask you this.
22        Do you recall questions from Ms. Leskin related
23  to Pfizer's campaign to understate the risk of Viagra
24  associated with NAION?
25    A.  I do, yes.

359

1    Q.  And do you recall the questions regarding
2  Pfizer's efforts to denigrate the McGwin study that had
3  been published?
4    A.  Yes.
5         JUDGE BORG:  We need a tape change very
6  quickly.
7         THE VIDEOGRAPHER:  We're off the video record.
8         (There was a discussion off the record.)
9         THE VIDEOGRAPHER:  We are back on the video
10  record.
11        MS. LESKIN:  I had an objection to that last
12  question.
13        JUDGE BORG:  Yeah.  Can I get the question,
14  please?  Or do you want to -- do you just want to
15  restate it?
16        MS. LESKIN:  I can tell you what the question
17  was, if that helps.
18        MR. OVERHOLTZ:  I said:  "Do you recall the
19  questions regarding Pfizer's efforts to denigrate
20  the McGwin study that had been published?"
21        MS. LESKIN:  And I object because I don't think
22  I asked any questions about Pfizer's efforts to
23  denigrate the McGwin study.  I don't think there has
24  been any testimony about Pfizer's efforts --
25        MR. OVERHOLTZ:  Yes, you did.

360

1         MS. LESKIN:  -- to denigrate the McGwin study.
2         JUDGE BORG:  Yeah.  It's overruled.  Go ahead.
3  BY MR. OVERHOLTZ:
4    Q.  Do you recall those questions?
5    A.  Yes.
6    Q.  And was it your understanding that the Gorkin
7  study that was published by Pfizer attempted to refute
8  the findings that were found in the McGwin study?
9    A.  Yes.
10    Q.  And that the --
11        JUDGE BORG:  Slow.  Slow.  Slow.
12  BY MR. OVERHOLTZ:
13    Q.  Were you aware that the Gorkin study and the
14  data presented in the Gorkin study were published to
15  refute the information that was coming out that there
16  was an association between Viagra and NAION?
17    A.  Yes.
18    Q.  And I had already asked you whether or not you
19  were aware that Pfizer had pooled that data together in
20  the publication of that Gorkin study, correct?
21    A.  I do understand that, yes.
22    Q.  Okay.  Was it appropriate for Pfizer to pool
23  the data from the clinical trial and the PIM study in
24  attempting to report an incidence rate to somehow
25  denigrate the information that was coming out regarding

361

1  an associate between Viagra and NAION?
2         MS. LESKIN:  Objection.  There's nothing in her
3  opinion as to -- in her report or the opinion she's
4  expressed today stating that she is going to give an
5  opinion about -- in criticism of the Gorkin report.
6         JUDGE BORG:  You know what?  I don't recall the
7  answer to that.  I'm going to overrule.  I'm going
8  to overrule it and let you ask the question, and if
9  you're able to answer it.
10  BY MR. OVERHOLTZ:
11    Q.  Let me ask you this.  Can you answer the
12  question?
13    A.  Yes.
14    Q.  Okay.  Go ahead.
15    A.  Yes.  Generally data are not pooled when they
16  come from such diverse areas of controlled clinical
17  trial data and a pharmaceutical event monitoring study,
18  an uncontrolled study.  So, yes, it is unusual to pool
19  those data.
20    Q.  Let me ask you -- I had been asking you some
21  questions regarding pharmacovigilance.
22    A.  Yes.
23    Q.  Is that correct?
24    A.  Yes.
25    Q.  And pharmacovigilance is a heavy topic of your

91  (Pages 358 to 361)

**CONFIDENTIAL**

362

1  report, correct?
2      A.  Correct.
3      Q.  And the fact that you have given opinions that
4  the company has a duty to investigate any signal?
5      A.  Correct.
6      Q.  In conducting that investigation, is part of
7  that investigation looking at data from previous
8  clinical trials?
9      A.  Yes.  You can, yes.
10     Q.  And can it also involve looking at data from
11 prescription monitoring trials?
12     A.  You can.
13     Q.  Should the company look at everything that's
14 available to it?
15     A.  Absolutely, absolutely..
16     Q.  In light of your opinion that there's a problem
17 with pooling that data, is that -- is -- was there a
18 problem with PIM -- the PIM data reporting an exposure
19 time with respect to the patients that took Viagra?
20         MS. LESKIN:  Objection.  Again outside the area
21     of expertise and beyond the area of her expert
22     report.
23         JUDGE BORG:  Overruled.
24         THE WITNESS:  Yes.  My understanding is that
25     the usage rate of Viagra was, if a patient took it

363

1  once, it was considered for the month.  And we know
2  that it isn't taken that way.  So using that
3  calculation, there would been a -- be a diminution,
4  a dilution of the occurrence rate using that.
5      So, yes, I understand how it was done.  And
6  based on what they later told FDA about the actual
7  usage of Viagra, it was -- it was an improper way of
8  calculating it.
9  BY MR. OVERHOLTZ:
10     Q.  You -- you hold a Ph.D. in pharmacology,
11 correct?
12     A.  Yes..
13     Q.  And as a pharmacologist, you understand that
14 sildenafil has an acute pharmacologic action on the
15 body; is that correct?
16     A.  Yes.
17     Q.  The half-life of -- of Viagra, sort of in
18 general, is about what?
19     A.  Four.  About four hours.
20     Q.  Okay.  And for -- even if five times, six times
21 that is what?  A day?
22     A.  Day's use or day's exposure.
23     Q.  And generally are you aware that an event that
24 could potentially be associated with Viagra is not
25 expected to have been caused by the drug unless it

364

1  happens within 24 hours of ingestion?
2      A.  That is my understanding, yes.
3      Q.  And that's because the drug is gone out of the
4  system?
5      A.  Right.
6      Q.  Is that right?
7      A.  Yes.  And it has an acute effect.  Not only
8  gone, but its effect is acute.
9      Q.  So in light of -- in light of your review of
10 the information that the PIM data would count a month of
11 exposure if the patient records using the drug for that
12 month -- well, let's strike that.  Let me ask you this.
13     Would it ever be appropriate for Pfizer in
14 attempting to determine an incidence rate of Viagra
15 associated with NAION to count as the time of exposure
16 to the drug days when the patient doesn't use the drug?
17         MS. LESKIN:  Objection; beyond the scope of her
18     expertise and beyond the scope of her report.
19         JUDGE BORG:  Overruled.
20         THE WITNESS:  No, I certainly don't think so.
21     And I think that was even discussed when FDA and
22     Pfizer were talking about the upcoming study..  And
23     it was agreed that it would only be the day the drug
24     was used.
25 BY MR. OVERHOLTZ:

365

1      Q.  In -- conducting their pharmacovigilance and
2  analyzing the signal, you would not want to count as
3  time exposed on a drug days in which the patients don't
4  take the drug?
5          MS. LESKIN:  Same objection.
6          THE WITNESS:  No, I don't believe so.
7          JUDGE BORG:  Overruled.
8          THE WITNESS:  I'm sorry.
9          MR. OVERHOLTZ:  Go ahead.
10         JUDGE BORG:  That's all right.
11         THE WITNESS:  No, I don't believe so.  And
12     that -- and -- and I believe that FDA agrees with
13     that in their interactions with Pfizer on the
14     current study.
15 BY MR. OVERHOLTZ:
16     Q.  Okay.  Just a couple more questions, Dr. Blume.
17     Could Pfizer have designed a case control study
18 to look at the association of NAION and Viagra?
19     A.  Yes.
20     Q.  And is it your opinion that based on Pfizer's
21 duty to conduct pharmacovigilance that they should have
22 initiated such a study?
23     A.  Yeah.  Oh, yes.  I think so, yes.
24     Q.  And do you believe, in analyzing Pfizer's
25 regulatory actions in this case, that Pfizer acted

92  (Pages 362 to 365)

CASE 0:06-cv-01064-PAM   Document 20-30   Filed 06/03/09   Page 93 of 100

**CONFIDENTIAL**

---

**366**

1  appropriately with respect to their delays in initiating
2  such a study?
3  A.  No, I don't think so.
4  Q.  Do you recall some questions regarding
5  underreporting of adverse event data?
6  A.  Yes.
7  Q.  Have you -- have you seen reports or seen
8  literature that indicates that men who take Viagra may
9  fail to inform their physicians that they've taken that
10  drug?
11  A.  I did see that in the Pfizer documents, yes.
12  Q.  And do you believe that men who have suffered a
13  visual event prior to this event being in the labeling
14  may have failed to report their use of Viagra to their
15  ophthalmologist?
16  A.  I did --
17  MS. LESKIN:  Objection; outside the area of her
18  expertise and beyond the scope of her expert report.
19  We're getting farfetched here.
20  JUDGE BORG:  I'm sorry?
21  MS. LESKIN:  She -- we're getting farfetched
22  and far way from where her area of expertise is.
23  JUDGE BORG:  Yeah. Okay.  It's overruled.  But
24  I want to hear the question again.
25  BY MR. OVERHOLTZ:

**367**

1  Q.  Do you believe that men who have suffered a
2  visual event prior to this being in the labeling for the
3  product could have failed to report their use of Viagra
4  to an ophthalmologist?
5  JUDGE BORG:  It's overruled.
6  Do you understand, are you able to answer the
7  question?
8  THE WITNESS:  Oh, yes, yes.  I understand the
9  question.
10  And I understand from reading the records that
11  that -- that was in the records that men -- men do
12  not always share with their ophthalmologist their
13  use of an erectile dysfunction drug.
14  BY MR. OVERHOLTZ:
15  Q.  Okay.  And we talked about your expertise here
16  today with respect to a company's pharmacovigilance
17  duties, correct?
18  A.  Correct.
19  Q.  In conducting that pharmacovigilance, does a
20  company have a duty to look at the issue of
21  underreporting --
22  A.  Oh, yes.
23  Q.  -- in analyzing their adverse event database?
24  A.  Absolutely, absolutely.
25  Q.  And so consideration of an issue such as men's

**368**

1  failure to report their use of a recreational drug or
2  drug like Viagra would be an important issue for a
3  pharmaceutical company to look at?
4  A.  Oh, of course, of course.
5  JUDGE BORG:  Mr. Overholtz, I've got to slow
6  you down again.
7  MR. OVERHOLTZ:  Okay.  Three more questions.
8  JUDGE BORG:  Our court reporter is so nice that
9  she won't do that, but.
10  BY MR. OVERHOLTZ:
11  Q.  Do you recall --
12  MR. BECNEL:  I have to tell Neil two questions
13  or, I ask two questions, whichever is quicker.
14  JUDGE BORG:  Well, go ahead and finish,
15  Mr. Overholtz.
16  MR. OVERHOLTZ:  Take a quick break and --
17  MR. BECNEL:  Huh?
18  MR. OVERHOLTZ:  We'll, take a quick little
19  thing --
20  JUDGE BORG:  Yeah.  No, no. Go -- go ahead and
21  finish, Mr. Overholtz.
22  BY MR. OVERHOLTZ:
23  Q.  Do you recall questions regarding whether or
24  not Pfizer had reported all of the adverse events they
25  had received related to NAION to the FDA?

**369**

1  A.  Yes.
2  Q.  Okay.  Are you aware that -- of correspondence
3  between Pfizer and the FDA in 2006 regarding two
4  cases --
5  A.  Oh, yeah.
6  Q.  -- of ischemic optic neuropathy in the IMHS
7  study that had previously not been reported to the FDA
8  by Viagra --
9  A.  Yes.
10  Q.  -- by Pfizer?
11  A.  I do recall that.
12  Q.  In conducting this investigation, we talked
13  about Pfizer went back and looked at their clinical
14  trials and the post-marketing studies like IMHS and PIM
15  in looking for -- and their adverse event database.
16  Okay?  Would it be appropriate, in light of the
17  fact that this event was not in the labeling and --
18  prior to 2005, that when Pfizer went back to look at
19  their clinical trials that they would actually look at
20  the reports and the medical records related to
21  abnormal -- abnormal vision to make sure there were no
22  cases?
23  A.  Yes, that would have been -- that would have
24  been wise to do.
25  Q.  Okay.  And do you know whether Pfizer has

93 (Pages 366 to 369)

**VERITEXT REPORTING COMPANY**
(212) 279-9424      www.veritext.com      (212) 490-3430

370

1  conducted that analysis or not?
2    A.   I don't know that they did that.
3    Q.   Okay.
4         JUDGE BORG:  Mr. Becnel, just to ask -- he has
5  a couple of -- well, okay.
6         MR. BECNEL:  That's not it.  He was given one
7  more.  Do you want me to ask it first?
8         MR. OVERHOLTZ:  Yeah, go ahead.
9         MR. BECNEL:  All right.
10            CROSS EXAMINATION
11 BY MR. BECNEL:
12   Q.   You're aware that Ms. Leskin talked to you
13 about some animal models?
14   A.   Yes.
15   Q.   Of dogs, rabbits, and rats?
16   A.   Yes.
17   Q.   Concerning trying to find out a signal in -- in
18 those animals; is that correct?
19   A.   True, yes.
20   Q.   Were those the appropriate animal models
21 to use for something dealing with ocular injuries?
22   A.   Well, they certainly didn't predict it in
23 the case of -- of the Viagra.  But my understanding
24 overall is that for ophthalmic tests in tracking ability
25 to see, the only animal model that may be useful is --

372

1         MR. BECNEL:  Judge, we're going to --
2         MR. OVERHOLTZ:  Move to strike anything
3  after --
4         JUDGE BORG:  I -- I know you do.
5         MR. BECNEL:  We have other depositions to
6  prepare for tomorrow.
7         JUDGE BORG:  I understand.
8         MR. BECNEL:  It's -- it's -- we have a court
9  reporter who is exhausted.  It's 7:00 o'clock.
10 We've been here for nine hours with --
11        JUDGE BORG:  I know.
12        MR. BECNEL:  -- virtually no breaks.
13        JUDGE BORG:  And the more we talk about
14 objecting, the more everybody gets tired.  So ten
15 more minutes, and then we're done, unless you have
16 something.
17        MR. OVERHOLTZ:  And I'd just reserve an
18 objection to later file in the court a motion to
19 strike any of this testimony after this.
20        JUDGE BORG:  You know, have at it.  We've had a
21 witness -- this witness has not been responsive on
22 the direct from Ms. Leskin.  That's eaten up a lot
23 of time.
24    So, Ms. Leskin, you've got ten minutes.
25        MS. LESKIN:  Thank you.

371

1  are monkeys.
2    Q.   And that's what Dr. Hayreh did in all of his --
3    A.   Yeah.
4    Q.   -- investigatory work?
5    A.   That's my understanding.
6    Q.   Thank you.
7    A.   But across all products.  I'm talking not just
8  erectile dysfunction drugs.
9         MR. BECNEL:  That's it.
10        JUDGE BORG:  Mr. Overholtz?
11        MR. OVERHOLTZ:  That's it.
12        JUDGE BORG:  Okay.  Ms. Leskin, do you want
13 any -- do you have anything else?
14        MS. LESKIN:  Yeah.  I have a few questions.
15        JUDGE BORG:  Okay.  Well, you have a few
16 minutes left from your five.
17        MS. LESKIN:  Can I expand that to 20?  I don't
18 think I'll need 20, but I'd like to expand that to
19 20 in light of some of the nonresponsiveness and
20 colloquy on the record.
21        JUDGE BORG:  I think 20 is a little heavy.
22 I'll -- I'll give you -- I'll give you ten.
23        MS. LESKIN:  Okay.
24        MR. OVERHOLTZ:  I'm going to object to
25 the ten.

373

1            REDIRECT EXAMINATION
2  BY MS. LESKIN:
3    Q.   Dr. Blume, you said that you applied the
4  methodology in this litigation that you use in
5  connection with your pharmaceutical clients in
6  nonlitigation, correct?
7    A.   Yes.
8    Q.   For your nonpharmaceutical -- for your
9  nonlitigation clients, do you review internal documents?
10   A.   Yes.
11   Q.   Internal e-mails and internal minutes of
12 meetings?
13   A.   Well, I don't always receive their internal
14 e-mails, but I'm generally at the meetings that deal
15 with their NDA submissions.
16   Q.   And is part of your responsibility analyzing
17 those internal e-mails and memos regarding the intention
18 or strategy for them on the marketing front?
19   A.   Oh, those I'll -- I may see.  Yes, those I'll
20 see, especially if it relates to the adequacy of
21 their -- or the appropriateness of their current
22 marketing or their planned marketing relating to either
23 their labeling or ongoing studies that they have.  Now,
24 those I may see.
25   Q.   You were asked about Dr. Osterloh's 2002 report

94  (Pages 370 to 373)

## 374

1 to the EMEA. Do you recall those questions?
2    A.  Yes.
3    Q.  And do you recall that Mr. Overholtz asked you
4 whether the conclusion that Dr. Overholtz reached about
5 not being able to exclude the possibility?
6         MR. BECNEL:  You made a mistake because you're
7 tired.
8         MS. LESKIN:  Yeah, that's probably right. And
9 I don't have the document in front of me. So let me
10 withdraw that question and fix that.
11 BY MS. LESKIN:
12    Q.  Okay. We're on Exhibit 24.
13         MR. BECNEL:  I'm glad you adopted it.
14 BY MS. LESKIN:
15    Q.  And Mr. Overholtz referred you to the summary
16 and conclusions that are on page 6. Do you recall that?
17    A.  Yes. I'm here.
18    Q.  And Mr. Overholtz asked you that -- whether
19 that last sentence on Dr. Osterloh's report was
20 sufficient to establish a signal meriting a change in
21 the label. Do you recall that testimony and that
22 question?
23    A.  I recall he asked if that was a signal, and if
24 they understood that there was a signal, whether for
25 a -- for that event it would -- was necessary to amend

## 375

1 the labeling. Yes, I understand that.
2    Q.  Okay. And you told Mr. Overholtz that that
3 sentence signaled a -- triggered a requirement to change
4 the label at least by the time of the submission,
5 correct?
6    A.  Certainly in my opinion, yes.
7    Q.  Okay.
8    A.  For that event.
9         (Exhibit No. 28 was marked for identification.)
10 BY MS. LESKIN:
11    Q.  Let me show you -- I'm going to give you
12 Exhibit 28.
13         Have you seen this document before?
14         And for the record, this is a
15 September 25th, 2002, telefax from the EMEA.
16         Have you seen this document before?
17    A.  I don't recall seeing this.
18    Q.  And you recall that -- and this postdates
19 Dr. Osterloh's submission that we just talked about as
20 Exhibit 24, correct? This is dated
21 September 25th, 2002. This was submitted the same time
22 as Dr. Barrett's report, which is dated June of 2002.
23         MR. BECNEL:  To which I'm going to object. If
24 it wasn't covered in direct and it wasn't covered in
25 cross, how can we start introducing new documents at

## 376

1 this point?
2         JUDGE BORG:  Because I gave you latitude on
3 scope, I'm going to let her do the examination.
4 It's overruled.
5         You can proceed.
6 BY MS. LESKIN:
7    Q.  Looking at the conclusion that the EMEA
8 provides to Pfizer on that front page --
9         Do you see the conclusion as -- the paragraph
10 there saying that "this is our conclusion"?
11         "We would like to inform you that the CPMC in
12 its meetings held from 7 to 19 September 2002 concluded
13 the following points."
14         Do you see that?
15    A.  Yes.
16    Q.  And CPMC says, "Considering the fact that the
17 incidence in the PEM study is not in excess compared to
18 the background incident of NAION, and assuming that only
19 5 to 10 percent of all cases are reported, this means an
20 incident rate of 1.4 to 2.8 per 100,000 still in line
21 with the background incidence. In view of these data it
22 seems acceptable not to include NAION as a
23 sildenafil-related adverse event and ask the MAH to
24 carefully monitor the occurrence of NAION and if
25 appropriate submit a Type II variation to add this

## 377

1 adverse event to the SPC at the time of the next PSUR."
2         Were you aware of that conclusion reached by
3 the EMEA?
4    A.  I was aware of the conclusion. I don't
5 specifically remember this document. But that doesn't
6 impact what my opinion would be for the United States
7 because the FDA specifically tells us that we are not to
8 involve -- we are not to consider incidence rate in
9 deciding on labeling inclusions for post-marketing
10 adverse events.
11         MS. LESKIN:  Objection; nonresponsive.
12         JUDGE BORG:  It is nonresponsive. It's
13 sustained.
14 BY MS. LESKIN:
15    Q.  Were you aware of this conclusion by the EMEA?
16    A.  Yes, I was aware of it for European labeling..
17    Q.  You were asked by Mr. Overholtz whether it was
18 reasonable to review the reports of blindness that had
19 been received. Do you remember that question?
20    A.  Yes.
21    Q.  Do you know whether Pfizer did that?
22    A.  Yes.
23    Q.  Yes, they did that, correct?
24    A.  I -- at least some of them, because they're --
25 they're listed in their reports.

95  (Pages 374 to 377)

CONFIDENTIAL

378

1    Q.   Doctor, you were asked some questions about
2  whether men could have failed to report to their doctors
3  that they had taken Viagra.  Do you recall that?
4    A.   Yes.
5    Q.   Do you have any expertise in a man's
6  willingness to disclose medication?
7    A.   Just my personal life.  I'm just referring to
8  the records that I recall in this case where they were
9  concerned that it would not be unlikely that a patient
10  wouldn't think to talk about an erectile dysfunction
11  drug while he was at his ophthalmology visit.
12    Q.   Have you conducted any studies to assess how
13  often men do or do not disclose their medications to --
14  to their doctors?
15    A.   No.  I was just referring back to the documents
16  in this case that was concerned about that.
17         (Exhibit No. 29 was marked for identification.)
18  BY MS. LESKIN:
19    Q.   There was some discussion about the Gorkin
20  article.  I'm going to hand you Exhibit 29, which is a
21  copy of Gorkin.
22         And you've seen that before, correct?
23    A.   Yes, I have.
24    Q.   You were asked some questions about the pooling
25  of data in the --

379

1    A.   Yes.
2    Q.   -- Gorkin study.
3         Where does the article say they've pooled data
4  from different sources?
5    A.   It says, "To determine the incidences of NAION
6  receive -- in men receiving sildenafil, we reviewed
7  safety data from the global clinical trials and European
8  observational studies."
9    Q.   Okay.  And if you look at the next paragraph,
10  it says, "A review of collective database of 103
11  double-blind or open-label trials of sildenafil
12  conducted between 1993 and 2003" -- just skipping a
13  little bit of the middle there -- "revealed no cases of
14  reported or observed NAION in more than 13,300
15  patient-years of observation."
16    A.   Correct.
17    Q.   Right?
18    A.   Correct.
19    Q.   And the next paragraph talks about the
20  International Men's Health Study, correct?
21    A.   Correct.
22    Q.   And at the bottom it says, "No cases of NAION
23  were reported during 2,935 patient-years of follow-up,"
24  correct?
25    A.   Correct.

380

1    Q.   The paragraph after that talks about the PEM
2  study, correct?
3    A.   Yes.
4    Q.   And at the bottom of that paragraph it says,
5  "Based on the report of one NAION case in a total of
6  35,500 patient years of observation in the PEM, the
7  adjusted incidence of NAION is estimated to be 2.8 cases
8  per 100,000 patient years of exposure.."
9         So I ask you again:  Where does it say that the
10  data from those three databases was pooled?
11    A.   Well, I don't recall talking about the pooling
12  from the IMHS study.
13    Q.   What pooling were you referring to, Doctor?
14    A.   I was referring to the control clinical data
15  and the PEM study.  I did not refer to the IMHS.
16    Q.   Okay.  So where does it say that the PEM study
17  and the clinical database were pooled?
18    A.   Give me one second here.
19         It says, "Using extensive epidemiology data and
20  the clinical trial data, we estimate an incident --
21  incidence of 2.8 cases per 100,000 patient-years."
22         So they -- there's an "and" in there with
23  clinical trial date and extensive epidemiologic data.
24    Q.   Where are you reading?
25    A.   Under "Discussion," first line of the second

381

1  paragraph.
2    Q.   But the 2.8 cases, where is that coming from?
3    A.   "An incidence of 2.8 cases per 100,000
4  patient-years."
5    Q.   And that's the same number that they got after
6  analyzing the PEM data, correct?
7    A.   Yes.  But they -- well, it's the same number,
8  but they added -- they pooled this together saying,
9  "Using this, we have come up with that estimate."
10    Q.   Did you review the deposition of Rachel Sobel
11  in this case?
12    A.   Yes.
13    Q.   Does Rachel Sobel acknowledge that -- say
14  anything about the pooling?
15    A.   I recall that she said they did not pool in the
16  IMHS.
17    Q.   That's the only thing you recall?
18    A.   Yes.
19    Q.   Do you recall Dr. Sobel's testimony regarding
20  the events that Mr. Overholtz classified as ION events
21  from the IMHS data?
22    A.   The two?
23    Q.   Yes.
24    A.   Yes, yes.
25    Q.   And do you recall Dr. Sobel saying that there

## 382

1  was no evidence that those cases were nonarteritic
2  anterior ischemic optic neuropathy?
3      A.  I recall that she said that.
4      Q.  And you haven't looked at the cases themselves,
5  have you?
6      A.  No.  I just recall that they found two later.
7      Q.  Last set of questions, Doctor.
8          Logically a cause must precede an event in
9  order for there to be an effect, correct?
10         MR. BECNEL:  Objection.  Cause?
11         JUDGE BORG:  What's the objection?
12         MR. BECNEL:  The objection is it makes no
13  sense.
14         JUDGE BORG:  Well, I -- do you understand the
15  question, Doctor, and are you able to answer it?
16         THE WITNESS:  I was just focusing on the last
17  paragraph of this paper, where they talk about the
18  incidences with -- they say when they -- the
19  analysis of both the clinical trial data and the --
20         THE REPORTER:  Excuse me.  Slow down.
21         JUDGE BORG:  Well, yeah.  Poor court reporter.
22  Can I have the question read back, please?
23         MS. LESKIN:  "Logically a cause must precede an
24  event in order for there to be an effect, correct?"
25         JUDGE BORG:  Okay.  Are you able to answer that

## 383

1  question?
2          THE WITNESS:  A cause must precede an effect
3  for there to -- a cause must precede an event for
4  there be an effect?
5          MS. LESKIN:  I'll rephrase it.
6          MR. BECNEL:  That's what I said, it --
7  BY MS. LESKIN:
8      Q.  In order for --
9          JUDGE BORG:  Well, that's why I asked the
10  witness if she could --
11  BY MS.. LESKIN:
12     Q.  Doctor, if you could put the document down so
13  you can concentrate on my question.
14         THE REPORTER:  One at a time.  I can't get you
15  all.  I can't get you all.
16         MR.. BECNEL:  You get ten minutes, and then we
17  violate the rule.
18         JUDGE BORG:  Well, we're getting a lot of
19  objections here, too, and --
20         MR. BECNEL:  But I didn't make up the question.
21         JUDGE BORG:  It's over -- it's overruled.  Get
22  the last question in, Ms. Leskin.
23  BY MS. LESKIN:
24     Q.  Logically the ingestion of a drug must precede
25  the -- an event in order for that drug to have caused

## 384

1  the event, correct?
2      A.  The ingestion of a drug must precede the event
3  in order for there to have caused the event?  Did you
4  use the word "cause"?
5      Q.  Yes.
6      A.  Well, I don't know if I worry about -- I don't
7  know if I agree with cause, but the -- the drug must be
8  ingested -- yes, I will agree that they must use the
9  drug.
10     Q.  Well --
11     A.  I'm not going to agree that --
12     Q.  If we're going to --
13     A.  -- it indicates cause.
14     Q.  That wasn't my question.  Let me rephrase,
15  then.
16         MR. BECNEL:  Objection.
17         JUDGE BORG:  Yeah, it's noted and it's
18  overruled.  Let's get the question asked and
19  answered.
20  BY MS. LESKIN:
21     Q.  If the allegation is that the drug causes an
22  event, the drug must have been taken before the event
23  occurred, correct?
24     A.  Yes.
25     Q.  An event that occurs before the drug is taken

## 385

1  could not have been caused by the drug, correct?
2      A.  I think that's logical.
3          JUDGE BORG:  Okay..  We're done.
4          MR. ALTMAN:  I just have two very quick.
5          JUDGE BORG:  Okay, Mr. Altman.
6          MR. ALTMAN:  Two very quick questions.
7          RECROSS EXAMINATION
8  BY MR.. ALTMAN:
9      Q.  We were talking about Dr. Osterloh's submission
10  to the -- submission to the EMEA, correct?
11     A.  Yes.
12     Q.  A little bit earlier.
13         That -- that submission was prepared by Pfizer,
14  correct?
15     A.  Correct.
16     Q.  Without suggesting that Pfizer did something
17  deceitful, is it possible that Dr. Osterloh could have
18  made a mistake in how he assembled the information to
19  present to the EMEA?
20         MS. LESKIN:  Objection; calls for speculation.
21         JUDGE BORG:  Overruled.
22         THE WITNESS:  This is possible.
23  BY MR. ALTMAN:
24     Q.  And the EMEA in rendering their opinion relied
25  upon the accuracy of that document when they rendered

**CONFIDENTIAL**

---

386

1  their opinion?
2    A.  Correct.
3    Q.  Please pull Exhibit 28 for a second, and go to
4  the second page.
5      Would you please read starting at the top and
6  through the -- the italicized --
7    A.  Uh-huh.
8    Q.  -- sentence.
9    A.  "It might also be possible to include a
10  statement comparable to the statement concerning
11  cardiovascular adverse events as these issues concerning
12  population at risk and background incidences are quite
13  comparable.  A statement example, anterior ischemic
14  optic neuropathy has been reported post-marketing in
15  temporal association with the use of Viagra, could be
16  added to the SPC."
17    Q.  And the SPC is the equivalent of the --
18    A.  Label.
19    Q.  -- U.S. label --
20    A.  Uh-huh.
21    Q.  -- correct?
22      So the EMEA didn't say this is wrong, correct?
23    A..  No, no.  They would have -- they would have
24  agreed to that statement being added if Pfizer had chose
25  to add it.

---

387

1      MR. ALTMAN:  Thank you.  I pass.
2      MR. OVERHOLTZ:  Okay.  I have a couple
3  questions, Dr. Blume.
4      RECROSS EXAMINATION
5  BY MR. OVERHOLTZ:
6    Q.  In looking at the Gorkin study --
7    A.  Right.
8    Q.  -- that Ms. Leskin was showing you, can you
9  look at the summary section at the top of the first
10  page?
11    A.  Yes.
12    Q.  Can you -- can you look at the summary section
13  of that document at the top of the page --
14    A.  Yes.
15    Q.  -- of the Gorkin study?
16      And there is a sentence there at the bottom of
17  the first paragraph that says "based on clinical trial
18  data."
19    A.  I see it.
20    Q.  Okay.  Can you read that?
21    A.  "Based on clinical trial data in more than
22  13,000 men and on more than 35,000 patient-years of --
23  of observation in epidemiologic studies, we estimated an
24  incidence of 2.8 cases of NAION per 100,000
25  patient-years of sildenafil exposure."

---

388

1    Q.  And if you could turn with me to the -- it's
2  patient 502.  It's, like, the third page of the study,
3  under the discussion section.
4    A.  Yes.
5    Q.  If you can read with me the sentence at the
6  very bottom of the page, beginning with "rather."  Right
7  there, "Rather, rather than supporting an increased
8  incidence of..."
9    A.  Oh.  "Rather than supporting an increase
10  incidence of NAION associated with sildenafil use, this
11  analysis of clinical trial and epidemiologic data
12  representing approximately 52 -- 52,000 patient-years of
13  observation indicates that the NAION incidence in men
14  with ED who took sildenafil worldwide is consistent with
15  the range of estimated NAION incidence in the general
16  U.S. population."
17    Q.  Do you believe it was appropriate to combine
18  the years of observation from the clinical trial and the
19  epidemiological data from the IMHS and PEM that
20  represent 52,000 patient years of observation to
21  indicate that there was the -- the -- the rate --
22  incidence rate of NAION was similar to background rate?
23    A.  No, and not in the summary.
24      MS. LESKIN:  Objection.
25      THE WITNESS:  2.8 cases per 100,000

---

389

1  patient-years.
2  BY MR. OVERHOLTZ:
3    Q.  Okay.  And do you know in the clinical trials
4  there were -- how many clinical trials were indicated in
5  the Gorkin study?  Is it 103?
6    A.  103..
7    Q.  Okay.  Do you know in each of those clinical
8  trials if the frequency of exposure to Viagra was the
9  same for all of the patients in those clinical trials?
10    A.  Are you talking about per -- per day?
11    Q.  Yes.
12    A.  Yes, one per day.
13    Q.  No.  But do you know that everybody in the
14  clinical trials took the pill every single day?
15    A.  No.
16    Q.  Same frequency?
17    A.  No.
18    Q.  Do you know if the -- the authors from Pfizer
19  who published this study adjusted for the different
20  frequency of exposure rates within the 103 different
21  clinical trials?
22    A.  Oh, if they did, I have not seen that.
23    Q.  Okay.  And do you know if they did any type of
24  adjustment related to the frequency of exposure to the
25  drug in the PEM data?

---

98  (Pages 386 to 389)

**CONFIDENTIAL**

---

**390**

1  A. No. They didn't.
2  Q. Would it have been appropriate to have done
3  such an adjustment?
4  A. Yeah -- well, we now -- yes, of course. And
5  FDA has affirmed that to them.
6  MR. OVERHOLTZ: Okay. Thank you. That's all
7  we have.
8  THE VIDEOGRAPHER: We're off the video record.
9  THEREUPON, the deposition of CHERYL BLUME,
10  Ph.D., taken at the instance of the Defendant Pfizer
11  Inc., was concluded at 7:21 p.m.

---

**391**

CERTIFICATE OF DEPONENT

I have read the foregoing transcript of
my deposition and except for any corrections or
changes noted on the errata sheet, I hereby
subscribe to the transcript as an accurate record
of the statements made by me.

_____
CHERYL BLUME, Ph.D.

SUBSCRIBED AND SWORN before and to me
this _____ day of _____, 20___.

_____
NOTARY PUBLIC

My Commission expires:

---

**392**

ERRATA SHEET
VERITEXT REPORTING COMPANY
1350 BROADWAY
NEW YORK, NEW YORK 10018
212-279-9424
CASE: VIAGRA PRODUCTS LIABILITY LITIGATION
DEPOSITION DATE: FEBRUARY 12, 2009
DEPONENT: CHERYL BLUME, Ph.D.
PAGE LINE(S)  CHANGE        REASON

CHERYL BLUME, Ph.D.

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ___ DAY OF _____, 20__.

(NOTARY PUBLIC)     MY COMMISSION EXPIRES:

---

**393**

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA
COUNTY OF SARASOTA

I, the undersigned authority, hereby certify
that the witness named herein personally appeared before
me and was duly sworn on February 12, 2009.
WITNESS my hand and official seal this 23rd day
of February, 2009.

_____
DONNA L. PETERSON, RDR, CRR
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION NO. DD668780
EXPIRES: 8-7-11

VERITEXT REPORTING COMPANY
www.veritext.com
(212) 279-9424     (212) 490-3430

CONFIDENTIAL

394

1           REPORTER'S DEPOSITION CERTIFICATE
2
3    STATE OF FLORIDA
4    COUNTY OF SARASOTA
5
6           I, Donna L. Peterson, Registered Diplomate
7    Reporter, Certified Realtime Reporter, and Notary Public
8    in and for the State of Florida at large, hereby certify
9    that the witness appeared before me for the taking of
10   the foregoing deposition, and that I was authorized to
11   and did stenographically and electronically report the
12   deposition, and that the transcript is a true and
13   complete record of my stenographic notes and recordings
14   thereof.
15          I FURTHER CERTIFY that I am neither an
16   attorney, nor counsel for the parties to this cause, nor
17   a relative or employee of any attorney or party
18   connected with this litigation, nor am I financially
19   interested in the outcome of this action.
20          DATED THIS 23rd of February, 2009, at Sarasota,
21   Sarasota County, Florida.
22
23

24          DONNA L. PETERSON, RDR, CRR
25