# DEPOSITION AND INDEX

## OF

# ANDREW LEE, M.D.

## MARTIN v PFIZER

MDL Case No. 1724
Case No. 06-cv-1064 (PAM)

ORIGINAL

Tuesday, January 13, 2009

Krista K. Irish, CSR, RPR, RMR
IRISH REPORTING, INC.
305 - 10th Avenue
Hiawatha, IA  52233
**319-393-5050**
E-mail - kirish@irishreporting.com

ORIGINAL

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In Re:                          )
                                )   MDL Case No. 1724
Viagra Products Liability       )
Litigation                      )
                                )
------------------------------)
Richard Martin,                 )
                                )
         Plaintiff,             )
                                )
    vs.                         )   Case No. 06-cv-1064(PAM)
                                )
Pfizer, Inc.,                   )
                                )
         Defendant.             )


         VIDEOTAPED DEPOSITION OF ANDREW LEE, M.D.,
taken on Tuesday, January 13, 2008, commencing
at 1:05 p.m., at Hotel Vetro, 201 South Linn
Street, Iowa City, Iowa, before Krista K. Irish,
Certified Shorthand Reporter of the State of
Iowa.


                Krista K. Irish, CSR, RPR, RMR
                   IRISH REPORTING, INC.
                    305 - 10th Avenue
                    Hiawatha, IA  52233
                     (319) 393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 2

1       APPEARANCES:
2 J. Jason Richards and Neil D. Overholtz,
    Appearing Telephonically, of Aylstock, Witkin,
3     Kreis & Overholtz, P.L.L.C., Attorneys at Law,
    803 North Palafox Street, Pensacola, Florida
4     32501, Attorneys for the Plaintiff.
    Daniel E. Becnel, Junior, of the Becnel Law
5     Firm, L.L.C., Attorneys at Law,
    P. O. Drawer H, 106 West 7th Street, Reserve,
6     Louisiana 70084, Attorney Appearing
    Telephonically for the Plaintiff.
7 Lori B. Leskin and Mark D. Spatz, of
    Kaye Scholer, L.L.P., Attorneys at Law,
8     425 Park Avenue, New York, New York
    10022-3598, Attorneys for the Defendant.
9
10 John W. Borg, District Court Judge, Retired,
    6612 Limerick Drive, Edina, Minnesota 55439,
11     Special Master.
12 ALSO PRESENT: Mark DeMeulenaere, videographer
13
14
15
16
17        INDEX
18 WITNESS   EXAMINATION     PAGE
19 Andrew Lee, M.D.  D(By Ms. Leskin)   7
         C(By Mr. Richards)  146
20         RD(By Ms. Leskin)  170
         RC(By Mr. Richards)  177
21         FRD(By Ms. Leskin)  180
22
23
24
25

## Page 3

1       EXHIBITS
2 NUMBER   EXHIBIT        M  I
3   1   Curriculum Vitae,     6  7
        Revised 11-17-08
4
5   2   Subpoena in a Civil Case,   28  28
        12-24-08
6   3   Hansen Letter of 10-24-08   34  34
        to Lee
7
8   4   Lee Letter of 10-29-08   34  34
        to Hansen; Receipt Attached
9   5   Lee Letter of 11-12-08   34  34
        to Overholtz
10
11   6   Expert Report of Andrew Go  44  44
        Lee, M.D., 12-1-08
12   7   Lee Deposition List,   44  44
        1996 Through 2008
13
14   8   Lee Letter of 10-29-08   48  48
        to Hansen
15   9   Neuroophthalmology Article,  63  63
        Prognosis of Neurological
16       Disorders, Second Edition,
        Chapter 7
17
18  10   The Fellow Eye in NAION:  64  65
        Report From the Ischemic
19       Optic Neuropathy Decompression
        Trial Follow-up Study
20       Article
21  11   Erectile Dysfunction Drugs  78  78
        and Nonarteritic Anterior
22       Ischemic Optic Neuropathy
        Article
23  12   Alert for Healthcare   89  89
        Professionals Sildenafil
24       (Marketed as Viagra)
        Article
25

## Page 4

1     E X H I B I T S (Cont'd.)
2 NUMBER   EXHIBIT       M  I
3  13   The Sally Letson Foundation  93  93
        and the University of
4       Ottawa, Department of
        Ophthalmology, 2006
5       Symposium, Neuroophthalmology
        Update, DVD set
6
7  14   The Sally Letson Foundation  93  93
        and the University of
8       Ottawa, Department of
        Ophthalmology, 2006
9       Symposium, Neuroophthalmology
        Update, Paper Copy
10  15   Leskin E-mail of 1-6-09 to  96  96
        Overholtz, Becnel, Hopper
11
12  16   The Sally Letson Symposium:  99  99
        Neuroophthalmology Update,
        Meeting Report, 9/14-16/06
13
14  17   Ferrera Medical Records   124  124
15
  18   Nichols Medical Records   127  127
16
17  19   McEllistrem Medical Records  130  130
18
19
20
21
22
23
24
25

## Page 5

1       P R O C E E D I N G S
2     THE VIDEOGRAPHER: My name is
3 Mark DeMeulenaere of Veritext. The date today is
4 January 13th, 2009, and the time is approximately
5 1:05 p.m. The deposition is being held in the office
6 of Hotel Vetro boardroom located at Linn Street,
7 Iowa City, Iowa. The caption of this case is
8 Richard Martin, plaintiff, versus Pfizer, Inc.,
9 defendant, in the Viagra products liability
10 litigation. The name of the witness is Dr. Andrew
11 Lee. At this time the attorneys will identify
12 themselves and the parties they represent, after
13 which our court reporter, Krista Irish of Veritext,
14 will swear in the witness, and we can proceed.
15     MR. SPATZ: Mark Spatz for Pfizer.
16     MS. LESKIN: Lori Leskin, Pfizer.
17     MR. RICHARDS: Jason Richards for
18 Mr. Martin.
19     MR. BECNEL: Daniel Becnel for the
20 plaintiffs' committee.
21     MR. OVERHOLTZ: Neil Overholtz for the
22 plaintiff.
23     JUDGE BORG: John Borg, special master.
24     Ms. Court Reporter, would you swear the
25 witness, please.

2 (Pages 2 to 5)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

## Page 6

1    (The witness was duly sworn at this time.)
2    JUDGE BORG: Dr. Lee, have you been deposed
3    before?
4    THE WITNESS: Yes.
5    JUDGE BORG: Okay. If a question is put to
6    you, and you don't understand it, you can go ahead
7    and say that, and whoever's examining will do their
8    best to make it clearer for you. If there is someone
9    who says objection, please don't answer the question
10   until I tell you whether or not you can, and if you
11   need any breaks, let us know. All right.
12   THE WITNESS: Thank you.
13   JUDGE BORG: Ms. Leskin, you may proceed.
14   MS. LESKIN: Thank you, judge.
15   (Lee Exhibit 1 was marked for
16   identification by Attorney Leskin.)
17
18
19
20
21
22
23
24
25

## Page 7

1    ANDREW LEE, M.D., was called as a witness
2    and, being first duly sworn, testified as follows:
3    DIRECT EXAMINATION
4    BY MS. LESKIN:
5    Q. Dr. Lee, I'm going to hand you what we've
6    marked as Lee Exhibit 1 (indicating), and this is
7    what we received from plaintiff's counsel
8    representing to be your current curriculum vitae.
9    Is this, in fact, a true and correct copy of your
10   current curriculum vitae?
11   A. Yes.
12   Q. If you'll look at the upper left-hand
13   corner, it says last revision was November 17th,
14   2008?
15   A. Yes.
16   Q. Have you made any changes to your CV since
17   November 17th, 2008?
18   A. Yes.
19   Q. Okay. What else has been added to your CV
20   since that time?
21   A. I presented at two additional meetings
22   and —
23   Q. And what meetings?
24   A. The Columbia University Grand Rounds in
25   New York City, and Current Concepts in Atlantic City,

## Page 8

1    and I've published a few more papers since this.
2    Q. Okay. Let's take those one at a time.
3    You said you presented at Columbia University
4    Grand Rounds?
5    A. Yes.
6    Q. When was that?
7    A. Just this past week.
8    Q. And was there a particular topic you
9    presented on?
10   A. Yes, neuroimaging studies and emergency
11   cases in neuroophthalmology.
12   Q. Were there any written materials or
13   presentation or PowerPoint slides or articles that
14   went along with that presentation?
15   A. No.
16   Q. You also said you presented at
17   Current Concepts in Atlantic City, New Jersey?
18   A. Yes.
19   Q. And when was that presentation?
20   A. On Saturday.
21   Q. And what was the topic of your presentation
22   at that meeting?
23   A. Infectious optic disk edema, and ten easy
24   mistakes to avoid in neuroophthalmology.
25   Q. And were there any written materials that

## Page 9

1    went along with that presentation?
2    A. No.
3    Q. Was there a PowerPoint slide you used —
4    PowerPoint slides you used?
5    A. Yes.
6    Q. Okay. And do you have copies of those
7    presentations?
8    A. Not on me.
9    Q. Okay. Did either the presentation at
10   Grand Rounds or the presentation at Current Concepts
11   involve Viagra?
12   A. No.
13   Q. Did it involve arteritic ischemic optic
14   neuropathy?
15   A. Yes.
16   Q. And did it involve causes of nonarteritic
17   ischemic optic neuropathy?
18   A. No.
19   Q. You also said you've published additional
20   papers since November 17th, 2008. What papers have
21   you published since then?
22   A. Some chapters and books and some monographs
23   were submitted, but nothing related to ischemic optic
24   neuropathy or Viagra.
25   Q. What were your book chapters about?

446b3b6a-95f2-499b-b993-55a9e16f1a8e

Page 10

1    A.  General neuroophthalmology topics.
2    Q.  And which textbooks -- or books, I should
3  say?
4    A.  One is an online guide called the
5  Hyperguide.  The other is a textbook that we're
6  writing on geriatric ophthalmology.
7    Q.  And was the subject of nonarteritic
8  ischemic optic neuropathy discussed in either of
9  those chapters?
10    A.  Yes.
11    Q.  And is Viagra mentioned in either of those
12  chapters?
13    A.  Not Viagra, no.
14    Q.  Are any of the PDE-5 inhibitors mentioned
15  in either of those chapters?
16    A.  No.
17    Q.  Are causes of nonarteritic ischemic optic
18  neuropathy included in those chapters?
19    A.  No.  It's just very general information.
20    Q.  And I keep saying nonarteritic anterior
21  ischemic optic neuropathy.  If I abbreviate that as
22  N A I O N or NAION, will you understand what I'm
23  referring to?
24    A.  Yes.
25    Q.  Okay.  Good, because I think that will make

Page 11

1  all of us much happier, including the court reporter.
2  Does the CV that we've marked as Exhibit 1 as
3  modified -- You can hold on to that.  Does the CV
4  that we've identified as Exhibit 1 with the addendums
5  we've just identified accurately reflect your
6  education and training?
7    A.  Yes.
8    Q.  Does it accurately reflect your employment
9  history?
10    A.  Yes.
11    Q.  And does it accurately reflect your medical
12  training?
13    A.  Yes.
14    Q.  And your medical appointments?
15    A.  Yes.
16    Q.  Does it accurately reflect your
17  publications?
18    A.  Yes.
19    Q.  Do you currently practice in terms of
20  seeing patients?
21    A.  Yes.
22    Q.  Okay.  And you practice as a
23  neuroophthalmologist, is that correct?
24    A.  Yes.
25    Q.  And you're board certified as an

Page 12

1  ophthalmologist?
2    A.  Yes.
3    Q.  How often do you -- Strike that.  How many
4  patients do you see in a given year would you
5  estimate?
6    A.  Three thousand.
7    Q.  And those are all through the
8  University of Iowa?
9    A.  Yes.
10    Q.  And how many of those approximately
11  three thousand patients have nonarteritic anterior
12  ischemic optic neuropathy?
13    A.  Maybe two or three hundred.
14    Q.  And of those two or three hundred patients
15  with NAION, how many of them have you personally
16  diagnosed with NAION?
17    A.  We either make the primary diagnosis or
18  provide a second opinion confirming that diagnosis.
19    Q.  And how many new cases of NAION do you
20  estimate you see in a given year?
21    A.  Probably fifty to a hundred.
22    Q.  Now, you've been at Iowa since about 2000,
23  correct?  Do I remember -- Did I read that correctly?
24    A.  Yes.
25    Q.  And before that you were at Baylor, right?

Page 13

1    A.  Yes.
2    Q.  And has the nature of your practice changed
3  since you've come to Iowa compared to what you were
4  doing at Baylor?
5    A.  No.
6    Q.  And has the number of patients you've seen
7  changed?
8    A.  A little less.
9    Q.  Less patients here?
10    A.  Yes.
11    Q.  And would the number of patients with NAION
12  that you've seen changed?
13    A.  No.
14    Q.  Do you teach?
15    A.  Yes.
16    Q.  What courses do you teach?
17    A.  We teach our residents and the medical
18  students.  They rotate through, so there's not really
19  a course.  And then I do national courses like I just
20  explained to you at Columbia and Atlantic City for
21  practicing physicians and residents in other parts of
22  the country.
23    Q.  Do you have a course that you teach within
24  the medical school?
25    A.  No.

4 (Pages 10 to 13)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

### Page 14

1   Q. Do you conduct research?
2   A. Yes.
3   Q. What types of research projects do you have
4 currently ongoing?
5   A. A number of clinical research projects.
6 A clinical research project is one that involves the
7 use of patients and performing tests on them and then
8 making some analysis of the data, so we have a number
9 of projects. My area of interest is optic nerve, so
10 looking at optic nerve diseases.
11   Q. Do you currently have any studies going on
12 regarding NAION?
13   A. We've been asked to participate but have
14 not recruited for yet two studies to look at the
15 possible cause and effect relationship of these
16 agents with ischemic optic neuropathy.
17   Q. Okay. Now, you said you've been recruited.
18 Have you signed up to actually participate in those
19 studies?
20   A. We've gone to the preliminary meetings
21 where the study design is unfolded and the
22 recruitment is explained, et cetera, but we haven't
23 actually recruited any patients yet. It's not to
24 that level yet. The other study is just in the
25 question phase, would you be willing to participate,

### Page 15

1 and we send in survey data, how many patients have we
2 seen with the condition, how many do you see in a
3 year, similar to what you've already asked me.
4   Q. Okay. The first study that you just
5 mentioned, who's sponsoring that study?
6   A. One is Pfizer, and the other, I think, is
7 Bayer, but I — I can't remember exactly, because
8 that other one is just in the asking stage, and I
9 didn't look at — there were — no protocol was
10 distributed with it, so I'm not sure if they're —
11 it's just a public relations firm that is doing the
12 initial part, because no company logo was attached
13 to this; it was just a outsourced survey form.
14   Q. And was there — Let's talk about the
15 study sponsored by Pfizer first. What is the
16 hypothesis that study is investigating?
17   A. If there's a cause and effect relationship
18 that can be excluded from the use of this agent in
19 relationship to nonarteritic anterior ischemic optic
20 neuropathy.
21   Q. Now, when you say "this agent," you're
22 referring to PDE-5 inhibitors?
23   A. Yes.
24   Q. Okay. And who is the primary investigator
25 at the University of Iowa?

### Page 16

1   A. We don't — We're not to that level yet of
2 signing.
3   Q. Okay. Did you personally attend the
4 presentation by Pfizer?
5   A. Yes.
6   Q. Okay. And did you receive a copy of the
7 protocol?
8   A. We did look at the — what was — the
9 preliminary. I don't know if this would be the final
10 or not —
11   Q. Okay.
12   A. — because we did not sign up for the
13 study yet, for me, because I'm moving to Houston,
14 Texas.
15   Q. Oh, you're moving to Houston?
16   A. (Witness nods head.)
17   Q. When are you moving to Houston?
18   A. April 1st.
19   Q. Okay. And what institution are you going
20 to be affiliated with?
21   A. I'm going to be the chairman of
22 ophthalmology at the Methodist Hospital in the
23 Texas Medical Center, Houston, Texas.
24   Q. Do you know whether Methodist Hospital is
25 participating in this study?

### Page 17

1   A. Probably will not be participating, because
2 it's too late for us to catch up to the rest of the
3 people.
4   Q. Do you know whether there is anyone at the
5 University of Iowa who will be participating in this
6 study?
7   A. I don't know that, because my colleagues —
8 After we went to the preliminary meeting, they did
9 not tell me whether they were going to participate or
10 not.
11   Q. Okay. So as of today, you don't know one
12 way or the other whether the University of Iowa will,
13 in fact, participate in the Pfizer study, is that
14 fair?
15   A. I think it's unlikely that they will.
16   Q. Okay. And do you know why that's unlikely?
17   A. I think there have been questions about
18 the study design that have made a lot of
19 neuroophthalmologists changed their minds about
20 participating.
21   Q. And are these questions that you raised?
22   A. These were raised at the — both at the
23 presentation meeting and also have been circulated
24 on our Internet chat site.
25   Q. Is that the NANOS chat site?

5 (Pages 14 to 17)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 18

1    A. Yes.
2    Q. But sitting here today, you don't know one
3  way or the other whether they will, in fact, sign up,
4  is that fair?
5    A. I don't know one way or the other, but I
6  doubt it.
7    Q. Okay. Now, you also made reference to the
8  the protocol design circulated by Bayer --
9    A. I think that's the --
10   Q. -- or the study invitation?
11   A. Yeah, there's a study outsource company
12  that -- They did not provide the protocol.
13   Q. Okay. But your belief is that that is
14  being sponsored by Bayer?
15   A. I think so.
16   Q. Okay. And is that -- What is the
17  hypothesis of that study?
18   A. Same study, but different agents, I think.
19   Q. Okay. Have you had the opportunity to
20  review a preliminary protocol from the Bayer study?
21   A. No.
22   Q. Do you know whether -- how the design of
23  the Bayer study compares to the Pfizer study?
24   A. No.
25   Q. Do you know whether there have been any

Page 19

1  questions raised regarding the design of the Bayer
2  study?
3    A. No, because we didn't get to see the
4  protocol yet, so --
5    Q. Do you know whether the --
6  Methodist Hospital will be participating in the
7  Bayer study?
8    A. It would be unlikely that we would
9  participate.
10   Q. And why is that likely?
11   A. It's unlikely, because we --
12   Q. Oh, unlikely or likely?
13   A. Unlikely.
14   Q. Oh, Okay.
15   A. -- because we are starting a new
16  department, and I would just have started there
17  April 1st. By the time we caught up there would
18  be -- It's unlikely that we would have enough time
19  to catch up.
20   Q. And do you know whether any of your
21  colleagues at the University of Iowa will be
22  participating in the Bayer study?
23   A. I think it's unlikely that they will
24  participate.
25   Q. Okay. But you don't know one way or the

Page 20

1  other?
2    A. No.
3    Q. Other than those two studies, are you
4  aware of any other studies regarding NAION that are
5  currently undergoing at the University of Iowa?
6    A. Not related to --
7    Q. Not related to the Pfizer or Bayer study we
8  just discussed.
9    A. Yeah, there are many.
10   Q. Okay. Are there any studies going on that
11  relate to the causation of NAION?
12   A. No.
13   Q. Are there any studies going on in animals
14  regarding NAION?
15   A. Yes.
16   Q. Okay. And do those studies relate to the
17  causation of NAION?
18   A. Yes, some.
19   Q. Okay. And are you participating in those
20  studies?
21   A. No.
22   Q. Okay. Have you had input into the design
23  of those studies?
24   A. No.
25   Q. And the study -- the other studies

Page 21

1  regarding NAION that you've discussed, do you have --
2  are you personally involved in any of those studies?
3    A. Yes.
4    Q. Okay. What studies are you personally
5  involved in regarding NAION currently?
6    A. We look at photographs and also
7  measurements of nerve fiber layer with a machine
8  called optical coherence tomography, which is OCT.
9  Those are the predominant studies that are ongoing
10  with this entity, but they're not causality studies.
11   Q. And what is the purpose of those studies?
12   A. To look at predictive value of certain
13  parameters that we see in the patients to see if we
14  can predict who's going to lose vision or keep their
15  vision, how much vision they're going to lose, these
16  types of things.
17   Q. Have you done any studies of blood flow at
18  the University of Iowa?
19       MR. RICHARDS: Objection, form.
20       JUDGE BORG: Overruled.
21   A. I haven't done any blood flow studies
22  myself, but there have been blood flow studies done.
23   Q. At Iowa?
24   A. Yes.
25   Q. And have you done any studies that look at

6  (Pages 18 to 21)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 22

1  the different technologies available to measure
2  ocular blood flow?
3       A.  Have I done studies?
4       Q.  Yes.
5       A.  No.
6       Q.  Have you participated in any studies of
7  that?
8       A.  No.
9       Q.  Have you done any epidemiological studies
10  regarding the prevalence of NAION?
11       A.  No.
12       Q.  Have you done any epidemiological studies
13  to determine whether various agents can cause NAION?
14  I'm asking you personally.
15       A.  No.
16       Q.  Okay.  Have you personally been involved
17  in any studies of Viagra?
18       A.  No.
19       Q.  Have you personally been involved in any
20  studies of any of the PDE-5 inhibitors?
21       A.  No.
22       Q.  Now, you told me that you are board
23  certified in ophthalmology, right?
24       A.  Yes.
25       Q.  And you're a licensed to practice medicine

Page 23

1  here in Iowa, I assume, is that right?
2       A.  Yes.
3       Q.  Where else are you licensed to practice
4  medicine currently?
5       A.  Texas.
6       Q.  Anywhere else?
7       A.  No.
8       Q.  Now, you're not an expert in hypertension,
9  is that fair to say?
10       A.  I am not.
11       Q.  And you don't treat hypertension in your
12  patients, right?
13       A.  No.
14       Q.  And you don't diagnose hypertension in your
15  patients?
16       A.  We sometimes diagnose hypertension.
17       Q.  Do you personally diagnose hypertension?
18       A.  Yes.
19       Q.  Okay.  And how do you go about diagnosing
20  hypertension in your patients?
21       A.  A patient might have an eye finding that
22  is related to hypertension, but they don't know it,
23  we check their blood pressure, can make the
24  diagnosis, call the internist, they confirm the
25  diagnosis, they treat.

Page 24

1       Q.  Okay.  So if a patient comes in who you
2  find has hypertension, you would refer them to
3  someone else to determine the appropriate treatment
4  for that patient, correct?
5       A.  Yes.
6       Q.  And you don't advise other doctors how to
7  treat patients with hypertension, is that right?
8       A.  We don't advise them how to treat
9  hypertension, but we might advise them on ocular
10  side effects of treatments if we see them in their
11  patient.
12       Q.  You're not an expert in urology, right?
13       A.  I'm an expert in neuroophthalmology.  Some
14  of that has overlap with neurology, but I am not a
15  neurologist.
16       Q.  Let me -- You may not have heard my
17  question, or I may have not spoken clearly.  You're
18  not an expert in urology?
19       A.  Oh, urology.
20       Q.  Urology.
21       A.  I'm definitely not an expert in urology.
22       Q.  Okay.  And you don't treat erectile
23  dysfunction in your patients, correct?
24       A.  I do not treat erectile dysfunction.
25       Q.  And you don't diagnose patients with

Page 25

1  erectile dysfunction?
2       A.  We might make the diagnosis if they tell
3  us a history compatible, but we would refer that
4  patient.
5       Q.  To a urologist or an internist?
6       A.  Yes, whoever they have chosen to treat
7  with.
8       Q.  Someone outside the ophthalmology
9  department?
10       A.  Yes.
11       Q.  Okay.  And you've never prescribed a
12  treatment for erectile dysfunction to a patient,
13  have you?
14       A.  No.
15       Q.  And you've not discussed the options for
16  treatment for erectile dysfunction of patients,
17  have you?
18       A.  If they have ischemic optic neuropathy,
19  we might give our advice.
20       Q.  Okay.  You're not an expert in
21  epidemiology, are you?
22       A.  No.
23       Q.  And you're not an endocrinologist, right?
24       A.  No.
25       Q.  And you don't diagnose diabetes, correct?

7  (Pages 22 to 25)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 26

1    A. We sometimes diagnose diabetes, but we
2  would treat --
3    Q. Okay. Under what circumstances would you
4  diagnose diabetes?
5    A. We might see diabetes in the eye, diabetic
6  retinopathy. We would draw the red blood studies,
7  blood sugar or hemoglobin A1c, make the diagnosis,
8  refer for confirmation and treatment.
9    Q. Okay. But you wouldn't treat the patients
10  for diabetes?
11    A. We don't treat the diabetes.
12    Q. Now, have you ever worked for any
13  pharmaceutical company?
14    A. No.
15    Q. Have you ever worked under contract for a
16  pharmaceutical company?
17    A. No.
18    Q. Have you ever received grants from
19  pharmaceutical companies?
20    A. No.
21    MR. RICHARDS: Judge Borg, if I could
22  just clarify. She asked -- The last question have
23  you ever received grants from pharmaceutical
24  companies, is she referring to him personally or the
25  University of Iowa?

Page 27

1    Q. Is there a distinction between that in your
2  mind?
3    A. Yes, the University receives many study
4  grants --
5    Q. Okay.
6    A. -- and we might participate.
7    Q. Okay. Have you applied for grants from any
8  pharmaceutical company, you personally on behalf of
9  the University of Iowa?
10    A. I've been an investigator where I was not
11  the principal investigator of drug studies to look
12  at the ocular portions, but I have not been the
13  principal recipient of the grant. We just get paid
14  to do the exams and send them back.
15    Q. Okay. And that -- But that work is funded
16  by a grant from a pharmaceutical company?
17    A. Several of those are pharmaceutical
18  supported.
19    Q. And is the fact that some of your work is
20  funded by a grant from a pharmaceutical company,
21  does that fact affect how you go about doing your
22  examination?
23    A. No.
24    Q. Does that affect how you do your work?
25    A. No.

Page 28

1    Q. Does that affect any of the conclusions you
2  draw about your patient?
3    A. No.
4    Q. Does it effect any diagnosis you might
5  make?
6    A. No.
7    Q. Have you ever received any speaking fees
8  from any pharmaceutical company?
9    A. No.
10    (Lee Exhibit 2 was marked for
11  identification by Attorney Leskin.)
12    Q. I've handed you what we've marked as
13  Lee Exhibit 2 (indicating), and I know you have a --
14  I saw you have a copy that you brought with you,
15  which is a copy of the subpoena that was served on
16  Mr. Overholtz on your behalf in this litigation.
17  When did you first receive a copy of the subpoena?
18    A. I think just right before today's
19  scheduled, maybe two days before.
20    Q. This week?
21    A. Yes.
22    Q. And how did you receive that?
23    A. I believe it came by fax, but I'm not sure.
24  It just appeared in my outbox. My secretary opens
25  the mail, so I'm not sure if it was a fax or mail.

Page 29

1    Q. Okay. And if you look at the third page of
2  the document we've marked as Exhibit 2, you'll see
3  there's something called Attachment A.
4    A. (Witness complies.) Yes.
5    Q. Were you aware that the subpoena asked you
6  to bring certain documents with you?
7    A. I looked at it. I tried to bring
8  everything on here.
9    Q. Okay. Tell me what you did to comply with
10  the request in the subpoena.
11    A. The things I had I brought with me.
12    Q. Okay. And you've already identified for
13  us, I know, a copy of your prior litigation list that
14  we had received --
15    A. Yes.
16    Q. -- a copy of the subpoena --
17    A. Yes.
18    Q. -- a copy of your expert report in this
19  litigation --
20    A. Yes.
21    Q. -- a copy of an article you authored with
22  Ms. Newman -- with Dr. Newman --
23    A. Yes.
24    Q. -- correct? And now you have -- Is there
25  anything else from that pile in front (indicating) of

8 (Pages 26 to 29)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

**Page 30**

1 you that I missed?
2 A. No.
3 Q. I also note that you brought three letters
4 from Zimmerman Reed, correct?
5 A. Yes. Some were me to them.
6 Q. I'm sorry?
7 A. Some were --
8 Q. Oh, you're right. You're right. One
9 letter from Zimmerman Reed to you from Ms. Hansen
10 dated October 24th, 2008, enclosing records of
11 Richard Martin, correct?
12 A. Yes.
13 Q. And a check for $1100 as a retainer,
14 correct?
15 A. Yes.
16 Q. And then you brought with you a letter
17 dated October 29th, 2008, from you to Ms. Hansen at
18 Zimmerman Reed --
19 A. Yes.
20 Q. -- regarding the Martin versus Pfizer case.
21 Reviewing the records, this required three hours to
22 review the record and formulate an opinion and
23 includes the time to discuss the opinion with your
24 office. This consumed the two-hour retainer, and I
25 would be most obliged if you could send a fee check

**Page 31**

1 in the amount of $550, and then you have a copy of
2 the receipt, which I would assume indicates you,
3 in fact, received that additional $550, right?
4 A. Yes.
5 Q. Okay. And the third letter is dated
6 November 12th, 2008, again from you to Neil Overholtz
7 at Zimmerman Reed, indicating that you had reviewed
8 the depositions of Mr. Martin and Ms. Martin
9 requiring three hours to review the record and to
10 formulate an opinion and includes the time to discuss
11 the opinion with your office. If a check can be sent
12 in the amount of sixteen -- $1,650. Did you, in
13 fact, receive a check in that amount?
14 A. Normally we put the check receipt on
15 there --
16 Q. So there's no check receipt --
17 A. -- so it might still be floating around in
18 the office somewhere.
19 Q. Okay. So to your knowledge it's your
20 normal course that if -- when you receive a check
21 for payment, you attach it to your letter?
22 A. I attach the receipt.
23 Q. You attach the receipt to your letter?
24 A. Yes.
25 Q. So the fact that there is no receipt, does

**Page 32**

1 that indicate to you you have not yet been paid?
2 A. Or it's in the University mail system or on
3 my secretary's desk somewhere.
4 Q. The address that you've requested the check
5 be sent to is 205 Black Springs Circle, Iowa City,
6 Iowa. Is that your work address?
7 A. No.
8 Q. That's your home address?
9 A. Yes.
10 Q. So did you, in fact, receive a check?
11 A. I don't know. I have to go check.
12 Q. Okay. Have you sent any additional
13 invoices to Mr. Overholtz or anyone at Zimmerman Reed
14 since November 12th, 2008?
15 A. I don't think so.
16 Q. You also brought with you -- And we'll come
17 back to these letters (indicating). You also brought
18 with you it looks like two green hanging folders.
19 A. Yes.
20 Q. Can you identify what those are?
21 A. The records they sent and the depositions.
22 Q. Okay. Now, the records they sent were for
23 Mr. Martin?
24 A. Yes.
25 Q. Okay. And the depositions were of whom?

**Page 33**

1 A. Mr. and Mrs. Martin.
2 Q. Any other deposition transcripts besides
3 Mr. and Mrs. Martin's?
4 A. I don't think so.
5 Q. It looks like there are three clipped
6 things there.
7 A. I think one is a duplicate. Mrs. Martin
8 again.
9 Q. Okay. So you have two copies of
10 Mrs. Martin's and one copy of Mr. Martin's
11 deposition?
12 A. Yes.
13 Q. Did you receive any other deposition
14 transcripts from plaintiff's counsel?
15 A. Not that I know of.
16 Q. Okay. And the medical records from
17 Mr. Martin that you received, do you know which
18 treaters those included?
19 A. They're in this (indicating) thing if you
20 want to look at it.
21 Q. Okay. If I can take a look at that.
22 A. (Witness complies.)
23 Q. Now, I want to go back to the letters you
24 brought. Now, the first letter here -- Do you mind
25 if I mark these as exhibits, and we'll put stickers

9   (Pages 30 to 33)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 34

1    on the original; is that okay?
2         A.  That's fine.
3         Q.  Okay.  We'll make copies before you leave.
4         A.  Okay.
5         (Lee Exhibits 3, 4 and 5 were marked for
6    identification by Attorney Leskin.)
7         Q.  I'm going to mark as Exhibit 3 --
8    Lee Exhibit 3 the letter dated October 24th, 2008
9    (indicating); as Exhibit 4 the letter dated
10   October 29th, 2008, and the attached check receipt;
11   and as Lee Exhibit 5 your letter dated November 12th,
12   2008.  This just makes it easier for us to identify
13   it on the record.  Okay?  So starting with Exhibit 3,
14   this letter, as you can see, is dated October 24th,
15   2008.
16        A.  Uh-huh.
17        Q.  How long prior to receiving that letter
18   on or about October 24th, 2008, was the first time
19   you spoke with anyone from Zimmerman Reed or on
20   behalf of the plaintiff about this case?
21        A.  How long -- I'm sorry.
22        Q.  How long -- That letter is dated
23   October 24th, 2008, correct?
24        A.  Yes.
25        Q.  Do you know how long after October 24th,

Page 35

1    2008, you first received that letter?
2         A.  No.
3         Q.  Was it sometime around October 24th, 2008?
4         A.  Yes.
5         Q.  Okay.  How long before October 24th, 2008,
6    did you first speak to anyone representing
7    Mr. Martin?
8         A.  I don't know that.  I'm not even sure I
9    did.  Maybe someone called and said here's the
10   records, here's the issue, would you like to review
11   the records, something like that.  I can't remember
12   dates.
13        Q.  Okay.  So prior to receiving this letter
14   from Ms. Hansen, you don't recall any conversation
15   with Mr. Overholtz or Ms. Stacy Hauer?
16        A.  No, normally someone would call --
17        Q.  Okay.
18        A.  -- in advance and say this is what we have,
19   would you be interested in looking at the record --
20        Q.  Okay.
21        A.  -- but I can't tell you the date or who.
22        Q.  Okay.  Can you tell me approximately how
23   long it was?
24        A.  No.
25        Q.  Was it a matter of weeks; was it a matter

Page 36

1    of months?
2         A.  I don't know.
3         Q.  Was it in 2008?
4         A.  I would guess it was probably within weeks,
5    but I --
6         Q.  Okay.
7         A.  I don't know.
8         Q.  So to your best recollection it was
9    sometime in October 2008?
10        MR. RICHARDS:  Objection to form.  He said
11   he doesn't know.
12        A.  I don't know.  I'm sorry.
13        Q.  Okay.  Could it have been in January 2008?
14        MR. RICHARDS:  Objection to form.
15        Q.  I'm just trying to better understand
16   when --
17        A.  I would be just guessing, but, yeah, maybe.
18        Q.
19        A.  Sometime plus or minus two months.
20        Q.  Okay.  That's fair.
21        MR. OVERHOLTZ:  Boy, he's sitting there,
22   he's our expert, none of this stuff even matters, and
23   you're wasting your time.
24        MS. LESKIN:  Thank you.
25        MR. RICHARDS:  And just so you know, Neil,

Page 37

1    Judge Borg has stepped out of the room.  He just --
2         MS. LESKIN:  No, he's back in the room.
3         JUDGE BORG:  I'm back.
4         MR. RICHARDS:  He just came back, but he
5    didn't hear the objection.
6         MS. LESKIN:  Okay.  I didn't have a
7    question on the table, so there's no objection, just
8    a statement for the record that he made.
9         MR. RICHARDS:  Just so he knows.
10        MR. BECNEL:  I join in the objection.
11        MS. LESKIN:  If I can get a question out,
12   it would be very helpful.
13        MR. BECNEL:  Yeah, but you had one out, and
14   Neil objected, and now I object.
15        Q.  Dr. Lee, do you keep any notes of any of
16   the consults that you have from a litigation
17   standpoint?  So when lawyers call you, do you keep a
18   note or a record of the conversations you have with
19   them?
20        A.  No.
21        Q.  Do you know whether you spoke with
22   Mr. Overholtz or Ms. Hauer in the first instance?
23        A.  No.
24        Q.  Do you recall the substance of the
25   conversation that you had with them?

10  (Pages 34 to 37)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

| Page 38 | Page 40 |
|---|---|
| 1   A. No. | 1   three hours and included time to discuss your |
| 2   Q. And so sometime in October of 2008 the | 2   opinion, again, with Mr. Overholtz or others in the |
| 3   records just showed up on your -- in your mailbox, | 3   office. Do you recall anything about the substance |
| 4   is that fair? | 4   of that conversation that's referenced in Exhibit 5? |
| 5   A. No. Normally they say we have a case, | 5   A. No, but I think similar to the opinion |
| 6   would you like to look at it, and I say send it or | 6   summary. |
| 7   not. | 7   Q. At what point in time were you asked to |
| 8   Q. Okay. | 8   take your opinion and prepare a report? |
| 9   A. But I don't recall -- | 9   A. After this date (indicating) sometime, but |
| 10  Q. But you don't recall any of the substance | 10  I don't know the exact date. |
| 11  of the conversation you had prior to receiving the | 11  Q. November 12th, 2008? |
| 12  records in October 2008? | 12  A. Yeah. |
| 13  A. That's correct. | 13  Q. Other than the deposition transcripts of |
| 14  Q. Do you know what records you received with | 14  Mr. and Mrs. Martin and the medical records that you |
| 15  this letter that we've marked as Exhibit 3? | 15  were provided, was there anything else about |
| 16  A. I think all of these (indicating) came with | 16  Mr. Martin that you reviewed? |
| 17  that, but I don't know for sure. | 17  A. No. |
| 18  Q. The medical records and the deposition | 18  Q. Was there anything else about Mr. Martin |
| 19  transcripts? | 19  that you discussed with the plaintiff's counsel? |
| 20  A. I think the depositions came later. | 20  A. I'm sure we talked about a lot of things |
| 21  Q. Okay. We marked as Exhibit 4 the letter | 21  about Mr. Martin, but I don't remember all the |
| 22  dated October 29th, and you said you spent three | 22  questions they asked. |
| 23  hours reviewing the record and formulating an | 23  Q. Okay. Did you talk about the deposition |
| 24  opinion, and it includes the time to discuss an | 24  testimony given by any of his treating physicians? |
| 25  opinion with your office, and that's the letter sent | 25  A. I don't think so. |

| Page 39 | Page 41 |
|---|---|
| 1   to Ms. Hansen, who is identified as a paralegal to | 1   Q. Did you talk about the reports given by any |
| 2   Mr. Overholtz, correct? | 2   other expert in this litigation? |
| 3   A. Yes. | 3   A. I don't think so. |
| 4   Q. Okay. What do you recall, if anything, of | 4   Q. Were you aware that there were other |
| 5   the conversation you had about the records you | 5   experts in this litigation? |
| 6   reviewed that you referred to in this letter? | 6   A. I was aware there were other experts, but I |
| 7   A. Those records that I reviewed? | 7   don't know who they are. |
| 8   Q. Whatever records you reviewed at the time | 8   Q. Were you told anything about the status of |
| 9   you sent this letter. | 9   the litigation? |
| 10  A. It's very similar to the opinions I gave as | 10  A. No. |
| 11  a summary. | 11  Q. How long did it take you to write the |
| 12  Q. Okay. And that was the report that you've | 12  opinion in this case? |
| 13  given in this case? | 13  A. Like actually type it up? |
| 14  A. Yes. | 14  Q. Yes. |
| 15  Q. Okay. At any time -- Now, did you talk to | 15  A. It probably took an hour and a half maybe. |
| 16  Mr. Overholtz or to someone else in the office? | 16  Q. Did anyone help you do that -- |
| 17  A. I don't remember. | 17  A. No. |
| 18  Q. Do you know if it was male or female? | 18  Q. -- or did you do it yourself? |
| 19  A. Sometimes it was Mr. Overholtz, but | 19  A. Just me. |
| 20  sometimes it was associates, but I can't remember who | 20  Q. And did you provide a draft to any of the |
| 21  they were. | 21  plaintiff's counsel before you signed it? |
| 22  Q. Did you ever speak to Mr. Richards before? | 22  A. I think I sent an e-mail nonheadered copy, |
| 23  A. I think so. | 23  yes. |
| 24  Q. Then Exhibit 5 references your review of | 24  Q. And did they give you any comments? |
| 25  the depositions of Mr. and Mrs. Martin that took | 25  A. I don't think so. |

11 (Pages 38 to 41)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

| Page 42 | Page 44 |
|---|---|
| 1   Q.  And to whom did you send that e-mail? | 1   Q.  How many drafts did you send to them by |
| 2   A.  The Overholtz office. | 2  e-mail before the final version? |
| 3   Q.  Did you keep a copy of what you sent? | 3   A.  I think just one. |
| 4   A.  No. | 4   Q.  And how long before the final version was |
| 5   Q.  If you wanted to check to see whether you | 5  sent did you send this to them? |
| 6  you still had a copy of the prior draft of your | 6   A.  I think right away.  They said good and |
| 7  report, where would you check? | 7  yes. |
| 8   A.  The deleted files.  I don't know. | 8       (Lee Exhibit 6 was marked for |
| 9   Q.  Did you make an effort to look for the | 9  identification by Attorney Leskin.) |
| 10  version you had e-mailed them? | 10   Q.  I'll show you what's marked as Exhibit 6 |
| 11   A.  No. | 11  a copy of the expert report that we received in this |
| 12   Q.  Were you aware that that had been requested | 12  case, and that is, in fact, your expert report, |
| 13  in the subpoena that you were served with? | 13  correct? |
| 14   A.  I didn't have it, so I can't remember what | 14   A.  Yes. |
| 15  I don't have. | 15   Q.  And that's your signature on the front |
| 16   Q.  Well, did you look to see if you had it? | 16  page? |
| 17   A.  I guess I could get the IT guy to go into | 17   A.  Yes. |
| 18  the deleted files, but normally I can't do that. | 18   Q.  And at the time you signed this front page |
| 19   Q.  Okay.  But do you have a specific | 19  was it attached to the report that you prepared? |
| 20  recollection of deleting that file? | 20   A.  Yes. |
| 21   A.  Normally it just overwrites the old one, | 21       (Lee Exhibit 7 was marked for |
| 22  you know, so you have to go back and get the -- | 22  identification by Attorney Leskin.) |
| 23   Q.  Well, but you indicated that you sent an | 23   Q.  I've marked as Exhibit 7 (indicating) a |
| 24  e-mail to plaintiff's counsel with an earlier version | 24  copy of the deposition list that we were provided, |
| 25  of your report. | 25  1996 through 2008, and you prepared this and gave |

| Page 43 | Page 45 |
|---|---|
| 1   A.  Yeah, they just overwrite on top of it. | 1  that to plaintiffs, correct? |
| 2   Q.  On top of the e-mail? | 2   A.  Yes. |
| 3   A.  No, on the -- I don't keep the version I | 3   Q.  Okay.  And that's a -- This appears to be |
| 4  sent to them.  They kept it. | 4  a complete copy of the list, correct? |
| 5   Q.  Did you keep the e-mail you sent to them? | 5   A.  Yes. |
| 6   A.  No. | 6   Q.  You don't have any dates listed on here. |
| 7   Q.  You delete out of your send folder?  I'm | 7  Does this go in chronological order with the most |
| 8  asking if you have the e-mail that you sent to | 8  recent first, or chronological order with the most |
| 9  plaintiff's counsel. | 9  recent last, or are they not in chronological order? |
| 10   A.  I didn't keep any of those. | 10   A.  I don't mean to be vague, but chronologic |
| 11   Q.  Okay.  Did you check to see in your outbox | 11  is not accurate, because they're overlapping, and |
| 12  as to whether any e-mails still existed? | 12  some are done, and some are active, some are -- |
| 13   A.  None of those exist. | 13   Q.  Okay.  So let me ask -- |
| 14   Q.  Did you check in your outbox to see if any | 14   A.  Like you mean from when I received the |
| 15  existed? | 15  record? |
| 16   A.  Yes, because our mailbox fills up quite | 16   Q.  Let's use that as our date, yes. |
| 17  quickly, so you have to delete all the sends and all | 17   A.  It's probably oldest to newest then. |
| 18  the deleted e-mails; otherwise, you can't use it. | 18   Q.  Okay.  So the most recent case other than |
| 19  It's a very small box. | 19  this one that you've worked on is Ramsey versus |
| 20   Q.  Did any of plaintiff's counsel give you | 20  Frank, is that correct? |
| 21  any comments on any -- on the drafts that you sent | 21   A.  Most recent would be, yeah, Ramsey versus |
| 22  them? | 22  Frank. |
| 23   A.  I think they said good. | 23   Q.  Okay.  And then this case comes after |
| 24   Q.  Did they ask you to make any changes? | 24  that -- |
| 25   A.  I don't think so. | 25   A.  Yes. |

12 (Pages 42 to 45)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

**Page 46**

1 Q. -- in time?
2 A. And after this I'll add this on here.
3 Q. You'll add what?
4 A. I'll add this on there.
5 Q. Okay. And have there been any other cases
6 that you've been retained in since this list was
7 prepared -- or provided to us?
8 A. That I've given deposition in?
9 Q. Yes.
10 A. No.
11 Q. Have there been any other cases that you've
12 been retained to prepare a report?
13 A. No. There are other cases we're at various
14 stages of looking at the records.
15 Q. Okay. How many of these cases that you
16 have listed in Exhibit 7 involve a product liability
17 case? Do you know what I mean by that?
18 A. Yes.
19 Q. Okay.
20 A. Not very many. Maybe one.
21 Q. Okay. Which one?
22 A. But I can't remember which one it is.
23 Maybe it has a company name on it, though.
24 Aventis Pasteur.
25 Q. What page? That's the Ken Lewis case?

**Page 47**

1 A. Yes.
2 Q. Is that -- The attorney is Ken Lewis?
3 A. Yes.
4 Q. And who did you testify for in that case,
5 which side?
6 A. I don't know.
7 Q. Do you know the product that was involved
8 in that case?
9 A. No.
10 Q. When was that case?
11 A. I don't know.
12 Q. Would you have any records that indicate
13 when that case was pending?
14 A. No. After the case is closed I destroy the
15 records.
16 Q. Do you have any records or any kind of
17 record that would indicate who Mr. Lewis was
18 representing in that case?
19 A. No. After the case is closed I destroy
20 everything.
21 Q. Okay. And sitting here today you don't
22 have a recollection one way -- which side you
23 testified on?
24 A. No.
25 Q. Do you remember the issue that was involved

**Page 48**

1 in that case?
2 A. No.
3 Q. Do you remember the injury that was
4 involved in that case?
5 A. I'm sure it was neuroophthalmologic
6 related, but I can't tell you what it was.
7 Q. Do you know what the allegation was in that
8 case?
9 A. No.
10 Q. Has your testimony ever been excluded by a
11 court?
12 A. No.
13 (Lee Exhibit 8 was marked for
14 identification by Attorney Leskin.)
15 Q. I'm going to hand you what we've marked as
16 Exhibit 8, which is a letter dated October 29th,
17 2008, purporting to be from you to Ms. Ann Hansen.
18 A. Yes.
19 Q. Did you, in fact, write this letter?
20 A. Yes, including the misspelling.
21 Q. Which misspelling?
22 A. The spell check made neuro into neuron.
23 Q. But this is a letter that you wrote and
24 you prepared, correct?
25 A. Yes.

**Page 49**

1 Q. And did you prepare it on or about
2 October 29th, 2008?
3 A. Yes.
4 Q. And what was the reason for preparing this
5 letter?
6 A. I think Mr. Overholtz's office asked us to
7 send this letter.
8 Q. Did they explain to you why they asked you
9 to send this letter?
10 A. No.
11 Q. As of October 29th, 2008, had you, in fact,
12 reached an opinion in this case?
13 A. Yes.
14 Q. And after October 29th, 2008, did you
15 review any other materials besides Mr. Martin's
16 medical records?
17 A. The depositions.
18 Q. And did that make any difference in your
19 opinion?
20 A. No.
21 Q. Are there any -- Is there anything else
22 that you relied upon in preparing your opinion in
23 this case?
24 A. No.
25 Q. Did you ever talk to Mr. Martin?

13 (Pages 46 to 49)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 50

1  A. No.
2  Q. Did you ever examine Mr. Martin?
3  A. No.
4  Q. Did you ever speak with Mrs. Martin?
5  A. No.
6  Q. And to be clear, you've never spoken with
7  any of the other expert witnesses in this case,
8  correct?
9  A. I have not.
10  Q. Do you know Dr. Heyreh?
11  A. Yes.
12  Q. Have you worked with Dr. Heyreh?
13  A. Yes.
14  Q. Okay. Have you spoken with Dr. Heyreh
15  about the Viagra litigation?
16  A. No.
17  Q. Are you aware that Dr. Heyreh was an expert
18  for plaintiffs in this litigation?
19  A. No.
20  Q. No one told you that?
21  A. No.
22  Q. Do you know Dr. Pomeranz; Howard Pomeranz?
23  A. Yes.
24  Q. Have you spoken to Dr. Howard Pomeranz?
25  A. About this?

Page 51

1  Q. Well -- Yes, about this.
2  A. No.
3  Q. Were you aware that Dr. Pomeranz was an
4  expert for plaintiffs in this litigation?
5  A. Yes, today.
6  Q. When did you learn that?
7  A. In the hallway.
8  Q. From whom?
9  A. The attorney (indicating).
10  Q. Mr. Richards?
11  A. Yes.
12  Q. And what were you told about Dr. Pomeranz's
13  role in this litigation?
14  A. I don't know. His name just came up,
15  but --
16  Q. Were you told that his opinion had been
17  excluded from this litigation?
18  A. I didn't know that.
19  Q. Have you ever spoken to Dr. Pomeranz about
20  Viagra?
21  A. Yes.
22  Q. Do you know Dr. Gerald McGwin?
23  A. No.
24  Q. Do you know Dr. Aruna?
25  A. No.

Page 52

1  Q. Do you know Dr. Williams?
2  A. No.
3  Q. Do you know Dr. Neal Sher?
4  A. Neal Sher I know --
5  Q. Okay.
6  A. -- but only peripherally. I don't know him
7  personally.
8  Q. Have you spoken to Dr. Sher about this
9  litigation?
10  A. No.
11  Q. Were you aware that he's an expert for the
12  plaintiffs in this litigation?
13  A. No.
14  Q. Do you know a Dr. Witt?
15  A. No.
16  Q. Do you know Dr. Cheryl Blume?
17  A. No.
18  Q. Had you ever worked with Mr. Overholtz
19  prior to this litigation?
20  A. No.
21  Q. Had you ever worked with anyone from the
22  Zimmerman Reed firm prior to this litigation?
23  A. I don't think so.
24  Q. Do you know how they came to contact you
25  for this litigation?

Page 53

1  A. No.
2  Q. Do you know Dr. Simmons Lessel?
3  A. Yes.
4  Q. Have you spoken to Dr. Lessel about this
5  litigation?
6  A. No.
7  Q. Were you aware that he was an expert for
8  Pfizer in this litigation?
9  A. No.
10  Q. Have you looked at his report that he gave
11  in this litigation?
12  A. No.
13  Q. Do you know Dr. Stephen Kimmel?
14  A. No.
15  Q. Do you know Dr. John Mulcahy?
16  A. No.
17  Q. Do you know Dr. Daniel Shames?
18  A. No.
19  Q. During any of the conversations you had
20  with Mr. Overholtz or anyone else from any of the
21  law firms representing plaintiff -- Mr. Martin --
22  representing plaintiff -- Let me strike that. Let me
23  start again. During any of the conversations you had
24  with any of plaintiff's lawyers in this case did you
25  talk about any plaintiff other than Mr. Martin?

14 (Pages 50 to 53)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 54

1    A. Yes.
2    Q. And who else did you talk about?
3    A. I can't remember the names.
4    Q. Okay. And what were you told about these
5  other plaintiffs?
6    A. They had similar allegations.
7    Q. Okay. Did the name Richard Stanley get
8  mentioned to you?
9    A. Yes.
10    Q. And what were you told about Mr. Stanley?
11    A. Similar allegation.
12    Q. Okay. And were you told anything about
13  Mr. Stanley's medical history?
14    A. Yes.
15    Q. What were you told?
16    A. I don't remember all the — because I
17  didn't have the whole thing to look at.
18    Q. Were you asked to write a report in
19  Mr. Stanley's case?
20    A. No.
21    Q. Were you asked to give an opinion in
22  Mr. Stanley's case?
23    A. Yes.
24    Q. Okay. And did you, in fact, give an
25  opinion in Mr. Stanley's case?

Page 55

1    A. Yes.
2    Q. And what opinion did you give in
3  Mr. Stanley's case?
4    A. The strength of the case was not as good as
5  the Martin case.
6    Q. Did you ever receive any medical records
7  from Mr. Stanley?
8    A. I think we had limited — limited
9  summary-type records.
10    Q. When you say "summary-type records," who
11  prepared the summary?
12    A. I don't know. I didn't have all the
13  records, just the ones they showed me.
14    Q. And when did they show those to you?
15    A. I don't remember the dates.
16    Q. Did you receive those in the mail the same
17  way you received these?
18    A. I believe so.
19    Q. And I apologize if I asked this question.
20  Do you know who prepared the summary?
21    A. No.
22    Q. Did anyone provide you a written summary of
23  records in this case?
24    A. No.
25    Q. Do you know whether there were any other

Page 56

1  plaintiffs that you specifically discussed with
2  plaintiff's counsel?
3    A. I don't think there were others. I think
4  maybe they had given various scenarios, but I don't
5  remember their names.
6    Q. Okay. Now, we talked a little bit about
7  nonarteritic ischemic optic neuropathy, which we've
8  been calling NAION for short. I want to talk just a
9  few minutes about what NAION is. Okay?
10    A. (Witness nods head.)
11    Q. Yes?
12    A. Yes.
13    Q. Okay. Now, it's a type of optic
14  neuropathy, right?
15    A. Yes.
16    Q. And that means that it's an injury to the
17  optic nerve?
18    A. Yes.
19    Q. And the A, the anterior, that means it's
20  the anterior portion of the optic nerve that's
21  affected, right?
22    A. Yes.
23    Q. And the anterior portion is the very front
24  of the optic nerve, correct?
25    A. Yes.

Page 57

1    Q. It's the part that's right behind the
2  eyeball, is that right?
3    A. It's where the eyeball and the eye nerve
4  meet (indicating).
5    Q. Okay. And that's referred to sometimes as
6  the optic nerve head?
7    A. Yes.
8    Q. And the reference to ischemia indicates
9  that it's an ischemic event, right, that occurs?
10    A. Yes.
11    Q. And that means a loss of blood to the optic
12  nerve, right?
13    A. It might not be loss of blood.
14    Q. Okay. What else might that mean?
15    A. The oxygen-carrying capacity might be
16  reduced.
17    Q. So it may not necessarily be because of a
18  loss of blood, but for some reason oxygen isn't
19  getting to the optic nerve head, right?
20    A. Yes.
21    Q. And, in fact, the cause of NAION is not
22  really known, is that fair?
23    A. It's ischemic, but the exact cause is not
24  known.
25    Q. There have been some hypotheses published,

15 (Pages 54 to 57)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

Page 58

1  right?
2     A.  That's correct.
3     Q.  Okay.  But no one has yet determined with
4  any specificity what the cause is?
5     A.  It's probably multifactorial, so it cannot
6  be assigned basically to one thing.
7     Q.  We have about eight minutes left on the
8  video before they have to change, so I just want to
9  ask you a couple more questions, and then we're going
10  to take a short break, change the video and come
11  right back.  Okay?
12     A.  All right.
13     Q.  Which vessels -- Which blood vessels feed
14  the anterior portion of the optic nerve?
15     A.  Well, the central retinal artery's on the
16  top, but the posterior ciliary arteries are the ones
17  that go to the back part of the anterior portion of
18  the nerve.
19     Q.  And those branch off of the ophthalmic
20  artery, correct?
21     A.  Yes.
22     Q.  Which branches off of the carotid artery?
23     A.  Yes.
24     Q.  Which is part of the main aorta coming up
25  from the heart, is that right?

Page 59

1     A.  Yes.
2        MS. LESKIN:  Okay.  We're going to take a
3  short break, and we'll change the videotape.
4        JUDGE BORG:  Mr. Videographer, what time?
5        THE VIDEOGRAPHER:  2:01.
6        (A brief recess was taken.)
7        JUDGE BORG:  Back on.  Time?
8        THE VIDEOGRAPHER:  2:06 p.m.
9     Q.  (By Ms. Leskin) Dr. Lee, before we took a
10  break we were talking about NAION, and I just want
11  to talk a little bit about the progression -- the
12  natural progression of NAION.  What's the first
13  indication that a patient will have that he has
14  NAION?
15     A.  Loss of vision.
16     Q.  How much time elapses between the insult to
17  the optic nerve and the patient noticing a loss of
18  vision?
19     A.  We don't know that, because we only see the
20  patients when they lose their vision.
21     Q.  Do you agree that for each case of NAION
22  there is some variation from patient to patient?
23     A.  Yes.
24     Q.  The ages vary, right?
25     A.  Yes.

Page 60

1     Q.  The location of the visual defect -- the
2  visual field defect changes?
3     A.  Not that it changes.  It's just variable
4  between patient.
5     Q.  That's what I meant.  It varies from
6  patient to patient, right?
7     A.  Yes.
8     Q.  And the progression within each patient
9  varies?
10     A.  Most don't progress, but some do.
11     Q.  And the extent of vision loss varies from
12  patient to patient?
13     A.  Yes.
14     Q.  And the final visual acuity is different,
15  right, from patient to patient -- it varies from
16  patient to patient?
17     A.  Yes.
18     Q.  Once NAION -- Once the insult occurs does
19  NAION come and go, or is it just always going to be
20  there now?
21     A.  It comes and stays.
22     Q.  And does the visual loss that the patient
23  experiences as a result of the NAION, does that come
24  and go, or does that either progress or get better,
25  or is it consistent -- That's a bad question.  Let me

Page 61

1  start that again.  When a patient has vision loss
2  from NAION, does the vision loss that they experience
3  come and go, or is it consistent?
4     A.  It comes and stays, but they might have
5  variability from day to day in their function.
6     Q.  But if a patient has a visual field defect,
7  will their vision suddenly become normal before it
8  gets worse?
9     A.  No, it won't be normal, but they'll have
10  better days and worse days, better days and worse
11  days.
12     Q.  And over what period of time does that
13  occur?
14     A.  Years.
15     Q.  In the acute stage, when the -- The optic
16  nerve is swollen, right?
17     A.  (Witness nods head.)
18     Q.  Yes?
19     A.  Yes.
20     Q.  For the court reporter's sake, you need to
21  answer verbally.  I know we have a video camera, but
22  she (indicating) needs to take down words.  We'll
23  just remind you if you forget.
24     A.  Thank you.
25     Q.  And during that acute stage can there be

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

**Page 62**

1  this coming and going of visual loss?
2      A. It's not that it comes and goes. It just
3  has fluctuation.
4      Q. If you look into a person's eye, can you
5  tell what caused their NAION?
6      A. No.
7      Q. If you look into a person's eye, can you
8  tell how the disease is going to progress in that
9  patient?
10     A. No.
11     Q. Now, the natural -- We talked about the
12 natural progression. You said it comes -- the vision
13 loss comes and stays, but sometimes over time it
14 may -- vision loss may improve, right?
15     A. It might improve.
16     Q. Or it might get worse?
17     A. Or it could get worse.
18     Q. And it's common that sometimes people who
19 have NAION in one eye will get NAION in the second
20 eye?
21     A. That's uncommon.
22     Q. Uncommon?
23     A. Uncommon.
24     Q. Okay.
25          MS. LESKIN: I apologize. I don't have a

**Page 63**

1  copy of this exhibit (indicating). If I find one,
2  I'll give it to you.
3          (Lee Exhibit 9 was marked for
4  identification by Attorney Leskin.)
5      Q. I'm going to mark as Exhibit 9 a chapter
6  called Neuroophthalmology, which is chapter 7 in a
7  book called Prognosis of Neurological Disorders.
8  You can show it to counsel.
9      A. (Witness complies.)
10     Q. And I'd like to direct your attention to
11 page 100 of the exhibit --
12          MR. RICHARDS: I still have the exhibit in
13 front of me.
14          MS. LESKIN: Okay.
15     Q. First let me direct your attention to
16 page 97 of the exhibit, which is actually page 97 of
17 the book; it's not 97 pages long. This is a book
18 chapter you wrote, correct --
19     A. Yes.
20     Q. -- with Paul Brazis, B R A Z I S?
21     A. Yes.
22     Q. And if you look at the page marked 100,
23 you'll see there's a section of the chapter called
24 nonarteritic anterior ischemic optic neuropathy,
25 right?

**Page 64**

1      A. Yes.
2      Q. Okay. And if you look at the left-hand
3  column of that book chapter --
4      A. Yes.
5      Q. -- of that page, I should say, the second
6  paragraph reads, although it is rare for nonarteritic
7  AION, N A, hyphen, A I O N, to recur in the same eye,
8  it may involve the fellow eye in 10.5 percent to
9  73 percent of cases, with most authors citing
10 contralateral eye involvement in 25 percent to
11 40 percent of cases. Did I read that correctly?
12     A. Yes.
13     Q. And that was based on the literature that
14 you reviewed in preparing this article, correct?
15     A. Yes, but this is not up to date.
16     Q. Okay. What is the more -- What do you rely
17 on for more up-to-date figures?
18     A. The ischemic optic neuropathy decompression
19 trial.
20     Q. Okay. And what is a number in that trial?
21     A. It's more like 12 to 14 percent, something
22 like that.
23          (Lee Exhibit 10 was marked for
24 identification by Attorney Leskin.)
25     Q. We're going to mark as Exhibit 10 --

**Page 65**

1  You can give that (indicating) to counsel, please.
2      A. (Witness complies.)
3          MR. BECNEL: Lori, did you attach that
4  chapter as an exhibit?
5          MS. LESKIN: Yes, Exhibit 9.
6          MR. BECNEL: Okay. I can't see what you're
7  doing, that's why.
8          MS. LESKIN: Understood.
9      Q. Exhibit 10 is an article by Nancy J.
10 Newman, et al, entitled The Fellow Eye in NAION:
11 Report From the Ischemic Optic Neuropathy
12 Decompression Trial Follow-Up Study. Is that the
13 article you're referring to, Doctor?
14     A. Yes.
15     Q. Okay. And if you look at page 320 of that
16 article --
17     A. (Witness complies.)
18     Q. -- in the right-hand column it says over
19 the course of the IONDT patient follow-up,
20 14.7 percent of patients at risk experience new
21 NAION in the fellow eye, right?
22     A. Yes.
23     Q. And is that the data that you were
24 referring to?
25     A. Yes.

17 (Pages 62 to 65)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 66

1    Q. Okay. So in this study at least almost
2   15 percent of the patients experienced NAION in the
3   other eye, right?
4    A. Yes. It's much lower than we used to
5   think.
6    Q. And the time frame that Dr. Newman followed
7   up her patients was a median of about -- a little
8   over a year, right?
9    A. I think this is a five-year data study.
10   Q. Well, if you look at page 320 again --
11   A. I --
12   Q. You're right. I misspoke. The time
13   interval between the original onset and new --
14   Strike that. The time interval in her study between
15   the original onset and the event in the second eye,
16   that median time interval was 1.2 years, right?
17   A. I think that's about right.
18      MR. RICHARDS: I'm going to ask if
19   Ms. Leskin is going to ask some questions relating
20   to the paper, that he be allowed the chance to at
21   least review the paper if he needs to to make sure
22   he's familiar with it so he can answer the questions.
23      MS. LESKIN: He can take as much time as
24   he wants. If he --
25   Q. If you can't answer my question, and you

## Page 67

1   need time to review the paper, please tell me, and
2   I'll be happy to give you as much time as you need.
3      JUDGE BORG: It doesn't sound like there's
4   an objection to the objection.
5      MS. LESKIN: Nope.
6      MR. RICHARDS: Do you need time to review
7   the paper?
8      THE WITNESS: Not for the questions she's
9   asked so far.
10   Q. And if you look at that right-hand column,
11   that first full paragraph, in fact, Dr. Newman,
12   et al, writes, the median interval between study
13   eye NAION, using enrollment date, and occurrence of
14   new NAION in the fellow eye was 1.2 years, right?
15   That's what she wrote?
16   A. (Witness nods head.)
17   Q. Yes?
18   A. Yes.
19      MR. RICHARDS: Are you looking at the
20   actual page, Dr. Lee?
21   Q. Page 320.
22   A. Which page are you on?
23   Q. I'm sorry. Page 320, the right-hand column
24   under the table, the first full paragraph. Do you
25   see where I read that from?

## Page 68

1    A. This one right here (indicating)?
2    Q. It says -- Right. The paragraph that
3   starts the median interval.
4    A. Yes, I think you read it -- what it says.
5    Q. Okay. And she reported that the median
6   interval between original NAION and new NAION was
7   1.2 years, correct?
8    A. Yes.
9    Q. And the range she reported was from sixteen
10   days up to six years, right?
11   A. Yes.
12   Q. And she goes on to report that nearly half
13   of the fellow eye NAION events, which she says is
14   twenty-two out of forty-eight of them, occurred in
15   the first year following the original event, right?
16   A. Yes.
17      MR. RICHARDS: I was just going to --
18   You're paraphrasing, right? You're not quoting
19   directly?
20      MS. LESKIN: That's correct. If he has any
21   problem with my paraphrasing, the doctor is more than
22   capable of checking that.
23   Q. But I paraphrased that correctly, right?
24   A. Yes.
25   Q. Now, to be clear, and please take your time

## Page 69

1   to read as much of the article as -- specifically
2   this section on risk of NAION in the fellow eye as
3   you need, but the numbers that Dr. Newman report are
4   the patients who develop NAION in the second eye
5   during the course of her follow-up, correct?
6    A. Yes.
7    Q. And she starts off this section saying
8   that study neuroophthalmologists determined at the
9   baseline examination that eighty patients, or
10   19 percent of total, had had an episode of NAION in
11   the fellow eye before enrollment, correct?
12   A. Yes.
13   Q. And concludes the section reporting that
14   30.6 percent of the patients based -- had -- Strike
15   that -- that 30.6 percent of the patients had NAION
16   in the second eye, correct?
17   A. In the second eye, but they had it
18   before -- some of them had it before they entered
19   the study.
20   Q. Correct. So that patients -- 30.6 percent
21   of the patients, though, had at some point in their
22   lives developed bilateral NAION, correct?
23   A. I'm sorry. You'll have to rephrase that.
24   Q. Sure. The NAION -- the ischemic optic
25   neuropathy decompression trial --

18 (Pages 66 to 69)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 70

1  A. Yes.
2  Q. -- was a study of patients with NAION,
3  correct?
4  A. Yes.
5  Q. And they enrolled patients based on a
6  diagnosis of new NAION in one of their eyes, correct?
7  A. That's correct.
8  Q. And then they followed them up?
9  A. Yes.
10  Q. Okay. Eighty of the patients that they
11  recruited into the study, they were recruited based
12  on a NAION event in their second eye?
13  A. That's correct.
14  Q. So that 19 percent of the patients involved
15  in the study entered the study with bilateral NAION,
16  correct?
17  A. That's correct.
18  Q. And of the patients who enrolled in the
19  study with one eye only affected, 14.7 percent of
20  those patients developed NAION during the course of
21  follow-up in the study, correct?
22  A. That's correct also.
23  Q. And when you look at the study population
24  as a whole, at the end of the study she reports that
25  a hundred and twenty-eight of the four hundred and

## Page 71

1  eighteen patients in the study, which is
2  30.6 percent, had NAION in both eyes by the end of
3  the study?
4  A. That's true, but some of them came with it,
5  so they're lumping two groups that have nothing to do
6  with each other.
7  Q. I'm just looking at the total number of
8  patients that had bilateral NAION by the end of the
9  study regardless of when the onset was, because
10  that --
11  A. No, that's not legitimate.
12  Q. Okay.
13  A. Because if you come into the study, and
14  you already had it, that doesn't -- You can't lump
15  that with the ones that developed it during the
16  study period, because they already had it when they
17  entered into the study, so there's apples and
18  oranges. You can't -- You can't lump them together.
19  Q. Okay.
20  A. They cannot be used for incidence number,
21  because they already came with it. Incidence is an
22  occurrence that occurs over a time period,
23  prospectively.
24  Q. Okay.
25  A. Anybody that comes into the study with the

## Page 72

1  event, they don't count, because they already had
2  their event before.
3  Q. But they had bilateral NAION.
4  A. Yes, but you can't combine these two
5  groups. Even though they have, it's interesting,
6  but it's not meaningful, because they already had it
7  when they came in, so you cannot say anything about
8  incidence with that number the way you phrased it,
9  bilateral. It's true, it is a fact that they had
10  bilateral, but so what. It has no bearing on the
11  incidence number.
12  Q. But Dr. Newman reports that of a hundred
13  and -- of four hundred and eighteen patients in the
14  the study, one hundred and twenty-eight of them had
15  bilateral NAION by the end of the study; that's what
16  she reports, correct?
17  A. No, not by the end of the study. Some of
18  them already had one eye beforehand. They don't
19  count for anything.
20  Q. One hundred and eighty-eight of the
21  four hundred and eighteen patients in the study had
22  bilateral NAION?
23  A. That's true.
24  Q. Okay.
25  A. That is a statement of fact, but --

## Page 73

1  Q. That's right. I've got --
2  A. -- it has no bearing on the incidence
3  number, so --
4  MS. LESKIN: Move to strike --
5  A. I just want to make sure you didn't combine
6  the apples and the oranges, because --
7  JUDGE BORG: Dr. Lee, the lawyers -- There
8  are certain rules here, and the lawyers can ask you
9  leading questions, and if you have an explanation --
10  THE WITNESS: Yes.
11  JUDGE BORG: -- the other attorney can ask
12  you some questions later on --
13  THE WITNESS: Okay.
14  JUDGE BORG: -- if they wish to pursue
15  that.
16  THE WITNESS: All right. I will be quiet
17  then.
18  JUDGE BORG: Thank you.
19  Q. And just to be clear, Dr. Lee, again,
20  Dr. Newman, et al, reported that of the four hundred
21  and eighteen patients, one hundred and twenty-eight
22  of them had bilateral NAION, correct?
23  A. That part I agree with.
24  Q. Now, NAION we called nonarteritic, correct?
25  A. Yes.

19 (Pages 70 to 73)

Page 74

1    Q.  And that's primarily to distinguish it
2  from a disorder known as arteritic anterior ischemic
3  optic neuropathy, right?
4    A.  Yes.
5    Q.  And arteritic anterior ischemic optic
6  neuropathy is an inflammatory condition, correct?
7    A.  Yes.
8    Q.  Also known as giant cell arteritis?
9    A.  Yes.
10    Q.  And the primary method by which you would
11  distinguish between arteritic and nonarteritic is
12  through a blood test, right, called ESR?
13    A.  Well, there are symptoms, there are blood
14  tests and a biopsy of the artery.
15    Q.  Okay.  And the symptoms would be pain in
16  the -- pain in the jaw, correct?
17    A.  Headache, pain in your jaw, pain in your
18  scalp (indicating).
19    Q.  Okay.  But there are patients with
20  arteritic who don't present with pain or headache,
21  correct?
22    A.  True.
23    Q.  And the blood test you do is called ESR,
24  right?
25    A.  Yes.

Page 75

1    Q.  And that stands for -- and I'm going to
2  mess up the pronunciation, and you'll correct me --
3  erythrocyte sedimentation rate?
4    A.  That's correct.
5    Q.  Okay.  And that basically measures the
6  blood rate at which the red blood cells fall in a
7  test tube in an hour?
8    A.  Yes.
9    Q.  And that's a nonspecific measurement of
10  inflammation in the system?
11    A.  Yes.
12    Q.  If an ESR is negative, is that conclusive
13  evidence against arteritic ischemic optic neuropathy?
14    A.  No.
15    Q.  You also mentioned a biopsy can be done.
16    A.  Yes.
17    Q.  And that's where they take a piece of the
18  vessel of the temporal artery to see if it shows
19  evidence of inflammation, correct?
20    A.  Yes.
21    Q.  If a patient is treated with steroids,
22  does that affect the findings on a biopsy?
23    A.  It might.
24    Q.  And how long does the patient need to have
25  been taking the steroids in order to affect the

Page 76

1  biopsy?
2    A.  Normally several weeks.
3    Q.  Would you agree with me that the natural
4  history of NAION has been difficult to define?
5    A.  No.  We have the natural history now.
6    Q.  And when you say "now" --
7    A.  Because the study was done to show the
8  natural history.
9    Q.  And some of the known risk factors for
10  NAION include age, correct?
11    A.  Yes.
12    Q.  Hypertension?
13    A.  Yes.
14    Q.  Diabetes?
15    A.  Yes.
16    Q.  High cholesterol?
17    A.  Yes.
18    Q.  Smoking?
19    A.  Yes.
20    Q.  Basically those are all conditions that
21  affect the vasculature, correct?
22    A.  Yes.
23    Q.  And if someone is a vasculopath, in other
24  words, they have an injury to their vascular system,
25  they're at risk for NAION, is that right?

Page 77

1    A.  Yes.
2    Q.  If a patient came into your office with a
3  diagnosis of NAION, and he was over age fifty with a
4  history of hypertension, increased blood sugars, what
5  would you say caused his NAION?
6        MR. RICHARDS:  Objection to form.
7        JUDGE BORG:  Overruled.
8        You may answer.
9    A.  There are predisposing conditions, and all
10  of the things you just mentioned are predisposing
11  conditions.
12    Q.  Okay.
13    A.  NAION is a multifactorial disease, so it
14  would be difficult to say one is more than the other.
15    Q.  Okay.  But if someone came into your office
16  with that history, and that was the entire history,
17  you wouldn't be surprised that that person developed
18  NAION, would you?
19        MR. BECNEL:  Objection.  The hypothetical
20  is not appropriate.  All of the factors are not
21  there.
22        JUDGE BORG:  Overruled.
23        Do you understand the question?
24    A.  I'm sorry.  You'll have to repeat it,
25  because --

### Page 78

1    Q.  Sure.  If a patient came into your office
2  over age fifty with a history of hypertension and a
3  history of elevated blood sugars, and that was the
4  entire relevant medical history, would you be
5  surprised that that patient had developed NAION?
6    A.  No.
7    Q.  And that's a pretty typical presentation
8  of NAION, right?
9    MR. RICHARDS:  Objection to form.  She's
10  saying that the typical presentation of NAION are --
11  is only the two examples she gave as a person who had
12  high blood sugar and high cholesterol, right?
13    JUDGE BORG:  Do you understand the
14  question, and are you able to answer it?
15    THE WITNESS:  Yes.
16    JUDGE BORG:  Overruled.
17    A.  Typically has vasculopathic risk factors.
18  The ones you mentioned are some, but not all of the
19  list of potential vasculopathic risk factors.
20    (Lee Exhibit 11 was marked for
21  identification by Attorney Leskin.)
22    Q.  Okay.  I'm going to mark as Exhibit 11
23  (indicating) and hand to you an article entitled
24  erectile dysfunction drugs and nonarteritic anterior
25  ischemic optic neuropathy written by Andrew G. Lee

### Page 79

1  and Nancy J. Newman from the American Journal of
2  Ophthalmology, October 2005.  I know you brought a
3  copy of this article with you as well, Doctor.
4  I take it you recognize this article?
5    A.  Yes.
6    Q.  And this is an article you wrote, correct?
7    A.  I wrote this with Nancy Newman.
8    Q.  Okay.  And the American Journal of
9  Ophthalmology is a journal directed to
10  ophthalmologists, correct?
11    A.  Yes.
12    Q.  That's the intended audience of people
13  with expertise in the individual field, right?
14    A.  Yes.
15    Q.  And if you go to the last page of what
16  we've marked as Exhibit 11, you'll see -- That's the
17  front cover of the journal that it appeared in?
18    A.  (Witness complies.)  I don't have the same
19  as what you have.
20    Q.  Oh.  Never mind.  Well, let me ask you
21  this.  Your article was an editorial, correct?
22    A.  Yes.
23    Q.  And you were invited to write the article?
24    A.  Yes.
25    Q.  And you understand that under the policies

### Page 80

1  of the American Journal of Ophthalmology, an
2  editorial is intended to be objective and
3  dispassionate, right?
4    A.  It might contain the opinions of the
5  author.
6    Q.  Okay.  But it's intended to be an objective
7  assessment of the evidence in forming your opinion?
8    A.  All articles are supposed to be an
9  objective assessment.
10    Q.  You serve on the editorial board of the
11  American Journal of Ophthalmology, right?
12    A.  Yes.
13    Q.  And this editorial was written for this
14  journal, because Dr. Fraunfelder had published an
15  article based on his review of the adverse event
16  database, correct?
17    A.  Yes.
18    Q.  Now, in your article, looking specifically
19  in the left-hand column of the first page of the
20  article, you make reference to adverse effect reports
21  that have been submitted to the FDA?
22    A.  Yes.
23    Q.  Did you personally go to the FDA web site
24  and locate those adverse event reports?
25    A.  Yes.

### Page 81

1    Q.  And what you found was as of May 18, 2005,
2  there were forty-three cases of ION reported after
3  PDE-5 use, correct -- PDE-5 inhibitor use, correct?
4    A.  Yes.
5    Q.  And not all of those were Viagra, right?
6    A.  That's correct.
7    Q.  Okay.  And you know that sildenafil is
8  Viagra, right?
9    A.  Yes.
10    Q.  And tadalafil is Cialis?
11    A.  Okay.
12    Q.  Were you aware of that?
13    A.  Yes.
14    Q.  And vardenafil, you understand, is Levitra,
15  right?
16    A.  Yes.
17    Q.  Okay.  Are you aware of the chemical
18  differences between those three drugs?
19    A.  They have different half-lives and action.
20    Q.  Now, after discussing the cases you wrote,
21  the FDA -- I'm looking at the bottom paragraph in
22  that left-hand column.  You wrote, the FDA also
23  readily acknowledges that most, but not all, of these
24  patients had underlying anatomic or vascular risk
25  factors for development of NAION, including, in

21 (Pages 78 to 81)

Page 82

1  parentheses, small, cup to disk ratio, quote, crowded
2  disk, age over fifty, diabetes, hypertension,
3  coronary artery disease, hyperlipidemia and smoking,
4  right?
5      A.  Yes.
6      Q.  And that's consistent with your own review
7  of those adverse event reports, correct?
8      A.  Yes.
9      Q.  And you went on to say, the FDA has been
10  careful to state that they cannot currently draw a
11  conclusion regarding cause and effect but that they
12  continue to monitor the situation.  Did I read that
13  correctly?
14      A.  Yes.
15      Q.  And then you wrote, although the case
16  reports to date suggest a possible association
17  between NAION and PDE-5 inhibitors, a causal
18  relationship has not been established conclusively.
19      A.  True.
20      Q.  And Dr. Fraunfelder, who's article is in
21  the journal of that same issue, reached the same
22  conclusion, correct?
23      A.  Yes.
24      Q.  And then you went on to write, according
25  to Pfizer, there have been more than one hundred

Page 83

1  clinical studies of Viagra, more than thirteen
2  thousand patients, and there were no reported cases
3  of NAION in these patients, right?
4      A.  True.
5      Q.  And you don't have any information
6  currently to contradict that, do you?
7      A.  No.
8      Q.  And to your knowledge that's still a
9  correct statement, correct?
10      A.  Yes.
11      Q.  And then you said that there have been
12  over 170 million sildenafil prescriptions given to
13  23 million men, up to one billion doses, and thus,
14  even if NAION is related to sildenafil use, the rate
15  of attack must be quite low.  To your knowledge is
16  that statement still true?
17      A.  Yes.
18      Q.  Then you continued on, spontaneous NAION
19  is relatively common and is the most common acute
20  optic neuropathy in patients over age fifty years.
21  That's still a true statement, correct?
22      A.  Yes.
23      MR. RICHARDS:  I'd like to clarify.
24  Are you referring to -- The first sentence of the
25  previous paragraph says according to Pfizer, and

Page 84

1  then it goes on.  So are you asking if it's a correct
2  statement according to Pfizer or a correct statement
3  according to him personally?
4      MS. LESKIN:  That's not the question I
5  asked.
6      MR. RICHARDS:  Well, it's confusing.
7  That's why I'm asking you to clarify.
8      JUDGE BORG:  Just -- Well, do we have a
9  question to the witness?
10      MS. LESKIN:  No.
11      JUDGE BORG:  Okay.
12      MR. RICHARDS:  No, she just asked him if
13  that was a correct statement, which she --
14      MS. LESKIN:  No, I asked --
15      MR. RICHARDS:  -- which she's going down
16  a list of paragraphs saying is this a correct
17  statement.
18      JUDGE BORG:  I understand what you're --
19      MR. RICHARDS:  I just want to make sure she
20  knows she's talking to Dr. Lee and not --
21      JUDGE BORG:  I understand what you're
22  saying.
23      Do you understand there's a question to
24  you?
25      THE WITNESS:  Yes.  She asked me if that

Page 85

1  was correct as written.
2      JUDGE BORG:  Okay.
3      A.  Yes, to my knowledge.
4      Q.  Then you went on, going down to where we
5  were, referring to the Johnson and Arnold study.
6  Do you see that?
7      A.  Yes.
8      Q.  And Johnson and Arnold did a
9  population-based study in Missouri and
10  Los Angeles County and estimated an incidence --
11  an annual incidence rate of 2.3 per hundred thousand
12  for NAION, correct?
13      A.  Yes.
14      Q.  And that study was done in 1994, right --
15  or published in 1994?
16      A.  Yes.
17      Q.  And then you refer to a study at the
18  Mayo Clinic, correct?
19      A.  Yes.
20      Q.  And that's the Hattenhauer study?
21      A.  Yes.
22      Q.  And Hattenhauer reported an estimated
23  annual incidence of 10.3 per hundred thousand,
24  correct?
25      A.  Yes.

22  (Pages 82 to 85)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

### Page 86

1   Q.  And that study was published in 1997,
2   right?
3   A.  Yes.
4   Q.  Since 1997 the population in the
5   United States has gotten fatter and grayer, would
6   you agree with that?
7   A.  Yes.
8   Q.  And you'll agree with me that as the
9   population gets older and heavier, diseases like
10  NAION increase in frequency?
11  A.  Yes.
12  Q.  You go on in the next paragraph, and you
13  said, although the exact ages for all patients taking
14  sildenafil is unknown, it is assumed that they are
15  older aged and harbor vasculopathic risk factors for
16  both erectile dysfunction and NAION.  Did I read that
17  correctly?
18  A.  Yes.
19  Q.  And that's because the risk factors for
20  erectile dysfunction overlap with the risk factors
21  for NAION, correct?
22  A.  Yes.
23  Q.  And that's vasculopaths, right?
24  A.  Yes.
25  Q.  And you go on to say, thus, a certain

### Page 87

1   number, several hundred to perhaps a few thousand,
2   of spontaneous NAION events would be expected to
3   occur each year in a population of 23 million
4   older-aged men using sildenafil.  Did I read that
5   correctly?
6   A.  Yes.
7   Q.  And that's because of the background rate
8   that would be expected in a population of older men,
9   right?
10  A.  Yes.
11  Q.  And that has nothing to do with what
12  medication -- whether or not they are taking a
13  medication like Viagra?
14  A.  It might have something to do with it.
15  Q.  Okay.  But the background rate is to be
16  expected?
17  A.  Yes.
18  Q.  Okay.  And you go on to say, in fact, some
19  of these events, depending on the frequency of use
20  of the drug, would fall by chance alone within six to
21  thirty-six hours of taking sildenafil, right?
22  A.  True.
23  Q.  And that's still a true statement?
24  A.  Yes.
25  Q.  It has been suggested that the symptoms of

### Page 88

1   spontaneous NAION are commonly noted upon awakening,
2   perhaps as a result of nocturnal hypotension.  That's
3   Dr. Heyreh's theory, right?
4   A.  Yes.
5   Q.  It would, therefore -- continuing to
6   read -- It would, therefore, not be unexpected for
7   the timing of some spontaneous NAION cases to follow
8   the use of sildenafil, a drug frequently used at
9   nighttime.  And by "spontaneous NAION," you're
10  referring to what we talked about earlier, your
11  typical case of NAION in a vasculopath person,
12  correct?
13  A.  Yes.
14  Q.  And you conclude that paragraph,
15  recollection, selection and ascertainment bias might
16  also be at play among the retrospective cases
17  reported to date, and the retrospective cases, those
18  are the case reports you're referring to, right?
19  A.  Yes.
20  Q.  What is recollection bias?
21  A.  You tend to remember things that happen
22  close to your vision loss better than you remember
23  things that are not close to your vision loss.
24  Q.  And what is selection bias?
25  A.  Selection bias is when you pick from a

### Page 89

1   certain group of patients; like you don't include all
2   of them, you only pick the ones that complained.
3   Q.  And what is ascertainment bias?
4   A.  That's the person collecting the data only
5   collects specific types of data and doesn't collect
6   all of the data, so you don't really know what the
7   denominator of the number of people you're looking at
8   is.
9   Q.  Turning to the end of your study -- your
10  article, you wrote, prospective or
11  case-control data will be helpful in the future to
12  determine if the association of NAION is causal or
13  coincidental.  Do you see that?
14  A.  Yes.
15  Q.  And as of October 2005 when you wrote this
16  article, you did not know whether the association of
17  NAION and Viagra -- and PDE-5 inhibitor use was
18  causal or coincidental, is that fair?
19  A.  Yes.
20  Q.  Now, in the article you make reference to
21  the FDA alert that was issued, right?
22  A.  Yes.
23  (Lee Exhibit 12 was marked for
24  identification by Attorney Leskin.)
25  Q.  I'm going to mark as Exhibit 12 a copy of

23  (Pages 86 to 89)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

Page 90

1  the FDA alert issued July 2005. Is this the alert
2  you're referring to?
3      A. Yes.
4      Q. And you'll see the middle of page 1 has
5  in bold what the actual FDA alert is, including
6  information about new labeling for the PDE-5
7  inhibitor drugs, right?
8      A. Yes.
9      Q. And at the bottom, the last two sentences
10 of that paragraph say, we cannot currently draw a
11 conclusion of cause and effect. FDA will continue to
12 evaluate the issue. Did I read that correctly?
13     A. Yes.
14     Q. And that's what you were referring to in
15 your article when you quote the FDA -- when you said
16 they were careful to state that they cannot currently
17 draw a conclusion?
18     A. Yes.
19     Q. And that's consistent with the conclusion
20 you wrote when you said a causal relationship has not
21 been established conclusively, right?
22     A. That's correct.
23     Q. And the FDA underneath that paragraph
24 wrote, this information reflects FDA's current
25 analysis of data available to FDA concerning this

Page 91

1  drug. FDA intends to update this sheet when
2  additional information or analyses become available.
3  Are you aware of any additional information issued
4  by the FDA on this issue -- on this question?
5      A. I think there are more cases now.
6      Q. Okay. But has the FDA changed its analysis
7  of the data?
8      A. No.
9      MR. BECNEL: Let me enter an objection.
10 If counsel looks at what the scientists for the FDA
11 have published to the Obama administration --
12     MS. LESKIN: Your Honor --
13     MR. BECNEL: Wait a minute. I'm entering
14 an objection.
15     MS. LESKIN: The only objection is to form
16 at this time.
17     MR. BECNEL: But, wait, my objection is
18 specific, because it involves fraud and the FDA.
19 Top scientists have notified the Obama administration
20 that they have been inhibited by drug and medical
21 manufacturers, and, in fact, if you look at the
22 New York Times today, it's fully documented, because
23 it just became public.
24     JUDGE BORG: Okay. The objection is
25 overruled.

Page 92

1      Do you need the question repeated?
2      MS. LESKIN: I think so.
3      Can you repeat the question, please?
4      MR. BECNEL: And, Judge, I'd like to make
5  that letter to the -- to the Congress and the Obama
6  administration part of the record as an exhibit.
7      JUDGE BORG: Well, it isn't here.
8  I presume that you can present that to the court at
9  the appropriate time.
10     MR. BECNEL: Well, I would just like to
11 get a number on it so I can do that, but I can fax
12 it there in two minutes or e-mail it.
13     JUDGE BORG: Well, there's no way --
14     MS. LESKIN: Your Honor, any exhibits that
15 are entered into the record should be done by counsel
16 at the time when they are asking questions, not in
17 the middle of my examination.
18     MR. BECNEL: Well, we've never had fraud
19 before by scientists at the FDA.
20     JUDGE BORG: Okay. Court Reporter, will
21 you read the question back, please?
22     Q. Let me ask the question again. Dr. Lee,
23 looking at Exhibit 12 underneath the FDA alert, the
24 FDA wrote, this information reflects FDA's current
25 analysis of data available to FDA concerning this

Page 93

1  drug. FDA intends to update this sheet when
2  additional information or analyses become available.
3  Sitting here today, are you aware of any updates that
4  the FDA has issued to this alert?
5      A. No.
6      Q. If you can look at your CV. We marked that
7  as Exhibit 1.
8      A. (Witness complies.) Yes.
9      Q. And if you can look at page 40.
10     A. (Witness complies.) Yes.
11     Q. If you look at number 119 on the list, do
12 you see that you are co-chair of the Sally Letson
13 symposium?
14     A. Yes.
15     (Lee Exhibits 13 and 14 were marked for
16 identification by Attorney Leskin.)
17     Q. I'm going to mark as Exhibit 13 a DVD,
18 which I will -- DVD set, which I will retain custody
19 of, but we'll also mark as Exhibit 14 a copy of the
20 cover of the box. So let me hand you Exhibit 14
21 (indicating), and you can compare that to the
22 original box that's Exhibit 13 (indicating), Doctor,
23 and make sure that it's an original copy. Is that
24 correct?
25     A. Yes.

24 (Pages 90 to 93)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 94

1   Q. And Exhibit 13 is a DVD set of the
2   presentations from the Sally Letson Foundation
3   symposium, correct --
4   A. Yes.
5   Q. -- that you co-chaired?
6   A. Yes.
7   Q. And if you can turn to the table of
8   contents, which is on the back of the DVD box, which
9   is also the second page of Exhibit 14, I'll direct
10  your attention to disk six.
11  A. (Witness complies.) Yes.
12  Q. And chapter four is a presentation called
13  Viagra and vision loss: Does sex make you blind?
14  Do you see that?
15  A. Yes.
16  Q. You and Dr. Sadun gave that presentation,
17  correct?
18  A. Yes.
19  Q. I'd like to take seven and a half minutes
20  and show you -- We've put that DVD into the DVD
21  player. If you can direct your attention to the
22  monitor.
23  (The DVD was played at this time.)
24  MR. BECNEL: This is Daniel Becnel. I'm
25  going to object to the use of a video which does not

## Page 95

1   contain a question.
2   JUDGE BORG: Well --
3   MS. LESKIN: Pause it.
4   (The DVD was paused at this time.)
5   JUDGE BORG: Yeah, hang on. I presume --
6   Well, that's a fair question. Are there going to be
7   questions that follow this video?
8   MS. LESKIN: There will be plenty of
9   questions following the video.
10  JUDGE BORG: Okay. Please proceed.
11  MS. LESKIN: Turn the volume up, please.
12  MR. BECNEL: Object to the special masses
13  ruling on the use of videos in a deposition.
14  MS. LESKIN: Go ahead.
15  JUDGE BORG: Okay. Proceed.
16  (The DVD was played at this time.)
17  MS. LESKIN: I know we have to change tapes
18  before we do. Let me just ask you one question.
19  That was you giving that presentation, correct?
20  MR. RICHARDS: I would object to the
21  introduction of the tape. I don't know if we ever
22  got any notice of the documents that they planned on
23  using for this deposition, and maybe counsel can
24  confirm that, whether we did or not, as required by
25  the order.

## Page 96

1   JUDGE BORG: Here's the deal. The
2   objection is overruled. Your objection is preserved.
3   You make it to the court when and if that opportunity
4   arises, but for purposes of the deposition it's going
5   to be in the record.
6   (Lee Exhibit 15 was marked for
7   identification by Attorney Leskin.)
8   MS. LESKIN: And just for the record, I'm
9   marking as Exhibit 15 an e-mail dated January 6th,
10  2009, from me to Neil Overholtz, Danny Becnel and
11  Randy Hopper, copied to Judge Borg, Mr. Slonim from
12  my office, that identifies the documents pursuant to
13  the court order, and that includes all documents
14  attached to or referenced in each witness's
15  curriculum vitae, including any articles and/or
16  presentations by the witness. So we'll make that as
17  an exhibit.
18  MR. RICHARDS: That's Exhibit 14?
19  MS. LESKIN: That's Exhibit 15.
20  MR. RICHARDS: 15.
21  Q. And that's you giving that presentation,
22  correct, Dr. Lee?
23  A. That's right, but you only showed half.
24  Q. But that was the entire presentation you
25  gave, correct?

## Page 97

1   A. Correct, but you did not show the pro --
2   Q. The other half is given by Dr. Sadun?
3   MR. BECNEL: Your Honor, that's the problem
4   with what she's doing. She's editing and then asking
5   questions with the witness telling her she only
6   showed half of what was done.
7   MS. LESKIN: Can I ask --
8   JUDGE BORG: Well, she's asking specific
9   questions. The objection is overruled. You can ask
10  him questions when this concludes -- or she
11  concludes.
12  Go ahead with your questions.
13  MS. LESKIN: Let me rephrase.
14  Q. This presentation was done in two halves,
15  correct?
16  A. That's correct.
17  Q. And Dr. Sadun gave the first half, correct?
18  A. Yes.
19  Q. And you gave the second half, correct?
20  A. Yes. This was the format of the symposium
21  section.
22  Q. Okay. And you gave the second half,
23  correct?
24  A. That's correct.
25  Q. Okay. And I showed the entire presentation

25 (Pages 94 to 97)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 98

1  that you gave, correct?
2      A.  But you only showed the con half.
3      Q.  I showed the presentation that you gave,
4  is that correct?
5      MR. BECNEL:  Objection.  She can't ask the
6  same question after she got an answer.
7      JUDGE BORG:  No, she didn't get an answer.
8  The objection's overruled.
9      You can repeat the question,
10  Ms. Court Reporter.
11      (Requested portion of record was read.)
12      A.  That's correct.
13      MS. LESKIN:  Okay.  We need to change the
14  tape.  Let's take a break.
15      JUDGE BORG:  Time, Mr. Videographer?
16      THE VIDEOGRAPHER:  3:04.
17      (A brief recess was taken.)
18      JUDGE BORG:  Start time?
19      THE VIDEOGRAPHER:  3:10 -- or 3:11.
20  I'm sorry.
21      JUDGE BORG:  Okay.
22      THE VIDEOGRAPHER:  On the record.
23      Q.  (By Ms. Leskin)  Now, Dr. Lee, referring,
24  again, to the presentation we just watched, you went
25  through the whole Bradford Hill criteria, right?

Page 99

1      A.  Yes.
2      Q.  And you stated that there's a weak but
3  biologically plausible mechanism for NAION, right?
4      A.  That's right.
5      Q.  That's what you stated?
6      A.  Yes.
7      Q.  And you were referring to the blood
8  pressure effect of drugs like sildenafil, correct?
9      A.  Yes.
10      Q.  Okay.  How much does Viagra lower blood
11  pressure?
12      A.  Several millimeters of mercury.  There was
13  a graph on there.
14      Q.  Let me just back up.  The symposium --
15  The Sally Letson symposium, that's a presentation
16  made to ophthalmic medical personnel, correct?
17      A.  That's correct.
18      Q.  And the people in the audience were
19  primarily physicians, right?
20      A.  Yes.
21      (Lee Exhibit 16 was marked for
22  identification by Attorney Leskin.)
23      Q.  And I'm go to mark as Exhibit 16 an
24  article -- and you can give this (indicating) to
25  counsel, please -- entitled the Sally Letson

Page 100

1  symposium:  Neuroophthalmology update, reporting on
2  September 14th to 16th, 2006, Ottawa, Ontario,
3  Canada, written by you, Fiona Costello and W. Bruce
4  Jackson, right?
5      A.  Yes.
6      Q.  And this is the meeting report that you
7  prepared following the program that you co-chaired,
8  correct?
9      A.  That's correct.
10      Q.  And this was published in -- What's the
11  name of this journal?  Expert Review of
12  Ophthalmology?
13      A.  Yes.
14      Q.  Okay.  And you wrote on the first paragraph
15  of the article that there were six hundred and
16  seventy-five paid attendees?
17      A.  Yes.
18      Q.  That it was the highest ever attendance for
19  one of these meetings, right?
20      A.  Yes.
21      Q.  Now, when you said that there was a --
22  that the biological mechanism for NAION in ED agents
23  was weak, that was because there are no studies
24  showing that Viagra or any of the PDE-5 inhibitors
25  caused a decrease in blood flow to the optic nerve,

Page 101

1  right?
2      MR. RICHARDS:  Objection to form.  I'm not
3  sure what she means by studies.
4      JUDGE BORG:  Do you understand the
5  question?
6      THE WITNESS:  Yes.
7      JUDGE BORG:  Are you able to answer it?
8      THE WITNESS:  Yes.
9      JUDGE BORG:  Okay.  Proceed.
10      A.  The link is with hypotension, and then you
11  have to make another link to the hypoperfusion of the
12  optic nerve, the weakest link.
13      Q.  Okay.  Because there is no link between --
14  There is no link, as you just described, that's been
15  proven by studies, correct, between the hypotension,
16  hypoperfusion and erectile dysfunction drugs?
17      A.  The linkage is what's weak, not the
18  hypotension.
19      Q.  And you mean between -- And just so I
20  understand, what you're calling weak is the link
21  between the drop in blood pressure and the drop in
22  blood flow?
23      A.  Yes.  This has not been demonstrated,
24  because we don't have good mechanisms to demonstrate
25  this.

26  (Pages 98 to 101)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 102

1    Q. Have you reviewed the studies that attempt
2  to measure blood flow following sildenafil use in the
3  optic nerve? Strike that. Have you reviewed the
4  studies that attempt to measure ocular blood flow
5  following Viagra use?
6    A. Not Viagra use per se, but just looking at
7  ocular blood flow, many, many papers have tried to do
8  this. It's quite difficult.
9    Q. Okay. But have you reviewed any of the
10 articles that specifically look at the effect of
11 sildenafil or Viagra on ocular blood flow?
12   A. No, but that would be very hard to do,
13 because the ocular blood flow studies in general are
14 not that good.
15   Q. Let me ask you this. Are you aware of any
16 study that demonstrates that Viagra causes a drop in
17 blood flow to the optic nerve?
18   A. The weak -- the link is weak, because we
19 cannot establish ocular blood flow in anything, let
20 alone in erectile dysfunction agents. The study
21 technologies for looking at ocular blood flow are not
22 good enough to answer this question in the arteries
23 that you're asking about.
24   Q. Just so I understand you, are you saying
25 that ocular blood flow in NAION -- strike that --

Page 103

1  that ocular blood flow with sildenafil has not been
2  studied?
3    A. No. Ocular blood flow is extremely
4  difficult to study in the optic nerve in the blood
5  supply that we're talking about, let alone in
6  sildenafil. If you want to make it specific for
7  erectile dysfunction agents, fine, but if you just
8  say what is the status of ocular blood flow imaging
9  right now, not good enough to answer any questions
10 about this particular blood supply, ischemic optic
11 neuropathy.
12   Q. Okay. And I appreciate the clarification
13 that you made about this particular blood supply.
14   A. Yes.
15   Q. And my question originally was a little
16 broader than that. Are you aware that there have
17 been studies of ocular blood flow in other vessels
18 following Viagra use?
19   A. Yes, but --
20   Q. And have you reviewed --
21   A. -- in this supply, no, because the
22 technology isn't good enough to answer the question.
23   Q. Okay. I understand that. I understand
24 what you're saying. But I want to talk about the
25 studies looking at ocular blood flow in other vessels

Page 104

1  following Viagra use. Okay?
2    A. Yes.
3    Q. And have you reviewed studies looking at
4  ocular blood flow in any vessel in the eye following
5  Viagra use?
6    A. I know these exist, but I have not reviewed
7  them carefully.
8    Q. And are you able to identify any study that
9  has shown that sildenafil causes a decrease in blood
10 flow to any vessel in the eye?
11   A. That's what I was alluding to when I said
12 the link is weak in the presentation that you showed.
13 It's not the hypotension. The hypotension part we
14 know about, because we have measurements of blood
15 pressure. What we don't have is the linkage to the
16 ocular blood flow. That's where the -- The link is
17 weak there.
18   Q. I just want to make sure you answered my
19 question. Are you aware -- and that's the only
20 question that I'm asking -- Are you aware of any
21 study that shows a decrease of blood flow in any
22 vessel following Viagra use?
23   A. No.
24   Q. Now, you use this term hypotension.
25   A. Yes.

Page 105

1    Q. How are you defining hypotension when you
2  use it?
3    A. Hypo means low. Tension means pressure.
4  Hypotension is low pressure. There is no
5  standardized accepted definition of hypotension.
6  Most people would say a 20 percent reduction in your
7  baseline is hypotension, but it's hypotension even
8  if it's 2 millimeters or 3 millimeters. It's, by
9  definition, lower than your norm. But there's no
10 standard definition for clinically significant
11 hypotension.
12   Q. And that's the distinction I want to talk
13 about -- I wanted to clarify. When you use
14 hypotension, you're referring to any decrease in
15 blood pressure, correct?
16   A. That's correct.
17   Q. You don't mean it to be a clinically
18 significant decrease in blood pressure?
19   A. It may or may not be a clinically
20 significant hypotension. Hypo just means it's lower,
21 so when I say hypotension, I simply mean lower
22 pressure.
23   Q. Okay. And so when you say that the
24 erectile dysfunction drugs cause hypotension, you're
25 simply using that to indicate that it causes a

27 (Pages 102 to 105)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 106

1  · reduction in blood pressure?
2      A.  Yes, and that we know is true.
3      Q.  Okay.  Are you aware of any studies that
4  demonstrate that Viagra causes a decrease in blood
5  flow to any part of the body?
6      A.  This can only be inferred from the
7  hypotension.  I am not aware of any studies for
8  specific blood flow rates to specific organs, but I
9  would not be looking at that literature.  I can only
10  comment on the optic nerve.
11      Q.  And when you say infer, you're
12  hypothesizing that there is that link, but you don't
13  have any studies that show that, correct?
14      A.  That's correct.  That is where the linkage
15  is weak.
16      Q.  You've used this term weak.  Is there any
17  evidence of that link between hypo -- a drop in blood
18  pressure and the hypoperfusion you're talking about?
19      A.  Yes.
20      Q.  And what evidence are you referring to?
21      A.  This is the basis of ischemic optic
22  neuropathy.  We know if the blood pressure goes too
23  low or if the oxygenation is too low, that you'll get
24  ischemic optic neuropathy.  What we don't know is
25  proving it with a blood flow measurement in the blood

## Page 107

1  vessels that we're talking about, but we can see the
2  result, ischemic optic neuropathy.  So hypoperfusion
3  is the end result after ischemic optic neuropathy.
4  Hypotension is one of those mechanisms that we listed
5  in the multifactorial list.
6      Q.  But when we're referring to the erectile
7  dysfunction drugs, the PDE-5 inhibitors, you told me
8  that -- when you said that there was a weak link --
9      A.  Weak link.
10      Q.  -- you were referring to the lack of
11  studies between showing a decrease -- a -- Strike
12  that.  You told me that the weak link you were
13  referring to on the erectile dysfunction agents
14  referred to the lack of studies on blood flow to the
15  optic nerve?
16      A.  That's correct.
17      Q.  Do I understand that correctly?
18      A.  That's correct.
19      Q.  Okay.
20      A.  We have a strong link on hypotension --
21      Q.  Meaning a drop in blood pressure.
22      A.  -- we have an outcome, ischemic optic
23  neuropathy, but we do not have the middle piece,
24  which is the blood flow, the perfusion of the optic
25  nerve, but the limiting factor is the technology and

## Page 108

1  the blood vessels.  There's no data.
2      Q.  Going back to your presentation, you said
3  that the report -- in the reported cases for Viagra
4  it's not possible to rule out chance as a cause, and
5  that's consistent with what you wrote in your article
6  with Dr. Newman, right?
7      A.  Yes.  Nothing in that presentation is
8  inconsistent with what I wrote in the editorial.
9  They're the same data.
10      Q.  And that's because ED drugs are used in
11  vasculopathic males, as we talked about?
12      A.  Yes, we went over that before.
13      Q.  You also talked -- said in your
14  presentation -- You made reference to the weak
15  temporal relationship between cause and effect.
16      A.  Of the forty-three cases that were in the
17  database.
18      Q.  Correct.
19      A.  Yeah.
20      Q.  And you said that that's inconsistent with
21  the known pharmacokinetics and the half-life, right?
22      A.  Many of the cases reported in the database
23  were not consistent with what we know about the onset
24  of action of these drugs.  So, for instance, if
25  someone had their ischemic optic neuropathy a week

## Page 109

1  later after the drug was administered, it would be
2  hard to accept that based on the pharmacokinetics of
3  the drug --
4      Q.  Right.
5      A.  -- so, in my opinion, many of those
6  forty-three cases would have to be thrown away.
7      Q.  And as you put up on the screen during your
8  presentation, the half-life of the drug is four
9  hours, right?
10      A.  It's quite short.  That's why they take it
11  pretty close to the event.
12      Q.  It's four hours is the half-life, right?
13      A.  Yes --
14      Q.  Okay.
15      A.  -- and then there's a peak.
16      Q.  And the peak plasma level occurs two hours
17  after you take the drug, right?
18      A.  Exactly.  You have a very short window to
19  get going.
20      Q.  And you're aware that the clinical effect
21  is greatest with the drug in that first four hours
22  after you take it, right?
23      A.  Yes, that's what the graph was showing.
24      Q.  Right.  Now, you said during the
25  presentation that there was no animal model to assess

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 110

1  the causal relationship, correct?
2      A. There is now, but at that time it wasn't
3  ready.
4      Q. Okay. And what animal model are you
5  referring to?
6      A. There's a rat model.
7      Q. Okay. And who published on that?
8      A. Neil Miller.
9      Q. And is that where they took the vessels and
10 obliterated the vessel?
11     A. Yes.
12     Q. And is that a good animal model for an
13 assessment of the cause of NAION?
14     A. No.
15     Q. It's an assessment for the natural
16 progression of the disease, correct?
17     A. Or treatment.
18     Q. Okay. But you couldn't use that rat model
19 to assess, for example, whether Viagra causes NAION?
20     A. No.
21     Q. Are you aware of any other animal model
22 that exists that could make that assessment?
23     A. No.
24     Q. Have you reviewed any of the animal studies
25 that were conducted during the development of Viagra?

## Page 111

1      A. No.
2      Q. Since you gave your presentation are you
3  aware of any dose response data that has been
4  developed?
5      A. There's no dose response data.
6      Q. Now, you also said during your presentation
7  that there's no effect specificity with regard to the
8  NAION in the Viagra cases, right?
9      A. That's correct.
10     Q. In other words, the NAION that a patient
11 who takes Viagra gets looks the same as any other
12 case of NAION, right?
13     A. Yes.
14     Q. You made reference to a rechallenge case
15 during the course of your presentation. You said
16 there was one convincing case of rechallenge, right?
17     A. Yes. There are more now.
18     Q. Okay. But the one that you referred to was
19 the Bollinger case report, correct?
20     A. Yes.
21     Q. That case did not involve Viagra, correct?
22     A. No.
23     Q. No, it did not?
24     A. No, it did not. But there are new
25 rechallenge cases now.

## Page 112

1      Q. What rechallenge cases -- other rechallenge
2  cases have been published since your presentation?
3      A. I don't have those references. I know they
4  exist.
5      Q. Okay. You're aware that we are here to
6  take your deposition to learn the bases of your
7  opinion?
8      A. Yes.
9      Q. And you're aware that you're required to
10 provide us the bases of your opinion?
11     A. Yes.
12     Q. Okay. So sitting here today are you able
13 to identify what other rechallenge cases exist?
14     A. No. I know they --
15     MR. OVERHOLTZ: I'm going to object to
16 counsel trying to intimidate the witness to believe
17 that he has some duty to produce documents from which
18 he's testified he has personal knowledge.
19     JUDGE BORG: Do you understand the
20 question --
21     THE WITNESS: Yes.
22     JUDGE BORG: -- Dr. Lee? Are you able to
23 answer it?
24     THE WITNESS: Yes.
25     JUDGE BORG: The objection is overruled.

## Page 113

1      MS. LESKIN: Your Honor, I would just
2  indicate that the court's order limits the objecting
3  attorneys to one attorney, and Mr. Richards is here
4  doing a fine job. Mr. Becnel and Mr. Overholtz have
5  all raised objections.
6      JUDGE BORG: What do you guys say to that?
7      MR. OVERHOLTZ: I think the order says two,
8  but I'm fine to live by the rules, whatever they are.
9      JUDGE BORG: All right. Then we're going
10 to have Mr. Richards make the objections.
11     MR. RICHARDS: Mr. Richards.
12     JUDGE BORG: Mr. Richards. I'm sorry.
13 Forgive me.
14     A. I don't have the articles. I'm sorry.
15 But I did not rely upon them.
16     Q. Okay. Now, you made reference to a
17 case-control study during your presentation.
18     A. Yes.
19     Q. Is that Dr. McGwin's study --
20     A. Yes.
21     Q. -- Dr. McGwin and Dr. Vaphiades?
22     A. Yes.
23     Q. And the conclusion that you drew from that
24 study is that patients taking -- patients with NAION
25 were not more likely to report the use of erectile

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

| Page 114 | Page 116 |
|---|---|
| 1  ·dysfunction agents in the controls, correct? | 1  Q.  Are you aware of any other evidence, |
| 2  A.  Yes. | 2  besides his deposition testimony, that Mr. Martin |
| 3  Q.  In other words, that study, in your | 3  took Viagra in close temporal relationship before he |
| 4  opinion, did not establish an increased risk among | 4  experienced visual symptoms? |
| 5  patients taking erectile dysfunction agents, correct? | 5  A.  We have the medical records that are in |
| 6  A.  That's correct. | 6  close temporal relationship to what the patient |
| 7  MR. RICHARDS: Objection, form. | 7  testified.  The ischemic optic neuropathy was |
| 8  THE WITNESS: Sorry. | 8  diagnosed within the parameter -- the time parameters |
| 9  JUDGE BORG:  What's that?  I'm sorry. | 9  that he stated in his deposition. |
| 10  THE WITNESS:  He objected. | 10  Q.  Okay.  But, again, let me just be clear on |
| 11  JUDGE BORG:  Yeah.  Oh, I need to -- | 11  what my question is.  Other than the deposition |
| 12  Got you.  Do you understand the question, and are | 12  testimony of Mr. Martin and his wife, what -- is |
| 13  you able to answer it? | 13  there any other evidence that you're relying on that |
| 14  THE WITNESS:  I do. | 14  Mr. Martin took Viagra before his -- the on -- |
| 15  JUDGE BORG:  It's overruled. | 15  immediately before the onset of his visual symptoms? |
| 16  You may answer. | 16  MR. RICHARDS: Objection to form.  He just |
| 17  A.  They did not find an association. | 17  testified that he relied upon the medical records in |
| 18  Q.  Since you gave -- I'll strike -- Let me | 18  proximity to his claimed ingestion as a basis also. |
| 19  start again.  Since you published your article with | 19  JUDGE BORG:  I understand the objection. |
| 20  Dr. Newman and since you gave this presentation at | 20  Do you understand the question, Dr. Lee? |
| 21  the Sally Letson symposium is there any new data | 21  THE WITNESS:  Yes. |
| 22  regarding the association -- regarding the | 22  JUDGE BORG:  And are you able to answer it? |
| 23  relationship between Viagra and NAION that you are | 23  THE WITNESS:  Yes. |
| 24  relying on in this case? | 24  JUDGE BORG:  It's overruled. |
| 25  A.  Not that I'm relying upon. | 25  A.  The medical record and the patient's |

| Page 115 | Page 117 |
|---|---|
| 1  Q.  I want to turn to your expert report. | 1  testimony. |
| 2  We've marked that as Exhibit 6 previously.  Do you | 2  Q.  Okay.  Show me the medical record you rely |
| 3  have that in front of you? | 3  on that shows that Mr. Martin took Viagra the night |
| 4  A.  (Witness complies.)  Yes, I do. | 4  before the onset of his visual symptoms. |
| 5  Q.  Okay.  Now, you gave the opinion in this | 5  A.  We only have -- For that question we only |
| 6  report that the use of sildenafil was a significant | 6  have the patient's testimony. |
| 7  precipitating factor for bilateral rapidly sequential | 7  Q.  Okay.  That's why I wanted to clarify. |
| 8  NAION, right? | 8  A.  And for the medical record it's the listing |
| 9  A.  Yes. | 9  of his medicines, whether he listed -- sometimes |
| 10  Q.  Okay.  And the first key factor that you | 10  listed and sometimes not. |
| 11  identified is the close temporal relationship between | 11  Q.  Okay.  So the only evidence that you're |
| 12  the drug ingestion and the visual loss, less than | 12  relying upon that Mr. Martin took Viagra the night |
| 13  twenty-four hours, right? | 13  before the onset of his visual symptoms is his |
| 14  A.  Yes. | 14  testimony and Mrs. Martin's testimony, is that |
| 15  Q.  Okay.  What did -- and then -- What did | 15  correct? |
| 16  you rely on to establish that there was, in fact, a | 16  A.  Yes. |
| 17  close temporal relationship between Mr. Martin's | 17  Q.  I want you to assume for a moment that |
| 18  ingestion of Viagra and the onset of his visual loss? | 18  Mr. Martin did not take Viagra the night before the |
| 19  A.  We only have the testimony of the patient | 19  onset of his visual symptoms.  Do you understand the |
| 20  and his medical records.  That's all we have. | 20  assumption I'm asking you to make? |
| 21  Q.  And is that -- So what specifically did | 21  A.  Yes. |
| 22  you rely upon in concluding that there was a close | 22  Q.  So if you assume that, does that change |
| 23  temporal relationship between Mr. Martin's drug use | 23  your opinion with regard to causation in this case? |
| 24  and his visual loss? | 24  MR. RICHARDS: Objection to form. |
| 25  A.  I believe he testified to this effect. | 25  JUDGE BORG:  Overruled. |

30  (Pages 114 to 117)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 118

1   A.   This is similar to what I stated in the
2   video.  If you don't have a close temporal
3   relationship between the drug use and the event that
4   is coherent with the pharmacokinetics of the drug,
5   in this case we talked about the half-life and its
6   maximum onset, so that means that night, then the
7   case is weaker.
8   Q.   Okay.
9   A.   The farther away you are from the dose,
10  the less strong the case is.  So that's why in the
11  video that you saw most of the forty-three cases I
12  would not consider very strong for temporal
13  relationship, because the event was not within the
14  same day.
15  Q.   Okay.  I want to talk about Mr. Martin.
16  So if Mr. Martin — If you assume for purposes of my
17  question that Mr. Martin did not take Viagra the
18  night before the onset of his visual symptoms, does
19  that change your opinion in this case?
20  A.   Yes.  Perhaps I didn't answer it the way
21  you wanted me to, but, yes, it would weaken the case
22  the further away the dose is to the event.  If you
23  say he didn't take it that night, it weakens the
24  case, but if you say it was twenty-five hours, it's
25  still — it wouldn't change the opinion that much,

## Page 119

1   but if it was two weeks before, that would change it
2   a lot.  So I guess I can't really answer it the way
3   you're phrasing it.  It's not all or none.  It just
4   weakens it or strengthens it.  The closer the
5   temporal relationship, the stronger the case; the
6   farther, the weaker the case, but it's not all or
7   none, because there's still drug in your system even
8   beyond the half-life; it's just less and less and
9   less.  Like — Am I making sense?  Like if you say
10  did he take it the night of; well, what if he had
11  taken it the day of, still you would have an
12  argument.  But because you didn't say the night of,
13  what does night of mean, seven o'clock, nine o'clock.
14  Q.   Well, that's a good question.  What's your
15  understanding of when Mr. Martin says he took Viagra?
16  A.   I think he took it the night of, and the
17  usual way that people take this is within a few
18  hours of wanting to use it, because it's in the
19  instructions, so that is my impression.
20  Q.   But I'm not talking about usually.  I want
21  to ask — You are giving an opinion.  I want to ask
22  the basis of your opinion.  So what is your
23  understanding of when Mr. Martin took Viagra?
24  A.   In the pre — Sometime in the preceding
25  twelve hours prior to the next morning, so the night

## Page 120

1   of, so let's just say seven.  I don't know.  I don't
2   know if we have the exact time or not.  But, you
3   know, the preceding day, within twenty-four hours,
4   I think, would be my ballpark.  If that's what you
5   mean by night, yes, I think that's reasonable.
6   I think I said that in my opinion.  Less than
7   twenty-four hours.
8   Q.   Are you aware that Mr. Martin testified —
9   testified that he took it — let's — Strike that.
10  You're aware there were two different incidents for
11  Mr. Martin, correct?
12  A.   Yes.
13  Q.   Okay.  So let's focus on the first
14  incident.  Okay?
15  A.   (Witness nods head.)
16  Q.   Are you aware that Mr. Martin testified
17  that he took it between seven-thirty and 8 p.m. at
18  night?
19  A.   I think that's correct.
20  Q.   Okay.  How long after Mr. Martin took the
21  the Viagra did he engage in sexual activity?
22  A.   This we'd have to look through the record
23  what he testified, but normally it would be within
24  several hours of that.
25  Q.   Do you know?

## Page 121

1   A.   No.
2   Q.   How long after he took the Viagra did
3   Mr. Martin go to sleep?
4   A.   I don't know the exact time he went to
5   sleep.
6   Q.   What time did Mr. Martin wake up the next
7   day?
8   A.   I don't know the exact time.
9   Q.   What time did Mr. Martin first notice
10  vision loss?
11  A.   I think it was about — sometime when he —
12  after he woke up.
13  Q.   What time —
14  A.   I don't know the exact time of day.
15  Q.   Do you know if it was in the morning versus
16  the evening?
17  A.   I think it was within the twenty-four-hour
18  period of time.  I would have to look if you want me
19  to see what he actually said on time.
20  Q.   Please.
21  A.   But it's not relevant.  As long as it's
22  within the twenty-four hours, that's what would be my
23  opinion.  Twenty-four hours is reasonable.
24  Q.   Okay.  But my question is what time did he
25  notice —

31 (Pages 118 to 121)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 122

1    A. I don't know any of these times.
2    Q. -- the onset of visual symptoms?
3    A. I don't know the time.
4    Q. Do you know what he was doing at the time
5    he noticed the visual symptoms?
6    A. I don't know what he was doing.
7    Q. Would that be relevant to your opinion?
8    A. Not really.
9    Q. Do you know whether he noticed any visual
10   symptoms at any other time during the day?
11   A. I don't know if he noticed any visual
12   symptoms.
13   Q. Do you know whether he noticed any visual
14   symptoms when he woke up that morning?
15   A. I don't know if he noticed visual symptoms
16   when he woke up.
17   Q. Let's go to the second day -- the second
18   eye. What time did Mr. Martin take the Viagra that
19   night?
20   A. I don't know any of these time things, so
21   you might as well not ask me those types of
22   questions.
23   Q. Well, do you know how long he took it --
24   how long after he took Viagra that second -- before
25   the second eye that he engaged in sexual activity?

## Page 123

1    A. I did not precisely chart any of these time
2    things to that level of precision.
3    Q. Okay. And you don't know how long after he
4    took the Viagra he went to sleep?
5    A. No, I don't know any of these time things.
6    Q. Do you know what time he woke up?
7    MR. RICHARDS: Objection. He just said he
8    doesn't know any time things. She keeps asking him
9    time things.
10   JUDGE BORG: And that's overruled. She
11   can.
12   A. I don't know any of these time things.
13   MR. RICHARDS: Even if he's already
14   answered he doesn't know any time things?
15   JUDGE BORG: I understand that. You know
16   how cross-examination works.
17   A. I'm sorry. I don't know any of these time
18   things.
19   Q. Do you know what time he first noticed
20   visual symptoms in his right -- in his second eye?
21   A. I don't know the time things.
22   Q. Do you know what he was doing at the time
23   that he noticed the visual symptoms in his second
24   eye?
25   A. I don't know what he was doing.

## Page 124

1    Q. Now, as part of your review of the records
2    in this case, did you look at the medical records
3    from Dr. Ferrera?
4    A. I don't know. You'd have to let me see
5    what you're referring to.
6    Q. Okay. Do you know who Dr. Ferrera is?
7    A. I don't know these names, unless you show
8    me what you're looking at.
9    (Lee Exhibit 17 was marked for
10   identification by Attorney Leskin.)
11   Q. We're going to mark as Exhibit 17 medical
12   records that are -- that were collected from
13   Dr. Ferrera in this litigation, and they are
14   Bates numbered on the bottom, for the record, Martin,
15   Ferrera 1 through 375 (indicating).
16   A. I doubt if I had that, because your stack
17   is thicker than my stack (indicating).
18   Q. Okay. You'll notice that on the bottom
19   right-hand corners are numbers, correct?
20   A. Yes.
21   Q. Okay. And those are Bates numbers that
22   were put on the records by my office when we received
23   them from Dr. Ferrera, and they're really there to
24   help ease reference to various documents. Okay?
25   A. Yes.

## Page 125

1    Q. Now, if you look at page 114 of
2    Dr. Ferrera's records --
3    A. (Witness complies.) Yes.
4    Q. -- those are records from May 1st, correct?
5    A. Yes.
6    Q. Do you see on the bottom of that page
7    there's a record from May 1st?
8    A. I see --
9    MR. RICHARDS: Objection to form. He can
10   read what's on here for May 1st. He didn't create
11   the records. He didn't know if it was actually on
12   May 1st or not.
13   JUDGE BORG: Do you --
14   MS. LESKIN: I'll rephrase.
15   JUDGE BORG: All right.
16   Q. I'm directing your attention to the bottom
17   of page 114 of Dr. Ferrera's records. Are you there?
18   A. Yes.
19   Q. Okay. And you'll see on the bottom of that
20   page there is a record dated May 1st, 2002, correct?
21   A. Yes.
22   Q. Did you see this record before?
23   A. I think I have seen it, yes.
24   Q. Okay. So this (indicating) is in the
25   records that plaintiff's counsel provided to you?

32 (Pages 122 to 125)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

### Page 126

1    A.  I have this page right here (indicating).
2    Q.  Okay.  And you've marked it with a Post-it
3  note?
4    A.  Yes.
5    Q.  Okay.  Did you mark that Post-it note, or
6  did plaintiff's counsel mark that for you?
7    A.  I marked it.
8    Q.  And you marked it, because that's the day
9  that Mr. Martin first reported his vision loss,
10  right?
11    A.  Yes.
12    Q.  On May 1st, 2002, do you see any record --
13  and you feel free to look back and forth in
14  Dr. Ferrera's records, but on May 1st, 2002, do you
15  see any indication that Mr. Martin reported to
16  Dr. Ferrera that he had taken Viagra the night before
17  he noticed his vision loss?
18    A.  Well, there are no medicines, so --
19    Q.  I'm sorry?
20    A.  There are no medicines.
21    Q.  So you do not see anything that refers to
22  the use of Viagra the night before, is that correct?
23    A.  Yes, because there are no medicines listed,
24  unless there's some other part of this record.  No.
25  The answer to your question is no.  No medicines are

### Page 127

1  listed.
2    (Lee Exhibit 18 was marked for
3  identification by Attorney Leskin.)
4    Q.  I'm going to mark as Exhibit 18
5  (indicating) medical records that we received from
6  Dr. Nichols, and they are Bate stamped Martin,
7  Nichols 1 through Martin, Nichols 28.
8    A.  Are you done with this one (indicating)?
9    Q.  For now.  You can put that off to the side,
10  but don't get rid of it.
11    A.  (Witness complies.)
12    Q.  Have you seen these records before, Doctor?
13    A.  Yes, I think I have some of these.
14    Q.  Okay.  If you'd look at Nichols 10.
15    A.  (Witness complies.) Yes.
16    Q.  Have you seen this page before?
17    A.  I think so.  Anyway, yes, I think so.
18    Q.  Okay.  And do you understand that to be an
19  intake form that was completed by Mr. Martin or his
20  wife the first time they saw Dr. Nichols?
21    A.  Yes.
22    Q.  And that's dated May 1st, 2002, correct?
23    A.  Yes.
24    Q.  And you'll see that there's a question 8
25  that says do you take any medications, correct?

### Page 128

1    A.  Yes.
2    Q.  And what medications did Mr. Martin list on
3  this form?
4    A.  Catapres.
5    Q.  Any others?
6    A.  No.
7    Q.  And I'll ask you to turn back in those
8  records to Nichols 3.
9    A.  (Witness complies.)
10    Q.  Are you there?
11    A.  Yes.
12    Q.  Have you seen this record before?
13    A.  Yes, I think so.
14    Q.  And you'll see on the bottom half of that
15  page there's a record dated May 1st, 2002, correct?
16  Are you with me?
17    A.  Yes.
18    Q.  And you'll see there's a note on the chart
19  that says Catapres?
20    A.  Yes.
21    Q.  Do you see anywhere on this form where
22  Dr. Nichols indicated that Mr. Martin took Viagra the
23  night before the onset of his eye condition?
24    A.  No, but he didn't really ask that either.
25    Q.  Well, did you review Dr. Nichols'

### Page 129

1  deposition transcript in this case?
2    A.  No.
3    Q.  Are you aware that Dr. Nichols gave the
4  following testimony:  Question -- and this is, for
5  the record, page 15, lines 12 through 24, of
6  Dr. Nichols' deposition testimony -- question, under
7  number 8 it asks for any medication the patient is
8  taking, and Mr. Martin mentioned Catapres?  Answer,
9  correct.  Question, did you review that information
10  with Mr. Martin at the time you saw him?  Answer,
11  yes.  Question, and were there any other medications
12  that Mr. Martin identified for you as of May 1st,
13  2002?  Answer, no.  Question, if Mr. Martin had told
14  you as of May 1st, 2002, that he had taken any other
15  medications, would you have noted that in his chart?
16  Answer, yes, I would have.  You'd not seen that
17  testimony before?
18    A.  No, but it doesn't say he asked about
19  Viagra there either.  If you don't ask, men will not
20  disclose this information.
21    Q.  I'm going to ask you to turn back to
22  Dr. Ferrera's records and ask you to turn to Ferrera
23  page 92.
24    A.  (Witness complies.) Yes.
25    Q.  Are you on that page?

33  (Pages 126 to 129)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 130

1    A. Yes.
2    Q. And if you look at the entry on the bottom
3  of that page, you'll see it's dated October 6th,
4  2004?
5    A. Yes.
6    Q. If you look at the fourth sentence of that
7  entry, it says, quote, he still has erectile
8  dysfunction but relates to me that he does not feel
9  that the Viagra was given at the time that he went
10  blind, end quote. Do you see that sentence?
11    A. Yes.
12    Q. Had you seen this entry before today?
13    A. I think I have seen this.
14    Q. Do you know who Dr. McEllistrem is?
15    A. No.
16    Q. Let me hand you an excerpt from
17  Dr. McEllistrem's records.
18      (Lee Exhibit 19 was marked for
19  identification by Attorney Leskin.)
20    Q. Well, you know what, I'll mark
21  Dr. McEllistrem's records as Exhibit 19 (indicating),
22  and these are Bate stamped Martin, McEllistrem 1
23  through Martin, McEllistrem 40, and I'll ask you to
24  take a look at that and tell me whether you've seen
25  these records before.

## Page 131

1    A. (Witness complies.) I don't think I have
2  seen this.
3    Q. If you take a look at page 31 of
4  Dr. McEllistrem's records.
5    A. (Witness complies.)
6    Q. And you see that's an entry dated at the
7  top October 29th, 2002?
8    A. Yes.
9    Q. Do you see that?
10    A. Yes.
11    Q. And that's about seven months after
12  Mr. Martin's onset, correct, of his vision loss?
13    A. Yes.
14    Q. And you'll see that Dr. McEllistrem wrote
15  patient had new medication for HTN -- That's
16  hypertension, right?
17    A. Yes.
18    Q. -- which caused him some dizziness on
19  standing up from squatting position, and he suddenly
20  developed difficulty with vision and was felt to have
21  had vascular occlusion to optic nerves. Did you see
22  that at the time?
23    A. Yes.
24    Q. Did you see this entry before today?
25    A. I think I have seen this entry.

## Page 132

1    Q. Did you, in fact, see this before today?
2    A. I think so.
3    Q. Okay. If Mr. Martin -- I want to go back
4  to Dr. Ferrera's record from October 6th, 2004, the
5  one we referenced earlier --
6    A. Can you tell me that number again?
7    Q. Sure. It's Ferrera 92.
8    A. (Witness complies.) Okay.
9    Q. -- where Dr. Ferrera wrote he still has
10  erectile dysfunction but relates to me that he does
11  not feel that the Viagra was given at the time he
12  went blind.
13    A. Yes.
14    Q. If Mr. Martin's statement to Dr. Ferrera
15  that he was not taking Viagra at the time of the
16  NAION onset, if that statement is correct, does that
17  change your opinion as expressed in your report?
18    A. Yeah, if he didn't take it, then it's hard
19  to establish close temporal relationship.
20    Q. The second element that you identified --
21  key factor you identified in your report is the
22  nocturnal use of the agent in question.
23    A. Yes.
24    Q. What is the significance of the nocturnal
25  use?

## Page 133

1    A. One of the things that people believe is
2  that nocturnal hypotension is a predisposing or
3  precipitating factor in ischemic optic neuropathy,
4  so if you take the agent during the day, it might not
5  cause your blood pressure to go down as much as if
6  you take it at night.
7    Q. Now, according to Dr. Heyreh's nocturnal
8  hypotension theory, the patient notices the vision
9  loss upon awakening, correct?
10    A. They can notice it upon awakening, but they
11  can notice it at any time.
12    Q. Okay. Are aware that Dr. Heyreh has
13  written that one of the bases to support his
14  nocturnal hypotension theory is that the patients
15  awake with vision loss?
16    A. Yes.
17    Q. The next key factor you wrote -- Well,
18  strike that. What was Mr. Martin's blood pressure
19  before he went to bed?
20    A. I don't know.
21    Q. How far did his blood pressure drop
22  overnight?
23    A. I don't know.
24    Q. What was his blood pressure when he woke up
25  in the morning?

34  (Pages 130 to 133)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 134

1 A. I don't know.
2 Q. What was his blood pressure immediately
3 before the onset of his eye loss -- vision loss?
4 A. I don't know. I don't know any of these
5 blood pressure things, because they weren't recorded.
6 Q. So you don't, in fact, know whether or not
7 Mr. Martin suffered from nocturnal hypotension, is
8 that correct?
9 A. On the nights in question?
10 Q. Correct.
11 A. Yeah, we don't know that.
12 Q. The next key factor you wrote is the
13 bilateral and rapidly sequential nature of the NAION
14 in close proximity in time to one another, right?
15 A. Yes.
16 Q. And as we identified earlier in
17 Dr. Newman's report on the decompression trial, the
18 median interval was 1.2 years, right, that she
19 reported between eyes, correct?
20 A. That's correct.
21 Q. But the range was between sixteen days and
22 six years, correct?
23 A. That's correct.
24 Q. Number 4 you wrote, was a biologically
25 plausible mechanism for the effect. Is that the same

## Page 135

1 effect that we've been talking about earlier?
2 A. Hypotension is the biologically
3 plausible --
4 Q. Okay. And that's the same effect that you
5 described on the video as weak, correct?
6 A. No, the hypotension is not weak. The
7 hypotension is strong. The weak link is the
8 hypoperfusion of the optic nerve head, which we do
9 not have that.
10 Q. Okay. How far did Mr. Martin's blood
11 pressure drop as a result of taking Viagra?
12 A. We don't know that.
13 Q. How far does your blood pressure have to
14 drop in order to cause NAION?
15 A. We don't know that, because there are
16 predisposing factors, and there are precipitating
17 factors. The predisposing factors are the things we
18 talked about before.
19 Q. The vasculopathic risk factors?
20 A. Vasculopathic. And so someone who's
21 totally healthy and has good blood vessels might be
22 able to sustain a significant hypotension, and
23 nothing would happen to them, but someone who has
24 predisposing factors, a little bit of hypotension
25 may be enough to precipitate an event.

## Page 136

1 Q. Okay. So someone with predisposing risk
2 factors, how far does their blood pressure have to
3 drop in order to cause NAION?
4 A. We don't know that.
5 Q. How long does their blood pressure have to
6 be dropped in order for there to be NAION?
7 A. We don't know that.
8 Q. How long has Mr. Martin's blood pressure
9 dropped, if at all?
10 A. We don't know any of the blood pressure
11 questions that you're asking me, because there are
12 no blood pressure measurements for the nights in
13 question.
14 Q. The next point you raise is the lack of
15 alternative etiologies for the effect. Now, you
16 identified exclusion of temporal arteritis here.
17 That's simply ruling out another cause of the effect,
18 the loss of vision, correct?
19 A. No, there are two types of ischemic optic
20 neuropathy. Remember we talked about arteritic and
21 nonarteritic?
22 Q. Right.
23 A. Arteritic is what you would be worried
24 about if you have bilateral and rapidly sequential.
25 So if someone has both eyes that close together, we

## Page 137

1 really are worried about temporal arteritis, but it
2 was not the case.
3 Q. So for number 5 the only thing you're
4 referring to is whether he had nonarteritic as
5 opposed to arteritic, correct?
6 A. Well, there are other causes of optic
7 neuropathy, inflammation, infection and all these
8 other things --
9 Q. Okay.
10 A. -- but none of them were present either,
11 but I gave the example of temporal arteritis.
12 Q. Okay. So when you -- On number 5 when you
13 say the lack of alternative etiologies for the
14 effect, are you referring solely to the diagnosis of
15 NAION as opposed to other disease conditions?
16 A. Yes.
17 Q. Okay.
18 A. So --
19 Q. You're not referring to other potential
20 causes of NAION here in this sentence?
21 A. Both.
22 Q. Okay.
23 A. There was no other precipitating factor
24 that could be implicated, even though there were a
25 number of predisposing, so -- For example, if you

35 (Pages 134 to 137)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

## Page 138

1  have surgery or blood loss, you can get ischemic
2  optic neuropathy. He had no — nothing else to
3  blame, so it's either coincidence, or it's the drug.
4  Those are your two choices.
5      Q.  Okay.  How do you rule out coincidence in
6  this case?
7      A.  You cannot.  Those are the two competing
8  hypotheses —
9      Q.  Okay.  And —
10     A.  — coincidence or not.
11     Q.  Okay.  And you cannot rule out coincidence
12 in this case, is that true?
13     A.  You cannot rule out coincidence.
14     Q.  Mr. Martin told his — told Dr. McEllistrem
15 that he had taken Catapres — just started taking
16 Catapres, correct?
17     A.  Yes.
18     Q.  Could Catapres be a precipitating factor
19 for NAION?
20     A.  Yeah.
21         MR. RICHARDS:  Objection, form.
22     A.  Yes.
23         MR. RICHARDS:  She hasn't established he
24 even knows what Catapres is.
25         JUDGE BORG:  The witness answered the

## Page 139

1  question, so —
2      THE WITNESS:  Sorry.  I'm too fast on the
3  draw.
4      Q.  I'll back up.  Do you know what Catapres
5  is, Doctor?
6      A.  I know what Catapres is.
7      Q.  What is Catapres?
8      A.  Antihypertensive drug.
9      Q.  Could Catapres be a precipitating risk
10 factor for NAION?
11     A.  Yes.
12     Q.  How are you able to rule out Catapres?
13 Well, strike that.  Are you able to rule out Catapres
14 as a potential precipitating cause in this case?
15     A.  You cannot rule this out.  You would apply
16 the same criteria, when did you take the drug, what
17 was the half-life and maximum onset, so if you say,
18 look, I took the Catapres, then that night I went to
19 bed, when I woke up I lost my vision, and every time
20 I take the Catapres I get dizzy, whatever, then these
21 are things that would suggest an alternative
22 etiology, but there's no test to rule out Catapres.
23     Q.  So have you ruled out Catapres as a
24 potential cause for Mr. Martin's NAION?
25     A.  There's no test to rule it out.

## Page 140

1      Q.  So you have not ruled out Catapres, is that
2  right?
3      A.  I have not, and there is no test to do
4  that.  There is no — You can only apply the
5  criteria, again, do the same things, same list, same
6  seven things, so — It's weaker on Catapres if you
7  apply the seven criteria of Austin Bradford Hill.
8      Q.  Okay.  The last key factor you identified
9  is the apparent rechallenge with the same effect,
10 and you're referring to the one eye and then the
11 second eye, that Mr. Martin testified he took Viagra
12 the night before?
13     A.  We skipped number six, but maybe —
14     Q.  Oh, I'm sorry.  You're right.  I did.
15 Number 6, the presence of predisposing vasculopathic
16 risk factors.  Now, you told me, though, that those
17 factors in and of themselves are risk factors for
18 NAION, correct?
19     A.  That's correct.  So —
20     Q.  And a patient could have those
21 vasculopathic risk factors and nothing else and
22 still get NAION, correct?
23     A.  That's correct.
24     Q.  And that's why you're not able to rule out
25 coincidence?

## Page 141

1      A.  That's correct, too.
2      Q.  Okay.
3      A.  But they're important in establishing the
4  predisposition.  So the predisposition is probably
5  necessary for a precipitating effect to occur if
6  there's some predisposing thing.  Like I said before,
7  if you're totally healthy, and your blood pressure
8  goes down 4 millimeters, probably nothing will happen
9  to you.
10     Q.  If Mr. Martin had walked into your office
11 with the same predisposing vasculopathic risk factors
12 that you reference here but had not taken Viagra,
13 what would you say caused his NAION?
14     A.  Then we would be going through the other
15 list of things, including the Catapres and the —
16 Other things would be subjected to the same
17 Austin Bradford Hill criteria.
18     Q.  And all of those things still are on the
19 differential for Mr. Martin, correct?
20     A.  That's correct.
21     Q.  And as you said, you cannot rule out
22 coincidence, and you cannot rule out Catapres,
23 correct?
24     A.  There's no test to rule these things out.
25         MS. LESKIN:  I'm told we have to change the

36  (Pages 138 to 141)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 142

1 tape, so — I need more than three minutes for my
2 line of questioning, so let's take a break.
3      JUDGE BORG: Time?
4      THE VIDEOGRAPHER: 4:07.
5      (A brief recess was taken.)
6      JUDGE BORG: We're on.  Time?
7      THE VIDEOGRAPHER: 4:17.
8      JUDGE BORG: 4:17.  Ms. Leskin, go ahead.
9      Q.  (By Ms. Leskin) Okay.  Doctor, the last
10 key factor you identified in your report talks about
11 the apparent rechallenge in this case?
12      A.  Yes.
13      Q.  Okay.  Now, a rechallenge -- Let's go
14 through some definitions.  A rechallenge --
15 A challenge is when you give someone a medication,
16 correct --
17      A.  Yes.
18      Q.  -- in the context of a medication, right?
19      A.  (Witness nods head.)
20      Q.  A challenge is you give someone the
21 medication, correct?
22      A.  Yes.
23      Q.  A positive challenge is they have an effect
24 from the medication, correct?
25      A.  Yes.

## Page 143

1      Q.  And a negative challenge is they have no
2 side effect -- they have no effect from the
3 medication?
4      A.  Yes.
5      Q.  Okay.  And a dechallenge is when you take
6 the medication away, they get -- You take the
7 medication away, that's dechallenge, correct?
8      A.  Yes.
9      Q.  And a positive dechallenge is you take the
10 medication away, and they get better, right?
11      A.  Yes.
12      Q.  And a negative dechallenge is you take the
13 medication away, and they either have no change, or
14 they get worse --
15      A.  Yes.
16      Q.  -- right?
17      A.  (Witness nods head.)
18      Q.  And a rechallenge is when you give someone
19 else -- when you give them the medication again --
20 the same person the medication again, correct?
21      A.  Yes.
22      Q.  And a positive rechallenge is when you
23 give the patient the medication again, and they have
24 an effect again, correct?
25      A.  Yes.

## Page 144

1      Q.  And a negative rechallenge is when you give
2 someone a medication again, and they don't have an
3 effect again, correct?
4      A.  Yes.
5      Q.  Okay.  Were you aware that Mr. Martin
6 started taking Viagra in April of 1998?
7      A.  Yes.
8      Q.  And he took it once or twice a week,
9 correct?
10      A.  Yes.
11      Q.  So by the time that he had his NAION in
12 his first eye, the end of April 2002, would you agree
13 with me that he would have used Viagra approximately
14 two hundred times?
15      A.  Yes.
16      Q.  And he had no side effects from any of
17 those, correct?
18      MR. RICHARDS: Objection to form.
19      A.  He did not have ischemic optic neuropathy.
20      Q.  Correct.  Thank you.  Thank you for
21 clarifying that.  He had no ischemic optic neuropathy
22 after taking Viagra, correct, on those first
23 two hundred times?
24      A.  On those previous challenges.
25      Q.  Okay.

## Page 145

1      JUDGE BORG: I was going to sustain that
2 objection.
3      MR. RICHARDS: You were?
4      JUDGE BORG: Yep.
5      MR. RICHARDS: It would have been the
6 first.
7      JUDGE BORG: But Dr. Lee straightened
8 Ms. Leskin out.
9      Q.  We are right on track with each other.
10 So under the definitions we just went over, each time
11 that Mr. Martin took Viagra, that's a rechallenge,
12 correct?
13      A.  Yes.
14      Q.  And so Mr. Martin was, in fact,
15 rechallenged two hundred times with Viagra without
16 getting ischemic optic neuropathy, is that correct?
17      A.  Yes.
18      Q.  You told me earlier -- We talked about
19 Richard Stanley.  Do you remember that --
20      A.  Yes.
21      Q.  -- way back at the beginning of the
22 deposition?
23      A.  (Witness nods head.)
24      Q.  And you told me that your opinion on
25 Mr. Stanley was not as strong, correct?

37 (Pages 142 to 145)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 146

1    A. Yes.
2    Q. Why was Mr. Stanley's case not as strong?
3    A. I don't remember exactly the circumstances,
4    but I believe that he did not have the full seven
5    criteria. He only had three or four. I can't
6    remember exactly.
7    MS. LESKIN: I have nothing further.
8    JUDGE BORG: Mr. Richards, are you going to
9    do it?
10   MR. RICHARDS: I'm going to take a short
11   break --
12   JUDGE BORG: Okay.
13   MR. RICHARDS: -- and get my questions
14   together and --
15   JUDGE BORG: All right. We can do that.
16   MS. LESKIN: Okay.
17   JUDGE BORG: Off the record at --
18   THE VIDEOGRAPHER: 4:20.
19   (A brief recess was taken.)
20   JUDGE BORG: Back on at --
21   THE VIDEOGRAPHER: 4:32.
22   JUDGE BORG: 4:32. Go ahead.
23            CROSS-EXAMINATION
24   BY MR. RICHARDS:
25   Q. Good afternoon, Dr. Lee. I'm going to

Page 147

1    follow up with some questions that Ms. Leskin touched
2    upon, and I may want to -- can you --
3    MR. RICHARDS: Can the videographer see
4    Dr. Lee okay?
5    THE VIDEOGRAPHER: Yes.
6    MR. RICHARDS: Okay.
7    Q. I know I'm sitting beside you, so I
8    apologize if it seems a little strange, but -- you
9    had testified earlier that back in -- your current
10   practice, about two hundred or three hundred NAION
11   cases -- You see about two hundred or three hundred
12   NAION cases a year, is that right?
13   A. Yes.
14   Q. And with any of those two or three hundred
15   NAION cases that you see a year, are you aware or
16   do you recall as to whether or not any of those
17   took -- any of those patients took a PDE-5 inhibitor
18   within a temporal relationship to developing the
19   onset of this disease?
20   MS. LESKIN: Objection to the extent that
21   it violates patient privacy, people who are not
22   patients -- plaintiffs in this litigation.
23   JUDGE BORG: Overruled. I'm going to
24   overrule that.
25   Q. And I don't want you to name any patient

Page 148

1    names, but if you can just tell me generally.
2    A. We always ask all our patients who have
3    NAION if they have taken Viagra or any of the
4    erectile dysfunction agents.
5    Q. And why do you ask that question?
6    A. Because of the question of causality, and
7    also we apply the Austin Bradford Hill criteria to
8    their individual cases so that we can advise them
9    appropriately on the risk and benefit of using these
10   agents.
11   Q. When did you -- If you recall, when did you
12   start asking that question?
13   A. Right when it all started coming out in
14   the lay press, that would be in the mid 2000s, very
15   close in time to the FDA warning that was listed as
16   an exhibit. I can't remember which one it was.
17   Q. So you apply the Bradford Hill criteria for
18   each patient that you see that informs you that they
19   took Viagra or a PDE-5 inhibitor?
20   A. Yes, and we have to make a special effort
21   to ask them about it, because, as I alluded to
22   before, many patients do not disclose that they are
23   taking these agents for various stigma reasons,
24   they're embarrassed by it, so if you don't ask, they
25   definitely don't tell you.

Page 149

1    Q. And in 2002 prior to the time that lay
2    opinion became -- the lay press kind of picked up on
3    the possible association there was even less of a
4    reason for a patient to inform a doctor that they may
5    have taken Viagra?
6    MS. LESKIN: Objection, calls for
7    speculation.
8    JUDGE BORG: Overruled.
9    A. Yes, patients were not aware of this until
10   it reached the lay press level and made all the
11   headlines, et cetera.
12   Q. In fact, physicians were generally not
13   aware of it before it reached the lay press and made
14   the headlines, right?
15   MS. LESKIN: Objection, calls for
16   speculation.
17   A. Yes, that --
18   JUDGE BORG: I'll overrule --
19   MS. LESKIN: If he's providing an expert
20   opinion on that, Judge, then he needs to have a
21   basis for that. That's not in his report.
22   JUDGE BORG: A little more foundation
23   would make it a little easier with respect to the
24   objection.
25   Q. In two thousand -- Prior to 2005 did you

38 (Pages 146 to 149)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 150

1  have a reason to believe that Viagra or any PDE-5
2  inhibitor was associated with NAION?
3      A.  No, only after that did it become a big
4  issue and become part of our standard questionnaire.
5      Q.  So in applying the Bradford Hill criteria
6  to the patients that you had mentioned, the two or
7  three hundred, do you recall whether or not you had
8  made any causal assessments on any of those patients?
9      MS. LESKIN: Objection. Those patients
10  are not plaintiffs in this litigation. He is not
11  being offered as an expert in those. To the extent
12  they form the basis for his opinion, then he needs to
13  be --
14      JUDGE BORG: So is your objection to form?
15      MS. LESKIN: Yes.
16      JUDGE BORG: It's overruled.
17      You can repeat the question.
18      MR. RICHARDS: Madam Court Reporter, could
19  you read the question?
20      MS. LESKIN: And to the extent it's not an
21  objection to form, we reserve the right to raise it
22  as to admissibility with the court.
23      JUDGE BORG: Of course you do.
24      MS. LESKIN: Just making clear.
25      JUDGE BORG: That goes without saying.

Page 151

1  All of those objections are reserved pursuant to the
2  court's order.
3      (Requested portion of record was read.)
4      A.  Yes, so if they have a weak assessment,
5  as I mentioned in the presentation, we tell them the
6  risk is low; if it's moderate, then we tell them the
7  risk is moderate; if it's high, and they have all
8  seven criteria, I tell them the risk is high, and
9  they have a quality of life decision whether they
10  want to continue to use the agent.
11      Q.  Ms. Leskin also asked you about the
12  Pfizer study that the institution here at the
13  University of Iowa is undertaking. You had mentioned
14  that you doubted whether your university would engage
15  in that study, that there were some questions
16  regarding the -- I guess the protocol. Could you
17  elaborate on what questions that you had or some of
18  your colleagues may have had regarding the protocol
19  posed by Pfizer?
20      A.  There have been numerous questions raised
21  about this study, and the major ones are sample size.
22  Because nonarteritic ischemic optic neuropathy is so
23  uncommon, it would take many, many thousands of
24  patients scattered over many, many centers, and you
25  would probably have to follow them for a significant

Page 152

1  number of years to establish a cause and effect
2  relationship, which, I believe, is why the FDA is
3  trying to do this. It's not going to be able to be
4  done by one single center, so -- it's going to take a
5  lot of patients and a lot of time, but if the study
6  is too small or too short, then it will show the
7  opposite effect; it will show there is no causal
8  relationship, even though there could be if you had
9  more patients and a longer time.
10      So I think the major quibbles with the
11  study are it needs to be bigger and needs to have
12  longer duration of follow-up, and then there were
13  some side disagreements about collecting other
14  additional data that might be useful. Since we're
15  getting the information on ischemic optic neuropathy
16  anyway, we might as well collect a whole broad range
17  of data points to learn something about the disease,
18  but the company is not willing to do this.
19      Q.  Is there a difference between a cause and
20  effect relationship in the scientific community
21  versus a cause and effect relationship in the legal
22  community?
23      A.  Yes. My understanding of it is that when
24  we're trying to establish cause and effect for a
25  population, that's an epidemiologic type of study

Page 153

1  that's going to require many, many, many patients
2  followed over years and in medical centers. That's
3  the whole point of the prospective studies that have
4  been mandated by the FDA for the companies. But when
5  we're talking about an individual patient that's
6  sitting there in the room with you, you can only
7  advise them on their specific situation, their
8  predisposing risk factors, and then we apply the
9  Austin Bradford Hill criteria to give them the best
10  advice that we can based on their specific situation.
11  So in a legal setting I was asked to comment about
12  Mr. Martin, and that's what I have done here.
13      Q.  And the legal setting is not to a
14  100 percent certainty, right?
15      A.  No. I was only asked is it more likely
16  than not, and that's why some of the cases that they
17  presented I didn't feel were very strong; some I
18  thought were very strong. Just as I presented in
19  the -- much more forcefully in the presentation that
20  was shown, a lot of the cases in the FDA database are
21  weak, but some, like Mr. Martin's, are very strong.
22      Q.  When you advise patients regarding various
23  risk factors associated with ED drugs, what do you
24  advise them?
25      A.  We try to tell them their risk. I try to

39 (Pages 150 to 153)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

## Page 154

1  establish the Bradford Hill criteria. The most
2  important is the temporal relationship coherent with
3  the pharmacokinetics of the drug. That's the thing
4  we talked about before. So if they have their
5  ischemic optic neuropathy, and it was like a week
6  later, I think the risk is not so good, but if
7  someone has had ischemic optic neuropathy, and then
8  they got a rechallenge, and they got it again, boy,
9  that's really going to make us nervous, and we're
10 going to tell that person there's a significant risk
11 for getting it again, and we probably would recommend
12 not using it. So there's -- A risk/benefit decision
13 has to be made based on the individual patient and
14 provide a discussion about the Bradford Hill
15 criteria, and then we lay out the risk/benefits to
16 them. I don't tell them they can't take it, because
17 it's a life-style choice, but I tell them the risk
18 is high, medium or low.
19      Q. On direct examination you had talked about
20 comparing the two groups in Dr. Newman's study and
21 how you can't provide -- I think comparing the two
22 groups does not provide you with an incidence rate.
23 Could you elaborate on that, why it's improper to
24 compare what you called apples and oranges in
25 Dr. Newman's study?

## Page 155

1      A. Because counsel was trying to lump in the
2  bilateral cases with the bilateral sequential cases.
3  The bilateral sequential cases tell you the incidence
4  of fellow eye involvement, and that number is
5  14.7 percent. The number we tell patients is between
6  12 and 14 percent to give it some range, because that
7  number is not hard and fast. But the patients that
8  came already to the study with bilateral, they cannot
9  be included, because they already had their event
10 before, and so you don't know when that occurred,
11 whether it was last year or five years ago to
12 ten years ago, and someone who's already had ischemic
13 optic neuropathy in one eye is a lot more likely to
14 go to the doctor, because they already have it in the
15 one eye, so you cannot use them for anything, so --
16     It's interesting that they were bilateral,
17 but it cannot be used to establish the incidence rate
18 in the fellow eye because of ascertainment bias,
19 which is what we talked about before. Ascertainment
20 bias means you're already collecting a bunch of
21 people who are bilateral, because those are the ones
22 that are super likely to go to the doctor and end up
23 at a medical center where a study is being done, so
24 that's ascertainment bias. So we cannot include the
25 bilateral patients who already had it in one eye as a

## Page 156

1  bilateral for the incidence calculation, because
2  they're the ones that are going to go to the doctor.
3  The only thing we include, the 14.7 percent fellow
4  eye involvement that occurred over the five-year
5  period of the study. I did not make this clear,
6  I don't think, to counsel very well, but it's apples
7  and oranges.
8      Q. Since you've published your paper -- your
9  Viagra paper -- or your PDE-5 inhibitor paper in
10 2005 -- in October 2005 are you aware of whether
11 Pfizer has undertaken any prospective or case-control
12 studies to determine a cause and effect relationship?
13     A. Yes, I think they have been mandated by
14 the FDA to do this and to try and get at this, and
15 that's where we are looking at the preliminaries, and
16 I attended the preliminary meeting, but I don't have
17 any involvement with it anymore because of moving to
18 Houston.
19     Q. So between October 2005 and until
20 relatively recently, you mean -- how many months ago?
21     A. In the last year.
22     Q. Okay. And between October 2005 when you
23 published your study and last year you're not aware
24 of any studies -- prospective case-control studies
25 that Pfizer has undertaken?

## Page 157

1      A. No, but why would they want to do this?
2  I mean, that's why it has to be mandated.
3      Q. What do you mean by that?
4      A. If there's a possibility that your drug
5  could cause blindness, you don't want to find that
6  out, let alone pay for it, but if FDA mandates it,
7  then you have to do it.
8      Q. And your understanding is the FDA has
9  mandated that they undertake these studies?
10     A. Yes, and I think that's a good thing,
11 because that's the only way we're really going to be
12 able to answer the question.
13     Q. And that's the ultimate goal, really,
14 isn't it, is to try to find out whether, in fact,
15 there is a cause and effect relationship with this
16 drug and NAION, right?
17     A. That's correct, that's the only way to
18 know. The only way to know is to have a prospective
19 observational study where we can look at specific
20 time points, capture all the patients and see whether
21 it really is cause and effect or whether it's
22 coincidence.
23     Q. You had made reference to the fact that
24 there may be more cases -- there may have been more
25 cases published since the 2005 FDA alert. Are you

40 (Pages 154 to 157)

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

## Page 158

1 referring to any specific cases or just generally?
2   A.  We know that many more cases have been
3 published in the literature and also that the
4 database has more patients in it.  I have not
5 accessed this database lately, but there are
6 definitely more patients in there from what people
7 are saying.  I think it's in the fifty range, but I
8 don't know.  There's definitely more patients.
9   Q.  In the presentation that was played on the
10 TV you said that the presentation that was shown to
11 you, the seven and a half minutes, did not show the
12 pro side of causation.  It showed, I guess, your
13 con side of causation.  Who did the pro side of
14 causation?
15   A.  Alfredo Sadun.  That's why it's misleading
16 to just show the con side, because the whole point of
17 the presentation was one doctor took the pro side,
18 and the other doctor took the con side.  We would
19 never present like that if I was just giving the
20 presentation about erectile dysfunction agents,
21 because I would never leave off just the pro side.
22 That would be ridiculous.  The whole point of that
23 presentation was to have two doctors to show the pro
24 and the con.  If you only show the con, that is
25 completely misleading and — I still stand by

## Page 159

1 everything that was said in that presentation,
2 because it totally jibes with my opinion.  There are
3 medium, weak and strong cases.  Mr. Martin's case
4 happens to be a strong case.  If you notice, the
5 Austin Bradford Hill criteria are — The exact same
6 criteria that we are using to support Mr. Martin's
7 allegations are the same things I mentioned in the
8 presentation.  But it's misleading to not show the
9 pro side.
10   Q.  Do you recall what the pro side was?
11   A.  Yes, the pro side was the same points on
12 the Austin Bradford Hill except the other guy said
13 the opposite of what I said, so —
14   Q.  Why were you tasked to take the con side?
15   A.  It was just luck of the draw.  I mean, you
16 have to take the pro and the con.  I took the con
17 side, because at that time it was — you know, the
18 data was equal, there could be — It was a
19 controversial topic.  It's still a controversial
20 topic.  So I think that what they neglected to
21 include in there was — The title of the whole
22 symposium was controversies in neuroophthalmology;
23 not that there was a right answer and a wrong answer,
24 but that there was a pro position and a con position,
25 and each doctor was assigned to take one side or the

## Page 160

1 other.  I happened to draw the con side.  But it's
2 totally misleading to just show the con side.
3   Q.  So in applying -- in rendering your opinion
4 in this case you applied the Bradford Hill criteria
5 to Mr. Martin's case?
6   A.  Yes.  In fact, I think that's why you chose
7 me to be an expert.  You knew that this was my
8 opinion.  You had my published editorial.  Everything
9 that was brought up in this deposition is my opinion.
10 I don't turn away from it.  I stand by every single
11 thing that we've said.  The whole point is I am a
12 skeptic and have been a skeptic the whole time, but
13 for this particular case, this patient's case meets
14 the more likely than not standard for causality, the
15 legal thing we're talking about.  Does it prove for
16 all the patients that erectile dysfunction agents
17 cause nonarteritic anterior ischemic optic
18 neuropathy; no, but no single case can prove that.
19 That means an observational prospective study.  But
20 if you're just asking me about this patient, yes, it
21 is my opinion that more likely than not it was a
22 precipitating factor.
23   Q.  And by "precipitating factor," explain to
24 me what you mean by that.
25   A.  So we talked a little before about what

## Page 161

1 causes ischemic optic neuropathy.  Predisposing
2 factors and precipitating factors.  Predisposing
3 factors are all the things that were vasculopathic
4 that were mentioned, high blood pressure, diabetes,
5 cholesterol, smoking, age.  Those are all
6 predisposing factors.  A precipitating factor is
7 nocturnal hypotension.  Nocturnal hypotension that
8 is made worse by using a medicine that lowers your
9 blood pressure like an erectile dysfunction agent is
10 a precipitating factor.  So you have to have the
11 predisposing factors, they push you to some
12 threshold, and then something is the straw that
13 breaks the camel's back and pushes you over the edge.
14 In my opinion the erectile dysfunction agent in this
15 case is the most plausible precipitating factor in
16 someone who is predisposed to the development of
17 nonarteritic anterior ischemic optic neuropathy.
18   Q.  But Pfizer points out that he had taken
19 it — Mr. Martin had taken it approximately
20 two hundred times before, so explain that —
21 explain — explain that to me.
22   A.  Well, it's a threshold effect.  It's not
23 really a toxicity of the medicine, which I made a lot
24 of — spent a lot of time in the presentation
25 discussing the difference between toxicity, which

41 (Pages 158 to 161)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 162

1  this doesn't look anything like toxicity, so it's
2  not that the erectile dysfunction agent
3  produces toxicity --
4       THE WITNESS: Is he saying something?
5       MR. RICHARDS: Hey, Neil?
6       MS. LESKIN: Neil?
7       MR. RICHARDS: Neil?
8    A. Keep going?
9    Q. Yes.
10   A. It's not a toxicity. It's a side effect
11  with a biologically plausible mechanism. So if you
12  don't reach the threshold, your blood pressure isn't
13  low enough, you won't get the event, so it's kind of
14  an all or none effect; you either get ischemic optic
15  neuropathy or you don't. The fact that you did not
16  get it two hundred times before is not the same as a
17  normal rechallenge for toxicity. In a normal
18  rechallenge for toxicity, like I get a rash every
19  time I take this medicine; every time you take it,
20  we rechallenge you, you get the rash, that's a
21  legitimate rechallenge, and then for that you would
22  say, look, you were rechallenged two hundred times,
23  you didn't get it.
24      In an all or none effect you don't get it
25  over and over again; it's either all or none.

Page 163

1  So you can take it two hundred times and never get
2  the threshold, but then you take it the two hundred
3  and first time, and that is the thing that pushes
4  you over the edge. So the fact that there were
5  two hundred other dosings is not the same as what we
6  use for rechallenge for side effects like rash or
7  nausea, whatever. It's not the same, because it's
8  an all and none effect. In this case NAION is an
9  all or none threshold effect.
10   Q. There were some questions raised about
11  whether or not Mr. Martin may have taken the drug
12  within twenty-four hours. Your opinion is based
13  upon the fact -- the assumption that it is true that
14  Mr. Martin took the drug within approximately
15  twenty-four hours of developing NAION, correct?
16   A. Yes.
17   Q. Okay. You're familiar with Catapres --
18  the drug Catapres?
19   A. Yes.
20   Q. Are you aware whether or not Catapres has
21  anything in its packaging or labeling regarding AION,
22  ION or NAION?
23   A. It doesn't have that.
24   Q. Are you familiar with whether or not
25  Mr. Martin was taking Zocor?

Page 164

1    A. Yes.
2    Q. Are you aware whether or not Zocor has
3  anything in its packaging or labeling regarding ION,
4  AION or NAION?
5    A. It doesn't.
6    Q. Only Viagra has the warning regarding
7  NAION, right?
8    A. I think the other erectile dysfunction
9  agents also have similar things in --
10   Q. So it's classified?
11   A. Classified, yeah. In fact, if we had shown
12  the pro side, that was what was argued. Every single
13  point that I argued with the Bradford Hill criteria
14  was argued on the other side by my esteemed opponent,
15  so -- You know, when you're on the con side, you
16  don't mention things that he just said, that would be
17  redundant, plus it's not the point of the symposium,
18  so --
19   Q. What was the point of the symposium?
20   A. To demonstrate that there are two sides to
21  every issue, a pro and a con; it was a controversy
22  then, and it's still a controversy now, and that you
23  could use the Austin Bradford Hill criteria for the
24  exact same set of patients and come to different
25  conclusions. And the conclusion that I drew, and I

Page 165

1  try to impress upon all of our residents and medical
2  students and everyone we talk to about this issue,
3  is you must apply them on individual patients,
4  because we don't have epidemiologic data to say one
5  way or the other, so we have to just use what we have
6  on individual patients to make the decision.
7    Q. I want to get into the blood flow studies
8  that Ms. Leskin had mentioned or the lack of blood
9  flow studies. I want to zero in on the fact that --
10  is it true that there are no -- there are no
11  scientific -- there's no scientific means to study
12  the blood flow at the point where NAION is alleged to
13  occur?
14   A. That's correct. That's why it's not really
15  legitimate. It's somewhat misleading to say there
16  are no studies to look at the blood flow of this for
17  Viagra, because there are no studies to look at the
18  blood flow in that particular area for anything.
19  So that's misleading to say that there are no studies
20  for this erectile dysfunction agent for ocular blood
21  flow for AION, because there are no good studies for
22  this for anything, so it's true, but it's not
23  relevant.
24   Q. Is it your understanding that blood flow
25  to the optic nerve head and blood flow to the other

42 (Pages 162 to 165)

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

**Page 166**

1  parts of the body are the same, or are they
2  different?
3      A. It's different, so — There are clearly
4  susceptibilities of the optic nerve head that are
5  different than other parts of the body, mostly
6  because there are not redundant systems; the
7  perfusion is kind of far from the heart, it's the
8  last place to go. So there are all sorts of — a
9  number of hypotheses why ischemic optic neuropathy
10  occurs, and you don't get the stroke at the same time
11  in your brain, so it seems to be just isolated to
12  your optic nerve.
13      Q. In your paper from 2005 you had mentioned
14  some of Pfizer's clinical studies; in fact, there
15  were more than thirteen thousand patients, and there
16  were no reported cases of NAION in these patients.
17  Do you know whether or not thirteen thousand patients
18  is thirteen thousand patients measured in terms of
19  patient years? Do you understand what I'm asking?
20      A. Yes.
21      Q. Do you know the difference between patient
22  years versus individual doses?
23      A. Yeah. I don't know which number that
24  number refers to in terms of patient years or actual
25  patients and how long they were followed for, so —

**Page 167**

1  if you follow for too short a time, you won't —
2  thirteen thousand would be a small number; it's not
3  sufficient time to develop ischemic optic neuropathy
4  given the incidence numbers that we know about.
5      Q. Is it fair to — What do you consider to be
6  an appropriate dose response time period? If someone
7  took it once in a month, is it appropriate to
8  calculate them as having — Strike that. I don't
9  want to confuse the issue. You mentioned in your
10  paper the Johnson and Arnold study and another study
11  measuring the estimated incidence rate for folks
12  with NAION per one hundred thousand. That's the
13  Johnson and Arnold. Are you aware of any other —
14  What is your understanding of the incidence rate in
15  the general population between — for NAION? Is it
16  just Johnson and Arnold, or is it —
17      A. The Mayo Clinic is also another one that's
18  frequently quoted, so it's somewhere in that range.
19      Q. And it's your understanding it's still in
20  the range of 2.3, according to Johnson and Arnold,
21  versus the 10.3 at Mayo Clinic?
22      A. Yeah, it's somewhere in that range.
23  It's low. So that's why it's going to take thousands
24  and thousands of patients to figure out if this agent
25  is related or not, because look at the low natural

**Page 168**

1  history numbers.
2      Q. When you say in your paper a causal
3  relationship has not been established conclusively,
4  at what point, if ever, in the scientific community
5  can a causal relationship be established
6  conclusively?
7      A. Well, if we had a large enough case-control
8  data study, you could be fairly certain within
9  certain statistical limits that there was or was not
10  a relationship; that is, you could say, well, there's
11  a 95 percent chance we have excluded a causal
12  relationship if we had this sample size of X,
13  followed this many patients for Y, and here's the
14  data we got. That's the best you're going to have.
15  But for 100 percent, you're never going to have that.
16      Q. Do you know under what circumstances Pfizer
17  has asked the University of Iowa to contribute in any
18  prospective case-control study?
19      A. Well, they recruited all the major study
20  centers. The University of Iowa obviously would be
21  one that would want to be included in that. We went
22  to the preliminary discussions. We saw the protocol.
23  So I think almost all the major centers have seen the
24  protocol; it's just a matter of participating, yes or
25  no, and this is still — the controversial debate is

**Page 169**

1  still going on.
2      Q. Where was the initial meeting held?
3      A. I can't remember. I want to say
4  California, but I can't remember right now.
5      Q. Did you go out there on your own dime?
6  Did you go to California on your own dime, or did the
7  pharmaceutical company sponsor your trip?
8      A. No, I think there was some — It was part
9  of another meeting, and so the refreshments,
10  et cetera, were provided, and then this presentation
11  unfolded at our other meeting, so it was simultaneous
12  to another meeting. People came on their own dime
13  anyway, but it was informational.
14      Q. Were there any handouts presented by Pfizer
15  with respect to the study?
16      A. Yeah, there were handouts.
17      Q. Do you have those? Do you still have
18  those?
19      A. No, and I think we are asked to sign a
20  confidentiality agreement on the details.
21      MR. RICHARDS: I think that's all I have.
22      JUDGE BORG: Ms. Leskin, anything?
23      MS. LESKIN: Yeah.
24      JUDGE BORG: Oh, time, 4:58. Ms. Leskin,
25  anything?

43 (Pages 166 to 169)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 170

1    MS. LESKIN: Yes, just a few minutes'
2  worth, Judge.
3       REDIRECT EXAMINATION
4  BY MS. LESKIN:
5    Q. I want to make sure I understood you
6  correctly. Did I hear you correctly; did you apply
7  a different standard when assessing legal causation
8  versus scientific causation?
9    A. No. There's a difference in the standard
10 that is accepted in the court of law. In this case
11 my opinion was more likely than not. That would be
12 a very difficult thing to use for life or death
13 decisions in the clinic, so --
14   Q. Okay.
15   A. That's the difference in the standard,
16 unless I'm not reading your -- the legal standard.
17 I was asked the specific question is it more likely
18 than not in this particular patient on the causality
19 question. Yeah, it's more likely than not. That was
20 the question that was posed to me. But it's
21 different in the clinic.
22   Q. You use a different criteria in science,
23 right?
24   A. Yeah, you can be much more rigorous, and
25 that's why, as I mentioned in the articles, causality

Page 171

1  has not been established for this agent.
2    Q. Okay. If you can turn to Exhibit 16, which
3  is the article you published, an expert review of
4  ophthalmology following the Sally Letson symposium.
5  It looks like this (indicating).
6    A. Yes. (Witness complies.) I should have
7  kept them in order.
8    Q. That's okay. We'll put it back in order.
9    A. Yes.
10   Q. Now, you told me it was a little misleading
11 not to look at the pro, because you only gave the
12 con side.
13   A. Yes.
14   Q. This (indicating) was a summary of the
15 presentation, right, that you wrote; this article,
16 Exhibit 16?
17   A. Yes.
18   Q. And at the end of the day you took all the
19 information that was given, and you wrote a summary
20 of the entire symposium, correct?
21   A. Correct.
22   Q. And if you look at the third page in the
23 left-hand column at the bottom, you talk about the
24 presentation we've been talking about for a while
25 today, right --

Page 172

1    A. Yes.
2    Q. -- the one with you and Dr. Sadun?
3    A. Yes.
4    Q. And you wrote, Sadun, pro, and Lee, con,
5  debated the question of whether or not erectile
6  dysfunction agents, e.g., Viagra, Pfizer, New York,
7  USA, can cause nonarteritic anterior ischemic optic
8  neuropathy. Although there is a biologically
9  plausible mechanism, i.e., hypotension, and there
10 have been several cases reported in the literature,
11 a cause and effect relationship remains unproven.
12 Did I read that correctly?
13   A. Yes.
14   Q. And that's a valid conclusion based on what
15 was presented, correct?
16   A. Yes.
17   Q. And you stand by that today, correct?
18   A. Yes, only a prospective observational
19 case-control study with sufficient power and sample
20 size can answer this question on a population basis.
21   Q. And because it has not been proven, that's
22 why Pfizer and Bayer, together with the FDA, are
23 doing these studies that are going forward, correct?
24   A. That's the whole point. If we could rely
25 upon everything that's been published before, why

Page 173

1  would you have to do another study --
2    Q. Right.
3    A. -- because it was either proven that it was
4  or was not causal, and you wouldn't have to have
5  another study, would you? So the fact that there
6  are these little case-control studies, and there's
7  all -- people like me giving their opinion, only a
8  prospective large sample size case-control study can
9  answer this question.
10   Q. And that hasn't been done yet?
11   A. It has not been done yet.
12   Q. You told us that you have not accessed the
13 FDA database since the time of the presentation,
14 correct?
15   A. I maybe looked at it, but not for this.
16   Q. Okay. And so the number of cases that are
17 in that database, that's just a guess on your part,
18 correct?
19   A. Yeah, I have no idea how many there are
20 now.
21   Q. Okay. And you're not relying on that for
22 your opinion in this case?
23   A. No. Like the last slide of my
24 presentation, it's just more anecdotes.
25   Q. Okay.

44 (Pages 170 to 173)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

Page 174

1    A.  Forty-three cases, sixty-five cases.
2    Q.  Counsel asked you when you started asking
3 patients specifically about their use of PDE-5
4 inhibitors, and you said it was mid-2000s when the
5 FDA warning -- right around the time of the FDA
6 warning.
7    A.  Yeah.
8    Q.  And we marked that earlier, and that was
9 July 2005, if you look at Exhibit 12.
10    A.  Yeah. It's probably -- The FDA warning is
11 not the time I would use. It's like somewhere around
12 there, because that's when the buzz was starting to
13 generate, and the people were starting to ask the
14 question.
15    Q.  So you didn't base your decision to start
16 discussing this issue with your patients on the FDA
17 statement, right?
18    A.  No, because Dr. Pomeranz had already
19 presented it, and it already had started to filter
20 through the meetings that this might be a problem,
21 so then people say, hey, maybe you should start
22 asking about it, and then the lay press and then the
23 FDA, so that's kind of the time line as it played
24 out.
25    Q.  And as a physician, you keep up with the

Page 175

1 current medical literature, is that fair?
2    A.  Yeah. So there were already cases kind of
3 trickling out before the FDA thing in '05.
4    Q.  And there were cases trickling out before
5 you started discussing it with your patients?
6    A.  That's right.
7    Q.  And there was a time that you were aware
8 of these case reports, but you weren't discussing it
9 with your patients, correct?
10    A.  That's correct.
11    Q.  Because it hadn't reached the point where
12 there was sufficient information that it was worth
13 talking to your patients about, is that fair to say?
14    A.  That is true.
15    Q.  So that scale, so to speak, that tipped
16 over to when you started talking with your patients,
17 just so I understand the time, that occurred, in your
18 mind, based -- sometime in 2005, is that fair?
19    A.  Maybe beforehand, because we had already
20 heard about the case reports, et cetera, so I can't
21 be precise on the date, year.
22    Q.  So about when, two thousand -- give or take
23 a year or two; was it more than that?
24    A.  Yeah.
25    Q.  Would it have been --

Page 176

1    A.  That's fair.
2    Q.  Okay. Do you know the design of the study
3 that Pfizer is conducting on the issue of PDE-5
4 inhibitors and NAION?
5    A.  Yeah, I believe it's an observational
6 crossover. It's a unique design, so -- I'm not an
7 expert on epidemiologic studies, but --
8    Q.  Do you need to follow up patients for
9 a significant -- for any period of time on a
10 case-control crossover study?
11    A.  That's one of the problems with the --
12 that was mentioned as what the debate is about,
13 so you're looking backwards in time, but it's still
14 considered prospective, because you're collecting
15 data that's reliable, versus going forward in time
16 from the start. So, yeah, this is a unique design.
17 That's what is part of the problem. Many people
18 complained that the uniqueness of the design was
19 not a strict case-control prospective. But, yes --
20 The answer is, yes, we don't have to do as much.
21    Q.  Have you discussed the study with any
22 epidemiologist?
23    A.  No, but the epidemiologist data was
24 presented at the meeting, and that's been the
25 subject of many e-mails along the NANOS chat line,

Page 177

1 criticizing the design and that the design might be
2 designed to find no result, and that's why some of
3 the places are not participating.
4    MS. LESKIN: I have no further questions.
5    MR. RICHARDS: I have a follow-up.
6    RECROSS EXAMINATION
7 BY MR. RICHARDS:
8    Q.  Just to clarify, in 2006 when you provided
9 this summary of the Sally Letson symposium, you said
10 a cause and effect relationship remains unproven.
11 That's in the scientific community, right?
12    A.  That's correct.
13    Q.  In the legal community the standard is
14 more likely than not, so with respect to proving
15 more likely than not, it has been proven in this case
16 with Mr. Martin, right?
17    MS. LESKIN: Objection.
18    JUDGE BORG: Overruled.
19    A.  Yes, I believe that the answer to the
20 more likely than not question that was posed to me
21 about this particular patient, given his
22 circumstances and using the Austin Bradford Hill
23 criteria on him, more likely than not the erectile
24 dysfunction agent was the precipitating factor.
25 But can you use Mr. Martin's case to prove a causal

45 (Pages 174 to 177)

446b3b6a-95f2-499b-b993-55a9e16f1a8e

Page 178

1 relationship for all of the cases in the world; no,
2 because that remains unproven, and that needs to be
3 answered with an observational prospective large
4 sample size trial.
5     Q.  If Mr. Martin's case can, by itself,
6 establish causation in Mr. Martin, then by its nature
7 you could, in turn, say that it could cause NAION in
8 other folks; you would have to just look at their
9 individual cases, right?
10     A.  And that is precisely what we describe we
11 do on every single patient that comes to us who has
12 ischemic optic neuropathy who says they are on one of
13 these agents.  We go through this whole list, because
14 that's really what the guy is asking, right; how much
15 risk am I going to have of going blind from taking
16 this?  If they don't have any of the criteria, then
17 I tell them the risk is low; if they have all the
18 criteria, I say the risk is high, so for that
19 particular patient more likely than not he should
20 stop, but I can't just say for everybody more likely
21 than not.
22     Q.  You have to look at their individual case?
23     A.  You have to look at individual cases.
24 That's why the other case that was mentioned, I
25 looked at that one, too, and I said, yeah, that's not

Page 179

1 so good.
2     Q.  Now, Mr. Pomeranz -- Dr. Pomeranz; you had
3 mentioned he has some case reports before 2005.
4 Those case reports that are circulated among the
5 scientific community, in your experience that's not
6 something that individual patients, who are not
7 scientists, who don't work in the field, would have
8 any buzz about, would you?
9     A.  No, they wouldn't know that.
10     Q.  They wouldn't know to ask their doctor
11 whether or not there's a relationship between Viagra
12 and NAION in 2002, because those are the only case
13 reports, and only academics would look at that issue,
14 right?
15     A.  That's correct.  That's why it's not
16 appropriate to say, look, if he didn't mention it,
17 he didn't mention it.  Why would he -- Why would he
18 mention that?  Nowadays, of course, many more
19 patients mention it.  But even today if you don't
20 ask men about the erectile dysfunction agents, they
21 will not disclose this information voluntarily.
22     Q.  Just so I'm -- Just so it's clear, if
23 Viagra, in your opinion, was a precipitating factor
24 in Mr. Martin's case, then you could extrapolate from
25 there and say that it could be a precipitating factor

Page 180

1 in other patients as well, generally speaking, but
2 you would have to look at each individual patient's
3 case to make that determination, right?
4     A.  That's correct.  Until we have prospective
5 observational studies from an epidemiologic
6 population basis, every one of these cases is going
7 to have to be looked at on an individual basis.
8     JUDGE BORG:  Is that it, Mr. Richards?
9     MS. LESKIN:  One more -- One more question.
10     JUDGE BORG:  Okay.
11     MR. RICHARDS:  Yes, but we both take up
12 on the same thing.  We're both trying to maneuver
13 now his testimony to fit our snippet in the sound
14 byte from the --
15     JUDGE BORG:  I don't think --
16     MS. LESKIN:  Objection to the
17 characterization.
18     JUDGE BORG:  Go ahead.
19     FURTHER REDIRECT EXAMINATION
20 BY MS. LESKIN:
21     Q.  Dr. Lee, have you done any studies
22 evaluating the likelihood of men to discuss their
23 Viagra use with their physician?
24     A.  No.  This is just based on my experience
25 and my patient population, but I can tell you from

Page 181

1 my experience that when they list their medicines,
2 and it's not on there, and then you say are you
3 taking anything else; no; how about an erectile
4 dysfunction agent; okay, maybe --
5     Q.  Okay.
6     A.  -- once in a while.
7     Q.  You haven't done any studies of that?
8     A.  No.
9     Q.  And you didn't talk to Mr. Martin about
10 that?
11     A.  No.
12     Q.  And you don't know why or why not
13 Mr. Martin discussed his Viagra use with his
14 physician, is that a fair statement?
15     A.  I don't know that.
16     MS. LESKIN:  No questions -- more
17 questions.
18     MR. RICHARDS:  I'm done.
19     JUDGE BORG:  Okay.  Thanks, Dr. Lee.
20     MS. LESKIN:  Thank you, Doctor.  And
21 thank you for moving us up to one o'clock.  Off the
22 record.
23     (Deposition concluded at 5:15 p.m.)
24
25

KRISTA K. IRISH, CSR, RPR, RMR
IRISH REPORTING, INC. - 319-393-5050

446b3b6a-95f2-499b-b993-55a9e16f1a8e

DEPOSITION OF ANDREW LEE, M.D., 1/13/2009

Page 182

```
 1              CERTIFICATE
 2          I, Krista K. Irish, Certified Shorthand
        Reporter of the State of Iowa, do hereby certify that
 3      on the 13th day of January, 2009, at Hotel Vetro,
        210 South Linn Street, Iowa City, Iowa, there
 4      appeared before me the following-named person,
        to wit: ANDREW LEE, M.D., who was by me first duly
 5      sworn to testify the truth, the whole truth, and
        nothing but the truth in the above-entitled cause;
 6      that I reported in shorthand the testimony of said
        witness, reduced the same to typewriting under my
 7      direction and supervision, and that the foregoing
        deposition is a true record of the testimony given by
 8      said witness and of all proceedings had on the taking
        of said deposition at the above time and place.
 9
            I further certify that I am not related to
10      or employed by any of the parties to this deposition,
        and further that I am not a relative or employee of
11      any attorney or counsel employed by the parties
        hereto or financially interested in the action.
12
            IN WITNESS WHEREOF, I have set my hand this
13      13th day of January, 2009.
14
15
16          _____
            Krista K. Irish
17          Certified Shorthand Reporter
            Registered Merit Reporter
18
19
20
21
22
23
24
25
```

47 (Page 182)

446b3b6a-95f2-499b-b993-55a9e16f1a8e