1

          IN THE UNITED STATES DISTRICT COURT

                 DISTRICT OF MINNESOTA


IN RE:

VIAGRA PRODUCTS LIABILITY LITIGATION

_____

       THIS DOCUMENT PERTAINS TO ALL CASES

_____

          MDL DOCKET NO. 1724

          JUDGE PAUL A. MAGNUSON


VIDEOTAPED DEPOSITION OF DR. GERALD MCGWIN, JR.


                 S T I P U L A T I O N S

          IT IS STIPULATED AND AGREED, by and

between the parties through their respective

counsel, that the deposition of:

          DR. GERALD MCGWIN, JR.,

may be taken before Carrie M. Robinson,

Certified Shorthand Reporter and Notary Public

of the State of Alabama, at the Law Offices of

Bradley, Arant, Rose & White, One Federal Place,

1819 5th Avenue North, Birmingham, Alabama,

35203, on the 14th day of June, 2007, commencing

at approximately 8:15 a.m.

**2**

1    IT IS FURTHER STIPULATED AND AGREED that
2 the signature to and reading of the deposition
3 by the witness is waived, the deposition to have
4 the same force and effect as if full compliance
5 had been had with all laws and rules of Court
6 relating to the taking of depositions.
7
8    IT IS FURTHER STIPULATED AND AGREED that
9 it shall not be necessary for any objections to
10 be made by counsel to any questions, except as
11 to form or leading questions, and that counsel
12 for the parties may make objections and assign
13 grounds at the time of the trial, or at the time
14 said deposition is offered in evidence, or prior
15 thereto.
16       ***
17
18
19
20
21
22
23
24
25

**4**

1    A P P E A R A N C E S (CONTINUED)
2
3    MALINI MOORTHY
4    Corporate Counsel
5    Pfizer, Inc.
6    235 East 42nd Street
7    New York, New York  10017
8
9 COURT-APPOINTED SPECIAL MASTER:
10    JOHN W. BORG
11    Attorney at Law
12    6612 Limerick Drive
13    Edina, Minnesota  55439
14
15 VIDEOGRAPHER:
16    DONNA EVANS
17
18 ALSO APPEARING:
19    STEPHEN E. KIMMELL, M.D.
20
21
22
23
24
25

**3**

1       A P P E A R A N C E S
2
3 FOR THE PLAINTIFFS:
4    DANIEL E. BECNEL
5    Attorney at Law
6    Becnel Law Firm, LLC
7    106 W. Seventh Street
8    P.O. Drawer H
9    Reserve, Louisiana  70084
10
11    NEIL D. OVERHOLTZ
12    R. JASON RICHARDS
13    Attorneys at Law
14    Aylstock, Witkin, Kreis & Overholtz
15    803 North Palafox Street
16    Pensacola, Florida  32501
17
18 FOR THE DEFENDANTS:
19    BERT L. SLONIM
20    LORI B. LESKIN
21    Attorneys at Law
22    Kaye Scholer, LLP
23    425 Park Avenue
24    New York, New York  10022-3598
25       ***

**5**

1       I N D E X
2                      Page
3 Examination by Mr. Slonim.....................8
4 Examination by Mr. Becnel.................216
5 Examination by Mr. Overholtz...............230
6
7       E X H I B I T   L I S T
8                      Page
9 Deposition Exhibit 1.........................9
10 Deposition Exhibit 2.......................15
11 Deposition Exhibit 3.......................21
12 Deposition Exhibit 4.......................23
13 Deposition Exhibit 5.......................23
14 Deposition Exhibit 6.......................23
15 Deposition Exhibit 7.......................30
16 Deposition Exhibit 8.......................28
17 Deposition Exhibit 9.......................28
18 Deposition Exhibit 10......................44
19 Deposition Exhibit 11......................87
20 Deposition Exhibit 12......................90
21 Deposition Exhibit 13......................92
22 Deposition Exhibit 14......................95
23 Deposition Exhibit 15....................123
24 Deposition Exhibit 16....................131
25 Deposition Exhibit 17....................139

2 (Pages 2 to 5)

6

EXHIBIT LIST (CONTINUED)
Page

Deposition Exhibit 18.......................146
Deposition Exhibit 19.......................150
Deposition Exhibit 20.......................151
Deposition Exhibit 22.......................196
Deposition Exhibit 23.......................200
Deposition Exhibit 24.......................210
Deposition Exhibit 25.......................212
Deposition Exhibit 26.......................214

---

8

1 Liability Litigation, filed in the United States
2 District Court for the Southern District of Iowa
3 (sic), MDL Number 06-1724.
4        The name of the witness is
5 Dr. McGwin. He will be sworn, and the
6 deposition will begin.
7        GERALD MCGWIN, JR., PH.D.,
8 being first duly sworn, was examined and
9 testified as follows:
10 EXAMINATION BY MR. SLONIM:
11 Q        Good morning, Dr. McGwin. How are
12 you?
13 A        I'm swell.
14 Q        We had a chance to say hello this
15 morning before the deposition. You understand
16 that my name is Bert Slonim. I represent the
17 defendant Pfizer in this action.
18 A        Yes, sir.
19 Q        Okay. Dr. McGwin, just for the
20 record, would you state your full name and
21 business address?
22 A        Yes. Gerald McGwin, Jr. I have
23 several addresses, but 1922 Seventh Avenue
24 South, Suite 120, Birmingham, Alabama.
25 Q        I'm going to mark as Deposition

---

7

1        I, Carrie M. Robinson, a Court
2 Reporter of Birmingham, Alabama, and a Notary
3 Public for the State of Alabama at Large, acting
4 as Commissioner, certify that on this date, as
5 provided by the Federal Rules of Civil Procedure
6 and the foregoing stipulation of counsel, there
7 came before me on the 14th day of June, 2007, at
8 the law offices of Bradley, Arant, Rose & White,
9 One Federal Place, 1819 5th Avenue North,
10 Birmingham, Alabama 35203, commencing at
11 approximately 8:15 a.m., DR. GERALD MCGWIN, JR.,
12 witness in the above cause, for oral
13 examination, whereupon the following proceedings
14 were had:
15        VIDEOGRAPHER: We are on the video
16 record. My name is Donna Evans. I'm a
17 Certified Legal Video Specialist with Bain &
18 Associates Court Reporting in Birmingham,
19 Alabama. Our address is 505 North 20th Street,
20 Birmingham, Alabama. The date is June the 13th
21 (sic), year 2007. The time is approximately
22 8:11 a.m.
23        We are in Birmingham, Alabama, at
24 the law firm of Bradley, Arant, Rose & White.
25 This case is entitled In Re Viagra Products

---

9

1 Exhibit Number 1 a document that's been given to
2 us as your curriculum vitae.
3 A        Yes, sir.
4        (Deposition Exhibit
           Number 1 was marked
5        for identification.)
6 Q        Can you identify that as a current
7 copy of your CV?
8 A        Yes, sir.
9 Q        Okay. I understand from the
10 curriculum vitae that you received your Bachelor
11 of Science degree from the University of Vermont
12 in 1993; is that correct?
13 A        Yes, sir.
14 Q        And that you then went on and
15 received a Master's of Science degree from
16 Harvard in 1995; is that right?
17 A        Yes, sir.
18 Q        Dr. McGwin, one thing I should have
19 mentioned before the deposition started, please
20 give me a chance to complete my question before
21 you begin your answer. And by the same token,
22 I'll try to make sure that I give you a chance
23 to complete your answer before I frame my next
24 question. The court reporter needs to take down
25 a transcript. And if we're too quick in

3 (Pages 6 to 9)

10

1 responding to each other, the court reporter
2 can't get it down.
3 A        My apologies.
4 Q        Not at all. Thank you.
5             I understand then from your CV that
6 you received a Ph.D. in epidemiology from the
7 University of Birmingham in Alabama (sic) in the
8 year 1998; is that right?
9 A        Yes, sir.
10 Q        Okay. And that you are currently
11 employed as an Associate Professor of
12 Epidemiology at the University of Alabama; is
13 that right?
14 A        Yes, sir.
15 Q        Okay. Epidemiology is the science
16 that studies the distribution and determinants
17 of disease in a population; is that correct?
18 A        Yes, sir.
19 Q        Do you have a medical degree,
20 Dr. McGwin?
21 A        No, sir.
22 Q        I take it you are not an
23 ophthalmologist, a specialist in eye disorders?
24 A        No, sir.
25 Q        And that you are not licensed to

11

1 diagnose or treat patients; is that right?
2 A        That is correct.
3 Q        You understand that this case
4 involves the prescription drug Viagra and an eye
5 condition called nonarteritic anterior ischemic
6 optic neuropathy; is that right?
7 A        Correct.
8 Q        Okay. And that condition which has
9 the long name that I just said is often referred
10 to by the acronym NAION; is that right?
11 A        NAION or NAION is -- depending on
12 how you want to pronounce it.
13 Q        Okay. If I use the term "NAION,"
14 N-A-I-O-N, you understand that I'll be referring
15 to nonarteritic anterior ischemic optic
16 neuropathy, okay?
17 A        Yes, sir.
18 Q        Okay. Viagra is an oral medication
19 that is used to treat erectile dysfunction; is
20 that right?
21 A        That is my understanding.
22 Q        Okay. And Viagra works by
23 inhibiting the action of an enzyme known as
24 phosphodiesterase type 5; is that right?
25 A        Not being a specialist in

12

1 pharmacology, I couldn't answer with any degree
2 of certainty.
3 Q        Have you heard of the term "PDE5
4 inhibitor"?
5 A        Yes, sir.
6 Q        And do you understand that Viagra is
7 in the class of drugs that are called PDE5
8 inhibitors?
9 A        That is my understanding.
10 Q        Okay. And -- withdrawn.
11          Viagra was first approved for use as
12 a medication in March of 1998; is that right?
13 A        I don't know that for certainty.
14 Q        Do you recall that it was in 1998,
15 without regard to the month, that Viagra was
16 first approved?
17 A        I don't know that with certainty.
18 Q        Okay.
19          MR. SLONIM: I'll ask counsel for a
20 stipulation that Viagra was approved for use in
21 the United States in March of 1998.
22          MR. OVERHOLTZ: That's fine.
23 I think Mr. Slonim is correct, it's
24 1998.
25          THE WITNESS: Sorry. I just --

13

1          MR. SLONIM: No, no, no.
2          MR. OVERHOLTZ: Just for purposes of
3 the record, I'm sure.
4          MR. SLONIM: Yeah.
5 Q        And do you understand that other
6 medications for the treatment of erectile
7 dysfunction that are also -- operate as or
8 classified as PDE5 inhibitors were approved
9 subsequent to Viagra?
10 A        Yes, I believe that's true.
11 Q        In other words, Viagra was the first
12 one that was approved?
13 A        That's correct.
14 Q        Okay. And for purposes of this case
15 as plaintiffs' counsel has stipulated, you
16 should assume that Viagra was approved in March
17 of 1998, okay?
18 A        Yes, sir.
19 Q        So in other words, Dr. McGwin, prior
20 to March of 1998, Viagra was not available and
21 in fact no PDE5 inhibitor was available,
22 correct?
23 A        Yes, sir.
24 Q        But there were cases of NAION that
25 were diagnosed before March of 1998; is that

4 (Pages 10 to 13)

**14**

1 right?
2 A    I don't know that for certainty.
3 Q    You know that NAION existed as a
4 medical disorder well before 1998, don't you?
5 A    Yes.
6 Q    Okay.  In fact -- and we'll talk
7 about this later -- in some of your work, you
8 reference studies by Johnson and Arnold and
9 Hattenhauer and other studies that talk about
10 the incidence of NAION, and those were published
11 well before 1998, correct?
12 A    That is correct.
13 Q    Okay.  You agree with me that Viagra
14 could not have caused any of the cases of NAION
15 that occurred before the medication was on the
16 market, correct?
17 A    That is correct.
18 Q    Whatever it was that caused the
19 cases of NAION that occurred before March of
20 1998, it could not have been Viagra or any other
21 of the oral ED medications, correct?
22 A    That is correct.
23 Q    Okay.  Let's mark as the next
24 deposition exhibit an article that you
25 coauthored entitled "Frequency Doubling

**15**

1 Technology Perimetry in Nonarteritic Ischemic
2 Optic Neuropathy with Altitudinal Defects."
3        (Deposition Exhibit
4        Number 2 was marked
5        for identification.)
5 Q    Dr. McGwin, can you identify this as
6 an article that you coauthored?
7 A    Yes, sir.
8 Q    Okay.  And I would like you to
9 refer, please, to page 1278.  It's about the
10 fourth page in.
11        I will direct your attention,
12 please, to the left-hand side.  And do you see
13 the first full paragraph that begins with the
14 word "although"?
15 A    Yes, sir.
16 Q    Could you just read that paragraph
17 out loud?
18 A    The entire paragraph?
19 Q    Yes.
20 A    Yes, sir.
21        "Although there is no good
22 experimental model of NAION, it is presumed that
23 it represents a vascular disease of the optic
24 disc.  The rapid onset, poor recovery, and
25 crowded appearance of the optic disc, and the

**16**

1 association with microvascular diseases, such as
2 hypertension and diabetes, support the widely
3 held theory that vascular insufficiency of a
4 structurally crowded optic disc leads to
5 infarction of the laminar and possibly the
6 retrolaminar optic nerve.  In addition, it has
7 been suggested that the altitudinal visual field
8 defects seen in NAION are the result of
9 infarctions of the optic disc that lie in the
10 watershed zone between the distribution of the
11 posterior ciliary arteries, possibly associated
12 with nocturnal systemic hypotension."
13 Q    Dr. McGwin, in that first sentence
14 of that paragraph that you just read, when you
15 state that there's no good experimental model of
16 NAION, what do you mean?
17 A    Not having written that sentence,
18 sir, I can't necessarily translate it in that
19 way.
20 Q    Okay.  That sentence is in a paper
21 in which you are coauthored.  Tell us what you
22 and your coauthors were trying to communicate to
23 the readers with that sentence.
24 A    I believe what we were trying to
25 convey is the fact that there is no commonly

**17**

1 used animal model of NAION or an etiologic model
2 of the disease, and that there are several
3 hypotheses.  And I believe Reference 10 is what
4 has been cited here, that it represents a
5 vascular problem, a vascular condition of the
6 optic disc.
7 Q    When you say there are hypotheses
8 and then in your sentence, that first sentence
9 when you say it is presumed that NAION is a
10 vascular disease, you use the word "presume"
11 because this is something that has not been
12 scientifically proven; is that correct?
13 A    That is correct.
14 Q    Okay.  And further down in that same
15 paragraph when you say it's a widely held theory
16 that NAION results from a vascular
17 insufficiency -- do you see that?
18 A    Yes, sir.  I'm just reading the full
19 sentence.
20 Q    No, please.  Let me start again just
21 to make sure you are focused on what I'm asking.
22        When you and your coauthors note in
23 this paragraph that it is a widely held theory
24 that NAION results from a vascular
25 insufficiency, you use the word "theory" to

5 (Pages 14 to 17)

**18**

1 communicate the information that this has not
2 been scientifically proven that vascular
3 insufficiency causes NAION, correct?
4 A      That is correct.
5 Q      And when you state that it has been
6 suggested that certain visual field defects
7 occurring in NAION result from infarction of
8 certain blood vessels, you use the word
9 "suggested" because it has not been
10 scientifically proven that NAION results from
11 infarction of those vessels, correct?
12 A     Yes, sir.
13 Q     And then farther down when you state
14 that NAION is possibly associated with nocturnal
15 systemic hypotension, you use the phrase
16 "possibly associated" because it has not been
17 scientifically proven that nocturnal systemic
18 hypotension causes NAION, right?
19          MR. OVERHOLTZ: I object to form.
20 It misstates the statement in the study that
21 NAION was possibly associated with nocturnal
22 hypotension.
23          THE COURT: It is overruled. You
24 can answer the question if you are able.
25 Q     Do you want to have it read back?

**19**

1 A      Yeah. Yes, please.
2 Q      Okay. The objection was overruled.
3 I want to read back the question so you have it
4 clearly in mind.
5          In the paragraph that you read out
6 loud, there's a portion in which you say NAION
7 is possibly associated with nocturnal systemic
8 hypotension. You used the phrase "possibly
9 associated" because it has not been
10 scientifically proven that nocturnal systemic
11 hypotension causes NAION, correct?
12 A     That is correct.
13 Q     And, Dr. McGwin, although there are
14 theories about the cause of NAION, which you
15 state in this paragraph, those theories have not
16 been scientifically proven, correct?
17 A     That is correct.
18 Q     Now, we alluded to this at the
19 beginning of the deposition, Dr. McGwin. There
20 is a spontaneous background incidence of NAION
21 in the general population, correct?
22 A     Can I ask a question about your
23 question? Is that --
24 Q     If you don't -- if you don't
25 understand my question, please.

**20**

1 A      Okay. The word "spontaneous" is
2 confusing to me.
3 Q      Okay. And what is it that you don't
4 understand about the word "spontaneous"?
5 A      Well, when we're talking about the
6 distribution or the occurrence of a disease in a
7 population, the word "spontaneous" to me
8 suggests accidental, erratic. And many
9 diseases, in fact most diseases, perhaps if we
10 exclude infectious diseases just for the moment,
11 have a background incidence that is usually
12 considered to be stable, perhaps barring some
13 temporal fluctuations such as injuries and
14 certain infectious diseases. So -- but
15 that's --
16 Q     Okay. Let me rephrase the question.
17 A     Okay.
18 Q     You agree that there is a background
19 incidence of NAION in the general population
20 that existed before Viagra or other ED
21 medications ever came on the market, correct?
22 A     That is correct.
23 Q     Okay. And in fact, Dr. McGwin, in
24 your own work, you have reported that an
25 estimated 1500 to 6,000 people in the U.S. each

**21**

1 year develop NAION, correct?
2 A      Which work are you specifically
3 referring to?
4 Q      Dr. McGwin, do you have your article
5 in front of you?
6 A      Yes, sir, right here (indicating).
7 Q      We'll mark it later as a deposition
8 exhibit.
9          MR. SLONIM: Oh, do you have it?
10 Q     We will mark it right now.
11 A     I'm sorry.
12 Q     No problem.
13          (Deposition Exhibit
              Number 3 was marked
14          for identification.)
15 Q     We'll mark as Deposition Exhibit
16 Number 3 an article by Dr. McGwin entitled
17 "Non-Arteritic anterior ischaemic optic
18 neuropathy and the treatment of erectile
19 dysfunction."
20          Dr. McGwin, take a look, please, at
21 the first two sentences of this paper. The
22 first sentence you write: "Non-arteritic
23 anterior ischaemic optic neuropathy is the most
24 common optic neuropathy among older adults in
25 the United States." Is that correct?

6 (Pages 18 to 21)

22

1 A        Yes, sir.
2 Q        Okay.  And in the next sentence, you
3 say, "An estimated 1500 to 6,000 people will
4 develop NAION annually."  Is that correct?
5 A        That is correct.
6 Q        Okay.  Does that refresh your
7 recollection that in your own work that you have
8 estimated that the background incidence of NAION
9 is 1500 to 6,000 people per year in the U.S.?
10 A       Those are not my personal
11 estimates.  They were obtained from the
12 literature.
13 Q       Right.  But those are estimates that
14 you referred to --
15 A       Yes, sir, I referred to them, that's
16 correct.
17 Q       -- and quote in your own published
18 work?
19 A       Yes, sir.
20 Q       Okay.  And you cite in support of
21 that, as you pointed out to me, some published
22 literature references, correct?  Those are
23 references 4 to 6?
24 A       Yes, sir.
25 Q       And that's the Johnson and Arnold

23

1 paper, the Hattenhauer paper, and also the AION
2 Decompression Trial paper?
3 A        Yes, sir.
4 Q        Okay.  Let's just mark those so we
5 have them as exhibits.
6          (Deposition Exhibit
                 Numbers 4-6 were marked
7                for identification.)
8 Q        Dr. McGwin, we've marked as
9 Deposition Exhibit Number 4 a paper by
10 Hattenhauer and others entitled "Incidence of
11 Nonarteritic Anterior Ischemic Optic
12 Neuropathy."  We've marked as Deposition Exhibit
13 Number 5 a paper by Johnson and Arnold entitled
14 "Incidence of Nonarteritic and Arteritic
15 Anterior Ischemic Optic Neuropathy," and we've
16 marked as Deposition Exhibit Number 6 a paper by
17 Newman and others entitled "The Fellow Eye in
18 NAION: Report From the Ischemic Optic
19 Neuropathy Decompression Trial Follow-Up Study,"
20 correct?
21 A       Yes, sir.
22 Q       And these are papers that you cited
23 as references in support of the statement that
24 1500 to 6,000 people estimated in the United
25 States develop NAION --

24

1 A        Yes, sir.
2 Q        -- per year?
3          Okay.  And take a look just for a
4 second at Exhibit Number 6.  That's the AION
5 Decompression Trial paper.  In that first
6 paragraph -- do you see that?
7 A        Yes, sir.
8 Q        And they have a similar sentence to
9 yours at the bottom of that first paragraph that
10 there were 1500 to 6,000 cases of NAION in the
11 United States per year, correct?
12 A       That is correct, sir.
13 Q       Okay.  And in the sentence before
14 that, they say the annual incidence of NAION has
15 been estimated from 2.3 to 10 per hundred
16 thousand persons 50 years and older, correct?
17 A       Yes, sir.
18 Q       And they cite references 3 and 4?
19 Take a look at their references 3 and 4, please.
20 A       Yes, sir.
21 Q       Their references 3 and 4 are the
22 Johnson and Arnold and the Hattenhauer papers,
23 correct?
24 A       That is correct.
25 Q       And those are also the references

25

1 that you cited?
2 A        Yes, sir.
3 Q        Okay.  And it's correct that the
4 Johnson and Arnold paper and the Hattenhauer
5 paper report that the annual incidence of NAION
6 ranges from 2.3 to 10.2 per hundred thousand for
7 persons age 50 and older, correct?
8          MR. OVERHOLTZ:  Object to the form
9 of the question.  It combines two studies to
10 draw one conclusion regarding a range.  It is an
11 improper question.
12         THE COURT:  Okay.  I'll sustain
13 that.  You can back that up, Mr. Slonim, or
14 split them up, I guess, whatever you want to do.
15 Q       (By Mr. Slonim)  Do you agree with me
16 that the Hattenhauer paper finds an incidence of
17 10.2 per hundred thousand?
18         Are you in Exhibit 4?
19 A       Yes, sir.  I'm just looking for the
20 exact number.
21 Q       Your -- take a look at the abstract,
22 or if you want to look at the whole document, I
23 don't have a problem.  Take a look at the
24 abstract --
25 A       Yes, sir.

7 (Pages 22 to 25)

26

1 Q   -- under the results.  The annual
2 incidence -- the crude annual incidence was 10.3
3 per hundred thousand individuals, correct?
4 A   10.3, yes, sir.
5 Q   And then it says when adjusted for
6 age and sex distribution of the 1990 white
7 population, the incidence was 10.2 per hundred
8 thousand, correct?
9 A   Yes, sir.
10 Q   Okay.  And then take a look, please,
11 at the Johnson and Arnold paper.  You can take a
12 look at the abstract for this purpose, I think.
13       It says that among subjects who were
14 50 or older the estimated mean annual incidence
15 rates per hundred thousand population were 2.3
16 for nonarteritic anterior ischemic optic
17 neuropathy, correct?
18 A   That is correct, yes, sir.
19 Q   Okay.  And so when you use the range
20 of 2.3 per hundred thousand to 10.2 per hundred
21 thousand, that's what generates the number of
22 1500 to 6,000 cases per year, correct?
23 A   I believe that is correct.
24 Q   Okay.  And that's the figure that
25 you report in Exhibit 3 in the first paragraph

27

1 and the same data that you cite, correct?
2 A   That is correct.
3 Q   Okay.  Now, Dr. McGwin, you're
4 familiar with the term "risk factors"?
5 A   Yes, sir.
6 Q   What are risk factors?
7 A   Risk factors are characteristics --
8 genetic, demographic, medical -- that predispose
9 or perhaps reduce one's predilection for certain
10 diseases.
11 Q   Okay.  And diseases that affect the
12 cardiovascular system such as diabetes, high
13 blood pressure and high cholesterol, those are
14 risk factors for erectile dysfunction, correct?
15 A   They are hypothesized risk factors.
16 Q   Have you seen any data, have you
17 looked for any data or studies that weigh in
18 that question?
19 A   Personally?
20 Q   Yes.
21 A   No, sir.
22 Q   You cited the Gorkin paper, correct?
23 A   In our BJO article.
24 Q   You cited it in your expert report
25 in this matter, correct?

28

1 A   I would have to refer to the report
2 to verify that.
3 Q   You know the Pfizer paper reporting
4 on clinical trial studies?
5 A   I'm not familiar with it, sir.
6       (Deposition Exhibit
          Number 8 was marked
7          for identification.)
8 Q   We've marked as Deposition Exhibit
9 Number 8 your report in this matter; is that
10 correct?
11 A   Yes, sir.
12 Q   Turn, please, to page 4.  On the
13 bottom of page 4 you refer to a Pfizer published
14 manuscript, correct?
15 A   That is correct.
16 Q   Okay.  And let's mark as Deposition
17 Exhibit Number 9 a paper by Gorkin and others
18 entitled "Sildenafil citrate use and the
19 incidence of nonarteritic anterior ischemic
20 optic neuropathy."
21       (Deposition Exhibit
          Number 9 was marked
22          for identification.)
23 Q   This is the Pfizer manuscript that
24 you referenced in your expert report that
25 reports on the 103 clinical studies, correct?

29

1 A   That is correct.
2 Q   Okay.  And take a look, please, on
3 Exhibit 9.  That's the Gorkin paper, first
4 page -- that's page number 500, I guess, in the
5 journal article -- on the right-hand side at the
6 full paragraph that begins with, "Many of the
7 risk factors" -- it says, "Many of the risk
8 factors for developing NAION also predict the
9 occurrence of erectile dysfunction (ED), such as
10 hypertension, diabetes, hyperlipidemia and
11 smoking," and they cite references 7 through 9,
12 correct?
13 A   That is correct.
14 Q   Okay.  Now, the same diseases that
15 are risk factors for erectile dysfunction are
16 also risk factors for NAION, correct?
17 A   Can the question be read again?
18 Q   Yes.
19 A   I'm sorry.
20 Q   I'll repeat it.  That's fine.  I
21 want to make sure you have the question clearly
22 in mind before you answer.
23       The same diseases -- hypertension,
24 diabetes, high cholesterol -- are also risk
25 factors -- that are risk factors for ED are also

8 (Pages 26 to 29)

30

1 risk factors for NAION, correct?
2 A      Yes.
3 Q           In other words, just so it's clear,
4 Dr. McGwin, conditions, cardiovascular
5 conditions such as diabetes, high blood
6 pressure, and high cholesterol, they are risk
7 factors for both erectile dysfunction and for
8 NAION, correct?
9 A      That is correct.
10 Q      And because men who are at an
11 elevated risk of developing -- strike that.
12      Let's mark as the next deposition
13 exhibit -- Dr. McGwin, yeah, we -- I guess we
14 skipped a number in the exhibit marking. We've
15 marked -- we marked the Gorkin article as
16 Exhibit 9. We marked your report as Exhibit 8,
17 so we skipped the 7. I'm going to --
18      MR. OVERHOLTZ:  7 was the report?
19      MR. SLONIM:  No.  8 was the report.
20      MR. OVERHOLTZ:  Oh, okay.
21      MR. SLONIM:  9 was the Gorkin
22 article.
23      MR. OVERHOLTZ:  I've got you.
24      (Deposition Exhibit
          Number 7 was marked
25          for identification.)

31

1 Q      I'm going to mark as Deposition
2 Exhibit Number 7 an article by Salomon and
3 others entitled "Analysis of Prothrombotic and
4 Vascular Risk Factors in Patients with
5 Nonarteritic Anterior Ischemic Optic
6 Neuropathy."
7      Is this a paper that you've come
8 across in any of your work?
9 A      I don't immediately recognize it,
10 but that's not to say that I haven't read it
11 before.
12 Q      Okay. Dr. McGwin, I'm going to ask
13 you some questions about this paper and some of
14 the findings. Let's do this:  Take a couple of
15 minutes right now, read the abstract, read
16 particularly Table 2. I'm not going to ask a
17 whole lot of questions; but if you need to read
18 the whole paper, we'll take a break and we'll
19 have you read the whole paper. But take a
20 minute right now and familiarize yourself with
21 it a little bit.
22 A      The abstract and table?
23 Q      The abstract and then Table 2 and
24 the discussion around Table 2.
25 A      Can I write on this?

32

1 Q      Sure.  Okay.
2 A      Thank you.
3 Q      And, Dr. McGwin, if you need more
4 time, we will give it to you.  The objective of
5 this study was to analyze whether blood clotting
6 disorders or certain vascular diseases played a
7 role in causing NAION or its recurrence,
8 correct?
9 A      I believe that is correct.
10 Q      Okay.  And among the conditions they
11 looked at was ischemic heart disease, correct?
12 A      Conditions they looked at as risk
13 factors?
14 Q      Yes.  One of the conditions they
15 looked at was a condition called ischemic heart
16 disease, correct?
17 A      Yes, sir.
18 Q      Okay.  And what they found in this
19 particular study was that men that had ischemic
20 heart disease were 2.9 times more likely to
21 develop than men that did not have ischemic
22 heart disease, correct?
23 A      My -- can you point to specifically
24 where that number comes from in the paper?
25 Q      Yeah.  It appears in the discussion

33

1 of Table 2. If you take a look -- take a look
2 at page 740, please, the right-hand side.  The
3 last sentence, the authors say, referring to
4 Table 2, "Statistically significant differences
5 were observed between patients and controlled
6 subjects with respect to ischemic heart disease,
7 hypercholesterolemia, and diabetes mellitus with
8 univariate odds of 2.9," and then they give the
9 confidence interval, 2.6 and the confidence
10 interval, and 2.3 and they give a confidence
11 interval, correct?
12 A      That is correct.
13 Q      Okay.  And so in this particular
14 study, at least, the authors found that men who
15 had ischemic heart disease were 2. times (sic)
16 more likely to develop NAION than men that did
17 not have ischemic heart disease, correct?
18 A      2. how many times?
19 Q      2.9?
20 A      Well, their later adjusted
21 analysis -- it may be a minor point -- suggests
22 that the association for ischemic heart disease
23 is 2.8, so -- adjusted for the effects of the
24 other characteristics.
25 Q      Okay.  So the rate -- when they did

9 (Pages 30 to 33)

34

1 an -- the unadjusted odds ratio was 2.9 and then
2 the adjusted odds ratio was 2.8?
3 A        Yes, sir.
4 Q        But in any event, they found, then,
5 a statistically significant increased risk of
6 men that had a history of ischemic heart disease
7 having NAION in the order of 2.8 or 2.9?
8 A        Yes, sir.
9 Q        Okay.  And likewise, they found that
10 high cholesterol -- strike that.
11        These authors also found that men
12 who had high cholesterol were approximately 2.6
13 times more likely to develop NAION than men who
14 did not have high cholesterol, correct?
15 A        If you are referring to the
16 univariate results on page 740, that is correct.
17 Q        Okay.  And those same studies also
18 indicated that men who had diabetes were about
19 2.3 times more likely to develop NAION than men
20 who did not have diabetes, correct?
21 A        Again, if you are referring to the
22 univariate results on 740, that is correct.
23 Q        Okay.
24 A        On page 740.
25 Q        Okay.  And men who have ischemic

36

1 developing erectile dysfunction, correct?
2        MR. BECNEL:  Objection, compound.
3        THE COURT:  Overruled.  You can
4 answer it.
5 A        I'm sorry, could you state --
6 Q        Yes, yes.
7        THE COURT:  Let's stop here for a
8 second.  Let's get Mr. Becnel on the record,
9 folks, so you know who you've got here.
10        MR. SLONIM:  Do you want to identify
11 yourself?
12        MR. BECNEL:  Daniel Becnel.
13 Q        (By Mr. Slonim)  Okay.  Let's -- let
14 me rephrase the question.
15 A        I'm sorry.  I apologize.
16 Q        No.  Let me -- let me rephrase the
17 question.
18        In the Gorkin article that we
19 discussed a few minutes ago, we saw that
20 conditions such as hypertension, diabetes, and
21 hyperlipidemia were risk factors for erectile
22 dysfunction, correct?
23 A        Have been shown in other articles to
24 be risk factors.
25 Q        Yes.  And in the Salomon study that

35

1 heart disease and who have high cholesterol and
2 who have diabetes, they are also -- those are
3 cardiovascular conditions that are associated
4 with erectile dysfunction, correct?
5 A        Diabetes isn't a cardiovascular
6 condition, per se.
7 Q        Let me rephrase the question.  Men
8 who have high cholesterol, who have ischemic
9 heart disease and have diabetes are also at an
10 increased risk of developing erectile
11 dysfunction, correct?
12 A        There are studies suggesting that,
13 yes, sir.
14 Q        Okay.  And because men who have
15 erectile dysfunction are the men who are likely
16 to take an erectile dysfunction medication like
17 Viagra, it's not at all surprising that some of
18 these men are going to have NAION because they
19 have an elevated risk for developing NAION,
20 correct?
21 A        Could you say that again, please?
22 Q        Yes.  Men who have ischemic heart
23 disease, who have high cholesterol, and who have
24 diabetes are at an elevated risk for developing
25 NAION and are also at an elevated risk for

37

1 we have marked as Deposition Exhibit Number 7,
2 these authors find that men who have ischemic
3 heart disease, men who have high cholesterol,
4 and men who have diabetes are at an elevated
5 risk of developing NAION ranging from 2.3 to 2.8
6 or 2.9, correct?
7 A        That is correct.
8 Q        Okay.  And of course it's the men
9 who have risk factors for erectile dysfunction,
10 that's the population of men who are likely to
11 take Viagra, correct?
12 A        I would think so, yes, sir.
13 Q        Okay.  Given the background
14 incidence of NAION among the population of men
15 who have risk factors for erectile dysfunction,
16 a man who took a Viagra and subsequently was
17 diagnosed with NAION might have developed NAION
18 even if he had never taken Viagra, correct?
19        MR. OVERHOLTZ:  Object to the form.
20 Calls for speculation.
21        THE COURT:  Overruled.  You may
22 answer it, Doctor.
23        MR. OVERHOLTZ:  I'm just going to
24 restate the objection.  My objection is that he
25 is asking a medical diagnosis question here of a

10 (Pages 34 to 37)

38

1 nonphysician. We've already established he's
2 not a physician who makes diagnoses of NAION.
3 I mean, if he wants to ask him epidemiology
4 questions about whether or not a person who took
5 a Viagra had an increased risk, then I think
6 that's an appropriate question.
7        THE COURT: He can ask him the
8 question; and if he can answer it, he can answer
9 it. If he can't, he can't. It's overruled.
10        MR. OVERHOLTZ: Okay.
11        MR. SLONIM: May I rephrase --
12 repeat the question so the witness has it in
13 mind?
14        THE COURT: Yes.
15 Q        (By Mr. Slonim) Dr. McGwin, given
16 the background incidence of NAION in the
17 population of men who have risk factors for
18 erectile dysfunction -- do you have that
19 premise?
20 A        Can we stop there for one second?
21 Q        Yes.
22 A        Do we know what the background
23 incidence of NAION is in that population?
24 Q        We know what the background
25 incidence of NAION is, and we know that men who

39

1 have -- we know that men who have ischemic heart
2 disease, high cholesterol, and diabetes,
3 according to the Salomon article, have more than
4 a twofold increase in risk, correct?
5 A        Yes, sir, but that doesn't
6 necessarily give me a now background incidence
7 number to work from.
8 Q        Here's the question. See if you can
9 answer it.
10 A        Okay.
11 Q        Given the background incidence of
12 NAION in the population of men who have risk
13 factors for erectile dysfunction, a man who took
14 Viagra and then subsequently was diagnosed with
15 NAION might have developed NAION even if he had
16 not taken Viagra, correct?
17 A        I think it's virtually impossible to
18 answer that question as to what caused the
19 disease in that particular individual. I mean,
20 as an epidemiologist, I can speak to what
21 happens in populations and what studies say put
22 people at increased risk, but I --
23 Q        Okay. Have you, Dr. McGwin, looked
24 at the incidence of NAION in the population of
25 people with erectile dysfunction?

40

1 A        No, sir.
2 Q        What are case reports and case
3 series?
4 A        Case reports are generally medical
5 publications describing an individual case,
6 usually something unusual, an unusual medical
7 procedure, an unusual disease. Oftentimes they
8 are used to identify hypotheses about these
9 unusual cases -- individual cases.
10        Case series are simply aggregates of
11 those individual case reports, at least two
12 people, usually more than that, often
13 demonstrating, again, unusual medical procedures
14 or, perhaps, unusual combinations of
15 hypothesized risk factors in groups of
16 individuals.
17 Q        There have been case reports and
18 case series indicating that some men who took
19 Viagra were subsequently diagnosed with NAION,
20 correct?
21 A        Yes, sir.
22 Q        Okay. Let's refer to your own
23 article which we've marked as Deposition Exhibit
24 Number -- bear with me while I find it.
25 A        I think it's Number 3.

41

1 Q        Hang on to that. Hang on to your
2 copy. Here's my copy. Thanks.
3        Okay. Take a look, please, at
4 Deposition Exhibit Number 3, your article, the
5 lower left-hand side, the paragraph that begins
6 with the word "unfortunately." You wrote, "To
7 date, there is no empirical evidence for or
8 against an association between sildenafil or
9 tadalafil and NAION. The only published studies
10 have been case reports and case series, which by
11 their nature, do not provide a comparison
12 group." That's what you wrote, correct?
13 A        That is what I wrote, yes, sir.
14 Q        Okay. And your point here is that
15 case reports and case series because they lack a
16 comparison group cannot scientifically test
17 whether men who take Viagra are at an increased
18 risk of developing NAION as compared with men of
19 the same age and medical condition not taking
20 Viagra, correct?
21 A        That's correct.
22        MR. OVERHOLTZ: Objection.
23 Objection. It misstates the quote. The witness
24 can answer. You can answer.
25 A        Sorry.

11 (Pages 38 to 41)

42

1 Q      The men -- the men in the case
2 reports and case series where there were reports
3 of someone taking Viagra and then subsequently
4 coming down with NAION, those men might have
5 developed NAION even if they had never taken a
6 Viagra, correct?
7 A      I don't feel qualified to say what
8 those men might or might not have done.
9 Q      Okay.
10      (Discussion off the record.)
11 Q      Dr. McGwin, if you want to
12 scientifically test the hypothesis that use of
13 Viagra can cause NAION, you must utilize
14 comparative scientific studies.  You can't
15 simply rely on case reports and case series,
16 correct?
17 A      That is correct.
18 Q      Okay.  And in your expert report in
19 this matter -- we marked that as Deposition
20 Exhibit Number 8 -- turn to page 3.  In about
21 the middle of the page you wrote that in the
22 field of epidemiology, there is a hierarchy in
23 evidence and that -- and then now I begin the
24 quote, "At the bottom of this hierarchy are case
25 reports and case series reflecting their

43

1 inability to test scientific hypotheses,"
2 correct?
3 A      Yes, sir.
4 Q      Okay.  And your point here is that
5 because case reports and case series have no
6 comparison group, they cannot be used
7 scientifically to test the hypothesis such as
8 the hypothesis that the use of Viagra can cause
9 NAION, correct?
10 A      That is correct.
11 Q      Okay.
12      MR. SLONIM:  Judge Borg, we've been
13 going for a little bit less than an hour.  We
14 could take a break now, or I'm happy to plod on.
15      THE COURT:  Sure.  No, I'll leave
16 that to you.
17      VIDEOGRAPHER:  We have 16 minutes
18 left on this tape.
19      THE COURT:  16.  Yeah, let's take
20 that, do it.
21      MR. SLONIM:  We can take just a
22 short break, and then we will move on.
23      THE COURT:  Okay.
24      MR. SLONIM:  Thanks.
25      VIDEOGRAPHER:  The time is 8:57, and

44

1 we're off the record.
2      (Recess taken.)
3      VIDEOGRAPHER:  The time is 9:09.
4 This is the beginning of Tape Number 2.  We are
5 back on record.
6 Q      (By Mr. Slonim) Dr. McGwin, are you
7 familiar with a type of epidemiological study
8 called a case-control study?
9 A      Yes, sir.
10 Q      Okay.  Let's mark as Deposition
11 Exhibit Number 10 a diagram of a case-control
12 study.
13      (Deposition Exhibit
           Number 10 was marked
14      for identification.)
15 Q      Can you identify that as a schematic
16 or a diagram of a case-control study?
17 A      Yes, sir.
18 Q      And in a case-control study,
19 Dr. McGwin, an investigator starts with a group
20 of people who have a certain disease, and those
21 are called the cases, and then selects a group
22 of individuals who do not have the disease who
23 are called the controls; is that right?
24 A      That is correct.  Although, there
25 are variants where one might start with a cohort

45

1 and select a case and control group from that.
2 Q      Okay.  So what we -- take a look at
3 Exhibit 10.  It's divided into the two halves,
4 the cases and the controls, correct?
5 A      Yes, sir.
6 Q      Okay.  And then what the researcher
7 does is compares the two groups in terms of
8 whether they were exposed to the substance that
9 is suspected of being associated with the
10 disease, correct?
11 A      Substance or disease, other disease,
12 risk factor, et cetera, yes, sir.
13 Q      Okay.  And if the substance is
14 associated with or causes the disease, you would
15 expect a higher proportion of the cases to have
16 been exposed to the substance than the controls,
17 correct?
18 A      I agree with the use of the word
19 "associated with," but causes is not what
20 case-control studies or epidemiological studies
21 demonstrate.
22 Q      What's the -- explain that, please.
23 A      Well, epidemiology is able to
24 demonstrate associations, not identify causes of
25 diseases.

12 (Pages 42 to 45)

46

1 Q        Okay.
2 A        So when you said that -- I don't
3 remember the exact --
4 Q        Let me rephrase the question.
5 A        Okay.
6 Q        Thank you. So when the investigator
7 who is conducting the case-control study
8 compares the two groups, if the substance that's
9 being investigated is associated with the
10 disease, you would expect a higher proportion of
11 the cases to have been exposed to the substance
12 than the controls, correct?
13 A        If it is a positive association,
14 yes.
15 Q        Okay. And we have previously
16 marked, Dr. McGwin, your study of nonarteritic
17 anterior ischemic optic neuropathy and erectile
18 dysfunction medications as Exhibit 3. Can you
19 put that in front of you?
20 A        Uh-huh.
21 Q        The style of that study, the study
22 design is a case-control study, correct?
23 A        Specifically, yes, a matched
24 case-control study.
25 Q        Okay. And just for clarification,

47

1 tell us what you mean by the word "matched."
2 A        In case-control studies, generally
3 they are as you described: One selects a group
4 of cases, and one selects a group of controls
5 who don't have the disease of interest.
6 Oftentimes there are what are known as
7 confounding characteristics. These are, I'll
8 use the word, generically ancillary
9 characteristics that we know are associated with
10 the disease and with the exposure of interest
11 but aren't risk factors in the context of the
12 study. And one can remove the effect, the
13 statistical effect of those third, sort of,
14 factors by matching the case and the control
15 group on most frequently age, gender, and race
16 so that any impact of age is removed, any impact
17 of race is removed. And what one ends up with
18 is a group of cases and controls that are
19 similar in those characteristics.
20 Q        And so when you designed your
21 case-control study, you took that extra step of
22 doing the matching in an effort to try to
23 minimize or eliminate the effect of possible
24 disparities along those lines of possible
25 confounders?

48

1 A        Yes, sir.
2 Q        Okay. The medications that you
3 studied in this article were Viagra and also
4 another medication for erectile dysfunction
5 called Cialis, correct?
6 A        That is correct.
7 Q        Okay. I want to walk through some
8 of the steps of the study with you. How were
9 the cases selected?
10 A        The cases were selected from the
11 University of Alabama at Birmingham Department
12 of Ophthalmology Clinic. There are -- at the
13 time we did this study, there were two
14 neuro-ophthalmologists practicing in the clinic,
15 and neuro-ophthalmologists are individuals who
16 would generally treat patients with NAION.
17 And we reviewed retrospectively the medical
18 records of these two practicing physicians to
19 obtain the cases for this particular study.
20         And if I can just go back for a
21 minute, when I say we reviewed the medical
22 records, we first obtained from the hospital --
23 I believe it's data resources, but I'll -- the
24 data resources office a printout of ICD-9 codes
25 for this particular disease and then we --

49

1 Q        Let's go back a little bit. The
2 first thing that you did, as I understand it,
3 based on your description of methods is that you
4 got a printout of ICD-9-CM Code 377.41, correct?
5 A        The first thing we did is get a
6 printout of all the ICD-9 codes for all the
7 patients seen. And then from that list we
8 selected.
9 Q        Code Number 377.41?
10 A        Yes, sir.
11 Q        Okay. And that is a code that's
12 used basically to classify cases so you can
13 retrieve them that decodes to ischemic optic
14 neuropathy, correct?
15 A        That is correct.
16 Q        And then after you -- after you got
17 -- so you started off you got all cases of optic
18 disorders, and then you looked at the subset of
19 Code Number 377.41, correct?
20 A        We got all cases of patients seen,
21 not just those with optic disorders.
22 Q        All cases seen. And then you looked
23 at the subset that were coded to 377.41,
24 correct?
25 A        That is correct.

13 (Pages 46 to 49)

50

1 Q      Okay.  And then you went, as I
2 understood it, and pulled medical record
3 abstracts; is that right?
4 A      We pulled the medical records and
5 then abstracted them.
6 Q      You went and pulled the medical
7 records for those patients and you abstracted
8 them?
9 A      Yes, sir.
10 Q      Okay.  Why did you do that?
11 A      They are -- the ICD-9 code that we
12 referred to, 377.41, or any ICD-9 code that is
13 in an administrative data system may be
14 incorrect -- a key stroke error when it's being
15 entered following the initial patient visit.
16 There are a number of reasons why those, you
17 know, codes may be in error; and therefore, we
18 wanted to be certain that the patients that we
19 identified as having that code did in fact have
20 a clinical diagnosis of NAION.
21 Q      And in fact, 370 -- Code Number
22 377.41 is ischemic optic neuropathy.  It is not
23 limited to nonarteritic anterior ischemic optic
24 neuropathy, correct?
25 A      That is correct.

51

1 Q      So even on its face, that code is
2 not capturing -- even if all the data entry was
3 perfect, that code would not be capturing
4 precisely the cases that you were looking to
5 investigate, correct?
6 A      That is correct.
7 Q      So even if there's no data entry,
8 you would have to do some kind of review to weed
9 out the cases that you were not interested in?
10 A      That is correct.  And can I --
11 Q      Please.
12 A      In consultation with Dr. Vaphiades,
13 the second author, Michael Vaphiades, and the
14 chair of ophthalmology, Dr. Lanning Kline, who
15 is a neuro-ophthalmologist, when we selected
16 that particular code they informed us that when
17 they see patients with NAION, this is the code
18 that they use.  And as you indicated, it is a
19 generic code, but it was the code that started
20 us off for the group of patients that we knew
21 that would subsequently by medical record have
22 this condition.
23 Q      So in other words, if you had simply
24 relied on Code Number 377.41 without going
25 through these extra steps of analyzing the

52

1 medical records and abstracting them, the cases
2 would have been misclassified?
3 A      There was certainly the potential
4 for that.
5 Q      Okay.  In how many instances did you
6 find a case that was coded to 377.41 where the
7 medical record failed to confirm NAION?
8 A      I don't believe there was any
9 that -- to my recollection all of the cases that
10 were identified with that code were then
11 subsequently confirmed by medical record review
12 as NAION.
13 Q      Okay.
14 A      I would have to go back to our data
15 abstractions and verify that, but to my
16 recollection.
17 Q      But in any event, in order to make
18 sure that there were -- that you were capturing
19 the right cases medically and to make sure that
20 somewhere a computer operator doing the coding
21 somewhere along the way didn't make an error,
22 you did not simply rely on the case code, you
23 took the extra step of going and actually
24 analyzing the medical records in consultation
25 with doctors, specialists in ophthalmology and

53

1 neuro-ophthalmology to make sure that the cases
2 that you identified were really the cases that
3 you were interested in which were NAION; is that
4 right?
5 A      That is correct.
6 Q      Okay.  How were the controls
7 selected?
8 A      As I referred to previously, we
9 obtained not just a list of 377.41, we obtained
10 a listing of all the patients seen in the time
11 period of interest, January 2002 to February
12 2004.  So we had people who were being seen for
13 just refraction, people who were being seen for
14 glaucoma, macular degeneration, a variety of
15 problems.  Basically, anyone who came to that
16 clinic during that time in addition to the NAION
17 cases were in this file.  And we selected the
18 controls, people who didn't have NAION, randomly
19 from the remainder of that list.
20      And also as I described previously,
21 this was a match study, so we were looking for
22 people who -- if we had a case who was a, for
23 example, 50-year-old African-American male, we
24 would go and identify at random one 50-year-old
25 African-American male as that person's matched

14 (Pages 50 to 53)

54

1 control.
2 Q        Who didn't have NAION, had some
3 other disorder?
4 A        That's correct.  That's correct.
5 Q        Were female cases and controls
6 selected?
7 A        As part of the larger study, female
8 cases and controls were selected.
9 Q        Just one clarification.  When you
10 said that you matched on race, take a look,
11 please, at the bottom of page 154.
12 A        I apologize.  I misspoke.
13 Q        The cases and controls were matched
14 on the basis of two variables, age and sex,
15 correct?
16 A        Yes.
17 Q        And the age match was not an exact
18 birth date, plus or minus a --
19 A        Plus or minus.
20 Q        Plus or minus a year, correct?
21 A        Yes, sir.
22 Q        Okay.  So the two variables in which
23 you matched?
24 A        I'm sorry.  I apologize.  I was
25 wrapped up in my example and I --

56

1 to males.
2 Q        Okay.
3 A        There was a -- this article here was
4 actually part of a larger study on risk factors
5 for NAION.  When we designed this particular
6 analysis being interested in Viagra, we limited
7 this analysis, this publication to males.  There
8 is, in fact, a larger study that underlies this
9 that does in fact include females.
10 Q        And has that resulted in a
11 publication?
12 A        There is another publication which
13 has presently been accepted for publication and
14 is available on the British Journal of
15 Ophthalmology Web site.  And I have a copy of
16 the manuscript here, and I can read the title
17 if --
18 Q        Sure.
19 A        -- that would be helpful.
20 Q        Yes.
21 A        "Nonarteritic Anterior Ischemic
22 Optic Neuropathy and Presumed Sleep Apnea
23 Syndrome Screened by the Sleep Apnea Scale of
24 the Sleep Disorders Questionnaire."
25        Do you want me to read the authors?

55

1 Q        Okay.  Okay.  And you got cases of
2 NAION by going through this procedure where you
3 started off with the ICD codes, went to the
4 medical records, you got your cases.  You got
5 your -- you got your controls from the listing
6 of people that were at the clinic, not NAION
7 cases, and then you did -- and then you matched
8 them on the basis of sex and age and that was
9 the basis for the cases and controls --
10 A        Yes, sir.
11 Q        -- right?
12        Okay.  And let me just go back.  I
13 want to -- bear with me for a second.
14        Now, you said that female cases and
15 controls were selected, correct?
16 A        Yes, sir.
17 Q        Okay.  How many cases and controls
18 were female?
19 A        Can I look at something in this
20 binder?
21 Q        Sure.  Is it in the article?
22 A        In the article that is marked
23 Exhibit 3 --
24 Q        Yes.
25 A        -- we limited this particular study

57

1 Q        Sure.
2 A        Okay.  The first author, who at the
3 time was a Ph.D. student in the department of
4 epidemiology, is Jian Li.  The second author is
5 myself, Gerald McGwin, Jr.  The third author is
6 Dr. Michael S. Vaphiades, and the senior author
7 is Dr. Cynthia Owsley.
8 Q        And as I understand, this manuscript
9 has been accepted and is actually available to
10 the public online?
11 A        That is correct.  The British
12 Journal of Ophthalmology has a procedure or
13 policy wherein recently accepted articles,
14 although not appearing in the print version of
15 the journal, are available on their Web site.
16 Q        So when the study was originally
17 designed, conceived and designed, what was the
18 purpose?
19 A        The original purpose of the -- let
20 me backtrack.  Dr. Michael Vaphiades is a
21 neuro-ophthalmologist, and he and I speak
22 frequently about epidemiology and eye disease.
23 And he had made some observations that there
24 have been several publications recently on
25 hypothesized risk factors for NAION, NAION,

15 (Pages 54 to 57)

58

1 several of which you mentioned, your case series
2 and the case reports that we discussed. And he
3 thought it would be interesting to pursue an
4 epidemiologic study wherein we looked at some of
5 these risk factors, we formally tested some of
6 these hypotheses.
7       He to my recollection made the
8 comment that there hadn't been a lot of what we
9 refer to as etiologic studies in this condition
10 because it was rare and also just generally
11 there aren't a lot of epidemiologists interested
12 in eye disease. You put that combination
13 together, and you don't get a lot of literature.
14       And so I subsequently talked with my
15 colleagues and we decided to do a study wherein
16 we looked at a broad array of risk factors. And
17 at the time, if one looked at the literature,
18 one would have found several of the case reports
19 that you mentioned on Viagra. Several -- you
20 would have also found a recently published
21 paper, although the exact manuscript escapes me,
22 on sleep apnea, that patients had been observed
23 with NAION also having sleep apnea.
24       And in speaking with Dr. Vaphiades
25 and, again, reading the literature, much of

59

1 which we have referred to in here, one would
2 also find certain medical conditions --
3 diabetes, several of the ones that you
4 mentioned -- as hypothesized risk factors. And
5 as is fairly common in epidemiology, one could
6 view, again, the larger study, not Exhibit 3,
7 the larger study that we were conducting as an
8 exploratory study wherein a number of risk
9 factors are evaluated.
10       MR. BECNEL: Counsel, can we attach
11 a copy of that article as an exhibit to the
12 deposition and get it photocopied later?
13       MR. SLONIM: You will get your
14 chance.
15 Q       Dr. McGwin, turn, please, to Table 1
16 of Exhibit 3. This table, this nine categories
17 of demographic and medical characteristics, that
18 reports the number of cases and controls that
19 had each of those characteristics, correct?
20 A       Yes, sir.
21 Q       Okay. I wanted to ask some
22 questions about some of these.
23 A       There's some writing on here that's
24 not mine. Is that -- is that not good?
25       MS. LESKIN: You gave him your copy.

60

1       MR. SLONIM: Yep.
2       THE WITNESS: I'm sorry, I read it.
3       MR. BECNEL: Now I want to enter it.
4       THE WITNESS: I'm sorry, I read what
5 it said.
6       MR. BECNEL: Did he admit liability
7 or not?
8       THE WITNESS: I have my own copy, if
9 that's --
10      MR. SLONIM: No, that's okay.
11      THE WITNESS: I'm sorry.
12      MR. SLONIM: No problem.
13      MS. LESKIN: Do you want this one?
14 Q       (By Mr. Slonim) Let's make sure I
15 understand some of these. Let's start with
16 alcohol. First of all, you had 38 cases and 38
17 controls, correct, in your study?
18 A       In the final analysis, yes, sir, 38
19 cases and 38 controls.
20 Q       Okay. And one of the things that
21 you asked each of the people that participated
22 about was their use of alcohol; is that right?
23 A       That is correct.
24 Q       And what you found was that actually
25 29 of the cases acknowledged alcohol use and 29

61

1 of the controls acknowledged alcohol use, right?
2 A       Yes, sir.
3 Q       Okay. And you get a p-value there
4 of .99. What does the p-value mean?
5 A       The p-value is the -- what's
6 referred to as the statistical significance of
7 that comparison, of 29 cases and 29 controls or
8 probably more appropriately the 76.3 percent and
9 the 76.3 percent. It is a measure of
10 probability that the observed differences --
11 here there's no difference -- but that the
12 observed differences are due to chance and that
13 the p-value is a measure of that probability.
14 Q       And the fact that the p-value is .99
15 indicates what in regard to whether or not this
16 is a result of chance?
17 A       Did you say what?
18 Q       Yes.
19 A       The conventional criteria for there
20 being a difference, a statistically significant
21 difference is a p-value of .05. And p-values
22 that are less than .05 are generally accepted as
23 being statistically significant differences.
24       In this particular case here, the
25 p-value of .99 means that there's no

16 (Pages 58 to 61)

62

1 statistically significant difference. In fact,
2 you can tell by the exact same numbers that they
3 are exactly the same.
4 Q       Okay. Take a look at another one,
5 myocardial infarction. And by the way, just for
6 the record, myocardial infarction is a medical
7 term, and a layperson would refer to that as a
8 heart attack, correct?
9 A       I believe that is correct.
10 Q       Okay. And in there what you found
11 in your cases, that 52.6 percent of the cases
12 had a history of myocardial infarction as
13 compared with 26.3 percent of the controls,
14 correct?
15 A       That is what we found, yes, sir.
16 Q       Okay. And you got a p-value there
17 of 0.02, correct?
18 A       Yes, sir.
19 Q       Which is less than the 0.05,
20 correct?
21 A       That is correct.
22 Q       Tell me what the p-value of .02
23 means in the myocardial infarction
24 characteristic.
25 A       With respect to the results from

63

1 myocardial infarction, it means that the cases
2 have a statistically significantly higher
3 frequency of myocardial infarction compared to
4 the controls.
5 Q       And that means that that difference
6 is unlikely to be due to chance; is that
7 correct?
8 A       That is correct.
9 Q       Go ahead, please.
10 A       Unlikely, but we've attached an
11 actual quantitative estimate to that. We've
12 said that the probability is .02 or fairly
13 small, yes.
14 Q       So the probability -- the
15 probability that that difference is due to
16 chance would be two percent?
17 A       That is correct.
18 Q       Okay. And then take a look at the
19 diabetes characteristic, or I should say medical
20 condition. What you found as I understand Table
21 1 is that for cases, 26.3 percent of those cases
22 had diabetes whereas 34.2 percent of the
23 controls had a history of diabetes, correct?
24 A       Yes, sir.
25 Q       Okay. And there you find -- so they

64

1 were -- the cases had -- the percentage of cases
2 that had diabetes was lower than the percentage
3 of controls that had diabetes, correct?
4 A       That is correct. The absolute
5 frequency was in fact lower.
6 Q       Okay. And you get a p-value of .45;
7 is that right?
8 A       Yes, sir.
9 Q       And give us the interpretation of
10 that p-value then. It is not statistically
11 significant, correct?
12 A       Can I do the interpretation and
13 then --
14 Q       Please, please.
15 A       Okay. If we sort of keep using this
16 cut-point of alpha .05, we would conclude that
17 those differences that we observed there are not
18 in fact -- and I'll put this in quotes --
19 "real," that although the frequency of diabetes
20 is lower in the cases, that that difference
21 could easily be due to chance. And the .45,
22 again, provides us a quantitative estimate. It
23 doesn't meet our alpha -- our .05 cut-point.
24 Q       In other words, if you pulled this
25 sample at random from a broader population,

65

1 there's a 45 percent probability that you would
2 have gotten this distribution purely as a result
3 of the play of chance or purely as the result of
4 chance alone, correct?
5 A       If we pulled this repeatedly there
6 would be a 45 percent chance -- no, I would not
7 agree with that.
8 Q       How would you phrase it?
9 A       I guess -- how would I phrase it? I
10 would say that you are -- right church, wrong
11 pew.
12 Q       Okay.
13 A       With respect to -- the p-value
14 refers to the data as it has been collected, not
15 necessarily to future collections of similar
16 data. I'm not sure if that makes sense. Your
17 statement connotes that we could take this
18 p-value here and sort of use it as a benchmark
19 for future sampling.
20 Q       Okay.
21 A       Whereas the p-value really is
22 specific to the data as it has been collected.
23 Q       Okay. So in other words, given the
24 fact -- given your 38 cases and controls, the
25 probability that this observed difference with

17 (Pages 62 to 65)

66

1 respect to diabetes occurred purely as a result
2 of chance is 45 percent; is that right?
3 A      That's more correct, yes, sir.
4 Q      Okay.  Now, just looking at the risk
5 factors -- or strike that.
6       Just looking at the medical
7 characteristics of coronary artery disease,
8 myocardial infarction, high cholesterol, and
9 hypertension, in other words, the bottom four --
10 A      Yes, sir.
11 Q      -- a higher percentage of cases than
12 controls had those conditions, correct?
13 A      That is correct.
14 Q      Although the only one that's
15 statistically significant is the myocardial
16 infarction?
17 A      That is correct.  If we use the
18 conventional .05 cut-point, which we did in this
19 paper.
20 Q      Okay.  Now, those conditions --
21 hypertension, coronary artery disease,
22 myocardial infarction, and high cholesterol --
23 are also conditions that predispose people to
24 erectile dysfunction, correct?
25 A      Yes, sir.

67

1 Q      Okay.  So because more of your cases
2 or a higher percentage of your cases had those
3 four conditions -- the hypertension, the
4 coronary artery disease, the myocardial
5 infarction, and the high cholesterol -- than
6 controls, you would expect a higher percentage
7 of use of Viagra among the cases than controls
8 because those people were predisposed to ED,
9 correct?
10      MR. OVERHOLTZ:  Object to the form.
11 It calls for speculation.  I don't know that
12 there is a foundational way that he could even
13 answer that question.
14      MS. LESKIN:  Judge.
15      THE COURT:  I'm sorry.  Overruled.
16 You can answer the question.  If he's able.
17 A      Yes, I would agree.
18 Q      Okay.. And in fact, I mean, one of
19 the reasons I understood that you did adjusting,
20 the matching and adjusting was to try to
21 equalize for those potential differences; is
22 that right?
23 A      Well, we matched on the demographic
24 characteristics.
25 Q      Yeah.

68

1 A      And the adjustment -- that's exactly
2 right.  That was -- the attempt was to remove
3 the dependence of those conditions.
4 Q      Okay.  I want to turn next -- I
5 think I understand Table 1.  I want to turn next
6 to Table 2.
7       Again, you indicate in this table
8 that there were 38 cases and 38 controls,
9 correct?
10 A      That is correct.
11 Q      Okay.  And of your 38 cases, how
12 many were exposed to Viagra?
13 A      It looks to be 14 in here.
14 Q      Okay.  And that would mean that 24
15 were not exposed to Viagra?
16 A      That's correct.
17 Q      Okay.  And of your 38 controls, how
18 many were exposed to Viagra?
19 A      That's interesting.  This actually
20 says 14 but the percentage is off.  Table 2 says
21 that there are 14.
22 Q      Okay.  Now, and then how many were
23 not exposed to Viagra?
24 A      If the paper says that there are 14,
25 then there would be a subsequent 28 that would

69

1 not have been.
2 Q      24?
3 A      Yes, sorry.  24, yes, sir.
4 Q      Now, if the data is that 14 cases
5 were exposed to Viagra and 14 controls were
6 exposed to Viagra as reported in Table 2, the
7 odds ratio would be 1.0, wouldn't it?
8 A      I would have to do the calculations,
9 but it would be my guess that it would be, yes,
10 sir.
11 Q      Well, it's not a guess.  It's the
12 exact same number were exposed, the exact same
13 percentages, correct?
14 A      That is correct.
15 Q      So there's something wrong with
16 Table 2, right?
17 A      Yes, I would agree with you there is
18 something wrong with Table 2.
19 Q      Either the percentage is wrong or
20 the number of people that were exposed is wrong,
21 correct?
22 A      That is correct.
23 Q      Mathematically, those numbers are
24 all inconsistent -- are inconsistent with each
25 other in Line 1 of Viagra use; isn't that right?

18 (Pages 66 to 69)

70

1 A     Could you restate the --
2 Q     Yes, let me rephrase that. If the
3 numbers of people exposed to Viagra in cases and
4 controls was 14 as set forth in Table 2, the
5 odds ratio would be .1 -- would be 1.0, correct?
6 A     Yes.
7 Q     Okay. But you are reporting an odds
8 ratio, an unadjusted odds ratio of 1.25,
9 correct?
10 A     An unadjusted odds ratio, yes, sir.
11 Q     So something is wrong with Table 2,
12 right?
13 A     Yes. My suspicion is that the
14 number is wrong.
15 Q     Which number?
16 A     Oh, pardon me. Under the controls
17 in Table 2, the 14 Viagra users.
18 Q     Okay. And if that was 12, would the
19 numbers work?
20 A     I would have to have a calculator,
21 but --
22 Q     If you divide 12 into 38, you have
23 31.6 -- I mean, the other way around. If you
24 divide 38 into 12, you get 31.6?
25 A     Are you telling me or asking me?

71

1 Q     I'm asking you.
2 A     If I had a calculator, I could --
3       MR. OVERHOLTZ: Do you want to give
4 him a calculator?
5       MR. SLONIM: I actually don't have
6 one.
7       THE WITNESS: I have one in my phone
8 but I turned it off because --
9       MR. SLONIM: Do you have a
10 calculator?
11      THE WITNESS: I mean, on these
12 computers there should all be little
13 calculators. I'm not very good with numbers.
14 I'm sorry.
15 Q     (By Mr. Slonim) I think if you use
16 the number 12, it will come out to 31.6.
17 A     Actually it is not --
18 Q     It's not?
19 A     It's not working. I mean -- pardon
20 me. It's -- I am not referring to the
21 calculation. I can't get the --
22 Q     Let's do this. Let's not digress.
23 We will come back to it.
24 A     If one divides 12 by 38, the result
25 is in fact 31.58 which if one rounds up is 31.6.

72

1 Q     Okay. And then the rest of the
2 numbers would be consistent, correct?
3 A     That is correct.
4 Q     Okay.
5 A     Thank you.
6 Q     Now, let's go over to the next -- go
7 over two columns to the odds ratio, please.
8 A     The adjusted or the --
9 Q     Let's start with the unadjusted --
10 A     Yes, sir.
11 Q     The 1.25?
12 A     Yes, sir.
13 Q     Tell us what that odds ratio means.
14 A     Sure. Would it be useful if I
15 provided some context for the odds ratio
16 itself?
17 Q     Sure, sure.
18 A     In a case-control study, the common
19 measure of association is an odds ratio, and the
20 odds ratio measures -- it's a ratio of
21 probability. So that's just a ratio of odds,
22 which is -- and odds is a probability. And so
23 in this particular case, what we are calculating
24 is the odds of exposure among the cases compared
25 to the odds of exposure among the controls. And

73

1 here the calculation of odds is taken as the
2 probability of the exposure over one minus that
3 probability. And then those are taken as odds.
4 So the odds ratio measures for us the
5 association between the exposure and the disease
6 in this case.
7       So if we would translate into
8 English that 1.25, one can say that the cases
9 were 1.25 times or 25 percent more likely to
10 have reported using Viagra compared to the
11 controls.
12 Q     Okay. Good. I'm sorry, I didn't
13 mean to --
14 A     It is frequently the approach for
15 calculating odds ratios, one can do it by hand,
16 one could use a statistical technique called
17 logistic regression to do it, which I would be
18 happy to go into painful detail to describe.
19      The matched nature of this study
20 means that there are specific statistics for
21 matched studies, and we used a conditional,
22 which is regression. The word "conditional"
23 refers to the fact that the study, the design of
24 this study has to take into account the matching
25 that we report.

19 (Pages 70 to 73)

74

1 Q       Okay.  So if I just put it in a
2 simple two-by-two table using the 14 and 24 for
3 the cases and the 12 and the 26 for the
4 controls, I wouldn't quite reproduce your
5 probability, your odds ratio?
6 A       That's right.  For matched studies,
7 if I can provide more detail, the traditional
8 two-by-two table which in the columns have cases
9 and controls and in the rows have exposed and
10 unexposed, that is not the appropriate
11 presentation for a matched study.
12       What one presents in a matched study
13 is the matched pairs, the discordant pairs and
14 then the concordant pairs.
15 Q       Understood.
16 A       So the two-by-two table is correct,
17 but the organization of the data for a matched
18 study is different.
19 Q       Understood.  Now, your next column
20 is the adjusted odds ratio, correct?
21 A       Yes, sir.
22 Q       Okay.  And referring to the first
23 line on the Viagra use you get an adjusted odds
24 ratio of 1.75, correct?
25 A       That is correct.

75

1 Q       And tell us what the difference is
2 between the adjusted and the unadjusted odds
3 ratio.
4 A       Okay.  As we looked at in Table 1,
5 there are a number of characteristics that
6 albeit not statistically significant, there are
7 differences between the cases and the controls.
8 There's only one myocardial infarction, which
9 was statistically significant.
10       The case control design, in fact
11 most epidemiologic designs, are observational
12 studies.  What this means is that while often
13 there's a primary characteristic of interest, in
14 this case Viagra, there are other what are known
15 as confounding factors that need to be accounted
16 for.  That is, there are things between the
17 cases and the controls that are different.
18       When one -- it is often referred to
19 as adjusting for them.  I don't particularly
20 care for that term because it connotes a sense
21 of control that one doesn't truly have.  When we
22 adjust for these characteristics, we attempt to
23 statistically remove those differences so that
24 one is -- what one is left with is a -- pure is
25 a strong word, but an independent effect that is

76

1 free of those differences that you attempted to
2 adjust.
3 Q       So in other words, when you looked
4 at Table 1, you identified demographic and
5 medical characteristics that were -- that were
6 potentially different between cases and controls
7 and you report that data in Table 1, right?
8 A       Yes, sir.
9 Q       And then in Table 2 in the
10 right-hand column in the adjusted odds ratio,
11 what you attempt to do is to do a statistical
12 adjustment on the data to make it as if there
13 were no differences between the cases and
14 controls on those nine variables in Table 1; is
15 that right?
16 A       To say that we make so that there
17 are no differences is not a hundred percent
18 correct.
19 Q       Okay.
20 A       What we are attempting to do is
21 minimize those differences on that association
22 of interest.
23 Q       Okay.  And did you -- when you made
24 your adjustment, did you try to adjust for all
25 nine variables that you identified in Table 1?

77

1 A       Did we try to, or did we?
2 Q       Did you?
3 A       The only thing that wouldn't have
4 been included in that particular statistical
5 model would have been age.
6 Q       Okay.  So you adjusted for eight
7 variables?
8 A       According to the table, we adjusted
9 for all variables in Table 1 except age.
10 Q       It's a footnote, I guess, that I
11 didn't refer to.  I apologize.
12       Given that there were eight
13 variables that you were adjusting for in a
14 population of 38 cases and 38 controls, was
15 there any concern about the statistical ability
16 to do that calculation?
17 A       There is -- there is a rule of thumb
18 that goes -- it is a ten-for-one rule.  For
19 every independent variable included in a
20 statistical model, and here independent variable
21 meaning a risk factor, one should have ten
22 events or cases.  And the one-for-ten rule would
23 apply to a cohort study, clinical trial,
24 whatever the case may be.  So in this case, ten
25 cases.

78

1      There's recent evidence in the
2 epidemiologic and statistical literature that
3 that one-for-ten rule is a vast overestimate.
4      So to answer your question, I would
5 say while the rule of thumb suggests that we did
6 not have enough cases to support that number of
7 variables in the model, it is an issue that is
8 not without controversy.
9 Q      Okay.  So some people would accept
10 it and some people would not accept it as a
11 reliable statistical adjustment when you have
12 eight variables for which you are controlling
13 and 38 cases?
14 A      That is correct.  Some people
15 wouldn't; some people would.
16 Q      Your p-value here is .64, is that
17 correct, for Viagra?
18 A      Oh, yes, sir.
19 Q      And we've all -- the whole
20 discussion has been on Line 1 of the table.
21 It's the Viagra line, just so it's clear.  The
22 p-value here is .64, correct?
23 A      Yes, sir.
24 Q      Now, does that .64 apply to the
25 unadjusted odds ratio, the adjusted odds ratio

79

1 or both?  What does it apply to?
2 A      While I can't state with a
3 certainty, it is my practice to have it refer to
4 the unadjusted result.
5 Q      Okay.  And the odds ratio that you
6 observed, the .125 (sic) which is the unadjusted
7 and the 1.75 which is the adjusted, that odds
8 ratio is not statistically significant, correct?
9 A      The 1.75 would not be statistically
10 significant.
11 Q      And nor would the 1.25?
12 A      Nor would the 1.25, no, sir.
13 Q      And in fact, the p-value here --
14 that's shown by the p-value of .64, correct?
15 A      Yes, sir.
16 Q      And the p-value of .64 means that
17 there's a 64 percent probability that the odds
18 ratio that you observed is the result of chance,
19 correct?
20 A      That would be one interpretation of
21 it, yes, sir.
22 Q      Another way of phrasing this, a
23 p-value of 64 means that there is a 64 percent
24 probability that the odds ratio was the result
25 of random noise in the data, correct?

80

1 A      Random noise could be one potential
2 explanation, yes, sir.
3 Q      Let's turn next to Table 3, please.
4 Now this table presents data for men who used
5 Viagra and/or Cialis and who had a history of
6 either heart attack or high blood pressure
7 compared with men who used neither medication
8 and had no history of either heart attack or
9 high blood pressure; is that right?
10 A      Yes, sir.
11 Q      Now, you don't indicate here whether
12 the odds ratios that you are reporting were
13 adjusted or unadjusted.  Can you tell us which
14 they were?
15 A      These would be adjusted.
16 Q      What technique did you use to do the
17 adjustment?
18 A      Conditional logistic regression.
19 Can I clarify?
20 Q      Please.
21 A      Conditional logistic regression
22 would be the statistical model that one used.
23 The statistical model is based on more
24 complicated statistics, maximum likelihood
25 estimates.  So I guess depending on how specific

81

1 you want to be.
2      Conditional logistic regression is
3 the statistical tool.  There are some
4 arithmetic, some fairly complicated statistics
5 that are used by the logistic regression model.
6 Q      Did you adjust in Table 3 for all of
7 the demographic factors reflected in Table 1?
8 A      I can't state it with a certainty.
9 I believe that was the case save age.
10 Q      Age.  Is there any reason why you
11 didn't -- in Table 2 you reported the adjusted
12 and the unadjusted.  Here you didn't indicate.
13 Is there any reason why you didn't report the
14 unadjusted?
15 A      I believe it was due to space.
16 Q      Okay.  The Table 3, this presents no
17 data for men who used Viagra alone compared with
18 men who did not use Viagra; is that right?
19 A      That is correct.
20 Q      And in this article when you report
21 the odds ratio, you did not report the odds
22 ratio for men who used Viagra alone and had a
23 history of myocardial infarction, correct?
24 A      Oh, you mean in the text of the
25 article?

21 (Pages 78 to 81)

82

1 Q      No. I'm talking about Table 3.
2 A      Viagra -- no, sir.
3 Q      And likewise in your article on
4 Table 3, you did not report the odds ratio for
5 men who used Viagra alone and had a history of
6 hypertension, correct?
7 A      No, sir.
8 Q      Now, take a look, please, at your
9 expert report that we marked previously. I
10 think it is Exhibit Number 3.
11      MS. LESKIN: 8.
12 Q      8, I'm sorry. Do you have your
13 expert report in front of you?
14 A      Yes, sir.
15 Q      Turn to page 2, please. In this
16 paragraph, last paragraph on the bottom of the
17 page in about the middle of the paragraph you
18 are reporting about the McGwin study, the study
19 that we've just been discussing, correct?
20 A      Yes, sir.
21 Q      Okay. And with regard to this Table
22 3, in your expert report what you state
23 referring to your article is that the authors
24 also reported an odds ratio of 10.7 for men who
25 used Viagra. Let's stop right there. Oh, and

83

1 had a history of myocardial infarction.
2 A      The sentence that begins, "The
3 authors also reported" --
4 Q      Yes.
5 A      Yes, sir.
6 Q      I want to focus just on -- let's
7 read it so it's just clear.
8      The authors also reported an OR,
9 odds ratio, of 10.7 for men who reported Viagra
10 use and a history of myocardial infarction.
11      Stop right there. That's what you
12 wrote in your expert report, correct?
13 A      That is in fact what I wrote.
14 Q      Okay. And contrary to what that
15 sentence says or that portion of the sentence
16 says, in your article you report no odds ratio
17 data for men who reported Viagra use alone and
18 had a history of myocardial infarction, correct?
19 A      That's correct, yeah.
20 Q      So that sentence is wrong?
21 A      Yes, that's correct.
22 Q      And by the same token, that sentence
23 where you say "and an odds ratio for men who
24 reported Viagra use and a history of
25 hypertension" -- I'm sorry. Let me rephrase

84

1 that. I misspoke.
2      You also said that the -- that
3 your -- in your expert report, you also said
4 that your article reported an odds ratio of 6.9
5 for men who reported Viagra use and a history of
6 hypertension when in fact your article does not
7 report any data for men who used Viagra alone
8 and had a history of hypertension, correct?
9 A      That's correct.
10 Q      Okay. So that entire sentence is
11 not reported by your article, correct?
12 A      That's correct.
13 Q      Turn to your article, please, page
14 156.
15 A      Okay.
16 Q      Do you see the subheading on the
17 left-hand side that says "Discussion"?
18 A      Yes, sir.
19 Q      Okay. And on the left-hand side,
20 you wrote that you observed, and I quote, that
21 you "observed a positive yet not statistically
22 significant associations between Viagra and/or
23 Cialis and the occurrence of NAION," correct?
24 A      That is correct.
25 Q      And you used the phrase "not

85

1 statistically significant" to acknowledge the
2 fact that your study results could be
3 attributable to chance, correct?
4 A      That is correct.
5 Q      And then on that same paragraph
6 going down to the bottom, the last sentence on
7 that same paragraph under "Discussion" --
8 A      Yes, sir. Yes, sir.
9 Q      Okay. You wrote that the lack of
10 precision associated with these estimates
11 provides little evidence regarding the true
12 strength of association should it truly exist.
13      You used the phrase "should it truly
14 exist" to acknowledge the fact that your study
15 did not prove that Viagra could cause NAION,
16 correct?
17 A      Could you restate the question?
18 Q      Yes. You used the phrase "should it
19 truly exist" to indicate and acknowledge that
20 your study did not prove that Viagra could cause
21 NAION, correct?
22 A      The objective of the study was not
23 to prove that Viagra caused NAION, so I doubt I
24 would have written a sentence towards that end.
25 Q      Let me rephrase it. You used the

22 (Pages 82 to 85)

86

1 phrase "should it truly exist" to indicate that
2 the associations that you reported were not
3 proven by your study, correct?
4 A        The phrase "should it truly exist"
5 acknowledges the fact that there is no one study
6 that is going to provide evidence of causation.
7 The phrase "should it truly exist" reflects the
8 current literature with some individuals
9 suggesting there is a relationship and as we've
10 seen others suggesting that there is no
11 relationship so that the phrase "should it truly
12 exist" really reflects the fact that it's an
13 epidemiologic study attempting to quantify an
14 association.
15         The leading part of the sentence
16 that you read bespeaks the fact that it was a
17 small and a sample size with wide, 95 percent
18 confidence intervals and that the true estimate,
19 should there be one, if we could actually know
20 the truth, was difficult to find in this
21 context.
22 Q       Okay.  Your study does not establish
23 that a true association exists.  That's why you
24 used the word "should it truly exist," correct?
25 A        Our study did not establish an

87

1 association between Viagra and NAION overall.
2 Q        Okay.  On the same page on the lower
3 right-hand portion of the page, the last
4 paragraph, you were -- do you see that, the
5 paragraph --
6 A        The one that begins with the Food
7 and Drug --
8 Q        The Food and Drug Administration.
9 You wrote that the Food and Drug Administration
10 has issued a statement regarding reports of
11 patients experiencing a sudden loss of vision
12 attributed to NAION after taking Viagra, Cialis
13 and Levitra.  This statement is clear that no
14 link has been established between these
15 medications and the occurrence of NAION.
16         That's what you wrote, correct?
17 A        That is what I wrote, yes, sir.
18 Q        Okay.  And you give a reference for
19 that statement, that FDA statement as Reference
20 Number 17; is that right?
21 A        Yes, it is Reference Number 17.
22         MR. SLONIM:  Let's mark that one as
23 an exhibit.
24         (Deposition Exhibit
               Number 11 was marked
25             for identification.)

88

1 A        Thank you.
2 Q        Is that Exhibit 11?
3 A        Yes, it is.  I'm sorry.  I'm just
4 trying to get these in order.
5 Q        We've marked as Deposition Exhibit
6 Number 11 an FDA press release, FDA statement
7 issued July 8th, 2005.  Do you have that in
8 front of you?
9 A        Yes, sir.
10 Q       Okay.  And that's the -- that is
11 Reference Number 17 cited in your published
12 article, correct?
13 A        It is, yes, sir.
14 Q        And referring then to the third
15 paragraph of the FDA statement, the FDA states,
16 and I quote, "It is not possible to determine
17 whether these oral medications for erectile
18 dysfunction were the cause of the loss of
19 eyesight or whether the problem is related to
20 other factors such as high blood pressure or
21 diabetes or to a combination of these problems,"
22 correct?
23         MR. OVERHOLTZ:  I'm going to object
24 to the form.  It leaves out the beginning of
25 that sentence by the FDA.

89

1         MR. SLONIM:  I'll read the whole
2 thing.
3 Q        Dr. McGwin, let me rephrase the
4 question to address the objection.
5         The third paragraph of Exhibit
6 Number 11, which is the FDA statement that you
7 cite in your article, says, "At this time, it is
8 not possible to determine whether these oral
9 medications for erectile dysfunction were the
10 cause of the loss of eyesight or whether the
11 problem is related to other factors such as high
12 blood pressure or diabetes or to a combination
13 of these problems," correct?
14 A        Yes, sir.
15 Q        Okay.  And your purpose in telling
16 your readers in your article that the FDA had
17 made this statement was to make sure that you
18 had called to the attention of readers the fact
19 that the FDA was unable to conclude that Viagra
20 could cause NAION, correct?
21 A        That's correct.
22 Q        Okay.  Counsel pointed out correctly
23 that this statement that we've marked as
24 Deposition Exhibit 11 is dated July 8th, 2005,
25 and it indicates "at this time."

23 (Pages 86 to 89)

**90**

1      Let's mark as Deposition Exhibit
2 Number 12 a document I printed from the FDA Web
3 site within the last few days.
4          (Defendant's Exhibit
               Number 12 was marked
5          for identification.)
6      VIDEOGRAPHER: Mr. Slonim, we have
7 five minutes on the tape.
8      MR. SLONIM: Okay.
9 Q      This is the FDA Patient Information
10 Sheet currently on the FDA Web site that we've
11 marked as Deposition Exhibit Number 12. Do you
12 see in the top left the FDA alert is dated July
13 2005?
14 A      Yes, sir.
15 Q      Okay. In the second paragraph of
16 the alert, the FDA says, "We do not know at this
17 time if Viagra, Cialis or Levitra causes NAION,"
18 correct?
19 A      It does say that, yes, sir.
20 Q      And that's the same thing that the
21 FDA said in Exhibit Number 11 that was issued on
22 July 8th, 2005, correct?
23 A      The sentence is not the same, but
24 the --
25 Q      The thrust?

**91**

1 A      Yeah, is the same.
2 Q      Okay. And then take a look at the
3 italics on the bottom of the first page. It
4 says that this information reflects FDA's
5 current analysis of data available to FDA
6 concerning this drug. FDA intends to update
7 this sheet when additional information or
8 analyses become available, correct?
9 A      Correct.
10 Q      And you notice that this document
11 was printed on June 11th, 2007? Do you see that
12 on the footer?
13 A      Yes, sir.
14 Q      Okay. To your knowledge, the FDA
15 has not come out with any different statement
16 about Viagra and NAION, correct?
17 A      To my knowledge -- I haven't
18 checked.
19 Q      You are not aware of any contrary
20 statement by the FDA?
21 A      No.
22 Q      Okay.
23      MS. SLONIM: Do you need to change
24 the tape?
25      VIDEOGRAPHER: We have three

**92**

1 minutes.
2      MR. SLONIM: Sure.
3      VIDEOGRAPHER: The time is 10:07.
4 This concludes Tape Number 2. We are off the
5 record.
6          (Recess taken.)
7      VIDEOGRAPHER: The time is 10:27.
8 This is the beginning of Tape Number 3. We are
9 back on the record.
10 Q      (By Mr. Slonim) Okay. Let's mark as
11 Deposition Exhibit Number 3 (sic) an article by
12 Fraunfelder, Pomeranz, and Edsel. It is actually
13 an editorial entitled "Nonarteritic Anterior
14 Ischemic Optic Neuropathy and Sildenafil."
15      (Deposition Exhibit
               Number 13 was marked
16      for identification.)
17 Q      Dr. McGwin, I should have asked this
18 earlier. A couple of times we've used the term,
19 you or I have used the term "sildenafil." You
20 understand that that is the chemical name for
21 Viagra. Viagra is the brand name or the trade
22 name?
23 A      That is my understanding, yes, sir.
24 Q      Good. You understand that
25 Dr. Pomeranz who is one of the coauthors on this

**93**

1 piece is also an expert for plaintiffs in this
2 matter?
3 A      Yes, that is my understanding.
4 Q      Okay. And have you seen this
5 Exhibit Number 13 previously?
6 A      Yes, sir.
7 Q      Okay. And take a look, please, at
8 the right-hand side slightly above the middle,
9 the first full paragraph. Dr. Pomeranz and his
10 coauthors write that a well-researched
11 explanation as to how sildenafil therapy could
12 cause NAION does not exist, correct? That's
13 what they wrote?
14 A      The complete sentence begins with
15 "despite the above," but yes, that's correct.
16 Q      And in the preceding paragraph, they
17 refer to different hypotheses that have been
18 suggested about -- that could possibly link
19 Viagra to NAION; is that right?
20 A      That's correct.
21 Q      Okay. They talk, for instance,
22 about a possible hypotensive effect in
23 Dr. Hayreh's hypothesis, correct?
24 A      That's correct.
25 Q      And then they go on in the paragraph

24 (Pages 90 to 93)

94

1 on the right, the first full paragraph, and they
2 say, "Despite those hypotheses above, a
3 well-researched explanation as to how sildenafil
4 therapy could cause NAION does not exist,"
5 correct?
6 A       Yes, sir.
7 Q       Okay.  And in fact, as we noticed
8 earlier in the article that you coauthored, I
9 think we marked it as Exhibit Number 2 with
10 Dr. Girkin, that paper says that there is no
11 good experimental model of NAION, correct?
12 A       That's correct.
13 Q       Okay.  And then referring back to
14 this Exhibit Number 13, the piece that was
15 written by Dr. Pomeranz and coauthors, they
16 write in the second full paragraph on the
17 right-hand side that until an animal model or
18 scientific study reveals a biological basis for
19 NAION caused by treatment with sildenafil, most
20 of the case reports of NAION related to this
21 drug may be an expected coincidence as
22 sildenafil is a top-selling medication and
23 patients who receive this drug are frequently
24 older, vasculopathic, and already at risk for
25 NAION, correct?

96

1 Number 14 a publication by authors Margo and
2 French entitled "Ischemic Optic Neuropathy in
3 Male Veterans Prescribed Phosphodiesterase
4 Inhibitors."  Do you have that in front of you?
5 A       Yes, sir.
6 Q       And this is a paper that you've read
7 previously, correct?
8 A       Yes, sir.
9 Q       And in fact, you referenced this in
10 your expert report, correct?
11 A       Yes, sir.
12 Q       Okay.  Now, Margo and French in this
13 paper did not conduct either a cohort study or
14 case-control study; is that right?
15 A       They refer to it as a retrospective
16 cohort study.
17 Q       Well, isn't what they did an
18 exploratory study to determine whether or not it
19 would be feasible to control -- to conduct a
20 case-control study?
21 A       Could you say that question again?
22 Q       Yes.  Take a look at the -- the
23 purpose of the study was to determine the
24 feasibility of a case-control study of PDE5
25 inhibitors and NAION, correct?

95

1 A       That is correct.  That's what it
2 says.
3 Q       Okay.  And you agree that the
4 reports of NAION among men who have used Viagra
5 could be a coincidence, correct?
6 A       Yes, I would agree with that.
7 Q       In other words, it could be the fact
8 that these men were at risk for developing NAION
9 and this just could be a coincidental finding?
10 A       That's correct.
11 Q       Okay.  Now, Dr. McGwin, one of the
12 papers that you cited in your expert report in
13 this matter was a paper by authors Margo and
14 French.  Do you recall that?
15 A       My citation or the paper itself?
16 Q       Do you recall the paper?
17 A       Yes, sir.
18 Q       Okay.  And you did cite it, correct?
19 A       I don't know the exact location, but
20 it's likely that I did as I was aware of it at
21 the time I wrote that report.
22        (Deposition Exhibit
         Number 14 was marked
23        for identification.)
24 A       Thank you.
25 Q       We've marked as Deposition Exhibit

97

1 A       That is the stated purpose, yes,
2 sir.
3 Q       And what this was was an exploratory
4 study to determine whether or not it would be
5 feasible to conduct a case-control study; isn't
6 that right?
7 A       I don't believe they ever call it an
8 exploratory study.  Are you asking about the
9 study design itself?
10 Q       Yes, yes.
11 A       The study design per their own words
12 is a retrospective cohort study.
13 Q       Does it meet your -- as a professor
14 of epidemiology, does it meet your criteria for
15 what you would call a retrospective cohort
16 study?
17 A       Yes, sir, it does.
18 Q       Okay.  Now, Margo and French
19 attempted to identify cases of NAION, and they
20 refer to it as "NION," by using these ICD-9-CM
21 codes, correct?
22 A       That is correct.
23 Q       Okay.  And you and I previously
24 talked about that in connection with your own
25 study, correct?

25 (Pages 94 to 97)

98

1 A      Yes, sir.
2 Q      And Margo and French, in fact, used
3 ICD-9-CM Code 377.41, correct?
4 A      That is correct.
5 Q      And that code does not distinguish
6 between arteritic and nonarteritic forms of
7 ischemic optic neuropathy, correct?
8 A      No, sir. It refers to ischemic
9 optic neuropathy.
10 Q      Okay. So it could be either
11 arteritic or nonarteritic, correct?
12 A      That's correct.
13 Q      And so what they did was they tried
14 without looking at medical records to pull out
15 the cases that might be arteritic, correct?
16 They identified cases that responded to ICD-9-CM
17 codes and then they excluded cases where there
18 was either temporal arteritis or something like
19 that, correct?
20 A      That would be my interpretation of
21 what they did, yes, sir.
22 Q      The ICD-9-CM Code 377.41 also does
23 not distinguish between ischemic optic
24 neuropathy that occurs in the anterior portion
25 of the optic nerve and optic neuropathy that

99

1 occurs in other portions of the optic nerve,
2 correct?
3 A      Not to my knowledge.
4 Q      Okay. And Margo and French did not
5 review the medical records or interview patients
6 in an effort to confirm that the cases that they
7 thought were NAION were actually really NAION;
8 is that right?
9 A      That's -- that's correct.
10 Q      Okay. So the method that Margo and
11 French used to identify cases of NAION was
12 susceptible to case misclassification, correct?
13 A      That's correct.
14 Q      And, in fact, they own up to that.
15 They write in their paper, they acknowledge that
16 a weakness of their study was the failure to
17 analyze medical records to confirm the presence
18 of NAION, correct? It is on the bottom -- it is
19 on page 539, bottom left.
20 A      Yes, sir.
21 Q      Okay. They also define cases of
22 possible NAION, correct?
23 A      Yes, sir.
24 Q      And possible NAION they define as
25 cases of papillitis or optic neuritis, correct?

100

1 A      Yes, sir.
2 Q      Okay. And so that's even a broader
3 definition -- the definition of possible NAION
4 is even a broader definition than the definition
5 that they had previously used of NAION and in
6 that respect is even more prone to
7 misclassification of cases --
8         MR. OVERHOLTZ: Object to form.
9 Lack of foundation.
10 Q      -- correct?
11         THE COURT: Overruled. You may
12 answer the question.
13 A      The question is is it more subject
14 to misclassification?
15 Q      Yes. Let me rephrase it. In the
16 definition of -- let me withdraw it and rephrase
17 it.
18         In the definition of possible NAION,
19 Margo and French are affirmatively including
20 cases that are not classified as even ischemic
21 optic neuropathy, correct?
22 A      Yes, sir.
23 Q      So they are affirmatively including
24 cases that are coded to things other than
25 ischemic optic neuropathy, correct?

101

1 A      That is correct.
2 Q      But if the subject matter that they
3 are interested in is NAION, they are going to be
4 pulling in cases that are non-NAION cases when
5 they use this definition of possible NAION,
6 correct?
7 A      Yes. Yes, sir.
8 Q      And so in that respect, it's prone
9 to misclassification of cases, correct?
10 A      Yes, sir.
11 Q      Okay. Now, referring to their
12 definition of NION, Margo and French found that
13 men who used a PDE5 inhibitor, not just Viagra
14 but a PDE5 inhibitor, did not have a
15 statistically significant increased risk of
16 NAION as compared with nonusers, correct?
17 A      They do not provide the p-value for
18 the association that you are referring to, but
19 one could infer from the confidence interval
20 that it would not be statistically significant.
21 Q      Okay. And just so it is clear on
22 the record, you are looking now on page 539 at
23 the bottom left-hand side where Margo and French
24 write that the relative risk of NION for men
25 prescribed PDE inhibitors was 1.02 per a 95

26 (Pages 98 to 101)

102

1 percent confidence interval, 0.92 to 1.12,
2 correct?
3 A      That is what I'm referring to, yes,
4 sir.
5 Q      Okay.  And so first of all, the
6 relative risk that they report is just barely
7 above 1.0, correct?
8 A      Yes, sir.
9 Q      Okay.  And if it was 1.0, regardless
10 of statistical significance, that would be no
11 increased relative risk?
12 A      No difference, that's correct.
13 Q      So this is just barely above --
14 two-hundredths of a -- two-hundredths above no
15 increased risk, correct?
16 A      That's correct.
17 Q      But even that bare elevation is not
18 statistically significant as shown by the fact
19 that the 95 percent confidence interval crosses
20 1.0, correct?
21 A      That's correct; although, I -- can I
22 clarify that statement?
23 Q      Sure.
24 A      It is often -- 95 percent confidence
25 intervals are often used as indicators of

103

1 statistical significance.  And it is probably --
2 well, it may not be important to you, but it is
3 important to point out that there can be
4 confidence intervals that include the null value
5 yet are statistically significant because the
6 manner in which confidence intervals and
7 p-values are calculated are in fact different.
8 I just want to point that out.
9 Q      Okay.  Normally epidemiologists feel
10 that when a 95 percent confidence interval
11 includes 1, the result is not statistically
12 significant, correct?
13 A      I can't speak to what most
14 epidemiologists would normally do.  Myself, I
15 would refer to the p-value itself if I was
16 interested in statistical significance.  One
17 does not perform statistical significance
18 testing using confidence intervals.
19 Q      Okay.  In any event, you don't have
20 any reason based on the data that's provided to
21 think that this 1.02 relative risk is
22 statistically significant, do you?
23 A      No, sir.
24 Q      Okay.  Margo and French did find a
25 statistically significant increased risk of

104

1 possible NAION, correct?
2 A      That is correct.
3 Q      Okay.  And let's read the sentence.
4 The RR, or relative risk, of possible NION for
5 men prescribed a PDE5 inhibitor was 1.34
6 percent, 95 percent confidence interval, 1.17 to
7 1.55, correct?
8 A      That is correct.
9 Q      Okay.  And as we -- you and I
10 discussed a minute ago, possible NAION is not
11 NAION by definition, correct?
12 A      That's correct.
13 Q      Okay.  And in fact, referring to
14 that particular finding looking to the
15 right-hand side of the page, Margo and French
16 say that the increased risk of papillitis-optic
17 neuritis observed in men prescribed PDE5
18 inhibitors in this study is difficult to explain
19 in this age group and deserves further
20 investigation, correct?
21 A      They do say that, that's correct.
22 Q      Now, looking at this page 539 on the
23 lower left-hand side, Margo and French
24 acknowledge that their study has certain
25 weaknesses, correct?

105

1 A      Yes, sir, they do.
2 Q      And specifically they acknowledge
3 that they did not in the course of doing this
4 work verify the accuracy of the diagnostic codes
5 that they relied on, correct?
6 A      Yes, sir.
7 Q      And what that means is that cases
8 that they treated as if they were NAION in
9 reality might not have even been NAION, correct?
10 A      Yes, sir.
11 Q      Okay.  And they also acknowledge
12 that they did not know the temporal relationship
13 between the use of a PDE5 inhibitor and the
14 diagnosis of NAION, correct?
15 A      Yes, sir.
16 Q      In other words, in the work that
17 Margo and French did, they could have counted as
18 cases of NAION instances where a person
19 developed NAION before he ever took a PDE5
20 inhibitor, correct?
21 A      Yes, that's certainly possible.
22 Q      Okay.  Obviously if a person
23 developed NAION before he was ever exposed to a
24 PDE5 inhibitor, the medication could not have
25 caused the NAION, correct?

106

1 A     Yes, that's correct.
2 Q     You agree with me that a cause must
3 precede an effect?
4 A     That's correct.
5 Q     At least in our world.
6       The Margo and French study does not
7 conclude that men who take Viagra are at a
8 statistically significant increased risk of
9 developing NAION compared with nonusers,
10 correct?
11 A     Could you say that —
12 Q     Yeah, yeah. The Margo and French
13 study does not reach the conclusion that men
14 take Viagra are at a statistically significant
15 increased risk of developing NAION compared with
16 nonusers, correct?
17 A     That's correct.
18 Q     Okay. Now, turn back to page 538 of
19 this paper, please. And I'll direct your
20 attention towards the bottom of that page and
21 then it's going to continue on to the next
22 page. Margo and French write, and I quote,
23 "Because PDE5 inhibitors are targeted to men who
24 have vasculopathic factors, it is also possible
25 that any association is coincidental. To date,

107

1 there is no definitive evidence to support a
2 causal relationship," correct?
3 A     That is in fact what they said, yes,
4 sir.
5 Q     Okay. And that is precisely what
6 the Food and Drug Administration wrote in the
7 two documents that we identified as exhibits
8 earlier that at this time it is not known if
9 Viagra, Cialis or Levitra causes NAION, correct?
10 A     That is correct.
11 Q     And that is the same thing that
12 Fraunfelder and Pomeranz and Egan wrote in the
13 document we just marked as an exhibit where they
14 say it could be a coincidence, correct? That's
15 Exhibit 13.
16 A     That's correct.
17 Q     Okay. Are you familiar with a type
18 of study called a randomized clinical study?
19 A     Yes, sir.
20 Q     And what is that?
21 A     Randomized clinical study are often
22 a — also referred to as a randomized clinical
23 trial. It's a study design wherein as opposed
24 to being observational, the risk factor, the
25 exposure of interest is randomly assigned.

108

1 There are variants of this study design in terms
2 of how the randomization is done and the
3 specific types of study design, the crossover
4 study, et cetera.
5       But, generally, it departs from
6 epidemiology in that it's not observational.
7 Q     It is experimental?
8 A     It is in fact experimental, yes,
9 sir.
10 Q     And in terms of the hierarchy of
11 epidemiological evidence, where does the
12 randomized clinical study stand in comparison to
13 a case-control study?
14 A     Relative to a case-control study, it
15 is higher.
16 Q     And where does it stand relative to
17 case reports or case theories?
18 A     Oh, it is much higher.
19 Q     Okay. And in the case of Viagra,
20 you know that there have been randomized
21 clinical studies of the medication, correct?
22 A     Yes, sir.
23 Q     Let's take a look at the Gorkin
24 paper that we previously marked as a deposition
25 exhibit. Let's see if I can find it.

109

1 A     I believe it is 9.
2 Q     9?
3 A     Yes, sir. I have an extra —
4 Q     I've gotten my papers out of order.
5 A     I have an extra copy, if you want.
6 Q     That's okay. Turn, please, to page
7 502. I'll direct your attention to the
8 left-hand side. And in part on the left-hand
9 side this article discusses 103 double-blind or
10 open-label clinical studies of Viagra, correct?
11 A     Yes, sir.
12 Q     Okay. And in those 103 studies,
13 there were more than 13,400 men who participated
14 in the studies, correct?
15 A     That is what it says, yes, sir.
16 Q     Okay. And these more than 13,400
17 men were followed on average for approximately
18 one year, correct?
19 A     It does not say that, but one could
20 infer that from the number of patient years that
21 are stated here.
22 Q     The studies include 13,400 men, more
23 than that, and approximately 13,300 patient
24 years of observation, correct?
25 A     Yes, sir.

28 (Pages 106 to 109)

110

1 Q      So that's pretty clear that on
2 average that the follow-up for each patient was
3 approximately one year --
4 A      Yes, sir.
5 Q      -- correct?
6        Okay. And in those 103 clinical
7 studies involving more than 13,400 men, there
8 were no cases of NAION that were reported,
9 correct?
10 A      That's correct.
11 Q      Okay. And then the article goes on
12 to discuss the International Men's Health Study,
13 correct?
14 A      Yes, it does.
15 Q      And the International Men's Health
16 Study was designed as a prospective cohort
17 study, correct?
18 A      Yes, sir.
19 Q      And what's the difference between a
20 prospective cohort study and a randomized
21 clinical trial?
22 A      They -- what's the difference or
23 how --
24 Q      Yes, what is the difference?
25 A      The assignment of the treatment, the

111

1 exposure, the medication, whatever the risk
2 factor of interest is.
3 Q      Okay. And how is it different?
4 A      In a prospective cohort study, it is
5 again observational. One simply ascertains what
6 the normal behaviors of the individual are. And
7 in the clinical trial, as we discussed, you, the
8 investigator, randomly assigns who receives that
9 particular risk factor or in this case
10 medication.
11 Q      But it has the virtue of being
12 prospective, even though the assignment is not
13 random?
14 A      That's correct, yes, sir.
15 Q      So it doesn't have whatever problems
16 may be introduced by trying to go backward in
17 time and get people's recollections?
18 A      That's correct.
19 Q      And in the International Men's
20 Health Study, there were 3,812 men that
21 participated in the study, correct?
22 A      Yes, sir.
23 Q      And they were followed on average of
24 slightly less than one year, correct?
25 A      Yes, sir.

112

1 Q      Okay. And there were no reported
2 cases of NAION among those 3,812 men in the
3 International Men's Health Study, correct?
4 A      That's correct.
5 Q      Okay. And then the article
6 describes a third study that was conducted, the
7 prescription event monitoring study in the
8 United Kingdom, correct?
9 A      Yes, sir.
10 Q      And that study was designed as a
11 retrospective cohort study, correct?
12 A      Although it doesn't state it, I know
13 that that is how it was designed.
14 Q      You are familiar with PEM studies?
15 A      Yes, sir.
16 Q      Okay. And you know that they are
17 retrospective cohort? What is the difference
18 between a retrospective cohort study and a
19 prospective cohort study?
20 A      The main difference is where the
21 investigator, the person doing the study is
22 standing at the time both the exposure and the
23 outcomes have occurred.
24 Q      Okay.
25 A      And in a prospective study, the

113

1 investigator is standing at the beginning. The
2 events haven't occurred yet, although the
3 exposures might have. In a retrospective study,
4 generally both the exposures and the events have
5 already happened. And often these are secondary
6 analyses of existing data that are used for
7 these retrospective studies.
8 Q      Okay. And in the prescription event
9 monitoring study involving Viagra, there were
10 more than 28,000 men who were studied, correct?
11 Do you see there were two phases? There was --
12 A      Oh, 22,473 and then 56 -- yes, sir.
13 Q      Okay. And that they were -- these
14 28,000 men were followed on average for more
15 than one year, correct?
16 A      That is correct.
17 Q      And you know that because for the
18 28,000 men, approximately, that were in the
19 study, the study reported approximately 35,500
20 patient years of observation, correct?
21 A      Yes, sir.
22 Q      And that indicates that each man was
23 followed on average for more than a year?
24 A      Yes, sir.
25 Q      Okay. And there was one reported

29 (Pages 110 to 113)

114

1 case of NAION among those 35,500 patient years
2 of observation, correct?
3 A      That is correct.
4 Q      Okay.  And one case of NAION in
5 35,500 patient years of observation means that
6 the incidence of NAION in this cohort is 2.8 per
7 hundred thousand patient years, correct?
8       MR. OVERHOLTZ:  I object to form.
9 It misstates the statements in the report that
10 this was patient years of observation as opposed
11 to patient years of using Viagra.
12      THE COURT:  Overruled.  You may
13 answer the question.
14 A      The manuscript does in fact state
15 that the unadjusted incidence was 2.8 per
16 hundred thousand person years.
17 Q      Okay.  And based on the Johnson and
18 Arnold and Hattenhauer studies that you and I
19 looked at at the beginning of this deposition,
20 the background incidence of NAION in the
21 population of men over age 50 ranges from about
22 2.3 to 10.3 per hundred thousand per year,
23 correct?
24 A      I would -- no, I would not agree
25 with that.

115

1 Q      Let's take a look at the ION
2 decompression trial paper that we marked as
3 Exhibit Number 6.
4 A      Newman?
5 Q      Yes, the Newman paper.
6 A      Yes, sir.
7 Q      This was one of the exhibits that
8 you cited in your report on Viagra and NAION,
9 correct?
10 A      I believe that is correct.
11 Q      This is a paper you referenced.
12 Okay.  And in the first paragraph of Exhibit 6,
13 the ION decompression trial study, the author
14 states that the annual incidence of NAION has
15 been estimated from 2.3 to 10.2 per hundred
16 thousand for persons 50 years and older,
17 correct?
18 A      That is in fact what they state.
19 Q      Okay.  And they cite references 3
20 and 4, which are the Johnson and Arnold and
21 Hattenhauer papers, correct?
22 A      Yes, sir.
23 Q      Based on the Johnson and Arnold and
24 Hattenhauer studies, the background incidence of
25 NAION in the population of men over age 50

116

1 ranges from 2.3 to 10.2 per hundred thousand per
2 year, correct?
3 A      Well, each of those studies provides
4 an individual estimate, one of which is 2.3.
5 The other is 10.2.
6 Q      And that gives you a range, correct?
7 A      No.  In fact it provides you two
8 numbers.  It's important to remember that the
9 rate of 2.3 has its own confidence interval
10 associated with it.  And the rate of 10.2 has
11 its on confidence interval associated with it.
12      So what -- the numbers that are
13 being cited are rates from two individual
14 studies, both of which are measured with error.
15 Q      In your article, Dr. McGwin, that
16 was marked as Deposition Exhibit Number 3, you
17 in fact wrote that the range of estimated number
18 of people that are going to get NAION in the
19 United States is from 1500 to 6,000 people per
20 year, correct?
21 A      That is correct.
22 Q      And you base that on that range of
23 1500 to 6,000 on the Johnson and Arnold and
24 Hattenhauer papers, correct?
25 A      Yes, sir.

117

1 Q      Okay.  And that range from Johnson
2 and Arnold and Hattenhauer is 2.3 to 10.2 per
3 hundred thousand per year, correct?
4 A      Those two studies, as I mentioned,
5 provide two individual estimates.  To refer to
6 what is a range fails to acknowledge that they
7 are both measured with a certain degree of
8 error.
9 Q      Bearing that in mind, it is a fact
10 that in Exhibit 3, your article on Viagra, you
11 reported that as the range of new cases in the
12 United States, 1500 to 6,000, correct?
13      MR. OVERHOLTZ:  Object to form.  Are
14 we talking about that he reported the 1500 to
15 6,000 or the 2.3 to 10.2 incidence rates?  I
16 just don't want to confuse those two on the
17 record as to what you are asking.
18      THE COURT:  I can barely hear you,
19 Mr. Overholtz, so I'm kind of waiting here to
20 read it.
21      Are you able to answer the question,
22 Doctor?
23      THE WITNESS:  I can answer the
24 question with respect to what I said in my
25 paper, yes, sir.

30 (Pages 114 to 117)

**118**

1    THE COURT: Okay. Go ahead and
2 answer it. It is overruled.
3 A    That is in fact what I state in the
4 paper, yes, sir.
5 Q    (By Mr. Slonim) Okay. In other
6 words, Dr. McGwin, there were no reported cases
7 of NAION among the 13,400 men in the clinical
8 studies. There were no reported cases of men
9 among the 3800 men that participated in the
10 International Men's Health Study --
11    MR. BECNEL: You misspoke, Counsel.
12 You might want to read it. You used "men"
13 twice.
14    MR. SLONIM: Let me withdraw the
15 question and I'll rephrase it.
16 Q    Dr. McGwin, referring to the Gorkin
17 paper, there were no reported cases of NAION
18 among the 13,400 men in the clinical studies,
19 there were no reported cases of NAION among the
20 3800 men in the International Men's Health
21 Study, and one reported case of NAION in the
22 prescription event monitoring study which -- and
23 that one case results in an incidence which is
24 at the lower end of the estimated background
25 incidence of NAION among men over age 50,

**119**

1 correct?
2    MR. OVERHOLTZ: Object to the form.
3 Compound question. I mean, it is asking about
4 number of cases per people in a study and then
5 asking whether or not there is a rate regarding
6 compared estimated backgrounds. I'm not sure
7 which question he's answering here.
8    THE COURT: Overruled. He can
9 answer the question if he's able.
10 A    Can I restate the question?
11    THE COURT: I was going to say, if
12 he can remember it.
13 Q    Sure, sure.
14 A    I understand the point that you're
15 trying to make, and I guess I'm just trying to
16 acknowledge the fact that there is this
17 background incidence, and I don't argue that if
18 we use the term generically that we have these
19 studies that provide us -- I'm not going to use
20 the word "range" -- ball park estimates.
21 Q    Okay.
22 A    But my concern is that we're failing
23 to recognize that each of those numbers is
24 measured with variability.
25 Q    Fine.

**120**

1 A    And in the lower -- or I can't
2 remember the phrase that you used -- the lower
3 estimate or the -- let me see if I can find
4 it -- the 2.8 number is the estimate from a
5 single study that has its own lower bound to it.
6 Q    Okay.
7 A    So if we're sort of looking at this
8 as combining those two studies, the Hattenhauer
9 study and the Johnson --
10 Q    -- and Arnold --
11 A    -- study, to combine them, we'd be
12 better off taking the data from them, putting
13 the data together, coming up with a single
14 estimate, and getting a confidence interval on
15 it.
16    So I guess I'm struggling with your
17 question. We're trying to -- you're clearly
18 trying to sort of lay a foundation that these
19 two numbers represent a range of background
20 incidence when in fact the epidemiology suggests
21 that there is some variability that I don't
22 think we are accounting for.
23 Q    Okay.
24 A    I don't know if I'm making myself
25 clear.

**121**

1 Q    Let me try to rephrase it a little
2 bit. Of the two studies that report on
3 background incidence of NAION in the population
4 of the United States, the one paper reports a
5 background incidence of about 10.2 and the other
6 paper reports an annual incidence of about 2.3
7 per hundred thousand for persons age 50 and
8 older, correct?
9 A    Yeah. Although, the numbers
10 reported in the paper we're taking about,
11 Gorkin, are actually different from that, but
12 those are numbers that are cited in those
13 papers, yes, sir.
14 Q    Okay. Very close?
15 A    Uh-huh, yes, sir.
16 Q    In any event, in the Gorkin paper,
17 there were no cases of NAION in the -- among the
18 13,000 men in the clinical studies, correct?
19 A    Yes, sir.
20 Q    And there were no cases of NAION
21 among the 3800 --
22    VIDEOGRAPHER: Mr. Slonim, your
23 paper is rubbing your microphone.
24    MR. SLONIM: Sorry.
25    VIDEOGRAPHER: Thank you.

31 (Pages 118 to 121)

**122**

1 Q      (By Mr. Slonim) And there were no
2 cases of NAION among the -- reported among the
3 3800 men in the International Men's Health
4 Study, correct?
5 A      That's correct.
6 Q      Okay. So those are both zero. And
7 then we get to the prescription event monitoring
8 study in which there was one case reported of
9 NAION out of the 35,500 patient years of
10 observation which results -- if you convert that
11 into an incidence, it results in a 2.8 per
12 hundred thousand patient years, correct?
13 A      That's correct.
14 Q      Okay. And, therefore, that is lower
15 than the paper that reports the 10.2 per hundred
16 thousand background incidence, correct?
17 A      Yes. That is lower, yes.
18 Q      And it's very close to the incidence
19 that was reported in the other paper, the 2.3
20 per hundred thousand for the year of men over
21 age 50, correct?
22 A      It's close and higher.
23 Q      A little bit higher, right?
24 A      Yes, sir.
25 Q      Okay. Take a look, please, at page

**123**

1 502 of the Gorkin article, the last paragraph.
2 A      Of the discussion?
3 Q      Yes, the last paragraph of the
4 discussion. The authors concluded, and I quote,
5 "Rather than supporting an increased incidence
6 of NAION associated with sildenafil use, this
7 analysis of clinical trial and epidemiological
8 data representing approximately 52,000 patient
9 years of observation indicates that the NAION
10 incidence of men with ED" -- that's erectile
11 dysfunction -- "who took sildenafil worldwide is
12 consistent with the range of estimated NAION
13 incidence in the general U.S. population,"
14 correct?
15 A      That is in fact what it says, yes,
16 sir.
17 Q      Okay. And the Gorkin article was
18 published in a peer-reviewed medical journal; is
19 that right?
20 A      I am actually not familiar with this
21 journal.
22 Q      Okay.
23          (Deposition Exhibit
              Number 15 was marked
24          for identification.)
25 Q      We've marked as Deposition Exhibit

**124**

1 Number 15 a page from the Web site of the
2 International Journal of Clinical Practice. Do
3 you have that in front of you?
4 A      Yes, sir.
5 Q      And do you see under Aims and Scope
6 the document states that the IJCP offers rapid,
7 robust peer review and publication, provides the
8 highest standard of author service?
9 A      Yes, sir, it says that.
10 Q      And you don't have any reason to
11 doubt that this International Journal of
12 Clinical Practice is peer reviewed, do you?
13 A      Oh, no.
14 Q      Okay.
15 A      I just wasn't familiar.
16 Q      Okay.
17 A      I hadn't heard of it before.
18 Q      Now, Dr. McGwin, we've talked about
19 three studies. We've talked about your study,
20 we've talked about the Margo and French study,
21 and we've talked about the Gorkin paper, which
22 in turn discusses three studies: the clinical
23 studies, the International Men's Health Study,
24 and the prescription event monitoring study.
25          It's correct that not a single study

**125**

1 has found that men who use Viagra have a
2 statistically significant increased risk of
3 NAION, correct?
4          MR. OVERHOLTZ: Object to the form.
5 I'm just -- I don't know if we are talking about
6 these three studies or if we're talking about
7 all studies. Are we talking about the actual
8 IMH study and PEM study or how Gorkin and those
9 people describe it?
10          THE COURT: Can you clean that up,
11 Mr. Slonim?
12 Q      (By Mr. Slonim) Dr. McGwin, none of
13 the studies that we've reviewed today -- your
14 study, the Margo and French study, or the Gorkin
15 paper -- find a statistically significant
16 increased risk of NAION among men who use
17 Viagra, correct?
18 A      That is correct.
19 Q      Okay. On the Bradford Hill
20 criteria, which you discuss in your expert
21 report, the first criterion is strength of
22 association, correct?
23 A      Yes, sir.
24 Q      Okay. What is strength of
25 association?

32 (Pages 122 to 125)

126

1    Let me rephrase it. Dr. McGwin,
2 strength of association refers to the magnitude
3 of the elevated risk, if any, over the
4 background risks, correct?
5 A    Elevated or it could be reduced in
6 certain contexts.
7 Q    Okay. In your own study,
8 Dr. McGwin, you wrote that the lack of precision
9 associated with these estimates provides little
10 evidence regarding the true strength of
11 association should it truly exist, correct?
12 A    I did write that, yes, sir.
13 Q    And none of the other studies that
14 we have discussed have found a statistically
15 significant increased risk of developing NAION
16 among Viagra users, correct?
17 A    Yes, sir.
18 Q    Okay. And you're not aware of any
19 study that we haven't discussed that reports
20 that men who have used Viagra are at a
21 statistically significant increased risk of
22 developing NAION, correct?
23 A    I'm aware of no such studies.
24 Q    In other words, we've covered the
25 universe today?

127

1 A    Unless something came out while we
2 were sitting here.
3 Q    Okay. The next criterion under the
4 Bradford Hill set of criteria is called
5 consistency, correct?
6 A    Yes, sir.
7 Q    And consistency refers to the fact
8 that a repeated observation of an association in
9 different studies or in different populations is
10 more indicative of a real association than an
11 isolated study, correct?
12 A    Yes, that is correct.
13 Q    Okay. And in the case of Viagra, as
14 we've discussed, none of the studies have found
15 a statistically significant increased risk of
16 NAION among Viagra users, correct?
17 A    Correct.
18 Q    Okay. The next criterion under the
19 Bradford Hill criteria is specificity, correct?
20 A    That's correct.
21 Q    And specificity refers to the notion
22 of a single -- of a specific exposure being
23 associated with a specific disease, correct?
24 A    Yes, sir.
25 Q    In the case of Viagra and NAION,

128

1 there are millions of men who have taken Viagra
2 without developing NAION, correct?
3 A    I don't know that for a fact, but it
4 would seem reasonable to conclude that.
5 Q    Take a look at the Gorkin paper,
6 page 501.
7 A    Yes, sir.
8 Q    Left-hand side, first full
9 paragraph, the authors report that sildenafil
10 has been approved for the treatment of ED,
11 erectile dysfunction, since 1998 and more than
12 150 million prescriptions have been written for
13 more than 27 million men worldwide since its
14 approval, correct?
15 A    Yes, sir.
16 Q    Okay. Does that refresh your
17 recollection that in the case of Viagra,
18 millions of men have taken Viagra without
19 developing NAION?
20 A    Yes, sir.
21 Q    And men, as we discussed at the
22 outset of this deposition, were diagnosed with
23 NAION long before Viagra was ever placed on the
24 market in 1998, correct?
25 A    Yes, sir.

129

1 Q    Do you agree with me that the
2 specificity criterion is not present here?
3 A    I'm not sure -- you're -- I don't
4 want to put words in your mouth. You are making
5 it seem as if these criteria are fixed, that
6 Hill said that this criteria is met or not and
7 there's no fence-sitting, I guess, so to speak.
8 So when you say that the criteria is not met, I
9 guess I don't see that being in the spirit of
10 how he originally set forth these criteria. In
11 fact, he, himself, doesn't sort of view them in
12 that regard.
13 Q    You wrote in your report, in fact,
14 under the specificity criterion that none of the
15 risk factors associated with NAION have been
16 demonstrated in a conclusive manner, correct?
17 A    Yes, sir.
18 Q    You agree with me that at the very
19 least, you cannot claim based on the state of
20 scientific knowledge currently available that
21 there is a specific association that has been
22 established, correct?
23 A    Can you say that one more time, just
24 that last part?
25 Q    I'm going to withdraw it.

33 (Pages 126 to 129)

130

1 A      Okay.
2 Q      The next criterion is temporal
3 relationship, correct?
4 A      Yes, sir.
5 Q      The idea of a temporal relationship
6 is that if a condition is caused by an exposure
7 to a substance, the exposure must precede the
8 onset of the disease or condition, correct?
9 A      That's correct.
10 Q      Okay.  And in the Margo and French
11 study, as you and I discussed, the investigators
12 did not determine whether there was a temporal
13 relationship between the use of Viagra and
14 NAION, correct?
15 A      That was a stated limitation.
16 Q      Yeah.  In other words, in the Margo
17 and French study, the patients might have
18 developed NAION before they ever even took
19 Viagra, right?
20 A      Yes, sir.
21 Q      And in your own study, Dr. McGwin,
22 although you tried to ascertain that people --
23 that the onset of the disease or the condition
24 was after the use of Viagra, you did not obtain
25 information about the exact timing of NAION

131

1 relative to Viagra use, correct?
2 A      Well --
3 Q      Let me withdraw the question.  Take
4 a look at your article, please, Exhibit 3, page
5 156, bottom left.  When you talk about the case
6 report, you say, "Many of the existing case
7 reports and series regarding Viagra or Cialis
8 and NAION have been able to isolate the exact
9 timing of use relative to the onset of
10 NAION-associated symptoms.  The retrospective
11 nature of the current study makes collecting
12 information with this degree of precision
13 difficult," correct?
14 A      That's correct.
15 Q      Okay.  And then you go on further to
16 say that if you wanted to try to ascertain
17 information about the timing, you would need to
18 do another study using a different design such
19 as a case-crossover design, correct?
20 A      Yes, sir.
21 Q      Okay.  Have you taken a look at the
22 pharmacokinetic curve of Viagra showing the
23 active ingredient, the concentration of active
24 ingredient in the blood serum per hour?
25 A      I'm going to say no.

132

1          (Deposition Exhibit
2          Number 16 was marked
3          for identification.)
3 Q      We've marked as Deposition Exhibit
4 Number 16 the Viagra label.  Over the course of
5 your work, have you had a chance to look at the
6 label for Viagra?
7 A      Yes, sir.
8 Q      Take a look, please, on page 2,
9 Figure 1.  This is a plot that shows the
10 concentration of sildenafil, that's Viagra, in
11 the blood plasma starting at the point of
12 ingestion and then following it for 24 hours,
13 correct?
14 A      Yes, sir.
15 Q      Okay.  You see at time zero, that's
16 when the person first swallows the pill, the
17 concentration of sildenafil in the blood plasma
18 is zero, correct?
19 A      Yes, sir.
20 Q      And then you see it reaches a
21 maximum concentration in a little bit less than
22 two hours, more like one hour, correct?
23 A      Yes, sir.
24 Q      And then you see that the
25 concentration of sildenafil in the blood plasma

133

1 rapidly begins to fall, correct?
2 A      That is correct.
3 Q      Okay.  And then you see that
4 basically after -- 12 hours after ingestion
5 there's very little of the active ingredient in
6 the blood plasma, correct?
7 A      Relative to its peak, yes, sir.
8 Q      And it's sort of an isotopic curve
9 and basically is more -- basically after 12
10 hours it is pretty well washed out of the
11 system, correct?
12 A      Yes, sir.
13 Q      Okay.  So that someone who takes
14 Viagra is under the pharmacological influence of
15 the drug for less than 12 hours, correct?
16          MR. OVERHOLTZ:  I'm just going to
17 object to the form.  He's asking him to draw
18 pharmacological conclusions.  He stated earlier
19 he wasn't a pharmacologist.  If he wants to ask
20 him what does this label report, that's
21 appropriate.
22          THE COURT:  I have to read it.  I
23 can't hear you.  Overruled.  He can answer the
24 question if he's able.
25 A      The figure appears to show that,

34 (Pages 130 to 133)

134

1 yes, sir.
2 Q        Okay.  So in terms of studying
3 whether or not there's a temporal causal
4 relationship with Viagra, understanding the
5 precise timing of when the person took Viagra
6 relative to the onset of NAION is important to
7 understand whether or not there's a temporal
8 relationship between the two, correct?
9 A        Is your question with respect to a
10 study such as a case-control study, or are you
11 using the term when you say "study" more
12 generically -- experimental, animal --
13 Q        Any study.
14 A        I would say the timing is important;
15 although, I'm not certain that the precise
16 timing is as important.
17 Q        If somebody took a Viagra and four
18 days later had NAION based on this
19 pharmacokinetic curve, would you think that
20 there was a reason that Viagra caused the NAION?
21 A        In a given individual?
22 Q        Yes.
23 A        I can't answer that question.
24 Q        In a population?
25 A        Is your question in a study if we

135

1 defined exposure as being limited to -- what did
2 you say?
3 Q        Four days.
4 A        Four days before?  That's a
5 difficult question.  I would -- I can't remember
6 whether you asked -- if it was affirmative.  I
7 will agree with you that that would be
8 difficult.  Was that your --
9 Q        Okay.  You answered the question.
10 A        Okay.
11 Q        The next criterion is biological
12 gradient, correct?
13 A        Yes, sir.
14 Q        And biological gradient refers to
15 the concept of a dose-response relationship
16 meaning the greater the exposure, the greater
17 the risk of developing the condition, correct?
18 A        Correct.
19 Q        And in the case of Viagra and NAION,
20 there were no studies that report a
21 dose-response relationship, correct?
22 A        That is correct.
23 Q        Okay.  And the next criterion under
24 the Bradford Hill criteria is biological
25 plausibility, correct?

136

1 A        That is correct.
2 Q        And in your -- the article that you
3 coauthored that we discussed, you indicated that
4 there is no good experimental model of NAION,
5 correct?
6 A        That's correct.
7 Q        Okay.  And in the Pomeranz,
8 Fraunfelder, and Egan piece that we marked, they
9 also say that there is no good experimental
10 model of linking Viagra and NAION, correct?
11 A        That's correct.
12 Q        And while there are hypotheses
13 regarding Viagra and NAION, some of which are
14 discussed in the Pomeranz, Fraunfelder, and Egan
15 piece, none of those hypotheses have been tested
16 and proven, correct?
17 A        That's correct.
18 Q        Okay.  And in your report,
19 Dr. McGwin, you refer to a hypothesis that
20 Viagra decreases systemic blood pressure which
21 could result in a decreased blood flow to the
22 optic nerve head, correct?
23 A        That is correct.
24 Q        That is one of Dr. Hayreh's
25 hypotheses?

137

1 A        Uh-huh.
2 Q        Have you done any research to see
3 whether or not there have been studies that have
4 investigated whether Viagra causes a decreased
5 blood flow to the optic nerve head?
6 A        I have done no such studies.
7 Q        I'll represent to you -- and I'm
8 happy to show it to you, we can take our time --
9 ten separate studies that have been conducted of
10 Viagra and blood flow to the optic nerve, none
11 of which find a decreased blood flow.  Do you
12 want to see those studies?
13         MR. BECNEL:  Objection.
14         MR. OVERHOLTZ:  Argumentative.
15         MR. BECNEL:  That's improper.
16 That's absolutely improper.  You know better
17 than that, Counsel.
18         THE COURT:  Just a second, folks.
19 It is overruled.  He can answer the question.
20 A        Was the question do I want to see
21 them or --
22 Q        Yeah.
23         THE COURT:  That was the question,
24 do you want to see those studies?
25 Q        Let me withdraw the -- let me

35 (Pages 134 to 137)

138

1 withdraw the question.
2        VIDEOGRAPHER: We have five minutes,
3 Mr. Slonim.
4        MR. SLONIM: I'm sorry?
5        VIDEOGRAPHER: Five minutes.
6        MR. SLONIM: Five minutes. Fine.
7 Q      Are you aware of any scientific
8 studies that report that Viagra decreases the
9 flow of blood to the optic nerve head?
10 A      No -- well, am I aware that they
11 exist, or am I familiar enough with the
12 literature to --
13 Q      Are you aware of any study reported
14 in any language in any piece of scientific
15 literature that concludes that Viagra decreases
16 the flow of blood to the optic nerve head?
17        MR. OVERHOLTZ: I'm going to object
18 to the form of the question with the use of the
19 word "study."
20        THE COURT: Overruled. You can
21 answer the question, Doctor.
22        THE WITNESS: Okay.
23 A      I'm not aware of such studies, no,
24 sir.
25 Q      Okay. I'm going to mark ten studies

139

1 as a collective exhibit, and we are going to go
2 through them one at a time and we are going to
3 talk about their conclusions.
4        MR. BECNEL: Counsel, let's not do
5 it as a collective exhibit. Do them one by one.
6        THE COURT: Let's see what he's
7 going to do first. Overruled. Go ahead,
8 Mr. Slonim.
9        Mr. Slonim, is it your intention to
10 mark all ten studies as one exhibit?
11        MR. SLONIM: I'll do this in a more
12 orderly fashion, Your Honor.
13        THE COURT: I think it's cleaner for
14 the record.
15        MR. SLONIM: Yeah.
16        (Deposition Exhibit
                Number 17 was marked
17              for identification.)
18 Q      Okay. Dr. McGwin, we've marked as
19 Deposition Exhibit Number 17 an expert report
20 prepared by Dr. Alon Harris, who is an expert
21 who has been consulting with the defendant in
22 this matter. Have you read this report?
23 A      Yes, sir.
24 Q      This was given to you in the course
25 of your work by the plaintiffs, right?

140

1 A        Yes, sir.
2 Q        Okay. Let's turn, please, to
3 paragraph -- let me get the right page number.
4 Page 10, Paragraph 16. Dr. Harris writes that
5 ten published peer-reviewed studies have
6 investigated the effect of Viagra on ocular
7 circulation. All ten of the studies contradict
8 or are inconsistent with Hayreh's hypotheses.
9 These studies report either that Viagra has no
10 effect on ocular blood flow, i.e., no decrease,
11 or that it actually increases blood flow, i.e.,
12 the opposite of an ischemic effect. None of
13 these studies found, or even suggests, that
14 Viagra decreases ocular circulation or blood
15 flow to the optic nerve head. Hayreh ignores
16 nine of these studies. He disputes the
17 methodology of one of these studies, Grunwald
18 2001, but his criticism is overstated. See
19 Paragraph 20.
20        Is that a paragraph that you read
21 when you got this -- when you received
22 Dr. Harris' report?
23 A      Yes, sir.
24 Q      And then in paragraphs 18 through
25 27, Dr. Harris cites and discusses each one of

141

1 the ten studies, correct?
2 A      Yes, sir.
3 Q      Okay.
4        MR. SLONIM: The court reporter
5 tells me we need -- the videographer tells me we
6 need to change the tape.
7        VIDEOGRAPHER: The time is 11:27.
8 This concludes Tape Number 3. We are off the
9 record.
10       (Recess taken.)
11       VIDEOGRAPHER: The time is 11:43.
12 This is the beginning of Tape Number 4. We are
13 back on the record.
14 Q      (By Mr. Slonim) Dr. McGwin, we were
15 talking about the Harris report which lists,
16 describes ten studies regarding the effect of
17 Viagra on blood flow to the optic nerve and you
18 had said that you had looked at paragraphs 18
19 through 27 that discusses each one of those
20 studies in seriatim, correct?
21 A      Yes, sir.
22 Q      Okay. And then on page -- it is
23 actually Paragraph 19 -- I'm sorry, Paragraph 29
24 on page 19 references a table. And, in fact,
25 each one of the studies is described in a table

36 (Pages 138 to 141)

142

1 with the results and the conclusions of the
2 studies summarized on the table that appears on
3 pages 19 and 21, correct?
4 A     Yes, sir.
5 Q     Okay. And based on -- did you read
6 any of the -- did you read any of the underlying
7 studies?
8 A     I likely did; although, I don't
9 remember them specifically. The only one that
10 immediately comes to mind is the Grunwald study.
11 Q     There are two Grunwald studies. Do
12 you remember which one?
13 A     No, sir. I'm afraid I do not.
14 Q     In any event, is it your
15 understanding that Dr. Harris in describing
16 these studies purports and quotes language
17 indicating that none of the studies found Viagra
18 to decrease the blood flow to the optic nerve
19 head?
20 A     That is correct.
21 Q     And you are not aware of any studies
22 that find that Viagra decreases the blood flow
23 to the optic nerve head, correct?
24 A     I'm not aware of such studies.
25 Q     Okay. So the bottom line is that

143

1 you're not aware of any studies that support the
2 hypothesis that Viagra decreases blood flow to
3 the optic nerve head, and Dr. Harris cites ten
4 studies that either find an increased flow or no
5 decreased blood flow to the optic nerve,
6 correct?
7 A     Yes and yes.
8 Q     Okay. You also refer to the
9 hypothesis that suggests that vasodilation
10 caused by Viagra could crowd the optic nerve and
11 damage it, correct?
12 A     In my paper or the report?
13 Q     Your report.
14 A     Yes, sir.
15 Q     You're not aware of any study that
16 finds that Viagra has that effect, correct?
17 A     I'm not aware of any such studies,
18 no, sir.
19 Q     In other words, that's an untested
20 and unproven hypothesis?
21 A     Yes, sir.
22 Q     Okay. The next criterion on the
23 Bradford Hill criteria is biological coherence,
24 correct?
25 A     Yes, sir.

144

1 Q     This refers to the concept that the
2 positive association -- that a positive
3 association should not conflict with observed
4 scientific facts about the disease, correct?
5 A     Yes, sir.
6 Q     Okay. And you know that the
7 pharmacological effect of Viagra is to cause
8 vasodilatation and a small decrease in blood
9 pressure, correct?
10 A     That is my understanding of how it
11 works, yes, sir.
12 Q     And Dr. Pomeranz in the piece that
13 he wrote with Fraunfelder and Egan that we've
14 marked as Deposition Exhibit 13, those authors
15 comment that even more potent vasodilators than
16 Viagra are not associated with NAION, correct?
17 A     Could you point --
18 Q     Yes. Take a look at the very -- on
19 page 733, the very bottom left-hand side, they
20 talk about the fact --
21 A     Oh, I've got you. Yes, sir.
22 Q     They talk about the fact that Viagra
23 does have a vasodilatory effect and decreases
24 blood pressure. And then they say, "Even potent
25 vasodilators that affect systemic arterial

145

1 circulation are not associated with NAION,"
2 correct?
3 A     That is correct.
4 Q     Okay. That fact, the fact that more
5 potent vasodilators than sildenafil are not
6 associated with NAION is inconsistent with the
7 hypothesis that Viagra causes NAION, correct?
8 A     Yes, sir.
9 Q     The next criterion under the
10 Bradford Hill criteria is experimental evidence,
11 correct?
12 A     Yes, sir.
13 Q     And you acknowledge in your expert
14 report that there's no direct experimental
15 evidence regarding the association between
16 Viagra and NAION in the form of human clinical
17 trials or laboratory experiments involving
18 animals, correct?
19 A     Yes, sir.
20 Q     Okay. We already discussed that in
21 the actual clinical studies involving more than
22 13,300 men that there were no reported cases of
23 NAION, correct?
24 A     Correct.
25 Q     And you also know that in the animal

37 (Pages 142 to 145)

146

1 toxicology studies, that several different
2 species were administered very large doses of
3 Viagra for extended periods of time and that
4 there was no evidence of injury to the optic
5 nerve, the retina, or any portion of the eye or
6 visual system, correct?
7        MR. OVERHOLTZ: Object to the form.
8 Lack of foundation.
9        THE COURT: Overruled. You can
10 answer the question if you're able.
11 A      I'm not familiar with those studies.
12 Q      Yeah, you are. I notice that you
13 brought with you in that collection of documents
14 the Laties-Zrenner article, but I'll mark it
15 separately as an exhibit.
16        (Deposition Exhibit
              Number 18 was marked
17            for identification.)
18 Q      We've marked as Deposition Exhibit
19 Number 18 an article by Laties and Zrenner
20 entitled "Viagra (sildenafil citrate) and
21 ophthalmology." This is an article you've seen
22 before, isn't it?
23 A      Yes, sir.
24 Q      Okay. In fact, you brought it with
25 you --

147

1 A      Yes, sir.
2 Q      -- in your materials today?
3        Okay. Turn, please, to page 491 and
4 then we'll continue on to 492. Page 491
5 starts talking about the animal toxicology,
6 correct?
7 A      Section 421?
8 Q      Yes.
9 A      Yes, sir.
10 Q     Okay. And turn on to the following
11 page, page 492. Take a minute and read that
12 paragraph up at the top.
13        MR. OVERHOLTZ: Are you referring to
14 the continuation paragraph?
15        MR. SLONIM: Yeah.
16 Q     You can start -- it is only two
17 paragraphs. Read the --
18 A      Yeah, I started on the prior --
19 Q      Yeah, read the entire two
20 paragraphs.
21 A      Okay. Got it.
22 Q      This article, this report on pages
23 491 and 492 reports on the animal toxicology
24 studies involving Viagra, correct?
25 A      Yes, sir.

148

1 Q      Okay. And it indicates that several
2 species of animals, dogs and rats, were
3 administered very large doses of Viagra, doses
4 that were 60 to 150 times the human therapeutic
5 equivalent of those, correct?
6 A      Yes, sir.
7 Q      And they were dosed at this very
8 large range, this 60 to 150 times the equivalent
9 human dose for periods of time ranging from 6 to
10 24 months, correct?
11 A      Yes, sir.
12 Q      And following those studies, the
13 animals were examined and there was found to be
14 no injury to the optic nerve, the retina or any
15 portion of the eye or visual system, correct?
16        MR. OVERHOLTZ: I object to the
17 form. Compound.
18        THE COURT: I'm sorry, the
19 objection?
20        MR. OVERHOLTZ: It is a compound
21 question.
22        THE COURT: Overruled. You can
23 answer, Doctor, if you are able to do that.
24 A      I see where they mention the retina,
25 but --

149

1 Q      Okay. Do you see on the top of page
2 492, after the authors tell us that the animals
3 were dosed at approximately 60 to 150 times the
4 maximum amount of the human equivalent --
5 A      Yes, sir, uh-huh.
6 Q      -- the next sentence says, "No
7 evidence of histopathological abnormalities in
8 any of the major internal structures of the eyes
9 or the neuronal aspects of the visual pathways
10 was found despite this chronic sustained
11 exposure to excessive free plasma sildenafil
12 concentrations, correct?
13 A      Yes, sir.
14 Q      Okay. And in other words, what they
15 are saying is that there was no evidence of
16 injury to the optic nerve, the retina or any
17 portion of the eye or visual system; isn't that
18 a fact?
19 A      Yes, sir.
20 Q      Now, the next criterion under the
21 Bradford Hill set of criteria is called analogy,
22 correct?
23 A      I believe it is. Let me confirm it.
24 Yes, sir.
25 Q      And analogy refers to a situation

38 (Pages 146 to 149)

150

1 where similar associations have been observed
2 between other exposures and a disease or
3 condition, correct?
4 A      Yes, sir.
5 Q      And in the case of PDE5 inhibitors,
6 the other PDE5 inhibitors, that refers to Cialis
7 and Levitra, correct?
8 A      Yes, sir.
9 Q      As the Food and Drug Administration
10 stated in its press release and its Patient
11 Information Sheet that we previously marked as
12 exhibits, a causal relationship between those
13 agents and NAION has not been demonstrated,
14 correct?
15 A      That's correct.
16      (Deposition Exhibit
         Number 19 was marked
17      for identification.)
18 A      Do I get the numbered one or the --
19 Q      Yes, you get the numbered one.
20      Dr. McGwin, we've marked as
21 Deposition Exhibit Number 19 a subpoena in this
22 action. Have you seen this before?
23 A      Yes, sir.
24 Q      Okay. And this asks you to bring
25 certain documents to the deposition with you.

151

1 A      Yes, it does.
2 Q      Okay. And I know you showed me
3 before the deposition began that you brought a
4 binder of materials with you?
5 A      Yes.
6 Q      And counsel did send us an e-mail or
7 -- an e-mail that attached a letter stating an
8 objection to Specification Number 18 which asks
9 for underlying data and documents related to
10 your published study. Are you aware of that
11 letter objection?
12 A      Is it a letter that I wrote?
13 Q      No. It is a letter that
14 Mr. Overholtz wrote. Let's do this.
15      MR. OVERHOLTZ: If you want to show
16 it to him --
17 Q      Let me withdraw this question, and
18 we will mark it as an exhibit.
19      (Deposition Exhibit
         Number 20 was marked
20      for identification.)
21 Q      We've marked as Deposition Exhibit
22 Number 20 a letter from Neil Overholtz to Lori
23 Leskin dated June 8th, 2007. Have you seen this
24 before?
25 A      This is the first time I've seen

152

1 this letter.
2 Q      Okay. You note -- take a look --
3 well, take a second to read it.
4 A      I read it. Yeah, I just read it.
5 Q      Okay. In the specification for
6 documents that we have, in Specification 20 we
7 requested underlying documents relating to your
8 study.
9      MR. OVERHOLTZ: 18, you mean?
10 Q      I'm sorry, I misspoke.
11      In Specification Number 18 --
12 A      Oh, 18. Sure.
13 Q      -- we requested documents relating
14 to your underlying study. In response to that
15 particular request, Mr. Overholtz sent us the
16 letter that we've marked as Deposition Exhibit
17 Number 20.
18      Can you tell me what confidentiality
19 agreements are there between the study's
20 authors, study participants, and the University
21 of Alabama?
22 A      With respect to the data or
23 documents?
24 Q      Both.
25 A      Okay. We can handle the -- I'll

153

1 talk about the data first.
2 Q      Okay.
3 A      When we conduct a research study, as
4 you're probably better familiar than I, it has
5 to be approved by an institution or review board
6 at the University of Alabama at Birmingham. And
7 to participate in this particular study, there's
8 a form that contains risks associated with
9 participating in the study, it describes the
10 details regarding the study, et cetera. And in
11 that document it states that any data that is
12 produced in our conversations with the patient
13 or abstracting from their medical records will
14 only be viewed by the individuals listed on that
15 IRB approval form that is the principal
16 investigator of the study as well as
17 collaborators, Dr. Vaphiades, Dr. Cynthia
18 Owsley, et cetera.
19      And so to provide that data would
20 violate that agreement that we have with the
21 patient and with the university who approves the
22 study.
23 Q      In other words, that would be --
24 that would refer to what, the abstracts that you
25 and your co-researchers created from the medical

39 (Pages 150 to 153)

154

1 records?
2 A      The hard copy, the information comes
3 from the actual medical record, the patient's
4 actual medical record into an electronic
5 database. In some instances, I don't recall
6 exactly in this study, the information moves
7 from the medical record, the paper medical
8 record to a paper abstraction form and then into
9 the database. So what I'm referring to here is
10 paper medical record abstraction form, should
11 there be one, as well as the electronic data
12 itself.
13 Q      Is the information coded in such a
14 way as to prevent patient identification?
15 A      The information is --
16 Q      In other words, the patient
17 identifying information is removed?
18 A      Oh, absolutely.
19 Q      Uh-huh. And it's your understanding
20 that the confidentiality agreement that you
21 provide to the patient would prohibit the
22 disclosure of any portion of this trail of
23 records from the original source material into
24 the electronic database?
25 A      Will you say that one more time?

155

1 Q      Yeah. What I'm trying to
2 understand, is it your understanding that the
3 confidentiality agreement that the institution
4 provides to participants in the study protects
5 from disclosure the entire chain of information
6 from the original source material all the way to
7 the tables that are stored in the electronic
8 database?
9 A      That is my understanding.
10 Q      And besides the medical records,
11 there were, I guess, interviews that were
12 conducted of patients?
13 A      Yes. That's correct, yeah.
14 Q      And were there promises or -- strike
15 that.
16      Were there any kind of
17 confidentiality agreements or representations?
18 A      It's the same -- the individual
19 signs one Consent to Participate Form that
20 covers our abstraction of their medical record
21 as well as the conversation that we have with
22 them regarding alcohol, smoking, Viagra, et
23 cetera.
24 Q      Is it your understanding that your
25 confidentiality obligations would preclude

156

1 turning those documents over to counsel even
2 where counsel in this case are subject to a
3 confidentiality order that prevents disclosure
4 of information produced during the course of the
5 litigation?
6      MR. OVERHOLTZ: I'm just going to
7 object to the question to the extent that it
8 calls him to make a legal conclusion. To the
9 extent he can provide his understanding from the
10 University, that's fine, but --
11      THE COURT: I'll overrule that if he
12 can answer it.
13 A      I'm afraid I can't answer it.
14 Q      Let me step back. You notice that
15 in the documents that you -- that were provided
16 -- some of the documents that were provided to
17 you by plaintiffs' counsel, there's a
18 confidentiality stamp on that and a statement on
19 the footer that indicates that it is subject to
20 a confidentiality order in this litigation?
21 A      That's right. You've pointed that
22 out, yes, sir.
23 Q      And we established off the record
24 that you had not yet signed a confidentiality
25 agreement, and we'll get that bit of

157

1 housekeeping done. But in any event, you
2 understand that the lawyers in this case are
3 bound by a court confidentiality order if the
4 information is properly stamped pursuant to that
5 order?
6 A      If you're telling me that's so. I'm
7 not familiar with the nature of a
8 confidentiality order, but that --
9 Q      Okay. And my question for you with
10 that background is whether it's your
11 understanding that your confidentiality
12 agreement with participants in the study would
13 preclude giving, disclosing the data to the
14 lawyers in this case bearing in mind that it
15 would be subject to a confidentiality order
16 imposed by the court?
17 A      Gee, I guess I would have to check
18 with the UAB risk management to answer that
19 question. I guess I don't feel qualified to --
20 I don't -- I mean, I know the consent form, and
21 we do them quite frequently, but I'm almost
22 certain it makes no reference to a court-imposed
23 confidentiality order. I guess I would feel
24 more comfortable talking with the folks at risk
25 management about how they would interpret your

40 (Pages 154 to 157)

158

1 question and the form that the patient signed.
2 Q       Just one more question. There's
3 also a reference in this letter that we've
4 marked as Exhibit 20 to -- disclosure of the
5 underlying documents would infringe upon
6 Dr. McGwin's proprietary rights. Do you know
7 what that refers to?
8 A       I'm going to infer that it refers to
9 the actual questionnaire that was administered
10 to the study participants.
11 Q      Okay.
12 A      Not having written the letter, I --
13 Q      Okay. Dr. McGwin, so I understand
14 that there's -- counsel interposed an objection
15 to Specification Number 18. The other -- did
16 you bring the other documents that were
17 requested by the subpoena?
18 A      The specific documents?
19 Q      Yes.
20 A      I think the only one that's listed
21 is my paper.
22 Q      No. It starts on -- Attachment A
23 starts with Question Number 1, all documents and
24 materials, published or unpublished, on which
25 you intend to rely as a basis, in whole or part,

159

1 for your opinions?
2 A       The only thing that I did not bring,
3 and I discussed this with the gentlemen, were
4 some depositions that were really long of a
5 Rachel Sobel and a -- what is the fellow's
6 name?
7 Q       Greg Gribko?
8 A       No, no. He was a --
9        MR. OVERHOLTZ: Steve Watt?
10 Q      Steve Watt? We can play 20
11 questions. Now we are going backwards. You are
12 asking me the questions.
13 A      I apologize.
14       MR. OVERHOLTZ: It would either be
15 Gribko, Watt, Osterloh --
16 A      That's it. That's it. Sorry.
17 Osterloh. I'm sorry. There were so many --
18 Q      So you were provided copies of
19 deposition transcripts?
20 A      Those two, yes, sir.
21 Q      Those two, Rachel Sobel and Ian
22 Osterloh. And you read those?
23 A      Yes, sir.
24 Q      Okay. And you didn't bring those
25 with you?

160

1 A       That's correct.
2 Q       Did you make any notations on those?
3 A       No, sir.
4 Q       And then other than those documents
5 and other than Specification 18 to which there
6 was an objection, did you bring with you today
7 the other documents that respond to the
8 subpoena?
9 A       I believe I did, yes, sir.
10 Q      And that's in this binder?
11 A      That's correct.
12 Q      What we'll do -- anything else
13 besides what's in the binder?
14 A      Did I rely on anything else other
15 than what's in the binder?
16 Q      Is there anything else that's
17 responsive to the subpoena besides what's in the
18 binder?
19 A      No, sir. Can I finish my thought
20 from before? I just wanted to say there
21 things in the binder that I relied -- that I've
22 read as background material just generally.
23 Q      Just as an example -- we're going to
24 go through -- I only had a minute to look at
25 your binder before we started the deposition,

161

1 but I noticed as an example you had expert
2 reports from plaintiffs' experts in other
3 litigation --
4 A       That's correct, yes, sir.
5 Q       -- Dr. Schang, Dr. Moye, others
6 having nothing to do with Viagra and NAION,
7 correct?
8 A       That's correct.
9 Q       So why did you look at those
10 documents?
11 A      This is my first deposition and this
12 was my first expert report, and the gentlemen
13 provided me examples, two of which were from a
14 colleague and mentor of mine, Dr. Jeffrey
15 Roseman, as a form of guidance for writing my
16 own document.
17 Q      Okay. Let's ask a couple of
18 questions here. When were you first contacted
19 by plaintiffs' counsel?
20 A      I have an e-mail here dated
21 Wednesday, February 28th of 2007, which
22 indicates that I had spoken with a Neil
23 Overholtz and I remember that Mr. Jason Richards
24 was also on that call. And this is -- I believe
25 that was our first communication.

41 (Pages 158 to 161)

162

1 Q      Okay.
2 A      And this e-mail.
3 Q      Okay.  And you had -- I know in your
4 materials that there were several pieces of
5 e-mail correspondence and perhaps letters.  Did
6 you bring those with you?
7 A      Yes, sir.
8 Q      Okay.  Did you have in-person
9 meetings with Mr. Overholtz or any of the
10 counsel for the plaintiffs?
11 A      Yesterday we met at 2:30 in the
12 afternoon.
13 Q      Prior to yesterday, did you have
14 any --
15 A      No, sir.
16 Q      So you didn't know what
17 Mr. Overholtz looked like?
18 A      No.  No, sir.
19 Q      Or any of the plaintiffs' attorneys?
20 A      No, sir.
21 Q      I won't ask the next question that
22 comes to mind.
23         How long did your meeting last
24 yesterday?
25 A      Approximately two hours.

163

1 Q      Okay.  Did you review any documents
2 at the meeting?
3 A      Yes, sir.  We reviewed -- to say
4 that we reviewed, I went through this binder
5 with them showing them the organization of it
6 and pointing out, generally, what was in here,
7 including the e-mails that we just discussed.
8 Q      If you can do it reasonably
9 succinctly, tell us what the logical
10 organization of the binder is.
11 A      Oh, goodness.  The first section is
12 a summary of various dates and specific things
13 that I read or things that I prepared and the
14 amount of time it took me to do those
15 activities.
16 Q      Okay.
17 A      The second section is my expert
18 witness report.  The third section is our paper,
19 which appeared in the British Journal of
20 Ophthalmology, as well as the related paper that
21 I've described previously on sleep apnea.
22         The next section is my curriculum
23 vitae.  The next section is a series of
24 papers -- one, two, three, four -- which
25 includes the original Bradford Hill paper as

164

1 well as two publications highlighting where
2 people frequently misinterpret his criteria.
3 And I found these particularly useful in
4 preparing my document, so I added them in here.
5         The next section are the expert
6 witness reports that you referred to.  There are
7 four in here.
8 Q      That would be by Dr. Harris,
9 Dr. Kimmel, Dr. --
10 A      No, no, no.  Sorry.  These are the
11 ones from the prior cases.
12 Q      Oh.
13 A      Dr. Farquhar, there are two by
14 Dr. Roseman.
15 Q      These were the exemplars --
16 A      Yes, sir.
17 Q      -- that had nothing to do with
18 Viagra or NAION but they were as exemplars for
19 expert reports?
20 A      Yes, sir.  I'm sorry.
21         The next section is the material
22 that I received from Neil and Jason regarding,
23 goodness, communications from Pfizer.  There is
24 a -- some reports in here about their work on
25 NAION and Viagra.  There's a document in here

165

1 from the FDA, a memo.
2 Q      These are documents that were
3 produced by Pfizer in the course of the
4 litigation that had the confidentiality stamp on
5 them?
6 A      Most of them have the
7 confidentiality -- some of them do not.
8 Q      Okay.  Good.
9 A      And these are -- I'm not sure if
10 there are more of them, but these are the ones
11 that I received.
12 Q      This was some group of documents
13 that were provided to you by Mr. Overholtz?
14 A      That's right, or Mr. Richards.
15 Q      Okay.
16 A      The next section is material,
17 literature, published literature, not including
18 my paper because it is in the other section, on
19 Viagra and ophthalmology but mostly the case
20 reports that we've been talking about -- the
21 Margo paper, the other Pfizer paper that we
22 talked about.  What I consider this to be, the
23 section, the literature section, the published
24 evidence section.
25 Q      Okay.

42 (Pages 162 to 165)

166

1 A        And it's just sort of complete as --
2 backs up the materials, the references that I
3 used in my paper. There are some other studies,
4 case reports in the literature that I don't
5 think I relied upon and didn't print them out.
6 And then the next section are the ones that --
7 the expert witness reports that you referred
8 to. And there are four of them. And as I
9 pointed out to you, there is one that printed
10 out kind of funny, but --
11 Q        Where the attachment for some reason
12 when you printed it was blacked out although
13 when you read it on the screen --
14 A        That's right.
15 Q        But the attachment was just the CV?
16 A        I believe the part that is blacked
17 out, for whatever reason -- the PDF looked fine
18 on the screen. On here it just printed out
19 black.
20 Q        Sure.
21 A        And in the front part of this binder
22 were the e-mails that I've referred to. And
23 it's basically -- there are three of them, and I
24 kept this one to make sure I had the date as to
25 the time that we first communicated. And then

167

1 this is a request for an hourly rate as well as
2 a request for other cases in which I've
3 testified in the past, which I've sort of kept
4 to document that they had asked me for that
5 information. And then another is an e-mail
6 wherein they -- it looks like from this e-mail,
7 from the attachment listed here, this is where
8 they sent me the expert witness reports that
9 weren't related to this case. And I also kept
10 this because it has their telephone numbers on
11 it.
12 Q        Have you worked on any other -- as a
13 litigation consultant in any other matters?
14 A        I'm not sure of the definition of
15 the term.
16 Q        Have you been -- in any other
17 matters, have you given expert assistance to
18 attorneys?
19 A        Does that mean writing an expert
20 witness report?
21 Q        No. It means any form of
22 assistance.
23 A        So somebody contacting me asking me
24 to look -- yes, sir.
25 Q        I mean, but not an initial -- I

168

1 mean, not just, gee, are you available, but
2 where you provided some substantive assistance
3 to an attorney?
4 A        Yes, sir.
5 Q        Okay. And what matters were those?
6 A        The specific name of the case or
7 just the nature of the case?
8 Q        Let's start with the nature of the
9 case.
10 A        There was -- both of them actually
11 involved eye injuries in motor vehicle
12 collisions in which I've done a lot of
13 research. One was a case, a -- one was a case
14 on an eye injury related to an air bag
15 deployment. And the issue at hand was whether
16 the woman at hand, whether her eye injury was
17 sustained because of the air bag being deployed
18 or whether the eye injury was sustained due to
19 some other mechanism.
20        The other case was a case in South
21 Dakota, I believe, wherein a young woman was
22 involved in a side impact motor vehicle
23 collision in which she was the passenger. And
24 the issue is she was unbelted and her air bag --
25 pardon me, the air bag did not deploy. And the

169

1 issue at hand was whether, if the air bag had
2 deployed, the observed injuries would have been
3 different in pattern.
4 Q        Okay. And those are the only cases
5 that you've consulted on besides this case?
6 A        That's correct.
7 Q        Okay. You indicated that there
8 were, I think, three pieces of e-mail
9 correspondence that you had with the plaintiffs'
10 attorneys. Was there any other correspondence
11 of any type whether it was e-mail correspondence
12 or other correspondence?
13 A        We e-mailed back and forth, yes,
14 sir.
15 Q        But other than these three e-mails,
16 was there any other e-mail correspondence?
17 A        Yes, sir.
18 Q        There was?
19 A        Yes, sir.
20 Q        And where is that?
21 A        The actual e-mails?
22 Q        Yes.
23 A        Oh, I deleted them.
24 Q        Oh. How many e-mails were there
25 that you deleted?

43 (Pages 166 to 169)

170

1 A    Well, there was probably one e-mail
2 with every -- each of these Pfizer documents
3 that they sent me, the ones with the protective
4 orders. And, you know, they might have sent
5 those maybe a couple in a single e-mail and then
6 there were some that came towards the end in
7 individual.
8 Q    In other words, they were e-mails
9 that were -- acted as covering e-mails that
10 transmitted attached --
11 A    Yeah, see attached.
12 Q    See attached?
13 A    Yes, sir.
14 Q    Were there any other e-mails that
15 were -- that had any kind of substantive
16 communication?
17 A    Oh, no, sir. It was made clear that
18 all the substantive communication was verbal.
19 Q    Okay. And what were the substantive
20 verbal communications that you had? Were there
21 phone conferences that you had --
22 A    Yes, sir.
23 Q    -- with plaintiffs lawyers?
24 A    Yes, sir.
25 Q    Are there any kind of records of

171

1 when those phone conversations took place, how
2 long they lasted?
3 A    I don't have any formal records of
4 those. I would have to go to my calendar -- I
5 don't have them here. I would have to go to my
6 calendar to see when they took place. But often
7 it would be -- they would send me something and
8 we would -- you know, are you available this
9 afternoon? And I would reach them or they would
10 be available to speak.
11 Q    Did you keep time records that
12 reflected when those calls took place?
13 A    I didn't log the time that we spoke
14 on the telephone, no, sir.
15 Q    How many phone calls would you
16 estimate there were?
17 A    Total number of phone calls?
18 Q    Yes.
19 A    Oh, goodness, maybe half a dozen.
20 Q    Okay.
21 A    And that probably included a few
22 recent short phone calls about setting up this
23 particular meeting in terms of my availability.
24 Q    In terms of substantive
25 communications, tell me what you remember of

172

1 discussing the substance of the case.
2 A    Sure. Most of the discussion was --
3 well, I can go chronologically if that would
4 help.
5    Many of the initial discussions were
6 about how to prepare an expert witness report.
7 So we discussed sort of the organization and the
8 format of the ones that they sent me --
9 Dr. Roseman's report, some of the others -- more
10 educational on my part.
11    As the material -- when I say
12 "material," the section, the protective order
13 information, as that started to come through, I
14 would digest it as rapidly as possible and we
15 would have a conversation about my
16 interpretation of it. They would generally ask
17 me specific questions about my thoughts and
18 feelings on this part of it, very much like the
19 questions that you've been asking here today.
20    And as we got towards the deadline
21 for providing the expert report, we talked about
22 the exact content of it and then probably some
23 ancillary conversations about do you want it
24 faxed, do you need an original hard copy, et
25 cetera.

173

1 Q    What was the process for preparing
2 the report?
3 A    My process for preparing the
4 report? Well, as I said, I read -- I had read
5 plenty of the literature already, but it had
6 been quite a while because by the time the
7 article came out it -- things had moved on. So
8 I reacquainted myself with much of this
9 literature here.
10    There had been several new studies.
11 The Pfizer study had come out, so I obtained
12 information regarding that. I read through
13 Dr. Roseman and the other expert witness
14 reports to kind of -- it sort of helps knowing
15 what the document is supposed to look like in
16 sort of preparing my thoughts. I digested this
17 material which -- and I took notes on it, and I
18 think I pointed those out to you. The notes are
19 here. There are some notes, handwritten notes
20 on this material here (indicating).
21 Q    Just so it is clear on the record,
22 you are referring now to the documents that you
23 had received from counsel that basically came
24 from Pfizer's files?
25 A    That's correct. That's correct.

44 (Pages 170 to 173)

174

1 I reacquainted myself with the
2 Bradford Hill literature. Basically, I read as
3 much material as I could and then sat down and
4 composed my report. Per my usual format, I
5 usually sit down, compose my thoughts very
6 rapidly, type them out, let it digest for a day,
7 if not more, and then go back and reread it and
8 make any necessary changes. And I probably
9 edited it for grammar and things of that nature.
10 Q      Did you share any drafts with
11 plaintiffs' counsel?
12 A      I believe I did share a draft with
13 them.
14 Q      And did they get back to you with
15 comments?
16 A      Yes. We had a telephone
17 conversation, I explicitly recall, about the
18 document.
19 Q      And what were their comments?
20 A      Their comments was that it was very
21 good, that it addressed all of the relevant
22 issues, the format, which was a big concern
23 because this was new to me, was fine. They
24 suggested a couple of grammatical changes. I
25 used -- I'm an epidemiologist. I wrote like an

175

1 epidemiologist, and there were some terms that
2 they asked if I could translate into lay
3 language, which I did to the best of my ability
4 that it wouldn't detract from the point I was
5 trying to make.
6      But it was -- as I recall, there
7 were very few changes from what I considered to
8 be the final version to what I -- what you
9 ultimately see here.
10      MR. SLONIM: Okay. It's about
11 12:25. I think this might be a good time to
12 break.
13      VIDEOGRAPHER: The time is 12:23.
14 We are off the record for lunch.
15      (Lunch recess was taken.)
16      VIDEOGRAPHER: The time is 12:59. I
17 changed tapes while we were at lunch. This is
18 the beginning of Tape Number 5. We are on the
19 record.
20 Q      (By Mr. Slonim) Dr. McGwin, do you
21 agree with me that no epidemiological study no
22 matter how well done is perfect, correct?
23 A      I do, yes, sir.
24 Q      Every study, regardless of how well
25 it is done, has flaws and limitations; is that

176

1 right?
2 A      Yes, sir.
3 Q      And as an epidemiologist, I take it
4 you're familiar with the term "bias"?
5 A      Yes, sir.
6 Q      And as used by epidemiologists, what
7 does bias mean?
8 A      It means some sort of error
9 introduced into the study either advertently or
10 inadvertently. There are a variety of different
11 types of bias, selection bias or recall bias.
12 But it is basically a distortion -- or pardon
13 me. It results in a distortion of what would be
14 considered the true results.
15 Q      Perhaps another way of expressing it
16 might be that bias refers to error other than
17 random sampling error that can compromise the
18 validity of a study. Would that be fair?
19 A      Yes, sir.
20 Q      And if bias is present in a study,
21 you might find an association between an
22 exposure and a disease when in fact there is no
23 association, correct?
24 A      Yes, sir.
25 Q      It can go the other way as well?

177

1 A      That's correct.
2 Q      I don't know if you mentioned it
3 when you listed several types of bias, but there
4 is one type of bias known as recall bias; is
5 that correct?
6 A      Yes, sir.
7 Q      What is recall bias?
8 A      Recall bias is generally a situation
9 where one group of study subjects, if we use the
10 case-control study as an example, provides
11 information or recalls information differently
12 than the controls would recall information. And
13 that differential in their recollection of
14 information produces a bias that can push the
15 results either towards or away from --
16 Q      If the cases have a better, sharper
17 memory of the exposure than the controls, for
18 instance, that would go to find an association
19 when perhaps there isn't a real association?
20 A      That's correct.
21 Q      When were your telephone interviews
22 of the cases and controls conducted?
23 A      Could I have my folder back, or can
24 I have my paper?
25 Q      Is that in the paper?

45 (Pages 174 to 177)

178

1 A      It will help me jog my memory.
2 Q      The paper refers to a January 2000
3 to February 2004 time frame. And I don't know
4 if that -- I couldn't tell if that's when the
5 interviews were done.
6 A      Did you say January 2000 to February
7 2004?
8 Q      Yes.
9 A      Yeah. That is not when the
10 interviews were done. That was the time period
11 for which we obtained the patient listing that
12 we've discussed previously.
13 Q      Okay.
14 A      If --
15 Q      Would it help to see the other paper
16 that you wrote, the apnea paper?
17 A      Yeah, it might. In one of the two
18 papers, we refer to the -- I believe we refer to
19 it. If you could just give me one second.
20 Q      Sure.
21 A      I don't see the exact dates in
22 here. It was accepted for publication in
23 October 2005. Can I give you a range?
24 Q      Yes.
25 A      Oh, okay. I would say given that

179

1 the list was truncated February 2004 and knowing
2 that -- the delay between data resources, I want
3 to say we probably started interviewing probably
4 soon after February 2004. And depending on the
5 workload in the clinical research unit, the
6 interviewing could have taken a period of three
7 to six months including callbacks and things of
8 this nature.
9 Q      Your best recollection, then, is
10 that the interview would have been taken -- the
11 interviews would have taken place sometime after
12 February 2004; is that right?
13 A      Oh, absolutely after February 2004,
14 yes, sir.
15 Q      Okay. You're not quite sure how
16 long after?
17 A      Yeah.
18 Q      And then the interviews, they
19 started at some point and then they continued
20 for several months?
21 A      Yes. Our general — we have several
22 research projects going on simultaneously, but
23 what we tend to like to do is to make sure that
24 we don't string out the process of interviewing
25 for any one study over a year or two,

180

1 particularly for a study of this size. It tends
2 to cause problems.
3      So for a study of this size, I can
4 tell you that our usual timeline for patient
5 interviewing, obtaining callbacks is probably
6 between three to six months. And I'd be
7 surprised if it were as long as six months.
8 Q      Okay. It's correct that by February
9 2004 there had been articles in the medical
10 literature and in the media reporting NAION
11 cases among men taking Viagra, correct?
12 A      I would say yes to those in the
13 literature. I'm not familiar with the dates of
14 those that were in the media.
15 Q      Fair enough. You're certainly aware
16 of the fact that there had been a number of case
17 reports and articles in the published medical
18 literature about a possible association between
19 Viagra and NAION prior to February 2004?
20 A      Yes, sir.
21 Q      Okay. And you indicated that the
22 patients that you recruited for the study were
23 patients that had been seen by ophthalmologists
24 and neuro-ophthalmologists at the University of
25 Alabama at Birmingham Ophthalmology Center?

181

1 A      Yes, in the Department of
2 Ophthalmology at the University of Alabama at
3 Birmingham.
4 Q      And you agree that ophthalmologists
5 at University of Alabama at Birmingham were
6 aware of the medical literature and case reports
7 of NAION among Viagra users prior to February of
8 2004, correct?
9      MR. OVERHOLTZ: Objection. Lack of
10 foundation and calls for speculation.
11      THE COURT: Overruled. You can
12 answer if you're able.
13 A      I am aware that Dr. Vaphiades was
14 aware of that literature. The other
15 neuro-ophthalmologist that I mentioned,
16 Dr. Lanning Kline, I don't know that he and I
17 ever actually discussed that literature.
18 Q      But ophthalmologists at the
19 University of Alabama Medical Center and at the
20 ophthalmology clinic make it a practice to keep
21 up-to-date with the medical literature, do they
22 not?
23      MR. OVERHOLTZ: Objection.
24 Speculation, lack of foundation.
25      THE COURT: Overruled. You can

46 (Pages 178 to 181)

182

1 answer, Doctor, if you are able.
2 A      I don't know whether my colleagues
3 keep up with the literature.
4 Q      Do you agree that if
5 ophthalmologists who were aware of case reports
6 and articles in the medical literature of
7 reports of NAION among Viagra users saw a
8 patient with NAION, they were likely to have
9 asked the patient about Viagra usage?
10 A      Oh, I can't say what they would or
11 would not have done when they saw such a
12 patient.
13 Q      It's a reasonable thing to think
14 that any ophthalmologists who knew there had
15 been reports of NAION among Viagra users and
16 then seeing a patient in the clinic with NAION
17 would think to ask the patient whether or not he
18 had taken Viagra prior to the NAION; isn't that
19 correct?
20      MR. OVERHOLTZ: Object to the form.
21 Calls for speculation.
22      THE COURT: Yeah, I'm going to
23 sustain that.
24 Q      I want you -- strike that.
25      Given the fact that there were case

183

1 reports in the medical literature about NAION
2 among Viagra users, do you agree that cases
3 might have been more likely to recall Viagra
4 usage than controls?
5 A      Yes, sir.
6 Q      Okay. And the effect of that would
7 be to find an association that was not real,
8 correct?
9 A      That's correct.
10 Q      Okay. There's another type of bias
11 called interviewer bias, correct?
12 A      Yes, sir.
13 Q      What is interviewer bias?
14 A      This is -- it's similar to recall
15 bias in that the person conducting the interview
16 would have a reason for probing one group of
17 patients, in this case the cases, more than they
18 would probe the controls. And they would do
19 this because they knew that -- I'm trying to
20 think of a good example. They knew that the
21 person perhaps was exposed or they had reason to
22 think, well, there is this hypothesis out in the
23 literature and these -- I know that these
24 patients have NAION or NION and maybe if I ask a
25 little bit harder --

184

1 Q      You'll get the information?
2 A      -- you'll get the information you
3 want, and they have no cause to do that in the
4 controls. And it produces results similar to
5 the one we just discussed.
6 Q      And in your study of Viagra and
7 NAION, Dr. McGwin, I take it from your
8 description of the methods that the interviewers
9 knew whether the person they were interviewing
10 was a case, meaning that the person being
11 interviewed had experienced NAION, or a control,
12 meaning that the person being interviewed had
13 experienced some condition other than NAION,
14 correct?
15 A      The interview, the survey instrument
16 contained a section about their experience with
17 NAION because we were interested in -- although
18 it's not in these papers -- quality of life
19 issues. And that was relevant if you had NAION,
20 but not -- and so by default we couldn't avoid
21 that.
22 Q      So in other words, the answer to my
23 question is that yes --
24 A      Oh, yes.
25 Q      -- the interviewers knew the status

185

1 of the person being interviewed as to whether he
2 was a case or a control?
3 A      Yes, sir.
4 Q      Okay. And because of that, as you
5 indicated, the interviewers may even
6 unconsciously have questioned the cases
7 differently than the controls regarding their
8 exposure to Viagra, correct?
9      MR. OVERHOLTZ: Object to the form.
10 Lack of foundation.
11      THE COURT: I'll sustain.
12 Q      Dr. McGwin, the fact that the
13 interviewers knew the status of participants in
14 the study as either cases or controls might have
15 led to interviewer bias, correct?
16 A      That would be true if they knew that
17 we were interested in Viagra as a risk factor.
18 Q      Okay. In your case, did the
19 interviewers know that you were looking at the
20 hypothesis that Viagra might be linked to NAION?
21 A      No, sir.
22 Q      There had been reports, though, in
23 the medical literature at that time that
24 indicated that Viagra was --
25      MR. BECNEL: Objection,

47 (Pages 182 to 185)

186

1 repetitious.
2       THE COURT: Overruled. You can
3 answer if you're able.
4 A      Yes, there had been reports up to
5 that -- previous to the time we had started.
6 Q      If the interviewers questioned the
7 cases who they knew had NAION more closely about
8 exposure to Viagra than controls, the effect of
9 that would be to find an association even though
10 such an association might not really exist,
11 correct?
12 A      A positive association, yes, sir.
13 Q      And that would be interviewer bias,
14 correct?
15 A      It would be.
16 Q      Okay. Are you familiar with a term
17 called "selection bias"?
18 A      Yes, sir.
19 Q      And what is selection bias?
20 A      Selection bias is often a problem in
21 case-control studies where one selects cases or
22 controls somehow systematically differently.
23 One of the frequent examples that's given for
24 selection bias are hospital-based case-control
25 studies where we select cases of cancer or

187

1 whatever the disease may be from a given
2 hospital. And the hospital has a catchment area
3 of a certain radius or geographic area, yet we
4 select our controls in such a way that they
5 aren't representative of that same geographic
6 area. And that can result in selection bias if
7 the exposure somehow is also related to that, in
8 this example, that given geographic
9 differential.
10 Q      Now, the controls in your study were
11 selected from the same tertiary care clinic as
12 the cases rather than from the general
13 population without NAION, correct?
14 A      That's correct.
15 Q      And if there is something different
16 about the population of patients that gets
17 referred to a tertiary care clinic than the
18 general population, that would introduce a
19 selection bias, correct?
20 A      Yes, that's true.
21 Q      Another thing that I noticed in your
22 study is that you excluded cases with prior
23 NAION but not controls with prior NAION,
24 correct?
25       I misspoke. Let me withdraw the

188

1 question and rephrase it.
2       In your study, Dr. McGwin, you
3 excluded cases with prior ION, that's ischemic
4 optic neuropathy, but you did not exclude
5 controls with prior ION; is that correct?
6 A      That is correct.
7 Q      And if the history of prior ION
8 affected the usage of Viagra, that would
9 artificially reduce the number of controls
10 exposed and artificially, therefore, increase
11 the odds ratio, correct?
12       MR. OVERHOLTZ: Objection. Lack of
13 foundation.
14       THE COURT: Overruled. You may
15 answer if you are able.
16 A      That would be correct.
17 Q      Are you familiar with the type of --
18       MR. SLONIM: I noticed in the
19 question -- this is to the court reporter. I
20 noticed in the question on the LiveNote
21 transcript that you wrote down AION, A-I-O-N.
22 In that question it should be ION, just I-O-N.
23       MS. LESKIN: That group of
24 questions.
25       MR. SLONIM: Yeah. And it makes a

189

1 difference.
2       COURT REPORTER: Okay.
3       MR. SLONIM: Thank you.
4 Q      Dr. McGwin, are you familiar with a
5 type of bias called "nonparticipation bias"?
6 A      Yes, sir.
7 Q      And what is that?
8 A      Oftentimes when you conduct a study
9 as in ours, you have a group of people who are
10 eligible for participation. And due to a number
11 of reasons -- lack of interest, lack of trust --
12 certain participants don't agree to participate
13 in the study, and -- which is fine and expected,
14 but the concern is not so much that they failed
15 to participate, it's that those who do and do
16 not participate are systematically different and
17 that difference is different between the cases
18 and controls resulting in a somehow skew or a
19 bias in the measure of association.
20 Q      And referring now to your study,
21 first of all participation was voluntary,
22 correct?
23 A      Absolutely, yes, sir.
24 Q      Okay. And both cases and controls,
25 a certain percentage of them refused -- people

48 (Pages 186 to 189)

190

1 that were eligible refused to participate,
2 correct?
3 A      That's correct.
4 Q      Okay. And specifically you
5 identified at the outset 88 cases of NAION among
6 males and females, but 15 of those cases refused
7 to participate, correct?
8 A      Yes, sir.
9 Q      And if you do the arithmetic, I
10 don't know if you have your calculator, but if
11 15 out of 88 refused to -- declined to
12 participate, that's a nonparticipation rate of
13 the cases of 17 percent, correct?
14 A      Yes, sir.
15 Q      Okay. And you also identified 130
16 potential age and sex match controls, but 42 of
17 those refused to participate, correct?
18 A      That's correct.
19 Q      And 40 over 132 (sic) is a
20 nonparticipation rate of 32 percent, correct?
21 A      That's correct.
22 Q      So the nonparticipation rate of the
23 controls was about double that of cases?
24 A      That's correct.
25 Q      Okay. Cases meaning cases of people

191

1 that actually had NAION, correct?
2 A      That's correct.
3 Q      Okay. And so people with NAION who
4 used Viagra might have been more interested in
5 participating in a study than controls who had
6 an eye condition other than NAION who used
7 Viagra, correct?
8       MR. OVERHOLTZ: Object to the form.
9 Lack of foundation.
10       THE COURT: Overruled. He can
11 answer if he's able.
12 A      Yeah. Hypothetically, sure, they
13 may be more likely to participate.
14 Q      And if that were the case, the
15 effect would be to find an association or a
16 higher odds ratio than the true association,
17 correct?
18 A      As long as the controls weren't
19 similarly affected, yes, sir.
20 Q      Okay. I want to ask some questions
21 about Table 1. We've referred to that a couple
22 of times previously.
23 A      Sure.
24 Q      Let me just get my copy. As we've
25 discussed, this identifies nine different

192

1 demographic or medical characteristics that you
2 looked at for each of the cases and controls,
3 correct?
4 A      Yes, sir.
5 Q      Did you perform analyses to assess
6 whether exposure effects differ in each of these
7 nine -- with respect to each of these nine
8 categories?
9 A      Did we conduct stratified analyses?
10 Q      No. What I want to know is whether
11 or not you looked at whether there was
12 differential exposure.
13 A      Oh, differential exposure. I
14 understand the question, yes, sir. It is likely
15 that we did.
16 Q      Do you recall?
17 A      Not specifically; although, it is my
18 general course to do such analyses.
19 Q      So just to take an example, did you
20 analyze the subgroup of patients that had
21 diabetes to see whether or not there was
22 differential exposure to Viagra between cases
23 and controls?
24 A      I likely did, yes, sir.
25 Q      And do you think you did the same

193

1 thing with coronary artery disease?
2 A      Yes, sir.
3 Q      Basically you think you ran down the
4 list and did an analysis to see whether there
5 was differential exposure in each of -- for each
6 of those characteristics?
7 A      Yes, sir.
8 Q      The only characteristics on which
9 you report your analysis of differential
10 exposure is for -- strike that.
11       What were the results for the
12 diabetes and the coronary artery disease
13 patients in terms of their differential
14 exposure? Did they have a statistically
15 significant increased risk of NAION?
16 A      Are you asking whether diabetics
17 have an increased risk of NAION?
18 Q      Diabetics -- I'm asking whether
19 diabetics who used Viagra had a statistically
20 significant increased risk compared with
21 diabetics who did not use Viagra?
22 A      I don't recall the results exactly,
23 but given that that's very similar to the data
24 we present in Table 2 and we didn't include it
25 in the paper, I'm going to -- I'm going to guess

49 (Pages 190 to 193)

194

1 that it probably was not statistically
2 significant.
3 Q        The same thing with coronary artery
4 disease?
5 A        Yes, sir.
6 Q        And each of the other categories?
7 A        Yes, sir.
8 Q        The only -- the only data that you
9 report concerns patients who used either Viagra
10 and/or Cialis and had a history of myocardial
11 infarction or who used Viagra and/or Cialis and
12 had a history of hypertension, correct?
13 A        Yes, sir.
14 Q        So that's called a subgroup
15 analysis, correct?
16 A        One could refer to it that way.  I
17 would generally refer to it as either effect
18 modification or interaction.  To my mind, a
19 subgroup analysis is really a whole analysis
20 limited to a group of individuals such that we
21 would have conducted a study wherein it was
22 limited just to people with MI, but I've often
23 referred -- seen these analyses referred to as
24 subgroup analyses.
25 Q        It's correct that the more questions

195

1 that are asked of a set of data, the more likely
2 it is that some will show a statistically
3 significant difference even if there is no real
4 underlying difference, correct?
5 A        Yes, sir.
6 Q        And, in fact, if you partition a set
7 of data into small subsets, you make it more
8 likely that some subset will show a
9 statistically significant difference even if
10 there is no real underlying difference, correct?
11 A        Yes, sir.
12 Q        And indeed, if you test enough
13 subgroups, a false positive result will emerge
14 from the data purely as the result of chance,
15 correct?
16 A        Will result or can result?
17 Q        Yes, will result.  If you test
18 enough subgroups --
19 A        If you test enough subgroups, yes,
20 sir.
21 Q        -- you're going to get it, right?
22 A        Yes, sir.
23 Q        And isn't it the case that at the
24 conclusion of a study, if some subgroup shows a
25 statistically significant effect, that after the

196

1 fact one can come up with a medical explanation
2 to fit the observation?
3 A        Sure, yeah.  Yes, sir.
4 Q        And -- strike that.
5          (Deposition Exhibit
6          Number 22 was marked
6          for identification.)
7 Q        We've marked as Deposition Exhibit
8 Number 22 an article by Schulz and Grimes
9 entitled "Multiplicity in randomized trial II:
10 subgroup and interim analyses" published in
11 Lancet in 2005.  Have you seen this article
12 before?
13 A        No, sir.
14 Q        Why don't you -- why don't you take
15 a couple of minutes and just read the abstract
16 and get a flavor for the article?
17          MR. BECNEL:  Well, let me enter an
18 objection.  If you're going to show him an
19 article he hasn't read, we are not going to let
20 him read the abstract.  We are going to let him
21 read the article if you're going to question
22 him.
23 Q        Dr. McGwin, if you need --
24          MR. BECNEL:  Counsel, that's my
25 instruction.  That is my instruction.

197

1          THE COURT:  No.  I'll instruct him.
2 I understand the objection.
3          MR. SLONIM:  Judge Borg, may I just
4 say one thing?
5          THE COURT:  Well, yeah.  I haven't
6 even ruled yet, though.  So are you going to --
7          MR. SLONIM:  I would say this:  Of
8 course if the witness wants -- if the witness
9 needs to read the entire article to respond to a
10 question, of course he should do that.  I don't
11 think it's --
12          THE COURT:  So is there a question
13 to him?
14          MR. SLONIM:  Not yet.  I just want
15 him to glance through the article, and I'm going
16 to frame a question.
17          THE COURT:  All right.
18          MR. SLONIM:  And if the witness
19 needs to spend more time reading the article, I
20 have no objection to that.
21          MR. BECNEL:  Judge, we have a case
22 management order that says we are not allowed to
23 pop new things on witnesses or counsel, that if
24 you are going to use something in the
25 deposition, we are supposed to be given it in

198

1 advance. You guys brought that up.
2     MR. SLONIM: Counsel, shame on you.
3 Shame on you. We of course disclosed this to
4 Mr. Overholtz and Mr. Becnel. Of course we
5 disclosed this. We sent them an e-mail five
6 days ago. Shame on you.
7     THE COURT: Well, you know what?
8 Let's stop the back-and-forth on that. If it
9 was disclosed -- and you represent that it was,
10 Mr. Slonim. Is there any --
11     MR. OVERHOLTZ: It was disclosed but
12 not provided.
13     THE COURT: I'm sorry?
14     MR. OVERHOLTZ: It was disclosed but
15 it wasn't provided.
16     MR. BECNEL: This is first I've seen
17 this.
18     MR. SLONIM: Your Honor, we have a
19 copy of the e-mail right here.
20     THE COURT: Mr. Overholtz just said
21 it was disclosed.
22     MR. OVERHOLTZ: I said it was
23 disclosed.
24     THE COURT: He just said it was
25 disclosed.

199

1     MR. OVERHOLTZ: It just wasn't -- we
2 didn't have a copy of it.
3     THE COURT: Go ahead with your
4 question.
5     MR. SLONIM: It was a false
6 citation.
7     THE COURT: Go ahead with your
8 question.
9 Q     (By Mr. Slonim) Dr. McGwin, take a
10 minute, please, and look at this article.
11     MR. OVERHOLTZ: There is no reason
12 to mark that as an exhibit. Come on, guys. I
13 said it was disclosed. Everybody knows it was
14 disclosed. Good Lord.
15     MS. LESKIN: The issue is the
16 witness had a copy of the list in the papers he
17 brought. So --
18     MR. SLONIM: We are going to put it
19 in the record.
20     MR. OVERHOLTZ: What does that have
21 to do with anything?
22     MR. BECNEL: I want to put it on the
23 record. I want to put it on the record. Last
24 Friday we were in a deposition and then we were
25 stuck in airplanes until all hours of the

200

1 morning on Saturday, and then we were required
2 to go to Minnesota all day on Monday and
3 Tuesday. And so to sit down as you as a
4 professional saying you disclosed something that
5 was published in 2005 that you had five days
6 before knowing what was going on, that's just
7 unconscionable and lacks professionalism.
8     THE COURT: Okay. We're going to
9 stop that right now. No more back-and-forth
10 about who's professional and who isn't. Let's
11 get a question to the witness.
12 Q     (By Mr. Slonim) Dr. McGwin, let's
13 mark as Deposition Exhibit Number 22 -- 23 an
14 e-mail that you brought with you from your
15 file.
16     (Deposition Exhibit
        Number 23 was marked
17       for identification.)
18 Q     Can you identify that as an e-mail
19 that you received?
20 A     Yes, sir.
21 Q     Okay. And that's an e-mail you
22 received from Mr. Overholtz, correct?
23 A     That's correct.
24 Q     And it forwards an e-mail that
25 Mr. Overholtz received from Ms. Lori Leskin,

201

1 correct?
2 A     That appears to be the case.
3 Q     Read the first sentence of
4 Ms. Leskin's e-mail, please.
5 A     Gentlemen, pursuant to the Court's
6 order regarding the deposition protocol, we
7 provide you with a listing of documents we
8 reasonably expect to use during the course of
9 Mr. -- pardon me -- Dr. McGwin's deposition.
10 Q     And would you please read then Item
11 Number 9 on that list?
12 A     Schulz, KF, Grimes, DA, Multiplicity
13 in randomised trials II, subgroup and interim
14 analyses, Lancet, Volume Number 356, pages 1657
15 to 1661, 2005.
16 Q     And that's the same article that we
17 have marked as Deposition Exhibit Number 22,
18 correct?
19 A     Yes, sir.
20     MR. BECNEL: Counsel, let me see a
21 copy of that e-mail?
22     MS. LESKIN: For the record, that
23 e-mail was sent to Mr. Becnel, Mr. Overholtz,
24 and Mr. Hopper by me on June 7th, 2007, at
25 4:48 p.m.

51 (Pages 198 to 201)

202

1      MR. BECNEL: Well, I've got it
2 listed on the top as saying 6-14-07. You just
3 printed it, is that what this is? Where is the
4 e-mail?
5      MS. LESKIN: The witness brought
6 that with him among materials he had.
7      MR. SLONIM: This is Mr. -- this is
8 what Mr. Overholtz forwarded to the witness.
9      MS. LESKIN: Counsel, I'm lead
10 counsel in this case. I'm the lead counsel.
11      MR. SLONIM: And you got a copy of
12 this.
13      MR. BECNEL: I was taking
14 depositions on Friday.
15      MR. SLONIM: The Court Order
16 requires us --
17      MR. BECNEL: I understand how you
18 practice law. I understand what you're doing.
19      MS. LESKIN: Mr. Becnel --
20      MR. BECNEL: We'll practice the same
21 way.
22      MS. LESKIN: Mr. Becnel, you have no
23 right to --
24      THE COURT: It's over. It's over.
25      MR. BECNEL: I've had enough of

203

1 this.
2      THE COURT: It's over. Both of you,
3 it's over. No more of that on the record. Get
4 the question to the witness.
5      MR. BECNEL: We would like to take a
6 break to read the document.
7      THE COURT: Well, he's going to ask
8 a question before we do that.
9      MR. BECNEL: Well, I would like to
10 read the document. I haven't had an opportunity
11 to read it.
12      THE COURT: Go ahead and start
13 reading it. Ask the question.
14 Q     (By Mr. Slonim) Dr. McGwin, this
15 article explains that conducting analyses of
16 every subgroup and reporting only those that
17 yield a positive result is a scientifically
18 flawed methodology, correct?
19      MR. OVERHOLTZ: Objection. Lack of
20 foundation. We need to take a break and let the
21 witness read the full --
22      THE COURT: All right. You're going
23 to take a break and read it, Counsel?
24      MR. OVERHOLTZ: And let the witness
25 read it.

204

1      MS. LESKIN: You know that there is
2 a question pending.
3      THE COURT: That's what I wanted was
4 a question pending.
5      THE WITNESS: Can I get the question
6 just one more time before I start reading?
7      MR. SLONIM: Yes, yes.
8 Q     This article explains that
9 conducting analyses of every subgroup and
10 reporting only those that yield a positive
11 result is a scientifically flawed methodology,
12 correct?
13      MR. OVERHOLTZ: So we are off the
14 record?
15      VIDEOGRAPHER: No, we are still on
16 the record.
17      MR. OVERHOLTZ: No, we're off the
18 record.
19      MR. SLONIM: No, I want it on the
20 record.
21      MR. OVERHOLTZ: He's going to take a
22 break and go in the other room --
23      MR. SLONIM: We don't need any
24 breaks.
25      THE COURT: Do you know what? Just

205

1 a minute, folks. I'll tell you whether or not
2 we are going to take a break.
3      Mr. Witness, do you need to read
4 this article, Dr. McGwin? Would you like to
5 read the article?
6      THE WITNESS: To answer this
7 specific question, I don't believe I need to
8 read the entire article, no, sir.
9      THE COURT: All right.
10 Mr. Overholtz and Mr. Becnel, have you both read
11 the article?
12      MR. BECNEL: No, I haven't. I have
13 not.
14      THE COURT: Mr. Overholtz, have you
15 read it?
16      MR. OVERHOLTZ: No, I have not.
17      THE COURT: All right. How much
18 time do you want to read it, gentlemen?
19      MR. OVERHOLTZ: It shouldn't take
20 more than a few minutes.
21      THE COURT: All right. Then we'll
22 stop the record for five minutes.
23      VIDEOGRAPHER: The time is 1:32 and
24 we are off the record.
25      (Recess taken.)

52 (Pages 202 to 205)

206

1      VIDEOGRAPHER: The time is 1:37 and
2 we are back on the record.
3      THE COURT: Counsel there will be no
4 further references from any one of you to any
5 other about everybody else's professionalism.
6 We are going to stick to the record, and we are
7 going to ask questions and we're going to get
8 answers.
9      And if you will recall from the
10 Court's Order on the conduct of the depositions,
11 the only objections are to the form, privilege,
12 and responsiveness. Everything else is reserved
13 specifically by the Court, and there are no
14 speaking objections other than those. And there
15 are no speeches from counsel.
16      You can proceed now. Repeat the
17 question to the witness, please.
18 Q      (By Mr. Slonim) Dr. McGwin, this
19 article that we've marked as Deposition Exhibit
20 Number 22 explains that conducting analyses of
21 every subgroup and reporting only those
22 subgroups that report a positive result is a
23 scientifically flawed methodology, correct?
24 A      That is correct.
25      MR. OVERHOLTZ: Objection. Lack of

207

1 foundation.
2      THE COURT: Overruled. You may
3 answer the question, if you're able.
4 A      Correct.
5 Q      In other studies that you, yourself,
6 have conducted, Dr. McGwin, you have
7 acknowledged that performing multiple subgroup
8 comparisons, specifically and particularly when
9 the subgroups are not defined a priori as a
10 hypothesis that you are investigating means that
11 chance cannot be ruled out as an explanation
12 even if the association appears to be
13 statistically significant, correct?
14 A      That would be correct.
15 Q      In particular, you recall that you
16 did a study involving at-fault automobile
17 crashes and medical conditions and medications
18 taken by elderly people?
19 A      Published in the American Journal of
20 Epidemiology, 1990 --
21 Q      Yes.
22 A      Yes, sir.
23 Q      Okay. And among other things, you
24 found that elderly automobile drivers who used
25 either calcium channel blockers or vasodilators

208

1 had a statistically significant reduced risk of
2 accidents, correct?
3 A      I believe that's correct, yes, sir.
4 Q      But you discounted those
5 statistically significantly associations because
6 they resulted from analyses of subgroups that
7 were not specified as part of the original
8 hypothesis being investigated, correct?
9 A      Well, I guess those weren't subgroup
10 analyses, per se. Those were simple risk
11 factors.
12 Q      But they were statistically
13 significant results that you found that people
14 that used calcium channel blockers or
15 vasodilators had a statistically significantly
16 reduced risk of at-fault automobile accidents,
17 correct?
18      MR. BECNEL: Objection.
19 Repetitious.
20      THE COURT: Overruled. He can
21 answer.
22 A      Yes. We found it statistically
23 significant, yes.
24 Q      But despite those findings, you
25 noted in your article that those results could

209

1 have been attributable to chance --
2 A      Yes, sir.
3 Q      -- correct?
4      Why could those results have been
5 attributable to chance even though they were
6 statistically significant?
7 A      Well, chance is always a potential
8 explanation for statistically significant
9 results. There is variability with all of the
10 statistical tests.
11 Q      But in this particular case, you had
12 done -- you had done multiple cuts through the
13 data, and calcium channel blockers and
14 vasodilators were a part of the multiple cuts
15 through the data. And even though the results
16 were statistically significant, you discounted
17 them, correct?
18      MR. OVERHOLTZ: Object to the form.
19 Foundation. If we are going to talk about the
20 data analysis in this motor vehicle study, we
21 ought to pull it out and look at it.
22      THE COURT: It is overruled. He may
23 answer if he's able.
24 A      By cuts to the data, we looked at a
25 number of different risk factors. And I guess I

210

1 just wanted to be sure that we don't shift gears
2 from subgroup analyses to primary independent
3 variables.
4 Q      Sure.
5        (Deposition Exhibit
         Number 24 was marked
6        for identification.)
7 Q      What exhibit number is that?
8 A      24.
9 Q      Dr. McGwin, we've marked as
10 Deposition Exhibit Number 24 an article that you
11 authored with others entitled "Relations Among
12 Chronic Medical Conditions, Medications and
13 Automobile Crashes in the Elderly: A
14 Population-based Case-Control Study." This is
15 the study that you and I have been discussing,
16 correct?
17 A      Yes, sir, uh-huh.
18 Q      And turn, please, to page 430. And
19 direct your attention to the second -- to the
20 first full paragraph on the left-hand side. You
21 wrote, "The results of this study reflect a
22 large number of analytic comparisons. It is
23 possible that some of the differences detected
24 were the result of chance. For some comparisons
25 such as those with respect to at-fault

211

1 involvement in crashes and heart disease or
2 stroke, there were definite a priori
3 hypotheses. However, for others such as the
4 differences with respect to the use of calcium
5 channel blockers and vasodilators and at-fault
6 involvement in crashes, there were no a priori
7 hypotheses. Chance cannot be ruled out as a
8 possible explanation for these findings."
9        So even though you found
10 statistically significant reduced incidence of
11 accidents among elderly drivers who used calcium
12 channel blockers and vasodilators, you
13 discounted those findings why?
14 A      I don't necessarily think that we
15 discounted them. I think what we did was we
16 indicated that lacking any prior literature that
17 they might be risk factors, lacking any good
18 scientific foundation that calcium channel
19 blockers might impair driving safety, one of the
20 then possible explanations is that they are
21 simply due to chance.
22 Q      Okay. We had marked the Schulz and
23 Grimes article. There are other articles in the
24 scientific and epidemiological literature that
25 explain that subgroup analyses are problematic

212

1 because as you do multiple comparisons, you may
2 get statistically significant results purely as
3 a function of the subgroup and chance, correct?
4 A      That's correct.
5 Q      Okay. And let's just mark one or
6 two of those other articles.
7        (Deposition Exhibit
         Number 25 was marked
8        for identification.)
9        MR. SLONIM: Exhibit Number 25?
10       MS. LESKIN: Yes.
11 Q      We've marked as Deposition Exhibit
12 Number 25 an article by Yusuf and others
13 entitled "Analysis and Interpretation of
14 Treatment Effects in Subgroups of Patients in
15 Randomized Clinical Trials." Is that article in
16 front of you?
17 A      Yes, sir.
18 Q      And is that an article that you've
19 seen before today?
20 A      No, sir.
21 Q      It was also identified on our --
22 actually this one was mentioned in Dr. Kimmel's
23 expert report. Did you read Dr. Kimmel's report
24 in this matter?
25 A      Yes, sir.

213

1 Q      Okay. Turn, please, to page 95. In
2 the middle of the page, the authors state,
3 "While postulating subgroup effects a priori
4 allows formal statistical hypothesis testing,
5 much less credence is due to formulating
6 hypotheses after examining the data. Such
7 analysis smacks a betting on a horse after the
8 race is over."
9        Do you see that, middle of the page?
10 A      Yeah, I've got it.
11 Q      Have I read it correctly?
12 A      Yes, sir.
13 Q      Okay. Do you agree that that is a
14 problem with subgroup analysis where the
15 subgroups are defined after the initial data
16 collection is done?
17 A      I think the analogy to betting on a
18 horse is a bit overstated.
19 Q      But you agree that that use of it,
20 the coauthors have identified a methodological
21 problem with subgroup analysis, correct?
22 A      Yes, sir.
23 Q      Okay. And there was another
24 article we inadvertently attached -- oh, we took
25 it off?

54 (Pages 210 to 213)

214

1        (Deposition Exhibit
          Number 26 was marked
2         for identification.)
3 Q       We marked as Deposition Exhibit
4 Number 26 an article by Sleight entitled
5 "Debate: Subgroup analyses in clinical trials --
6 fun to look at but don't believe them."
7        This is also identified in Exhibit
8 Number 23, correct, Dr. McGwin? Exhibit Number
9 23 was the e-mail.
10 A      Yes, sir.
11 Q      Okay. Referring your attention to
12 the abstract, the author states, Analysis of
13 subgroup results in clinical trials is
14 surprisingly unreliable, even in the clinical
15 trial. This is the result of a combination of
16 reduced statistical power, increased variance,
17 and the play of chance. Reliance on such
18 analyses is likely to be more erroneous, and
19 hence harmful, than application of overall
20 proportional, or relative, result in the whole
21 trial to the estimate of the risk in the
22 subgroup. Plausible explanations can usually be
23 found for effects that are in reality simply due
24 to the play of chance. When clinicians believe
25 such subgroup analyses, there is a real danger

215

1 of harm to an individual patient.
2        Do you agree that Sleight has
3 identified and characterized methodological
4 flaws with subgroup analysis?
5 A       Before I answer, you misspoke when
6 you read the first sentence. You omitted the
7 word "large."
8 Q       Okay.
9 A       Just for the sake of clarity.
10 Q      Thank you.
11 A      I believe that's correct.
12 Q      Okay. Dr. McGwin, let me -- let's
13 take a short break. Let me consult with my
14 colleagues and see if we can wrap this up.
15       VIDEOGRAPHER: The time is 1:49, and
16 we are off the record.
17       (Recess taken.)
18       VIDEOGRAPHER: The time is
19 2:00 p.m. I changed tapes. This is the
20 beginning of Tape Number 6. We are back on the
21 record.
22       THE COURT: Mr. Slonim?
23       MR. SLONIM: I have no further
24 questions, Your Honor.
25       THE COURT: Mr. Overholtz?

216

1        MR. OVERHOLTZ: Mr. Becnel is going
2 to begin with our redirect.
3 EXAMINATION BY MR. BECNEL:
4 Q       Doctor, until today, you didn't know
5 who I was, did you?
6 A       No, sir.
7 Q       And you met me for the first time at
8 lunch.
9 A       Yes.
10 Q      Other than seeing me?
11 A      Other than seeing you walk in the
12 room, yes, sir.
13 Q      You've worked at UAB as a teacher
14 and scientist; is that correct?
15 A      That is correct.
16 Q      You have no interest in the outcome
17 of this litigation one way or another, do you?
18 A      No, sir.
19 Q      You were contacted after your paper
20 was published by members of the plaintiffs'
21 team; is that correct?
22 A      That is correct.
23 Q      Has Pfizer ever contacted you after
24 you published your studies to say what you had
25 found, why you found them, and what was going on

217

1 with them?
2 A       No, sir.
3 Q       You've never heard from Pfizer?
4 A       No, sir.
5 Q       Are you aware that drug companies
6 are required to provide warnings and warning
7 labels to people who take their products; is
8 that correct?
9 A       I am aware of that, yes, sir.
10 Q      And that's an ethical obligation as
11 well as a legal requirement?
12       MR. SLONIM: Objection.
13       THE COURT: Overruled. You can
14 answer it if you are able.
15 A      I believe that's correct, yes, sir.
16 Q      Because of safety, because of
17 efficacy of the drug and because of the side
18 effects that might occur --
19 A      Yes, sir.
20 Q      -- is that correct?
21       The literature -- were you aware of
22 how this drug was first developed?
23 A      No, sir.
24 Q      Were you aware that this drug was
25 developed as a drug for angina that had no

55 (Pages 214 to 217)

218

1 effect on angina; and when they discovered it
2 had an effect on impotence, they switched it to
3 an impotence drug?
4        MR. SLONIM: Objection. Lack of
5 foundation.
6        THE COURT: Overruled. If he's able
7 to answer. He'll tell us whether or not he
8 knows the answer.
9 A        That kind of sounds familiar, but I
10 can't say that it was knowledge that I have been
11 carrying around with me.
12 Q        Now, what kind of reputation --
13 scratch that.
14        You went to Harvard, which is one of
15 the more prestigious schools, is it not, in your
16 field?
17 A        I believe people would characterize
18 it as such.
19        THE COURT: If you are able to
20 answer that one.
21        What are you doing having come from
22 Harvard at UAB, and why?
23 A        If your question is why did I come
24 to UAB, I was interested in the area of injury
25 epidemiology. And at the time, the Harvard

220

1 A        Yes, sir.
2 Q        You consider yourself a researcher
3 more than anything else, do you not?
4 A        I view myself as a researcher as
5 well as a teacher, yes, sir.
6 Q        As well as a teacher. Now, in
7 addition to that, sir, you have a unique
8 expertise in the field we are discussing right
9 now, do you not?
10 A        I believe that's correct, yes, sir.
11 Q        There are only about a half a dozen
12 in the whole country and maybe ten in the whole
13 world that have your expertise; is that correct?
14 A        There are very few card-carrying,
15 that is, Ph.D.-trained epidemiologists who focus
16 specifically on eye disease, yes, sir.
17 Q        And how many would you think are in
18 the U.S.?
19 A        In the U.S., I'm familiar with six,
20 six to eight individuals trained as Ph.D.
21 epidemiologists who focus mostly or solely in
22 eye disease.
23 Q        How about in the world?
24 A        I would say we could probably number
25 it close to 12 or so total.

219

1 School of Public Health did not have an interest
2 in Ph.D. students who were interested in injury
3 epidemiology. That is why I came to UAB in the
4 first place. I haven't left since then, despite
5 actually having been recruited to go back to
6 Harvard, having been recruited to go to the
7 University of Pennsylvania because people at UAB
8 are nice. It's a great place to work.
9 Q        In addition to that, what is the
10 reputation of the school?
11 A        I believe that the reputation of UAB
12 is that it's a fine institution, both the
13 medical school as well as the school of public
14 health as well as the university in general.
15 It's one of the better funded institutions from
16 the NIH. It has a very good reputation
17 medically. It does very well in standard
18 metrics, the U.S. News and World Report, best
19 doctors, best hospitals. It ranks very highly
20 in transplant medicine and arthritis and
21 rheumatology and a number of disciplines.
22        So I believe both from my own
23 perspective but also using national benchmarks
24 that it's a very highly rated institution.
25 Q        You consider yourself a scientist.

221

1 Q        Now, why did you begin studying this
2 particular problem as a scientist, as a teacher,
3 and as an epidemiologist?
4 A        Referring to the Viagra question?
5 Q        The Viagra-related issues.
6 A        As we discussed earlier, we were
7 pursuing a study on risk factors for NAION. And
8 at the time, one of the, as we've discussed,
9 issues that had come up in the literature was
10 the role of Viagra. At the time we were
11 working, there was no epidemiologic study. It
12 was case reports, which are valuable in the
13 terms of generating hypotheses. It is where
14 most research begins, identifying an unusual
15 combination of disease and exposure. That's not
16 to say they don't -- they test the hypothesis.
17 They don't do that.
18        So we inserted several questions
19 about Viagra and Cialis. Levitra at the time
20 hadn't hit the streets, and so we didn't include
21 that into our questionnaire. The manuscript
22 itself was not the primary focus of the study.
23 I mean, clearly not. We included women. We
24 were interested in risk factors in general.
25        The paper is a natural progression

56 (Pages 218 to 221)

222

1 of scientific inquiry. It's -- we had the case
2 reports. There was a hypothesis at hand, and we
3 pursued it.
4 Q      Now, you have written a report which
5 you wrote entirely yourself; is that correct?
6 A      That's correct.
7 Q      Nobody from the plaintiffs' side or
8 anywhere else had any influence in you writing
9 that report?
10 A      No, sir.
11 Q      And no changes other than
12 grammatical and showing you how an expert report
13 had to comply with the federal rules did anybody
14 give you any information to include?
15 A      No, sir.
16 Q      Nor did you get media trained, even
17 though this is your first deposition?
18 A      No, sir.
19 Q      And we didn't spend weeks or days or
20 hours preparing you for your deposition, did we?
21 A      No. As I mentioned earlier, we met
22 for at most two hours yesterday afternoon.
23 Q      Now, your expert report has a
24 critique of Pfizer's evidence in this case; is
25 that correct?

224

1 statistical power of the comparisons that were
2 done was lacking. So in a sense in terms of its
3 contribution to the science, it had many of the
4 normal limitations you would see in
5 epidemiologic studies, but it was secondary
6 data. It was data that was being looked at in a
7 very ad hoc sort of way.
8       Much of the other information that I
9 was given was -- some of the more interesting
10 pieces of material were recommendations to
11 Pfizer about doing a case-control study. I
12 believe there was a document from the FDA
13 suggesting a case-control study. I believe
14 there was a panel -- I don't know if it was an
15 expert panel or a --
16 Q      A scientific advisory panel?
17 A      -- scientific advisory panel wherein
18 they reviewed my study and they saw the same
19 flaws in it that were discussed here and most of
20 the same flaws that I admitted in the paper, yet
21 still indicated that a case-control study would
22 be feasible and somewhat doable.
23       So, again, that was the material
24 that I read. It clearly indicated that our
25 approach was a reasonable and valid one. The

223

1 A      That's correct. I believe it does.
2 Q      And you have some major criticisms
3 of that evidence of Pfizer; is that correct?
4 A      Yes, sir, I believe I do.
5 Q      All right. Will you give us the
6 background of why you have that criticism as a
7 scientist and as a teacher who specializes
8 uniquely in this subject matter?
9 A      Placed in the context of much of
10 what we talked about today, most of the material
11 I've been handed here are studies from the
12 bottom of case reports and case series up
13 through case-control studies and then a small
14 cohort study. Much of the evidence that I was
15 given was secondary analyses of clinical trial
16 data, and we talked about that in the -- the
17 author escapes me. We talked about it in the
18 Pfizer publication this morning.
19       Many of the criticisms that we
20 talked about with respect to my study, the
21 ability to define NAION, the data from Pfizer
22 suffers from the same problems. They didn't
23 have formal clinical definitions of NAION in the
24 data that they searched. There was no formal
25 statistical evaluation of those hypotheses. The

225

1 scientific evidence that they provided, the
2 quantitative evidence was very weak and subject
3 to even more of the limitations that we faced in
4 our study.
5 Q      And this particular drug has its
6 purpose in society; however, it has
7 limitations --
8       MR. SLONIM: Objection.
9 Q      -- in its use; is that correct?
10       MR. SLONIM: Objection.
11       THE COURT: What's the objection?
12       MR. SLONIM: Form.
13       THE COURT: Overruled. You can
14 answer if you are able, doctor.
15 A      I believe Viagra does have its use
16 in society. There are men that suffer from
17 impotence who at least in my knowledge of the
18 literature clearly benefit from its use. I
19 believe it's also been used to treat premature
20 infants with respiratory disease. I believe
21 it's been used in situations such as that. So I
22 would agree with you, yes, it has its purpose in
23 society.
24 Q      But it has its limitations depending
25 on certain risk factors of men who are

57 (Pages 222 to 225)

226

1 predisposed to some other disease or limitations
2 according to the FDA, people with smoking habits
3 and people with high cholesterol and people with
4 previous heart-related problems, et cetera?
5        MR. SLONIM: Objection, Your Honor.
6 Lack of foundation. There's no evidence for any
7 of this.
8        THE COURT: Overruled. If he's able
9 to answer it, he can say so.
10       MR. BECNEL: Counsel, let's get the
11 exhibit number. I don't -- you didn't give me a
12 copy. The exhibit number, the FDA advisory. Do
13 you know what number that is?
14       THE WITNESS: 12. 11 and 12.
15       MR. BECNEL: I'm referring to the
16 one from -- they had one from 6-11-07 and the
17 earlier one in '05.
18 Q      The people that shouldn't get this
19 drug, at least according to the FDA, are people
20 who have heart disease, are over 50 years old or
21 have diabetes, have high blood pressure, have
22 high cholesterol, smoke, and have certain eye
23 problems.
24       MR. SLONIM: Objection, Your Honor.
25 That's not what it says.

227

1        THE COURT: Just a minute.
2        MR. SLONIM: Let him -- please let
3 him read it.
4        VIDEOGRAPHER: Mr. Slonim, your
5 papers are on your microphone. Thank you.
6        THE COURT: Do you want to state
7 your objection again because I don't think
8 the videographer got it.
9        MR. SLONIM: Yes. The objection,
10 Your Honor, is that that is not at all what the
11 document says.
12       THE COURT: Well, the document says
13 what it does. It's overruled. And if you need
14 to ask him a question coming back at him, you
15 can do that. Overruled.
16       THE WITNESS: The document that I
17 have as Exhibit 12 indicates that the groups
18 that you mentioned -- heart disease, 50 years
19 old, or have diabetes -- are people who are at
20 -- have a higher chance of NAION, but I do not
21 believe it makes specific reference to the use
22 of Viagra, Cialis, or Levitra, at least the
23 sentence as I'm reading it.
24 Q      (By Mr. Becnel) Sir, tell me, in
25 terms of your ultimate opinion, you have

228

1 concluded in your summary and conclusion what in
2 this case?
3 A      May I read it verbatim?
4 Q      Sure.
5 A      This is in Section 4, page 7 of my
6 expert witness report, the last sentence. Thus,
7 in conclusion, to a reasonable degree of
8 scientific certainty, it is my opinion that
9 Viagra can cause NAION and other ocular vascular
10 disorders.
11 Q      And the basis of that is what?
12 A      The basis of that statement is the
13 entirety of the research that not only I've done
14 but also the research that I've read on this
15 topic as it refers to Viagra and NAION and case
16 reports to the limited number of epidemiologic
17 studies to the animal as well as basic science
18 literature.
19 Q      And you've read the work of
20 Dr. Hayreh?
21 A      Yes, sir.
22 Q      Is he well respected?
23 A      Yes, sir.
24 Q      Where would you consider him in
25 terms of this area of research and treatment?

229

1 A      I would say he's perhaps one of --
2 he is the leading researcher in this area.
3 Q      And have you ever heard any
4 criticism of him whatsoever other than from
5 Pfizer's experts?
6 A      Other than from Pfizer's experts,
7 no, sir.
8 Q      In the whole universe of your field
9 of specialty?
10 A      No, sir.
11 Q      Now, is it more probable
12 epidemiology-wise, medical-wise and
13 scientific-wise that it is more probable than
14 not that Viagra is associated with sufficient
15 evidence that it can cause NAION? In other
16 words, if you use the little scales of justice,
17 what is more one way than the other?
18 A      You said epidemiologically and
19 medically.
20 Q      Well, you are not a medical doctor,
21 I understand.
22 A      So I can respond epidemio --
23 Q      Yes.
24 A      Epidemiologically, I would agree
25 with you that more probable than not that there

58 (Pages 226 to 229)

230

1 is an association between Viagra and other ED
2 medications and NAION.
3 Q       Thank you. I have no further
4 questions.
5       THE COURT: Mr. Slonim, anything
6 else? Mr. Overholtz, do you have some
7 questions?
8       MR. OVERHOLTZ: I've got just a
9 couple of questions.
10 EXAMINATION BY MR. OVERHOLTZ:
11 Q       Dr. McGwin, you were asked some
12 questions by counsel regarding some studies that
13 you had read for the first time today and seen
14 regarding subgroup analysis.
15 A       Yes, sir.
16 Q       Your publication on the use of ED
17 medications and the risk of NAION, Exhibit 3
18 that we've talked about, did you do a subgroup
19 analysis in that paper?
20 A       If we use the term generically,
21 yes. I mean, the papers that were given to me,
22 Exhibit Number 22, 25, and 26, use the term
23 "subgroup analyses" in the context of a clinical
24 trial, which is a different study design than
25 what we did which is a matched case-control

231

1 study. And the issues related to clinical
2 trials and statistics are, although similar in
3 that the same tools are used, some of the
4 theoretical issues involved in clinical trials,
5 i.e, subgroup analyses, but particularly interim
6 analyses and endpoint analyses are different.
7       In fact, the paper, Schulz, Exhibit
8 Number 22, leaves open the possibility that
9 while subgroup analyses are problematic, tests
10 for statistical interaction, which is what we
11 did in our study, there is a place for them when
12 done appropriately. So it's important to
13 differentiate subgroup analyses in the context
14 of a clinical trial from issues of statistical
15 interaction in an observational study.
16 Q       And when you describe an
17 observational study, your case-control study is
18 an observational study; is that correct?
19 A       That's correct.
20 Q       You mentioned that you had read in
21 preparing for your report and doing your
22 research you were familiar with the case reports
23 or case series that have been published on this
24 issue, correct?
25 A       That's correct.

232

1 Q       Have you ever heard the statement
2 that a case report or a case series is just
3 one-half of a case-control study?
4 A       I do believe I have used -- I have
5 said that myself, yes, sir.
6 Q       And is it a fair statement that case
7 controls -- I mean, case reports and case series
8 are one-half of a case-control study?
9 A       They are the case part of it, yes,
10 sir.
11 Q       And those can play an important
12 factor when combined with other evidence --
13 pharmacologic, plausibility, epidemiology,
14 anecdotal reports -- in determining whether or
15 not there is an association between a disease
16 and a particular actor?
17 A       My personal opinion is that case
18 reports and case series aren't given their due
19 weight in the field of epidemiology and in the
20 field of medical research generally. They have
21 a purpose of pointing out to clinicians unusual
22 occurrences, but they also serve a role in
23 epidemiology for generating hypotheses.
24       In the context of the discussion
25 this morning, we are looking at the weight of

233

1 evidence. And we discussed it for a brief
2 amount of time the Hill criteria. And many of
3 his original thoughts gave a lot more weight to
4 these often discarded case reports and series.
5 Q       We talked about a case-control
6 study, and your study was a case-control study,
7 correct?
8 A       That's correct, a matched
9 case-control study.
10 Q       A matched case-control study. You
11 described NAION earlier in the deposition as a
12 rare event. Is that a fair statement that NAION
13 is a --
14 A       Oh, yes, sir.
15 Q       And is there a particular reason why
16 a case-control study is a medically and
17 scientifically reasonable study to look at
18 cause-and-effect relationships for rare events
19 like NAION?
20 A       Yes, although the term -- the phrase
21 "cause and effect" --
22 Q       Association.
23 A       Okay.
24 Q       I amend my question.
25 A       Thank you. Rare diseases do not

59 (Pages 230 to 233)

**234**

1 lend themselves to cohort studies. If we just
2 do the math, a disease that has an incidence of
3 one per hundred thousand would require us to
4 have a sufficiently large cohort or be willing
5 to sit around for a very long period of time to
6 see enough events' outcomes of interest. The
7 case-control design was originally developed to
8 address this problem. It is the study design.
9 It is the preferred study design for rare
10 diseases such as NAION.
11 Q      Are there any other examples where
12 -- you will recall earlier there was a
13 discussion about a hierarchy of
14 epidemiological-type studies and observational
15 studies and a hierarchy of those --
16 A      Yes, sir.
17 Q      -- and where case-control studies
18 fit within that hierarchy, correct?
19 A      Yes, sir.
20 Q      But are there examples where
21 case-control studies other than NAION have been
22 accepted in the world of science and medicine as
23 establishing a definite association between a
24 disease and a particular act or event, drug,
25 what have you?

**235**

1 A      There is an example that I often use
2 in my introductory classes when we get to the
3 discussion of case-control studies. It is often
4 difficult for students to grasp rare, one in a
5 hundred thousand, two in a hundred thousand.
6 One of the papers I often give is -- there was a
7 paper published in the New England Journal of
8 Medicine early '80s about clear cell carcinoma
9 of the vagina and exposure to DES which was a
10 drug that was given to pregnant women. This a
11 very small matched case-control study. The
12 numbers elude me, but I want to say maybe there
13 were 17 cases and an equal number of controls.
14      Clear cell carcinoma of the vagina
15 is a very rare disease, and my recollection is
16 foggy, but nearly all, maybe all but one of the
17 cases was exposed and none of the controls were
18 exposed. The relationship between the two was
19 very, very clear. I'm not saying it was a
20 cause-and-effect relationship, but that's often
21 held up as, not only an example of a rare
22 disease situation, but it is often held up as a
23 situation where a case-control study has been
24 used to identify, you know, a potentially
25 at-risk medication.

**236**

1 Q      In light of the evidence that we've
2 talked about today regarding Viagra and NAION,
3 if a researcher, an epidemiologist, was to
4 undertake a study about NAION, a case-control
5 study, would it be scientifically reasonable and
6 acceptable to include NAION -- I mean, to
7 include use of ED medications like Viagra on the
8 questionnaire today based on the evidence?
9 A      Yes, sir, I believe it would be
10 reasonable.
11 Q      You've -- you were shown some
12 evidence, some data from Pfizer that was
13 published in the Gorkin-Sobel article, the
14 Pfizer article, and you've looked at some of
15 that data.
16      Does the data presented by Pfizer's
17 expert demonstrate a lack of an association
18 between Viagra and NAION at all?
19 A      This is the -- some of the numbers
20 that we discussed earlier, the three clinical
21 trials, and we had this conversation earlier.
22 They -- when one aggregates that data, there is
23 an incidence rate that is arrived at. And in
24 this particular paper, they use the background
25 incidence which is derived from two of the other

**237**

1 studies that we talked about. It is a very hard
2 comparison to make. It's -- it's not a
3 quantitative comparison, per se. There's no
4 study design here. This is a -- it's partially
5 a literature review. It's partially a -- so, to
6 say that there's a statistical result here, to
7 say that they demonstrate an association, they
8 don't present the data in that way. They simply
9 state that the aggregated data from these
10 clinical trials -- oh, pardon me, one is a
11 clinical trial, the other was a prospective
12 study, the other was a retrospective study.
13 Sorry -- are similar. If your question is is
14 there an association, I think as I responded --
15 Q      My question was does their data show
16 a lack of association?
17 A      No, it does not.
18      MR. OVERHOLTZ: That's all I have.
19      THE COURT: Mr. Slonim, anything
20 else?
21      MR. SLONIM: No.
22      THE COURT: Mr. Becnel?
23      MR. BECNEL: No, sir.
24      VIDEOGRAPHER: Nothing further? The
25 time is 2:27. This concludes Tape Number 6 and

60 (Pages 234 to 237)

238
1 the deposition of Dr. McGwin.  We are off the
2 record.
3       (End of deposition.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

239
1       C E R T I F I C A T E
2
3 STATE OF ALABAMA )
4 JEFFERSON COUNTY )
5
6       I hereby certify that the above and
7 foregoing deposition was taken down by me in
8 stenotype, and the questions and answers thereto
9 were reduced to computer print under my
10 supervision, and that the foregoing represents a
11 true and correct
12 transcript of the deposition given by said
13 witness upon said hearing.
14
15       I further certify that I am neither of
16 counsel nor of kin to the parties to the action,
17 nor am I in anywise interested in the result of
18 said
19 cause.
20
21
   _____
22 Carrie M. Robinson, Commissioner
23
24
25

61 (Pages 238 to 239)