1

1    UNITED STATES DISTRICT COURT

2         DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - - - - - -

4    In Re:  Viagra Products

              Liability Litigation

5

6                              MDL No. 06-MD-1724

7    This Document Relates to:

8    MARTIN V. PFIZER

     STANLEY V. PFIZER

9    - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12

13

14          VIDEOTAPED DEPOSITION of JOHN M. WILLIAMS,

15   SR., M.D., M.P.H., taken at the instance of Pfizer, under

16   and pursuant to the Federal Rules of Civil Procedure, and

17   the acts amendatory thereof and supplementary thereto,

18   before me, KIM M. PETERSON, CM, Registered Professional

19   Reporter and Notary Public in and for the State of

20   Wisconsin, at 3000 Westhill Drive, Wausau, Wisconsin, on

21   the 13th day of January, 2009, commencing at 9:15 o'clock

22   in the forenoon.

23

24

25

**2**

APPEARANCES

AYLSTOCK WITKIN KREISS & OVERHOLTZ,
PLLC, 803 North Palatox Street, Pensacola, Florida,
32501, by MR. DANIEL THORNBURGH, appeared on behalf of
Mr. Martin and Mr. Stanley.

KAYE SCHOLER, LLP, 425 Park Avenue,
New York, New York, 10022-3598, by MR. BERT L. SLONIM and
MS. AVIGAEL FYMAN, appeared on behalf of Pfizer.

ALSO PRESENT: Mr. Neil D. Overholtz,
via telephone.

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| JOHN M. WILLIAMS, SR. By Mr. Slonim | | 6 |
| | By Mr. Thornburgh | 141 |
| | By Mr. Slonim | 151 |
| | By Mr. Thornburgh | 152 |

**4**

E X H I B I T S (continued)

| EXHIBIT NO.: | MARKED |
|---|---|
| 23 - Pomeranz and Hayreh article | 90 |
| 24 - Report | 93 |
| 25 - Dr. Nichols' medical record | 105 |
| 26 - Martin radiology records | 110 |
| 27 - Dr. McEllistrem records | 111 |
| 28 - Dr. Ferrara's records | 114 |
| 29 - Viagra label | 116 |
| 30 - Dr. Bhavasar's record | 128 |
| 31 - Referral letter | 130 |
| 32 - Dr. Pelletier and Sheridan records | 131 |

(The original exhibits were attached to the original
transcript.)
(The original transcript was sent to Mr. Slonim.)

**3**

EXHIBITS

| EXHIBIT NO.: | MARKED |
|---|---|
| 1 - CD with medical records | 23 |
| 2 - Handwritten notes re Mr. Martin | 23 |
| 3 - Handwritten notes re Mr. Stanley | 24 |
| 4 - Attorney contact information | 24 |
| 5 - Correspondence to Attorney Richards | 25 |
| 6 - Court and deposition testimony list | 25 |
| 7 - Articles | 26 |
| 8 - Correspondence and attachments | 27 |
| 9 - Stanley time record | 27 |
| 10 - Martin time record | 27 |
| 11 - Curriculum vitae | 27 |
| 12 - Zimmerman Reed documents | 28 |
| 13 - Subpoena | 28 |
| 14 - Stanley medical records | 29 |
| 15 - Martin medical records | 29 |
| 16 - Martin medical summary | 30 |
| 17 - Lee article | 68 |
| 18 - FDA 2005 statement | 79 |
| 19 - FDA patient information sheet | 81 |
| 20 - Pomeranz article | 84 |
| 21 - Pomeranz and Bhavsar article | 86 |
| 22 - Pomeranz, Fraunfelder and Egan article | 87 |

**5**

PROCEEDINGS

VIDEOGRAPHER:  My name is Steve
Peters, videographer on behalf of Veritext today.
This is the beginning of the video
deposition of John M. Williams, Sr., M.D., M.P.H.,
on January 13, 2009.  The time, 9:15 a.m.
This is in re: Viagra Products
Liability Litigation in relation to Martin versus
Pfizer; also, Stanley versus Pfizer, pending in
the United States District Court for the District
of Minnesota, case number MDL docket number
06-MD-1724.
Counsel will now please state their
appearances.
MR. THORNBURGH:  My name's Daniel
Thornburgh, T-H-O-R-N-B-U-R-G-H.  I represent the
plaintiff -- plaintiffs.
MR. SLONIM:  Bert Slonim on behalf of
defendant Pfizer.
MS. FYMAN:  Avigael Fyman on behalf of
defendant Pfizer.
MR. SLONIM:  Neil, would you state
your --
MR. OVERHOLTZ:  Sure.  This is Neil
Overholtz and I represent the plaintiffs.

2  (Pages 2 to 5)

6

1      VIDEOGRAPHER: The court reporter will
2  now swear in the witness.
3      JOHN M. WILLIAMS, SR., M.D., M.P.H.,
4  called as a witness herein by Pfizer, after
5  having been first duly sworn, was examined and
6  testified as follows:
7      EXAMINATION
8  BY MR. SLONIM:
9  Q    Good morning, Dr. Williams.
10 A    Good morning.
11 Q    My name's Bert Slonim. I represent defendant
12 Pfizer. We had a chance to say hello before the
13 deposition started this morning. How are you
14 today?
15 A    Doing fine. Thank you.
16 Q    Dr. Williams, can you tell us when you were first
17 contacted by plaintiffs' counsel in this matter?
18 A    Yes. I'd refer to a letter dated November 17,
19 2008, in which I received a compact disk with
20 medical records of Richard Martin and Richard
21 Stanley. The following day I received a retainer
22 for $1400.
23 Q    Did you have any communications, a phone call or
24 something, prior to --
25 A    I had an e-mail prior to that inquiring as to

7

1  whether I might be interested in providing expert
2  testimony on this case, and I had also worked with
3  Mr. Thornburgh on a previous case and he had asked
4  if I might be interested in doing some future work
5  for them.
6  Q    What was that earlier case in which you had worked
7  with Mr. Thornburgh?
8      MR. THORNBURGH: I'm going to object.
9  BY MR. SLONIM:
10 Q    Was that a -- Was that a -- Well, his objection's
11 noted.
12 A    It was -- I don't recall specifically the
13 patient's name, but it was a case in which a
14 woman, an elderly woman with macular degeneration,
15 had lost a significant amount of vision and a
16 insurance policy that would have paid her benefits
17 for vision loss was unwilling to -- to cover that.
18 So I reviewed the records and provided my opinion.
19 Q    When was that case? When was your work in that
20 case, I should say?
21 A    That was in 2008. Specific dates, I don't have it
22 at hand.
23 Q    Did you prepare an expert report in that matter?
24 A    I did.
25 Q    And did you give expert testimony?

8

1  A    Just a report.
2  Q    There was no deposition?
3  A    No deposition.
4  Q    Had you worked with any of the plaintiffs' other
5  counsel besides Mr. Thornburgh prior to your
6  retention in the Martin and Stanley matters?
7  A    Worked with Mr. Thornburgh's firm, but he was the
8  lead attorney on that specific case. No other
9  cases.
10 Q    I know you've produced -- brought with you, I
11 should say, some documents reflecting written
12 communications back and forth with the plaintiffs'
13 attorneys. Can you tell us, have you had any
14 in-person meetings with the plaintiffs' counsel
15 about the Martin or Stanley cases?
16 A    In person meaning face to face. Today's the first
17 day that I've met Mr. Thornburgh face to face.
18 Q    Did you spend some time chatting about the case
19 prior to the deposition this morning?
20 A    We did talk for approximately 30 minutes this
21 morning.
22 Q    Did you review any documents?
23 A    Yes. We looked briefly at all the documents here
24 in the -- in the folder, as well as the books,
25 book chapters that I brought along.

9

1  Q    Did you have telephone conferences with the
2  plaintiffs' attorneys during the course of your
3  work in this matter?
4  A    Yes, I did.
5  Q    Walk us through chronologically, as best you can
6  recall, the telephone conferences.
7  A    Let me take a look at some of my notes here. It
8  was approximately November -- the November 23rd
9  through 26th timeframe. During that period of
10 time we did discuss by phone the Stanley and
11 Martin cases. And I also on -- during that
12 timeframe had a chance to speak with Mr. Stanley,
13 as well as Mr. Martin, by phone.
14 Q    With whom did you speak from the plaintiffs'
15 attorneys about the Martin and Stanley case during
16 that three or four-day period from November 23rd
17 to the 26th?
18 A    Let's see here. I believe I was primarily working
19 with Jason Richards, Esquire.
20 Q    Yep. And how -- in total how long were those --
21 did those conversations last?
22 A    Approximately, I believe it was about an hour, if
23 we're just talking about the conversations with
24 Mr. Richards. And then with the individual
25 plaintiffs, I believe I spoke to Mr. Stanley

3 (Pages 6 to 9)

**10**

1    approximately 45 minutes, Mr. Martin an equal
2    period of time.
3  Q   What materials were provided to you by plaintiffs'
4    counsel?
5  A   I was provided a CD ROM that's titled Martin
6    Medical Records and Stanley Medical Records, and I
7    took those and then upon receipt of those printed
8    those into hard copies which I've brought with me
9    today.
10 Q   Were you provided with any medical literature?
11 A   No.
12 Q   I notice that you have some medical literature in
13    your -- in the folder that you brought with you.
14    Can you tell us how you went about getting that?
15 A   Yes.  After being retained for this -- these
16    particular cases, I did a literature review
17    looking specifically at cases of nonarteritic
18    ischemic optic neuropathy that were associated
19    with Viagra use.
20       And in the course of that literature
21    search, which was done through the National
22    Library of Medicine, their Pub Med web site, in
23    the course of that literature search identified
24    several abstracts pertinent to these cases.
25       After identifying the abstracts, those

**11**

1    that seemed most pertinent I worked with our
2    clinical library here at Aspirus in Wausau and my
3    library obtained the full text articles for me.
4  Q   And you've printed those out?
5  A   Yes, I did.
6  Q   Were there any -- Strike that.  Do you recall --
7    Strike that.  Did you save your search request?
8       MR. THORNBURGH:  Objection.
9    BY MR. SLONIM:
10 Q   You can answer.
11 A   As far as the list of specific articles, I don't
12    have that with me, but I believe I may have that
13    in an e-mail that I sent to my librarian.
14 Q   Okay.  That would certainly be within the scope.
15    We'll get to the subpoena, but that's a document
16    that we would want.
17 A   Okay.
18 Q   So in other words, if I understand it correctly,
19    you formulated a -- a search inquiry that you
20    punched into Pub Med.  Pub Med then spit back --
21    generated back a set of results that picked up
22    those search terms, and then you identified
23    certain of those results that you were interested
24    in in reviewing the full copy of and you sent
25    those to the clinical library, is that the idea?

**12**

1       MR. THORNBURGH:  Objection.
2       THE WITNESS:  Correct.  Sent a list of
3    the articles that I felt were pertinent to the
4    librarian who found the articles and sent them to
5    me.  Some of the actual abstracts from the Pub Med
6    search I do have with me here.
7  BY MR. SLONIM:
8  Q   Okay.  Did you review other expert reports?
9  A   Other in -- you mean in published literature or --
10 Q   Let me rephrase.  Were you aware of the fact that
11    other physicians have -- besides yourself have
12    provided expert reports in connection with Viagra
13    and NAION?
14 A   I understand as of today when we discussed earlier
15    that they have retained other experts and one was
16    named to me, but I've not seen their reports.
17 Q   Who was the expert that --
18 A   Dr. Hayreh.
19 Q   Ah-huh.  But you have not had the opportunity to
20    review any of the other expert reports?
21 A   No, I haven't.
22 Q   Have you read any deposition transcripts?
23 A   Regarding this particular case?
24 Q   Yes.
25 A   No.

**13**

1  Q   So in other words, you didn't read any transcripts
2    of Mr. Martin or Mr. Stanley or any of their
3    physicians; is that right?
4  A   Not deposition transcripts, no.
5  Q   And by the same token you have not seen deposition
6    transcripts of any of the other experts who may
7    have testified?
8  A   No.
9  Q   Would it be relevant to your opinion to have read
10    other expert reports?
11 A   In other cases that I've reviewed, at times it is
12    helpful to see the opinions of other experts.
13    Without actually having seen the report it's
14    difficult for me to tell you whether or not it
15    would have been.
16 Q   Would it have been pertinent to your opinion to
17    have read the testimony of plaintiffs' treating
18    physicians?  That would be Mr. Martin and
19    Mr. Stanley's treating physicians; his
20    ophthalmologist, his neuro-ophthalmologist and his
21    other physicians?
22       MR. THORNBURGH:  Objection.
23       THE WITNESS:  I think it would add
24    some additional information.  In the medical
25    records there was, I believe, a letter that was

4 (Pages 10 to 13)

**14**

1      prepared by one of the plaintiffs' physicians
2      commenting on his opinion as a causation, but as
3      far as the actual depositions, no, I didn't see
4      those.
5  BY MR. SLONIM:
6  Q   Can you tell us the process that you went through
7      in preparing the reports?  You -- You said that
8      you were -- you had received a CD on or about
9      November 17th, that you had some phone calls on
10     the -- November 23rd through November 26th.  And
11     then can you tell us how you went through that
12     process of preparing the reports?
13  A   Yes.  What I first did is after receiving the
14     records and retainer is I took the CD ROM and I
15     printed all the records out.  I prefer, when I
16     review records, to look at paper copies rather
17     than looking at them on a computer.  Organized the
18     records in chronological order for each case.
19     Read from the beginning, earliest record, to the
20     most recent record, and then at that point
21     prepared letters on each individual case that I
22     entitled Review of Records, and briefly summarized
23     in chronological order what had occurred with each
24     plaintiff.
25         After that I presented my opinion as

**15**

1      to causation to a reasonable degree of medical
2      probability.  I quoted one of the articles that I
3      had used -- or actually, let me back up here.  I
4      also, after reviewing the medical records, did my
5      literature search, as we talked about earlier, and
6      then after reviewing the records and the
7      literature search, in the process of preparing the
8      letter commented on, a brief capsule summary, of
9      what had transpired clinically, my opinion as to
10     causation with some supporting references from the
11     literature, and then finally summarized the
12     conversation that I had with each of the
13     plaintiffs in terms of what their experience had
14     been and how the visual changes had impacted
15     their -- their lives in terms of employment,
16     recreational activities, et cetera.
17         And then the last part of the report
18     was a -- an opinion as to my impairment -- or
19     actually, it was an impairment-based rating based
20     the 6th edition of the AMA guides to the
21     Evaluation of Permanent Impairment, which I
22     brought with me today, and I assigned a -- a
23     visual system impairment rating to each of the
24     plaintiffs.
25  Q   Okay.  Did I understand that you had prepared a --

**16**

1      a summary of your record review?
2  A   That was in -- in the letters dated to
3      Mr. Richards.
4  Q   In other words, that's the beginning where you
5      have a little bit of a -- of a summarization of
6      the facts.
7  A   Correct.  Correct.  That's a summary.
8  Q   Did you -- Did anyone assist you in any way in
9      preparing your reports?
10  A   The only assistance I had was my secretary, who
11     transcribed my dictated report, and then when I
12     had corrections after I red penciled it she
13     changed those things.  In terms of assistance with
14     anything else, no.
15  Q   Did you -- Did you -- You generated an original
16     draft from your dictation and then you marked that
17     up?
18  A   Correct.
19  Q   And how many drafts did you go through?
20  A   Approximately two.
21  Q   Do you have the drafts?
22  A   No.
23  Q   What happened to the drafts?
24  A   They were destroyed.
25  Q   Do you have the original dictation tape?

**17**

1  A   That is erased after we use -- after we use the
2      tapes because we reuse them.
3  Q   Are you sure about that?  There is a subpoena, and
4      that would be responsive material to the subpoena.
5         MR. THORNBURGH:  Objection.
6  BY MR. SLONIM:
7  Q   Let me -- Well, are you -- Sitting here today, are
8      you positive that that tape has been destroyed, or
9      do you think it might still be in existence?
10        MR. THORNBURGH:  Objection.
11        THE WITNESS:  The term destroyed is
12     probably not correct.  After we use our tapes
13     they're passed through a magnet so they may be
14     reused for other dictation.  So it's my opinion
15     that that dictation is not extent on a tape
16     currently.
17  BY MR. SLONIM:
18  Q   Did you provide the report in draft form to
19     plaintiffs' counsel for their input?
20  A   No.  I sent them the final report.  That was the
21     first thing I sent them.
22  Q   How much time did you spend preparing your report?
23     I noticed there was some documents that looked
24     like time records.
25  A   Yes.  I did print off --

5  (Pages 14 to 17)

**VERITEXT REPORTING COMPANY**
**www.veritext.com**
(212) 279-9424                         (212) 490-3430

## 18

1  Q    Why don't you identify this document?
2  A    Yeah.  That is a printout of the time spent on
3       Mr. Stanley's case.  November 25th, records
4       review, plus conversation with Mr. Stanley by
5       phone, a total of 120 minutes.  The following day,
6       November 26th, 120 minutes spent preparing and
7       editing the report.  I also spent an equal amount
8       of time with Mr. Martin's.
9  Q    Let me ask you to take a look at this.  These are
10      not quite identical copies, and I was wondering
11      what the explanation was.  They have slightly
12      different dates.
13          MR. THORNBURGH:  Objection.
14          THE WITNESS:  They do.  I believe
15      that -- Let me take a look here.
16 BY MR. SLONIM:
17 Q    And I didn't see a counter one for Martin.
18 A    For Martin, that's correct.  Let me take a look
19      and see if -- I know I reviewed and prepared the
20      report on Martin after the report on Stanley.  I
21      believe this November 26th-November 28th entry
22      should say Martin instead of Stanley.
23 Q    Okay.  So there was -- So even though they both
24      say Stanley, your best recollection now is that
25      one of those applies to Mr. Martin and one applies

## 19

1       to Mr. Stanley?
2  A    Correct.
3  Q    And in each case you spent approximately -- a
4       total of approximately four hours over -- over two
5       or three days?
6  A    Correct.
7  Q    And was -- is there any time that you spent
8       working on the reports that are not reflected in
9       those time entries in connection with your
10      literature search or anything else?
11 A    No.  That reflects all my efforts up to the point
12      when I dictated the letters and reports that I
13      sent to Mr. Richards.
14 Q    Okay.  And you said, but can you tell us
15      your rate of compensation in connection with this
16      matter?
17 A    Yes.  I charge $350 per hour for review of
18      records, telephone conversations, preparation of
19      reports.  I also charge $500 per hour for
20      deposition time.  For actual court testimony time
21      $500 per hour with an eight-hour minimum, to
22      include necessary expenses to travel if that's
23      necessary, and then $125 per hour for actual
24      travel time.
25 Q    Okay.

## 20

1  A    And I think I have, in one of my correspondences I
2       think I --
3  Q    The rate?
4  A    -- had that -- yes.
5  Q    There was a sheet.
6  A    The December 1st letter to Mr. Richards.  And then
7       I have a deposition cancellation fee.
8  Q    You explained to me that prior to today's
9       deposition that you had spent about a half hour
10      meeting with Mr. Thornburgh and that you, in the
11      course of that, had reviewed the documents that
12      you had brought with you.  Is there anything else
13      that you did in order to prepare for today's
14      deposition?
15 A    Yes.  Last night I spent approximately two hours
16      reviewing all the records that I had and looked at
17      the books as well, which is a practice I do before
18      I do any deposition.
19 Q    You set forth your opinions in your expert
20      reports; is that correct?
21 A    Correct.
22 Q    Are there any opinions that you intend to offer
23      that are not set forth in your report?
24 A    Can you rephrase that or ask that again?
25 Q    When you -- When you wrote your opinions in your

## 21

1       report, is that the entire extent of the opinions
2       that you intend to offer in this matter?
3  A    Well, I guess that would depend on the questions
4       that you ask me today.  I would be willing to
5       answer questions that I feel are in my realm of
6       expertise and training.  And frankly, my expertise
7       and training goes far beyond what was in those
8       prepared letters.
9  Q    But in terms of your intention to -- Well, strike
10      that.  What did you understand your -- your
11      mission was in -- in preparing the expert report?
12      What did you understand the scope of the report
13      was to encompass?
14          MR. THORNBURGH:  Objection.
15          THE WITNESS:  I was retained to
16      comment on, first, the impact of the visual loss
17      on the activities of daily living for these two
18      plaintiffs, and secondly to comment on what I felt
19      the mechanism or physiologic mechanism of the
20      injury to the optic nerves was.
21 BY MR. SLONIM:
22 Q    And that's what you've set forth in your report?
23 A    Correct.
24 Q    Okay.  Is there anything else upon which you
25      intend to opine?

6  (Pages 18 to 21)

**22**

1  A  Other than physiologic mechanism, the role that
2  the Viagra played and the impact on the activities
3  of daily living and the percent impairment rating,
4  those would be the things I would comment on that.
5  Outside of that, no.
6  Q  I'm sorry. Have you set forth the bases for your
7  opinions?
8  A  Yes.
9  Q  And is there any material that you're relying on
10  that's not listed in your report?
11  A  The -- Well, I brought supporting documents along
12  with me that are not specifically referenced in
13  the report, yes.
14  Q  So you're relying -- Are you relying on those in
15  addition to the material set forth in your report?
16  A  Yes.
17  Q  Anything else that you're relying on?
18  A  Well, my -- other than my -- my training and
19  background and board certification in
20  ophthalmology experiencing patients, I would say
21  that would be the extent of it.
22  Q  Can you identify the materials that you -- that
23  you brought with you? And I think what we'll
24  probably do is -- is mark them as -- as various
25  deposition exhibits.

**23**

1  A  Okay. I'll start at the top of the pile and work
2  my way down, is that okay?
3  Q  Sure.
4  A  First, CD ROM titled Martin Medical Records,
5  Stanley Medical Records.
6  Q  Let's mark that as deposition Exhibit No. 1.
7     (Exhibit No. 1 was marked for
8  identification.)
9     THE WITNESS: Do you need to see these
10  documents? Okay.
11  BY MR. SLONIM:
12  Q  You can hold them up, that's fine.
13  A  Second document is a legal pad sized piece of
14  paper with my handwritten notes on Mr. Martin,
15  which I was preparing when I reviewed the records
16  and also when I spoke to him by phone.
17  Q  Let's mark that as deposition Exhibit No. 2.
18  A  There are two pages of these.
19  Q  Is that dated, by the way?
20  A  No. It does not have a date on it.
21  Q  Okay.
22     (Exhibit No. 2 was marked for
23  identification.)
24     THE WITNESS: Next exhibit is three
25  legal sized pieces of paper with my notes on --

**24**

1  handwritten notes on Richard Stanley, also
2  undated.
3  BY MR. SLONIM:
4  Q  Okay. Let's mark that as deposition Exhibit No.
5  3.
6     (Exhibit No. 3 was marked for
7  identification.)
8     THE WITNESS: Next is --
9  BY MR. SLONIM:
10  Q  I don't know that it's necessary for you to hold
11  it up. Let's -- It will move it along quicker.
12  A  This is just addresses of Zimmerman Reed and
13  Aylstock Witkin Kreis & Overholtz, contact
14  information.
15  Q  We'll mark that as deposition Exhibit 4.
16     (Exhibit No. 4 was marked for
17  identification.)
18     THE WITNESS: Next is a fax cover
19  sheet dated December 1st, 2008, letter or
20  correspondence from myself to Jason Richards dated
21  November 26, the review of records regarding
22  Mr. Stanley's case and a review of records
23  regarding Mr. Martin's case dated December 1st,
24  2008, and we have some copies of these as well
25  that they're all --

**25**

1  BY MR. SLONIM:
2  Q  Are those -- Are they identical copies?
3  A  Some -- I believe some of these copies I signed in
4  the -- in the -- In the interest of expediting
5  these reports my secretary signed some of these
6  and put my initials, but the reports were
7  unchanged after I signed the originals.
8  Q  Okay. I'm going to mark that as deposition
9  Exhibit No. 5.
10     (Exhibit No. 5 was marked for
11  identification.)
12     THE WITNESS: My expert trial and
13  deposition testimony records as requested,
14  deposition court testimony --
15  BY MR. SLONIM:
16  Q  And that's just a listing --
17  A  -- hearings.
18  Q  That's a list that you prepared?
19  A  Correct.
20  Q  We'll mark that as deposition Exhibit No. 6.
21     (Exhibit No. 6 was marked for
22  identification.)
23     THE WITNESS: Then I have multiple
24  articles and abstracts regarding ischemic optic
25  neuropathy and association with Viagra use. I

7  (Pages 22 to 25)

**26**

1 don't know if you want to individually identify
2 all those because there's about 20 of them.
3 BY MR. SLONIM:
4 Q I think let's -- Let's mark those as a group, and
5 if we need to come back we can.
6 A Maybe as a group as literature search or
7 references. Let me make sure I've got all those
8 for you there. Yes, that's all the literature.
9 Q And let's -- What we'll do, Dr. Williams, and,
10 Dan, is put a paperclip around those since it's
11 just a -- several loose articles.
12 (Exhibit No. 7 was marked for
13 identification.)
14 THE WITNESS: Correspondence from Ann
15 Hansen, paralegal for Zimmerman Reed, with -- It
16 was basically a letter that accompanied the CD
17 ROM. Once again, duplicates of their contact
18 information, fax cover sheets and a letter
19 detailing my fee schedule, and then a copy of the
20 Martin report and then a copy of my previous
21 depositions and court testimony.
22 So all the things you already have, I
23 brought all the copies, and then the two billing
24 sheets here.
25 BY MR. SLONIM:

**27**

1 Q Let's keep the correspondence separate. We'll
2 mark the correspondence and attachments as Exhibit
3 No. 8, and let's keep the time records for -- Do
4 you know which one is Martin? They both say
5 Stanley. Can you tell which one is Martin and
6 which one is Stanley?
7 A Can I take a look at this here?
8 (Exhibit No. 8 was marked for
9 identification.)
10 BY MR. SLONIM:
11 Q Yeah, sure.
12 A The first one, November 25th-26th is Stanley. The
13 November 26th-28th is Martin.
14 Q Let's do this. Let's mark Stanley as Exhibit 9.
15 And let me ask you to take a pen and just make the
16 correction on the document and initial it, please,
17 and we'll mark Martin as deposition Exhibit
18 No. 10.
19 (Exhibit Nos. 9 and 10 were marked for
20 identification.)
21 THE WITNESS: You've already marked
22 that. I brought two copies of my current C.V.
23 BY MR. SLONIM:
24 Q We'll mark that as -- Well, I think we only need
25 one. They're identical?

**28**

1 A Yeah.
2 Q Okay. We'll mark the C.V. then as deposition
3 Exhibit No. 11.
4 (Exhibit No. 11 was marked for
5 identification.)
6 THE WITNESS: I have a handwritten
7 message that Mr. Richards called me and ask that I
8 call him back dated November 25th. On the reverse
9 side contact numbers for Mr. Martin and
10 Mr. Stanley. And then a cover letter that
11 accompanied the retainer check, once again from
12 Ann Hansen, paralegal, dated November 18th, and
13 then an actual copy of the initial retainer check.
14 BY MR. SLONIM:
15 Q We'll mark that group of documents as Exhibit
16 No. 12.
17 (Exhibit No. 12 was marked for
18 identification.)
19 THE WITNESS: The subpoena that I
20 received last Thursday afternoon before I was
21 headed out of town.
22 (Exhibit No. 13 was marked for
23 identification.)
24 BY MR. SLONIM:
25 Q Okay.

**29**

1 A All of the records on Mr. Stanley.
2 Q Okay. And that's a pile.
3 A Correct.
4 Q And we'll mark that -- that group of records as
5 Exhibit No. 14.
6 (Exhibit No. 14 was marked for
7 identification.)
8 BY MR. SLONIM:
9 Q I notice that you put some Post-its on there.
10 A Yes.
11 Q Did you put any other markings on there? Any
12 handwritten notes or delineations or anything?
13 A I do not believe so. Just the Post-it notes.
14 Q Okay. Let me just see if my colleague can find a
15 rubber band. All right.
16 A Sum total of all of Mr. Martin's records with
17 Post-it notes.
18 Q Can you find that other rubber band? Oh,
19 excellent. Thank you.
20 (Exhibit No. 15 was marked for
21 identification.)
22 BY MR. SLONIM:
23 Q We've marked Mr. Martin's records as deposition
24 Exhibit No. 15.
25 A Then a medical summary that accompanied the

8 (Pages 26 to 29)

**30**

1 records on Mr. Martin detailing the -- his
2 medical -- or clinical encounters between
3 May 10th, 2000 and March 30th, 2005.
4 Q    Who prepared that?
5 A    I know I didn't prepare it. It would be my
6 opinion that I believe I received this from
7 Mr. Richards.
8 Q    Okay. And there's some handwriting on there or --
9 A    Yes. I highlighted a passage there.
10        (Exhibit No. 16 was marked for
11 identification.)
12 BY MR. SLONIM:
13 Q    Thank you, Dr. Williams.
14 A    Now, if you want to mark the books --
15 Q    No. I think what we should do is let's identify
16 and maybe we can get copies of the pertinent
17 chapters. Tell us what books -- You brought two
18 with you.
19 A    Yes. First book is the Guides to Evaluation of
20 Permanent Impairment published by the American
21 Medical Association, 6th edition.
22 Q    And was there a particular chapter or pages that
23 you referred to?
24 A    Yes.
25 Q    Which chapters are you relying on?

**31**

1 A    And what we can do is, if you're interested, I can
2 copy this chapter for you at a nominal fee and
3 send it. The chapter on the visual system, and I
4 can tell you the pages exactly. Chapter 12,
5 beginning with page 281.
6 Q    Is that something you used in -- in --
7 A    Determining the degree of impairment rating,
8 correct.
9 Q    Okay. And was there another Post-it there?
10 A    Yeah. That's actually in the chapter itself, I've
11 got --
12 Q    I see.
13 A    -- posted on the page that discusses specifically
14 rules for calculating impairment for visual field
15 loss. The classification of impairment, the
16 visual system, of the whole person table.
17 Q    What's the Post-it? Oh, okay.
18 A    Yeah. The evaluation of permanent impairment
19 form, and then the combined values chart.
20 Q    Okay. What I think would be helpful is if, as you
21 suggested, that you could make a copy. You're
22 going to be supplying some additional materials to
23 us in response to the subpoena. If at that
24 time --
25 A    What I could is I could make a copy of that

**32**

1 chapter and put Post-its where I have them in
2 here.
3 Q    That would be perfect.
4 A    Okay. The next or last book here is -- it's
5 called a Practical Approach to Occupational and
6 Environmental Medicine, which is the -- what we
7 like to think of as the Bible of our specialty.
8 And I've put a Post-it note on Chapter 34, which
9 is a chapter on occupational ophthalmology, which
10 I was a co-author on with Dr. Bernie Blaze and
11 Dr. Tom Tredagee (phonetic).
12 Q    Did you rely on that for -- in connection with
13 your work?
14 A    Yes, I did. Specifically the section entitled
15 Screening for Eye Disorders in the Workplace, How
16 to Evaluate Vision for Various Jobs. Occupational
17 ophthalmology is a subspecialty which looks at the
18 importance of vision to performing certain
19 work-related tasks.
20 Q    I'm going to just put these back in -- in
21 numerical order by exhibit number so we can refer
22 to them if we need to. I'm going to hand these
23 back to you, Dr. Williams.
24 A    Okay.
25 Q    I was going to ask you to turn -- Oh, I'm sorry.

**33**

1 I was going to ask you to turn to the, I think
2 it's Exhibit No. 13, which is the subpoena.
3 A    Okay.
4 Q    Okay. Can you turn, please, to Attachment A?
5 A    I'm there.
6        MR. THORNBURGH: I'm going to raise
7 the initial objection related to the subpoena and
8 the duces tecum requests. As I explained
9 previously, the Doctor did not receive the
10 subpoena or the request until Thursday, the night
11 before he went out of town. Hasn't had time to --
12 no reasonable time to pull together the entire
13 request. So I think we -- we talked about maybe
14 extending that time.
15 BY MR. SLONIM:
16 Q    No. I -- I understand that you haven't had
17 sufficient time to get the materials.
18 A    Right. And at the time I received the duces tecum
19 I was in the process of leaving town for military
20 duties in San Diego, so had no time Friday,
21 Saturday or Sunday to do this.
22        I did offer to Mr. Thornburgh an offer
23 to delay the deposition to give me time to -- to
24 find these materials, and it was my understanding
25 that the thought was let's have the deposition

**34**

1  rather than continuing it and then come up with
2  materials later. Was that correct in that
3  assumption?
4  Q   Yes, that's correct.
5  A   So no intent to be in contempt of the subpoena.
6  Q   I understand completely. Let me ask you this. In
7      your review of the subpoena you believe that you
8      will have in your possession other materials that
9      will be responsive, correct?
10 A   I think if we -- maybe we could go line by line.
11     I can tell you what I can produce and what I
12     can't, if that would be helpful.
13 Q   That would be helpful. And I understand that if
14     you find something that escaped your recollection
15     today, that's perfectly understandable, but why
16     don't you tell us what you think you may have that
17     you haven't brought with you today.
18 A   Certainly. We'll start with number one. You're
19     asking for all documents, materials published or
20     unpublished you intend to rely on as a basis in
21     whole or part for the opinions you intend to
22     express in this litigation. I believe that I
23     brought those with me today.
24         Number two. All materials and
25     documents obtained, received, reviewed, considered

**35**

1  or consulted by you in connection with this
2  litigation whether you found the matter contained
3  in these documents or materials to be helpful or
4  not. I'm probably going too fast. The documents
5  and materials requested include all records, data,
6  depositions, statements, transcripts, medicals,
7  whatever that is, articles, books and
8  correspondence. I believe I may have some e-mail
9  correspondence back and forth as to, you know,
10 when do you want the report, I haven't got the
11 check yet, I should be able to recover those and
12 print them.
13         Number three. Documents not limited
14 to -- including, but not limited to notes, data,
15 spreadsheets, reports, draft reports, records and
16 computer disks prepared or otherwise recorded. I
17 brought all that with me today.
18         Articles or papers you have written,
19 presented or participated in writing or presenting
20 that relate to or concern the subject matter of
21 your testimony in this litigation. I would say
22 that I would have those with me today.
23         Drafts of such articles, papers or
24 presentations, photographs or videos. I think
25 requirement four is complied with.

**36**

1      All documents concerning any research
2  that you have undertaken that relates to or
3  concerns the subject matter of your opinion. I
4  believe we've got all that.
5      Number six. Correspondence or other
6  documents reflecting communications. As I
7  mentioned, e-mail correspondence, I believe I can
8  print off some things that I don't have with me
9  today.
10     Number seven. Writings, notes or
11 tangible evidence concerning conversations you
12 have had with anyone concerning or relating to
13 your opinion. That would be included in the
14 materials I brought today, as well as the e-mail
15 correspondence that I'll bring.
16     A list of cases I've testified as an
17 expert witness, past 10 years. Brought that.
18 Copies of all affidavits, reports, declarations or
19 sworn testimony. That's going to be a problem.
20 Generally, as a deponent, I'm not provided with a
21 copy of the deposition unless I specifically
22 request it.
23 Q  This doesn't require you to do homework. If you
24 have something reasonably in your possession,
25 custody or control, that's what -- that's all we

**37**

1  ask for.
2  A   Okay. Number 10. All documents including
3      reports, affidavits, draft reports, e-mails, other
4      correspondence received from or provided by -- to
5      any other expert or potential expert. I've not
6      had any communications with any of the plaintiffs'
7      experts or potential experts.
8          Documents sufficient to establish the
9      amount of time you spent. Brought those.
10     Corrected that one to -- that I just signed off
11     on. A listing including name, address and
12     telephone number of everyone who assisted you in
13     forming your opinion and preparing your report.
14     Well, as I said, I prepared the opinion myself, so
15     I didn't rely on --
16 Q   That's fine.
17 A   -- calling up another expert. Documents including
18     web sites maintained on your behalf which reflect
19     any advertising you have conducted regarding your
20     services as an expert witness. I can provide
21     that. May I borrow your pen there?
22         All documents you have provided to or
23     received from any expert witness. There aren't
24     any. Any and all opinions where your
25     qualifications of an expert witness have been

                                        10 (Pages 34 to 37)

| | 38 |
|---|---|
| 1 | limited or rejected by a judicial or |
| 2 | administrative tribunal.  There have not been any |
| 3 | instances where my qualifications have been |
| 4 | rejected, so there's no documents there. |
| 5 | Any and all documents relating or |
| 6 | concerning any criminal charges other than traffic |
| 7 | offenses.  I did run a red light in San Diego a |
| 8 | few months ago and was caught by their camera, |
| 9 | so -- but I don't believe that would qualify under |
| 10 | there and -- but I did go to traffic school so my |
| 11 | record's expunged. |
| 12 | Any and all documents including all |
| 13 | judicial pleadings concerning any malpractice or |
| 14 | disciplinary proceedings.  I have no malpractice |
| 15 | claims or disciplinary proceedings.  I would say |
| 16 | we probably have the bulk of what was requested. |
| 17 | Q   Yes, you do.  This is one of the original |
| 18 | exhibits, so let's leave that with you. |
| 19 | A   Okay. |
| 20 | Q   One of the documents I know we marked was your |
| 21 | C.V.  Let's see if we can find that one.  What |
| 22 | exhibit is that, please? |
| 23 | A   11. |
| 24 | Q   Without reading us your C.V., can you just give us |
| 25 | a brief overview of your education and training |

| | 40 |
|---|---|
| 1 | Q   Can you tell us what your duties and |
| 2 | responsibilities are at Aspirus? |
| 3 | A   Yes.  Aspirus is a -- a multi-specialty group with |
| 4 | a clinical network of approximately 274 physicians |
| 5 | who service Central and Northern Wisconsin, as |
| 6 | well as the Upper Peninsula of Michigan.  We have |
| 7 | about 45 different specialties, and I -- and we |
| 8 | have six affiliated hospitals, and I provide |
| 9 | occupational health services, as well as |
| 10 | consultations for the group. |
| 11 | Q   Can you tell us what occupational medicine |
| 12 | encompasses? |
| 13 | A   Yes.  It's a specialty that deals with the health |
| 14 | of a person or worker and the impact that illness |
| 15 | or injury may have upon their ability to do a |
| 16 | particular task.  It's a broad range of -- It's a |
| 17 | broad -- actually, a very broad specialty that |
| 18 | encompasses several different subspecialties |
| 19 | including orthopedics, physical medicine, |
| 20 | ophthalmology, internal medicine, family practice, |
| 21 | psychiatry.  We do have elements of those |
| 22 | specialties within our speciality, particularly as |
| 23 | it relates to a person's ability to perform a |
| 24 | task, whether it's for gainful employment or work |
| 25 | around the house. |

| | 39 |
|---|---|
| 1 | starting with college? |
| 2 | A   Yes.  Bachelor's degree in Zoology, Summa Cum |
| 3 | Laude, Texas A & M University, 1979.  Medical |
| 4 | degree, University of Texas, Southwestern Medical |
| 5 | School in 1982.  Internship, Baylor University |
| 6 | Medical Center, '82 to '83.  Internship was in |
| 7 | Internal Medicine.  Ophthalmology residency, |
| 8 | University of Miami, Bascom, B-A-S-C-O-M, Palmer |
| 9 | Eye Institute, '83 to '86. |
| 10 | Fellowship in Vitreoretinal Disease |
| 11 | and Surgery, Duke University, '86, '87. |
| 12 | Instructor in Ophthalmology and Chief Resident at |
| 13 | University of Miami, Bascom Palmer Eye Institute, |
| 14 | '87, '88.  In addition to this, Master's of Public |
| 15 | Health degree, University of Michigan, 1999. |
| 16 | Residency in Occupational Medicine, 1998 through |
| 17 | 2000, University of Michigan as well.  Board |
| 18 | certification in both Preventive Medicine, |
| 19 | specifically Occupational Medicine and |
| 20 | Ophthalmology. |
| 21 | Q   Now, you're currently the Medical Director of |
| 22 | Aspirus Occupational Health; is that correct? |
| 23 | A   Yes. |
| 24 | Q   And what year did you join Aspirus? |
| 25 | A   In July of 2003. |

| | 41 |
|---|---|
| 1 | Q   Since July 2003 has the focus of your medical work |
| 2 | been on occupational medicine as opposed to |
| 3 | ophthalmology? |
| 4 | A   Correct. |
| 5 | Q   According to the curriculum vitae, you serve as a |
| 6 | medical consultant to a number of corporations; is |
| 7 | that correct? |
| 8 | A   Yes. |
| 9 | Q   For each of those corporations could you just |
| 10 | describe your responsibilities? |
| 11 | A   Yes.  The NewPage Corporation Paper Company, that |
| 12 | actually had acquired the corporation below it, |
| 13 | Stora Enso North America.  Responsibilities |
| 14 | include seeing and taking care of injured and ill |
| 15 | workers, development of company policies with |
| 16 | regard to health and safety, worked with corporate |
| 17 | compliance as it relates to compliance with OSHA |
| 18 | and other federal and state regulations that deal |
| 19 | with -- with employment safe work practice. |
| 20 | The performance of what are called |
| 21 | fitness for duty exams that assess a person's |
| 22 | ability to perform a certain job or task.  The |
| 23 | review of worker's compensation claims, review of |
| 24 | disability retirement applications, and consultant |
| 25 | in -- for the executive suite to provide travel |

11  (Pages 38 to 41)

**42**

1  medicine services, to also provide executive
2  physicals, and to perform vision screening in
3  treatment of eye injuries that occur in the
4  industrial environment.
5      The relationship with Stora Enso and
6  its successor NewPage began in 2001 and involved
7  approximately two-and-a-half days per week working
8  in our Wisconsin Rapids office performing that
9  work.
10  Q  These are essentially manufacturing facilities?
11  A  Correct. Yeah. This -- It's a -- makes paper.
12  Paper company.
13  Q  Okay.
14  A  Roehl Transport is a large trucking firm and I
15  work as a paid consultant for them also providing
16  similar types of consultations as I previously
17  mentioned. The trucking industry is federally
18  regulated so they have specific requirements in
19  terms of a person's ability to see, person's
20  ability to hear, blood pressure. Certain medical
21  conditions can prevent a driver from being
22  certified, so it is an environment that is
23  probably the most regulated environment of workers
24  that I normally deal with.
25      Medical consultant for Wausau Paper.

**43**

1  That's another large paper company located here in
2  Wausau. Greenheck Fan Corporation, multi-national
3  corporation that makes industrial fans. Merrill
4  Iron and Steel, a local iron and steel
5  manufacturing company.
6      I'm the Medical Director of Employee
7  Health for Riverview Hospital in Wisconsin Rapids,
8  Wisconsin, a town about 45 miles from here. It's
9  a -- I believe a 79-bed hospital, and I deal with
10  any issues that regard illness or injury with
11  hospital workers; nurses, laundry personnel,
12  nursing assistants, et cetera.
13      I work as a Medical Advisor for the
14  Wood County Health Department, Wood County being
15  the county immediately south of Marathon County
16  where we're located. My duties there involve --
17  I'm the physician for the Health Department. I'm
18  also a member of the Wood County Health and Human
19  Services Committee, which is a committee that has
20  oversight of approximately $60 million worth of
21  the Wood County budget.
22      I am a peer -- member of the Peer
23  Review Committee here at Aspirus Clinics where we
24  review fellow physicians' requests for clinical
25  privileges, that sort of thing.

**44**

1  Q  Let me ask you, is your work as a medical
2  consultant to these companies that are listed on
3  your C.V. and that you just described, is that
4  under the auspices as Medical Director of Aspirus
5  Occupational Health, or is it --
6  A  Yes.
7  Q  That's encompassed within your occupational health
8  work at Aspirus?
9  A  Yes. Correct.
10  Q  I see. Is there work at Aspirus Occupational
11  Health apart from the medical consulting that you
12  do for these various companies?
13  A  Yes, and that's one of the reasons we have to be
14  done by noon is yes, I see patients who are
15  referred -- well, I'll tell you there are multiple
16  ways the patients can come to me. They may come
17  in with, for example, a work-related eye injury.
18  They may have been seen in one of our emergency
19  rooms or urgent care clinics with an eye problem
20  or another work-related injury, and then they're
21  referred to us for follow-up.
22      I may receive a patient in
23  consultation from, you know, one of the 274 or 275
24  physicians in our group practice who has an
25  occupationally-related issue that they want my

**45**

1  commentary and opinion on. And then I also
2  receive consultations, similar to this one, where
3  I'm asked to provide expert opinions as to an
4  ophthalmology problem. And I provide those not
5  only here in Wausau, but I travel throughout the
6  state and I've also, on occasion, gone out of
7  state to provide those opinions.
8  Q  Have you ever worked as a consultant for a
9  pharmaceutical company?
10  A  No, I have not.
11  Q  Did I understand, as you described your various
12  responsibilities, that some portion of your time
13  is spent where you would actually be treating
14  patients?
15  A  Correct.
16  Q  And can you tell us approximately, let's say, over
17  the past year, what percentage of your time would
18  be spent in treating patients?
19  A  I would say between 50 and 60 percent of my time.
20  Q  And it sounded like you see patients with a
21  variety of conditions?
22  A  Correct.
23  Q  Can you -- If there's a way for you to describe
24  the approximate breakdown of conditions, I don't
25  know if that's possible or not, but if you

12  (Pages 42 to 45)

**46**

1  could --
2  A  I would think so. Musculoskeletal issues,
3  strains, sprains, fractures, I would estimate
4  probably 30 percent of the patients we see.
5  Burns, cuts, lacerations, bruises, slips and
6  falls, perhaps another 20 percent. Then -- So
7  we're probably about 50 -- 50 percent there.
8       The other half would include patients
9  that I'm seeing for specific consultations as to
10  fitness for duty. For example, I do a
11  pre-placement exam on an employee that once has
12  been offered a position as a flight paramedic
13  who's colorblind, and I'm asked to provide
14  commentary as to whether or not that person is
15  safe to operate in an aviation environment being
16  colorblind.
17       Or I'm being asked we have a forklift
18  operator who recently had an accident, he tells us
19  that he really only has one eye because he lost
20  one in a childhood accident, is it safe for him to
21  continue operating a forklift.
22       So those I would call more specific
23  fitness-for-duty-type referrals, workability
24  referrals. So I would balance it between sort of
25  50/50 between acute and then these -- these

**47**

1  special requests.
2  Q  Since the time you joined Aspirus in July 2003
3  have you treated any patients who had NAION,
4  nonarteritic anterior ischemic optic neuropathy?
5  A  Yes. I did provide a -- actually, it was a -- it
6  was a case in which my expert opinion was
7  requested on a fellow who had had a nonarteritic
8  ischemic optic neuropathy in both eyes, and he was
9  located in Montana. I reviewed the case and
10  traveled to Montana and obtained a temporary
11  medical license there and saw the patient,
12  formulated an opinion and returned here.
13  Q  What was the consultation in connection with? Was
14  it litigation, or something else?
15  A  Yes. It was a -- a case in which the patient
16  had -- had claimed a significant visual disability
17  in that he claimed that he was unable to -- to see
18  to even walk around. And it was his opinion and
19  his attorney's opinion that a series of orthopedic
20  surgical procedures he had had after a
21  work-related accident had led to the sequential
22  nonarteritic ischemic optic neuropathy where the
23  fellow had lost vision in one eye and then the
24  second eye.
25       He had claimed a significant

**48**

1  disability. The insurance company that was at
2  risk for paying the claim did not feel that his
3  disability was as significant as he claimed it to
4  be.
5  Q  So the issue on which you were asked to consult
6  related to the degree of impairment?
7  A  Correct.
8  Q  Did it relate to the cause of the NAION?
9  A  That as well, yes.
10  Q  And what was your view about the cause of the
11  NAION?
12  A  Well, it was an interesting case. He had had --
13  He'd fallen off a roof, he'd injured his knees and
14  had had multiple knee surgeries. It was his
15  supposition and his attorney's supposition that in
16  the course of these surgeries his blood pressure
17  had dropped so low that he had a -- essentially a
18  stroke of the optic nerve, or the nonarteritic
19  ischemic optic neuropathy, the medical term.
20       In the first case this loss of vision
21  was remote from the period of time that he had
22  actually had a surgery. It was some two months
23  later, I believe. In the second there was some
24  close proximity to the time of one of the
25  surgeries.

**49**

1       He had multiple medical problems,
2  including untreated hypertension. He was a heavy
3  smoker, heavy consumer of alcohol and elicit
4  drugs, and I believe he was also rather obese.
5       It was my opinion that, to a
6  reasonable degree of medical probability, that the
7  first instance where he lost vision two months
8  distant from the surgery, that it was unrelated to
9  the surgical procedure. In the second case I also
10  felt that the second loss of vision, that it was
11  more likely than not due to his -- the medical
12  issues that I previously mentioned.
13  Q  Are there certain issues that put a patient at
14  risk for developing NAION?
15  A  Yes.
16  Q  What are those issues?
17  A  Hypertension, diabetes, cardiovascular disease.
18  Those are the primary things. A small what we
19  call cup-to-disk ratio. If you think of the optic
20  nerve as being cup shaped and the entire nerve
21  being a disk, the ratio of the size of the cup to
22  the area of the disk itself is denoted a
23  cup-to-disk ratio.
24       Normal is in the .3 to .5 range. A
25  very small cup-to-disk ratio with a small

13  (Pages 46 to 49)

**50**

1    indentation in the disk, on the order of .1, may
2    predispose a person to a nonarteritic ischemic
3    optic neuropathy. Those are the main risk
4    factors.
5  Q    Did you provide any treatment to that particular
6    patient?
7  A    No, I did not. I saw him for a one-time
8    examination.
9  Q    Um-hum. Why did you travel to Montana to see the
10    patient?
11  A    Well, the plaintiff's attorney felt that due to
12    his visual disability he would be unable to travel
13    here to Wisconsin.
14  Q    And was this something that you felt in order to
15    assess his degree of impairment that it was
16    necessary for you to -- to personally examine him?
17  A    In that particular case, yes, because one of the
18    issues that was -- one of the main issues was that
19    it was felt by the insurance carrier that his
20    vision was actually better than what he was
21    telling his -- his treating providers.
22        There was some talk that he had been
23    observed actually driving a vehicle, and his claim
24    was that he couldn't see well enough to get up and
25    walk across the room.

**52**

1    professional publications and presentations?
2  A    Yes.
3  Q    And is it correct that your last professional
4    publication was in the year 2003?
5  A    Let me take a look just make sure.
6  Q    You should have it in front of you.
7  A    Oh, okay. Yes. My last major publication -- Now,
8    I've written some newsletter articles that really
9    I don't include in -- in this particular list
10    because generally in a C.V. for a physician we're
11    including peer-reviewed --
12  Q    Scientific articles.
13  A    Correct.
14  Q    And do any of your publications, professional
15    publications, concern NAION?
16  A    No, they do not.
17  Q    Have you given any -- given any professional
18    presentations concerning NAION?
19  A    No, I haven't.
20  Q    Do any of your professional publications discuss
21    Viagra?
22  A    No, they do not.
23  Q    And have you given any professional presentations
24    regarding Viagra?
25  A    No, I have not.

**51**

1        So in that sort of setting, if there's
2    any sort of question as to functional visual loss,
3    meaning loss of vision that's not anatomically
4    explained, the direct observation may be helpful.
5    And in that particular case I felt it was. There
6    were some things that I observed on my examination
7    that indicated to me that he was seeing better
8    than -- than he indicated when asked to read an
9    eye chart.
10  Q    And approximately when was it that you saw this
11    particular patient?
12  A    Let's see. That would have been -- It was last
13    year. I just can't say specifically. I
14    believe -- I believe it was in the fall. Let's
15    say the -- I think around the fall of 2007.
16  Q    Okay.
17  A    But don't hold me to that. If you want to know, I
18    can look it up.
19  Q    No, no. I don't think we need a precise date.
20    Since July 2003, to the best of your recollection,
21    have you seen any other patients with NAION
22    besides this gentleman from Montana?
23  A    I believe he's the only one.
24  Q    Now, in your C.V. that was marked as deposition
25    Exhibit No. 11, does that accurately reflect your

**53**

1  Q    One of the documents that we marked in your
2    collection was your expert -- a list of your
3    expert testimony and trial testimony and
4    deposition testimony, correct?
5  A    Correct.
6  Q    And that's Exhibit 6. Do you have that in front
7    of you?
8  A    Exhibit 6. Could we take a break?
9  Q    Of course.
10        VIDEOGRAPHER: This ends tape number
11    one of the video deposition of John M. Williams,
12    Sr., M.D., on January 13, 2009. The time,
13    10:18 a.m.
14        (Recess taken.)
15        VIDEOGRAPHER: This is the beginning
16    of tape two of the video deposition of John M.
17    Williams, Sr., M.D., on January 13, 2009. The
18    time, 10:24 a.m.
19  BY MR. SLONIM:
20  Q    Dr. Williams, before we broke you were telling me
21    about this gentleman in Montana who you had
22    examined with regard to a NAION injury --
23  A    Correct.
24  Q    -- and the extent of impairment. Did you prepare
25    a report in that case?

14 (Pages 50 to 53)

**VERITEXT REPORTING COMPANY**
www.veritext.com
(212) 279-9424        (212) 490-3430

**54**

1   A   Yes, I did.

2   Q   Okay.  Do you have a copy of that report?

3   A   I do have a copy.

4   Q   Okay.  And that would be one of the materials that
5       would be encompassed by this?

6   A   Yes.  And perhaps -- can somebody take a note of
7       the things that I need to get to you and that way
8       I'll make sure I have everything.

9   Q   We'll work with your -- with the plaintiffs'
10      counsel.

11  A   Okay.

12  Q   The -- I also wanted to ask you in connection with
13      that case, did you give any testimony?

14  A   I did not, was not deposed, and no trial
15      testimony.

16  Q   We've marked as deposition Exhibit No. 6 a
17      document prepared expert trial and deposition
18      testimony, John M. Williams, Sr., M.D., M.P.H.  Is
19      this a document you prepared?

20  A   Yes.

21  Q   And is this a complete list of your prior
22      deposition and trial testimony?

23  A   There may be some cases that predate 2002 that I
24      don't have on there, but this is, I would say, as
25      accurate as what I can pull together.

**55**

1   Q   Is the NAION case listed on this schedule?

2   A   No, because all I've detailed here are just the
3       cases where I gave deposition or trial testimony.
4       If I had to put every case I've done an expert
5       report on, this would be many pages long.

6   Q   Okay.  I notice that many of the cases here are
7       worker's compensation matters; is that correct?

8   A   Correct.

9   Q   Can you categorize the types of injuries, if
10      possible, for the --

11  A   Sure.  We can start at number one and work our way
12      down.  The Guy Dupee case was a case in which a
13      worker for Stora Enso, the company I worked as a
14      medical consultant for, had claimed a work-related
15      back injury.  The company contested the claim, had
16      video surveillance on the worker indicating that
17      he was much more capable of performing the
18      job-related tasks than what either he or his
19      doctor said.  And it was my job there to speak for
20      the company, as well as to give testimony at the
21      worker's comp hearing and comment on the video
22      deposition tape.

23  Q   Okay.

24  A   Cases two and three, John Deferro, that was a case
25      that I had done.  Initially started as an

**56**

1       independent medical exam.  The worker, I believe,
2       had claimed a back injury related to working in a
3       copper mine, and it was a case that had -- initial
4       claim, I think, was 10 years prior to when I
5       actually had seen him, he had had multiple
6       surgeries, and they were looking at trying to
7       close the claim and come up with an impairment
8       rating for him.

9   Q   On whose behalf did you testify?

10  A   That was on behalf of the insurance carrier.

11  Q   Okay.  Next one would be number four.

12  A   Lederhaus versus Seter, medical malpractice case.
13      It was a case in which Mr. Lederhaus was working
14      at a foundry.  He had struck a piece of metal that
15      hit him in the eye.  He went to see Mr. Serrano, a
16      physician's assistant who worked for Dr. Seter.
17      He -- Mr. Serrano did not see the foreign body
18      that had actually penetrated into the -- into the
19      posterior portion of the eye, and Mr. Lederhaus
20      had this foreign body there for some months and
21      developed a condition in the eye that led to a
22      serious deterioration of his vision due to a
23      retained inter-occular foreign body.  In that case
24      I testified on behalf of the plaintiff, Gary
25      Lederhaus.

**57**

1       Next case, Simon versus Medical
2       Associates, also a medical malpractice case.
3       Simon -- Testifying for the plaintiff, Mr. Simon.
4       He was seen for a follow-up exam for glaucoma.  A
5       technician was performing a pachymetry examination
6       on him, which is a -- a type of ultrasonic test
7       that measures the thickness of the cornea.  It's
8       the first time the technician had ever performed
9       the task, had not received significant training,
10      in my opinion, and caused a serious injury to
11      Mr. Simon's cornea, which took months to heal and
12      he still has problems with recurrent corneal
13      erosions.  The --

14  Q   On whose behalf did you testify?

15  A   On Mr. Simon's behalf.

16  Q   Plaintiff.

17  A   Plaintiff, right.  And in fact, I don't have
18      listed, but I do have -- I believe we have a court
19      date coming up this summer.  I just got an e-mail
20      about that a couple days ago.

21      Lederhaus, once again, we see trial
22      testimony.  Santini versus Brunswick, testifying
23      on behalf of the claimant, Mr. Santini.  He was
24      injured in a workplace violence incident in which
25      a co-worker basically sucker punched him causing

## 58

1    a -- a blowout fracture resulting in intractable
2    double vision.  So I testified on Mr. Santini's
3    behalf.
4          The Azure versus Dr. Grube and Johnson
5    case, medical malpractice, testifying on behalf of
6    the plaintiff, Heidi Azure.  Young woman in North
7    Dakota.  She and her husband were shooting off
8    some fireworks.  Bottle rocket hit a tree, bounced
9    back, struck her in the eye, caused a
10   corneoscleral laceration.
11         She went to a local hospital.  The
12   laceration was closed.  She was referred to Mr. --
13   or Dr. Grube, a retinal specialist, who looked at
14   her, said you need surgery, vitrectomy and
15   possibly a scleral buckle.  Scheduled her for
16   surgery.  When he found out that she had no
17   insurance, in my opinion, abandon her.  And she
18   had a very poor outcome, ended up developing a
19   blind, painful eye.
20         Gonzalez versus Galindo, personal
21   injury case.  I'm testifying on behalf of the --
22   of Mr. Gonzalez.  Wait a minute.  Mr. Galindo, I'm
23   sorry.  This was another fireworks case.  The two
24   young men were shooting off fireworks around the
25   4th of July.  One of them took some powder out of

## 59

1    a firework and constructed a -- an illegal
2    firework in a plastic two-liter bottle that
3    exploded in his face causing a serious eye injury.
4          Galindo, and I don't have the case in
5    front of me, I may confuse the two, but I
6    believe -- well, Gonzalez obviously sued Galindo
7    because it happened at Galindo's house and he
8    claimed that Galindo's brother had bought the
9    fireworks.  In my opinion, the injury that
10   occurred -- There was some disagreement as to
11   whether the injury occurred from a conventional
12   firework versus this homemade firework that
13   Gonzalez made, and it was my opinion that Gonzalez
14   was injured by the -- basically, at own hands by
15   making an illegal firework.
16         We see Simon versus Medical Associates
17   depo.  Witt versus Glazer, another medical
18   malpractice case.  Miss Witt developed a retinal
19   detachment and a vitreous hemorrhage, was seen at
20   a hospital and seen by an ophthalmology resident
21   who diagnosed a retinal detachment, discussed it
22   with her supervising physician who agreed with the
23   diagnosis, referred to Dr. Glazer, a retinal
24   specialist.
25         He looked in the eye, did not see the

## 60

1    retinal detachment, presumably because of the
2    vitreous hemorrhage and, in my opinion, missed the
3    diagnosis of the retinal detachment.  And that
4    delayed her eventual surgery and she had a poor
5    outcome because of that.
6    Q    You testified on behalf of the plaintiff?
7    A    Correct.  Alsaker versus City of Minneapolis.  I
8    believe that was a federal civil rights case.
9    Alsaker, a young man that was assaulted by some
10   police officers for the City of Minneapolis.  He
11   sustained also a blowout fracture and had
12   intractable double vision.  I provided testimony
13   on his behalf.
14         Witt v. Glazer we've already talked
15   about.  And then the final case down there,
16   Pinsonneault versus Snap-on, this particular case
17   I'm testifying on behalf of the insurance carrier
18   for Snap-on.
19         Pinsonneault was a fellow who was
20   hammering metal on metal while working in an auto
21   repair shop, was not wearing safety glasses as he
22   was supposed to.  Piece of -- Chard of metal
23   entered his eye and caused a -- a serious retinal
24   injury.  They were claiming that it was due to a
25   defective tool.  In my opinion it was due to --

## 61

1    Well, my opinion is -- is, as regards the injury,
2    I felt that he was not wearing safety glasses and
3    that's why he sustained the injuries.
4    Q    Have you ever testified in a case involving an
5    alleged injury from a pharmaceutical product?
6    A    I have provided a records review summary on that,
7    but I've not given deposition or trial testimony.
8    Q    What product?
9    A    This was a -- a tooth bleaching product, and I
10   don't have -- Actually, it was in New York, and
11   I'm trying to think of the name of the tooth
12   bleaching product.  I don't have it right in front
13   of me, but if that's of interest I can come up
14   with that.
15         Basically, the claim was that the
16   injured party, a dental assistant, was preparing
17   a -- a binary chemical product.  It had a -- a
18   caustic, as well as hydrogen peroxide in it,
19   preparing the gel so the dentist could apply it to
20   the teeth and bleach them.
21         In the process of preparing the
22   chemical the plaintiff stated that the -- that the
23   syringe that the substance was contained in
24   ruptured, spraying her in the eyes and causing a
25   serious caustic burn of the -- of the eye.

16 (Pages 58 to 61)

**62**

1        There was no -- no dispute that there
2  was a serious eye injury there.  The dispute was
3  as to whether or not the -- the syringe was
4  defective and whether or not the person could have
5  been wearing safety glasses, as she claimed, and
6  sustained the type of injury she did.  It was my
7  opinion that if she had been wearing safety
8  glasses the way she claimed to have, she could not
9  have sustained the type of eye injury.
10 Q    Other than the tooth bleaching product, have you
11 had the occasion to testify or consult on a case
12 involving an alleged injury from a pharmaceutical
13 product?
14 A    A specific USP pharmaceutical product, no.
15 Q    Some non --
16 A    Well, I mean, if we're talking about chemicals, I
17 guess they don't fall in the pharmaceutical realm,
18 so --
19 Q    No.  I want to turn to Viagra, Dr. Williams.  Do
20 you know when Viagra was first approved for use by
21 the FDA?
22 A    I believe it was 1998, but I'm not absolutely
23 sure.
24 Q    Your memory's very good.  March of 1998 was the
25 approval.

**63**

1  A    Okay.
2  Q    Do you understand that there were reported cases
3  of NAION before Viagra was put on the market?
4  A    In association with Sildenafil?
5  Q    No.  I may have misspoken, or perhaps you
6  misunderstood.
7  A    Okay.
8  Q    You agree that sometime prior to March of 1998
9  when Viagra was first put on the market there had
10 been cases observed by ophthalmologists of NAION,
11 correct?
12 A    Oh, certainly, certainly, certainly.  I understand
13 what you're saying.
14 Q    I don't know if I misspoke or you misunderstood.
15 And you also agree that subsequent to Viagra being
16 put on the market in March of 1998, that NAION is
17 diagnosed in people who have never taken the
18 medication; is that right?
19 A    Correct.
20 Q    And you agree with me that Viagra could not have
21 caused any of the cases of NAION that were
22 reported either before the drug came on the market
23 or that occurred in people who never took the
24 medication.
25        MR. THORNBURGH:  Objection.

**64**

1  BY MR. SLONIM:
2  Q    Correct?
3  A    So you're saying that if a person never took
4  Viagra, then we can't blame Viagra for causing
5  their NAION.
6  Q    That's what I'm asking you.
7  A    Okay.  I would agree with that.
8  Q    And you also agree with me that people that
9  developed NAION before the drug was ever put on
10 the market, whatever caused it it couldn't have
11 been the drug.
12        MR. THORNBURGH:  Objection.
13        THE WITNESS:  Correct.  The only thing
14 I would state is in one of the articles that I
15 brought there was actually a person who had taken
16 a Chinese remedy, this was reported in -- in
17 November in the literature, that turned out that
18 caused a NAION -- a bilateral case of NAION.  And
19 they found when they analyzed what was in this
20 Chinese remedy it was Sildenafil, but that would
21 still apply, I guess.
22 BY MR. SLONIM:
23 Q    But you agree certainly for the -- certainly for
24 the people that developed NAION before --
25 A    Before it was developed, yes.  It couldn't -- Yes,

**65**

1  I agree.
2  Q    Whatever caused it, it couldn't have been the
3  drug, right?
4  A    I agree.
5        MR. THORNBURGH:  Objection, unless
6  they're a part of some sort of study, pre- study.
7  BY MR. SLONIM:
8  Q    What was the cause of NAION in the cases that
9  were -- that were reported before the drug was put
10 on the market?
11 A    Well, what NAION is in layman's terms is you could
12 think of it as a stroke of the optic nerve.  Just
13 like any other tissue in our body, it requires a
14 blood supply.  You interrupt that blood supply,
15 the tissues die.
16        So an interruption in the blood supply
17 to the anterior portion of the optic nerve,
18 anterior meaning the front portion, would result
19 in a nonarteritic ischemic optic neuropathy.  So
20 anything that would interrupt that blood supply,
21 and there's a host of different medical
22 conditions.  I think we talked about
23 microvascular, meaning small blood vessel
24 narrowing that can occur in hypertension and
25 diabetes, associated with some cardiovascular

17  (Pages 62 to 65)

**66**

1   diseases, associated with some connective tissue
2   diseases, hypotension, H-Y-P-O, a drop in blood
3   pressure to the point where not enough blood is
4   being pumped to those vessels that supply the
5   optic nerve could cause a -- a NAION.
6   Q   And because of those underlying medical conditions
7      that predispose a person to NAION, there's a
8      spontaneous background incidence of NAION in the
9      general population; is that right?
10         MR. THORNBURGH:  Objection.
11         THE WITNESS:  Correct.
12  BY MR. SLONIM:
13  Q   Do you know what that incidence is?
14  A   The percent of people that develop nonarteritic
15     ischemic optic neuropathy in the general
16     population, I don't have that percentage or figure
17     at hand, but I can find that out for you.
18  Q   You agree that NAION is the most common acute
19     optic neuropathy in patients over 50 years old; is
20     that right?
21  A   Correct.
22  Q   That's well known among ophthalmologists.
23  A   Correct.
24  Q   And you've identified as risk factors for NAION
25     factors including hypertension.  That's high blood

**67**

1   pressure, right?
2   A   Correct.
3   Q   Cardiovascular disease.
4   A   Correct.
5   Q   Is that right?  Hyperlipidemia, high cholesterol?
6   A   Correct.
7   Q   And diabetes?
8   A   Correct.
9   Q   Okay.  And do you know if those are the similar
10     risk factors that are associated with erectile
11     dysfunction?
12  A   Yes, they are.
13  Q   And so someone that's predisposed to erectile
14     dysfunction very often has hypertension,
15     cardiovascular disease, hyperlipidemia, high
16     cholesterol, diabetes, those kinds of conditions;
17     is that right?
18         MR. THORNBURGH:  Objection.
19     Objection.
20         THE WITNESS:  Correct.
21  BY MR. SLONIM:
22  Q   So you would agree with me that the risk factors
23     for NAION and the risk factors for erectile
24     dysfunction overlap; is that right?
25  A   Correct.

**68**

1   Q   And you would agree with me for that reason that
2      men who have erectile dysfunction are at an
3      elevated risk for developing NAION because they
4      have -- because the same conditions that
5      predispose for erectile dysfunction are the same
6      conditions that predispose for NAION, correct?
7         MR. THORNBURGH:  Objection.
8         THE WITNESS:  Correct.
9         (Exhibit No. 17 was marked for
10     identification.)
11  BY MR. SLONIM:
12  Q   I'm going to mark as Exhibit No. 17 an article by
13     Lee, et al., entitled Erectile Dysfunction Drugs
14     in Nonarteritic Anterior Ischemic Optic
15     Neuropathy, published in October 2005 in the
16     American Journal of Ophthalmology.  You want to
17     take a minute and look at that?
18  A   Yes.  Yes.  I -- I've seen this article before.
19  Q   This article discusses the scientific evidence
20     regarding Viagra and NAION; is that right?
21  A   Well, it looks to me to be a review article in
22     which they have summarized results of -- of some
23     studies that -- I believe I see 14 references here
24     and I see a reference to according to Pfizer there
25     have been more than a hundred clinical studies of

**69**

1   Viagra, but I don't see those studies referenced,
2   but it looks like it's a review article.  It's
3   not -- doesn't look like any new research was
4   performed, but --
5   Q   It's a review article discussing the scientific
6      evidence regarding Viagra and NAION, whether or
7      not there's a causal link; is that right?
8         MR. THORNBURGH:  Objection.
9         THE WITNESS:  Correct.
10  BY MR. SLONIM:
11  Q   Now, the article notes, as you pointed out to me,
12     that there have been more than a hundred clinical
13     studies of Viagra involving more than 13,000
14     patients with no reported cases of NAION; is that
15     right?
16  A   That's what -- That's what this states, correct.
17  Q   And in the course of your research have you come
18     up with any reason to disagree with that
19     statement?
20  A   Well, I -- I mean, certainly when you are quoting
21     a hundred clinical studies and you see none of
22     them referenced, I would be curious at least to
23     take a look at it.
24  Q   Have you yourself, Dr. Williams, reviewed any of
25     the Viagra clinical studies to see if there were

18  (Pages 66 to 69)

**70**

1   any cases of NAION?
2   A   No, I have not.
3   Q   So --
4   A   Are you talking about the FDA Phase I, Phase II,
5   Phase III reports?
6   Q   I'm talking about really the Phase III clinical
7   studies. The placebo controlled clinical studies.
8   A   No, I have not.
9   Q   In forming an opinion about whether Viagra is
10   linked to NAION, is that a relevant and important
11   source of information?
12   MR. THORNBURGH:  Objection.
13   THE WITNESS:  I would think it would
14   be one thing that you would take into account,
15   certainly.
16   BY MR. SLONIM:
17   Q   Sitting here today, based on the research that
18   you've done, you don't have any reason to dispute
19   the statement in this article that there have been
20   more than a hundred clinical studies of Viagra
21   involving more than 13,000 patients with no
22   reported cases of NAION, correct?
23   MR. THORNBURGH:  Objection.
24   THE WITNESS:  Well, without actually
25   looking at the studies it would be difficult to

**71**

1   say.
2   BY MR. SLONIM:
3   Q   Focus on my question.
4   A   Go ahead and state it again.
5   Q   My question is whether or not sitting here today,
6   given the research that you've done as plaintiffs'
7   expert in this matter, whether you have any reason
8   to disagree with the statement that there have
9   been more than a hundred clinical studies of
10   Viagra involving more than 13,000 patients and
11   that there were no reported cases of NAION?
12   A   I would say that's what the author stated in the
13   article. I would not -- I would have to look at
14   the studies to be able to form an opinion myself.
15   Q   But in your research, you've told us you did a Pub
16   Med search, you found no reason to dispute that
17   statement, have you?
18   A   Well, once again, I would say without looking at
19   the actual studies I couldn't comment.
20   Q   Focus on my question, Dr. Williams. You have some
21   articles in front of you that you pulled as a
22   result of a Pub Med search that you described to
23   us.
24   A   Correct.
25   Q   Based on your search of the literature, you have

**72**

1   no reason to dispute the statement in this article
2   that there were a hundred studies involving more
3   than 13,000 men, no reported cases of NAION,
4   correct?
5   A   I would -- I would -- I would be uncomfortable
6   stating that. I don't know when these studies
7   were completed. I mean, obviously we know the FDA
8   has made a rather strong recommendation about
9   potential association, so --
10   Q   We'll come to -- We'll come to the FDA
11   recommendation in due course. My question to you,
12   and please focus on the question, based on your
13   research in the published medical literature, you
14   didn't find anything that said there were clinical
15   studies of Viagra from which there were reports of
16   NAION, correct?
17   MR. THORNBURGH:  Objection.
18   THE WITNESS:  Well, there are studies
19   that have reported, which are clinical studies,
20   anecdotal cases of --
21   BY MR. SLONIM:
22   Q   You know there's a difference between an anecdotal
23   case report and a placebo controlled clinical
24   trial, don't you?
25   MR. THORNBURGH:  That's not the

**73**

1   question you asked.
2   THE WITNESS:  What's the placebo
3   controlled clinical trial that you're referring
4   to?
5   BY MR. SLONIM:
6   Q   I'm referring to the hundred -- the hundred --
7   A   But it doesn't say placebo controlled clinical
8   trial. It doesn't say FDA Phase I, II or III. My
9   discomfort is with what's being referred to there.
10   Q   You see that the next sentence refers to
11   170 million Sildenafil prescriptions given to
12   23 million men. You understand that when there's
13   a case report, the case reports come from the
14   general use in the field as opposed to the
15   clinical trials in which there is a placebo
16   controlled comparative group, don't you?
17   A   Correct.
18   Q   Okay. I'm referring and I would like you to focus
19   your attention on the statement that deals with
20   the clinical -- with the hundred clinical trials,
21   and whether or not you encountered anything in the
22   published literature that causes you to disagree
23   with that statement that there were no reports of
24   NAION in the clinical trials.
25   A   Well, I believe I ran across one reference that

19  (Pages 70 to 73)

**74**

1    said that there was some information to the effect
2    that there was some suspicion that perhaps there
3    was an association, but that had not been reported
4    to the FDA until later.
5  Q  In a clinical trial?
6  A  In one of the articles that I read.
7  Q  Not in a case -- Not in a case report. You're
8    representing to us that you found a reference in a
9    published article about a -- about a case of NAION
10   in a controlled clinical study?
11 A  No. It was an anecdotal report.
12 Q  We're going to get to the anecdotal reports.
13   Please keep your attention focused on my question.
14   I'm asking about the controlled clinical studies,
15   and if --
16 A  Which controlled clinical studies?
17 Q  The controlled clinical studies conducted by
18   Pfizer. The hundred controlled studies referenced
19   here.
20 A  I'd be happy to look at them and give you my
21   opinion there. I'm not going to give an opinion
22   based on somebody's --
23 Q  But you are going to give an opinion based on the
24   medical literature that you researched, and I'm
25   asking you if you can identify in any single piece

**75**

1    of medical literature a report of a controlled
2    clinical study in which a patient was reported to
3    have NAION?
4  A  Well, I think at this point it would a hard time
5    performing a study like that getting that past
6    your IRB given the fact that there has been a
7    suggestion there's an association.
8  Q  I'm asking whether or not when you searched the
9    medical literature you can identify for us, you
10   show us today, a single clinical study in which
11   there was a report of NAION.
12 A  And you're talking about a case controlled
13   prospective study, is that what your --
14 Q  Talking about a comparative clinical study where
15   some patients were given Viagra, some patients
16   were given placebo, and the two groups were
17   compared.
18 A  Okay. Prospective.
19 Q  Yes.
20 A  Meaning going -- starting at the beginning, going
21   towards the future, giving one group placebo and
22   one group Viagra and identifying -- No, I'm not
23   familiar with -- with that study.
24 Q  Okay. You understand that's how drugs are tested.
25 A  Correct. Of course.

**76**

1  Q  Right? Before they're put on the market they're
2    tested, and even after they're put on the market
3    they're tested.
4  A  Depending on the type of the drug. We certainly
5    have drugs out there that we've been prescribing
6    for years that didn't go through that rigorous
7    type of testing.
8  Q  But you understand that Viagra, which was approved
9    in 1998, went through a series of controlled
10   clinical tests.
11 A  Yes, but have I read those tests? No, I haven't.
12 Q  Are you aware of any controlled studies -- Strike
13   that. Are you aware of any studies that show an
14   increased rate of NAION in patients taking Viagra
15   as compared with similar patients not taking
16   Viagra?
17 A  No.
18 Q  Are you aware of any studies that report patients
19   who take higher doses of Viagra have a higher rate
20   of NAION than patients who take lower doses?
21 A  There was one of the clinical reports that I read
22   that talked about a patient who had taken -- had
23   increased their dosage, and each time they took a
24   hundred milligrams they noticed visual field loss.
25   That's one of the articles I brought today.

**77**

1  Q  Focus on my question. My question asks are you
2    aware of any studies that are in the nature of a
3    dose response relationship that show that patients
4    that take a higher dose of Viagra are at a greater
5    risk of NAION than patients that take a lower
6    dose?
7      MR. THORNBURGH: Objection.
8      THE WITNESS: So you're saying are
9    there studies out there where -- once again, case
10   control, blinded studies, prospective, going
11   forward, where they've tried increasing doses and
12   found whether there was vision loss associated
13   with increasing doses?
14 BY MR. SLONIM:
15 Q  Focus on my question. I want to know whether or
16   not there are any studies, not -- not necessarily
17   prospective, any studies that show a dose response
18   relationship indicating that patients that take a
19   higher dose of Viagra are at a greater risk of
20   developing NAION than patients who take a lower
21   dose.
22 A  No. I've not seen a specific study that has
23   addressed that.
24 Q  Now, you talked about the FDA. Take a look,
25   please, at the document we've marked as deposition

20  (Pages 74 to 77)

**78**

1 Exhibit No. 17, and direct your attention to the
2 top right-hand corner. The sentence says, and I
3 quote, "The FDA has been careful to state that
4 they cannot currently draw a conclusion regarding
5 cause and effect, but they continue to monitor the
6 situation." That's what the sentence says; is
7 that right?
8 A    That's correct.
9 Q    And Dr. Williams, it's a fact that the Food and
10 Drug Administration has concluded that it's not
11 known whether Viagra's capable of causing NAION,
12 isn't that true?
13        MR. THORNBURGH: Objection.
14        THE WITNESS: Well, I'm looking at an
15 article here from, you know, almost
16 three-and-a-half years ago, and I know for a fact
17 that we've seen more anecdotal reports and more
18 reports in the literature of a -- of a suspected
19 association. So I would wonder what does the FDA
20 say today, 2009, as to whether or not they feel
21 there's a cause and effect association.
22 BY MR. SLONIM:
23 Q    Focus on my question, please.
24        MR. THORNBURGH: Objection. He is
25 focusing on your questions. He's answering the

**79**

1 questions. You going to keep on asking him until
2 you get the answer you like?
3 BY MR. SLONIM:
4 Q    You agree with me that as of October of 2005 the
5 FDA was careful to state that they cannot
6 currently draw a conclusion regarding cause and
7 effect --
8        MR. THORNBURGH: Objection.
9 BY MR. SLONIM:
10 Q    -- between Viagra and NAION; is that right?
11 A    Well, according to this statement here in the --
12 in the article, that's what they -- they state,
13 but once again, I would kind of be curious to look
14 at the web site and see if that's, you know,
15 really what it said.
16 Q    Have you looked at the web site?
17 A    I haven't.
18 Q    Let's help you out.
19 A    Not the web site that was referenced in this
20 particular article. Is that what you got there?
21 Q    Let's help you out.
22        (Exhibit No. 18 was marked for
23 identification.)
24 BY MR. SLONIM:
25 Q    We've marked as deposition Exhibit No. 18 an FDA

**80**

1 statement for immediate release dated July 8th,
2 2005. Do you see that?
3 A    Yes.
4 Q    And it says FDA updates labeling for Viagra,
5 Cialis and Levitra for rare post-marketing reports
6 of eye problems. Do you see that?
7 A    I do.
8 Q    And do you see that this was published -- was
9 printed -- it was printed, if you look at -- off
10 of the FDA web site on January 8th, 2009. See
11 that?
12        MR. THORNBURGH: Objection.
13 BY MR. SLONIM:
14 Q    Lower right-hand corner.
15 A    I see that January 8th, 2009, correct.
16 Q    And do you see that -- Look at the last paragraph
17 of the statement. At this time, it is not
18 possible to determine whether these oral
19 medications, which includes Viagra, for erectile
20 dysfunction, were the cause of the loss of
21 eyesight, or whether the problem is related to
22 other factors such as high blood pressure or
23 diabetes or to a combination of these problems.
24 See that?
25 A    I do see that paragraph.

**81**

1 Q    So you agree that as of July 8th, 2005, and
2 currently published on the FDA's web site, it says
3 that the FDA is not able to determine whether
4 Viagra causes NAION.
5        MR. THORNBURGH: Objection.
6        THE WITNESS: Correct. That's what
7 they're stating here.
8 BY MR. SLONIM:
9 Q    Okay. Let's mark as the next deposition exhibit
10 an FDA document entitled Patient Information
11 Sheet.
12        (Exhibit No. 19 was marked for
13 identification.)
14 BY MR. SLONIM:
15 Q    See that this refers to an FDA alert that was
16 issued in July 2005?
17 A    Correct.
18 Q    And direct your attention, please, right to the
19 middle of the page, middle paragraph, first
20 sentence. Says we, referring -- referring to the
21 FDA, do not know at this time if Viagra, Cialis or
22 Levitra causes NAION; is that correct?
23 A    That's what that says.
24 Q    Okay. And do you see that this article, this web
25 site I published -- I printed off January 8th,

**82**

1  2009?  Look at the lower right-hand corner.  See
2  that?
3  A   Correct.
4  Q   And do you see at the bottom of the page it says
5  this information reflects the FDA's current
6  analysis of data available to the FDA concerning
7  this drug.  FDA intends to update this sheet when
8  additional information or analyses become
9  available; is that right?
10  A   That's what it says there.
11         MR. THORNBURGH:  Objection.
12  BY MR. SLONIM:
13  Q   So on the FDA's web site, as recently as
14  January 8th, 2009, the FDA says quote, "We do not
15  know at this time if Viagra, Cialis or Levitra
16  causes NAION," correct?
17         MR. THORNBURGH:  Objection.
18         THE WITNESS:  Well, once again, that's
19  what it says, but -- but, let me finish, this is
20  July 2005 and they're saying a small number of men
21  have lost eyesight.  I would think if you called
22  up the FDA up today and said is it still a small
23  number, I don't think they're going to repeat that
24  that's still the case.
25  BY MR. SLONIM:

**83**

1  Q   Move to strike.  Not responsive.  You agree with
2  me that -- that -- that this document, which was
3  printed on January 8th, 2009, states this
4  information reflects FDA's current analysis of
5  data available to the FDA concerning this drug; is
6  that correct?
7         MR. THORNBURGH:  Hold on one second.
8  He just responded to the same question you just
9  asked.  He did respond.  Asked and answered.
10  Objection.
11         THE WITNESS:  Ask me the question
12  again.
13  BY MR. SLONIM:
14  Q   Exhibit No. 19, which is from the FDA web site,
15  which was printed on January 8th, 2009, says we,
16  referring to the FDA, do not know at this time if
17  Viagra, Cialis or Levitra causes NAION.  And it
18  also says this information reflects FDA's current
19  analysis of data available to the FDA concerning
20  this drug, correct?
21  A   That's what it says.
22  Q   Okay.  Now, referring back to deposition Exhibit
23  No. 17, which was the article by Lee, directing
24  your attention to the right-hand side, first full
25  paragraph, Doctors Lee and Newman state that

**84**

1  although case reports to date suggest a possible
2  association between NAION and PDE-5 inhibitors, a
3  causal relationship has not been established
4  conclusively, correct?
5  A   As of 2005 one had not.
6  Q   And they also say that Dr. Fraunfelder's review on
7  this issue reaches the same conclusion; is that
8  right?
9  A   That's what that says there.
10  Q   You don't have any basis to conclude -- Strike
11  that.  Now, I noticed that among the articles that
12  you looked at were some case reports by
13  Dr. Pomeranz?
14  A   Correct.
15  Q   Okay.  You agree with me that Dr. Pomeranz, in his
16  published case reports, states that a definite
17  causal relationship between Viagra and NAION
18  cannot be determined; is that right?
19  A   Let me have a look at that.  Which exhibit are you
20  referring to?
21  Q   Well, we marked those -- Let's do this.  I'm going
22  to mark it separate.  Just -- I'll mark separate
23  documents so we have it in front of us.
24         (Exhibit No. 20 was marked for
25  identification.)

**85**

1  BY MR. SLONIM:
2  Q   We've marked as deposition Exhibit No. 20 an
3  article by Pomeranz and others entitled
4  Sildenafil, Associated Nonarteritic Anterior
5  Ischemic Optic Neuropathy, published in 2002; is
6  that right?
7  A   Correct.
8  Q   And this discusses a series of -- or strike that.
9  This case report discusses five patients who
10  developed NAION; is that right?
11  A   Correct.
12  Q   Turn, please, to page 586.
13  A   Okay.
14  Q   I direct your attention to the right-hand side of
15  the page, the next to bottom paragraph.
16  A   Okay.
17  Q   About the middle of the paragraph Dr. Pomeranz and
18  his co-authors write because of a large number of
19  prescriptions for Sildenafil that have been
20  written, the overlap in populations that are at
21  risk for NAION and likely to be prescribed
22  Sildenafil in a small number of cases reported in
23  this article, a definite causal relationship
24  between Sildenafil and NAION cannot be established
25  here; is that correct?

22  (Pages 82 to 85)

**86**

1  A   That's -- Yeah, you read it correctly.
2  Q   And you agree with me that Dr. Pomeranz and his
3  co-authors in this case report conclude that a --
4  a causal relationship has not been -- definite
5  causal relationship between Viagra and NAION has
6  not been established; is that right?
7       MR. THORNBURGH: Objection.
8       THE WITNESS: Yes. At the time the
9  article was accepted for publication in July of
10 2001, I believe that was the author's belief, yes.
11      (Exhibit No. 21 was marked for
12 identification.)
13 BY MR. SLONIM:
14 Q   We've marked as deposition Exhibit No. 21 an
15 article by Pomeranz and Bhavsar entitled
16 Nonarteritic Ischemic Optic Neuropathy Developing
17 Soon After Use of Sildenafil (Viagra): A Report
18 of Seven New Cases. This was published in the
19 Journal of Neuro-Ophthalmology in 2005; is that
20 right?
21 A   Correct.
22 Q   Turn, please, to page 12. Direct your attention
23 to the right-hand side of the page, about
24 three-quarters of the way down the page, the first
25 sentence of the paragraph that begins because of

**87**

1  the lack of a model in which to test for a
2  relationship between Sildenafil and NAION, a
3  definite causal relationship cannot be established
4  at this time. Is that what these authors wrote?
5  A   Correct.
6  Q   So Dr. Pomeranz wrote in 2002 that a definite
7  causal relationship had not been established, and
8  then he repeated in 2005 that a definite causal
9  relationship cannot be established; is that right?
10      MR. THORNBURGH: Objection. There are
11 two authors.
12      THE WITNESS: Correct. That's what it
13 says there.
14 BY MR. SLONIM:
15 Q   And do you know that Dr. Pomeranz wrote later
16 pieces in which he also said that a causal
17 relationship could not be conclusively
18 established?
19 A   I'm not aware of those articles, and if you've got
20 them with you I'd be happy to look at them.
21      (Exhibit No. 22 was marked for
22 identification.)
23 BY MR. SLONIM:
24 Q   We've marked as deposition Exhibit No. 22 an
25 editorial written by Doctors Fraunfelder, Pomeranz

**88**

1  and Egan entitled Nonarteritic Interior Ischemic
2  Optic Neuropathy and Sildenafil. This was
3  published in May 2006. Do you have that in front
4  of you?
5  A   Yes, I do.
6  Q   And direct your attention, please, to the
7  right-hand side, about halfway down the page, do
8  you see the paragraph that begins until an animal
9  model?
10 A   Yes.
11 Q   Okay. And these authors, including Dr. Pomeranz,
12 write, and I quote, "Until an animal model or
13 scientific study reveals a biological basis for
14 NAION caused by treatment with Sildenafil, that's
15 Viagra, most of the case reports of NAION related
16 to this drug may be an expected coincidence as
17 Sildenafil is a top selling medication and
18 patients who receive this drug are frequently
19 older, vasculopathic and are already at risk for
20 NAION." That's what they wrote, correct?
21 A   Correct. That's what it says.
22 Q   So in May 2006 Dr. Pomeranz, who wrote the case
23 reports started in 2002 and wrote more case
24 reports starting in 2005, both of which said a
25 definite conclusion could not be established,

**89**

1  reiterates to -- again, with his co-authors in May
2  2006, that the case reports may be a coincidence,
3  correct?
4  A   That's what they're stating here.
5       MR. THORNBURGH: Objection.
6  BY MR. SLONIM:
7  Q   And you agree, Dr. Williams, that the reports of
8  NAION among men who have used Viagra could be a
9  coincidence because Viagra's widely used in
10 patients who are taking the medication are at
11 elevated risk of developing NAION due to their
12 underlying medical condition; is that right?
13 A   It's possible.
14      MR. THORNBURGH: Objection.
15 BY MR. SLONIM:
16 Q   Okay. Now, Dr. Williams, one of the things that I
17 noticed that you referenced in your written report
18 was an article -- actually, an editorial or a
19 viewpoint by Dr. Hayreh; is that correct?
20 A   Correct. And I think it's one of the exhibits,
21 isn't it?
22 Q   It was included --
23 A   No. It's an exhibit, too, I brought along.
24 Q   That was included in the collection of documents
25 that you brought.

**90**

1  A    Yes, of course.

2  Q    What we'll do -- Dr. Williams, what we'll do --

3        Yes, you did include it.  What we'll do for ease

4        of reference, I think, is mark it separately.

5        Yeah.  That's -- That's -- Is that the 2005?

6        Hayreh 2005?

7  A    Yep.

8  Q    Where did you take that from?

9  A    That was from the compendium of documents.

10  Q    Documents that you brought.  I'm going to ask you

11        to just put that back in the compendium so that we

12        keep the order intact.  And what we'll do is mark

13        that -- mark that same article separately as an

14        exhibit.

15  A    Okay.

16  Q    Is that okay?

17        (Exhibit No. 23 was marked for

18        Identification.)

19  BY MR. SLONIM:

20  Q    We've marked as deposition Exhibit No. 23 a

21        viewpoint editorial by Dr. Hayreh entitled

22        Erectile Dysfunction Drugs and Nonarteritic

23        Anterior Ischemic Optic Neuropathy:  Is There a

24        Cause and Effect Relationship, published in the

25        Journal of Neuro-Ophthalmology in 2005.  Do you

**91**

1        have that in front of you?

2  A    Yes, I do.

3  Q    And this is the article that you specifically

4        reference as something you're relying on in your

5        expert report; is that right?

6  A    Yes.

7  Q    Can you tell us how you came across Dr. Hayreh's

8        article?

9  A    Well, this was in -- When I did my Pub Med

10        literature search, Dr. Hayreh is considered the

11        premier expert in retinal and ocular vascular

12        disorders due to his long and distinguished career

13        and publications.  So I saw the abstract, looked

14        at it, looked like an objective assessment and --

15        and got the article and then read it.

16  Q    Okay.  Can you tell us what your understanding is

17        of Dr. Hayreh's theory of Viagra and NAION?

18  A    Well, his feeling is that there may be a

19        hypotensive effect of Viagra in which the blood

20        pressure is lowered, and when that occurs the

21        vessels in the optic nerve head that may already

22        be compromised due to diabetes or long-standing

23        hypertension or smoking or other microvascular

24        disease, those two events in -- in combination

25        lead to a stroke or NAION.

**92**

1  Q    In your assessment, is that a view that you share?

2  A    Yes.  Yes.

3  Q    In other words, Dr. Hayreh's hypothesis about how

4        Viagra might causally be linked to NAION as set

5        forth in the document we've marked as Exhibit

6        No. 23 is the -- is the view that you share?

7  A    Yes.  I think it's a plausible explanation.

8  Q    Do you have any theories about how Viagra causes

9        or could cause NAION that are different from

10        Dr. Hayreh's?

11  A    No.

12  Q    Let's talk about Mr. Martin, if we can.  Did I

13        understand correctly that one of the things that

14        you did on preparing your report was review

15        Mr. Martin's medical records?

16  A    Correct.

17  Q    But if I understood correctly, you did not review

18        Mr. Martin's deposition testimony; is that right?

19  A    No.  I did not have -- have that available to me.

20  Q    And nor did you review the deposition testimony of

21        any of Mr. Martin's treating physicians; is that

22        right?

23  A    No.  Just the medical records.

24  Q    If you -- I'm going to ask some questions about

25        Mr. Martin's medical condition, and if you need to

**93**

1        refer to the medical records, by all means, do so.

2  A    Okay.  Go ahead.

3  Q    Let's do this, also.  I realize we marked your

4        report as -- early on, but let's mark separately

5        the report.  What -- What exhibit number is that?

6  A    Five.

7  Q    You know what I'm going to do, we have -- when the

8        plaintiffs' lawyers produced it to us they

9        produced it to us without the fax transmittal

10        sheet.  So I'm going to just mark this as a

11        separate exhibit in the way the plaintiffs'

12        attorneys gave it to us.

13  A    Okay.

14        (Exhibit No. 24 was marked for

15        Identification.)

16        THE WITNESS: Okay.

17  BY MR. SLONIM:

18  Q    Dr. Williams, we've marked as deposition Exhibit

19        No. 24 your report, actually in the Martin case,

20        and then also attached is your report in the

21        Stanley case, and also sandwiched in between is

22        your letter to Mr. Richards about -- regarding

23        your fees on these matters, correct?

24  A    Yes.

25  Q    Do you have that in front of you?

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                    (212) 490-3430

**94**

1  A    Yes, I do.

2  Q    I'm going to ask some questions about Mr. Martin.

3       If you want to refer to your report or if you want

4       to refer to his medical records, by all means, do

5       so.

6  A    Okay.

7  Q    Mr. Martin started using Viagra in April of 1998

8       and he used it at the rate of one to two times per

9       week; is that right?

10 A    I believe that's correct, yes.

11 Q    And Mr. Martin developed his problem with vision

12      in April of 2002; is that right?

13 A    Correct.

14 Q    So in other words, between April 1998 and April of

15      2002, which is a period of four years, Mr. Martin

16      was using Viagra at the rate of one to two times

17      per week, correct?

18           MR. THORNBURGH:  Objection.

19           THE WITNESS:  You know, I'm not

20      absolutely sure that every week during that period

21      of time that he used it once or twice.  I know

22      there was some anecdotal mention as to usage, but

23      I don't believe I saw the pharmaceutical records

24      indicating that I could absolutely state that he

25      took it twice per week.

**95**

1  BY MR. SLONIM:

2  Q    If I represent to you that Mr. Martin testified at

3       his deposition on page 127, lines 14 to 18:

4            "Question.  After that first time you

5       took Viagra, how often would you take it?

6            "Answer.  Every time we had sex.

7            "Question.  Which was about how often?

8            "Answer.  Once or twice per week."

9  A    Okay.

10 Q    Is that in any way inconsistent with anything you

11      saw in the medical records?

12 A    It's his personal statement.  I don't believe the

13      medical records went into that level of detail as

14      to how often he was taking it, but then again,

15      like I said, I didn't have the deposition to

16      review, so --

17 Q    Based on the medical records you saw, you agree

18      with me that Mr. Martin used Viagra many times

19      before April 2002; is that right?

20 A    Yes.  I would agree with that.

21 Q    And in none of those times that Mr. Martin used

22      Viagra starting in April of 1998 and prior to

23      April of 2002 did he report any problem in regard

24      to Viagra and his vision; is that right?

25 A    Correct.

**96**

1  Q    If Viagra had some kind of a toxic effect on

2       Mr. Martin's vision, how was he able to use the

3       drug numerous times between April of 1998 and

4       April of 2002 with no ill effect?

5  A    Well, I think you may be using the word toxic

6       incorrectly.  Toxin is a poison that actually may

7       destroy a cell by interfering with its -- the

8       cell's physiologic processes.  I think the

9       mechanism we're talking about is a hypotensive

10      process rather than a direct toxic process.

11           As to why it didn't happen, I suppose

12      that his -- the pressure in the small vessels in

13      the optic nerve head did not reach that critical

14      low point to cause infarction of the -- of the

15      optic nerve tissue until that point in 2002.

16 Q    Why -- Why if the drug did something

17      physiologically that caused the NAION event in

18      2002 was he able to tolerate the medication with

19      no observed ill effect many times prior to

20      April 2002?

21           MR. THORNBURGH:  Objection.

22           THE WITNESS:  Well, I think the human

23      body in response to -- to a particular drug may

24      have different responses depending on the day of

25      the week or what your blood pressure's doing and

**97**

1       that sort of thing.  So it is possible to take a

2       drug and not have an ill effect until sometime

3       later.

4  BY MR. SLONIM:

5  Q    Familiar with the term challenge/rechallenge?

6  A    Yes.

7  Q    And are you familiar with how

8       challenge/rechallenge relates to whether or not a

9       drug might be causally linked to an event?

10 A    Correct.

11 Q    Okay.  And if a drug -- One of the ways that you

12      might consider whether a drug causes an event is

13      to see if a person takes it, a medication, there's

14      an ill effect; discontinues the medication, the

15      ill effect dissipates; takes it again, the ill

16      effect recurs, correct?

17 A    Correct.

18 Q    That's a challenge/rechallenge?

19 A    Yes.

20 Q    In this case, Mr. Martin had numerous challenges

21      and rechallenges prior to April 2002 with no ill

22      effects on either the challenge or the

23      rechallenges, right?

24           MR. THORNBURGH:  Objection.

25           THE WITNESS:  Well, it was my opinion

**98**

1  as far as causation, I mean, you know where I
2  stand there, that a rechallenge occurred, you
3  know, on May 29th and he lost vision on May 30th.
4  BY MR. SLONIM:
5  Q  Well, we're talking about -- we're going to get to
6  April and May. I'm -- I'm talking about --
7  A  You're talking about prior to April 30th?
8  Q  I'm talking about prior to April 30th, 2002.
9  Starting -- Starting in April 1998, April 19th,
10  1998, and continuing through April 30th, 2002, a
11  period of four years, Mr. Martin had numerous
12  challenges and rechallenges with Viagra and had no
13  ill effects on his vision, correct?
14       MR. THORNBURGH: Objection.
15       THE WITNESS: Correct, until
16  April 30th, 2002.
17  BY MR. SLONIM:
18  Q  Okay. Now, one of the things that you expressed
19  to me and you wrote in your report is that
20  Mr. Martin took Viagra in temporal association
21  before his event in April 2002; is that right?
22  A  Correct. I think I used the term close temporal
23  proximity.
24  Q  And what's your understanding of what the temporal
25  proximity was?

**99**

1  A  He stated he did take the Viagra at approximately
2  8 p.m. the night before he noted the visual loss
3  on April 30th and May 30th, 2002. So we're
4  talking 12 hours.
5  Q  Now, where did you get that information from?
6  A  That was my conversation with Mr. Stanley by
7  phone.
8  Q  Let me ask you this.
9  A  I'm sorry. Strike that. Mr. Martin by phone.
10  Q  So that's something Mr. Martin told you when you
11  spoke with him in November of 2008?
12  A  Correct.
13  Q  Okay. But this event happened in April of 2002;
14  is that right?
15  A  Correct.
16  Q  Did you search Mr. Martin's medical records, his
17  contemporaneous medical records in the April 2002
18  timeframe, to see whether or not there's any
19  documentation or contemporaneous records that
20  supports a close temporal association between the
21  use of Viagra and the onset of the NAION?
22  A  If you're asking me did I see that he gave the
23  history I took it at 8 o'clock the night before my
24  vision loss, I did not see that in there, that
25  specific statement.

**100**

1  Q  Well, let me ask you, you've got Mr. Martin's
2  medical records in front of you. Hold up the pile
3  to the camera.
4  A  (Witness complies.)
5  Q  Can you show me -- Can you show me any
6  contemporaneous medical record that indicates that
7  Mr. Martin used the -- used Viagra the night
8  before his observation of NAION?
9  A  Let me take a look here. I did see this note here
10  from a visit to the Minneapolis VA.
11  Q  What date?
12  A  Let's have a look here. I see the date it was
13  printed on, but I don't see the date of the visit.
14  Let me see if I can find that for you here. Yeah.
15  Looks like -- Looks like about January of 2006.
16  Q  So that's four -- that's more than four years.
17  A  Right.
18  Q  My question is do you find any contemporaneous
19  records from the 2002-2003 timeframe when
20  Mr. Martin got his NAION that -- that supports a
21  close temporal association between the use of
22  Viagra and the NAION?
23  A  Well, I do see mention in here that he did, you
24  know, that he had a prescription for it, and I see
25  renewals of the prescription, but I don't see

**101**

1  where he mentioned that specifically when he came
2  in with the eye problem, if that's what you're
3  asking.
4  Q  Did you look at Dr. Ferrara's records and when
5  Dr. Ferrara asked him what medication he was on
6  and he lists a bunch of medications, he doesn't
7  list Viagra?
8  A  Right. I -- I didn't see Viagra in that list.
9  Q  Did you see Dr. Nichols' record when Dr. Nichols
10  asks him what medications he's on and he lists a
11  bunch of medications and he doesn't list Viagra?
12  A  Right.
13       MR. THORNBURGH: Objection.
14       THE WITNESS: Correct.
15  BY MR. SLONIM:
16  Q  And did you notice -- And did you notice that a
17  few days before he got his NAION that Mr. Martin
18  had been placed on a new anti-hypertensive, a
19  nitrate called Catapres?
20  A  No, I didn't see that.
21  Q  I think -- Can I see the last document in your
22  stack that you -- in your collection?
23  A  Yes.
24  Q  No. It would be the -- It was in the -- It could
25  have been -- It might have been on the clinical --

26  (Pages 98 to 101)

**102**

1    In that group of -- The last one we marked. Let's
2    see this. Let's mark -- Let's take a look at
3    deposition Exhibit No. 16. This is a document
4    that you produced -- that you brought with you
5    today, I should say; is that correct?
6  A  Correct.
7  Q  Take a look at the entry for -- on the first page
8    for April 24th, 2002.
9  A  Okay.
10 Q  What's it say about Catapres?
11 A  Start Catapres TTS, one patch, one per week, given
12   four.
13 Q  What kind of medication is Catapres?
14 A  It's for elevated blood pressure.
15 A  It's a nitrate and --
16 A  It's not a nitrate, I don't believe.
17 Q  It's not a nitrate.
18 A  It's an alpha blocker.
19 Q  But in any event, it lowers the blood pressure; is
20   that right?
21 A  Correct. That's its intended purpose.
22 Q  Six days before Mr. Martin was diagnosed with his
23   NAION he was started on that anti-hypertensive; is
24   that right?
25 A  Correct.

**103**

1  Q  Did you consider whether or not Catapres could
2    have caused his NAION?
3  A  Well, I thought it was unlikely because I know
4    when he was seen in East Metro Family Practice on
5    May 1st his blood pressure was 168 over 80. So I
6    didn't see anything to indicate that he was
7    getting hypotensive on -- on Catapres or the other
8    medications he was on.
9  Q  But you agree with me that he had just started
10   Catapres six days before -- Catapres patch, so the
11   medication is being continuously infused; is that
12   right?
13      MR. THORNBURGH: Objection. Lack of
14   foundation.
15      THE WITNESS: Correct.
16 BY MR. SLONIM:
17 Q  And he just started Catapres six days before he
18   was diagnosed with his NAION on April 30th, 2002.
19      MR. THORNBURGH: Objection.
20      THE REPORTER: I'm sorry. I didn't
21   get your question.
22      MR. THORNBURGH: If we could just slow
23   down on the answering and the new question so I
24   can raise an objection, I'd appreciate it, so I
25   don't have to interrupt anybody.

**104**

1  BY MR. SLONIM:
2  Q  In any event, you -- you see that although
3    Mr. Martin does not mention to any of his
4    physicians contemporaneously that he was taking
5    Viagra at or about the time of his NAION, that on
6    April 24th, 2002, six days before he was
7    diagnosed, he was started on a new
8    anti-hypertensive, Catapres, correct?
9  A  Correct.
10      MR. THORNBURGH: Objection.
11 BY MR. SLONIM:
12 Q  Okay.
13 A  Should I wait a couple minutes after -- before I
14   answer?
15      MR. THORNBURGH: No. It's okay. I'll
16   get it in.
17      THE WITNESS: Okay.
18 BY MR. SLONIM:
19 Q  Did you also notice, or is it also your view that
20   there was a close temporal association between
21   Mr. Martin's use of Viagra and the development of
22   NAION in his second eye? That would be the left
23   eye.
24 A  He had told me in our telephone conversation that
25   he took Viagra approximately 8 p.m. the night

**105**

1    before he noted the visual loss on May 30th.
2  Q  And you saw, though, in the medical records that
3    that statement is unsupported and that he told his
4    doctors contemporaneously that he -- there was a
5    three to four-day interval between the time he
6    last used Viagra and he noticed his vision loss,
7    isn't that right?
8      MR. THORNBURGH: Objection.
9      THE WITNESS: You'd have to point that
10   out to me because I did not see that statement
11   there. Was that in the deposition or --
12 BY MR. SLONIM:
13 Q  Well, did you find -- did you notice
14   Dr. Nichols -- Did you review Dr. Nichols' medical
15   record?
16 A  I reviewed everything we had in here. I'd be
17   happy to look at it if you point it out to me.
18 Q  Well, take a look at Dr. Nichols' medical records
19   dated May 31st, 2002. You know what, I'll mark
20   it.
21 A  Maybe you can find it for me.
22 Q  I'm going to mark it as a separate exhibit so
23   we'll have it clearly in the record.
24      (Exhibit No. 25 was marked for
25   identification.)

27 (Pages 102 to 105)

## 106

BY MR. SLONIM:

1 Q  By the way, there's no reference in any -- We've
2 marked as deposition Exhibit No. 25 Dr. Nichols'
3 medical records. Dr. Nichols is the
4 neuro-ophthalmologist to whom Mr. Martin was
5 referred for care of his NAION, correct?
6 A  Let me see that summary there. Is Nichols the
7 neuro-ophthalmologist, or is he just a regular
8 ophthalmologist?
9 Q  A regular ophthalmologist.
10 A  Okay. I didn't think he was a
11 neuro-ophthalmologist.
12 Q  Thank you for the correction. In any event, do
13 you agree with me that Dr. Nichols was caring for
14 Mr. Martin's vision problem?
15 A  Yes. I do agree with that. And then you had
16 asked earlier did I see where he had told
17 Dr. Nichols that he had taken it three to four
18 days before?
19 Q  Yes. Take a look, please, at the second page of
20 Dr. Nichols' medical records. Do you see the --
21 Do you notice this these documents are Bates --
22 what we call Bates numbered? They have sequential
23 numbering on the bottom. If you'd turn to Bates
24 number 2, that's the second page.

## 107

1 A  Um-hum.
2 Q  Direct your attention to the right-hand side. Do
3 you see the entry for May 31st, 2002?
4 A  I do.
5 Q  And these are notes of -- these are Dr. Nichols'
6 notes of Mr. Martin's visit on April 31st, 2002;
7 is that right?
8 A  Yes.
9 Q  And do you see where he describes the history, the
10 patient's history, and he says can't see street
11 signs three to four days?
12 A  Yes.
13 Q  So Mr. Martin was having problems seeing the
14 street signs with his left eye for three to four
15 days prior to May 31st, 2002; is that right?
16 A  That's what it says here.
17 Q  Did you look at the St. Paul Radiology forms?
18 A  Bates page number?
19 Q  Well, separate records. Those are separate
20 medical records. I just wanted to know if you
21 recall that.
22 A  I don't know that I had all these records here.
23 These questionnaires here don't look familiar.
24 Q  These were not included in the documents that the
25 plaintiffs' lawyers --

## 108

1 A  I don't know that I've seen this -- this health
2 history.
3 Q  Well, let's take a look at that. Turn, please, to
4 the page that bears Bates number 10. It's a
5 little bit obscured because of the way the
6 stamping is. Do you see that?
7 A  Um-hum.
8    MR. THORNBURGH:  Well -- I'm sorry.
9 Page 10?
10    MR. SLONIM:  Bates 10.
11    THE WITNESS:  Let me compare that to
12 what I had here, see if it looks different.
13    MR. THORNBURGH:  That should just be a
14 copy of what you have.
15    THE WITNESS:  Okay. I've got it.
16 I've got it.
17 BY MR. SLONIM:
18 Q  Okay. And --
19 A  Just didn't look the same. This copy's not as --
20 Q  This --
21 A  -- clear.
22 Q  This is a questionnaire where Mr. Martin is asked
23 to report to the St. Paul Eye Clinic, to
24 Dr. Nichols, what medications he was taking when
25 he was being treated for his NAION on May --

## 109

1 May 1st; is that right?
2 A  Yes.
3 Q  And do you see the medication he lists is
4 Catapres; is that right?
5 A  Yes.
6 Q  Doesn't list Viagra, does he?
7 A  No, he doesn't.
8 Q  And in fact, if you search Dr. Nichols' medical
9 records and start at page 1 and go to the end, you
10 don't find any reference of Viagra, do you?
11 A  No, I don't.
12 Q  So the question that we were working on was
13 whether or not there was any temporal -- any
14 contemporaneous records of a temporal association
15 between the use of Viagra the night before the
16 onset of the NAION, and we had not found any for
17 the April 30th, 2002 event, and now we're looking
18 for the May 31st event. And what we've found so
19 far, based on Dr. Nichols' records, is that
20 although the -- that the NAION -- that the problem
21 with the vision was three to four days prior to
22 May 31st, 2002, according to Dr. Nichols' records;
23 is that right?
24 A  Correct.
25 Q  Okay. Let's take a look at the radiology records

28 (Pages 106 to 109)

**110**

1    and see if that sheds some light on this.
2         (Exhibit No. 26 was marked for
3    identification.)
4    BY MR. SLONIM:
5    Q    We've marked as deposition Exhibit No. 26
6    Mr. Martin's radiology records taken at the
7    St. Paul Radiology Center, and would you turn,
8    please, to page 4. These, again, have Bates
9    numbers. Do you notice that there's a patient
10   questionnaire -- patient history questionnaire
11   here?
12   A    Yes, I see it.
13   Q    Okay. And do you see that with respect to the
14   left eye, Mr. Martin -- Mr. Martin was asked, in
15   the middle of this questionnaire, how long have
16   you had these symptoms, and he lists -- he writes
17   that, with respect to his left eye, that the onset
18   was May 27th or May 28th; is that right?
19   A    That's what's written there, yes.
20   Q    And that's perfectly consistent with Dr. Nichols'
21   records that said that he began having problems
22   with his left eye three or four days prior to
23   May 31st, 2002; is that right?
24        MR. THORNBURGH: Objection.
25        THE WITNESS: I'd say two or three. I

**111**

1    wouldn't say three or four.
2    BY MR. SLONIM:
3    Q    Okay. And looking at the entire body of
4    Mr. Martin's medical records that you've reviewed,
5    do you find a -- single record that documents a
6    use of Viagra in the 24-hour period prior to the
7    onset of decreased vision in the left eye on
8    May 31st, 2002?
9    A    Not outside what he told me in our phone
10   conversation.
11   Q    Okay. The videographer tells me that we need to
12   change the tape. I think that will just take a
13   minute.
14        VIDEOGRAPHER: This ends tape number
15   two of the video deposition of John M. Williams,
16   Sr., M.D., on January 13, 2009. The time, 11:36
17   a.m.
18        (Recess taken.)
19        (Exhibit No. 27 was marked for
20   identification.)
21        VIDEOGRAPHER: This is the beginning
22   of tape number three of the video deposition of
23   John M. Williams, Sr., M.D., on January 13, 2009.
24   The time, 11:38 a.m.
25   BY MR. SLONIM:

**112**

1    Q    We've marked as deposition Exhibit No. 27 medical
2    records from Dr. McEllistrem, who was Mr. Martin's
3    urologist. Turn, please, to Bates number 31.
4    Direct your attention to the top -- the entry at
5    the top of the page. Do you see that Mr. Martin
6    was seen by Dr. McEllistrem on October 29th, 2002?
7    A    Yes.
8    Q    That's about four months after the onset of
9    Mr. Martin's vision problem with his right eye and
10   about three months after the vision problem with
11   his left eye, correct?
12   A    Correct.
13   Q    And do you see the subheading that says P-H?
14   A    Yes.
15   Q    And do you understand that that is the
16   abbreviation for patient history?
17        MR. THORNBURGH: Objection.
18        THE WITNESS: That's not a standard
19   abbreviation. I would guess it was probably past
20   history.
21   BY MR. SLONIM:
22   Q    Past history?
23   A    Um-hum.
24   Q    Okay. In any event, it's under -- it's under the
25   S subheading. That stands for symptoms?

**113**

1    A    Yes.
2    Q    That's standard nomenclature for symptoms?
3    A    No. Well, S stands for subjective.
4    Q    Subjective.
5    A    Yes.
6    Q    And then there's a Section P-H, and you interpret
7    that as to refer to past history?
8    A    Yes.
9    Q    Okay. And would you read that out loud?
10   A    Says patient has new medication for HTN,
11   hypertension, which caused him some dizziness on
12   standing up from squatting position and he
13   suddenly developed difficulty with vision and was
14   felt to have vascular occlusion to optic nerves.
15   He has converted to Accupril at present time and
16   this does not cause vertigo, as noted with other
17   medication.
18   Q    In this note, according to the past history, the
19   attribution for the vision problem that Mr. Martin
20   experienced was his new medication for
21   hypertension; is that right?
22        MR. THORNBURGH: Objection.
23        THE WITNESS: It looks like the
24   urologist, Dr. McEllistrem, has -- has included
25   that in his note.

29 (Pages 110 to 113)

**114**

BY MR. SLONIM:

Q   And there's no reference to the patient having
used Viagra in association with NAION, is there?

A   No mention of Viagra there.

Q   Okay. Now, let's take a look at Dr. Ferrara's
medical records. Have we marked those previously?
I don't think so.

(Exhibit No. 28 was marked for
Identification.)

BY MR. SLONIM:

Q   Is that 28?

A   Got it.

Q   We've marked as deposition Exhibit No. 28 records
from Dr. Ferrara for Mr. Martin, and please direct
your attention to the bottom of the page, the
entry dated October 6th, 2004. Do you see that?

A   I do.

Q   Okay. And do you see that Dr. Ferrara writes that
he, meaning Mr. Martin, still has erectile
dysfunction, but relates to me that he does not
feel that the Viagra was given at the time he went
blind?

A   Yes. I recall reading that, and I also recall
that Mr. -- in other document, that Mr. Martin had
disputed that -- that -- that entry.

**115**

Q   If this record is correct, would that change your
opinion as to the link in Mr. Martin's case
between Viagra and NAION?

A   Well, it says he does not feel that the Viagra was
given at the time he went blind. Is he referring
to the morning when he woke up? Is he referring
to he didn't have it the night before, two nights
before? I guess I'd need some more detail.
If he said the last time he had it was
a week before, I think it would be difficult to
draw a connection. If he said, you know, it was
36 hours, 48 hours prior to developing the loss of
vision, then it's possible it could play a role.

Q   What's your basis for saying that a medication
taken -- that Viagra taken more than 20 hours --
24 hours before the onset of NAION could play any
role in --

A   Some of the clinical reports have indicated that
people taking it, I believe, as long as 36 to 40
hours have -- have had episodes of NAION
associated with that.

Q   Have you looked at the pharmacokinetics of the
drug to ascertain how much of the active
ingredient of Viagra remains in the bloodstream
after 24 hours?

**116**

A   No, I have not seen that.

Q   Have you looked at the Viagra label?

A   Yes, I have.

Q   Does the Viagra label provide any information
about the rate at which Viagra is metabolized and
how much remains in the bloodstream at various
points in time --

A   I believe it does. I don't have it committed to
memory, but I also understand that that's variable
depending on the patient, how quickly the liver
and kidneys clear a particular drug. So
everyone's different in terms of the length of
time that metabolites may remain in their system.

Q   You agree with me that the pharmacokinetic studies
of the metabolism of Viagra show that there is no
active ingredient left in the bloodstream after 24
hours; is that right?

MR. THORNBURGH: Objection.

THE WITNESS: I would have to see that
to -- I'm not a pharmacologist, so let me take a
look at it if you got something there.

(Exhibit No. 29 was marked for
Identification.)

BY MR. SLONIM:

Q   We've marked as deposition Exhibit No. 25, the --

**117**

29, the label for Viagra. Please turn to page 2,
Figure 1, at the bottom of the page. Do you see
that?

A   Yes, I do.

Q   That shows you the mean, meaning average,
Sildenafil and Viagra plasma concentrations in
healthy male volunteers starting at time zero,
which is time of ingestion, going through 24
hours. Do you see that?

A   Yes.

Q   And do you see that at the 24-hour mark that the
amount of Viagra left in the bloodstream is zero?

A   No, I do not see that.

Q   What do you see?

A   I see that there's still some Viagra left because
if it was zero that line would meet the X axis,
which it doesn't.

Q   Okay.

A   The medication half-life, what that means is that
half the medication is gone at a certain period of
time, and as -- as that half is halved is halved,
you're not reaching zero by 24 hours.

Q   Do you notice that at the zero -- Do you notice
that at the zero mark, zero hours from the time of
ingestion, that the zero is above some -- slightly

30 (Pages 114 to 117)

**118**

1  above the X axis so that they can show where the
2  line is? Do you see that on the left-hand side of
3  the curve?
4  A  Yes.
5  Q  And do you see that on the right-hand side of
6  the curve at 24 hours that the zero -- that the mark
7  is at the same height as the time of ingestion,
8  the zero mark?
9          MR. THORNBURGH: Objection.
10         THE WITNESS: I see where the mark is,
11  but I don't agree that there would be no Viagra in
12  the bloodstream at 24 hours.
13  BY MR. SLONIM:
14  Q  Okay.
15  A  I think it would be a small amount, but there
16  would still be some there.
17  Q  When you considered possible causes of
18  Mr. Martin's NAION, did you consider anything else
19  other than Viagra?
20  A  Well, as mentioned before, there are certain
21  clinical conditions that predispose one to
22  developing nonarteritic ischemic optic neuropathy,
23  whether that be diabetes or hypertension,
24  microvascular disease, hypotension, collagen
25  vascular disease, smoking, those sorts of things.

**119**

1  So yes, those -- those things were considered.
2  Q  Based on Mr. Martin's age and his vasculopathic
3  risk factors, his hypertension, his hyperlipidemia
4  and his diabetes, could those have accounted for
5  his NAION?
6  A  He would be at risk for that -- increased risk for
7  that given those diagnoses, yes.
8  Q  And so he could have just developed NAION as a
9  consequence of having the underlying risk factors
10  for the condition; is that right?
11  A  That's possible, correct.
12  Q  And are you familiar with spontaneous NAION?
13  A  Yes.
14  Q  Some people just wake up and have NAION, right?
15  A  Yes, but I think if you investigate further and
16  rule out other possible causes of loss of vision
17  due to optic nerve abnormalities, some things such
18  as optic neuritis may potentially be present and
19  unrecognized. And there's also the arteritic type
20  of ischemic optic neuropathy, which we haven't
21  really talked about much.
22  Q  But no one thinks he has arteritic --
23  A  No. He has a normal sedimentation rate and I
24  believe he had a temporal artery biopsy, and that
25  was ruled out.

**120**

1  Q  No one has ever suggested in this case that it was
2  an arteritic patho --
3  A  No. I think that was in a differential diagnosis,
4  though, so that was worked up and ruled out.
5  Q  Okay. But let's focus on the nonarteritic
6  ischemic optic neuropathy. Given the fact that
7  this is the most common form of optic neuropathy
8  that occurs in people over age 50, is there any
9  way you could rule out spontaneous NAION?
10  A  No.
11  Q  If someone came into your office with the precise
12  set of medical conditions that Mr. Martin had;
13  same age, same medical history, but no history of
14  using Viagra, with NAION, what would you say the
15  cause of the NAION was?
16  A  As we talked about before, the fact that as the
17  blood vessels are narrowed, the supply of blood to
18  the optic nerve may be interrupted. And the
19  thought is that perhaps when a person is sleeping
20  at night and their blood pressure normally lowers,
21  if that profusion pressure head is not enough to
22  nourish the optic nerve tissue, then it infarcts
23  and dies.
24  Q  And that could have happened to a person in
25  Mr. Martin's medical condition and age even if he

**121**

1  hadn't taken Viagra?
2  A  It's possible, yes, yes.
3  Q  And you noticed that Mr. Martin also was taking
4  medications for hypertension at the time he
5  experienced NAION and, in fact, had just been
6  changed a few days before to a new
7  anti-hypertensive, Catapres; is that right?
8  A  Yes.
9  Q  Can you rule out Catapres as possibly causing
10  Mr. Martin's NAION?
11  A  Well, as we saw in the clinical notes and I
12  mentioned earlier, when he came in on the 30th his
13  blood pressure was actually quite high. And so it
14  didn't appear that the Catapres was having much
15  effect on it.
16  Q  In your report -- I wanted to go to the impairment
17  point.
18  A  Okay.
19  Q  In your report you state that Mr. Martin's visual
20  impairment places him in the severe vision loss
21  category when compared to the International Ranges
22  of Vision Loss scale; is that right?
23  A  Yes, I did state that.
24  Q  Can you tell us what the International Ranges of
25  Vision Loss scale is?

31 (Pages 118 to 121)

**122**

1  A  Yes. I'm referencing the Guides to Impairment
2  of -- or Evaluation of Permanent Impairment, 6th
3  Edition, specifically looking at page 307, this
4  chart here. I found his functional acuity score
5  at 35. Can you see that?
6  Q  Yes.
7  A  Which when looking that this column corresponds to
8  Class 3A, AMA class of impairment of the visual
9  system. The corresponding International Range of
10  Vision Loss based on the ICD-IX criteria, Class 3A
11  corresponds to severe vision loss.
12  If we look further, the World Health
13  Organization ranges for international statistics
14  would classify that in the low vision range. We
15  drop down further in looking at estimated ability
16  to perform activities of daily living. Those are
17  things such as feeding one's self, washing one's
18  self, putting on your clothes, ambulating. We
19  find that in severe vision loss, Class 3A, that he
20  would be in the restricted category, restricted
21  performance, indicating that his performance would
22  be slower a normal person even with aids.
23  Aids meaning visual aids; magnifiers, glasses,
24  CCTV cameras, and then would there be needs and
25  means for visual rehabilitation. At that level it

**123**

1  is possible that there -- some vision enhancement
2  aids could help him; magnification, increased
3  lighting, increased contrast, those sorts of
4  things.
5  Q  Are there categories of visual impairment that are
6  worse than severe?
7  A  Yes.
8  Q  And what are those categories?
9  A  Profound and near or -- near total or total visual
10  loss.
11  Q  And based on the international scale and your
12  assessment, it was your opinion that Mr. Martin's
13  visual impairment is not profound; is that right?
14  A  Correct. According to what we've just mentioned,
15  it doesn't fall in the profound category.
16  Q  And you would also agree that his visual
17  impairment is not near blindness; is that right?
18  A  As defined, it's not near or total vision loss.
19  Q  Okay.
20  A  Now, there are several different ways, I mean, you
21  know, when we throw around the term legal
22  blindness, yes, he would fall under that category,
23  but if we're talking about the World Health
24  Organization or the other criteria, I've discussed
25  those.

**124**

1  Q  In terms of the international criteria for
2  assessing the magnitude of vision loss, there are
3  three categories of vision loss that are greater
4  than -- than Mr. Martin's vision loss is.
5  A  Well, actually two. They lump -- The profound
6  vision loss is one category, and then total or
7  near total vision loss is the worst.
8  Q  Okay. And in making your assessment of
9  Mr. Martin's visual impairment did you conduct any
10  type of a physical examination or --
11  A  No. I did not do a hands-on exam. This was done
12  by -- strictly by review of the records at hand.
13  Q  Let's turn to Mr. Stanley. Mr. Stanley was
14  diagnosed with NAION in September of 2000; is that
15  right?
16  A  Correct.
17  Q  And did you note in the records that you had
18  reviewed that Mr. Stanley had been using Viagra
19  once every week -- once or twice every -- once
20  every week for about two to five months without
21  any prior affect on his vision?
22  A  Right. I believe it was more towards the
23  five-month time period rather than two, but --
24  yeah, I wouldn't dispute that because -- Yeah.
25  Here I go on further and say he got his first six

**125**

1  samples of Viagra on March 3rd, 2000. So, you
2  know, that's almost six months.
3  Q  So in any event, based on the records that you've
4  reviewed, Mr. Stanley had used Viagra, had been
5  challenged with Viagra and rechallenged with
6  Viagra a number of times over a six-month period
7  prior to his NAION, and during those prior uses of
8  Viagra not --
9  A  Correct. He had given --
10  MR. THORNBURGH: Objection. Sorry.
11  THE WITNESS: Can I go ahead?
12  MR. THORNBURGH: Yeah.
13  THE WITNESS: -- six samples on
14  March 3rd, 18 prescribed on April 18th, and then
15  18 on December 8th of 2000.
16  BY MR. SLONIM:
17  Q  How do you account for the fact that Mr. Stanley
18  was able to use Viagra repeatedly prior to
19  developing the NAION without reporting any ill
20  effect on his vision?
21  MR. THORNBURGH: Objection.
22  THE WITNESS: Once again, the same
23  explanation. You can take a drug. It may not
24  have an ill effect until sometime after starting
25  it. As to why it happened that particular day and

32 (Pages 122 to 125)

**126**

1  it didn't happen the day before or two weeks
2  before, I'm not absolutely certain.
3  BY MR. SLONIM:
4  Q   Or it could be a coincidence that at the time it
5  happened you just happened to have taken Viagra a
6  few days before, isn't that right?
7         MR. THORNBURGH: Objection.
8         THE WITNESS: That's a possibility,
9  but I think in this case we did have documentation
10  that he told his physician he had used it one to
11  two days prior to loss of vision in his eye.
12  BY MR. SLONIM:
13  Q   And so in this case you found in the -- in the
14  medical records a notation that Mr. Stanley had
15  reported that he had used Viagra one to two days
16  before the loss of vision?
17  A   Correct.
18  Q   And given what we saw about how quickly Viagra
19  washes out of the bloodstream --
20  A   Yes.
21  Q   -- if it was more than a 24-hour -- Mr. Stanley
22  reported one to two days between the time he used
23  Viagra and the onset of his NAION. Given the
24  half-life of Viagra and the rate at which it
25  washes out of the bloodstream, is it your opinion

**127**

1  that Viagra still could have caused the NAION?
2         MR. THORNBURGH: Objection.
3         THE WITNESS: I would say most likely
4  within the first 24 hours, but once again,
5  anecdotal reports, I believe, patients as far as
6  36 hours out have -- have been reported in the
7  literature.
8  BY MR. SLONIM:
9  Q   Those patients reported in the literature are case
10  reports without any control group; is that right?
11  A   Correct.
12  Q   That's just somebody saying gee, a patient took
13  Viagra 36 hours ago and -- when they came into
14  my office I diagnosed NAION, right?
15  A   Correct.
16  Q   There may or may not be any causation in those
17  case reports; is that right?
18         MR. THORNBURGH: Objection.
19         THE WITNESS: Well, I wouldn't lump
20  the case reports together as a single entity, but
21  certainly I think some of the cases have stronger
22  documentation than others in terms of whether
23  causation was there.
24  BY MR. SLONIM:
25  Q   Did you notice in Dr. -- in Dr. Bhavsar's notes

**128**

1  any indication that Mr. Stanley had taken Viagra
2  in close temporal association with his NAION?
3  A   You want me to use an exhibit, or --
4  Q   Let me -- Let me -- In the interest of time, let
5  me just mark an exhibit.
6  A   May I take a peek out in hallway just to see if
7  we're --
8         VIDEOGRAPHER: We are going off the
9  record at 11:58 a.m.
10         (Exhibit No. 30 was marked for
11  identification.)
12         (Discussion off the record.)
13         VIDEOGRAPHER: We are back on the
14  record at 11:59 a.m.
15  BY MR. SLONIM:
16  Q   We've marked as deposition Exhibit No. 30 a record
17  from Dr. Bhavsar of Mr. Stanley. These are dated
18  September 5th, 2000. Do you have that in front of
19  you?
20  A   Yes, I do.
21  Q   Do you see that Dr. Bhavsar notes various
22  medications, but does not indicate Viagra?
23  A   What I see, it looks to me like he has written
24  same and then he's put Cardizem added. So I would
25  probably refer to an earlier note where he would

**129**

1  have had a complete listing of all his
2  medications. Generally, that's convention. If
3  you've seen a patient more than once and they come
4  back and medicines haven't changed, you just write
5  same.
6  Q   We'll mark as a deposition exhibit Dr. Bhavsar's
7  full set of records. I'm not sure I have
8  Dr. Bhavsar's full records with me. Can you see
9  if, in your records, if you can find any
10  indication that he told Dr. Bhavsar -- if there's
11  any mention in Dr. Bhavsar's records of Viagra?
12  A   Well, I'm looking at a note dated June 7, 2000,
13  and it says medication changes, it says not on
14  Coumadin yet. That's what he says there.
15  Q   No reference to Viagra?
16  A   I don't see that there. I do see -- There's a
17  letter signed by Dr. Bhavsar, March 14th, 2001,
18  thanking Mr. Stanley for a letter regarding
19  reported association of Viagra with anterior
20  ischemic optic neuropathy.
21  Q   I'm sorry. When is that?
22  A   March 14th, 2001. Says perhaps you may wish to
23  consider discontinuing Viagra given these findings
24  that you've discovered.
25  Q   But that's not a contemporaneous record indicating

**130**

1  that he had used Viagra --
2  A   No, no.
3  Q   -- in the close proximity to the onset of NAION.
4  A   I don't see Viagra listed in there. However,
5      there was a -- Oh, I think we had the
6      pharmaceutical records of the Viagra being
7      dispensed. Looked like he got some on April 18th
8      of 2000 and December 8th of 2000, hundred
9      milligram tablets.
10 Q   But again, no --
11 A   But again, no --
12 Q   -- no indication that he took it in close
13     proximity to the onset?
14 A   Correct. Correct.
15 Q   Dr. Bhavsar referred Mr. Stanley to a
16     neuro-ophthalmologist, Dr. Weingarden; is that
17     right?
18 A   Right.
19 Q   Let's mark as deposition Exhibit No. 31 records of
20     that referral.
21         (Exhibit No. 31 was marked for
22     identification.)
23         THE WITNESS: Yeah. This is Bhavsar's
24     letter to Sheridan, who -- I'm not sure if -- I
25     think Sheridan must be Stanley's primary

**131**

1  ophthalmologist. Bhavsar is the retinal surgeon,
2  and then Bhavsar is recommending follow-up with
3  Weingarden.
4  BY MR. SLONIM:
5  Q   Okay.
6  A   This isn't Weingarden.
7  Q   This is not Weingarden.
8  A   No.
9  Q   No reference of any connection between Viagra and
10     Mr. Stanley's NAION?
11 A   Not in this letter.
12 Q   Okay. Did you notice that Dr. Sheridan and
13     Dr. Weingarden are part of the same practice
14     group?
15 A   They're in a -- big group there in St. Paul.
16     Yes, I am aware of that.
17 Q   Let's mark as deposition Exhibit No. 32 records
18     from Dr. Pelletier and Dr. Sheridan, that same
19     group, relating to Mr. Stanley.
20         (Exhibit No. 32 was marked for
21     identification.)
22         THE WITNESS: Now, who's Pelletier?
23     Is he one of Sheridan's partners?
24 BY MR. SLONIM:
25 Q   Yeah. These were records that were produced to us

**132**

1  from the whole group.
2  A   Okay.
3  Q   By the whole group. And take a look at the lower
4      left-hand -- the entry for the lower left-hand
5      corner dated September 7.
6  A   Um-hum.
7  Q   Do you see that there are various medications that
8      Mr. Stanley reported to Dr. Weingarden?
9  A   Yes. Looks like he misspelled diuretics.
10     Sacalol, Dysoxa --
11 Q   But the --
12 A   -- Coumadin.
13 Q   Do you see any -- any reference to Viagra?
14 A   I'm trying to read what that -- Can't read all of
15     it, but I don't see anything that looks like
16     Viagra listed.
17 Q   Can you find a single record relating to
18     Mr. Stanley in the year 2000 which suggests that
19     Mr. Stanley took Viagra shortly before the onset
20     of his NAION?
21 A   In the year 2000?
22 Q   Yes.
23 A   No. I have not seen that. Only after the fact,
24     and then in his conversation with myself.
25 Q   Did Mr. Stanley -- When you talked to Mr. Stanley

**133**

1  did he tell you that he had done research on the
2  Internet after he developed his NAION to try to
3  figure out what may have caused it?
4         MR. THORNBURGH: Objection.
5         THE WITNESS: Yes. I believe he
6     did -- had done some -- some reading about it.
7  BY MR. SLONIM:
8  Q   On the Internet?
9  A   I believe it was on the Internet, yes.
10 Q   And do you know whether Mr. Stanley reported to
11     his physicians that he had taken Viagra in close
12     association with his NAION only after he had done
13     his Internet research?
14         MR. THORNBURGH: Objection.
15         THE WITNESS: I don't know that --
16     that specifically, but I do know that there was
17     that letter there where he did contact Dr. Bhavsar
18     and ask his opinion regarding some research he had
19     done, but that was after the fact. He didn't -- I
20     don't believe he specifically mentioned Internet
21     research on that.
22 BY MR. SLONIM:
23 Q   But is it your understanding that -- that
24     Mr. Stanley only mentioned Viagra in close
25     temporal association with NAION after he had gone

34  (Pages 130 to 133)

**134**

1  on the Internet -- after he had done research
2  on -- to possible causes?
3      MR. THORNBURGH: Objection.
4      THE WITNESS: Yes.
5  BY MR. SLONIM:
6  Q  In view of Mr. Stanley's age, his hypertension,
7     his atrial flutter and fibrillation, which we
8     haven't talked about but which you saw in the
9     medical records, was Mr. Stanley at an elevated
10    risk for developing NAION?
11     MR. THORNBURGH: Objection.
12     THE WITNESS: Yes.
13 BY MR. SLONIM:
14 Q  Can you rule out the possibility that
15    Mr. Stanley's NAION was attributable to his age
16    and his cardiovascular risk factors?
17 A  No.
18     MR. THORNBURGH: Objection.
19 BY MR. SLONIM:
20 Q  One of the records indicates -- several of the
21    records indicate that Mr. Stanley was started on a
22    cardiac medication called Sotalol shortly before
23    the onset of his NAION.  Did you see those
24    records?
25 A  Which doctor started him on that?  I don't know if

**135**

1  I saw that.  I remember seeing Sotalol mentioned,
2  but not at the time at which it was prescribed.
3  Q  I think about -- Do we have Bhavsar 2?  Bhavsar 2.
4     Take a look at deposition Exhibit 30.  I don't
5     know if this will give us a start date.  Yeah.
6     Take a look -- Well, take a look at deposition
7     Exhibit No. 30.  That's the Bhavsar 2.  I think
8     it's in front of you.
9  A  I'm looking at 32 here.  Okay.  Let's see.  Where
10    are you?  Those are the articles.
11 Q  Well, let me give --
12 A  Can I look at yours?
13 Q  Let me give you my copy.
14 A  This is 30.
15 Q  30.  That's deposition Exhibit No. 30.  It's
16    Bhavsar 2.  Is that --
17 A  Says Cardizem added, changed -- Cardizem added,
18    changed to Sotalol.  Not sure what that means.
19     MR. THORNBURGH: I'm sorry.  Where are
20    you guys looking at?
21     THE WITNESS: Here.
22 BY MR. SLONIM:
23 Q  Okay.  So you're not able to tell from these --
24    Are you able to tell from this record when he
25    started Sotalol in relation to the NAION?

**136**

1  A  No.
2  Q  Okay.  Well, let me ask it in the hypothetical.
3     If he had started Sotalol in -- within the several
4     weeks before his NAION, would you be able to rule
5     out Sotalol as a possible cause of the NAION?
6  A  You know, if it's possible that it had an affect
7     of lowering the blood pressure, that -- it could
8     have contributed.
9  Q  Do you know what Sotalol is?  It's an
10    anti-arrhythmic.
11 A  Yes.  I believe a beta blocker.  It's in the beta
12    blocker family.  And beta blockers can decrease
13    contractility and the force with which blood is
14    pumped, which may have a result in decrease in
15    blood pressure.
16 Q  Let's turn to the impairment with respect to
17    Mr. Stanley.
18 A  Okay.
19 Q  In your report you state that Mr. Stanley's visual
20    impairment places him in the moderate vision loss
21    category when compared to the International Ranges
22    of Vision Loss scale; is that right?
23 A  Yes.  That's what I state in here.
24 Q  And can you tell us how you reached that
25    assessment?

**137**

1  A  Well, in his case, and we're looking at the same
2     table, 1210, his functional vision score was
3     higher than Mr. Martin's.  His was 70 because he
4     did not have the bilateral vision loss.  So when
5     we look at 70 here, we're looking at AMA Class 2
6     impairment.
7         Coming down here to the International
8     Ranges of Vision Loss, moderate category here, all
9     on the same column.  World Health Organization
10    would consider that still low vision, and there
11    would be some need for visual aids, and vision
12    enhancement aids such as magnification, increased
13    lighting or contrast would potentially benefit
14    someone such as this.
15 Q  And are there categories of visual impairment that
16    are more severe than moderate?
17 A  Yes.  There's severe, profound and then total or
18    near total vision loss.  Three -- Three categories
19    worse.
20 Q  And based on the international scale and your
21    assessment, Mr. Stanley did not suffer any of
22    those more significant visual impairments, the
23    severe or the profound --
24 A  Or total or near total, no.
25 Q  Right.

35  (Pages 134 to 137)

**138**

1  A   Once again, just to clarify, we're looking at, you
2      know, function of both eyes together.
3  Q   Yes. By the way, do you know if Mr. Stanley is
4      able to drive?
5  A   Let's see here. He does still hold a driver's
6      license, but he did state to me that his wife
7      doesn't like him to drive, and they're going
8      somewhere so she'll drive and have him be the
9      passenger, but he does still hold a driver's
10     license.
11 Q   And he is able to drive?
12 A   Yes. Martin isn't.
13 Q   In your report you noted that Mr. Stanley has
14     difficulty using a computer.
15 A   Correct.
16 Q   Is that something he told you?
17 A   Yes.
18 Q   Would it affect your assessment if you knew that
19     Mr. Stanley spent a lot of time using a computer?
20     MR. THORNBURGH: Objection.
21     THE WITNESS: Well, I have a
22  brother-in-law who's legally blind who uses a
23  computer quite a bit, but he has a talking
24  computer. So just because you have difficulty
25  doesn't mean that you might not use it for, you

**139**

1   know, a considerable amount of time, and it also
2   might mean that it may take you longer to do what
3   you formerly did in a shorter period of time.
4  BY MR. SLONIM:
5  Q   In your report you noted that Mr. Stanley's
6      problems with ambulation, walking, are not due
7      wholly to his vision loss and that they're
8      partially attributable to problems with his leg.
9      Is that something that you took into account when
10     you assessed his degree of impairment?
11 A   Yes.
12 Q   And can you explain how you -- how you took into
13     account the fact that some of the ambulation
14     problem was not attributable to vision?
15 A   Well, the impairment ratings here are strictly
16     based on the person's visual field and visual
17     acuity scores. So it doesn't take into account
18     other disabilities a person may have.
19     There is the ability to give
20  additional percentage, up to 10 percent, for
21  things that don't necessarily fit in this
22  category; things such as disfigurement, eye
23  irritation, pain, things such as that. I felt in
24  his particular case that a five-point reduction in
25  his functional visual score rather than a 10-point

**140**

1   reduction was -- was in order given the fact that
2   he did have a loss of useful depth perception, or
3   stereopsis is the medical term.
4  Q   So in other words, you -- you tried -- when you
5      made the assessment, what you're telling us is
6      that you tried to account appropriately for the
7      fact that some of the difficulty in walking was
8      not attributable to the vision?
9  A   Correct. Correct. And given the fact that you
10     could rate -- give an additional rating up to
11     10 percent as opposed to the five percent that I
12     gave.
13 Q   And in making your assessment about Mr. Stanley's
14     visual impairment did you conduct any type of
15     physical examination of him?
16 A   No. This was purely based on a review of the
17     records.
18     MR. SLONIM: Let me just take a
19  minute, consult with my colleague and see if we
20  have any other questions.
21     VIDEOGRAPHER: We are going off the
22  record at 12:16 p.m.
23     (Recess taken.)
24     VIDEOGRAPHER: We are back on the
25  record at 12:21 p.m.

**141**

1     MR. SLONIM: Dan, I pass the witness.
2     MR. THORNBURGH: Thank you.
3     EXAMINATION
4  BY MR. THORNBURGH:
5  Q   Dr. Williams, I just have a couple follow-up
6      questions. Doctor, you're familiar with a
7      differential diagnosis?
8  A   Correct.
9     MR. SLONIM: Objection.
10 BY MR. THORNBURGH:
11 Q   And did you -- Is that one of the bases of your
12     opinion as it relates to both plaintiffs'
13     condition of NAION?
14 A   Yes.
15 Q   Okay. And can you explain to us what a
16     differential diagnosis is?
17 A   Well, a differential diagnosis is a list of
18     possible diagnoses that could cause a clinical
19     syndrome or clinical finding. You can sort of
20     think of it as a top 10 list, or sometimes less
21     than 10 or more than 10. Likely types of things
22     that could be responsible for a -- a clinical
23     problem.
24     For example, a person presents to the
25  clinic. They've got a cough that's productive.

36 (Pages 138 to 141)

**142**

1  You could think it's a viral upper respiratory
2  infection. Could be pneumonia. It might be
3  tuberculosis. Could possibly be an anthrax
4  infection, but that would be very rare, but those
5  things could be potentially included in a
6  differential diagnosis.
7  Q   And you used a differential diagnosis in reaching
8      your conclusion with respect to Mr. Stanley?
9  A   Correct. And I think -- in this particular case I
10     don't think there's any dispute on either side
11     that he has nonarteritic ischemic optic
12     neuropathy. I think the dispute lies in, you
13     know, what contributed to it or what caused it.
14     And certainly there are, as we've talked about
15     before, many predisposing things that can increase
16     a person's risk of developing a nonarteritic
17     ischemic optic neuropathy.
18  Q   And did you rule out the other risk factors and
19     determined that Viagra was the cause?
20  A   In this particular case, based on a review of the
21     records, review of the literature, and then a
22     personal conversation in which both Mr. Martin and
23     Stanley did account to me a close temporal
24     relationship between taking Viagra and having the
25     visual symptoms, I felt that, to a reasonable

**143**

1  degree of medical probability, that the Viagra
2  played a role.
3  Q   I understand -- I appreciate counsel's review of
4      the records, but in your -- in your -- do you
5      treat anybody currently or have you treated
6      anybody the past that has been prescribed Viagra?
7  A   I certainly see patients all the time in my
8      practice who are taking Viagra or similar
9      medications.
10  Q   And what is Viagra used for?
11  A   It's used for erectile deficiency, or ED.
12  Q   And the patients that you treat, are they often a
13     little bit embarrassed about their -- their
14     condition of erectile dysfunction?
15  A   Yes, to the point that sometimes it's not even
16     mentioned in the clinical encounter and I might
17     see it in the electronic medical record and say
18     oh, did you forget to mention that to me and --
19     Yeah, it's an embarrassing thing, I think.
20  Q   So often times patients may not tell you that
21     they -- they were on Viagra?
22  A   I think that's a fair statement.
23  Q   All right. And in 2002 when Mr. Stanley was
24     diagnosed with NAION -- I believe that was the
25     time, right?

**144**

1           MR. SLONIM: No.
2  BY MR. THORNBURGH:
3  Q   Sorry. May 31st, 2002?
4           MR. SLONIM: No.
5           THE WITNESS: That's Martin. 2000 is
6  Stanley.
7           MR. THORNBURGH: Okay. September of
8  2000?
9           MR. SLONIM: Yes.
10          THE WITNESS: Yeah.
11 BY MR. THORNBURGH:
12 Q   In September of 2000 was there any literature that
13     linked Viagra to NAION?
14 A   I believe the first clinical report --
15 Q   Let me rephrase. Was there any -- Was it well
16     known to the general public that Viagra caused
17     blindness?
18 A   No.
19          MR. SLONIM: Objection.
20 BY MR. THORNBURGH:
21 Q   Had it been known, Mr. Stanley perhaps could have
22     linked it and told his doctor that he had been
23     taking Viagra at the time of his blindness.
24          MR. SLONIM: Objection.
25          THE WITNESS: That's possible, yes.

**145**

1  BY MR. THORNBURGH:
2  Q   And same for Mr. Martin. In 2002 when he was
3      diagnosed with NAION, was it widely known to the
4      general public that Viagra caused blindness?
5           MR. SLONIM: Objection.
6           THE WITNESS: At that time it was -- a
7  handful of cases had been reported. So not
8  widely --
9  BY MR. THORNBURGH:
10 Q   The FDA wasn't -- wasn't telling -- wasn't sending
11     out alerts to consumers?
12 A   Not at that point.
13 Q   But -- So the only way that Mr. Stanley or
14     Mr. Martin would have known that Viagra caused
15     NAION is if Pfizer had warned them about it.
16          MR. SLONIM: Objection.
17          THE WITNESS: Or if they'd heard about
18     it through the mainstream media. That's typically
19     where patients hear about problems with drugs.
20 BY MR. THORNBURGH:
21 Q   But if the mainstream media wasn't reporting it in
22     2000 or 2002, the only way Martin or Stanley would
23     have found out about the problem is through
24     Pfizer.
25          MR. SLONIM: Objection.

**37 (Pages 142 to 145)**

## 146

1      THE WITNESS: That would have been the
2  source you would expect to have put the
3  information out.
4  BY MR. THORNBURGH:
5  Q   If Pfizer had clinical studies in 2002, wouldn't
6      you expect them -- or earlier, wouldn't you expect
7      them to warn consumers about the risk?
8  A   If there had been reported cases in the -- in the
9      Phase I or Phase II or Phase III clinical trials,
10     it's incumbent upon them to report that to the
11     FDA.
12 Q   And the FDA hasn't been called as an expert or
13     witness in this legal proceeding to testify on the
14     legal causation of Viagra and its association to
15     NAION, have they?
16     MR. SLONIM: Objection.
17     THE WITNESS: Not to my knowledge.
18 BY MR. THORNBURGH:
19 Q   Does Sildenafil cause NAION?
20 A   In my opinion, in these particular two -- two
21     particular cases, to a reasonable degree of
22     medical probability, it was a factor in the
23     development of nonarteritic ischemic optic
24     neuropathy.
25 Q   Do they warn about NAION on their label?

## 147

1  A   There is a -- a warning currently that if a person
2      has some of these conditions we've previously
3      talked about, that they should discuss it with
4      their doctor because there have been -- there is
5      potential risk.
6  Q   Does Zocor cause NAION?
7  A   Not to my knowledge.
8  Q   Any of the other medications that you reviewed
9      from either the Stanley records or the Martin
10     records, have any of those other medical
11     prescriptions been linked to NAION?
12 A   Not to my knowledge.
13 Q   So the only other drug that Mr. Stanley was taking
14     in 2000 when he was diagnosed with NAION that had
15     been associated or has been associated with NAION
16     is Viagra, correct?
17 A   Correct.
18 Q   And you looked at these drugs and the temporal
19     relationship between his use and his injury to
20     reach the conclusion that Mr. Stanley's injury was
21     caused by Viagra and not by anything else,
22     correct?
23     MR. SLONIM: Objection.
24     THE WITNESS: Well, as I said, I
25     believe it was a contributing factor to it. He

## 148

1      did have other risk factors, but given the
2      temporal -- at least as reported to me by both
3      patients, the temporal association between taking
4      it and developing the problem in a short period of
5      time and looking at similar cases reported in the
6      literature, I felt that there was causation, yes.
7  BY MR. THORNBURGH:
8  Q   And you were able to rule out these beta blocker
9      drugs as a potential cause because you looked at
10     the records and you noted that there was no
11     hypo -- hypotension?
12 A   Correct. As I referred to in that one note, I
13     believe the blood pressure while on Catapres 159
14     systolic, which normal should be about 120. So
15     that was almost 40 points higher than normal. I
16     think we got a group forming out here.
17 Q   Okay. One question then. In Martin, he was
18     diagnosed with NAION on two different occasions;
19     one in his left eye and one in his right eye?
20 A   Yes.
21 Q   And each time he had stated to you and during his
22     deposition -- or assume with me during his
23     deposition, that he was on Viagra at the time --
24     or within just 24 hours or less of his injury,
25     correct?

## 149

1  A   That's what he told me.
2  Q   And that's what we call challenge/rechallenge?
3  A   In this particular case you could use that
4      terminology.
5  Q   In -- In the articles that were referenced
6      previously, I believe in Erectile Dysfunction Drug
7      and Nonarteritic Anterior Ischemic Optic
8      Neuropathy, Is There a Cause and Effect
9      Relationship, it's been marked as defendant's
10     Exhibit No. --
11     MR. SLONIM: Is it Hayreh's article?
12     THE WITNESS: Yes. 23. Got it.
13 BY MR. THORNBURGH:
14 Q   23? And can you read the last sentence in -- on
15     the right-hand side of the -- of the --
16 A   Yes. It says quote, "Despite a lack of mechanism
17     of action, the strong rechallenge data, Reference
18     9, suggests the drug effect may be significant.
19     And Reference 9 is Bollinger, Lee article,
20     Recurrent Visual Field Defect in Ischemic Optic
21     Neuropathy Associated with Tadalafil Rechallenge,
22     Archives Ophthalmology 2005.
23 Q   And does Dr. Hayreh reference Pomeranz's articles
24     there? Or Egan and -- I'm sorry, Egan and
25     Fraunfelder?

38 (Pages 146 to 149)

## 150

1  A   Yeah. He references Egan, Egan and Pomeranz,
2      Pomeranz, Pomeranz, references himself a lot,
3      and -- Let's see. I don't -- I'm looking for
4      Fraunfelder here. No, I didn't see Fraunfelder.
5  Q   I think in the -- in the paragraph itself he's
6      referencing the Archives of Ophthalmology?
7  A   Oh, okay. Egan and Fraunfelder, 11, yes. Okay.
8  Q   Saying that the connection between Sildenafil --
9  A   Yeah, Reference 11.
10 Q   -- use and development of NAION does not meet
11     World Health Organization's criteria for cause and
12     effect relationship, but go on to state that
13     despite a lack of mechanism of action, a strong
14     rechallenge data suggests the drug's effect may be
15     significant. Does it state that?
16 A   Yes.
17 Q   Did I read that correctly?
18 A   Yes. We really have to finish it up.
19 Q   Okay. The other articles that -- that you have
20     read haven't said that there is no cause and
21     effect relationship, have they? In fact, they --
22     they have associated NAION to the use of --
23 A   Right. There's an association --
24         MR. SLONIM: Objection. Let me just
25     get it on. Objection.

## 151

1  BY MR. THORNBURGH:
2  Q   You can answer.
3  A   The articles I've looked at have -- have said that
4      there is a -- no one has proved a pure cause and
5      effect relationship, but we have to look at where
6      the bar is set for proving cause and effect in the
7      medical world and suggesting a cause and effect to
8      a reasonable degree of medical certainty. Those
9      two percentages are not the same. So I think we
10     may be talking about apples and oranges here.
11         I think it's a higher -- much higher
12     bar to prove cause and effect, whether it's a
13     toxin or a medication, in the medical realm when
14     looking at an individual drug, as opposed to more
15     likely than not, 51 percent or greater, that sort
16     of thing.
17         MR. THORNBURGH: Okay. All right.
18     Thank you. No further questions.
19         EXAMINATION
20 BY MR. SLONIM:
21 Q   Just one other question. You were asked a
22     question about the label. Would you turn to
23     Exhibit No. 29, which is the label. Turn, please,
24     to page 23.
25 A   Okay.

## 152

1  Q   And you were asked about the warning that was
2      given in connection with Viagra and -- and NAION.
3      Do you recall those questions?
4  A   Yes.
5  Q   Okay. And do you see that -- that the warning
6      itself states, last sentence of the warning, it is
7      not possible to determine whether these events,
8      meaning NAION, are related directly to the use of
9      PDE-5 inhibitors, to the patients' underlying
10     vascular risk factors, or anatomical defects, to a
11     combination of these factors or to other factors;
12     is that right?
13 A   That's what it says there.
14 Q   So in other words, the warning says although there
15     have been reports of NAION among Viagra users,
16     whether or not the drug is the cause is not known
17     at this time; is that right?
18 A   Right. Then it refers to precautions information
19     for patients for further detail.
20 Q   Correct.
21         MR. SLONIM: I have no further
22     questions.
23         EXAMINATION
24 BY MR. THORNBURGH:
25 Q   Just one more on that. And that's Pfizer's label?

## 153

1  A   Well, this is -- looks like the label, but --
2  Q   Look at the last page.
3  A   -- I don't see it labeled Pfizer.
4  Q   Look at the last page, page 25.
5  A   Oh, yeah. Says Pfizer Labs. Revised August 2008.
6          MR. THORNBURGH: Okay. That's all.
7          MR. SLONIM: We're done.
8          VIDEOGRAPHER: This ends the video
9      deposition of John M. Williams, Sr., M.D., M.P.H.,
10     on January 13, 2009. The time, 12:36 p.m.
11         (At 12:36 p.m. the deposition
12     concluded.)
13
14
15         JOHN M. WILLIAMS
16
17 Subscribed and sworn to before me
18 this _____ day of _____, 2009.
19
20
21     _____
22         Notary Public
23
24
25

39 (Pages 150 to 153)

154

1   STATE OF WISCONSIN )
2   MILWAUKEE COUNTY   ) SS:
3            I, KIM M. PETERSON, CM, Registered
4   Professional Reporter and Notary Public in and for the
5   State of Wisconsin, do hereby certify that the deposition
6   of JOHN M. WILLIAM, SR., M.D., M.P.H., was taken before
7   me at 3000 Westhill Drive, Wausau, Wisconsin, on the 13th
8   day of January, 2009, commencing at 9:10 o'clock in the
9   forenoon.
10            That it was taken at the instance of
11   Pfizer upon verbal interrogatories.
12            That said deposition was taken to be
13   used in an action now pending in the United States
14   District Court, District of Minnesota, in re:  Viagra
15   Products Liability Litigation, Martin v. Pfizer and
16   Stanley v. Pfizer.
17            A P P E A R A N C E S
18            AYLSTOCK WITKIN KREISS & OVERHOLTZ,
19   PLLC, 803 North Palatox Street, Pensacola, Florida,
20   32501, by MR. DANIEL THORNBURGH, appeared on behalf of
21   Mr. Martin and Mr. Stanley.
22            KAYE SCHOLER, LLP, 425 Park Avenue,
23   New York, New York, 10022-3598, by MR. BERT L. SLONIM and
24   MS. AVIGAEL FYMAN, appeared on behalf of Pfizer.
25            ALSO PRESENT:  Mr. Neil D. Overholtz,

155

1   via telephone.
2            That said deponent, before
3   examination, was sworn to testify the truth, the whole
4   truth, and nothing but the truth relative to said cause.
5            That the foregoing is a full, true and
6   correct record of all the proceedings had in the matter
7   of the taking of said deposition, as reflected by my
8   original machine shorthand notes taken at said time and
9   place.
10
11
12
13
14
15
16
17
18            _____
18            Notary Public in and for
19            the State of Wisconsin
20
21
22   Dated this 19th day of January, 2009,
23   Milwaukee, Wisconsin.
24   My commission expires April 11, 2010.
25

40  (Pages 154 to 155)