# In The Matter Of:

## In Re: Viagra Products Liability Litigation

---

### DANIEL A. SHAMES
### March 13, 2009

---

# MERRILL LEGAL SOLUTIONS

## 25 West 45th Street - Suite 900
## New York, NY 10036
### PH: 212-557-7400 / FAX: 212-692-9171

### SHAMES, DANIEL A. - Vol. 1

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---------------------------------x

In re

Viagra Products Liability Litigation,

                        MDL Docket No. 1724

This Document Relates to All Actions

---------------------------------x

                    March 13, 2009

                    10:55 a.m.


          Deposition of DANIEL A. SHAMES, taken by

Plaintiffs, pursuant to Notice, at the offices

of Kaye Scholer LLP, 425 Park Avenue, New York,

New York, before ERIC J. FINZ and ANITA SHEMIN,

Shorthand Reporters and Notaries Public within

and for the State of New York.

Page 2

1
2   A P P E A R A N C E S:
3   BEFORE:
4       JOHN W. BORG, ESQ.
            Special Master
5
6
        THE MILLER LAW FIRM, LLC
7       Attorneys for Plaintiffs
            Two Bala Plaza
8           Bala Cynwyd, Pennsylvania 19004
9   BY:   CHRISTOPHER A. GOMEZ, ESQ.
10
11      KAYE SCHOLER LLP
            Attorneys for Pfizer
12          425 Park Avenue
            New York, New York 10022
13
        BY:   LORI B. LESKIN, ESQ.
14              -and-
            MARK D. SPATZ, ESQ.
15
16
17  ALSO PRESENT:
18  CHRISTINE HOGAN, Kay Scholer LLP
19
20
21
22
23
24
25

Page 3

1           DANIEL A. SHAMES
2   D A N I E L   A.   S H A M E S,
3   having been first duly sworn by the Notary
4   Public (Eric J. Finz), was examined and
5   testified as follows:
6           EXAMINATION BY
7           MR. GOMEZ:
8       Q.   Good morning, Dr. Shames.
9       A.   Yes.
10      Q.   Did I pronounce that correctly?
11      A.   Yes.
12      Q.   We met earlier.  My name is Chris
13  Gomez, I'm here to take your deposition today.
14          From what I understand, this is
15  your first time ever giving a deposition?
16      A.   That's correct.
17      Q.   Before we begin, let me go over a
18  few things with you.  I'm going to be asking
19  the questions, you'll be providing me the
20  answers.  I'm usually the culprit, but we
21  can't talk over each other so the court
22  reporter can take down an accurate record.
23  Feel free to tell me if I'm doing that,
24  because I'm the one that usually does it.
25      A.   Okay.

Page 4

1           DANIEL A. SHAMES
2       Q.   Any time you don't understand my
3   question, you'll tell me?
4       A.   Yes.
5       Q.   So if you do answer my question,
6   I'm going to assume you answer it truthfully
7   and fully.  Is that fair?
8       A.   That's fair.
9       Q.   If you need a break at any time,
10  as Judge Borg indicated, please tell me, and
11  we'll accommodate you.
12      A.   Um-hum.
13      Q.   If you could just state your full
14  name and address for the record.
15      A.   Daniel A. Shames.  In New York
16  it's 180 West End Avenue, Apartment 27-B, New
17  York, New York.
18      Q.   And are you a medical doctor?
19      A.   Yes.
20      Q.   What's your specialty?
21      A.   Urology.
22      Q.   And do you currently treat
23  patients?
24      A.   No, I do not.
25      Q.   I have seen some indications that

Page 5

1           DANIEL A. SHAMES
2   you have a urology practice in South Carolina;
3   is that correct?
4       A.   I had a urology practice in South
5   Carolina, that is correct.
6       Q.   When did you stop being associated
7   with that practice?
8       A.   In 1996.
9       Q.   Okay.  Have you treated patients
10  in the urology field since 1996?
11      A.   I briefly treated patients early
12  on during the period when I started at FDA in
13  a clinic, in a teaching, I was an associate
14  professor at Georgetown.  And I was in a
15  clinic with the residents and performed some
16  teaching services and treated patients with
17  the residents.  I did a clinic.  Only one half
18  afternoon a week.
19      Q.   Okay.  Doctor, I'm going to mark
20  now as Exhibit 1, Shames 1, what's called the
21  notice of your videotape deposition, which is
22  not being videotaped.
23          (Shames Exhibit 1 for
24          identification, notice of videotape
25          deposition.)

Page 6

DANIEL A. SHAMES
1
2    Q.    I'll just pass that to you.
3          MR. GOMEZ:  Lori, do you need a
4    copy?
5          MS. LESKIN:  I don't have a copy
6    with me.
7    Q.    Doctor, have you seen that
8    document before?
9    A.    Yes, I have.  I have seen this
10   document before.
11   Q.    I just want to point your
12   attention to the, just go to the back, I
13   believe it's the third page from the back,
14   there is a page entitled "attachment A."
15         Do you see that?
16   A.    Yeah, I see that.
17   Q.    When you received that document
18   and reviewed it, did you have a chance to go
19   through all the things on there to determine
20   if you had any responsive documents?
21   A.    Yes, I did.
22   Q.    And just for the record, I've been
23   provided with a pile of documents here that
24   you reviewed in preparing your report as well
25   as your deposition.  Is that fair?

Page 7

DANIEL A. SHAMES
1
2    A.    That is correct.
3    Q.    Now, I'm going to go through these
4    in a moment -- strike that.
5          I'm going to go through these
6    right now, then at the end I'll ask you if
7    there is anything else that you reviewed.  But
8    I was provided, just for the record, a CD-ROM
9    entitled Pfizer Viagra expert report of Daniel
10   L. Shames, M.D.  It's been represented to me
11   that on this CD-ROM are all the medical
12   literature and the materials you reviewed that
13   is referenced in your report, I believe it's
14   in appendix B or appendix 2.
15   A.    Yes.  I personally have not seen
16   that CD, but it represents, I've been told it
17   represents all the material that I reviewed.
18   The materials that you have there are the
19   materials that I marked up.  There is some
20   redundancy, because I think those materials
21   are also on the CD-ROM.
22         MS. LESKIN:  Just for the record,
23   what's on there are the things that are
24   cited in his expert report or cited on
25   that attachment to his expert report as

Page 8

DANIEL A. SHAMES
1
2    material he relied upon.
3          MR. GOMEZ:  You mean the appendix
4    and whatever's cited within the expert
5    report?
6          MS. LESKIN:  Exactly.
7    Q.    Doctor, I was also provided with
8    an updated curriculum vitae.  We will go over
9    this in more detail in a moment, but I just
10   wanted to point that out for the record.
11   A.    Okay.
12   Q.    And some deposition transcripts
13   that you reviewed.  And you've reviewed the
14   deposition transcripts of Gregory Gribko?
15   A.    It may be -- I may have looked at
16   it.  I didn't review that one in extreme
17   detail.  There were others that I've reviewed
18   in more detail.
19   Q.    Okay.  And there was also a
20   deposition transcript of Stephen Watt.  Do you
21   remember reviewing that?
22   A.    I was given that, but I didn't
23   review that in detail.
24   Q.    Okay.  And finally deposition of
25   Michael Witt, M.D.

Page 9

DANIEL A. SHAMES
1
2    A.    That also I was given but I didn't
3    review it in detail.  The other ones, you have
4    other ones that I have reviewed in more
5    detail.
6    Q.    Did you review the deposition
7    transcript of Dr. Cheryl Bloom?
8    A.    Yes.
9    Q.    And moving on to this other pile
10   of documents that was provided to me.  This
11   one is a folder which has written on it
12   regulatory -- "reg. HX labelling Viagra."
13         That's safe to say that's
14   regulatory history Viagra?
15   A.    Yes.
16   Q.    And you reviewed these documents?
17   A.    Yes.
18   Q.    I'm not going to ask you questions
19   about all of these documents, I'm going to
20   move on to a few in a moment.  I want to
21   identify some of these for the record.
22         Here's a folder titled
23   "Dr. Shames's emails."  Did you print these
24   out?
25   A.    No.

Page 10

DANIEL A. SHAMES

1
2      Q.    I've looked through the emails,
3  and I might be incorrect, but I only see that
4  you had email correspondence with Ms. Leskin.
5      A.    Yes.  There was one exception, I
6  believe I did have a correspondence from, one
7  correspondence from Ms. Hogan regarding a web
8  site or something.  But virtually all of them
9  were from Ms. Leskin.
10     Q.    I stand corrected, I did see an
11 email from -- who is Ms. Hogan?
12     A.    Ms. Hogan is the associate, I
13 believe.
14     Q.    Okay.
15     A.    And also I think I have a couple
16 of emails from Todd Porter, who is the legal
17 assistant or whatever you call it.
18     Q.    Did you search your own computers
19 for the emails?
20     A.    Yes.  That's how --
21     Q.    Did you print them out?
22     A.    I had -- no, I did not.
23     Q.    Okay.  Why not?
24     A.    Because I was having some
25 trouble -- this was a few days ago, I was

Page 11

DANIEL A. SHAMES

1
2  having trouble with my printer, so I contacted
3  Mr. Spatz and said I'm having some trouble
4  with my computer -- my printer.  Which is a
5  home printer.  And can I just forward these to
6  you.
7      Q.    Okay.  So what you did is you
8  looked at all your emails on your computer,
9  rather than printing them out yourself you
10 forwarded them to Kaye Scholer, Ms. Leskin's
11 office?
12     A.    I have a search option, which
13 brings up all the emails.  And I went through
14 the emails, and each one individually I
15 forwarded.
16     Q.    And you did that within the last
17 few days?
18     A.    Yes.
19     Q.    Okay.
20           MR. GOMEZ:  Off the record.
21           (Discussion off the record.)
22     Q.    Doctor, we've talked about the
23 emails, okay.  That's one folder that was
24 provided to me.  Another manila is entitled
25 "citizen, I think I can read your handwriting,

Page 12

DANIEL A. SHAMES

1
2  citizen petitioner's."  Let me hand this to
3  you.  Whatever it in black ink under there,
4  what that says.
5      A.    It says citizen petitions and
6  summaries.  I must say that, you know, this is
7  my own system and may have been using it for
8  something else and then I -- this says
9  original NDA vision summary, which I don't
10 think is still in this folder.  But this is,
11 these were primarily the citizens petitions
12 and, you know, the two citizen petitions.
13     Q.    The ones in 1998 and 2005?
14     A.    Right.
15           MS. LESKIN:  Just make sure you
16     don't talk over him.
17           MR. GOMEZ:  I'm really bad at
18     that.  Lori, feel free to let me know.
19     Q.    Okay, we've identified that.
20           Another manila entitled "Bloom,"
21 deposit, I assume that means deposition.  And
22 then ER.
23     A.    Expert report.
24     Q.    Okay..  That's another folder.
25           Another one is, if you could just

Page 13

DANIEL A. SHAMES

1
2  read that for me.
3           MS. LESKIN:  He just wants you to
4     read what's on top.
5      Q.    I just want you to read what's on
6  the tab there.
7      A.    What is on the tab here has no
8  relationship to what's in the -- this has to
9  do with my check.  I took this from somewhere
10 else, and there is no relationship between
11 what's on there.
12     Q.    I do it all the time.  No problem.
13           But within this are some
14 documents, just for the record, when I open it
15 up is a, one entitled "feasibility assessment
16 of a case control study to determine whether
17 Sildenafil Viagra is an independent risk
18 factor for NAION."
19           Did you print these out yourself
20 or were these documents provided to you?
21     A.    I believe that they were
22 provided --
23           MR. GOMEZ:  I'm sorry, let's go
24 off.
25           (Discussion off the record.)

Page 14

DANIEL A. SHAMES

1
2    Q.    Doctor, I'm looking at some
3    documents that were provided to me before the
4    deposition that are responsive to attachment A
5    of the notice of deposition.  And I was just
6    asking about this folder of documents, I think
7    my specific question was, did you print these
8    out yourself or were they provided to you by
9    Ms. Leskin, counsel for Pfizer?
10    A.    I would have to look at the
11   documents.  Most of the documents I got were
12   provided to me, but I did, I believe, look up
13   some papers by myself and print them out.  So
14   I would have to look up -- I would have to
15   look at the whole folder to see which it was.
16    Q.    Let me pass this to you.  If you
17   don't mind me walking around.  You stay
18   seated, doctor.  I just want to hand this to
19   you.
20          And within this folder I've put in
21   front of you is a copy of what we'll refer to
22   later that's in your report, the McGwin study.
23          Do you see that?
24    A.    Yes, I do.
25    Q.    If you could just read for me the

Page 15

DANIEL A. SHAMES

1
2    notes here, what does that say?
3    A.    "Selection bias."
4    Q.    What do you mean by that?
5    A.    I mean that in my view, this was a
6    case cohort study, and in my view there was
7    some bias in the selection of the cases.  They
8    did not exactly match the controls because
9    they were taking PDE5 inhibitors, which in my
10   view meant they had perhaps more advanced
11   cardiovascular disease than the controls.
12   That's what I meant by that.
13    Q.    That's a criticism, your criticism
14   of this study?
15    A.    That's correct.
16    Q.    And down at the bottom there is
17   some other handwriting.  Can you just read
18   that for me.
19    A.    I'm not sure I can read it
20   completely, but it does say aged matched.
21   It's the same concept as this.
22    Q.    Okay.  I'm sorry, finish your
23   answer.
24    A.    Often when I'm reviewing a
25   document, I will just scribble things down to

Page 16

DANIEL A. SHAMES

1
2    keep a thought in my head and then later when
3    I go back I may not be able to read it.  But
4    that's the concept of what was in there.
5    Q.  .  So people like me can ask you
6    questions about it.  I'm not going to go
7    through every single one of your handwritings
8    at all.  Or we'd be here until tomorrow.
9          MR. BORG:  Your profession does
10   have a bit of a reputation about how it
11   writes.
12    Q.    Doctor, another folder here is
13   entitled CFRs, et cetera.  CFR, Code of
14   Federal Regulations.  And I believe you
15   listed, we'll go over those in a while when we
16   go over your report, but you did list some
17   specific CFR regulations that you reviewed?
18    A.    That is correct.
19    Q.    Would those be contained in this?
20   Do you need to see it to make sure?
21    A.    Yes.
22    Q.    Here you go.
23    A.    These were materials that
24   generally dealt with CFRs.  And CFR -- and
25   information in the title CFR that might be

Page 17

DANIEL A. SHAMES

1
2    related to my report or other issues here.
3    Q.    We'll go over those, I might have
4    some specific questions later on when we go
5    over your report.  So if you just want to hand
6    that back to me so I can keep these in order.
7          And I have another manila folder
8    here with some documents inside, with for lack
9    of a better word, I'll call them sticky notes,
10   and your writing on them.  And written on the
11   folder is, I think I can read this, early eye
12   labelling stuff.  I can't read this, but I'll
13   attempt it, Wiley Chambers?
14    A.    Wiley Chambers, yes.
15    Q.    Who is that?
16    A.    Wiliy Chambers is one of the
17   senior ophthalmologists at the FDA who was
18   involved in the early interactions between FDA
19   and Pfizer regarding eye issues.  In fact,
20   he's still involved in those issues.  So this
21   has to do mostly, I believe, with the early
22   labelling interactions and review of material
23   that was in the original NDA, and some of the
24   materials that followed with early labelling
25   issues in the first six months or so after the

Page 18

1      DANIEL A. SHAMES
2  drug was approved.
3      Q.    And underneath Wiley Chambers is
4  ERG, and then another word I can't read.  On
5  this one, for the record, I point that out to
6  you.  Can you read that for me?
7      A.    ERG is electroretinogram.
8      Q.    Okay.
9      A.    And I don't know what other word
10  is.
11      Q.    Fair enough.
12          Doctor, I might come back to these
13  and ask you some questions.
14      A.    Okay.
15      Q.    But a few more folders here.  This
16  one was provided to me, and the first page
17  that I open to is your, it looks like your
18  first invoice in this case dated December 30,
19  2008.  When were you first contacted regarding
20  reviewing this case?
21      A.    I believe it was in December.  I
22  believe it was in December of last year, 2008.
23      Q.    Your invoice begins --
24          THE WITNESS:  November?
25          MS. LESKIN:  For the record, I

Page 19

1      DANIEL A. SHAMES
2  think it's two pages.  There may be two
3  separate invoices there.
4          MR. GOMEZ:  Right.  I'm asking
5  about the first one.
6      Q.    I'm not trying to trick you up,
7  doctor.  Because I'm looking at the document
8  and you're not.  Your first entry on here is
9  dated 9th November, review of Viagra
10  documents.  So you would have been contacted
11  before that?
12      A.    Yes.  I believe there is actually
13  an email, and I don't remember the date, but
14  there is an email I believe in which
15  Ms. Leskin first contacts me, I think.
16      Q.    Okay.  And you charge $500 an
17  hour?
18      A.    That is correct.
19      Q.    And that's for reviewing documents
20  and any deposition time?
21      A.    That is correct.
22      Q.    And your first invoice, dated from
23  29th of November to the 30th of December of
24  2008; correct?  And the total was $36,125.
25  Does that sound right?

Page 20

1      DANIEL A. SHAMES
2      A.    That sounds right, yes.
3      Q.    That's what the document says.
4  I'll represent that to you.  $36,125.
5      A.    That is correct.
6      Q.    And then attached to this is page
7  2, is a January 31, 2009 invoice.  And you
8  spent, I'm not good at the math, but the total
9  for the month of January was $5,250; correct?
10      A.    That is correct.
11      Q.    Did you prepare a February
12  invoice?
13      A.    I think I did, but it may have
14  been -- I think I have -- we were supposed to,
15  what I've already been paid for, I do have a
16  February invoice.  I can get it.
17      Q.    From what I understand it, is this
18  deposition was originally scheduled for
19  sometime in early February.  Do you remember
20  that, being told that?
21      A.    I think I recall something about
22  this being scheduled in early February, yes,
23  February 4th or 5th or something.
24      Q.    We're now at March 13th.  Did you
25  do any work on this case in February?

Page 21

1      DANIEL A. SHAMES
2      A.    Actually, I may not have done any
3  work on this case in February.  I may not have
4  had a February invoice.
5      Q.    Okay.  If you could just check
6  your files, if there is a February invoice,
7  provide it.
8      A.    I may not have had a February
9  invoice.
10      Q.    Okay.  I'll keep this one to the
11  side because we are going to talk about your
12  report in a few minutes, and I'll have a few
13  questions about that.
14          But also within this folder is a
15  copy of the notice of videotaped deposition.
16          A document dated June 24, 2005,
17  with United States Senate letterhead on it.  I
18  might have a few questions about that.  It
19  looks like it was from Senator Grassley?
20      A.    Yes.
21      Q.    And you reviewed this in preparing
22  your report?
23      A.    Yes, I did.
24      Q.    Also within here is the Supreme
25  Court of the United States opinion in Wyeth

Page 22

DANIEL A. SHAMES
1
2 versus Levin.  Did you read this?
3     A.    Yes, I did.
4     Q.    Are you going to rely on anything
5 in this, did you glean anything from this,
6 with your report, obviously this came down
7 after your report was authored, but anything
8 you'd like to --
9     A.    I don't think it's critical to
10 anything.  I believe that it was important for
11 me to understand somewhat what was in that
12 report.  I'm not sure I can say that I totally
13 understood the -- I can say that I did not
14 totally understand all the legal
15 ramifications.
16     Q.    And also within this folder is a
17 document entitled "Federal Register," from
18 Wednesday, January 16, 2008.
19           Do you remember reviewing that?
20     A.    Yes.  That document has to do with
21 some perhaps changing of the rules regarding,
22 surrounding issues regarding CBEs, change
23 being effected, regulations.  I read it as a
24 background, background information.
25     Q.    Briefly, what are some of the

Page 23

1           DANIEL A. SHAMES
2 changes being discussed in this document
3 regarding CBEs?
4     A.    I believe that this document
5 actually states that it's not really a change,
6 but it's putting into -- putting down in the
7 regulations what has been the practice
8 previously of the FDA, essentially that a CBE
9 is not the routine way that labelling changes
10 are created.  That's done primarily through a
11 supplement, prior approval supplement.  So
12 that the FDA can have an opportunity to review
13 information that the company may have and
14 review wording, make sure that the wording is
15 properly associated with the information, with
16 the data.
17           And that's what that document
18 talks about.
19     Q.    Okay.  And moving on to another
20 folder, written in I believe it's your
21 handwriting, and underlined twice, it says "my
22 issues."
23           What does that mean?
24     A.    Well, I think, I'm not sure that
25 what's in there has anything to do with my

Page 24

1           DANIEL A. SHAMES
2 issues.
3     Q.    Okay.
4     A.    My issues were simply as I went
5 through expert testimony and discussions,
6 these were issues that I felt I had to do, you
7 know, particular research about.  I mean,
8 brushing up on the regulations or at one time
9 Dr. Bloom's deposition may have been in there.
10 Things that I personally thought were
11 important issues in this case.
12     Q.    Okay.  And within this --
13     A.    What's in there now may have
14 nothing to do with what I at one time thought
15 were my issues.  Just I happened to put it
16 into that folder.  But I'm not sure what's in
17 there right now.
18     Q.    I don't want to get bogged down
19 going through it.  I might just put this
20 aside.  I have a question about this document,
21 but I can ask it in context later.  I'm just
22 going to move on.
23           Finally is a folder entitled
24 "Pfizer NDA."
25     A.    Revision summary.

Page 25

1           DANIEL A. SHAMES
2     Q.    It looks like fee/S vision
3 summary.  I thought that was an L.  And
4 summary from FDA.
5     A.    Right.  I don't know exactly
6 what's in that.  But certainly the vision
7 summary is the portion of the -- excuse me, of
8 the NDA that was submitted by Pfizer in which
9 they review all the vision issues, all the
10 information related to vision issues.
11     Q.    Let me pass this over to you.
12 This is a, what's entitled "Sildenafil visual
13 summary."
14     A.    Yes.
15     Q.    A few questions about this
16 document.  First of all, if you could just,
17 there is some handwriting.  Can you read that
18 for me?
19     A.    "Pfizer affirmatively looked at
20 vision problems in NDA.  No NAION plus look at
21 NDA review."  This is a note to myself because
22 I noted one of the issues was whether Pfizer
23 was, I think maybe this was in Dr.. Bloom's
24 expert report, but I had the impression that
25 Dr. Bloom did not the think that Pfizer was

**Page 26**

DANIEL A. SHAMES
1
2 aggressively looking at the vision issues.
3         And I was looking to see, looking
4 at this material and other material to see if
5 they had adequately studied certain vision
6 issues. So at one time I may have -- I had
7 issues, and I put perhaps the supporting
8 documents under the issues. Something like
9 that.
10    Q.    And that you would have had --
11 strike that.
12         What this is is a response to some
13 of the opinions in Dr. Bloom's report?
14    A.    Correct.
15    Q.    Okay. And we'll go through your
16 report.
17    A.    Okay.
18    Q.    But we don't need to waste time
19 right now. I would like to keep this
20 together.
21         Doctor, I have asked you some
22 questions about your curriculum vitae, some of
23 your background. On here it says under
24 professional experience, October 2008 to
25 present, that you're the president of the

**Page 27**

DANIEL A. SHAMES
1
2 Daniel A. Shames Consulting, Inc.?
3    A.    Yes.
4    Q.    What do you do?
5    A.    I consult with primarily
6 pharmaceutical companies on issues related to
7 their interactions with FDA, communications
8 and interactions with FDA. And also regarding
9 their planning of clinical trials, their
10 development of particular drugs. The clinical
11 trial issues, drug evaluation issues. Kind of
12 scientific issues. And also regulatory issues
13 related to FDA interactions. Or proposed FDA
14 interactions.
15    Q.    Has Pfizer retained you in that
16 capacity?
17    A.    No, they have not.
18    Q.    What other pharmaceutical
19 companies?
20    A.    I'm not sure I can say that. Most
21 of them have confidentiality agreements.
22    Q.    I'm not asking you to say what
23 you're doing, but can you name the companies?
24    A.    Some of the companies actually
25 don't want me to say that I'm working for the

**Page 28**

DANIEL A. SHAMES
1
2 company.
3    Q.    I don't want to get you in
4 trouble. Let me ask this way --
5    A.    About fifteen pharmaceutical
6 companies from very large pharmaceutical
7 companies, large multinational companies, to
8 very small companies where there are one or
9 two people.
10    Q.    Okay. And also you mentioned on
11 here that litigation departments of large law
12 firms.
13    A.    Yes.
14    Q.    Are you consulting as an expert
15 witness in any other cases besides this
16 litigation, as we sit here today?
17    A.    Yes.
18    Q.    And which litigations would that
19 be?
20         MS. LESKIN: I just want to
21 caution and see if we can get some
22 foundation to make sure that he's not --
23 if he's a consulting expert and not a
24 testifying expert, that is privileged
25 information. And so I think we need to

**Page 29**

DANIEL A. SHAMES
1
2 make a distinction to where he's
3 supposed to be a testifying expert as
4 opposed to a consulting expert. Because
5 that's protected information.
6         MR. BORG: Will you carve those
7 up?
8         MR. GOMEZ: Absolutely. Let me
9 rephrase the question.
10    Q.    Have you been retained by any
11 litigation law firms to be a testifying expert
12 on behalf of a pharmaceutical company?
13    A.    Yes.
14    Q.    Okay. Which pharmaceutical
15 companies were those? And I'm asking you
16 about testifying expert, not consulting
17 expert.
18    A.    Right. Merck, other counsel for
19 Merck, which is --
20    Q.    And what litigation is that?
21    A.    This is --
22    Q.    What drug does that involve?
23    A.    Fosamex, which is Aledronate, and
24 the issue is osteonecrosis of the jaw.
25    Q.    Have you been, obviously this is

Page 30

DANIEL A. SHAMES
1
2  your first deposition.
3        What others, besides Merck?
4     A.    The other one is Roche, which is
5  Accutane.  And irritable -- excuse me,
6  inflammatory bowel disease.
7     Q.    Let me just back up to Merck.  Any
8  other drugs besides Fosamex?
9     A.    No.
10    Q.    That you reviewed for Merck?
11    A.    No.
12    Q.    Okay.  We talked about Roche.  Any
13 others?
14    A.    There may be one or two others
15 that I'm not at the point where I know I'm
16 going to be a testifying.  So I'm not sure if
17 I'm just consulting.
18    Q.    Well, if you're not sure, that's
19 good enough.  I don't want you to have to
20 answer that.
21    A.    Okay.
22    Q.    Have you been contacted by any
23 plaintiffs to be an expert in any
24 pharmaceutical litigations?
25    A.    I have not been contacted by any

Page 31

DANIEL A. SHAMES
1
2  plaintiffs.
3     Q.    Okay.  Going back to your CV, I'm
4  going to go work from the past to the present,
5  rather than from the present to the past.  We
6  are under the section entitled "professional
7  experience."
8        You were in the United States Army
9  Medical Corps?
10    A.    Yes, I was.
11    Q.    From 1977 to 1979?
12    A.    That is correct.
13    Q.    And you practiced urology at Fort
14 Jackson, South Carolina?
15    A.    That's correct.
16    Q.    And I think I read in your report
17 that you were honorably discharged at that
18 time?
19    A.    That is correct.
20    Q.    And then you went to work for,
21 what did you do after that, there seems to be
22 a six year gap here between 1979 and 1985.
23 Maybe it's just out of order.  I see 1979 to
24 1996, that's where you were working for
25 Urology Consultants?

Page 32

DANIEL A. SHAMES
1
2     A.    Yes, I founded a urology practice,
3  a private practice in South Carolina.  And
4  ultimately hired two other urologists, and the
5  practice was still going when I left in 1996.
6  But I was continually in practice from the
7  time I left the Army until I left South
8  Carolina.
9     Q.    So in 1996, is that when you went
10 to work for the FDA?
11    A.    That is correct.
12    Q.    Okay.  Tell me about that.  What
13 was your first position at the FDA?
14    A.    I was a medical officer at the
15 FDA, which is an individual that primarily
16 reviews the material related to drug
17 development, in various stages, all stages of
18 drug development.  Early drug development, at
19 the time when a sponsor, a company wants to
20 put the drug for the first time into a human
21 being, on to later trials, phase II trials,
22 which primarily were dose finding.  Phase III
23 trials, where we're testing the efficacy of
24 the drug.  And during this time there is
25 usually a lot of interaction between myself

Page 33

DANIEL A. SHAMES
1
2  and the company.
3        And if the drug is marketed, there
4  is continual evaluation of safety, et cetera.
5  That's what a primary medical officer does.
6     Q.    I'll ask you some more questions
7  about that when we get into your report.
8        But you were the deputy director
9  of DRUP?
10    A.    Yes, I was.
11    Q.    And what is, for a layperson, what
12 is DRUP?
13    A.    It's the division of reproductive
14 and urologic products.
15    Q.    And you were there from 2000 to
16 2001?
17    A.    In that position, correct.
18    Q.    Okay.  And then from 2001 to 2006,
19 you were the director of the division of
20 reproductive and urologic drug products,
21 DRUPP?
22    A.    It's the same division.
23    Q.    Same division?
24    A.    Yes.  I was the director.
25    Q.    The sole director at this point?

Page 34

DANIEL A. SHAMES

1
2      A.    The sole --
3      Q.    I see you had shared
4   responsibility with that before; correct?
5      A.    Absolutely, yes.
6      Q.    And then from 2007 to 2008, you
7   were the director of the division of
8   gastroenterology and in borne error products?
9      A.    That is correct.
10     Q.    What was your role in that
11  position?
12     A.    Well, I was the director, meaning
13  I was in charge of the scientific and
14  administrative and regulatory functioning of
15  that division. I became the director of that
16  division because I was actually in a higher
17  position in the office, a higher supervisory
18  position. And that particular division was
19  having some difficulty and the senior
20  management at the office of new drugs asked me
21  to take that division over and help it out.
22  Straighten it out and run it for a while. I
23  ran it for about a year, eight months.
24     Q.    Okay. And then you went on to be
25  deputy director office of drug evaluation 3?

Page 35

DANIEL A. SHAMES

1
2      A.    That is correct.
3      Q.    Okay. And along with that title
4   is the ODE 3, what's that?
5      A.    Office of drug evaluation is ODE.
6      Q..   And then it says "/CDER." Can
7   you, for the record, what's that?
8      A.    Center for drug evaluation and
9   research.
10     Q.    Okay. And you were in that
11  position from 2006 to 2008 when you left the
12  Food and Drug Administration; right?
13     A.    That is correct.
14     Q.    Going to a little bit -- doctor,
15  are you board certified?
16     A.    Yes, I am.
17     Q.    In what specialty?
18     A.    Urology.
19     Q.    You did your undergrad at Brandeis
20  University?
21     A.    Brandeis University, yes.
22     Q.    1963 to 1967?
23     A.    That is correct.
24     Q.    Georgetown Medical School?
25     A.    That is correct.

Page 36

DANIEL A. SHAMES

1
2      Q.    And then you went on to do your
3   residency at the University of Pennsylvania?
4      A.    That is correct.
5      Q.    In Philadelphia?
6      A.    That is correct.
7      Q.    1973 to 1974, National Institute
8   of Health, postdoctoral fellow in renal
9   research?
10     A.    That is correct.
11     Q.    It says here you published
12  research in peer reviewed journals?
13     A.    That is correct.
14     Q.    Have you ever published anything
15  on drug labelling?
16     A.    No.
17     Q.    Are you in the process of writing
18  any articles as we sit here today on drug
19  labelling?
20     A.    No, I am not.
21     Q.    Any articles on Viagra?
22     A.    No.
23     Q.    Have you ever published on Viagra?
24     A.    No.
25     Q.    Have you ever published on

Page 37

DANIEL A. SHAMES

1
2   nonarteritic NAION?
3      A.    No, I have not..
4      Q.    I call it NAION, I've been told
5   that we are not supposed to do that. But for
6   the deposition it will show up as N-A-I-O-N,
7   but I'll say NAION.
8           1974 to 1977 you were at the
9   University of Pennsylvania, urology. What did
10  you do there at that point?
11     A.    Well, kind of to explain. The
12  postgraduate training in urology at the
13  University of Pennsylvania involved six years
14  of training. So the first two years involves
15  basic training of general surgery and
16  gynecology and medicine, to get one ready for
17  your urology training. And at the University
18  of Pennsylvania, it was required that you
19  spend a year in the lab doing research.
20  That's when I spent a year in the lab doing
21  renal physiology research.
22          And then there is three years of
23  actual urology training. So those are
24  parcelled out perhaps on my CV resume there.
25  I think, it may be confusing. But it's sort

Page 38

DANIEL A. SHAMES

1
2   of one period of time that I spent in
3   Philadelphia at the University of
4   Pennsylvania.
5       Q.    How did you like Philadelphia?
6       A.    I liked Philadelphia.
7       Q.    That's where I'm from.
8           Under the next heading it says
9   "related experience and skills," it says under
10  first bullet, "member of office of new drugs,
11  OND, senior management team, attended weekly
12  briefing in which all important issues across
13  all drug areas are discussed."
14          To the best of your recollection,
15  was Viagra ever discussed during these
16  meetings?
17          MS. LESKIN:  I'm going to object.
18  Dr. Shames is here -- I will wait for
19  him to come back.
20          (Discussion off the record..)
21          (Record read as requested.)
22          MS. LESKIN:  The objection is, and
23  it may be that particular question, I
24  just want to make sure where we are
25  here.  Dr. Shames is being offered as an

Page 39

DANIEL A. SHAMES

1
2   expert, and he's not here as a fact
3   witness.  And there are restrictions on
4   his ability to testify as a fact witness
5   under the terms of regulations that he's
6   been told when he left the agency.
7   So --
8           MR. BORG:  This is when he was at
9   the FDA?
10          MS. LESKIN:  Yes.  And the
11  question was was Viagra discussed at
12  these weekly meetings when he was at
13  FDA.  I think that particular question
14  is general enough that it can be
15  answered yes or no.
16          MR. BORG:  That's why I'm going to
17  overrule the objection to that.  Let's
18  see what the answer is, then we'll --
19  you can answer the question.
20      A.    I might have to give a little
21  background.  That I was on that group toward
22  the end -- in the last two years that I was
23  there.  Viagra may have been discussed, I'm
24  not sure.  It was in the last two years.  It's
25  possible it was discussed.  I don't remember.

Page 40

DANIEL A. SHAMES

1
2   It's possible it was discussed at that
3   meeting.
4       Q.    Generally what is discussed in
5   these meetings?
6       A.    Generally what is discussed is all
7   the senior management people are there in the
8   various areas of drug development.  And the
9   individuals discuss what the important issues
10  are that week or the coming week or past week.
11  And the head of the office of new drugs,
12  Dr. Jenkins, is there.  And so everybody at
13  that meeting is kind of aware of what the
14  large issues are.
15      Q.    And you said you would have been
16  attending these meetings in the last two years
17  that you were at the FDA?
18      A.    Correct.
19      Q.    So roughly in the 2006 to 2008
20  time frame?
21      A.    Yes.
22      Q.    Were issues discussed regarding
23  labelling of drugs that have been approved in
24  the past at these meetings?
25      A.    Probably.

Page 41

DANIEL A. SHAMES

1
2       Q.    From what I understand you don't
3   remember specifically whether Viagra was
4   discussed during the time frame that you
5   attended these meetings; is that what you
6   testified to?
7       A.    That is correct.
8       Q.    Now, from what I understand, you
9   dealt with the media?
10      A.    Yes.
11      Q.    For the FDA, during what time
12  frame that you were there?
13      A.    Primarily -- well, as a division
14  director, and in the office -- primarily I
15  would say when I was the director of D-R-U-P,
16  DRUP.  Primarily at that time.  I dealt with
17  media.
18      Q.    I did see in looking at some
19  things in getting ready for this deposition
20  that you did some media for the Ortho Evra
21  birth control patch.  Do you remember doing
22  that?
23      A.    Yes, I do.
24      Q.    Did you ever do any media
25  interviews on the issue of Viagra?  Or press

Page 42

DANIEL A. SHAMES

1
2  conferences, in addition to interviews.
3      A.    I don't recall that.
4      Q.    During your tenure at the FDA, did
5  you ever work on the drug Viagra?
6      A.    Yes, I did.
7      Q.    What did you do when you were at
8  the FDA in terms specifically to Viagra?
9          MS. LESKIN:  Objection. He's not,
10  again, he is not here as a fact witness.
11  And there are restrictions on his
12  ability to testify about facts learned
13  during the course of his employment at
14  FDA.
15          MR. BORG:  What do you have to say
16  about that?
17          MR. GOMEZ:  Judge, he gives a lot
18  of opinions in his report on the
19  labelling, the interactions between
20  Pfizer and the FDA.  Maybe I should just
21  focus my question to that.
22          MR. BORG:  Why don't you do that.
23      Q.    Dr. Shames, when you were at the
24  FDA, as you know in this case one of the
25  issues is regarding the labelling of Viagra in

Page 43

DANIEL A. SHAMES

1
2  terms of NAION.  When you were there, did you
3  ever participate, in your capacity, whatever
4  it was, on that issue?
5          MS. LESKIN:  Objection.  Again,
6  his report is based on documents that
7  he's reviewed, and you can ask him
8  specifically what his opinions in the
9  report are based on.  But there are
10  ethical and restrictions that he has
11  been given that he's been told that he
12  is not allowed to testify as to facts
13  learned in the course of his employment.
14  And we are not offering him for that
15  basis.
16          MR. BORG:  Well, is your objection
17  a privileged objection?
18          MS. LESKIN:  Yes, on behalf I
19  guess of the FDA, the FDA has instructed
20  him not to provide testimony about facts
21  learned.  And I have information he was
22  given when he left, and we can mark this
23  as an exhibit, a summary of
24  post-employment restrictions.  And one
25  of the things he was told is former

Page 44

DANIEL A. SHAMES

1
2  employees cannot provide testimony
3  concerning information acquired during
4  the course of their official duties.
5          So you could ask him what his
6  report is based on, and he can tell you
7  what it's based on.  But it's not based
8  on his role within the FDA.
9          MR. BORG:  That sounds fair
10  enough.
11          MR. GOMEZ:  I don't want to get
12  the doctor in trouble.
13          MR. BORG:  I know you don't.  Part
14  of this is getting educated as to what
15  he is able to do under his obligations.
16          MR. GOMEZ:  Let me ask one more
17  question.
18      Q.    Doctor, please don't answer it
19  until your -- Ms. Leskin has had a chance to
20  object.
21          During your time frame at the FDA,
22  did you ever discuss Viagra and its adverse
23  events or labelling with any representatives
24  from Pfizer, whether it be through
25  correspondence, email, any sort of

Page 45

DANIEL A. SHAMES

1
2  communication?
3          MS. LESKIN:  Are you just asking
4  him did he discuss and not what was
5  discussed?  Correct?
6          MR. GOMEZ:  At this point, yes.
7          MS. LESKIN:  So that's a yes/no
8  question that I think you can answer.
9      A.    Yes.
10      Q.    Who did you talk to?
11      A.    Well --
12          MS. LESKIN:  Again, he is just
13  asking the identification.
14      A.    Actually in reality I'm not sure I
15  can remember.  There were many meetings, I
16  can't remember the names of the people.  The
17  regulatory people at Pfizer.  I mean, if you,
18  perhaps if you had those names I might
19  remember.  But there were, over the years
20  there were different regulatory people.  And
21  the main interactions were years ago.  So I
22  don't remember the specific names.
23      Q.    Let me ask this:  Yes or no, did
24  you discuss with any representatives from
25  Pfizer the issue of NAION?

Page 46

DANIEL A. SHAMES

1
2     MS. LESKIN:  Again, that could be
3  answered yes or no.
4     A.    I'm trying to think.  But there
5  were obviously there were written
6  communications.
7     Q.    And those would be reflected in
8  Pfizer's internal documents and in the FDA's
9  documents on Viagra?
10     A.    If you're talking about written
11  communications, then yes.  I mean, that counts
12  as -- yeah.  Yes.
13     Q.    And if I wanted to look at those I
14  could go find those and look at them?
15     A.    Yes.  Well, you have most of them.
16  Right.
17     Q.    Besides correspondence, any
18  conversations with representatives from
19  Pfizer, yes or no, on the issue of Viagra and
20  NAION?
21     A.    I believe there were T-cons,
22  telephone conversations in which I
23  participated.  I cannot recall if I
24  specifically said anything, but I may have.
25  So probably.  There were T-cons where I was

Page 47

DANIEL A. SHAMES

1
2  there and Pfizer people were there.  And so
3  maybe.  Or possibly.
4     Q.    Okay.  Let me ask you this:  When
5  was the first T-con meeting, teleconference
6  meeting you had with Pfizer on the issue of
7  NAION and Viagra?  Just when was it.
8     A.    I don't believe -- let me think.
9  I don't believe there were any communications
10  before 2005.
11     Q.    There were no communications where
12  you were involved, or -- is that your
13  testimony?
14     A.    Yes.
15     Q.    Okay.  How many teleconferences
16  did you participate in with representatives
17  from Pfizer regarding Viagra and NAION?
18     A.    I can't recall how many.  I
19  believe that the information I reviewed
20  correctly reflected the T-cons that were
21  involved.  But the information that's
22  available.
23     Q.    We will get into that in more
24  detail later.  Are you specifically referring,
25  for example, to the T-cons that took place

Page 48

DANIEL A. SHAMES

1
2  after 2005 on the issue of whether or not a
3  pharmacoepidemiological study should be
4  performed, were you participating in those
5  calls?
6     A.    Some of them, yes.  Some.  I don't
7  think I -- I think I may have participated in
8  some of them.
9     Q.    Did you indicate if your expert
10  report whether you participated in those
11  calls?
12     A.    In my expert report?
13     Q.    Yes.  There is a section on that
14  very timeline.  There are telephone
15  conferences mentioned.  Did you mention in
16  your report, and we'll get to it in a moment,
17  but did you ever mention that you had been on
18  those calls?
19     A.    I don't think I mentioned in my
20  report whether I did or didn't.
21     Q.    But you're testifying now that you
22  were on those calls; correct?
23     A.    I'm testifying that from the
24  documents that I reviewed and the list of
25  people involved in some of those T-cons, my

Page 49

DANIEL A. SHAMES

1
2  name was there.
3     Q.    Okay.  Do you have any independent
4  recollection of -- strike that.
5     In authoring your report, did you
6  base any of your opinions on what you remember
7  was said during those telephone conferences,
8  or do you base it upon documents that you
9  reviewed that summarized those telephone
10  conferences?  Do you understand my question?
11     A.    Yes.  I base it on those
12  documents.
13     Q.    Okay.  Besides that timeline, 2005
14  through 2008, on the issue of the studies, do
15  you remember any other specific issues that
16  you talked about with Pfizer regarding Viagra
17  and NAION?
18     MS. LESKIN:  Objection.  I think
19  that goes to information he learned
20  during the course of his employment.
21     MR. BORG:  I'll sustain that.
22     MR. GOMEZ:  Okay.
23     Q.    Let me ask it this way, I'm not
24  going to ask you what was discussed, but were
25  there other issues that you discussed with

Page 50

DANIEL A. SHAMES

1
2   Pfizer regarding Viagra and NAION?
3       A.   Besides --
4       Q.   Besides the feasibility of a study
5   and the FDA's request to do that, that you
6   discuss in your report, are there any other
7   issues?
8       MS. LESKIN:  That's a yes/no
9   question.
10      Q.   Quantify it numerically, yes or no
11  and then how many.
12      A.   May I rephrase your question or
13  can you? Were there other issues beside the
14  study issue, the observational study issue,
15  the epidemiologic study issue, yes.
16      Q..  Okay. How many other different
17  issues? Again, I'm not asking what they are,
18  just how many were there.
19      A.   Maybe one other issue.
20      Q.   And you first went to work for the
21  FDA in what year, 1996?
22      A.   Correct.
23      Q.   Were you involved in any way with
24  the approval process of Viagra? And Viagra
25  was approved in 1998; correct?

Page 51

DANIEL A. SHAMES

1
2       MS. LESKIN:  Again, that's a yes
3   or no question?
4       MR. GOMEZ:  Yes.
5       Q.   Yes or no, were you involved with
6   the approval process of Viagra?
7       A.   Can you define approval process?
8       Q.   Why don't you tell me, what goes
9   into --
10      A.   Let me say this, and then answer
11  that. The drug was not approved in the
12  division which I resided. It was approved in
13  a different division. The answer is yes.
14      MS. LESKIN:  Do you remember the
15  question?
16      MR. GOMEZ:  Yes, I think I do.
17      Q.   Why don't you tell, for a
18  layperson, what's the first step in having a
19  drug approved?
20      A..  The first step in having a drug
21  approved is getting permission to test the
22  drug in human beings.
23      Q.   Okay. And eventually the drug is
24  approved by the FDA; correct? After numerous
25  other things happen. I don't want to get into

Page 52

DANIEL A. SHAMES

1
2   detail right now because I'll ask you about it
3   in your report. Correct?
4       A.   Or not.
5       Q.   Okay. Absolutely.
6       And Viagra was approved for use in
7   1998; correct?
8       A.   That is correct.
9       Q.   Now, to go back to the question
10  that you asked me that I asked you that I
11  didn't understand, were you involved with the,
12  yes or no, were you involved with any of the
13  safety aspects of the approval process for
14  Viagra?
15      A.   No. We're talking about the
16  original, we're talking about what the initial
17  NDA approval?
18      Q.   Yes.
19      A.   The answer is no.
20      Q.   What about any of -- let me give a
21  time frame. 1998 to 2001, any post-marketing
22  safety issues, were you involved with
23  evaluating that, yes or no?
24      A.   I can't really recall that,
25  honestly. Was I involved in that?  Between

Page 53

DANIEL A. SHAMES

1
2   what years did you say?
3       Q.   1999 to 2001.
4       A.   Now it's '99 to 2001? Yes, the
5   answer is yes.
6       Q.   Same question for the time frame
7   up, 2001 to 2005?
8       A.   Yes.
9       Q.   Were you --
10      A.   Involved, yes.
11      Q.   In what capacity were you
12  involved?
13      A.   Well, for much of that I was --
14  for much of that I was the supervisor or the
15  director of that division. So I had general
16  supervisory responsibility, authority and
17  knowledge about safety issues.
18      Q.   When you were head of that
19  division regarding safety issues at the FDA,
20  how many people worked under you?
21      A.   My direct reports were 40 or 50.
22      Q.   40 or 50 individuals?
23      A.   Directly. Let me explain that.
24  The FDA is sort of a matrix organization. So
25  the divisions, the drug divisions have the

Page 54

DANIEL A. SHAMES
1   DANIEL A. SHAMES
2   medical officers and the toxicologists and
3   certain other people. But there are other
4   people, clinical pharmacologists,
5   statisticians, safety people, who are not
6   directly under the supervision of the
7   director. However, the director supervises
8   the projects that the teams that they're
9   involved with.
10      So it's sort of direct
11  responsibility, 40 or 50, and indirect
12  responsibility for a lot more for projects
13  involving a lot more people.
14      Q.   You mentioned in your report, I'll
15  ask you more detail later, but you talked
16  about there was a team of people involved with
17  the Viagra, in terms of monitoring for safety
18  issues. How many individuals worked on Viagra
19  specifically?
20      A.   A lot of people at one time worked
21  on Viagra.
22      Q.   Maybe I could --
23      A.   Ten, fifteen. People who worked
24  on it at one time, ten or fifteen or twenty.
25  Viagra was, and maybe perhaps still is, a very

Page 55

1   DANIEL A. SHAMES
2   high profile drug. There was a lot of
3   publicity about it. There was a lot of
4   publicity when it was approved. There were a
5   lot of safety issues in the public eye when it
6   was approved. So it required a lot of
7   attention. And person power.
8       Q.   Define for me a high profile drug.
9   What is that?
10      A.   A drug that -- well, there are a
11  lot of reasons a drug can be high profile.
12  Say tremendous use, high media attention, a
13  question regarding safety that may be
14  particularly examined in the media.
15      Q.   Let me stop you there. What
16  safety issues were associated with Viagra when
17  it first came on the market in 1998?
18      MS. LESKIN:   Are you asking him
19  from his role in the FDA or his role
20  public and generally?
21      MR. GOMEZ:   Public and generally.
22      A.   Generally?
23      Q.   Yes. Based on any documents you
24  reviewed.
25      A.   Based on documents that I

Page 56

1   DANIEL A. SHAMES
2   reviewed, and my knowledge, general knowledge,
3   there were initially a lot of concern about
4   cardiac issues and interactions between Viagra
5   and cardiac drugs. Those were big, I think,
6   initial issues, big burst of issues.
7       Q.   Okay.
8       MS. LESKIN:   Can we take five
9   minutes, we have been going about an
10  hour.
11      MR. BORG:   Okay, five.
12      (A recess was taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 57

1       MR. BORG:   Mr. Gomez, your last
2   question? Tell me everything you said. I think
3   Ms. Leskin wants to put something on the record.
4       MS. LESKIN:   We are going to mark a
5   document from the Department of Health and Human
6   Services Office of the General Council Ethics
7   Division entitled "Summary Of Post Employment
8   Restrictions January 2008" that we referred to
9   earlier provided some restrictions on Dr. Shames's
10  ability to provide fact testimony in this case.
11      (Document titled "Summary of Health and
12  Human Services Office of the General Council
13  Ethics Division, January 2008" marked Shames
14  Exhibit 5 for identification.)
15      MR. BORG:   Okay.
16  CONTINUED EXAMINATION BY MR. GOMEZ:
17      Q   Doctor, I am going to start asking you
18  some questions about your expert report, and I
19  premarked this as Exhibit 2 and contained within
20  your expert report is also a copy of your CV that
21  is not as current and up to date as the one we
22  talked about earlier, correct?
23      A   Can I check that?
24      Q   I think the only difference is it
25  doesn't mention your current company.

Page 58

1       (Expert report marked Shames Exhibit 2
2  for identification.)
3       A    Right.  That should be correct, yes.
4  Yes.
5            MR. GOMEZ:  Okay.  Do you need a copy?
6            MS. LESKIN:  I do.  Do you have one?
7  Oh, wait, I have one.
8  BY MR. GOMEZ:
9       Q    Now, Doctor, you authorized this report?
10      A    Yes, I did.
11      Q    Did you write it yourself?
12      A    Yes, I did.
13      Q    How many drafts of this report did you
14  have before it was finalized?
15      A    It was a -- define drafts.
16      Q    Sure.
17           When you first started writing the
18  report, I assume there came a time when you
19  finished and forwarded it to Ms. Leskin in written
20  form.  Did you ever do that and then make any
21  changes?
22      A    I did not make any drafts and forward
23  them to Ms. Leskin.  The process, I did not do
24  that.
25      Q    I am not trying to imply there is

Page 59

1  anything wrong in doing that, I just want to know
2  besides the one I have here today that was
3  produced to us, are there any other written
4  versions of this report that you have on your
5  computer or in your possession?
6       A    No.  I -- it was an iterative process.
7       Q    Besides Ms. Leskin, are there any other
8  attorneys at Kaye Scholer, any other attorneys for
9  Pfizer that you sat down and met with in person
10  prior to writing your report?
11      A    I can't tell you the exact time.  There
12  were other attorneys that I have met with here
13  during the course of this process, Mr. Spatz and
14  Ms. Hogan.  And at one point I met with Ms. Leskin
15  and another attorney in Washington, I believe
16  Mr. Hoffman.  I think I had written my report
17  essentially by that time.
18      Q    I saw an e-mail from Ms. Leskin to you.
19  It might have been the first e-mail that mentions
20  that she got your name from Mr. Hoffman.  Do you
21  remember that e-mail?
22      A    I think I remember the e-mail, yes.
23      Q    How did you know Mr. Hoffman?
24      A    I didn't know Mr. Hoffman.  I was -- I
25  think -- I believe what happened is Mr. Hoffman

Page 60

1  had been working on some litigation with some
2  colleagues of mine, colleagues meaning former FDA
3  people who were working in this area, who were
4  working on certain cases, and I think Mr. Hoffman
5  knew some of them and might have said -- basically
6  I think Mr. Hoffman got my name through somebody
7  else and referred me to Ms. Leskin.  I believe
8  that is what happened.  I never met Mr. Hoffman
9  previously.
10      Q    Okay.  I assume there was an initial
11  meeting that you sat down and met with the
12  attorneys for Pfizer.  Do you remember when that
13  was?
14      A    I don't remember exactly when it was.
15      Q    How many meetings did you have
16  face-to-face leading up to the authorship of your
17  report with the attorneys from Pfizer?
18      A    I don't think I had many meetings before
19  the authorship, one or two.  I haven't had that
20  many meetings altogether.  One or two, I can't
21  recall.
22      Q    I was provided before the deposition,
23  and you also reference in your report the
24  materials that you reviewed regarding your report.
25  Who provided you with those materials?

Page 61

1       A    They were primarily provided to me by
2  Ms. Leskin, her law firm.
3       Q    How were they sent to you?
4       A    Federal Express.
5       Q    Was there a cover letter with them?
6       A    There probably was.  I don't recall it
7  was.
8       Q    If there was, would that be in your
9  file?
10      A    It should be.
11      Q    I might have missed it because --
12      A    I think there are some in there.  There
13  are some letters.  Everything -- everything -- you
14  should have everything.
15      Q    Okay.  I might have missed it.  I did
16  not see any cover letter in the documents that I
17  reviewed --
18      A    Okay.
19      Q    -- prior to today.  If you could just
20  check your files to see if there is one.
21      A    Okay.
22      Q    And if there is one, could you provide
23  it to us?
24           MS. LESKIN:  Follow it up with a letter.
25           MR. GOMEZ:  Sure.

Page 62

1  BY MR. GOMEZ:
2      Q   You said a portion of the documents or
3  materials that you reviewed that helped you author
4  your report were provided by attorneys for Pfizer.
5  What specific documents did you go get on your own
6  that helped you write your report?
7      A   I think I looked -- I primarily looked
8  at some websites, looked at the FDA website as
9  some background -- for some background material.
10 I can't recall, for example, the pharmacovigliance
11 guidance and some of the other guidances may have
12 been provided to me, but I also went to the FDA
13 website to look at them and I went to the GAO
14 website --
15     Q   I am sorry, what is that?
16     A   General Accountability Office regarding
17 the report, the report regarding the function of
18 the FDA.  And I went to the Institute of Medicine
19 websites because they had a report on the FDA.
20     Q   Any documents that you got from these
21 websites that you relied on in forming your
22 opinions, they would have been cited in your
23 report, correct?
24     A   I didn't cite -- well, I think -- I
25 think we cited the GAO and the Institute of

Page 63

1  Medicine Report, I think, but I know we have said
2  that I looked at those websites.  I sent e-mails
3  asking what -- you have e-mails that say that I
4  cited those reports, those websites.
5      Q   Did you ever speak to anybody at the
6  FDA, have any conversations or written
7  communications regarding your opinions that are in
8  your expert report?
9      A   No.
10         MS. LESKIN:  Since leaving?
11     Q   Since leaving the FDA?
12     A   No, I did not.
13     Q   Now, you did not review any of the
14 medical records of the plaintiffs in this case,
15 correct?
16     A   No, I did not.
17     Q   And we went over the depositions that
18 you reviewed, correct?
19     A   Yes, that is correct.
20     Q   Previously?
21     A   (No response).
22     Q   I want to go to your report and start
23 talking about your opinions.
24         On Page 2 of your expert report is a
25 section titled "Your Qualifications of Expert

Page 64

1  Writing this Report," and rather than go into
2  those, I will pass over those, we went over those
3  in your CV, correct?
4      A   Yes.
5      Q   Okay.  Then Section 1.1 is entitled "The
6  following list of items was reviewed in
7  preparation for this expert report."
8          Going down to the last bullet, it says
9  "Information and experience accrued by myself from
10 my career at the FDA and OND evaluating and
11 supervising the Office of the Safety and Efficacy
12 of Drugs during their entire life cycle from
13 preclinical to post marketing."
14         What other drugs are you talking about
15 there?  Would Viagra -- I am sorry.
16     A   Okay.  What other drugs?  Well, to
17 start, I was the director of this reproductive and
18 urologic drugs, so I -- at the time, I had
19 experience with drugs that were used primarily by
20 urologists and gynecologists, but I -- you know,
21 lots of drugs, some of which I can mention, some
22 of which I can't.  A lot of contraceptives, drugs
23 for reproductive technology, some drugs for
24 prostate cancer, drugs for incontinence, drugs for
25 menopausal -- treatments for menopausal symptoms

Page 65

1  and sexual dysfunction, other -- those -- those --
2  most a lot of these are drugs that are still under
3  development, but those are the kind of drugs that
4  I had experience with.
5      Q   On Page 4 of your report, you said that
6  the two major organizations within the FDA that
7  are pertinent to your expert report are the Center
8  for Drug Evaluation and Research.  I am sorry,
9  within that, the Center for Drug Evaluation and
10 Research, two offices which are pertinent to your
11 report, the Office for New Drugs, the OND, and the
12 Office of Surveillance and Epidemiology, the OSE.
13 Do you see that?
14     A   Yes.
15     Q   The OSE was previously named the Office
16 Of Drug Safety, correct?
17     A   That is correct.
18     Q   Which of these did you work in?  Which
19 office?
20     A   Office of New Drugs.
21     Q   Now, what is the difference between the
22 two, the Office of New Drugs and the Office of
23 Surveillance and Epidemiology?
24     A   Well, the Office of New Drugs is the
25 organization that has primary responsibility for

## Page 66

1 overseeing the development of the drugs for sure.
2    Q   Okay. That would be, for example, the
3 development of the drugs which would lead up to an
4 end date of approval; is that a fair statement?
5    A   No. It was at least that, but it was
6 more than that. They also had responsibility in
7 post marketing, and they had responsibility to
8 evaluate safety.
9    Q   Okay.
10    A   The other, the Office of Safety, or SA,
11 had primary responsibility -- their total focus
12 was on evaluating safety, technical aspects of
13 accumulating the information and looking at the
14 information, but there was a dual responsibility .
15 in these two offices.
16    Q   Okay. While you were working at OND,
17 were you involved in any of the safety and post
18 marketing issues?
19    MS. LESKIN:  Generally?
20    MR. GOMEZ:  Generally, yes.
21    A   Generally, yes.
22    Q   On that topic, you write in the last
23 paragraph, it says, "Once the product is marketed
24 OND, it has the responsibility regarding the
25 oversight of the continued safety of the drug in

## Page 67

1 the marketplace." Did I read that correctly?
2    A   Yes.
3    Q   Okay. And then the responsibility for
4 the oversight of safety in the post marketing
5 period is shared equally with OSE, correct?
6    A   Correct.
7    Q   Turning to Page 5, you write that "After
8 a drug is approved and marketed, staff at OSE and
9 OND gather information regarding safety as the
10 drug is used in the marketplace. This process is
11 called pharmacovigilance."
12    Can you define for me what
13 pharmacovigilance is?
14    A   Saving and data gathering activities
15 related to the collection, assessment and
16 understanding of adverse events.
17    Q   I think I asked this earlier, and I am
18 going to come back. We will talk a little bit
19 about safety signals. I am going to show you
20 another document, so I am not going to be
21 repetitive because I want to move along, but going
22 down to the middle paragraph, I think it is the
23 second full paragraph, it says "Staff at OND and
24 OSE who have responsibility for Viagra are
25 continuously monitoring adverse events."

## Page 68

1    A   Excuse me, what paragraph are we on?
2    Q   I am sorry. On Page 5, the one that
3 begins "The main sources," which would be the
4 second full paragraph.
5    A   Yes.
6    Q   I will repeat, "Staff at OND and OSE who
7 have responsibility for Viagra are continuously
8 monitoring adverse events."
9    How are they doing that? How do they
10 continuously monitor adverse events?
11    A   Well, there is a -- there is a system
12 called the Adverse Events Reporting System in
13 which events are sent to the FDA from various
14 sources, often drug companies or from other
15 sources. They get inputted into this system, they
16 get analyzed. Well, they get coded and put into
17 the system, and various people have access to this
18 system, both the safety people and many times even
19 the new drug people.
20    And they are looking at -- you know,
21 they are assigned to certain drugs, the safety
22 people are, and so are the new drug people, and
23 they are looking for what kinds of adverse events
24 accumulate in this database, and they are also
25 looking at -- besides the adverse events, they are

## Page 69

1 looking at their -- they are looking around for
2 literature reports or other reports that might
3 bear on the safety of a particular drug.
4    Q   Okay. So, for example, if there is a
5 report of a serious condition in a medical
6 journal, is that considered an adverse event?
7    A   It is.
8    Q   Even though it is not reported by the
9 drug company?
10    A   It is considered something to look at in
11 determining if there are safety issues, yes.
12    Q   And I believe --
13    A   Ultimately, usually, those are, in fact,
14 sent in. Those -- those are reported. They --
15    Q   They could be reported from more than
16 one source..
17    A   Yes.
18    Q   And the reporting of these adverse
19 events and any responsibilities to follow up are
20 governed by CFR 314.80, correct?
21    A   Yes -- in post marketing?
22    Q   Yes..
23    A   I believe it is, yes.
24    Q   I will show you that a little later. I
25 want to get into that, but I want to move along

Page 70

1  now.
2      If there is adverse event in a study,
3  for example, a report of NAION in a study, all
4  caps, does a drug company have a responsibility to
5  investigate that in one of their studies, for
6  example, if it comes from a physician?
7      MS. LESKIN: Objection, vague.
8      MR. BORG: I am sorry, the objection is
9  what?
10      MS. LESKIN: It is a form objection, it
11  is vague.
12      MR. BORG: Do you understand the
13  question?
14      THE WITNESS: No, not exactly.
15  Q   I will repeat.
16      If the FDA receives a report of adverse
17  event from a physician, for example, what do they
18  do with that? Do they inform the drug company?
19  A   I believe if they -- yes. I think they
20  usually try to inform the drug company about
21  adverse events that they receive independently.
22  That is my understanding. It may not be a
23  continuous process, but I believe that is how it
24  works.
25  Q   If an adverse event is reported in a

Page 71

1  medical article, does the drug company have an
2  obligation to investigate that?
3  A   As much as possible.
4  Q   What do you mean by as much as possible?
5  A   They may not have access to the
6  information directly as opposed to when they get
7  information from a physician, say, access in terms
8  of who the patients are, can they talk to the
9  patients, but the drug company will make
10  whatever -- some kind of good faith effort. They
11  are supposed to make some kind of good faith
12  effort to investigate whatever adverse events come
13  to them by whatever route.
14  Q   When you say supposed to make a good
15  faith effort, under what authority?
16  A   The CFR.
17  Q   What authority binds them to that to
18  make a good faith effort?
19  A   I think the CFR 314.
20  Q   Okay. It is the responsibility of the
21  drug company to investigate adverse events, not
22  the FDA, correct?
23  A   That is not correct.
24  Q   Why not?
25  A   Because I think the FDA does have a

Page 72

1  responsibility to investigate adverse events as
2  well as the drug company.
3  Q   Who would be better equipped to
4  investigate adverse events, the FDA or the
5  sponsored drug company, in your opinion?
6  A   It depends on the circumstances.
7  Q   What circumstances? Give me an example.
8  A   The FDA has -- I think they are both
9  well equipped to investigate adverse events. Both
10  are well equipped.
11  Q   Equally equipped, is that -- I mean,
12  when you say they are both well equipped, I am
13  assuming you mean equally?
14  A   The FDA -- I have to answer -- that
15  would have to be answered in a specific
16  circumstance, but they are both well equipped to
17  investigate adverse events, and they are both
18  charged -- well, both charged with investigating
19  adverse events. The CDER mission statement says
20  that we are providing save and effect -- we have
21  the responsibility to provide save and effective
22  drugs to the public, and the entire time I was
23  there, safety was an important priority.
24  Q   Let me do a little housekeeping on this
25  expert report. I want to point your attention

Page 73

1  before I go back and ask some more specific
2  questions to your Section 5, "Summary and
3  Conclusions."
4      Could you go there. I think it is on
5  Page 16.
6  A   Right.
7  Q   Okay. Let me go down to under 5.2,
8  "Conclusions." You write, "Erectile dysfunction
9  is a serious condition usually caused by
10  underlying organic disease which causes great
11  distress among men and their partners, often with
12  grave consequences to relationships." Viagra, an
13  extremely effective therapy for ED, is used by
14  tens of millions of patients in the United
15  States."
16      Is that one of your opinions in this
17  case?
18  A   One of my --
19  Q   Yes?
20  A   This paragraph?
21  Q   In your expert report?
22  A   Yes, I agree with that.
23  Q   Okay. What is your basis for this
24  opinion? Go ahead.
25  A   My basis for the opinion that this

Page 74

1  causes great distress and emotional problems, I
2  was a practicing urologist for many years.  At
3  that time I was familiar with the literature
4  regarding erectile dysfunction.  I was a urologist
5  before that era.  Many patients were willing to go
6  through extreme therapy to correct their erectile
7  dysfunction, such as having surgery, such as
8  injecting themselves in their penis in order to
9  have erections.
10     I spoke many, many times with men and
11  their partners regarding this problem, and it is
12  clear that this caused a lot of distress.  It is
13  public information.  There have been advisory
14  committees subsequently, public information
15  advisory committees on drugs for erectile
16  dysfunction in which experts stated that they had
17  patients that would rather die literally than not
18  have their erections.  So I believe that condition
19  does cause significant distress, and it is a major
20  emotional and psychological issues to lots of
21  patients and their partners.
22     Q   Okay.  Turning over to Page 18, you give
23  an opinion that Viagra did an appropriate job in
24  the post marketing period in terms of
25  pharmacovigilance regarding adverse events.  That

Page 75

1  is one of your opinions in this case, correct?
2     A   That is correct.
3     Q   Another opinion in this case is "The
4  oversight by the FDA of the post marketing vision
5  safety issues was appropriately rigorous and
6  included active participation of FDA's
7  ophthalmologic expert.  This oversight resulted in
8  adequate labeling modifications regarding vision.
9  These included 1998 changes based on Pfizer's
10  clinical pharmacology trials examining vision
11  effects and reviewed by FDA's Chief of
12  Ophthalmology and a 2005 labeling based on the
13  accrual of Pfizer adverse events and requested by
14  the FDA as a prior approval supplements."
15     That is another one of your opinions in
16  this case, correct?
17     A   Correct.
18     Q   Another one of your opinions in this
19  case, and I read from your report on Page 18,
20  regarding the interactions between the FDA and
21  Pfizer pertaining to the discussions regarding
22  labeling and observational trials, "I believe
23  these interactions were appropriate and the time
24  frames were consistent for these types of
25  activities."

Page 76

1     That is another one of your opinions,
2  correct?
3     A   That is correct.
4     Q   Going back to Page 17, one of your
5  opinions in this case that "The initial approved
6  labeling for Viagra was found to be adequate by
7  the FDA.  The FDA will reject the entire
8  application for approval if the labeling is deemed
9  false or misleading.  The sponsor conducted
10  insufficient testing or the risk of therapy
11  outweighs the benefits."
12     So one of your opinions in this case is
13  the initial approved labeling for Viagra was
14  adequate, correct?
15     A   That is correct.
16     Q   Okay.  And that another one of your
17  opinions is that the data submitted to the FDA for
18  initial approval of Viagra by Pfizer and the
19  evaluation of that material by FDA reviewers met
20  the standards regarding safety, efficacy and
21  appropriate risk benefit assessments to allow
22  marketing of Viagra in the United States?"  That
23  is another one of your opinions in this case,
24  correct?
25     A   That is correct.

Page 77

1     Q   Doctor, we know in July of 2005, the
2  label for Viagra was changed to reflect in a broad
3  sense NAION, correct?
4     A   Yes.. July 2005.
5     Q   We can agree on that?
6     A   Yes.
7     Q   One of the sections where the label was
8  changed was the section under precautions.  I
9  think it is under the precautions of patient
10  information?
11     A   That is correct.
12     Q   What is the standard under the
13  regulation that you cite in your report to change
14  the precaution section of a pharmaceutical label?
15     A   The standard for that particular section
16  at that time was that the adverse event was
17  reasonably associated with the use of the drug.
18     Q   Okay.  In July of 2005, the change of
19  the label to the precaution section indicates that
20  there was a reasonable association between Viagra
21  and NAION, correct?
22     A   Correct.
23     Q   What is the standard to change the
24  warning section of a label in July of 2005 based
25  upon the regulations that you reviewed?

Page 78

1   A   You know, I don't know if I know, but I
2   would -- I believe warnings would require
3   something like it might involve some causation
4   issue.  I don't know what they were before.  I
5   know currently a warning would require some
6   reasonable evidence of, I think, causation.  Let's
7   see, reasonable evidence of a causal association,
8   that is the current standard.
9   Q   Okay.. Going back to the
10  pharmacovigilance.
11  A   Yes.
12  Q   You defined that earlier.  What is a
13  signal?
14  A   A signal, a safety signal?
15  Q   Yes.  What is a safety signal?
16  A   A safety signal is a concern that that
17  adverse event might occur more frequently than
18  would be expected in a particular population.
19  Q   Okay.  Generally, if there is a signal,
20  what is the responsibility of the drug company at
21  that point?
22  A   To investigate the information if
23  they -- if -- to investigate.
24  Q   Okay.  To investigate a drug company on
25  their own conduct, a pharmacoepidemiological

Page 79

1   study, correct, generally, to determine if there
2   is some sort of relationship that would require
3   changing the label; is that a fair statement?
4   A   You don't need -- I don't quite
5   understand.
6   Q   Sure.
7   A   You don't need a -- what do you need to
8   change a label?  You don't need a
9   pharmacoepidemiological study to change a label.
10  Q   That is not my question.  If there is a
11  safety signal --
12  A   Yes.
13  Q   -- do you agree with me that on their
14  own, a drug company can conduct a
15  pharmacoepidemiological study to further
16  investigate?
17  A   Well, I don't think they would do that.
18  There are other ways of looking at a safety
19  signal.
20  Q   I understand that.  But my question is:
21  They could on their own conduct a
22  pharmacoepidemiological study to further
23  investigate, that is one of the things that they
24  could do, correct?
25  A   They could do that.

Page 80

1   Q   They could do a survey, that is another
2   thing a drug company could do, correct?
3   A   They could do these things, but I do not
4   believe that they would do these things unless
5   they evaluated the safety signal in other more
6   pertinent ways, which are, for example, a safety
7   signal.  They would -- a safety signal, someone
8   might be concerned because there were a series of
9   events, good events and good cases.
10          I believe the first thing they would do
11  before they did a pharmacoepidemiological study,
12  which is a big deal, or any other thing, they
13  would try to assess whether there was -- put
14  things in context, for example.  Put things in
15  context to determine whether they thought there
16  needed to be further investigation, how strong is
17  the signal, there are weak signals and strong
18  signals, how strong is a signal.
19          They also might investigate second
20  things like biological plausibility.  They might
21  do mechanistic studies before they went ahead
22  doing a large pharmacoepidemiological study.  They
23  could do animal studies.  They would do a lot of
24  things before they would move on to do an
25  epidemiological study.

Page 81

1   Q   Okay.  In this case, we had a change to
2   the precautions section of the Viagra label in
3   July 2005, correct?
4   A   Correct.
5   Q   Yes.
6          Subsequent to that, and you talk about
7   this in your report in a lot of detail, the FDA
8   contacted Pfizer about doing a study on this issue
9   of Viagra and NAION, correct?
10  A   That's correct.
11  Q   Okay.  Would you agree with me that the
12  reason the FDA asked Pfizer to do this study after
13  the change to the label is for safety issues?
14  A   Well, for safety issues.  They asked
15  them to investigate to further investigate the
16  safety issue, correct.
17  Q   Because they want to know if there is a
18  safety issue, correct?
19  A   Yes.
20  Q   In your opinion, was there a signal, a
21  safety signal regarding NAION and Viagra?
22      MS. LESKIN:  Is there a specific time?
23  A   When are we talking about?
24  Q   When do you think there was a safety
25  signal regarding Viagra and NAION?

Page 82

1    A   I think that from the information that I
2  have read, you know, all of this information, I
3  think certainly by -- I believe there was a weak
4  signal by February 2005.
5    Q   When you say there was a weak signal by
6  February 2005, what did you review specifically?
7  What did you review to form the basis of that
8  opinion?
9    A   I reviewed all of the PSURs, among other
10 things.
11   Q   I am sorry to interrupt you.  For the
12 layperson, what is a PSUR?
13   A   Periodic Safety Update Report.
14   Q   Okay.
15   A   These are reports in which a sponsor
16 evaluates all of the safety issues either
17 quarterly or twice a year, depending upon the
18 situation.  I reviewed those reports, I reviewed
19 additional reports that Pfizer generated, kind of
20 summary reports regarding safety.  I reviewed
21 Pfizer's reports that were sent to the FDA in
22 response to FDA's inquiries regarding the label
23 regarding the information that they had about
24 their clinical trials, information regarding their
25 animal studies, information regarding kind of

Page 83

1  mechanistic studies that they did in human beings
2  regarding the biological plausibility of Viagra
3  being related to NAION.  So there's lots of
4  information studies, other outside studies that
5  were done, papers, a lot of information regarding
6  the relationship between NAION and Viagra.
7    Q   Okay.  The date of February 24th, 2005,
8  when you mention that date, you are referring to a
9  request by DRUP requested in a letter received by
10 Pfizer on March 16th, 2005, that changes be made
11 to the post marketing adverse events section of
12 the Viagra labeling?
13   A   Correct.
14   Q   You write on February 24th, 2005, "After
15 reviewing the recent data from post marketing
16 adverse events."  What specific recent data are
17 you referring to?
18   A   I can't answer what specific data.  That
19 wording comes from the letter.  The letter that
20 DRUP sent to Pfizer states that we are asking you
21 to put this on the label based on information.  I
22 can surmise from my general knowledge and from
23 other information that they were evaluating this
24 safety signal with various data, MedWatch reports,
25 and literature and things like that.

Page 84

1    Q   For example, I think you refer to them
2  in the documents that you reviewed of
3  Dr. Pomerantz's abstract in October 2000 of two
4  cases of NAION at that point, correct?
5    A   That is correct.
6    Q   And you would agree with me that NAION
7  is a serious condition?
8    A   We can debate that, yes.  From a
9  regulatory sense, it is not totally clear, but you
10 could say certainly from the patient's point of
11 view, it is serious.
12   Q   From a?
13   A   Regulatory.
14   Q   What about from a pharmaceutical
15 company's perspective, is it a serious condition?
16   A   Certainly Pfizer took it as a serious
17 condition.
18   Q   Could you point to anything that you
19 reviewed or anything that you saw that showed
20 Pfizer investigated those two reports in 2000?
21   A   I think when they became aware -- I
22 can't remember.  I reviewed all of these PSURs,
23 and every report that they were aware of, they
24 investigated, and it stimulated them to do
25 additional studies, mechanistic studies to see

Page 85

1  whether they thought there was a relationship
2  between -- that Viagra was affecting the blood
3  flow.
4        NAION is, of course, a condition which
5  is supposed to be related to ischemia of the optic
6  nerve, so one of the key biological issues here is
7  does Viagra cause ischemia, or does it promote
8  ischemia, whatever, of the optic nerve, and Pfizer
9  was very aggressive in pursuing that avenue.
10   Q   Let me back up.  I think you just said
11 subsequent to this, Dr. Pomerantz's abstract, that
12 Pfizer conducted mechanistic studies to
13 investigate this issue?
14   A   Yes.
15   Q   Which studies?
16   A   There were -- let me say there were
17 studies done previously to look at the --
18   Q   But that wasn't my question.
19        MS. LESKIN:  Let him finish his answer.
20   Q   Fair enough, Doctor.
21   A   There were studies done previously
22 during the approval process regarding retinal
23 toxicity in humans and animals.
24   Q   You talked about this?
25   A   Then there were studies done afterwards.

Page 86

1  I think some of these studies were done in
2  Stanford, I think, or Penn, excuse me. Actually,
3  Dr. Grunwald did some studies looking, and others
4  did studies among other things looking at the
5  blood flow to the various areas of the retina or
6  the optic nerve to assess that situation.
7      Q   I am sorry, are you finished with your
8  answer?
9      A   Yes.
10     Q   You just testified, and I asked you to
11 follow up on that, subsequent to October 2000,
12 when Dr. Pomerantz's abstract came out citing the
13 two cases of NAION, you said Pfizer did
14 mechanistic studies after that. Which studies are
15 you referring to.
16     MS. LESKIN: Objection, asked and
17 answered.
18     MR. GOMEZ: I don't think he answered
19 it.
20     MR. BORG: Overruled.
21     A   I believe -- I may have the dates wrong,
22 but I believe that is the mechanistic studies that
23 I am talking about were done after 2000. The
24 ophthalmologic studies.
25     MR. GOMEZ: Real quick, time?

Page 87

1      MS. LESKIN: 1:01.
2      Q   Let's talk a little bit about where we
3  are now. As we sit here today, March 2009, you
4  write in your report that Pfizer is in the process
5  now of conducting a case control study on this
6  issue with Viagra and NAION, correct?
7      A   No.
8      Q   What is the study?
9      A   It is a case crossover study.
10     Q   Explain. What are they looking for in
11 this case crossover study?
12     A   What they are looking for is to see if
13 the incidence of the adverse of NAION occurs more
14 frequently in people taking PDE5 or Viagra than in
15 the population not taking Viagra.
16     Q   What is the purpose of this study?
17     A   That is the purpose of the study..
18     Q   Okay. When were they first asked to do
19 this study?
20     A   A letter was sent to them regarding
21 doing an observational study in December of 2005.
22     Q   Okay. You are referring to on
23 December 21st, 2005, DRUP sent a regulatory letter
24 to Pfizer in regard to, quote, "rare post
25 marketing reports of vision loss due to NAION in

Page 88

1  men who have taken PDE5 inhibitors, including
2  Viagra"?
3      A   I think that is the letter in which they
4  ask for a -- a post marketing study.
5      Q   In fact, Doctor, they recommended, or
6  they write in the letter that "We recommend that
7  you conduct a case control study of incident NAION
8  cases;" is that correct?
9      A   That is correct.
10     Q   The objective of this study would be "to
11 determine whether use of PDE5 inhibitors is an
12 independent risk factor for NAION," end quote,
13 correct?
14     A   That is correct.
15     Q   The letter went on as you write to
16 recommend certain technical aspects of the study
17 and suggest that Pfizer consult with FDA's," quote
18 "Guidance for industry on good pharmacovigilant
19 practices and pharmacoepidemiology assessment,
20 March 2005," correct?
21     That is a document that I want to show
22 you before the end. I want to talk about that
23 because you do mention it a few times in your
24 report. What was Pfizer's response to that
25 letter?

Page 89

1      A   Pfizer's response was that they provided
2  information in which they said they believed that
3  there was sufficient information to say there was
4  no increased incidence of NAION in patients taking
5  Viagra, and two, they weren't sure a case control
6  study was feasible. They give scientific argument
7  regarding why a case control study was not
8  feasible.
9      Q   Okay. But as we sit here today, they
10 are doing this study?
11     A   No, they are not doing that study.
12     Q   What is the difference?
13     A   The difference is that ultimately, there
14 is a lot of technical interactions between FDA and
15 Pfizer.
16     Q   Okay.
17     A   Ultimately, FDA realized that, in fact,
18 a case control study is not feasible, and then we
19 get into the discussion about a case crossover
20 study. But ultimately, the FDA acquiesced or
21 agreed with Pfizer that a case control study would
22 take too long or, you know, was not feasible in
23 this situation. So then they got into further
24 discussions.
25     Q   The purpose of this case crossover study

## Page 90

1  that we are speaking of today --
2      A   Yes.
3      Q   -- is to investigate the relative risk
4  of NAION when patients are exposed to PDE5
5  inhibitors compared to when they are not?
6      A   That is correct.
7      Q   Okay.  If they find that the relative
8  risk -- explain that to a layman.  What does that
9  mean, relative risk?
10     A   It means that the chance of getting
11 NAION would be more if you took Viagra than if you
12 had not taken Viagra, if that is what the result
13 of the study shows.
14     Q   And --
15     A   They are looking to see if it is true
16 that the chance of getting NAION is when you take
17 Viagra than when you don't take Viagra.
18     Q   That is information that a prescribing
19 physician would want to know, he would find that
20 helpful in determining whether or not to prescribe
21 a drug to his patient, correct?
22     A   I am not sure about that.  The label
23 already puts physicians on notice that there is
24 some possibility that there may be an association,
25 so I really can't answer that question.  You would

## Page 91

1  have to --
2      Q   I am sorry, Doctor.  I didn't mean to
3  interrupt.  I told I am bad at that.
4          If the results of this study show a
5  relative risk that is high in epidemiological
6  standards, that is something that a prescribing
7  physician would want to tell their patient; would
8  you agree with that?
9      A   If -- well, I guess that -- I think that
10 is true if it is -- if it is substantial
11 information.
12     Q   What do you define as substantial
13 information?  What would be a relative risk that
14 is substantial?  Would you explain that to a
15 layperson?
16     A   It is hard to answer that question.
17 Maybe -- I don't know if I am the right person to
18 answer that question, to tell you the truth.
19 There is a lot of unknowns here about how a
20 physician would react to these things, how
21 physicians take into account labeling, you know,
22 that kind of thing.  I am not sure I can answer
23 that question.
24     Q   The purpose of this study that is going
25 on right now is to investigate the relative risk

## Page 92

1  of NAION when patients are exposed to a PDE5
2  inhibitors like Viagra?
3      A   Yes.
4      Q   Compared to people who are not, correct?
5          MS. LESKIN:  Objection, asked and
6  answered.
7          MR. BORG:  Overruled.
8          Answer it.
9      A   Repeat the question.
10     Q   Sure.
11         I am going to quote what you write in
12 your report.
13         MS. LESKIN:  What page?
14         Q   Page 16, last paragraph before Section
15 5.F, you write, "Pfizer acquiesced to the FDA's
16 technical and temporal parameters regarding a case
17 crossover study to investigate the relative risk
18 of NAION when patients are exposed to PDE5
19 inhibitors compared to when they are not."
20         As of the writing of this report, Pfizer
21 had begun accrual of patients' details of the
22 study which can be found at clinicaltrials.gov.
23 Assume for purposes of this next question that the
24 results of this study show a statistically
25 significant relative risk of NAION when patients

## Page 93

1  are exposed to Viagra or any other PDE5 inhibitor
2  compared to when they are not.  If that is the
3  case, is that something a prescribing physician
4  would want to know so they can relay to their
5  patient when prescribing the Viagra?
6          MS. LESKIN:  Objection, improper
7  hypothetical, lack of foundation.
8          MR. BORG:  Overruled.
9          Are you able to answer that question?
10     A   I disagree with the assumption.  I
11 disagree with the assumption because I -- I --
12 quite frankly, my opinion is that this
13 epidemiologic study is not from -- not going to
14 show any difference because I feel there is enough
15 information to indicate that there is no
16 difference.
17     Q   Okay.
18     A   Or little difference.
19     Q   That's a new opinion.  You are now --
20     A   Right.
21     Q   That is not in your report?
22     A   Right.
23     Q   So you are giving an opinion now you
24 don't think the study is going to show a relative
25 risk?  You don't think that?

Page 94

1    A   I don't think so.
2    Q   Okay.  Based on what?
3    A   Based on the information that I have
4  reviewed regarding NAION..  All of this other
5  information regarding the risk, the cases we have
6  here relative to the background information, the
7  mechanistic studies, all of this information
8  together leads me to believe, in my opinion, that
9  we will not find -- there will not be found an
10 increased relative risk of NAION when -- at the
11 completion of this study.
12   Q   If that is the case, why does the FDA
13 want Pfizer to do the study?
14   A   Well, there are people --
15   Q   What is the purpose of the study?
16      MS. LESKIN:  Objection, compound.
17      MR. BORG:  You have two questions.  I
18 bet you want them both answered.
19 BY MR. GOMEZ:
20   Q   As you sit here today, why does the FDA
21 want to do it, then?  I will stop there.
22   A   I don't see -- the FDA, from the
23 material that I reviewed, was interested in
24 further studying this event, which is appropriate,
25 and you said to me assuming that the study shows

Page 95

1  an increased risk, and I answered that by saying I
2  don't agree with that assumption.  The FDA is
3  doing this because the people at FDA involved here
4  believe that it is appropriate to investigate this
5  issue further.  That is why they asked for this
6  study.
7    Q   And you disagree with that?
8    A   My personal opinion is that -- my expert
9  opinion is that this study did not show a
10 difference between Viagra and --
11   Q   Did you convey that in 2005 on any
12 telephone conference?
13      MS. LESKIN:  Objection.  It is
14 protected, Exhibit 5.
15      MR. BORG:  When he was working for the
16 FDA?
17   A   I can't answer that question.
18      MR. BORG:  I don't think he can, either.
19 Sustained.
20 BY MR. GOMEZ:
21   Q   All right.  We can agree that there was
22 a safety signal with Viagra and NAION even though
23 you call it weak, correct?
24   A   That is correct, in 2005.
25   Q   Right.  There was a label change,

Page 96

1  correct?
2    A   Yes.
3    Q   After 2000, when there were two reports
4  of NAION, I believe there were two reports of
5  NAION associated with Viagra, according to
6  Dr. Pomerantz's abstract.  Is that a signal in
7  your opinion?
8    A   In my opinion?
9    Q   Yes.
10   A   I would have to see the specific
11 reports, two reports by themselves.  A safety
12 signal is a concern.  You have to look at the
13 reports if we are talking about specifically, but
14 in general, you look at the reports, and reports
15 have a lot of difficulties, there is -- they could
16 be duplicate reports, they could be insufficient
17 reports.
18      So you have to first look at the
19 reports, evaluate the quality of the reports and
20 then accumulate in your ongoing investigation,
21 accumulate a series of reports and then put those
22 series of reports into context regarding the
23 background information, think about biological
24 plausibility, and at some point during that
25 process, someone or a group of people, and usually

Page 97

1  at the FDA, it is a team effort, so at some point,
2  a group of people would decide there is a safety
3  signal, and at that point, there are continuing
4  investigations regarding whether we generally meet
5  the standard of wanting to put something in the
6  label, is there evidence enough to put it in the
7  label or at least discuss with the company to put
8  it in the label.
9      And the company goes through the same
10 process because companies are going through the
11 same process of looking at safety signals, and
12 investigating and then go further on to determine
13 whether the information should be put on the
14 label.
15   Q   You would agree with this general
16 proposition that one serious adverse event can be
17 a signal?
18   A   Can be generally.
19   Q   Generally?
20   A   Yes, right.
21   Q   Yes?
22   A   But those circumstances, they would have
23 to be -- there are circumstances, for example,
24 when you would have an event that was unheard of
25 in the population, and something occurred which

Page 98

1  normally would never have occurred in the
2  population, and you had a really good case,
3  something like that, which of course, is not at
4  all which we have with NAION, but it is a
5  possibility.
6      Q   You would agree with me that NAION is a
7  serious adverse event?
8      A   In a medical sense, maybe not in a
9  regulatory sense.  It is something that is very
10 serious to the individual, absolutely.
11     Q   It causes blindness, correct?
12     A   Sometimes.
13     Q   But it causes blindness?
14     A   Sometimes.
15     Q   Blindness is a permanent condition,
16 correct?
17     A   Sometimes.
18     Q   Obviously I agree with you.  Sometimes
19 it can resolve, correct?
20     A   Yes.
21     Q   But we can agree medically serious
22 adverse event, correct?
23     A   Correct.
24     Q   Okay.  What did Pfizer do to investigate
25 these two incidents of NAION referenced in

Page 99

1  Pomerantz's 2000 abstract?
2      A   Pfizer, when they received these
3  reports, looked at the reports.  When we received
4  the actual reports, looked at the reports, put
5  them in context, put them in the context of all of
6  the other visual events, and at the same time they
7  were looking at all sorts of other events, but
8  they -- from everything I have read, Pfizer was
9  very aggressive about evaluating all of their
10 adverse events, including their visual effects
11 from the information I have.
12     Q   But is there anything to indicate in the
13 record that you have reviewed, please point it out
14 to me, that Pfizer tried to contact these
15 patients?
16     A   I don't recall anything like that.
17     Q   They could have done that if they wanted
18 to, correct?
19     A   They may have done that, I don't know.
20 I don't specifically.
21     Q   Fair enough.
22     A   They are obligated to contact --
23 according to the regs, they are supposed to try to
24 get more information and do follow-up for these
25 serious adverse events.  And there are impediments

Page 100

1  sometimes in terms of things like patient
2  confidentiality.  Sometimes the FDA or the company
3  will try to get further information, but they may
4  not be able to get further information, you know.
5      Q   But sometimes adverse events are
6  underreported, correct?
7      A   Estimates?
8      Q   No, strike that.
9          There is a general rule out there that
10 adverse events are underreported for certain
11 incidents?
12     A   What is better to say is that we don't
13 know whether things are underreported or even
14 overreported.  For many drugs, they may be
15 underreported.  For a drug like Viagra, they may
16 be overreported.  We know that, that is all I will
17 say for now.
18     Q   Going back to this case crossover study.
19     A   Yes.
20     Q   What is the status now as of March 13,
21 2009, of the study?
22     A   My understanding from the public website
23 is that they are accruing patients.  That is all I
24 know about it, they are accumulating patients.
25     Q   Let me ask you this:  You would agree

Page 101

1  that Pfizer knew of a possible association between
2  Viagra and NAION in 2000, correct?
3      A   No.
4      Q   Well, they knew of patients who had
5  taken Viagra and had developed NAION in 2000,
6  correct?
7      A   Correct, I think.
8      Q   Why not just do a study then?  Why not?
9      A   We have to put things in context.  There
10 were two reports.  Quite frankly, I don't even
11 know if the two reports were on NAION, but there
12 were two reports of something, some sort of
13 ischemic optic neuropathy, among maybe --
14 ultimately, when the report in 2005 was made
15 public, it included foreign reports and American
16 reports.
17         In a particular year, there were perhaps
18 100 million tablets, at least, maybe 150 million
19 tablets of Viagra administered, taken by people.
20 Among that, there were two, maybe, reports of
21 NAION.  They investigated those reports as they
22 investigated all sorts of other reports about all
23 sorts of things that came into them, and something
24 like that didn't rise to the level of a signal or
25 anything.  If that standard was appropriate for

Page 102

1    those two cases, they possibly would be doing God
2    knows how many, 50 epidemiology studies.  If they
3    had two reports of something, there are two
4    reports of many different things.
5        Q    But, Doctor, they had more than two
6    reports?  Prior to July 2005, they had more than
7    two reports?
8        A    That's right.
9        Q    In fact, from January 1998 to December
10   2004, Viagra was associated with the highest
11   number of ischemic optic neuropathy reports,
12   19 percent in the AERS database, you would agree
13   with that?
14       A    I have seen that written.  I have no --
15       Q    That is something that comes from the
16   2005 Public Citizen Watch Letter that was sent to
17   the FDA, correct?
18       A    That analysis was in there, yes.
19       Q    And that is what we called data mining?
20       A    Yes.
21       Q    And you state data mining is unreliable,
22   correct?
23           MS. LESKIN:  Objection.
24       Q    In your report, generally?
25       A    It is not just me.  Data mining is kind

Page 103

1    of an exploratory analysis that is even at a lower
2    level than the analysis one has from looking at
3    the ARS work report because it is based on the ARS
4    reports.  And actually, one of the flaws of that,
5    I think, in Dr. Wolfsen's petition, he compares
6    Viagra and maybe PDE5 inhibitors in general with
7    other drugs, which is specifically cautioned
8    against in the pharmacovigilance guidance.
9           Aside from the fact that there are
10   particular problems with what he did, there is a
11   general opinion that most people agree that you
12   should not be comparing different classes of drugs
13   in a data mining exercise.
14       Q    We are talking about the Pomerantz
15   report in 2000, he reported the seven additional
16   reports in 2005, correct?
17       A    I think it was 25, yes.
18       Q    Adverse events just don't come from the
19   United States, correct?
20       A    Serious adverse events, yes.
21       Q    Serious adverse events like NAION?
22       A    Correct.
23       Q    Pfizer has an obligation to look around
24   the world, correct?
25       A    Yes.

Page 104

1        Q    Do you know about any incidents of NAION
2    being reported in Europe in the time frame of
3    2003?  Did you review anything?
4        A    There are several things I can comment
5    about.
6        Q    Sure.
7        A    One is that there were several
8    observational studies in -- one was in U.K. and
9    one was in Europe after it was approved there, I
10   am not sure of the exact timing, where both in the
11   U.K. study and the European study, the conclusion
12   was that there was no increased incidence of
13   NAION.
14           The second thing I can comment about
15   that in the final public comment that FDA made in
16   July of 2005, after all of this labeling changes,
17   the FDA broke down on their website where the
18   reports came from, and some of the reports in the
19   analysis were foreign.
20           So there were both foreign and U.S.
21   reports in the final 2005 analysis, and Pfizer, in
22   fact, was required, I believe by regulatory
23   authorities, to do both of these European
24   studies -- I should say English and European
25   studies.  So they were investigating.

Page 105

1           This is just one of the ways that they
2    were investigating foreign reports, and when you
3    read -- one reads the PSURs, you can see these
4    reports broken down by country as well as the
5    number of drugs.  It is distribution of the drug
6    by company.  So they were analyzing foreign
7    information, also.
8        Q    The February 2005 letter from the FDA
9    from Pfizer regarding changing the labeling, the
10   information that the FDA was relaying to Pfizer
11   that they were basing their request on was
12   something that Pfizer had in their possession,
13   too, correct?
14       A    Not completely.  Perhaps.
15       Q    What do you mean by not completely?
16       A    I believe that it is.
17       Q    Are you saying that the FDA had more
18   information than Pfizer?
19           MS. LESKIN:  Wait, one person at a time.
20       Q    I am sorry.
21       A    The FDA often has different information.
22   They most likely had similar adverse event
23   reporting.
24           The 2005 labeling request, from the
25   information I read, was precipitated by

Page 106

1   accumulating events by Viagra, but perhaps other
2   PDE5 inhibitors which Pfizer probably had no
3   information regarding. This was, in my view, a
4   class -- a request for class labeling because FDA
5   actually says that in a letter, you know, the next
6   letter that they write. So some of the
7   information, I believe, perhaps regarding other
8   drugs was not at Pfizer's disposal.
9      Q   You write specifically that in your
10  report on Page 13, right before 4.4, you said, "I
11  believe that the resultant labeling was adequate,
12  and the time frame for implementing this labeling,
13  considering these changes involved other sponsors
14  in this case, class labeling was appropriate."
15     What do you know about the other
16  sponsors?
17     MS. LESKIN: Based upon public
18  information?
19     Q   Based on what you reviewed --
20     A   Okay.
21     Q   -- to write that statement?
22     A   Well, the labeling -- the FDA in their
23  letter, which I have access to here, says that
24  they are going to do class labeling in the second
25  letter, and also in the FDA public statement in

Page 107

1   July, they talk about the other two drugs. They
2   talk about -- it is Viagra, Cialis and Levitra.
3      Q   You would agree with me that Viagra is
4   No. 1 in terms of sales and prescriptions?
5      A   It was at that time.
6      Q   It still is?
7      A   I am not sure. I don't know for sure.
8      Q   In fact, Viagra has been reported in
9   some years as 1.9 billion in sales, correct?
10     A   I don't know.
11     MR. GOMEZ: What time is it? How much
12  time do we have?
13     MR. BORG: It is 1:25.
14     Q   Going back to Page 16.
15     MS. LESKIN: Of the report?
16     MR. GOMEZ: We are still with the
17  report.
18  BY MR. GOMEZ:
19     Q   Now, you refer to an August 2nd, 2007
20  face-to-face meeting between Pfizer and the FDA,
21  correct?
22     A   Yes.
23     Q   Okay. Then you write at that time, "FDA
24  was primarily interested in the time frame to
25  complete the study and was willing to sacrifice

Page 108

1   precision for rapid conduct of the study." Did I
2   read that correctly?
3      A   Yes.
4      Q   So the FDA wanted this study to happen
5   faster than it was, correct?
6      A   Yes.
7      Q   Why?
8      A   I can't tell that exactly from this
9   information.
10     Q   Why would the FDA want to do a case
11  control study?
12     MS. LESKIN: He was finishing his
13  answer.
14     MR. GOMEZ: I am sorry, I thought he was
15  done.
16     MS. LESKIN: You can finish your prior
17  answer.
18     A   Yes, from the information I have been
19  given, everything I have read, I am not sure why
20  they were so anxious. I can understand why they
21  were so anxious to get the thing done and
22  apparently less concerned about the correct
23  conduct of the study. I can't really answer that
24  question.
25     Q   Would it be fair to say that the FDA

Page 109

1   wanted the study done in a rapid manner because
2   there were safety issues at stack?
3      A   I think that the FDA wanted -- clearly
4   the FDA wanted the study accomplished, yes, to
5   further investigate the safety issues.
6      Q   Would you agree with this statement,
7   that if the results of a study showed that there
8   was a safety issue with Viagra, that that would
9   hurt Pfizer's sales of Viagra? Do you agree with
10  that?
11     MS. LESKIN: Objection.
12     MR. BORG: Overruled.
13     A   In regard to if there was some -- you
14  know, I am not sure that is true.
15     Q   Okay. You would agree if the FDA wants
16  the study done fast for safety issues, why doesn't
17  Pfizer want to do the same thing?
18     A   Because there is no point doing a study.
19  You are wasting a lot of resources doing a study
20  where the results will be questioned.
21  Epidemiological studies are often questioned.
22  They are very difficult to do, much harder than
23  control studies. Almost every epidemiological
24  study that I have seen, there are questions about
25  all sorts of issues.

Page 110

1    So it is very important to get these
2  parameters correct from the beginning.  In this
3  case, from what I have read, Pfizer was making a
4  good faith effort to get everything correct.  In
5  fact, they hired one of the main -- one of the
6  main people, the consultant was somebody who the
7  FDA quotes in their pharmacovigilance guidance.
8  They may have made every effort to get all of this
9  information and the conduct correct, and the FDA
10  on its own says, essentially, well, you know, we
11  know there are some problems here, but let's just
12  go ahead and do the study.  I cannot answer why
13  that was, but that is clearly shown in the
14  information that I read.
15    Q    We can agree on this, that the study was
16  requested at the end of December, December 21st,
17  2005, over three years have gone by, and the study
18  is still not completed, correct?
19    A    It is not completed.
20    Q    I guess --
21    A    However, even if they started the study
22  when it was requested, it wouldn't be completed at
23  this date.
24    Q    How long is the study going to take to
25  be completed?

Page 111

1    A    Well, that was one of the controversies
2  about this.  I don't know the current, but at one
3  point, someone thought it might take 10 or 15
4  years.  I am guessing, I don't have the date.
5  Maybe five or six years, I just don't know.  I
6  don't have enough information.
7    Part of the problem is that a more
8  precise study would have taken a longer period of
9  time.  The FDA didn't want to take that long, and
10  they were willing to accept less precision for a
11  shorter study.
12    Q    Well, at first, Pfizer didn't want to do
13  the study at all because they thought it wasn't
14  feasible, correct?
15    A    That is true.  And the FDA agreed with
16  them, that a case control study was not feasible.
17  Then they switched to a different kind of study
18  that was perhaps more feasible.  The FDA's own
19  ophthalmologist, and it is quoted in the telecon,
20  Dr. Wiley Chambers, stated in one of the -- either
21  in a letter or the telecons that he did not think
22  that the case control study was feasible.
23    Q    On April 12th, 2006, DRUP believed that
24  a prospective case control study was feasible,
25  correct?

Page 112

1    A    I think in that same letter, they talk
2  about disagreement, and he didn't -- that there
3  were -- in one of the letters, they talk about
4  disagreements.
5    Q    Right.
6    A    Ultimately, they changed their mind and
7  said let's do a case crossover study rather than a
8  case control because a case control, it would take
9  too many people, and it would take too long.  A
10  lot of this discussion was surrounding the type of
11  study to do.
12    Q    "On April 12th, 2006, the division
13  informed Pfizer that in consultation with the
14  division of drug risk and valuation in OSE that
15  'while many of the design issues for such a study
16  require further discussion, DRUP believes that a
17  prospective case control study is feasible and may
18  provide additional information toward determining
19  the potential risks of PDE5 inhibitors as
20  independent contributors to NAION events.'"  Did I
21  read that correctly?
22    A    Yes.
23    Q    Okay.  Then you talked about
24  Dr. Chambers?
25    A    Yes..

Page 113

1    Q    You write on Page 15, the second to the
2  last paragraph, okay?
3    A    Yes.
4    Q    "In its written response to Pfizer's
5  October 9th, 2006 submission described above, DRUP
6  sent draft comments in preparation for a
7  teleconference to be held between the appropriate
8  FDA and Pfizer clinical and regulatory experts." I
9  will stop right there.
10    Were you on that conference call; yes or
11  no?  That is all I want to know.
12    A    I don't remember.  I can easily check
13  the records and see if I was on the conference
14  call.
15    Q    In these comments communicated by DRUP,
16  it was stated there are different opinions within
17  the collaborating groups regarding the feasibility
18  of an epidemiologic study.  For example,
19  Dr. Chambers," who you talked about, "and the FDA
20  ophthalmology experts expressed, meaning
21  prospective case control study is not likely to be
22  doable at this time."  Did I read that correctly?
23    A    That is correct.
24    Q    And DRUP further stated that although it
25  believed that a prospective case study is

Page 114

1  feasible, it recognizes that the definition of
2  NAION in the exposure window are two areas that
3  need additional discussion. DRUP still believed
4  as of March 23rd, 2007, that a case control study
5  was feasible, correct?
6       MS. LESKIN: Objection, misstates the
7  evidence, lack of foundation.
8       MR. BORG: Overruled.
9       If you are able to answer.
10  A    Restate that question.
11  Q    As of March 23rd, 2007, DRUP believed
12  that a prospective case study was feasible,
13  correct?
14  A    But as I state, there were differences
15  of opinions internally.
16  Q    Fair enough. And we talked about that,
17  right?
18  A    Yes.
19  Q    How many studies did Pfizer do to get
20  Viagra approved?
21  A    Ten human studies, maybe 20, 30, 40
22  animal studies. Another 50, something like that,
23  just off the top of my head.
24  Q    Have I covered all of your opinions that
25  you are going to give, if asked to testify?

Page 115

1  A    (No response).
2  Q    Have I covered all of the ones in your
3  report?
4  A    Covered all my opinions?
5  Q    Yes..
6  A    Yes, we went through the conclusions
7  which are my main opinions.
8  Q    Okay.
9  A    I have lots of opinions.
10  Q    Sure. We could sit here all day and ask
11  you about that, but --
12  A    I have opinions about Dr. Bloom's
13  opinions, which of course, the big issues are
14  covered.
15  Q    The opinions that you will testify to
16  are contained in this report?
17  A    Yes.
18  Q    Are you going to give any other opinions
19  that aren't in this report?
20  A    I don't think so.
21  Q    I guess what I want to ask is: Pfizer
22  conducted over 20 to 40 human studies to get
23  Viagra approved, correct?
24  A    It was efficacy, does the drug work.
25  Q    Does the drug work and is it safe,

Page 116

1  correct?
2  A    Yes.
3  Q    After it is approved in 1998, all the
4  way through July 2005, you would agree with me in
5  between that time frame, whether it be 2000, 2001,
6  2002, that Pfizer became aware that there were
7  reports out there that a very serious eye
8  condition called NAION was being suffered by
9  people who were taking their drug Viagra. Would
10  you agree with that?
11  A    That they were aware that people were
12  getting NAION who also happened to be taking their
13  drug, that is true.
14  Q    They were aware of reports that were out
15  there?
16  A    Yes.
17  Q    Why not do one more study? Why not?
18  A    Well, I guess I sort of gave that answer
19  before. If you put that standard to it, there
20  were people out there with all sorts of stuff
21  going on. I mean, these were -- these are older
22  men, okay, and they were getting everything that
23  older men get. NAION is one of them. But they --
24  if you look at the PSUR reports, there are reports
25  of all sorts of serious things going on with these

Page 117

1  older men. So they could have done -- they would
2  end up doing multiple studies using that standard,
3  in my opinion. Every time they got a report about
4  some serious event, not even saying the studies
5  are feasible, we didn't even know if these studies
6  were feasible, doing multiple epidemiological
7  studies, taking up multiple resources, costing a
8  lot of money for the people at the FDA. Forget
9  about Pfizer, people at the FDA do not -- everyone
10  considers the resources involved in doing a study.
11       So there would be no motivation to just
12  do studies every time one or two events -- reports
13  of a serious adverse event came in when it is not
14  even to the level of a safety signal, much less
15  even to be on the label.
16  Q    But they are doing the study now; aren't
17  they, correct?
18  A    They are doing the study now, that is
19  correct.
20  Q    We have had a label change, correct?
21  A    That is correct.
22  Q    In the precautions section of the label,
23  correct?
24  A    That is correct.
25  Q    The standard for a precautions section

Page 118

1  label change is that there is a reasonable
2  association between the drug and the event,
3  correct?
4      A   Correct.
5      Q   Pfizer never took it upon themselves to
6  change the label, correct?
7      A   Not from the information that I have
8  here, correct.
9      Q   So it is your opinion before we stop,
10  that the label change was timely, correct?
11      A   That is correct.
12      Q   We went over everything that you base
13  your opinion on, it is in your report?
14      A   That is correct.
15      Q   Okay.  It is your opinion that the study
16  that was asked to be done in 2005, the case
17  crossover study, is being done in a timely manner,
18  correct?
19      A   In a timely manner, correct.  Yes..
20          MR. GOMEZ:  Let me have a second to go
21  through my notes.
22          MR. BORG:  Mr. Gomez, don't rush this
23  because of me.
24          (Recess taken)
25          MR. GOMEZ:  As Exhibit 3, CFR 314.80.

Page 119

1          (CFR 314.80 marked Shames Exhibit 3 for
2  identification.)
3          MR. GOMEZ:  "Guidance for Industry," I
4  am going to mark this as Shames 4, please.
5          (Document titled "Guidance for Industry"
6  marked Shames Exhibit 4 for identification.)
7  BY MR. GOMEZ:
8      Q   Real quick, Page 9 of your report.
9          Are you there?
10      A   Yes.
11      Q   The second full paragraph down, it's one
12  beginning with "ED," there is a sentence in there?
13      A   Yes.
14      Q   That says, "Therefore, it is not
15  possible to say there is a causal relation between
16  NAION and the use of Viagra."
17      A   Correct.
18      Q   Yes?
19      A   That is what I said.  Therefore, it is
20  not possible to say there is a causal relation
21  between NAION and the use of Viagra, right.
22      Q   When you say causal relation, define
23  that.
24      A   A causal relationship to my view is when
25  there is a high level of evidence that the drug is

Page 120

1  related to the particular adverse event, the
2  biological event.  There is no standard definition
3  of causality by the FDA or anyone else that I
4  know.  There is some subjectivity.  That is my
5  definition of causality.
6      Q   Just so that I understand you, you
7  talked earlier about changing the precaution
8  section of a label, correct?
9      A   Yes.
10      Q   Okay.  We agreed that to put a change in
11  that section, there has to be reasonable evidence
12  of an association, correct, between the drug and
13  the event, you agreed to that?
14      A   Right, whatever reasonable association.
15      Q   So when you say it is not possible to
16  say there was a causal relation between NAION and
17  use of Viagra, you are putting that on a continuum
18  above reasonable association?
19      A   The evidence for causation, I would say,
20  is much higher than reasonable association.
21      Q   Percentage wise, what is it?
22      A   Percentage wise, I don't even know what
23  that means.
24      Q   More likely than not?
25      A   (No response).

Page 121

1      Q   What is reasonable evidence of
2  association?
3      A   Reasonable evidence of association in
4  terms -- in practical terms in this situation is
5  when the FDA decides there is a reasonable
6  evidence of an association.  That's in reality
7  what it is.
8          Or in fact, a drug company could look at
9  the regulations and decide when they believe there
10  is a reasonable evidence of association.
11      Q   It seems like you are saying two
12  different things.  You are saying there is not a
13  causal relationship, you also testified there is a
14  reasonable evidence of association?
15      A   I may be wrong, but I think causation is
16  a much higher -- causation is much higher, a
17  higher level of -- on a continuum, you have a
18  suspicion, then you have an association, but these
19  are not causation.  Causation means the drug --
20  you know, if you have a drug that causes liver
21  failure, or aplastic anemia or something, and that
22  never occurs in this population given the drug,
23  but if they get aplastic anemia, you can consider
24  that the evidence is much higher, that might be
25  causation.  There is nothing here that indicates

Page 122

1  causation. You don't need causation to be on the
2  label.
3      Q    What is your understanding of causation?
4  On the continuum, where is the causation?
5      A    Causation is way out there.
6      Q    Is that 75 percent?
7      A    I don't know how that --
8      Q    More likely than not, is that evidence
9  of causation?
10     A    You know, causation is such a high
11  standard. I don't think it ever appears in the
12  FDA label. To be sure of causation, it is very,
13  very unusual that you would actually kind of be
14  absolutely assured of causation, so --
15     Q    Where would I find that in the documents
16  you reviewed, that definition?
17     A    well, I don't know about the definition
18  of that. In the pharmacovigilance guidance, it
19  says that the FDA has no standard definition of
20  causation, rather it says there is no real good
21  standard of causation.
22     Q    I don't mean to belabor the subject, you
23  say they don't have a standard definition for
24  causation. Correct me if I am wrong, your
25  understanding for causation is way up there, you

Page 123

1  said? I am just trying to understand what is your
2  definition of causation.
3      A    My understanding is you take this drug,
4  you are going to get this, that is my -- that to
5  me is a causation.
6      Q    So in other words, correct me if I am
7  wrong, if you take a drug, and you get a
8  condition, it is the cause of the condition, would
9  that be your definition?
10     A    No, no. I mean, if there is no other
11  reason for you to get this than that, that could
12  be causation. There is no other reason for you to
13  get this, you take the drug and you get it, that
14  might -- and that happens multiple times.
15     Q    So it is your testimony that there can't
16  be more than one cause of an event?
17     A    I didn't say that.
18     Q    Am I understanding you correctly, that
19  is what you are saying?
20     A    No, I didn't say that. I said -- I said
21  the drug could be a cause, but there certainly
22  could be other causes.
23     Q    Okay.
24     A    I mean, you know.
25     Q    Let me go to Page 12 at the top. You

Page 124

1  say, "When the agency or a sponsor seeks to alter
2  safety related labeling." We can agree that the
3  sponsor, Pfizer, didn't seek to alter any safety
4  related labeling in this case, correct?
5      A    I am not aware of any, no.
6      Q    A few things, general propositions I
7  want to ask you about, and then we are done
8  regarding post marketing.
9          Would you agree with me that once a
10  signal is detected, adverse events should be fully
11  and quickly evaluated to determine if a safety
12  risk is identified? Would you agree with that
13  statement?
14     A    It should be further investigated,
15  correct.
16     Q    Okay. Would you agree with me that a
17  sponsor or a pharmaceutical company is required to
18  review information with the FDA to determine if
19  additional studies are needed to address safety
20  concerns?
21     A    Say that -- at what point is this? Just
22  in general, what do you mean?
23     Q    These are general propositions.
24     A    That a company is required to -- yes,
25  they --

Page 125

1          MS. LESKIN: Can you repeat the
2  question.
3      Q    Would you agree with me that a
4  pharmaceutical company is required to review
5  information with the FDA to determine if
6  additional studies are needed to address safety
7  concerns?
8      A    I don't know if that is an actual
9  requirement. I mean, it is certainly a good idea,
10  I agree with that. I just don't know if there is
11  a regulatory requirement, that is what I am not
12  sure about. Companies sometimes will often do
13  studies that the FDA is not aware of. It might be
14  in Europe or somewhere. Sometimes they might do
15  studies elsewhere or -- I am not sure they need
16  permission, but in most cases, it is a good idea
17  to talk to the FDA, I can agree to that. Whether
18  they are required, I just don't know.
19     Q    You would agree with me that the duty to
20  act quickly and promptly, as we discussed just a
21  moment ago, falls to the manufacturer?
22     A    Quickly and promptly regarding -- I
23  think both the FDA and the manufacturer have a
24  duty to act promptly to investigate safety issues,
25  yes.

Page 126

1    MR. GOMEZ: I think that is all I have.
2  I might have one or two more.
3  EXAMINATION BY MS. LESKIN:
4    Q   I have a couple of questions to follow
5  up, Doctor.
6        We talked a little bit today about
7  pharmacovigilance?
8    A   Yes.
9    Q   Mr. Gomez asked you about the number of
10 reports of NAION that existed at various points in
11 time. Is it acceptable pharmacovigilance
12 methodology to similarly count the number of
13 adverse events before taking an action such as
14 changing the label?
15   A   No. The pharmacovigilance guidance
16 specifically says how one should individually
17 evaluate the reports, the individual reports.
18 This evaluation includes information related to
19 the adverse event, like when did the adverse event
20 occur, what is the extent of the adverse event,
21 what are the symptoms and signs of the adverse
22 event, the timing of the adverse event related to
23 the drug, the clinical course of the patient after
24 the adverse event, whether the adverse event did
25 or did not require hospitalization, whether it was

Page 127

1  disabling or not disabling, as much detail as
2  possible how the adverse event was diagnosed,
3  laboratory studies, the diagnostic criteria. A
4  condition like NAION requires, of course, a lot of
5  diagnostic tools to diagnose it.
6    Q   Is the total number of prescriptions
7  being written a relevant factor to evaluate?
8    A   Absolutely. It says -- it specifically
9  states in the pharmacovigilance guidance -- there
10 is a whole section about context that requests
11 people to create reporting rates and compared to
12 background. On its face, of course, it makes
13 sense to have to put this in context, so it is a
14 very important part, and the FDA believes it is an
15 important part.
16   Q   When you say background, is the
17 background rate of the event relevant to proper
18 pharmacovigilance?
19   A   Absolutely. And it is again stated in
20 this guidance, but it only makes sense that it
21 would be important if you have an event that is
22 reported two or three a year, and in one case,
23 this event has never been reported ever in the
24 history of that population. That would make -- it
25 might make you think one thing.

Page 128

1        If, however, it was reported two or
2  three a year, and there were millions and millions
3  of people taking it, and in this population of the
4  people taking it, this event occurred in a defined
5  manner, then you would look at it in some other
6  different way. It would make you evaluate it
7  differently.
8    Q   Would it be appropriate pharmacovigilant
9  methodology to suggest a label simply on a count
10 of the adverse event without doing this analysis
11 that you just described?
12   A   Absolutely not.
13   Q   Mr. Gomez asked you some questions about
14 studies Pfizer had conducted. Following the
15 approval of Viagra, did Pfizer conduct additional
16 studies of the drug?
17   A   Yes.
18   Q   Additional clinical studies?
19   A   Yes.
20   Q   I want to direct you to Page 8 of your
21 report, and there is that third paragraph from the
22 bottom. Are you there? It starts "no cases."
23   A   Yes.
24   Q   How many patients were involved in the
25 original clinical data set that was submitted to

Page 129

1  the FDA in connection with the Viagra NDA?
2    A   The people exposed to Viagra were 3,800,
3  right.
4    Q   Directing you to Page 14 of your report,
5  the paragraph talking about the August 5th, 2005
6  Pfizer letter at the top of that page. Do you see
7  where I am?
8    A   Right.
9    Q   As of August 5th, 2005, how many
10 patients had participated in clinical trials for
11 Viagra?
12   A   Approximately, 13,000.
13   Q   So that is about --
14   A   13,000 took Viagra, so that is, you
15 know --
16   Q   It is a little less than 9,000
17 additional patients were involved in clinical
18 studies between the time of approval and August of
19 2005; is that fair to say?
20   A   That is correct.
21   Q   Did any of those patients get NAION?
22   A   None of those patients got NAION.
23       MS. LESKIN: I have nothing further.
24 CONTINUED EXAMINATION BY MR. GOMEZ:
25   Q   One or two follow-ups on that very

Page 130

1  issue.
2         Doctor, you can agree with me that the
3  studies that Ms. Leskin just referred to weren't
4  designed to look for NAION?
5      A   Generally, they were not.
6      Q   Even though you had all of these
7  studies, you would agree with me that the FDA
8  still wanted an additional study done on this very
9  issue?
10     A   That is true.
11     Q   Okay. So you would agree with me that
12 as a former employee of the FDA, if a study had
13 been done on this issue regarding Viagra and NAION
14 previously, you wouldn't ask the company to do a
15 study again; would you?
16        MS. LESKIN:  I want to make sure of the
17 context you are asking as an expert, not based on
18 what he knew at the time he worked at the FDA,
19 correct?  I want to make sure.  You said as a
20 former employee.
21     Q   I am asking you as an expert, and part
22 of your expertise is based on your FDA experience,
23 correct?
24     A   The answer is that there would have had
25 to have been a reason to do the study in the first

Page 131

1  place.
2      Q   That is not my question, with all due of
3  respect.
4      A   I didn't say you wouldn't do another
5  study.  It depends on the record of the first
6  study.  The first study might have been equivocal.
7  Just because they did one study on a condition on
8  a situation doesn't mean they wouldn't have asked.
9  I have seen times where they would ask for another
10 study.  It depends on the first study.  Maybe the
11 first study was equivocal, and then they would ask
12 for another study, or there was criticism of the
13 first study.
14        MR. GOMEZ:  Doctor, that is all I have.
15 I appreciate your time.  It was a pleasure.
16        (Time noted: 2:08 p.m.)
17
          _____
18        DANIEL A. SHAMES, M.D.
19 Subscribed and sworn to before me
20 this ____ day of _____, 2009.
21
22
   _____
23 NOTARY PUBLIC
24
25

Page 132

1  STATE OF NEW YORK   )    Pg 77 of 78 Pgs
2                      ss:
3  COUNTY OF NEW YORK  )
4      I wish to make the following changes, for
5  the following reasons:
6  PAGE LINE
7  ____ ____ CHANGE: _____
8       ____ REASON: _____
9  ____ ____ CHANGE: _____
10      ____ REASON: _____
11 ____ ____ CHANGE: _____
12      ____ REASON: _____
13 ____ ____ CHANGE: _____
14      ____ REASON: _____
15 ____ ____ CHANGE: _____
16      ____ REASON: _____
17 ____ ____ CHANGE: _____
18      ____ REASON: _____
19 ____ ____ CHANGE: _____
20      ____ REASON: _____
21 ____ ____ CHANGE: _____
22      ____ REASON: _____
23 ____ ____ CHANGE: _____
24      ____ REASON: _____
25

Page 133

1         C E R T I F I C A T E
2  STATE OF NEW YORK   )
3                      : ss.
4  COUNTY OF NEW YORK  )
5      I, ANITA SHEMIN, a Certified
6  Shorthand Reporter and Notary Public within
7  and for the State of New York, do hereby
8  certify:
9         That DANIEL A. SHAMES, M..D., the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by the witness.
14        I further certify that I am not
15 related to any of the parties to this action
16 by blood or marriage, and that I am in no way
17 interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto
19 set my hand this _____ day of _____,
20 2009.
21
22
   _____
23 ANITA T. SHEMIN, CSR
24
25

Page 134

```
 1        DANIEL A. SHAMES
 2        C E R T I F I C A T E
 3   STATE OF NEW YORK  )
                        : ss.
 4   COUNTY OF NEW YORK )
 5
 6        I, ERIC J. FINZ, a Shorthand Reporter
 7   and Notary Public within and for the State of
 8   New York, do hereby certify:
 9        That DANIEL A. SHAMES, the witness whose
10   deposition is hereinbefore set forth, was duly
11   sworn by me and that such deposition is a true
12   record of the testimony given by the witness.
13        I further certify that I am not related
14   to any of the parties to this action by blood
15   or marriage, and that I am in no way
16   interested in the outcome of this matter.
17        IN WITNESS WHEREOF, I have hereunto set
18   my hand this ____ day of _____, 2009.
19
20        _____
21        ERIC J. FINZ
22
23
24
25
```

MERRILL LEGAL SOLUTIONS (212) 557-7400

MERRILL LEGAL SOLUTIONS (212) 557-7400

Page 135

```
 1   MARCH 13, 2009
 2        I N D E X
 3   WITNESS          EXAMINATION BY
     PAGE
 4
 5   DANIEL SHAMES, M.D..  Mr. Gomez        1
 6             Ms. Leskin     70
 7             Mr. Gomez      73
 8
 9        E X H I B I T S
10   FOR IDENTIFICATION              PAGE
11   Shames Exhibit 1  Notice of Videotaped Depo    5
12   Shames Exhibit 2  Expert report       58
13   Shames Exhibit 3  CFR 314.80 118         119
14   Shames Exhibit 4  Document titled "Guidance 118 119
               for Industry"
15   Shames Exhibit 5  Document titled "Summary    57
               of Health and Human Services
16             Office of the General Council
               Ethics Division, January 2008"
17
18
19
20
21
22
23
24
25
```