1

1       IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3
                              )
4                             )
                              )
5                             )
                              ) MDL DOCKET NO. 1724
6    IN RE:                   )
                              ) Judge John W. Borg
7    VIAGRA PRODUCTS          )
     LIABILITY LITIGATION     )
8                             )
                              )
9                             )
                              )
10                            )

11
                   - - -

12

13       Deposition of MICHAEL A. WITT, M.D.

14           (Taken by Defendants)

15            Atlanta, Georgia

             January 21, 2009

16

17   Reported by: Lynne C. Fulwood

18            Certified Court Reporter

19

20

21

22

23

24

25

**2**

1  STATE OF GEORGIA
2  COUNTY OF COBB
3  DEPOSITION OF MICHAEL A. WITT, M.D.
4
5        Pursuant to Article 8.B of the RULES
6  AND REGULATIONS OF THE BOARD OF COURT REPORTING
7  OF THE JUDICIAL COUNCIL OF GEORGIA, I make the
8  following disclosure:
9        I am a Georgia Certified Court
10  Reporter.  I am here as a representative of
11  Veritext Reporting Company.
12        Veritext Reporting Company was
13  contacted by the offices of KAYE SCHOLER, LLP,
14  to provide court reporting services for this
15  deposition. Veritext Reporting Company will not
16  be taking this deposition by O.C.G.A. 15-14-37
17  (a) and (b).
18
19
20
21
22
23
24
25

**4**

1          INDEX TO EXHIBITS
2  Exh 1    Michael A. Witt, M.D., Curriculum
3           Vitae.........................7
4  Exh 2    Subpoena.......................26
5  Exh 3    Expert Report of Michael A. Witt,
6           M.D. .........................36
7  Exh 4    Expert Opinion History.........47
8  Exh 5    Vacuum device (retained by counsel
9           For the Defendant)............63
10  Exh 6    Venus Flow Controller (retained by
11           Counsel for the Defendant)....64
12  Exh 7    Complete Implant (retained by
13           Counsel for the Defendant)....67
14  Exh 8    Caverject (retained by counsel for
15           The Defendant)................70
16  Exh 9    MUSE Demonstration (retained by
17           Counsel for the Defendant)....75
18  Exh 10   Viagra insert..................88
19  Exh 11   FDA Statement..................93
20
21
22
23
24
25

**3**

1  ON BEHALF OF THE PLAINTIFF:
2      CHRISTOPHER GOMEZ
        Attorney at Law
3      The Miller Firm, LLC
        Two Bala Plaza, Suite 613
4      Bala Cynwyd, Pennsylvania 19004
        610-660-0622
5      Cgomez@doctoratlaw.com
6
7  ON BEHALF OF THE DEFENDANT PFIZER, INC.:
8      LORI B. LESKIN
        Attorney at Law
9      Kaye Scholer, LLP
        425 Park Avenue
10     New York, New York 10022-3598
        212-836-8541
11     Lleskin@kayescholer.com
12
13  ALSO PRESENT:
        John W. Borg, Special Master
14     The Videographer
15          - - -
16       Deposition of MICHAEL A. WITT,
17  M.D., taken by the Defendant Pfizer, at
18  1201 West Peachtree Street, One
19  Atlanta, Center, Suite 4200, Atlanta,
20  Georgia 30309-3424 on the 21st day of
21  January 2009, at 2:00 p.m., before
22  Lynne C. Fulwood, Certified Court
23  Reporter.
24
25

**5**

1          P R O C E E D I N G S,
2                - - -
3         (Whereupon, the video camera was
4  turned on.)
5         THE VIDEOGRAPHER:  Good afternoon,
6  ladies and gentlemen.  It's January
7  21st, 2009.  It's 2:06 p.m.  We're in
8  Atlanta, Georgia.  We're at the offices
9  of Alston and Bird, 1201 West Peachtree
10  Street.  This will be the deposition of
11  Michael A. Witt, M.D.
12         The case is in re:  Viagra
13  Products Liability Litigation in the
14  United States District Court, District
15  of Minnesota, MDL docket number 1724.
16         My name is Rick Richey.  I'm the
17  videographer.  Our Court Reporter is
18  Lynne Fulwood and we represent Veritext
19  New York.  Would the attorneys please
20  introduce themselves.
21         MS. LESKIN:  Lori Leskin, Kaye
22  Scholer for defendant Pfizer.
23         MR. GOMEZ:  Christopher Gomez, the
24  Miller firm for the plaintiffs.
25         THE VIDEOGRAPHER:  Would the Court

2  (Pages 2 to 5)

**6**

1    Reporter please swear the witness.
2         MICHAEL A. WITT, M.D.,
3    having first been duly sworn, was deposed
4    and examined as follows:
5         THE COURT:  Doctor, this is -- I'm
6    John Borg.  I'm the special master in
7    this case.  If a lawyer says objection,
8    before you answer the question, please
9    allow me to rule on it and then I'll
10   tell you whether or not you can do
11   that.
12        And if you don't understand a
13   question or if it's not clear to you,
14   please indicate that to whoever's
15   asking you the question and they'll --
16   they're rephrase that for you.  Okay.
17   Go ahead.
18        EXAMINATION
19   BY MS. LESKIN:
20   Q    Thank you, Judge.  Good afternoon,
21   Doctor.  How are you?
22   A    Very well.
23   Q    As I introduced myself a few moments
24   ago, my name is Lori Leskin and I'm here on
25   behalf of Pfizer.  When's the last time you had

**7**

1    your deposition taken?
2    A    I believe the last deposition I had
3    was in November of 2007.
4    Q    Okay.  And that was as an expert
5    witness?
6    A    Correct.
7         (Whereupon, Witt Exhibit No. 1 was
8         marked for identification by the court
9         reporter.)
10   Q    Let's start with this.  I'm going to
11   hand you what we've marked as Witt Exhibit 1.
12   This is a copy of your curriculum vitae that
13   was provided to us together with your expert
14   report.  Is this in fact a current version of
15   your CV?
16   A    Yes.
17   Q    And does this CV accurately reflect
18   your education and training?
19   A    Yes.
20   Q    Does it accurately reflect your
21   employment history?
22   A    Yes.
23   Q    Does it accurately reflect your
24   medical appointments?
25   A    Yes.

**8**

1    Q    Does it accurately reflect all of
2    your publications?
3    A    Yes.
4    Q    Have you had any recent publications
5    that do not appear on this copy of your CV?
6    A    Yes.
7    Q    Okay.  When is the most recent
8    publications you've had?
9    A    Oh, no, it does.  I'm sorry.  It
10   does.  Yeah, the most recent one is 13 on the
11   last page so no, it does.
12   Q    Okay.  And that was going to be my
13   question because you'll see that there's a
14   revision date on the bottom there that says
15   6/21/2000?  You see that?
16   A    I do.
17   Q    Okay.  And number 13 is published in
18   2006?
19   A    That's correct.
20   Q    Okay.  Have there been any
21   publications since this article which the first
22   author is Kort?
23   A    No, there's not.
24   Q    Okay.  Now if you turn to the second
25   page of your CV under employment, it's listed

**9**

1    Michael A. Witt, M.D., PC in Atlanta, Georgia
2    since June of 1995?
3    A    Yes.
4    Q    Are you currently in a sole -- solo
5    practice?
6    A    I'm -- work as a consultant in an
7    infertility practice and essentially there sort
8    of -- on a consulting basis.
9    Q    And that's the Reproductive Biology
10   Associates?
11   A    Biology Associates, correct.
12   Q    For the Court Reporter's sake, it's
13   helpful if only one of us speak at a time.  I
14   know it's very obvious where my questions are
15   going but for her sake, just let me finish the
16   question and I'll let you finish your answer,
17   okay?
18   A    Yes.
19   Q    Okay.  So that's Reproductive Biology
20   Associates, correct?
21   A    Yes.
22   Q    And how long have you been affiliated
23   request Reproductive Biology Associates?
24   A    Since June of 1995.
25   Q    Okay.  Do you have a practice outside

3 (Pages 6 to 9)

**10**

1  of Reproductive Biology Associates?
2      A    I do.
3      Q    Okay.  And what is the nature of that
4  practice?
5      A    Again, it's a consultant for an
6  infertility practice in Florida.
7      Q    And what's the name of that practice?
8      A    Fertility Care.
9      Q    And how long have you been consulting
10  with Fertility Care?
11      A    Since 2007.
12      Q    What -- how do you divide your time?
13  Is there a percentage at each practice?  How
14  does that work?
15      A    On average, it's about twelve days a
16  month -- I mean twelve days a year, one day a
17  month typically.
18      Q    That you go down to Florida?
19      A    Correct.
20      Q    Okay.  And where in Florida is that?
21      A    Orlando.
22      Q    So other than your consulting work
23  for Reproductive Biology Associates and for
24  Fertility Care, do you have any other practice?
25      A    The only other consulting I do, which

**11**

1  is maybe once a year, is in Tennessee in
2  Nashville, Tennessee at I think it's called if
3  I remember right, Reproductive Specialists in
4  Nashville, Tennessee.
5      Q    Now you say you do that once a year?
6      A    On average.
7      Q    And when did that consultancy start?
8      A    Around 2006.
9      Q    Any other practice -- practices that
10  you are consulting with or have on your own?
11      A    No.
12      Q    So outside of Reproductive Biology
13  Associates, Fertility -- start that again.
14  Outside of Reproductive Biology Associates,
15  Fertility Care or Reproductive Specialists, you
16  don't see patients; is that fair?
17      A    Yes.
18      Q    Okay.  Are you familiar with the
19  Southeastern Fertility Institute?
20      A    Yes.
21      Q    Okay.  What is that group?
22      A    That used to be a -- I don't know the
23  actual business term.  I would say a sort of a
24  subsidiary of RBA.
25      Q    Okay.

**12**

1      A    It used to be Reproductive Biology
2  Associates, which was primarily responsible for
3  all the in vitro fertilization care.  And then
4  there was Southeastern Fertility Institute,
5  which took care of every other clinical aspect
6  of the infertile couple except for in vitro
7  fertilization.  And then for branding purposes
8  because of confusion, they just consolidated
9  the name to Reproductive Biology Associates
10  probably three years ago.
11      Q    But it's in general the same
12  practice?
13      A    Yes.
14      Q    And your work for the groups remain
15  the same?
16      A    Yes.
17      Q    Now would you agree that the primary
18  focus of your practice is on male infertility?
19      A    Yes.
20      Q    And do you treat patients other than
21  infertile males?
22      A    Yes.
23      Q    Okay.  And what other type of
24  patients do you see?
25      A    Predominantly men with sexual

**13**

1  dysfunction ranging from premature ejaculation
2  to erectile dysfunction to ejaculatory
3  dysfunction.
4      Q    And what percentage of the patients
5  you see are men with sexual dysfunction?
6      A    Currently it's about 30 percent all
7  the patients that I see.
8      Q    Among the three different practices?
9      A    Yes.
10      Q    And are any of those patients the men
11  with sexual dysfunction that you see in
12  Reproductive Specialists in Nashville?
13      A    No.
14      Q    And are any of the men with sexual
15  dysfunction that you see at Fertility Care in
16  Orlando?
17      A    A small -- a small number.  There's
18  an -- it's an increasing number but it's -- but
19  it's pretty small.
20      Q    Of the men with sexual dysfunction
21  that you see, what percentage of those patients
22  are erectile dysfunction patients?
23      A    About 80 percent.
24      Q    Now on the Reproductive Biology
25  Associates web site, you're listed as

4  (Pages 10 to 13)

**14**

1  specializing in male fertility, correct?
2      A   Correct.
3      Q   And you'll agree that is your
4  specialization in terms of your practice?
5      A   That's a majority of the practice,
6  correct.
7      Q   Are you familiar with an organization
8  called faculty of one thousand?
9      A   Yes.
10     Q   Okay.  And what is faculty of one
11 thousand?
12     A   That is a web-based group of
13 physicians that have been conscripted to write
14 summaries of what they perceive the individual
15 faculty member as pertinent to the practice of
16 medicine in their respective field that then
17 get put on line and then physicians can access
18 those so that they can sort of in one place get
19 a pretty quick overview of what are the
20 emerging issues in respective fields.
21     Q   And how did you come to join the
22 faculty of one thousand, which I understand is
23 actually more than a thousand physicians at
24 this point?
25     A   Probably.  They just asked me.  There

**15**

1  was an invitation sent by them because I
2  believe one of the people that started it is
3  Peter Schlegel out of New York, who is also a
4  fertility specialist that I know, and my name
5  came with a group of names that then got an
6  invitation sent to and you either responded
7  positively or negative to that invitation.
8      Q   And you're listed there on the
9  faculty as a specialist in male infertility,
10 right?
11     A   Correct.
12     Q   And there's a separate group for male
13 sexual dysfunction, right?
14     A   That wouldn't surprise me but, yeah.
15     Q   And you're not listed in that group?
16     A   I don't think so.
17     Q   What journals do you read on a
18 regular basis?
19     A   I would say there's probably four --
20 well, there's five actually.  There's the
21 Journal of Urology.  There's the British
22 Journal of Urology.  There's Fertility and
23 Sterility, Human Reproduction and I believe
24 it's the Journal of Sexual Medicine.
25     Q   And do you attend meetings of the

**16**

1  American Urological Association?
2      A   Yes.
3      Q   Have you ever been subject to
4  disciplinary action by any medical licensing
5  entity?
6      A   No.
7      Q   Your CV lists medical licensing in
8  five states?
9      A   Yes.
10     Q   Right?  Georgia, Massachusetts,
11 Tennessee, Oregon and Florida?
12     A   Correct.
13     Q   And given your testimony, I'm
14 assuming that your licensure in Tennessee,
15 Florida and Georgia remain active?
16     A   Yes.
17     Q   Is your licensing in Massachusetts
18 still active?
19     A   No.
20     Q   And how about in Oregon?
21     A   That's a good question.  I think it
22 still is.  Yeah, I think it still is.
23     Q   And you're licensed because that's
24 where you completed your medical degree?
25     A   Correct.

**17**

1      Q   Okay.  And your licensing was in
2  Massachusetts because that's where you did your
3  residency?
4      A   Correct.
5      Q   Okay.  Do you teach any courses?
6      A   Not currently.
7      Q   When you were at Emory, did you teach
8  any courses?
9      A   No didactic courses.
10     Q   Nothing in the classroom?
11     A   Right.
12     Q   And you made that distinction for a
13 reason so what kind of courses did you teach?
14     A   Well, there was rounds and there was
15 presentations to the residents and there was
16 ongoing, more casual nongraded urologic
17 conferences that you would give to medical
18 students and residents about different aspects
19 of urology but I was never on the sort of the
20 teaching faculty in a medical school, which at
21 least that's how I define didactic.
22     Q   And since leaving Emory, have you led
23 any similar type of courses in your current
24 practice?
25     A   There have been some courses taught

**18**

1   at the meetings, at the annual meetings that
2   are given, whether it would be a round table or
3   whether it would be a course given to general
4   urologists who are attending the meetings, but
5   nothing on any given medical campus in a
6   classroom setting.
7       Q   And are those presentations that you
8   gave at the annual meetings included on your CV
9   here?
10      A   Yes, they are.
11      Q   Okay.  Is that --
12      A   I think three of them are under
13  courses.
14      Q   -- And that's the microsurgical
15  course, the evaluation of the infertile male
16  and the testicular sperm retrieval?
17      A   Yes.
18      Q   Okay.  Are there any other courses or
19  presentations that you've led since, other than
20  those three, since leaving Emory?
21      A   Yes.
22      Q   Okay.  And what are those?  What have
23  those been on?
24      A   They were primarily focused on -- I
25  think the topic was microsurgical

**19**

1   reconstruction and that was given I believe in
2   -- if I can remember right, '90 -- no, that
3   would have been 2000, 2001, 2002 and 2003 if I
4   remember right.
5       Q   At what meeting would those have been
6   given?
7       A   American Urologic Association, the
8   annual AUA meeting.
9       Q   And microsurgical reconstruction,
10  does that refer to a reverse vasectomy?
11      A   Yes.
12      Q   Okay.  You have on your CV a study
13  listed called a placebo controlled safety and
14  efficacy study about alprostadil alphadex?
15      A   Yes.
16      Q   In the treatment of erectile
17  dysfunction?
18      A   Right.
19      Q   Now alprostadil is the active
20  ingredient used in Caverject, right?
21      A   Correct.
22      Q   Was it one of those two products that
23  you were investigating at the time?
24      A   Yes.
25      Q   Which one?

**20**

1       A   MUSE.
2       Q   And when was that study conducted?
3       A   That would have been 1994.
4       Q   And you're listed as the principal
5   investigator.  Were you the principal
6   investigator at Emory?
7       A   Correct.
8       Q   You weren't the principal
9   investigator for the entire study, were you?
10      A   That's correct.
11      Q   Okay.  And do you know how many sites
12  were involved in that study?
13      A   It would be a guess and I would have
14  to say at least ten.
15      Q   And how many patients did you oversee
16  at Emory as part of the MUSE study?
17      A   Boy, that's a great question.
18  Probably around 50 I would think.
19      Q   And were they randomly assigned as to
20  placebo --
21      A   Yes.
22      Q   -- versus active ingredient?
23      A   Correct.
24      Q   And were you involved in the analysis
25  of the data from that study?

**21**

1       A   No, I was not.
2       Q   And did you publish any papers
3   arising out of that study?
4       A   I don't believe so.  Not that I
5   recall.
6       Q   Have you conducted any other studies
7   on any erectile dysfunction treatments?
8       A   No.
9       Q   The study that we just talked about
10  regarding MUSE, who sponsored that study?
11      A   What was her name.  They were based
12  out of San Francisco.  It would have been --
13  yeah, I'm blanking on the name.
14      Q   Was that Vivus?
15      A   Yeah, Vivus, that's right.
16      Q   Vivus?
17      A   Exactly.
18      Q   And they actually went onto
19  manufacture and market MUSE?
20      A   They did.
21      Q   When Vivus sponsored the study, they
22  paid the expenses involved with the study?
23      A   They did.
24      Q   And did they pay part of your salary
25  involved in that study?

6  (Pages 18 to 21)

**22**

1     A    They did not.
2     Q    Okay.  That went to the university --
3  their sponsorship went to the university?
4     A    You know, I don't believe there was a
5  financial stipend that went to the university.
6  I think they just purely sponsored the costs of
7  doing the study.
8     Q    And supplied you with the medication?
9     A    Yes, exactly and protocols.
10    Q    And did they provide you with the
11 training necessary to conduct the study?
12    A    They did.  I mean, they went over the
13 protocol and we trained somebody on site, you
14 know, to help conduct the study.  I think she
15 was a nurse.  And they went over how to collect
16 the data and how to present the data, how to,
17 you know, download the data back to them.
18    Q    And what was your specific role
19 during the course of the study?
20    A    It was to evaluate the men at the
21 initial entrance to the study, get -- you know,
22 make sure they signed all the consents, were
23 aware of all the risks and complications, do
24 the initial evaluation, and then just monitor,
25 you know, their responses and any sort of

**23**

1  adverse events that developed.
2     Q    And the fact that the study was
3  sponsored by Vivus or Vivus, did that influence
4  the way you evaluated any of your patients?
5     A    No, not really.
6     Q    You said not really?
7     A    Yeah.  I would say no.
8     Q    Did it influence the way in which you
9  collected information about these patients?
10    A    No.
11    Q    Did it influence the way you reported
12 the information about these patients?
13    A    No.
14    Q    Other than the study -- strike that.
15 You also have listed on your CV a study on the
16 effects of artificially stimulated ejaculation
17 in the acutely injured spinal cord patient?
18    A    Yes.
19    Q    What was the purpose of that study?
20    A    That was to determine if there was an
21 interval of time immediately after injury
22 during which seminal quality was better than
23 what it would be with advancing time and if
24 there was a window where seminal parameters
25 were optimal, then it would be during that time

**24**

1  that you would want to potentially collect the
2  specimen and use it for long-term storage.
3     Q    Who designed the protocol of that
4  study?
5     A    I did.
6     Q    And this was also while you were at
7  Emory?
8     A    Yes.
9     Q    What was the timeframe of the study?
10    A    It was over the course of I think
11 1993 to 1995.
12    Q    And was Emory the only center
13 involved with that study?
14    A    Well, yes.  Yes.  The patients were
15 located at Shepherd Spinal Cord Center so we
16 would see patients there on some occasions but
17 the funding, at least the grant, was all based
18 out of Emory.
19    Q    And that grant was given by the
20 Paralyzed Veterans of America Spinal Cord
21 Research Center?
22    A    Yes.
23    Q    And did you publish any papers out of
24 that study?
25    A    We did.  We published an abstract,

**25**

1  which I believe was -- should be under
2  abstracts.  Yeah, that was number 17 under
3  abstracts.
4     Q    The results of rectal probe
5  electroejaculation in the spinal cord injured
6  patient within two months of injury?
7     A    Correct.
8     Q    And was a full paper ever published?
9     A    No.
10    Q    Other than these two studies that you
11 listed on your CV, have you participated in any
12 other research studies?
13    A    No.
14    Q    Have you ever done any other work for
15 any pharmaceutical company?
16    A    No.
17    Q    Now you're not an ophthalmologist,
18 correct?
19    A    Correct.
20    Q    And you don't treat patients with any
21 type of eye disease, correct?
22    A    Correct.
23    Q    And if a patient came in complaining
24 of any sort of visual problem, you would refer
25 them to an ophthalmologist, correct?

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                                                          (212) 490-3430

26

1    A   Yes.
2    Q   Do you treat patients with
3  hypertension?
4    A   No.
5    Q   Do you treat patients with diabetes?
6    A   No.
7    Q   Do you consider yourself an expert in
8  epidemiology?
9    A   No.
10       (Whereupon, Witt Exhibit No. 2 was
11   marked for identification by the court
12   reporter.)
13   Q   I want to show you what we've marked
14  as Exhibit 2 and I believe you have a copy of
15  this in the papers you brought with you.  This
16  is a copy of the subpoena that was issued for
17  your deposition today.  You've seen this
18  document before?
19   A   Yes.
20   Q   And this first page, which is the
21  actual subpoena, you brought a copy of that
22  with you today?
23   A   Yes.
24   Q   And I think you mentioned to me
25  before we started that Attachment A to the

27

1  subpoena was missing from your copy?
2    A   Correct.
3    Q   Okay.  Have you seen Attachment A
4  before?
5    A   I have.
6    Q   When was the first time you saw a
7  copy of the subpoena that we've marked as
8  Exhibit 2?
9    A   Let's see.  I believe it was December
10  4th, 2008.
11   Q   December 4th?
12   A   No.  That would have been -- that was
13  the initial -- no, that was the initial report.
14  That would have been -- it was sometime in
15  January.
16   Q   You'll see that the subpoena is
17  signed December 24th, 2008 on the front page?
18   A   Correct.
19   Q   Do you know about how long after that
20  that it would have been that you first saw the
21  subpoena?
22   A   It would probably have been the week
23  after that after Christmas.
24   Q   Okay.  And at the time you received
25  the subpoena, was Attachment A included in what

28

1  you received?
2    A   Yes.
3    Q   And tell me what you did to respond
4  to the request in Attachment A?
5    A   I just made sure -- I tried to get as
6  much of that documentation that I had
7  available.
8    Q   And did you check your e-mails?
9    A   You mean after?
10   Q   After you received this, did you
11  check your e-mails --
12   A   Yes.
13   Q   -- to download any responsive
14  information?
15   A   I don't quite understand the
16  question.
17   Q   Okay.  Well, let me point you to
18  number six on the Attachment A, request all
19  correspondence or other documents reflecting
20  communications with anyone regarding your
21  opinion or testimony in this litigation or its
22  subject matter including but not limited to
23  e-mail correspondence.  Do you see that?
24   A   I do.
25   Q   And did you see that at the time you

29

1  received the subpoena?
2    A   Yes.
3    Q   Have you had e-mail correspondence
4  with anyone about this case?
5    A   I have.  There was -- I had like this
6  e-mail from Jason Richards.
7    Q   And this is an e-mail dated December
8  1, 2008 from Mr. Richards.  It says, attached
9  is a caption for your report for the Martin
10  Stanley cases.  I'll be at the office until
11  5:00 p.m. central time and can be reached on my
12  cell phone and gives his phone number.  Did you
13  have any other e-mail correspondence with
14  anyone regarding the litigation?
15   A   There was these documents for the
16  patient records.
17   Q   The CD's that you brought with you?
18   A   Right.
19   Q   And you got those by e-mail or they
20  were mailed to you?
21   A   These were mailed to me and then they
22  had sent some -- what did they send on line.
23  They sent -- there was one other thing sent on
24  line.  I can't recall what that was.  There was
25  one other thing that was sent on line.  I'll

8  (Pages 26 to 29)

**30**

1  try to remember what that was.
2      Q    Okay.  Let's -- let's start with
3  this.  When were you first contacted by anyone
4  on behalf of the plaintiffs in this litigation?
5      A    Early -- no, late November.
6      Q    And who called you?  Who contacted
7  you?
8      A    Jason Richards.
9      Q    And how did he contact you the first
10  time?
11      A    By phone.
12      Q    And had you worked with Mr. Richards
13  before?
14      A    I don't recall.  I think either I had
15  peripherally or he had worked with somebody who
16  had worked with me.
17      Q    And do you know who that was?
18      A    Yeah, I don't.
19      Q    Okay.  And what did Mr. Richards tell
20  you when he first called you in late November
21  of 2008?
22      A    He asked if I would be able to review
23  these cases for him and issue a statement
24  regarding sort of my impression of these cases
25  specifically.

**31**

1      Q    Did he tell you anything else about
2  the status of the litigation?
3      A    He mentioned that there was a
4  deadline for getting the statement generated
5  and I believe that was sometime in the first
6  week of December.
7      Q    Anything else that you recall he told
8  you during that initial conversation?
9      A    No.  I just said send me the records;
10  I'll look at them and try to, you know, get
11  something written to you and then you can tell
12  me if that's, you know, if that's what you're
13  looking for and you can let me know if you want
14  to go ahead with it.
15      Q    And did he tell you anything about
16  Mr. Martin or Mr. Stanley during that first
17  conversation?
18      A    No, other than he mentioned it was a
19  case ongoing with Pfizer because of potential
20  complications from the use of Viagra.
21      Q    Okay.  After you spoke with him, they
22  sent -- Mr. Richards sent you the CD's with the
23  medical records?  Is that the right timeline?
24      A    Yes.
25      Q    About how long after you first spoke

**32**

1  with him did you receive the medical records?
2      A    Pretty quickly.  I would say within
3  four or five days.
4      Q    And you received the two CD's that
5  you have before you?
6      A    (Witness nods head affirmatively.)
7      Q    Yes?
8      A    I did.
9      Q    Do you know which medical records are
10  on those CD's?
11      A    I do.
12      Q    Which records?
13      A    There's extensive sort of medical
14  records of both Richard Stanley and Richard
15  Martin involving sort of their medical care and
16  their ophthalmologic care and then there's a
17  bunch of other files on there, too.
18      Q    Did Mr. Richards identify which
19  records in particular you should look at from
20  those two CD's?
21      A    He did not.
22      Q    Other than the two CD's of medical
23  records, did he send you anything else at that
24  time?
25      A    He -- well, when he asked -- he asked

**33**

1  -- he sent me this caption.  I think that's
2  what I got an e-mail.  It was a caption for
3  this statement.
4      Q    And that's the e-mail we just
5  referred to dated December 1st?
6      A    Yeah.  It was -- the caption came
7  with this and he wanted me to sign that caption
8  and fax it to him.  It had to be signed and
9  sent back to him within a certain period of
10  time along with the statement.
11      Q    Okay.  Did he send you anything else?
12      A    No.
13      Q    Did he send you any deposition
14  transcripts?
15      A    No.
16      Q    Have you ever seen any of the
17  deposition transcripts?
18      A    No.
19      Q    Did he send you any expert reports
20  from any other expert in the litigation?
21      A    No.
22      Q    Did he send you any medical
23  literature?
24      A    He did.  He sent me two articles
25  which are here.  Yeah, the two studies on NAION

9  (Pages 30 to 33)

**34**

1  and their potential association with -- with
2  phosphodiesterase inhibitors.
3      Q   And that's the article by Dr. McGwynn
4  and the article by Margo and French?
5      A   Yes.
6      Q   Had you seen those articles before
7  you received them from Mr. Richards?
8      A   I had not.
9      Q   Other than those two medical
10 articles, were there any other articles that
11 Mr. Richards sent you?
12     A   No.
13     Q   Were there any other articles that
14 you reviewed in the preparation of your expert
15 report?
16     A   Yes.
17     Q   What other articles did you review?
18     A   Wikipedia on NAION and then I went
19 back to some articles I'd read like in like
20 2002. And I want to say it was by Pomeranz on
21 some of the initial cases that had been
22 reported, that had occurred or at least had
23 been reported with sildenafil and citrate and
24 NAION and there was a smattering of those cases
25 and then there was some abstracts in the

**35**

1  ophthalmological literature most recently, you
2  know, discussing, you know, NAION and its risk
3  factors and, you know, does Viagra increase the
4  risk or not and I forget exactly -- it was just
5  on Pubmen -- it was a list of abstracts that
6  came out with Pubmen.
7      Q   Did you keep a copy of any of the
8  abstracts or articles or listings of the
9  articles you reviewed?
10     A   I did not. I could -- I could get
11 them probably.
12     Q   Did you rely on any of those articles
13 in the preparation of your expert report?
14     A   No. That happened just in the last
15 two weeks so no, that was well after the
16 report.
17     Q   So that I understand the timing, in
18 preparation of the report -- strike that. Let
19 me start again. So I understand the timeline
20 that occurred, you received the phone call from
21 Mr. Richards; you received the medical records
22 from Mr. Richards together with the McGwynn and
23 Margo and French study?
24     A   Actually these came later.
25     Q   Okay.

**36**

1      A   These actually came after the report.
2      Q   Okay. So at the time you prepared
3  your report in this case, the only thing you
4  had reviewed were the medical records?
5      A   Correct.
6      Q   And there was no medical literature
7  you relied upon in preparing your report; is
8  that correct?
9      A   Not at that time, other than what had
10 been discussed at meetings and had been
11 presented, you know, with various abstracts at
12 different meetings, you know, about the
13 potential association between the two but,
14 yeah, nothing -- what I had already sort of
15 seen in the urologic literature.
16         (Whereupon, Witt Exhibit No. 3 was
17     marked for identification by the court
18     reporter.)
19     Q   Okay. I'm going to mark as Exhibit 3
20 a copy of the expert report we received in this
21 case. Have you seen that document before?
22     A   Yes.
23     Q   And is that in fact the expert report
24 you prepared in this case?
25     A   Yes.

**37**

1      Q   And I believe attached to that is
2  another version of your CV, correct?
3      A   Yes.
4      Q   Or another copy. And if you look at
5  the first page of Exhibit 3, you'll see there's
6  basically a cover page that says expert report
7  of Michael A. Witt, M.D. and then there's a
8  signature line and a date, correct?
9      A   Correct.
10     Q   And is that the caption that Mr.
11 Richards sent to you?
12     A   Correct.
13     Q   And did you in fact sign that on or
14 about December 1st, 2008?
15     A   Yes.
16     Q   How far before you signed the first
17 page, this caption page, had you prepared the
18 report that's attached to it?
19     A   I think on the same day if I
20 remember.
21     Q   So that was all prepared on or about
22 December 1st?
23     A   Yes.
24     Q   And how long before you prepared the
25 report had you received the medical records

10  (Pages 34 to 37)

38

1 about Mr. Stanley and Mr. Martin?
2      A   I would say about a week before.
3      Q   And how much time did you spend on
4 the case before preparing the report?
5      A   It was around two hours I believe.
6      Q   And were those two hours time that
7 you spent reading the medical records?
8      A   Yes, and preparing the report.
9      Q   Now you told me earlier that at the
10 time you prepared the report, you relied on the
11 medical records and also some things that you
12 had reviewed during the course of time --
13      A   Yes.
14      Q   -- in your experience.  Is that a
15 fair summary?
16      A   Yes.
17      Q   What articles did you rely upon in
18 preparing the report that we've marked as
19 Exhibit 3?
20      A   I mean none specifically.  It was
21 probably just a culmination of everything that
22 I knew about erectile dysfunction, had
23 continued to learn about erectile dysfunction
24 and had stayed current with regarding the
25 treatment of erectile dysfunction specifically

39

1 with the phosphodiesterase inhibitors.
2      Q   And the articles that you received
3 from Mr. Richards, specifically the McGwynn and
4 the Margo and French study, those you received
5 after December 1st, correct?
6      A   Yes.
7      Q   Do you know how long after December
8 1st?
9      A   It would have been around the first
10 or second week of January.
11      Q   And do you know what the reason for
12 sending you those articles was?
13      A   Well, I think I was aware of the
14 deposition and he had called just to say, you
15 know, are you aware of the deposition coming up
16 and, you know, here's what your statement says,
17 you know, have you read these articles.  And I
18 said, no, I haven't.  He goes, well, I'll send
19 them to you because they talked a little bit
20 about the risks potentially associated with
21 phosphodiesterase inhibitors and NAION.
22      Q   And having read the Margo and French
23 and McGwynn articles now, does that change any
24 of the opinions that you've expressed in your
25 report?

40

1      A   No.
2      Q   And having gone back and reviewed the
3 other literature you identified for me, does
4 that change any of the opinions as expressed in
5 your report?
6      A   No.
7      Q   Was there any draft of the report
8 that we've marked as Exhibit 3 that existed
9 before this version that you signed?
10      A   No.
11      Q   You didn't prepare a draft and send
12 it off to Mr. Richards to look at before you
13 signed this?
14      A   No.
15      Q   Between the first conversation you
16 had with Mr. Richards and late November 2008,
17 did you have any other conversations with him
18 prior to December 1st?
19      A   There was a conversation -- actually
20 I think it was on December 1st if I remember
21 right -- about how to get this to him on time.
22      Q   Okay.
23      A   Because there was a deadline and I
24 was supposed to get this out and get this
25 signed and get this to him and I think I sent

41

1 it to the wrong office.  I sent part of it to
2 the wrong office and so then we had some phone
3 calls that evening about how to getting things to
4 him.  We kind of figured out how to do it
5 electronically later that evening.
6      Q   And did you have any discussions with
7 him about the substance of what your report
8 said?
9      A   No.
10      Q   Did you have a conversation with
11 anyone other than Mr. Richards about the
12 substance of your report?
13      A   After it had been sent around the
14 time of these, the Margo and McGwynn study were
15 sent, Chris Gomez was in on a conversation we
16 had that was involving these articles and also
17 my report.
18      Q   Okay.  So just looking at the
19 different timeframe blocks, between the time
20 you got your first phone call from Mr. Richards in
21 November 2008, and the time you signed your
22 report on December 1st, 2008, you had one or
23 two conversations with Mr. Richards, right?
24 The first was about the case and the second was

**42**

1  about the logistics of getting him the report?
2      A    Correct.
3      Q    Okay.  Is that -- is that fair?
4      A    That's fair, yes.
5      Q    And then between December 1st, 2008
6  and today, before today --
7      A    Yes.
8      Q    -- how many conversations did you
9  have with any attorney representing the
10  plaintiff?
11      A    Two.
12      Q    Okay.  And who -- first, when were
13  those conversations?
14      A    I think the first week of January,
15  first or second week of January.  That was with
16  Mr. Richards and Mr. Gomez and that was at the
17  time that the Margo and McGwynn studies were
18  sent and they went over again my statement with
19  me.  And then I had a conversation last night
20  with Mr. Gomez about, again, the statement and
21  what was said and was I aware of what was in it
22  and have I read it and this is how your
23  deposition will go and do this; don't do this,
24  you know.
25      Q    So going back to the conversation you

**43**

1  had the first week of January with Mr. Richards
2  and Mr. Gomez, what did they tell you about the
3  Margo and French and McGwynn articles?
4      A    Well, they'd asked me what articles I
5  had read and knew about and then in that --
6  those lists, this wasn't included and they said
7  have you read these.  And I said, no, and they
8  said these tend to imply there may be an
9  associated risk and if you haven't read them,
10  you probably should read them.  And I said,
11  fine, you know, send them and I'll read them
12  and then that's -- then they sent them at that
13  point.
14      Q    And what else do you recall about
15  that conversation during the first week of
16  January with Mr. Richards and Gomez?
17      A    I think I queried them just, you
18  know, what was the nature of the case.  I
19  didn't really know specifically the details
20  and, you know, what are the issues on either
21  side; who's trying to say what; and so I think
22  we had a brief conversation about why the case
23  existed and where it was going and what the
24  issues were.
25      Q    And what do you recall them telling

**44**

1  you about that?
2      A    Well, that's when I was really aware
3  that it was about, you know, specifically the
4  use of NAION, an instance of NAION or the
5  potential occurrence of NAION after the use of
6  phosphodiesterase inhibitors, which Pfizer
7  manufactures and there was an intent to sort of
8  figure out, you know, when is there a causation
9  or not and, you know, how do you practice in
10  regards to your awareness of this issue and so
11  we had a conversation sort of around those
12  topics.
13      Q    And then you said last night you had
14  a conversation with Mr. Gomez?
15      A    I did.
16      Q    And how long did that conversation
17  last?
18      A    Maybe 15 minutes.
19      Q    And that was on the phone or in
20  person?
21      A    Phone.
22      Q    And tell me going back real quick to
23  the conversation the first week of January, how
24  long were you on the phone during that
25  conversation?

**45**

1      A    I would say 15 minutes maybe.
2      Q    And tell me what you remember about
3  the conversation last night with Mr. Gomez?
4      A    He just wanted to make sure I had
5  read everything, that there was -- you know, I
6  was aware of what was in my statement here.  So
7  we kind of went over that again.  He said, are
8  you aware you said this; are you aware he said
9  this.  And then just, you know, the nature of a
10  deposition, you know, what not to say, you
11  know, what not to try and do, those kind of
12  things.
13      Q    Was there anything specific Mr. Gomez
14  told you not to say?
15      A    Well, he said don't overreach --
16          MR. GOMEZ:  Objection.
17      A    -- so I said that's fine and I said
18  I'm not an expert in ophthalmology here so I
19  don't want to, you know, how do I talk about
20  this but not be an expert in it because I've
21  fallen into that trap before in depositions.
22      Q    And anything else you remember about
23  that conversation last night?
24      A    That was about it.  He just said
25  stick to your statement and, you know, and know

12  (Pages 42 to 45)

**46**

1  what it's in it.

2  Q   And did you have any discussions with

3  Mr. Gomez today before the deposition started?

4  A   No.

5  Q   Have you submitted any invoices to

6  the plaintiffs for payment yet in this case?

7  A   I have and that was -- it was for two

8  hours and it was after preparation of the

9  statement.

10  Q   And has that been paid?

11  A   That's a review of the medical

12  records and preparation of the statement.

13  Q   Sorry.  And has that been paid?

14  A   Yes.

15  Q   And who paid that?

16  A   Oh, boy.  I think I sent it to -- I

17  was always confused where to send stuff but I

18  think that went to -- I want to say I think

19  that may have gone to Aylstock, Witkin and

20  Kreis I believe.

21  Q   Had you ever worked with any

22  attorneys from Aylstock Witkin prior to this

23  litigation?

24  A   You know, that's what I can't recall

25  because I was asking how -- why did they get my

**47**

1  name and I never did the diligence to figure

2  out how they got my name but I think I may have

3  but it may have been somebody -- I want to

4  think -- I want to say it was this case that I

5  had back in what was it?  Where's my case

6  history here?

7  Q   Let's -- I have a copy of that.  I'm

8  going to mark that as an exhibit so we can talk

9  about that --

10  A   There was a priapism case back in

11  November of '07.

12  Q   That was the Kieff versus Chabert

13  case?

14  A   No.  Wait a minute.

15  (Whereupon, Witt Exhibit No. 4 was

16  marked for identification by the court

17  reporter.)

18  Q   While you're looking I'm going to

19  mark as Exhibit 4 a copy of your prior opinion

20  history that we received in this case.

21  A   Yes; correct.

22  Q   Is that in fact --

23  A   It was the Hopkins Roush case.

24  That's -- it was David Doyle so I think that

25  was --

**48**

1  Q   March '06?

2  A   I don't remember what firm he was

3  with but I think that may have been the

4  connection but I never figured that out.  I was

5  curious though.

6  Q   Now you said that Hopkins versus

7  Roush case involved priapism?

8  A   Yes.

9  Q   And was that a product liability

10  case?

11  A   No.  It was a case being brought by

12  an inmate against the health care system of the

13  State of Florida for their detention centers.

14  Q   And you testified on behalf of the

15  defendant in that case?

16  A   Yes.

17  Q   And what was the nature of your

18  opinion?

19  A   The nature of the opinion was that

20  the priapism potentially could have been

21  prevented if it had been addressed and

22  identified, you know, at the proper time but

23  that there were definitely mitigating

24  circumstances that made it very difficult for

25  that to have occurred and there could have been

**49**

1  some better management issues even after

2  identification, you know, of the problem.

3  Q   Are any of these other cases listed

4  on Exhibit 4 product liability cases and do you

5  understand what I mean?

6  A   I do.  No, they're not.

7  Q   Are they basically medical

8  malpractice cases?

9  A   Yes.

10  Q   Do any of these cases involve

11  erectile dysfunction?

12  A   Yes.

13  Q   Which cases?

14  A   Massingale versus Lee, Hopkins Roush.

15  I mean indirectly Hulls versus Amin.  The

16  primary issue wasn't erectile dysfunction but

17  that was a component of that case, and I think

18  Short versus Raynor I think.  I'd have to look

19  back at that.  I think Short versus Raynor was.

20  Q   Are those all the ones?

21  A   Yes, that I can remember.

22  Q   Now those four cases, in those cases

23  was erectile dysfunction the injury that was

24  alleged or was that the underlying condition

25  that was being treated?

13  (Pages 46 to 49)

**50**

1  A   That was the injury that was alleged.
2  Q   In all four of the cases?
3  A   Correct.
4  Q   And so none of these cases involve
5  the treatment of erectile dysfunction as the
6  grounds for the lawsuit --
7  A   Correct.
8  Q   -- correct.  Okay.
9  A   Unless -- I mean, technically the
10 Hopkins Roush case is a treatment of erectile
11 dysfunction but not as it's known in the public
12 eye.
13 Q   The treatment of priapism?
14 A   Right, which is erectile -- but, you
15 know, most people think you can't get an
16 erection is erectile dysfunction.  But this is
17 getting too much of an erection.
18 Q   Understood.  This list that we have
19 as Exhibit 4, is that something you prepared
20 for this litigation or is this a running list
21 that you maintain?
22 A   It's a running list.
23 Q   So when we asked for that, you just
24 printed it up from your computer?
25 A   Yes.

**51**

1  Q   Have there been any additions to this
2  list or changes to this list since you
3  submitted your report on December 1st?
4  A   No, other than this case which isn't
5  on the list yet.
6  Q   Which will be after today?
7  A   Yes.  Ys.
8  Q   Has your testimony ever been excluded
9  by a court?
10 A   Not that I'm aware of.
11 Q   Did you have any conversations with
12 Richard Martin prior to writing your report?
13 A   No.
14 Q   Have you spoken with Mr. Martin since
15 you've written your report?
16 A   No.
17 Q   Did you have any conversations with
18 Mr. Stanley prior to writing your report?
19 A   No.
20 Q   Did you have any conversations with
21 Mr. Stanley since writing your report?
22 A   No.
23 Q   Have you ever spoken with any of Mr.
24 Martin's physicians?
25 A   No.

**52**

1  Q   Have you ever spoken with any of Mr.
2  Stanley's physicians?
3  A   No.
4  Q   Have you spoken with either of their
5  spouses?
6  A   No.
7  Q   I take it you've never examined
8  either one of them?
9  A   Correct.
10 Q   And I think you told me you did not
11 review Mr. Martin's deposition transcript,
12 right?
13 A   Correct.
14 Q   And you did not review Mr. Stanley's
15 deposition transcript?
16 A   Correct.
17 Q   Has anyone provided you with a
18 summary of their deposition testimony?
19 A   No.
20 Q   Has anyone provided you with a
21 deposition summary of any of their treating
22 physicians?
23 A   No.
24 Q   Has anyone provided you with the
25 deposition summary of any of Pfizer's

**53**

1  employees?
2  A   No.
3  Q   Has anyone provided you with a
4  deposition summary of any other expert in this
5  case?
6  A   No.
7  Q   Do you know who any of the other
8  experts in this litigation are?
9  A   No, I don't.  I know there's -- Mr.
10 Gomez mentioned there's an ophthalmology expert
11 but he didn't mention the name.
12 Q   Have you done any on-line research
13 about the litigation?
14 A   No.
15 Q   Have you asked anyone to do any such
16 research on your behalf?
17 A   No.
18 Q   I think I asked this question.  I
19 just want to make sure I'm clear.  Prior to
20 signing your report, did you review the
21 substance of the report with anyone on behalf
22 of the plaintiffs?
23 A   No.
24 Q   Has anyone ever asked you to make any
25 changes to your expert report?

14  (Pages 50 to 53)

**54**

1   A   No.
2       MS. LESKIN:  I'm told we have to
3   change the videotape so let's take a
4   quick break.
5       THE VIDEOGRAPHER:  3:00 o'clock
6   we're off the record.  This is the end
7   of tape number one.
8       (Whereupon, the video camera was
9   turned off.)
10      (Whereupon, a brief recess was
11  taken.)
12      (Whereupon, the video camera was
13  turned on.)
14      THE VIDEOGRAPHER:  3:09; we're
15  back on the record.  This is the
16  beginning of tape number two.
17  BY MS. LESKIN:
18      Q   Doctor, I want to talk a little bit
19  about erectile dysfunction generally.  You say
20  in your report, you define ED as the inability
21  to obtain and/or maintain male penile erection
22  sufficient for satisfactory sexual performance
23  and that it afflicts over thirty million men in
24  the United States and over a hundred-and-fifty
25  million men worldwide.  What is the basis for

**55**

1   those statistics?
2       A   I believe these are epidemiological
3   studies that have been done by population
4   sampling in general in specific locations such
5   as like the Framingham study that have
6   documented percentages of ED in different age
7   groups and then confirmed by other similar
8   epidemiological studies and other sites
9   internationally and then I think they've
10  extrapolated sort of come up with those
11  numbers.
12      Q   And do you know the years in which
13  those studies were done?
14      A   Not off the top of my head.
15      Q   You mentioned -- you mentioned here
16  that the greatest risk factor for ED is age?
17      A   Yes.
18      Q   And our population is getting older,
19  correct?
20      A   Yes.
21      Q   Would you expect that as the U.S.
22  population gets older, that ED will become a
23  greater problem?
24      A   Yes.
25      Q   You also state here that the primary

**56**

1   mechanism for ED is vascular dysfunction.  What
2   does that -- what's the basis for that
3   statement?
4       A   Well, the corporal tissue is
5   primarily a specialized vascular structure so
6   there are a lot of mechanisms that can affect
7   the integrity of that structure but at the end
8   of the day, it primarily becomes something
9   that's affected the vascular integrity of that
10  structure.
11      And there are obviously other reasons
12  for erectile dysfunction that aren't vascular
13  in nature but probably the majority of them
14  affect the overall function of that vascular
15  system.
16      Q   And are the majority of erectile
17  dysfunction patients that you see in your
18  practice, patients whose ED is caused by
19  vascular problems?
20      A   If you're asking do they have
21  identifiable vascular etiologies that would be
22  the cause for the erectile dysfunction,
23  probably 50 percent of the time they do and
24  then probably 50 percent of the time they
25  don't.  So in some cases, you can't find a

**57**

1   specific vascular reason though you know there
2   is an -- there's a vascular effect for the
3   symptom but then in the other half, you will --
4   there will be sort of comorbidities that are
5   known to affect the vascular system in general
6   and corporal tissue directly.
7       Q   So conditions that affect the
8   systemic vasculature will also effect the
9   penile vasculature, correct?
10      A   It can, not always but it can.
11      Q   And so hypertension is a big risk
12  factor for ED, correct?
13      A   Yes.
14      MR. GOMEZ:  Objection.
15      THE COURT:  Overruled.
16      Q   And diabetes is a risk factor for
17  erectile dysfunction?
18      A   Yes.
19      Q   And high cholesterol?
20      A   Yes.
21      Q   And smoking?
22      A   Yes.
23      Q   And those are all conditions that
24  affect the vasculature throughout this body,
25  correct?

15  (Pages 54 to 57)

58

1    A   Yes, it can.
2    Q   Would you agree that erectile
3  dysfunction can be a major health concern for
4  men?
5    A   I would say it's a major concern.  It
6  can definitely affect quality of life, which
7  can then indirectly affect health but as a
8  cause of any other significant pathology or
9  disease process, it's a fairly -- it's pretty
10  much an end point, you know, as opposed to the
11  initiating event of some other cascade process
12  that results in deterioration of health.
13    Q   But it could also be a symptom that
14  there are other diseases happening in the body,
15  correct?
16    A   It can be -- I mean, there's some
17  debate as to, you know, if it's a heralding
18  sign of potential risk for vascular integrity
19  throughout the body but, yes, sometimes it can
20  be -- I mean, the penile vascular can come
21  under the same sort of effect that the rest of
22  the body's vascular system can come under from
23  known sort of vascular pathologies such as the
24  one you mentioned.
25    Q   You mentioned the Framingham study

59

1  earlier?
2    A   Yes.
3    Q   That's the Massachusetts male aging
4  study, right?
5    A   Correct.
6    Q   And that's -- the data from that
7  study did in fact suggest that erectile
8  dysfunction is an indicator of arterial
9  insufficiency, right?
10    A   Correct.
11    Q   When a patient comes to you
12  complaining of erectile dysfunction, do you
13  undertake any type of examination to determine
14  the cause of that problem?
15    A   Yes.
16    Q   And what kind of things do you look
17  for?
18    A   Well, we take a pretty thorough
19  history and you want to concentrate on any
20  other medical problem that they have obviously.
21  And you want to get a pretty thorough
22  pharmacological history as well, recreational
23  drug history, and then in examination, you do a
24  blood pressure; you do a pulse; you do a pretty
25  thorough cardiac exam, pretty thorough

60

1  neurologic exam.
2        If -- if at that point in time, there
3  aren't really any identifiable problems or they
4  don't come in with any known identifiable
5  problems or currently under treatment, then
6  usually you'll check their hormonal profile,
7  get a lipid panel, get a cholesterol panel,
8  maybe a thyroid, a glucose level, and at that
9  point based on sort of how they're responding,
10  determine if there's a vascular study should be
11  done, you know, the penile vasculature with
12  duplex doppler ultrasound.
13        And then put that together to come up
14  with the diagnosis, identify comorbidities and
15  then come up with a treatment plan or
16  palliative plan potentially for the erectile
17  dysfunction and then a treatment plan for any
18  comorbidities that exist.
19    Q   Have there been patients who have
20  come to you complaining of erectile dysfunction
21  without a known comorbid -- without any known
22  comorbidities in which you have diagnosed such
23  comorbidities?
24    A   Yes.  Yes.  So there's been patients
25  that have presented with sort of the classic

61

1  metabolic syndrome that -- I mean, we're aware
2  something was going on in terms of the overall
3  weight but maybe had never had it diagnosed,
4  the diagnosis of high blood pressure, have
5  diagnosed, you know, elevated cholesterol
6  levels, have diagnosed new onset of neurologic
7  conditions, whether that be spinal cord
8  mediated or peripherally mediated so, yes.
9    Q   And then so not only can those
10  patients be treated for their erectile
11  dysfunction but they can be treated for other
12  conditions as well?
13    A   Exactly.
14    Q   And you would refer patients then for
15  treatment of their hypertension or their
16  diabetes or other conditions that you've
17  discovered?
18    A   Correct.
19    Q   Now we talked earlier about the study
20  you participated in involving MUSE or what
21  ultimately was marketed as MUSE.  Prior to MUSE
22  being available on the market, what did you
23  have available to you as a urologist to treat
24  patients with erectile dysfunction?
25    A   Well, there were the oral agents that

16  (Pages 58 to 61)

62

1  were out there such as yohimbine, trazodone.
2  There were injectable agents available, oral
3  agents that would be injected into the
4  corporate tissue.  There were vacuum devices,
5  penile prosthetic devices, and I'm trying to
6  remember if -- there was some overlap of when
7  the phosphodiesterase inhibitors came out but
8  there was that available, too.
9      Q    But that was much later in time?
10     A    Right.
11     Q    You mentioned a couple of oral
12  therapies yohimbine and trazodone.  Erectile
13  dysfunction was not an FDA approved indication
14  for either of those products, correct?
15     A    Correct.
16     Q    And would you use those to treat your
17  patients?
18     A    At that time?
19     Q    Yes.
20     A    Yes.
21     Q    Were they effective?
22     A    No, not significantly.
23     Q    You also mentioned vacuum devices,
24  yes?
25     A    Yes.

63

1      Q    And did you prescribe those to your
2  patients to treat their erectile dysfunction?
3      A    Yes.
4      Q    I want to show you -- we can mark it
5  as an exhibit but I'm going to keep custody of
6  these.  I want to show you a device which I ask
7  you if you recognize this.  I'm going to let
8  you take it apart because I really frankly
9  don't know how to put it together.  Is this in
10  fact a vacuum device?
11     A    Yes.
12          (Whereupon, Witt Exhibit No. 5 was
13     marked for identification by the court
14     reporter.)
15     Q    And we'll mark this Exhibit 5.  And
16  can you show us since we do have the benefit of
17  the videotape, how this device worked?
18     A    Well, this device usually consists of
19  a cylinder, which I believe is this structure
20  here, and then it usually consists of a pump
21  that creates negative pressure in the cylinder
22  and you just connect these two up like this.
23          And then it's optional whether
24  they'll be sort of a constricting ring placed
25  at the base of the cylinder and then this gets

64

1  placed over the phallus and then compressed
2  against the pubic synthesis and then you
3  generate negative pressure with this device,
4  which then will sort of pull blood into the
5  corporal bodies and then you can -- sometimes
6  you apply a constricting device and then
7  release the cylinder and the suction from the
8  skin.
9      Q    I'm going to show you what's been
10  provided to me.  Is this the type of
11  constricting device you're referring to?
12     A    This is one but typically they would
13  be more like these.  This is what comes with
14  the device and this is one that can be used
15  sort of independent of using any kind of vacuum
16  device is typically how this was marketed but
17  you could use this with a vacuum device.
18     Q    Just for the record, the packaging
19  for the second device is called an actus venous
20  flow controller?
21     A    Yes.
22          (Whereupon, Witt Exhibit No. 6 was
23     marked for identification by the court
24     reporter.)
25     Q    And we'll term that as Exhibit 6 to

65

1  the deposition.
2      A    Yeah.  I think actually MUSE -- I
3  think Vivus actually marketed these.
4      Q    And it's the name that's on the
5  labeling?
6      A    Oh, there we go, yeah.  There you go.
7      Q    And how did the venus flow controller
8  work independently?
9      A    You mean how did the actus or how did
10  the vacuum device --
11     Q    The actus.
12     A    I mean, they would use this either
13  independently or so you could use it in sort of
14  mild cases where there was, you know, problems
15  with sort of what's called corporal occlusion
16  versus arterial in-flow and this would work
17  relatively well in those cases and then you
18  could also use it potentially with MUSE as sort
19  of an enhancer, you know, to sort of help trap,
20  especially if there was an occlusive problem.
21     Q    Going back to the vacuum device, was
22  it an effective treatment for erectile
23  dysfunction?
24     A    Well, it would generate a
25  penetratible erection in about 80, 85 percent

**VERITEXT REPORTING COMPANY**
www.veritext.com

(212) 279-9424                                           (212) 490-3430

66

1 of the cases. It wasn't a normal erection so
2 it wasn't a satisfactory erection for most
3 people but for those who didn't want to do
4 anything more invasive like injections or
5 surgery and whose frequency of intercourse or
6 requirements for erection weren't great, it
7 became, you know, an option.
8    Q   Now. You said it's not a normal
9 erection. What do you mean by that?
10   A   Well, the rigidity you get is only
11 from the pubis synthesis out to the tip of the
12 corporal body. So you have fullness and you
13 have rigidity in that part of the penis but you
14 don't have any sort of corporal expansion of
15 the sort of pelvic-based component of the
16 corpus.
17       So there's a hinging effect and it
18 creates kind of a floppy erection as opposed to
19 a rigid erection.
20   Q   Were there any complaints from your
21 patients about the vacuum device?
22   A   I mean, it was mechanically a
23 challenge and then it would be the ring would
24 be painful sometimes and it was definitely a
25 learning curve and they didn't like the fact

67

1 that, you know, it wasn't completely rigid all
2 the -- you know, throughout the entire length
3 of the corporal body.
4    Q   And lacks some spontaneity; was that
5 a complaint you heard?
6    A   Not too much because at that point in
7 time, they weren't getting any erection so they
8 were happy just to get what they could get.
9    Q   But patients would use a vacuum
10 device in the absence of an alternative?
11   A   Yes.
12   Q   You also mentioned the prosthetic
13 implant?
14   A   Yes.
15       (Whereupon, Witt Exhibit No. 7 was
16 marked for identification by the court
17 reporter.)
18   Q   We'll call this Exhibit 7. I believe
19 this is a complete implant. Can you tell us
20 how that worked?
21   A   Well, there's numerous classes of
22 implants. This is an inflatable
23 three-component device and it's composed of two
24 cylinders that sit within the corporal chambers
25 and then there's a pump that sits inside the

68

1 scrotum and then there's a reservoir that sits
2 behind the pelvic bone.
3       And then this pump will transfer
4 fluid from the reservoir to the cylinders to
5 generate an erection and then there's a release
6 valve that will allow sort of the decompression
7 of the cylinders and the transfer of fluid back
8 to the reservoir for flaccidity.
9    Q   Now this was pretty invasive surgery?
10   A   Yes.
11   Q   The cylinders are actually implanted
12 into the corpus cavity of the penis, correct?
13   A   Yes.
14   Q   Did you perform surgery to implant
15 these devices?
16   A   Yes.
17   Q   What risks were associated with the
18 use of an implants?
19   A   Well, at the -- if you exclude all
20 the procedural risks, it mainly would have to
21 do with infection of the device or malfunction
22 of the device or erosion through the tissue,
23 you know, of the device.
24   Q   Were patients once they had the
25 device implanted satisfied with it?

69

1    A   Very.
2    Q   Did you receive any type of
3 complaints about it?
4    A   Well, yeah, the common complaint is
5 that it wasn't as long as they remembered their
6 original erection being. That was a common
7 complaint. Or that they could feel the tubing
8 or that it took longer to recover than what
9 they thought.
10       But apart from any obvious complaints
11 like it's infected or it's not working anymore,
12 you could remedy most of those complaints by
13 just counseling the patient ahead of time of
14 what to expect and if you could get them to
15 lower their expectations -- the typical
16 response was I wish I'd done that a lot sooner.
17 That was usually the typical response.
18   Q   When you say it wasn't as long as
19 they remember their erection, did you mean by
20 length or by time?
21   A   Length. The advantage of this device
22 is you can generate an erection whenever you
23 want to and you can keep it erect for as long
24 as you want to.
25   Q   It requires manual deflation as

18  (Pages 66 to 69)

70

1  opposed to ejaculation?
2      A   Yes.
3      Q    And before there was MUSE, there was
4  a product you said an injection called
5  caverject, correct?
6      A   Correct.
7          (Whereupon, Witt Exhibit No. 8 was
8      marked for identification by the court
9      reporter.)
10     Q   Can you show us how caverject worked?
11 We'll mark that's as Exhibit 8 for the
12 deposition.
13     A   This is essentially an active
14 ingredient.  This one is I believe PGE-1, which
15 is a prosthetic gland and it comes in a form
16 and you with this one I believe, you take the
17 solvent and you mix it with the powder.  It
18 dissolves and then you draw it back up into the
19 syringe and then you would inject the penis
20 into the lateral side of the corporal body and
21 then inject the required amount to get the
22 erection that you want.
23     Q   And how long before engaging in
24 sexual activity would you have to do the
25 injection?

71

1      A   It varies from patient to patient but
2  it's anywhere from five to fifteen minutes.
3      Q   And was caverject effective?
4      A   It was.  I mean, caverject is just
5  one of the injectable agents.  I mean, if you
6  take all of the type of agents that you can
7  inject, you can generate erections in about 95,
8  96 percent of the cases.
9      Q   But those all required a syringe that
10 you would inject into the penis?
11     A   Correct.
12     Q   Were patients pleased with caverject?
13     A   Very.  But they -- most people, 50
14 percent of people fall out or at least stop
15 using it because they have to inject
16 themselves, even if it works exactly like they
17 want it to.
18     Q   And what type of side effects or
19 complaints do the patients have from using
20 caverject?
21     A   The biggest one initially and this
22 wasn't with caverject.  This was with the
23 initial agents that were used was the erection
24 would last too long.  That was the biggest
25 complaint.

72

1      Q   Was it painful for men to inject
2  themselves?
3      A   Yes.  I mean, it's painful.  It's not
4  as painful as they think it is so it's about as
5  painful as giving yourself like an insulin
6  shot.
7      Q   A lot of it is maybe just mental?
8      A   Well, a lot of it is more protective
9  just because most people aren't used to putting
10 a needle into their penis.
11     Q   Did you have complaints from patients
12 that the caverject interfered with spontaneity?
13     A   A little bit.  I mean, obviously the
14 problem with it is you always had to have it
15 around and that would create some problems with
16 flexibility but if it was available, it wasn't
17 -- it really wasn't too much of a complaint.
18 It was just I have to inject myself and then
19 you'd get some spousal complaints that they had
20 to use an injection to get the erection.
21     Q   And then we have the MUSE was the
22 next one, correct, and this is the one that you
23 participated in?
24     A   Correct.
25     Q   And I don't have an actual MUSE.  I

73

1  just have diagram here.
2      A   Yes.
3      Q   And can you show us how this worked?
4      A   Yes.  Well, there was a pellet that
5  was placed in this device that you would insert
6  into the tip of the penis and then you would
7  place the pellet in the urethra itself, which
8  is the urine tube; release it and the pellet
9  would dissolve and it would get absorbed into
10 the corporal chambers here and then it would
11 elicit a vascular response.
12     Q   And how did the entry urethral
13 insertion compare to your patients -- compare
14 to the injection of caverject?
15     A   In regards to what effect?
16     Q   In regards to their willingness to do
17 it.  Was it an easier process or a more
18 difficult process?
19     A   I would say most men were more
20 willing to use this as opposed to an injection
21 or at least try it.
22     Q   And what were some of the complaints
23 or side effects that you would receive with
24 MUSE?
25     A   Yeah, the biggest one is that it

19  (Pages 70 to 73)

74

1   didn't work. And then there was just the
2   burning in the urethra that would be
3   experienced afterwards with the voiding that
4   would occur. Some people would get some blood
5   in the urine but the biggest one was that it
6   didn't work.
7       Q   You said that with the caverject, men
8   dropped out because they didn't want to inject
9   themselves with a needle. Did you have a
10  similar experience with MUSE?
11      A   Not so much because it just wasn't
12  that effective so they dropped out much earlier
13  just because it didn't work. They would move
14  onto another forum.
15      THE VIDEOGRAPHER: 3:31; we're off
16  the record.
17      (Whereupon, the video camera was
18  turned off.)
19      (Whereupon, a brief recess was
20  taken.)
21      (Whereupon, the video camera was
22  turned on.)
23      THE VIDEOGRAPHER: 3:32; we're
24  back on the record.
25      (Whereupon, Witt Exhibit No. 9 was

75

1   marked for identification by the court
2   reporter.)
3   BY MS. LESKIN:
4       Q   For the record, we're going to mark
5   the MUSE demonstrative as Exhibit 9 to the
6   deposition and, again, for Exhibits 5 through 9
7   I'll maintain possession of those. I'll
8   represent to you that Viagra was approved by
9   the FDA in March of 1998. Does that sound
10  about right to you?
11      A   Yes.
12      Q   How long after the approval of Viagra
13  -- strike that. When Viagra was approved, did
14  you prescribe it to your patients?
15      A   Yes.
16      Q   And how long after it was first
17  approved, did you start prescribing Viagra to
18  your patients?
19      A   Almost immediately.
20      Q   And you'll agree that Viagra was the
21  first FDA approved oral treatment for the
22  treatment of erectile dysfunction?
23      A   Yes.
24      Q   What were the benefits that you saw
25  at the time in March of '98 to the use of

76

1   Viagra as compared to the treatments that came
2   before?
3       A   The first was that it was a
4   noninvasive, nonmechanical therapy for treating
5   erectile dysfunction of almost all kinds and --
6   and it was effective if patients were properly
7   counseled and followed.
8       Q   And what percentage of your patients
9   did you find Viagra to be effective?
10      A   Overall it worked effectively to
11  their satisfaction in about 65, 70 percent of
12  cases.
13      Q   Did you find you needed to titrate
14  patients to the correct dose?
15      A   Yes. More cases you had to titrate
16  them to minimize side effects and maintain
17  efficacy and then the other thing was
18  essentially counseling them about its proper
19  use to get the effect they wanted.
20      Q   When the drug was first approved --
21  when Viagra was first approved in March of
22  1998, what information did you review prior to
23  prescribing it to your patients?
24      A   Well, you'd go over the side effect
25  profile. You would make sure they weren't on

77

1   any nitrates or Alpha blockers and at that
2   point in time, there was some debate as to, you
3   know, how cautious you should be in
4   administering the patients with a history of
5   cardiac disease, a recent MI or, you know, on
6   more than one anti-hypertensive agent.
7       Q   And what did you personally review --
8   before you wrote your first prescription, what
9   did you personally review about Viagra to learn
10  about the drug?
11      A   Well, obviously the studies had been
12  presented at the AOA so most of us knew sort of
13  how it worked and I had a pretty close working
14  relationship with one of the guys who did sort
15  of the initial smooth muscle studies on the
16  phosphodiesterase inhibitors so we also had an
17  idea of what it was and how it worked and what
18  some of the side effects were. So I mean, I
19  don't know if there was anything specifically I
20  reviewed on the day it was released other than
21  what had already been presented, you know, at
22  meetings and in the literature.
23      Q   You said you had a good working
24  relationship with the person who did the smooth
25  muscle studies. Who was that?

20  (Pages 74 to 77)

78

1    A    That was Inego Atta (phonetic).
2    Q    And where was he?
3    A    He was at Boston University at that
4  time.
5    Q    Did you speak to anyone at Pfizer
6  before you first started prescribing Viagra to
7  any of your patients?
8    A    No. No, I did not.
9    Q    Did you read the printed package
10  insert for Viagra before you started
11  prescribing it?
12    A    Yes.
13    Q    Now you said when the drug first came
14  out -- I want to focus on that March 1998,
15  early 1998 timeframe -- you used to review the
16  side effect profile with your patients?
17    A    Correct.
18    Q    What information did you include in
19  that profile?
20    A    Well, it was that you had to look for
21  if there was any contraindication for being on
22  the drug.  You had to look for headache,
23  dyspepsia, nasal congestion, flushing, visual
24  disturbance, mainly what sort of color, and
25  then lower back pain and erection that lasted

79

1  too long, those kinds of things.
2    Q    You mentioned visual disturbance.
3  What was your understanding of the visual
4  disturbance associated with Viagra at the time
5  the drug was first approved?
6    A    Well, it was known that it had some
7  crossover effect with the phosphodiesterase
8  inhibitor, you know, six and so that obviously
9  had higher concentrations of rods and cones and
10  there would be some changes in either color
11  perception or sense of waviness in the eye that
12  they could experience and they just need to be
13  aware of.
14    Q    And you -- you understand that that
15  visual disturbance is different from the NAION
16  that this litigation involves?
17    A    Yes.  Yes.
18    Q    And do you have any opinion as to
19  whether the visual disturbances caused by the
20  effects on PDE-6 is at all related to ischemic
21  optic neuropathy?
22    A    I don't.
23    Q    You don't have an opinion one way or
24  the other?
25    A    Yeah, I don't know.  I would just say

80

1  I don't know.
2    Q    Okay.  Do you have an understanding
3  as to the half life of the drug?
4    A    Well, the Viagra half life typically
5  would be close to, you know, three to six
6  hours, sort of in that range, you know, based
7  on the dose they used and what else they took
8  or had in their stomach at the time of
9  ingestion.
10    Q    Do you continue to -- do you continue
11  to prescribe Viagra to your patients?
12    A    I do.
13    Q    And is there any group of patients
14  that you do not prescribe Viagra for?
15    A    Well, obviously if they're on
16  nitrates, if they're on any kind of Alpha
17  blockers, and then obviously if they have any
18  history of NAION, you know, or, you know, more
19  visual side effects than just sort of color
20  tinge or things of that nature so.
21    Q    Have you ever given any lectures on
22  Viagra?
23    A    I have given -- I mean, I've given
24  talks to medical students and I have given a
25  couple lectures on the comorbidities of

81

1  erectile dysfunction and I believe -- I think
2  those were sponsored by Pfizer if I remember
3  right but they weren't specifically on Viagra.
4    Q    When were those presentations?
5    A    They would have been I think 1996,
6  '97.
7    Q    Before Viagra was approved?
8    A    Or shortly thereafter.  Yeah, shortly
9  thereafter.
10    Q    And which medical students?
11    A    These would have been medical students that,
12  you know, you would rotate on the service with
13  you and you would tell them about what was
14  coming out.  So mainly it would be urology
15  medical students.
16    Q    Is that while you were at Emory?
17    A    No.  This would have been, you know,
18  after Emory, you know, when they would rotate
19  up with us, you know, on -- at RBA and they'd
20  sort of rotate with me for a while and then
21  they're rotate with the RA for a while and you
22  talk with them sort of about ED and those kinds
23  of things.
24    Q    And you said these presentations on
25  erectile dysfunction generally -- they were,

82

1  they were not or you don't recall whether they
2  were sponsored by Pfizer?
3      A   I don't recall if they were sponsored
4  by Pfizer. I think they were. I think they
5  were.
6      Q   Would you have any records that would
7  indicate whether or not they were sponsored by
8  Pfizer?
9      A   I could probably -- I could probably
10 find those.
11     Q   We'd asked for any records that
12 indicate that any -- whether there's any
13 presentations sponsored by Pfizer.
14     A   Yeah, I can check that.
15     Q   Did you review any of the clinical
16 studies conducted by Pfizer on Viagra?
17     A   No.
18     Q   Did you -- have you reviewed any of
19 the animal studies conducted by Pfizer on
20 Viagra?
21     A   No.
22     Q   Since Viagra was introduced to the
23 market, you know that there's two other PDE-5
24 inhibitors that have since been approved by FDA
25 in the United States?

83

1      A   Yes.
2      Q   And that's Cialis and Levitra?
3      A   Correct.
4      Q   Do you prescribe Cialis or Levitra to
5  your patients?
6      A   I do.
7      Q   And what is the main difference
8  between the drugs as you understand it?
9      A   Mainly has to do with absorption and
10 length of effect, you know, based on their half
11 life.
12     Q   And is there any class of patients
13 that you would prescribe one of the drugs for
14 versus the other?
15     A   No.
16     Q   How do you decide which drug to
17 prescribe to patients?
18     A   Well, a lot of it depends on patient
19 preference. They're so well marketed that
20 patients usually have an idea of what they want
21 to start using, which is fine. If they're not
22 familiar with it or haven't experienced or
23 don't have any experience with the drug, I'll
24 usually recommend starting with one of the
25 shorter acting agents like Levitra or Viagra so

84

1  if they get side effects, it has sort of a
2  shorter duration of effect. But, you know,
3  guys who run Viagra will switch to Cialis and
4  guys who run Cialis will go back to Viagra and
5  some will take both. It's just very -- it's
6  kind of, you know, whatever they -- the patient
7  really prefers.
8      Q   Would you say the majority of your
9  patients is on one drug versus another right
10 now?
11     A   I would say it's pretty even. If
12 there's one that has a slight preponderance, it
13 would probably be Cialis but I haven't studied
14 that specifically. But I would it's pretty --
15 I would say it's pretty even across the board.
16     Q   And when you go through with patients
17 the side effect profiles and the other
18 information you told us you share with your
19 patients, does it depend -- does it matter
20 which of the drugs they're taking? In other
21 words, does your talk with patients differ
22 depending on which drug you're giving them?
23     A   It's very similar, other than just a
24 discussion of the duration of the effect but in
25 terms of their -- the risk profile and the side

85

1  effects they could experience, yeah, it's very
2  similar.
3      Q   Have you generally found that Viagra
4  has been an effective treatment for your
5  patients?
6      A   Yes.
7      Q   And have you found that Viagra is
8  generally a safe treatment for your patients?
9      A   Yes.
10     Q   And it's not your opinion that Viagra
11 should never have been approved, is it?
12     A   No.
13     Q   And, in fact, drugs like Viagra today
14 are the first line therapy for erectile
15 dysfunction treatment?
16     A   Correct.
17     Q   Do you find -- strike that. Did you
18 note any increase in the number of patients
19 coming to you to talk about erectile
20 dysfunction once drugs like Viagra came onto
21 the market?
22     A   In my practice, I did not see a huge
23 increase in the number of patients with
24 erectile dysfunction because my population was
25 pretty much enriched with those patients anyway

22  (Pages 82 to 85)

86

1 but obviously everybody who had erectile
2 dysfunction wanted to try Viagra.
3     Q    Did you find that men were more
4 willing to talk about erectile dysfunction
5 after Viagra came on the market?
6     A    Yeah, that would be hard to
7 determine.  Men were more willing to ask for
8 Viagra because they knew something was
9 available obviously due to the marketing that
10 was out there.  Whether those men eventually
11 would have come to the office or not, I don't
12 know.
13         But there's still a huge number of
14 people that don't seek treatment for ED at all
15 and those numbers are fairly recalcitrant and I
16 don't know -- I think the hope was it would
17 bring a lot of people out of the closet but I
18 think it's helped a little bit but not -- not
19 completely.
20     Q    We talked about some of the other
21 treatments for erectile dysfunction.  Do you
22 have patients -- well, do you have patients
23 today who continue to use products like MUSE or
24 caverject?
25     A    Not MUSE.  Definitely caverject.  Not

87

1 the vacuum device.  Definitely the prosthesis.
2     Q    I want to talk a little bit about the
3 information you provide to your patients.  We
4 talked about the side effect profile and we
5 talked about the nitrate contraindication and
6 the Alpha blocker warnings.
7         What do you tell your patients about
8 the nitrate contraindications?
9     A    Well, I just say if they are on
10 nitrates on a PRN basis or continually, that
11 they can't use the phosphodiesterase
12 inhibitors.
13     Q    If a patient is using nitrates
14 intermittently, will you prescribe Viagra to
15 them?
16     A    No.
17     Q    Do you give your patients any
18 information about using nitrates after they
19 have taken a PD-5 inhibitor?
20     A    Well, I'll explain to them that if
21 you -- if you have a cardiac history and it
22 looks like there is a risk for MI and they're
23 not on nitrates, that if you were ever admitted
24 to the ER, you know, or if you ever have any
25 kind of surgical therapy or if your primary

88

1 care physician wants to put you on nitrates,
2 you need to let them know you're on Viagra
3 because a lot of men won't list that as a
4 medication in their pharmacology profile.  So
5 they have to make sure that that gets -- I'll
6 counsel them that you need to be sure you
7 mention that.
8     Q    Do you counsel your patients about
9 risks cardiovascular risks associated with
10 sexual activity when you prescribe them one of
11 the PD-5 five inhibitors?
12     A    Not really, not if they're not on
13 nitrates.
14         (Whereupon, Exhibit No. 10 was
15     marked for identification by the court
16     reporter.)
17     Q    I want to show you what we've marked
18 as Exhibit 10.  Do you recognize this as the
19 current label for Viagra?
20     A    Yes.
21     Q    When I say label, the professional
22 product insert, correct?
23     A    Correct.
24     Q    The product information.  And have
25 you seen this before?

89

1     A    Yes.
2     Q    As labels are updated --
3     A    Much smaller print though.
4     Q    -- yes.  As labels are updated, how
5 do you keep track of changes to the information
6 provided?
7     A    Well, either it comes out in the
8 literature obviously.  You'll see it first at
9 the meetings because that's where emerging
10 things and things that are in development
11 usually get presented before they're even
12 published and then sometimes with the, you
13 know, in-service that drug representatives
14 provide.
15     Q    I want to direct you to page 12 of
16 Exhibit 10.  You'll see -- and this is within
17 the section labeled warnings, right, if you go
18 back to the prior page, you'll see at the top
19 of the page language that says, there is no
20 controlled clinical data on the safety or
21 efficacy of Viagra in the following groups.  If
22 prescribed, this should be done with caution.
23 Patients who have suffered a myocardial
24 infarction stroke or life-threatening
25 arrhythmia within the last six months, patients

23  (Pages 86 to 89)

90

1  with resting hypotension or hypertension,
2  patients with cardiac failure or coronary
3  artery disease causing unstable angina;
4  patients with retinitis pigmentosa.  Did I read
5  that language correctly?
6      A   You did.
7      Q   Were you aware of this language in
8  the label before today?
9      A   I was.
10     Q   And you know that this language was
11 added in about November of 1998?
12     A   I didn't know the exact date but,
13 right, I knew it had been added.
14     Q   And it had been added early in the
15 life of Viagra?
16     A   Yes.
17     Q   Okay.  Do you have any conversations
18 with your patients about this information?
19     A   Well, in going over their history,
20 obviously if they have sort of unstable angina
21 or recent MI, then typically I'll, you know,
22 I'll counsel them not to use Viagra in those
23 settings.  But those are pretty dramatic
24 components of their history.
25     Q   If I could direct your attention to

91

1  page 22 of the label, you'll see there's a
2  section entitled postmarketing experience
3  cardiovascular and cerebrovascular?  Yes?
4      A   Yes.
5      Q   And it talks about serious
6  cardiovascular, cerebrovascular and vascular
7  events including myocardial infarction and
8  others have been reported postmarketing in
9  temporal association with the use of Viagra.
10 Were you aware of this paragraph's existence
11 prior to today?  Take your time.
12     A   No.  I had not read this paragraph
13 before.
14     Q   Okay.  So you were not aware that
15 this paragraph had been added to the label in
16 November of 1998?
17     A   Correct.
18     Q   Did you have any conversations with
19 any of your patients regarding the reports of
20 heart attack and sudden cardiac death in
21 patients taking Viagra?
22     A   No, I have not.
23     Q   I'd ask you to turn to page 23 of the
24 label and you'll see there's a section there
25 entitled special senses in the middle of the

92

1  page?
2      A   Yes.
3      Q   Right above overdosage?
4      A   Yes.
5      Q   And there's a paragraph that reads,
6  non-arteritic anterior ischemic optic
7  neuropathy, NAION, a cause of decreased vision
8  including permanent loss of vision has been
9  reported rarely postmarketing in temporal
10 association with the use of phosphodiesterase
11 type five, PDE-5, inhibitors including Viagra.
12     Most, but not all, of these patients
13 had underlying anatomic or vascular risk
14 factors for developing NAION including but not
15 necessarily limited to low cup to disc ratio
16 crowded disc, age over 50, diabetes,
17 hypertension, coronary artery disease,
18 hypolipidemia and smoking.
19     It is not possible to determine
20 whether these events are related directly to
21 the use of PDE-5 inhibitors to the patients
22 underlying vascular risk factors or anatomical
23 defects to a combination of these factors or to
24 other factors.  Did I read that correctly?
25     A   You did.

93

1      Q   Were you aware that that paragraph
2  existed prior to today?
3      A   Yes.
4      Q   And that's a true statement, correct?
5      A   Yes.
6      Q   You don't have any information that
7  would contraindicate any of the information in
8  this paragraph, do you?
9      A   No.
10     Q   When did you first become aware of
11 this paragraph being added to the Viagra label?
12     A   Well, I was aware of this issue I
13 think in the -- like 2002 when some of the
14 first case reports came out and there was some
15 debate going on, you know, in the urologic
16 community about its risk and how should that
17 change, how you counsel patients and whether
18 you should use it.  So I was aware of that and
19 then I think I became aware in 2006 that it had
20 actually been added as additional language in
21 the labeling.
22     (Whereupon, Witt Exhibit No. 11 was
23 marked for identification by the court
24 reporter.)
25     Q   I want to show you what we've marked

24  (Pages 90 to 93)

94

1  as Witt Deposition Exhibit 11.  Have you seen
2  this document before?
3      A  I have not.
4      Q  Okay.  This is an FDA statement dated
5  July 8th, 2005, right?
6      A  Correct.
7      Q  And this says FDA updates labeling
8  for Viagra, Cialis and Levitra for rare
9  postmarketing reports of eye problems.  And it
10 discusses the new labeling information to talk
11 about the reports of NAION, right?
12     A  Correct.
13     Q  Are you aware of any updates of this
14 information since July 2005?
15     A  I'm not.
16     Q  Now you mentioned that you first
17 became aware of the reports of NAION in 2002,
18 correct?
19     A  Correct.
20     Q  And that's when Dr. Pomeranz
21 published a case series?
22     A  Right, correct.
23     Q  Did you change the -- change the
24 information you provided to your patients at
25 that time?

95

1      A  I did.
2      Q  In 2002?
3      A  Yes.
4      Q  And what information did you start
5  providing them in 2002?
6      A  Well, there was just that they had
7  the potential risk for serious visual loss and
8  they had to be aware of that risk reporting
9  symptoms of visual loss acutely and if they
10 had, you know, a history of smoking or history
11 of other retinal issues that they needed to use
12 the medication with much more caution and
13 understand that that was a risk going forward.
14     Q  And when in 2002 did you start
15 counseling your patients like that?
16     A  I mean, I think as soon as that
17 became -- I think it was when -- it was around
18 the time it hit the Wall Street Journal I
19 recall, I believe.  But patients were pretty
20 aware pretty quickly, you know, of the problem.
21 So it was sort of -- I remember finding out
22 about it sort of simultaneously, you know, from
23 the literature as well as from patients.
24     Q  Now going back to your report, you
25 have the statement here, a rare side effect

96

1  presumably of Viagra is NAION, right, you wrote
2  that in your report?
3      A  I did.
4      Q  Now when you say side effect, what do
5  you mean by that?
6      A  Mean that in a handful of cases there
7  have been men who took Viagra and then
8  developed sudden visual loss.  So it would
9  indicate that there's a potential relationship
10 there that they just need to be aware of that
11 hasn't either been confirmed or disproved but
12 just because of the severity of the nature of
13 the problem, they need to recognize it's a risk
14 and be aware of it.
15     Q  And that's -- in the last sentence of
16 that paragraph you said because of the
17 disabling nature of NAION until a causal link
18 between PDEI's and NAION can be proven or
19 invalidated warnings to physician and the
20 patient must included in all labeling, right?
21     A  Correct.
22     Q  And you put that sentence in there
23 because as of today, it still has not been
24 proven or invalidated whether there's a causal
25 link between drugs like Viagra and NAION?

97

1      A  Correct.  Correct.
2      Q  Do you prepare any written
3  information for your patients who are taking
4  Viagra or one of the other PDE-5 inhibitors?
5      A  I don't.  I usually just refer them
6  to the labeling at this point.
7      Q  And do you give them a copy of the
8  label?
9      A  No.  I just -- no.  I just say when
10 you get your prescription, be sure you read
11 through the label pretty thoroughly.
12     Q  Now are you offering an opinion in
13 this case as to whether Mr. Martin's NAION was
14 caused by Viagra?
15     A  No.
16     Q  Are you offering an opinion in this
17 case as to whether Mr. Stanley's NAION was
18 caused by Viagra?
19     A  No.
20     Q  In the second paragraph of your
21 report you wrote, both men, referring to
22 Richard Martin and Richard Stanley, suffered
23 from erectile dysfunction were treated with the
24 phosphodiesterase inhibitors, sildenafil
25 citrate or Viagra and developed non-arteritic

25  (Pages 94 to 97)

98

1  anterior ischemic optic neuropathy in
2  association with their Viagra use. What did
3  you mean by in association with?
4      A   Meaning that while they were on their
5  Viagra, they developed their -- they NAION.
6      Q   Okay. And you're not offering an
7  opinion as to the temporal relationship between
8  their use of Viagra and the onset of NAION, are
9  you?
10     A   No, other than they were -- they were
11 on the medication at the time of the occurrence
12 so.
13     Q   And when you say on the medication,
14 you mean they had been taking it over a period
15 of time?
16     A   Correct.
17     Q   But you don't have an opinion as to
18 the time between their last ingestion prior to
19 the onset and the onset?
20     A   No.
21     Q   Now the risk factors for NAION and ED
22 overlap, correct?
23     A   They do.
24     Q   In fact, you wrote that in your
25 report, right?

99

1      A   Correct.
2      Q   And those are the vascular risk
3  factors that we talking about earlier?
4      A   Correct.
5      Q   And then you said, but not all men
6  who have developed NAION after PDEI use possess
7  these risk factors. And that's a true
8  statement, correct?
9      A   Correct. Yeah.
10     Q   And it's also true that men who
11 develop NAION have not taken a PDE-5 inhibitor,
12 correct?
13     A   Correct.
14     Q   And there's men who take the PDE-5
15 inhibitors who do not develop NAION?
16     A   Correct.
17     Q   And the fact that there were reports
18 of men who have taken Viagra and suffered
19 NAION, that in and of itself is not proof of
20 the causal relationship, right?
21     A   Correct.
22     Q   Do you have any criticism of the
23 label of Viagra for Viagra as it currently
24 reads?
25     A   No.

100

1      Q   Do you have any criticism of the
2  label for Viagra at any particular point in
3  time?
4      A   No.
5          MS. LESKIN: We need to change the
6  tape. So we'll take a break.
7          THE VIDEOGRAPHER: 4:05; we're off
8  the record. This is the end of tape
9  number two.
10         (Whereupon, the video camera was
11 turned off.)
12         (Whereupon, a brief recess was
13 taken.)
14         (Whereupon, the video camera was
15 turned on.)
16         THE VIDEOGRAPHER: 4:15; we're
17 back on the record. This is the
18 beginning of tape number three.
19 BY MS. LESKIN:
20     Q   Dr. Witt, other than the opinions
21 that we talked about today as you've expressed
22 in your report and we've otherwise discussed,
23 do you have -- have you been asked to give any
24 other opinions in this litigation?
25     A   No.

101

1          MS. LESKIN: I have nothing
2  further.
3          MR. GOMEZ: I have no questions.
4          MS. LESKIN: We're done.
5          THE VIDEOGRAPHER: 4:15; we're off
6  the record. This is the end of tape
7  number three. This concludes the
8  deposition.
9          (Whereupon, the video camera was
10 turned off.)
11         THE COURT REPORTER: Did you want
12 to discuss signature?
13         THE WITNESS: I'm waiving
14 signature.
15         THE COURT REPORTER: Do you all
16 need copies of the transcript?
17         MR. GOMEZ: Yes, thank you.
18         MS. LESKIN: Yes, thanks.
19             - - -
20 (Deposition concluded at 4:25 p.m.)
21
22
23
24
25

26  (Pages 98 to 101)

102

```
 1          C E R T I F I C A T E
 2   STATE OF GEORGIA:
 3   COUNTY OF COBB:
 4
 5        I hereby certify that the foregoing
 6   transcript was taken down as stated in the
 7   caption and the questions and answers
 8   thereto were reduced to typewriting under my
 9   direction, that the foregoing pages 1
10   through 100 represent a true, complete and
11   correct transcript of the evidence given
12   upon said hearing, and I further certify
13   that I'm not of kin or counsel to the
14   parties in the case; am not in the regular
15   employ of counsel of any of said parties;
16   nor am I in anywise interested in the result
17   of said case.
18        This 3rd day of February, 2009.
19
20
21
22           LYNNE C. FULWOOD,
             Certified Court
23           Reporter
             State of Georgia
24           License No. B-1075
25
```

27  (Page 102)